### United States District Court
### Western District of Texas
### Austin Division

| | | |
|---|---|---|
| Fund Texas Choice, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | No. 1-22-CV-859-RP |
| Ken Paxton, in his official capacity | § | |
| of Attorney General, *et al.* | § | |
| | § | |
| *Defendants.* | § | |

---

### Response to Plaintiffs' Motion for Preliminary Injunction And Motion to Dismiss Plaintiffs' Complaint

Plaintiffs seek to enjoin the Attorney General from enforcing the pre-*Roe* statutes, Senate Bill 8, and the Human Life Protection Act (HLPA) against Plaintiffs for any action they take in connection with any abortion that occurs outside the State of Texas. Dkt. #1 at 50. Plaintiffs' pre-enforcement challenges to Texas's abortion laws are based on sheerly speculative assumptions of future injury and unsubstantiated legal conclusions. Plaintiffs are a collection of non-profit organizations who assist women in procuring an abortion (Dkt. #1 at ¶ 20) and an obstetrician who has performed abortions in Texas and other states (*id.* at ¶ 31).

Plaintiffs' contention that they face an imminent threat of enforcement for helping women procure out-of-state abortions is not based on any statement or action taken by the Attorney General, and their manufactured threats of injury are insufficient to confer them with Article III standing. Moreover, Plaintiffs' claims are barred by sovereign immunity, and Plaintiffs are unlikely to succeed on the merits of their claims. For these reasons alone, Plaintiffs' claims must be dismissed and the Court should deny their Motion for Preliminary Injunction.

## STANDARD OF REVIEW

### I.  PRELIMINARY INJUNCTION

An award of preliminary injunctive relief is "an extraordinary remedy that should only issue if the movant shows: (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) the injunction will not disserve the public interest." *Ridgely v. Fed. Emerg. Mgmt. Agency*, 512 F.3d 727, 734 (5th Cir. 2008). "[T]he enormity of the relief is difficult to overstate." *Trinity USA Oper'g, LLC v. Barker*, 844 F. Supp. 2d 781, 785 (S.D. Miss. 2011) (citing Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2948 (courts describe such requests as "drastic," "extraordinary," and the requesting party must make a "clear showing")). Plaintiffs have not met their burden of demonstrating an entitlement to this "extraordinary remedy."

### II.  MOTION TO DISMISS

#### A.  Federal Rule of Civil Procedure 12(b)(1)

Rule 12(b)(1) governs motions to dismiss for lack of subject matter jurisdiction. "Federal courts are courts of limited jurisdiction, and absent jurisdiction conferred by statute, lack the power to adjudicate claims." *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). Accordingly, "[a] case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998) (citation omitted). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) motion before addressing any motion as to the merits. *Ramming*, 281 F.3d at 161. "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P 12(h)(3).

**B.  Federal Rule of Civil Procedure 12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) governs motions to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a Rule 12(b)(6) motion, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "A claim for relief is implausible on its face when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'" *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679).

Although a court accepts all well-pleaded facts as true, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A plaintiff's obligation to demonstrate his entitlement to relief requires more than mere conclusory statements. *Twombly*, 550 U.S. at 555. Rather, a plaintiff must plead facts with enough specificity "to raise a right to relief above the speculative level." *Id.* A plaintiff must allege more than "'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted). "Where the facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has stopped short of showing that the pleader is plausibly entitled to relief." *Howe v. Yellowbook, USA*, 840 F. Supp. 2d 970, 975 (N.D. Tex. 2011).

**ARGUMENT**

**I.   THE COURT LACKS SUBJECT MATTER JURISDICTION**

Plaintiffs' claims against the Attorney General are jurisdictionally barred, and, accordingly, the Court cannot grant them preliminary injunctive relief. *See, e.g., Speech First, Inc. v. Fenves*, 979

F.3d 319, 329 (5th Cir. 2020) ("A preliminary injunction, like final relief, cannot be requested by a plaintiff who lacks standing to sue."); *Moore v. La. Bd. of Elementary & Secondary Educ.*, 743 F.3d 959, 964 (5th Cir. 2014) (reversing grant of preliminary injunction when the State defendants were immune and *Ex parte Young* did not apply). Plaintiffs' claims are all barred by lack of standing, sovereign immunity, and the ripeness requirement. The Court should dismiss this case for lack of jurisdiction without opining on any other issues raised by Plaintiffs. *See Okpalobi v. Foster*, 244 F.3d 405, 409 (5th Cir. 2001) (en banc).

### A. Plaintiffs Lack Standing

Standing requires a plaintiff to "prove that he has suffered a concrete and particularized [injury in fact] that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). A plaintiff must clearly allege facts demonstrating each element of Article III standing. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) ("[P]laintiffs bear the burden of *pleading and proving concrete facts* showing that the defendant's actual action has caused the substantial risk of harm." (emphasis added)); *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) ("The litigant must clearly and specifically set forth facts sufficient to satisfy these Art. III standing requirements."); *Warth v. Seldin*, 42 U.S. 490, 518 (1975) ("It is the responsibility of the complainant *clearly to allege facts demonstrating that* he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." (emphasis added)). An association or organization can demonstrate that it has incurred an injury-in-fact under either associational or organizational standing. *NAACP v. City of Kyle, Tex.*, 626 F.3d 233, 237–38 (5th Cir. 2010).

Plaintiffs fail to allege facts that "clearly and specifically" demonstrate they satisfy each element of Article III standing. *Whitmore*, 495 U.S. at 155. That alone requires dismissal of Plaintiffs' claims. Finally, this Court's analysis under *Ex parte Young* also bears on the standing

analysis, and that issue is addressed below in Argument § C. *See City of Austin v. Paxton*, 943 F.3d 993, 1003 (5th Cir. 2019) (noting the doctrinal overlap).

### 1. Plaintiffs' speculative injuries are not fairly traceable to any action by the Attorney General

Plaintiffs have made no allegations—and have introduced no evidence—that a single enforcement action has been taken or will be taken against them by the Attorney General. Plaintiffs allege that the *existence* of the challenged abortion statutes has exerted a chilling effect on their activities, but this too fails to constitute an injury in-fact. Plaintiffs do not have standing against *statutes*. To survive a motion to dismiss, Plaintiffs must allege facts sufficient that a reasonable person could infer that the *Attorney General* is violating their constitutional rights such that they would be entitled to relief under Section 1983 or the Declaratory Judgment Act. For prospective relief, Plaintiffs' injury "must be certainly impending to constitute injury in fact"—"[a]llegations of possible future injury are not sufficient." *Clapper*, 568 U.S. at 409 (quotations omitted).

Plaintiffs' entire theory of standing with respect to the Attorney General is based on two things: (1) an advisory from the Attorney General that says he is authorized to enforce civil penalties under the HLPA and the pre-*Roe* statutes are enforceable by district and county attorneys, and (2) a tweet by the Attorney General stating that the pre-*Roe* statutes are in effect. Dkt. #1 at ¶¶ 77–78; Dkt. #1-3; Dkt. #1-4. Plaintiffs do not contest these points. *See generally* Dkt. #1. And these innocuous statements hardly support Plaintiffs' standing with respect to the Attorney General, because neither of these statements represent a threat that he will interpret the pre-*Roe* statutes to "criminalize abortion funds, including Plaintiffs, for all activities related to abortion, regardless of whether abortions take place in a jurisdiction outside of Texas in which abortion is legal." Dkt. #1 at ¶48. Indeed, Plaintiffs concede that it is not the Attorney General—or even any named defendant—who has made this threat. Rather, as Plaintiffs say, such statements have been made by Texas legislators. Dkt. #1 at ¶ 13. Plaintiffs allege no facts supporting the reasonable inference that the Attorney General is involved in any "partnership and/or coordinated effort between private and state actors to intimidate Plaintiffs" through Rule 202 petitions. Dkt.

#1 at ¶ 8. Plaintiffs' allegations relate only to legislators in the Texas Freedom Caucus and Senator Bryan Hughes, who Plaintiffs acknowledge is acting in his *individual* capacity. *Id.* at ¶¶ 7–8; Dkt. #6 at 10. While Plaintiffs point to a letter sent by the Texas Freedom Caucus and statements made by Representative Briscoe Cain, they allege no facts tying that threat of enforcement or that interpretation of the law to the Attorney General. *See, e.g.*, Dkt. #1 at 3, 27. The Attorney General cannot enforce S.B.8. *See Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 539 (2021); *Whole Woman's Health v. Jackson*, 642 S.W.3d 569 (Tex. 2022). Plaintiffs acknowledge that the Attorney General lacks criminal enforcement action. Dkt. #1 at ¶ 80. And Plaintiffs do not allege any imminent risk that the Attorney General will pursue civil enforcement against them under the HLPA. *See generally* Dkt. #1. Nor do Plaintiffs allege any facts sufficient to support the reasonable inference that the Attorney General will prosecute them for abortions they performed or assisted before *Roe v. Wade* was overturned. In sum, the Court may not "hold unconstitutional 'a statute that is . . . constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it.'" *Netchoice, LLC v. Paxton*, No. 21-51178 slip op. at *68 (5th Cir. Sept. 16, 2022) (quoting *United States v. O'Brien*, 391 U.S. 367, 384 (1968)).

In their sworn declarations, Plaintiffs contend that "Texas public officials" and *private litigants* have "claim[ed] that various Texas law [*sic*] now not only criminalize and civilly penalize abortion *in Texas*, but also criminalize and civilly penalize providing abortion services to Texans in other states where those abortions are legal" and "helping pregnant Texans get legal abortions elsewhere." Dkt. #4-11 at ¶6 (emphasis in original); Dkt. #4-7 at ¶ 8; *see also* Dkt. #4-10 at ¶ 8 (same); Dkt. #4-9 at ¶ 8 (same); Dkt. #4-8 at ¶ 6 (same); Dkt. #4-6 at ¶ 7 (same); Dkt. #4-5 at ¶ 7 (same); Dkt. #4-4 at ¶ 7 (same); Dkt. #4-3 at ¶ 9 (same). These general allegations are inadequate to clearly and specifically plead facts sufficient for the Court to draw the reasonable inference that the *Attorney General* aims to prosecute Plaintiffs for these actions. *Cf. Whitmore*, 495 U.S. at 155 ("A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing."). Plaintiffs' claims against the Attorney General should be dismissed for lack of standing.

### 2.   Plaintiffs lack a concrete and particularized injury

Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. As long as Plaintiffs bear no probable, imminent risk of the Attorney General enforcing the HLPA against them or their members in the way Plaintiffs hypothesize, their reactions deriving from "subjective fear" do "not give rise to standing." *Id.* at 418. Plaintiffs' speculation about *how* the Attorney General may enforce the law does not confer them with standing. Federal courts' jurisdiction is limited to actual controversies; this prevents them "from anticipat[ing] a question of constitutional law in advance of the necessity of deciding it." *Netchoice*, slip op. at *10 (5th Cir. Sept. 16, 2022) (internal quotation marks omitted). Similarly, Plaintiffs seek relief to protect them from reotractive application of the pre-*Roe* statutes. Dkt. #1 at ¶¶ 164–69. But Plaintiffs identify no threat of retroactive enforcement from the Attorney General or any named Defendant. *See generally* Dkt. #1.

Plaintiffs' declarations do not cure this fatal pleading deficiency. In total, Plaintiffs submitted nine declarations in support of their purported harm, none of which include any evidence the Attorney General has threatened to pursue civil or criminal action against them. And they do not point to any statement, advisory, or opinion from the Attorney General that says anything other than that he will enforce Texas's laws. *See* Dkt. 4-12. Plaintiffs do not allege that they have been warned to stop or threatened with prosecution by anyone with prosecutorial authority. *Cf. Steffel v. Thompson*, 415 U.S. 452 (1974). Nor do they identify any threat that they will be prosecuted for any abortions they performed or assisted with before *Roe v. Wade* was overruled.

Indeed, Plaintiffs' claims of a chilling effect are belied by the testimony of the Executive Director of the North Texas Equal Access Fund (TEA Fund). In her declaration, she testifies that the organization "*continues* to openly communicate with the public regarding abortion, voicing its support for abortion rights, advocating for reproductive freedom and reproductive justice, and seeking the support of others who share the same values." Dkt. #4-4 at ¶ 5 (emphasis added).

While she claims TEA Fund's volunteers and staff are chilled from "traveling with Texans seeking abortions in states where abortion is legal," there is no testimony that they ever did so in the past or plan to do so in the future. *See generally* Dkt. #4-4.

Similarly, the Co-Founder and Executive Director of the Afiya Center testified that the organization "*continues* to advocate for abortion access where is [*sic*] legal," demonstrating there is no chilling effect on their First Amendment rights. Dkt. #4-7 at ¶4 (emphasis added). And while she asserts that Afiya's volunteers and staff are "chilled" from "traveling with Texans seeking abortions in states where abortion is legal," there is no evidence that they ever traveled with them in the past or have plans to do so in the future.

In another declaration, the Executive Director of Fund Texas Choice (FTC) testified that FTC's free speech and right to travel are being chilled. Dkt. #4-3 at ¶ 12. But she provides no testimony that FTC's volunteers, board, or staff ever travelled out-of-state with women seeking abortions before or have any plans to do so in the future. *See generally* Dkt. #4-3.

The Deputy Director for the Lilith Fund testified that the organization's volunteers and staff "are chilled from associating with or traveling with people seeking abortions in states where abortion is legal." Dkt. #4-5 at ¶ 10. Again, there is no testimony that the Lilith Fund ever traveled with out-of-state with women seeking abortions in the past or have plans to do so in the future. *See generally id.*

Similarly, the Executive Director of the Frontera Fund testifies that their "rights are being violated" and they are chilled from speaking and "traveling with people seeking abortions in states where abortion is legal." Dkt. #4-6 at ¶ 11. But again, there is no testimony that the Frontera Fund ever traveled out-of-state with these women in the past or has plans to do so in the future.

Likewise, neither the President of the West Fund nor the Executive Director of Jane's Due Process provide any testimony that the any of their volunteers, staff, or board members ever traveled with women seeking abortions in the past—or even have plans to in the future. *See generally* Dkt. #4-8; Dkt. #4-9.

**B.  Plaintiffs' speculative injuries are not fairly traceable to the Attorney General**

Plaintiffs do not satisfy Article III's requirements by complaining about injuries that arise from the mere *existence* of Texas's abortion laws, rather than any threatened action by the Attorney General. Plaintiffs contend that the pre-*Roe* statutes and the HLPA "chill" their First Amendment rights. *See, e.g.*, Dkt. #1 at ¶¶ 138–40; Dkt. #6 at 28–29. But this purported "chilling effect" cannot support their standing unless it is "fairly traceable" to the conduct of the Attorney General. *See California v. Texas*, 141 S. Ct. 2104, 2113 (2021) ("A plaintiff has standing only if he can 'allege personal injury *fairly traceable to the defendant's allegedly unlawful conduct* and likely to be redressed by the requested relief.'" (emphasis added) (citation omitted)). Here, the purported "chilling effect" is not traceable to the Attorney General, because he has not threatened Plaintiffs with prosecution—and Plaintiffs cite nothing to support that he has. *See generally* Dkt. #1. Failing to allege that they face an imminent threat of prosecution, any purported "chilling effect" imposed on Defendants is traceable to the *legislature*, not the defendants. *Cf. Collins v. Yellen*, 141 S. Ct. 1761, 1779 ("[F]or purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to allegedly unlawful conduct of the defendant, not to the provision of law that is challenged." (internal quotation marks omitted)). Moreover, as Plaintiffs acknowledge, the Attorney General lacks criminal enforcement authority under both the pre-*Roe* statutes and the HLPA. Dkt. #1 at ¶ 80.

**3.  Plaintiffs do not have associational standing**

In addition to bringing claims on behalf of themselves, the Fund Groups and CASN purport to bring claims on behalf of "their staff, volunteers, and donors." *E.g.*, Dkt. #1 at ¶¶ 33, 138, 154. An association has standing to bring claims on behalf of its members when "(1) individual members would have standing, (2) the association seeks to vindicate interests germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the individual members' participation." *Students for Fair Admissions, Inc. v. Univ. of Tex. at Austin*, 37 F.4th 1078, 1084 (5th Cir. 2022). But Plaintiffs fail to plead facts sufficient to support the reasonable inference that they have associational standing with respect to their donors, volunteers, and staff. Plaintiffs do not even

allege that their donors, volunteers, or staff are *members* of their organizations. *See generally* Dkt. #1.

While Plaintiffs could try to demonstrate standing on behalf of their donors, volunteers, and staff by showing that they satisfy the indicia-of-membership test, they fail to do that too. Under the indicia-of-membership test, the Fifth Circuit considers "whether an organization's purported 'members' (1) elect the organization's leaders, (2) serve in the organization's leadership, (3) finance the organization's activities, (4) associate voluntarily with the organization, and (5) provide sworn testimony of membership." *Id.* at 1084 n.7. Plaintiffs do not plead any facts demonstrating that any of the of the Fund Plaintiffs' or CASN's donors, volunteers, or staff satisfy these requirements. *See e.g.*, Dkt. #1 at ¶¶ 22–30, 33.

Nor do Plaintiffs plead facts sufficient to demonstrate that they have a "close relationship" with these third-parties and "there is a hindrance to the [third-parties'] ability to protect [their] own interests." *Vote.Org v. Callanen*, 39 F.4th 297, 303–04 (5th Cir. 2022). Because Plaintiffs fail to allege the necessary elements of representational standing, all claims they assert on behalf of their donors, volunteers, and staff should be dismissed.

### 4.  Plaintiffs lack standing to assert claims challenging the application of Senate Bill 8 outside of Texas (Count VII)

In Count VII of their Complaint, Plaintiffs contend that S.B.8 should only apply in Texas. Dkt. #1 at 45. Assuming that Plaintiffs even have a federal right enforceable under Section 1983 for this count, the Court cannot redress any purported injury resulting from the application of S.B.8 outside of Texas by enjoining the Attorney General because any injury caused by the enforcement of S.B.8 is not traceable to the Attorney General. S.B.8 allows *private litigants* to sue a person who aids or abets a post-heartbeat abortion, or who intends to engage in such conduct. *See* Tex. Health & Safety Code § 171.208(a); *see also Whole Woman's Health*, 642 S.W.3d at 583 (holding that no state official has authority to enforce S.B.8). The statute specifically prohibits a State officer or employee from bringing suit. *Id.* An injunction that merely reiterates the statutory prohibition on Defendants filing suit under S.B.8 does not redress any injury that Plaintiffs might purportedly

suffer on account of that statute. Moreover, injunctive relief is improper because Plaintiffs necessarily have an adequate remedy at law. No fees can be awarded unless court-ordered, which gives them the opportunity to raise any constitutional defenses in the course of that litigation.

### 5. Plaintiffs lack standing to sue the Attorney General over SB8's fee-shifting provision (Count XI)

Plaintiffs' claims regarding S.B.8's fee-shifting provision are likewise barred by lack of standing and ripeness. Plaintiffs lack standing to sue the Attorney General over S.B.8's fee-shifting provision because they do not allege the Attorney General has sought (or will imminently seek) attorneys' fees under S.B.8. Plaintiffs do not allege that any of the defendants will acquire "prevailing party" status in this litigation, as any such prediction would amount to a confession that their claims should lose. Any possibility that the Attorney General might someday sue them for fees under S.B.8 is "conjectural" and "hypothetical," which is insufficient to confer Article III standing. *See Lujan*, 504 U.S. at 560 (holding that an injury in fact must be "actual or imminent, not conjectural or hypothetical" (citation and internal quotation marks omitted)); *O'Shea v. Littleton*, 424 U.S. 488, 494 (1974) ("It must be alleged that the plaintiff has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged statute or official conduct. The injury or threat of injury must be both real and immediate, not conjectural or hypothetical." (citations and internal quotation marks omitted)).

### C. The Attorney General is Entitled to Sovereign Immunity

Absent a waiver of immunity, sovereign immunity bars suit against states in federal court, regardless of the nature of the remedy sought. *See, e.g., Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100–01 (1984); *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974) ("[T]his Court has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State") (internal citations omitted)). "A suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). "Suits against state

officials in their official capacity [] should be treated as suits against the State." *Hafer v. Melo*, 502 U.S. 21, 25 (1991).

Section 1983 does not abrogate sovereign immunity. *Will*, 491 U.S. at 67. Nor has Texas voluntarily waived sovereign immunity for claims brought under Section 1983. *See Texas A&M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 839 (Tex. 2007). The Declaratory Judgment Act does not waive sovereign immunity either. *E.g. Acosta v. Univ. of Tex. at El Paso*, No. EP-06-CA-408-H, 2007 WL 9701442, at *2 (W.D. Tex. 2007) ("A litigant cannot circumvent [sovereign immunity] by pleading a claim under the Declaratory Judgment Act."). Therefore, as a preliminary matter, any Section 1983 claim or request for declaratory relief against the Attorney General in his official capacity is barred by sovereign immunity unless an exception applies. *See McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 412 (5th Cir. 2004) (citation omitted).

Under the *Ex parte Young* exception, sovereign immunity is no bar when the suit "seeks prospective, injunctive relief from a state actor, in [his] official capacity, based on an alleged ongoing violation of the federal constitution" or other federal law. *K.P. v. LeBlanc*, 729 F.3d 427, 439 (5th Cir. 2013); *McCarthy*, 381 F.3d at 413–14. But the state official being sued "must have some connection with the enforcement of the [challenged] act, or else [the suit] is merely making him a party as a representative of the state, and thereby attempting to make the state a party." *City of Austin*, 943 F.3d at 997–98 (cleaned up); *see also Air Evac EMS Inc. v. Tex. Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 517 (5th Cir. 2017); *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014). A court's initial step is determining whether the plaintiff has sued the right defendant. *City of Austin*, 943 F.3d at 997. "Where a state actor or agency is statutorily tasked with enforcing the challenged law and a different official is the named defendant, [the court's] *Young* analysis ends." *City of Austin*, 943 F.3d at 998. An official's "general duty to see that the laws of the state are implemented" is insufficient to establish the requisite connection to enforcement. *Morris*, 739 F.3d at 746. Rather, the official sued must bear "the particular duty to enforce the [provision] in question," alongside a demonstrated willingness to enforce it. *Id.*

As mentioned above, the Attorney General does not have independent statutory authority to enforce the criminal provisions of the pre-*Roe* statutes or the HLPA. *See* Tex. Gov't Code § 402.028. As the Attorney General does not enforce those statutes, the *Ex parte Young* exception does not apply, and sovereign immunity bars Plaintiffs' claims. *Mi Familia Vota v. Abbott*, 977 F.3d 461, 477 (5th Cir. 2020); *see also Haverkamp v. Linthicum*, 6 F.4th 662, 670 (5th Cir. 2021); *cf. Whole Woman's Health*, 141 S. Ct. at 2495. The Attorney General's to assist in certain criminal cases is not sufficient to establish that he has enforcement authority for the *Ex parte Young* analysis. *Starr v. Cnty. of El Paso, Tex.*, No. EP-09-CV-353, 2010 WL 3122797, at *5 (W.D. Tex. Aug. 5, 2010).

Even if the Attorney General had enforcement authority, the *Ex parte Young* exception does not apply to Plaintiffs' claims, because the Attorney General has not "demonstrated a willingness to enforce" the statutes in the way Plaintiffs hypothesize. *See Morris*, 739 F.3d at 746. To substantiate their threat of future harm, Plaintiffs rely only on the Attorney General's statements that the pre-*Roe* statutes are in effect and that he will enforce the civil provisions of the HLPA. *See* Dkt. #1-3 at 3; Dkt. #1-4. Even still, Plaintiffs do not allege any facts supporting their allegation that the Attorney General will interpret the law to apply to "any behavior undertaken by Plaintiffs in connection with any abortion that occurs outside the State of Texas." Dkt. #1 at 50. Because Plaintiffs fail to allege facts sufficient to draw the reasonable inference that the Attorney General will enforce the law in the way Plaintiffs fear, their claims remain barred by sovereign immunity. *See Starr*, 2010 WL 3122797, at *5 (*Ex parte Young* exception to sovereign immunity did not apply when the Attorney General "had not taken any action to enforce the challenged statute").

Plaintiffs also challenge S.B.8's attorneys' fees provision, arguing it violates their First Amendment rights and is "preempted" by 28 U.S.C. § 1988. Dkt. #1 at 48–49. Plaintiffs theorize that the very existence of this fee-shifting provision requires them to "liv[e] under an existential threat to their operations, conduct, and freedom." *Id.* at ¶ 200. But "the proposition that the [F]irst [A]mendment, or any other part of the Constitution, prohibits or even has anything to say about fee-shifting statutes in litigation seems too farfetched to require extended analysis." *Premier*

*Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*, 814 F.2d 358, 373 (7th Cir. 1987) (footnote omitted).

The Attorney General does not "enforce" the fee-shifting provision merely because it allows him the opportunity to recover attorneys' fees if he defends certain Texas laws. In the *Ex parte Young* context, an "enforcer" is one who exercises powers of "compulsion or constraint." *City of Austin*, 943 F.3d at 1000. A litigant who seeks attorneys' fees does not compel or constrain in this sense. The existence of a fee-shifting statute does not prohibit plaintiffs from filing lawsuits, it just makes them liable for attorneys' fees if their opponents prevail. If the Attorney General were to seek attorneys' fees under S.B.8 section 4, it would be in the posture of a litigant, not as a government official "enforcing" the law within the meaning of *Ex parte Young*. Like other litigants invoking fee-shifting statutes, the Attorney General would have to seek an award of attorneys' fees from the court. *See* Tex. Civ. Prac. & Rem. Code § 30.022(a), (c). Without a court order, he cannot compel anyone to pay attorneys' fees.

Finally, Plaintiffs have not shown that the Attorney General has a "demonstrated willingness" to seek attorney's fees under S.B.8. *City of Austin*, 943 F.3d at 1000. It is not enough that a defendant official "*might*" someday request attorneys' fees, *id.*, but "might" is the very most plaintiffs can allege.

## II.  PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS

### A. The Declaratory Judgment Act Does Not Provide a Cause of Action

The Declaratory Judgment Act is not a cause of action. It is "not an independent source of federal jurisdiction; the availability of such relief presupposes the existence of a judicially remediable right." *Schilling v. Rogers*, 363 U.S. 666, 677 (1960); *see also Sid Richardson Carbon & Gasoline Co. v. Interenergy Res. Ltd.*, 99 F.3d 746, 752 n.3 (5th Cir. 1996). A request for a declaratory judgment is not a substantive claim. Accordingly, to the extent Plaintiffs purport to bring standalone claims under the Declaratory Judgment Act, they should be dismissed for failure to state a claim.

**B. Plaintiffs Fail to State Cognizable Claims under Section 1983**

"Section 1983 provides a federal remedy for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 105 (1989). "Section 1983 speaks in terms of 'rights, privileges, and or immunities,' not violations of federal law" *Id.* at 106. "To state a section 1983 claim, 'a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.'" *James v. Collin Cty.*, 535 F.3d 365, 373 (5th Cir. 2008) (quoting *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000)).

### 1. Plaintiffs cannot assert third-parties' rights under Section 1983

CASN brings third-party claims on behalf of its volunteers and staff, contending that the pre-*Roe* statutes and HLPA violate these third parties' right to travel. Dkt. #1 at ¶ 116. The Fund Groups and CASN bring third-party claims on behalf of their donors, staff, volunteers, and donors, contending that the pre-*Roe* statutes and HLPA violate their First Amendment rights. Dkt. #1 at ¶¶ 138, 154. Plaintiffs' Complaint invokes both Section 1983 and the Declaratory Judgment Act, but neither of those statutes provides a cause of action that allows plaintiffs to assert the rights of non-litigant third parties. Both Section 1983 and the DJA provide limited relief that extend only to litigants who assert their *own* rights. *See* 42 U.S.C. § 1983 (every "person" who acts under color of state law and deprives another person of his constitutional or federal rights "shall be liable *to the party injured*") (emphasis added); 28 U.S.C. § 2201(a) (authorizing federal courts to "declare the rights and other legal relations of *any interested party seeking such declaration* . . .") (emphasis added).

As a general rule, a plaintiff "must assert his own legal rights and interests, not those of third parties." *McCormack v. Nat'l Collegiate Athletic Ass'n*, 845 F.2d 1338, 1341 (5th Cir. 1988). Section 1983 is no exception: it provides a cause of action only when the plaintiff suffers "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. It does not provide a cause of action to plaintiffs claiming an injury based on the

violation of a third-party's rights. *Cf. Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2275 (2022) ("The Court's abortion cases have … ignored the Court's third-party standing doctrine.").

The Declaratory Judgment Act imposes similar obstacles to the third-party claims in this case. A request for a declaratory judgment is not a cause of action. *Id.* Nevertheless, assuming Plaintiffs have a valid cause of action, like Section 1983, the federal Declaratory Judgment Act provides limited relief, one that allows litigants to seek a declaration only of their *own* rights and legal relations. *See* 28 U.S.C. § 2201 ("In a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations *of any interested party seeking such declaration*.") (emphasis added). The Declaratory Judgment Act necessarily excludes actions brought to declare the rights or legal relations of non-parties—or anyone other than the party "seeking such declaration" under the Act. It provides no authority for a federal court to declare the rights of those who are not "seeking" a declaration under the statute.

Failing to establish associational or representational standing, Plaintiffs' third-party claims brought on behalf of their donors, volunteers, and staff cannot proceed, and these claims must be dismissed for failing to state a claim on which relief can be granted.

### 2.   As to Counts VI–VIII, Plaintiffs fail to assert any federal right enforceable under Section 1983

In Counts VI–VIII of their Complaint, Plaintiffs contend that Texas's abortion laws do not apply to abortions or medical care occurring outside of Texas, but Plaintiffs fail to identify any violation of a federal right in these counts. *Ex parte Young* does not extend to determining the meaning of state laws. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). Because a violation of a federal right is a necessary element of a cognizable Section 1983 claim, these claims must be dismissed. *See James*, 535 F.3d at 373.

### 3.   "Preemption" is not a right secured by Section 1983

In Count IX, Plaintiffs assert that S.B.8's fee-shifting provision is preempted by § 1988. But Section 1988 does not confer any substantive right. Nor can Plaintiffs bring this claim under

Section 1983, because Section 1983 itself does not confer any substantive rights. *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (plurality opinion) (cleaned up) ("Section 1983 is not itself a source of substantive rights; it merely provides a method for vindicating already conferred federal rights."); *Chapa v. City of Alvin*, No. 3:20-CV-00362, 2021 WL 3077671, at *2 (S.D. Tex. July 21, 2021) ("Section 1988 does not provide a substantive right or cause of action.") Similarly, "the Supremacy Clause is not the source of any federal rights." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015) (internal quotations and citations omitted) (citing *Golden State Corp.*, 493 U.S. at 107); *see also Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't*, 849 F.3d 615, 626 (5th Cir. 2017). Rather, it "creates a rule of decision." *Armstrong*, 575 U.S. at 324. As the Supreme Court has explained, the Supremacy Clause instructs courts to "not give effect to state laws that conflict with federal laws." *Id.* In other words, the Supremacy Clause does not create a right to preemption a litigant can preemptively assert; instead, it "instructs courts what to do when state and federal law clash." *Id.* at 325–26. Accordingly, preemption is not a "right[] secured by the Constitution or laws of the United States" and cannot be asserted under Section 1983. *Armstrong*, 575 U.S. at 324.

In sum, while Plaintiffs contend that "SB8's Fee-Shifting Provision is Preempted," they fail to identify any "right secured by the Constitution or laws of the United States" of which S.B.8 deprives them. *James*, 535 F.3d at 373. Accordingly, this claim should be dismissed.

### C. Plaintiffs Fail to State a Claim for Facial Relief (Counts I–IV)

Plaintiffs bring both facial and as-applied First Amendment and right-to-travel challenges to the pre-*Roe* statutes and HLPA. *See* Dkt. #1 at ¶¶ 129, 146. Plaintiffs fail to meet their high burden to obtain such relief. *See Justice v. Hosemann*, 771 F.3d 285, 296 (5th Cir. 2014).

Pre-enforcement facial challenges to legislation are "disfavored for several reasons"—"to put it mildly." *Netchoice,*, slip op. at *8–9 (internal quotation omitted). "[F]acial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange*

*v. Wash. State Rep. Party*, 552 U.S. 442, 451 (2008). States and their duly enacted legislation are entitled to deference when a court is considering a facial challenge to the constitutionality of that legislation. *See Netchoice*, slip op. at *10.

"[F]acial and as-applied challenges have different substantive requirements." *Catholic Leadership Coal. of Texas v. Reisman,* 764 F.3d 409, 425–26 (5th Cir.2014) (citing *Doe v. Reed,* 561 U.S. 186, 130 S. Ct. 2811, 2817 (2010)). A facial challenge fails unless "no set of circumstances exists under which the Act would be valid." *U.S. v. Salerno*, 481 U.S. 739, 745 (1987). This is an "extraordinarily high" standard, *Netchoice*, slip op. at *10, and courts "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange*, 552 U.S. at 449. And it applies in "cases concerning abortion" just as it applies in "any other context." *SisterSong Women of Color Reprod. Justice Collective v. Governor of Georgia*, 40 F.4th 1320, 1328 (11th Cir. 2022). The overbreadth doctrine eases this burden slightly in the First Amendment context, permitting a plaintiff to succeed "if a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Netchoice*, slip op. at *11 (quotation omitted). But this overbreadth doctrine is "a last resort," not a saving grace, and it "attenuates as the regulated expression moves from pure speech toward conduct." *Id.* at *12 (quotation omitted).

The Plaintiffs do not even attempt to hoist the heavy burden required for a facial challenge. Indeed, they repeatedly disavow any challenge to the statutes' application within Texas. *E.g.*, Dkt. #1 at ¶¶ 84–85. As Plaintiffs' facial challenges can succeed only if there is "no set of circumstances . . . under which [the laws] would be valid," *Justice*, 771 F.3d at 298 (quoting *Catholic Leadership Coalition of Tex. v. Reisman*, 764 F.3d 409, 426 (5th Cir. 2014)), Plaintiffs' disavowal is fatal.

More, nothing on the face of Texas's abortion laws purports to burden speech, burden the freedom of association, or impose a burden on the right to travel. Certainly Plaintiffs point to no such burden; their Motion offers nothing but hypotheticals, identifying no particular task Plaintiffs wish to undertake and no imminent risk of being penalized by the Defendants for doing so. *See* Dkt. #6 at 36. Their "whataboutisms . . . exemplify why it's inappropriate to hold the law facially

unconstitutional in a pre-enforcement posture." *Netchoice*, slip op. at *14. A talented talespinner can weave a saga of woe, but facial challenges are not dramaturgy—Plaintiffs must come forward with evidence of imminent danger of punishment. Mights and coulds and maybes do not build such a case, and mights and coulds and maybes are all the Plaintiffs can identify. *See Netchoice*, slip op. at *15–16 (courts should avoid determining the constitutionality of State statutes "in hypothetical situations where it is not even clear the State itself would consider its law applicable" (quotation omitted)); *see also Hersh v. U.S. ex rel. Mukasey*, 553 F.3d 743, 762 (5th Cir. 2008) ("[t]he fact that a court can hypothesize situations in which the statute will impact protected speech is not alone sufficient" to support a facial challenge).

Because the statutes are not facially unconstitutional, any constitutional challenge must be as-applied. "Exercising judicial restraint in a facial challenge 'frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy." *Wash. State Grange*, 552 U.S. at 450 (citing *United States v. Raines*, 362 U.S. 17, 22 (1960)).

### D.  Plaintiffs are Not Likely to Succeed on Their First Amendment Challenge

#### 1.  Plaintiffs do not have a First Amendment right to fund illegal conduct.

The thrust of Plaintiffs' claims is their desire to fund abortions or to pay to transport a mother to her abortion appointment, *see, e.g.*, Dkt. #1 at ¶¶ 22–30, and, for Moayedi, to actually *perform* or *prescribe* medications for the abortion. Dkt. #4-11 at ¶¶ 6, 10. That is conduct, not speech, and courts have long dawn the line between the two. *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2373 (2018). States may make certain conduct illegal, and "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 62 (2006).

Plaintiffs' declarations make it plain their challenges are about conduct. Fund Texas Choice's mission is "practical support" for abortion, including "paying vendors for bus tickets, ride shares, providing food assistance, and lodging." Dkt. #4-3 at ¶¶ 4–5. TEA Fund's mission is "to foster reproductive justice" by providing "financial . . . and logistical support" for abortion services. Dkt. #4-4 at ¶ 4. The Lilith Fund, Frontera Fund, and Afiya seek to "provide practical and/or financial support to Texans seeking abortions." Dkt. #4-5 at ¶11; *see also* Dkt. #4-6 at ¶ 4; Dkt. #4-7 at ¶ 5. Likewise, the West Fund aims "to provide . . . funding" for abortions, and JDP "historically provided funds to abortion providers." Dkt. #4-8 at ¶ 3; Dkt. #4-9 at ¶ 6. CASN notes that the "majority of [its] activities involved providing transportation, accommodations, and direct payments" for abortion services. Dkt. #4-10 at ¶ 4. Each of these is conduct, not speech. Indeed, the organizational plaintiffs all provided testimony that they have ceased their "assistive activities." In other words, they have ceased their assistive *conduct*, which is not protected by the First Amendment. Dkt. #4-3 at ¶ 9; Dkt. #4-4 at ¶ 7; Dkt. #4-5 at ¶ 7; Dkt. #4-6 at ¶ 8; Dkt. #4-7 at ¶8; Dkt. #4-8 at ¶ 6; Dkt. #4-9 at ¶ 8; Dkt. #4-10 at ¶8.

Even if their conduct is carried out through speech by talking to a client, that does not transform the conduct into a protected speech issue. *See Rumsfeld*, 547 U.S. at 62; *see also NIFLA*, 138 S. Ct. at 2373 ("The First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." (internal quotation marks omitted)). It does not violate the First Amendment to "regulat[e] the *conduct* of an entity," and invoking the First Amendment does not shroud conduct with constitutional protection. *See Netchoice*, slip op. at *21, *35 (emphasis added).

Moreover, Plaintiffs' conduct is not inherently expressive. *See Rumsfeld*, 547 U.S. at 66. Making appointments, performing abortions, funding abortions, and paying for incidental expenses are no more inherently expressive conduct than paying for a tank of gas is inherently expressing disagreement with support for alternative energy. Supreme Court precedent supports this. A person does not cloak unlawful conduct in the First Amendment by first "announc[ing] that he intends to express his disapproval of the Internal Revenue Serviced by refusing to pay his income

taxes." *Id.* So too here. "If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it." *Id.* There is no constitutional right to an abortion, there is no constitutional right to pay for an abortion, there is no constitutional right to help someone get an abortion, and the First Amendment does not protect those things just because Plaintiffs want to perform those illegal deeds at the same time they talk about performing them. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 30 (2010).

> ### 2.   Even if Texas's abortion statutes implicated the First Amendment, they survive constitutional scrutiny.

Even if the pre-*Roe* statutes and HLPA burdened Plaintiffs' First Amendment rights, they do so in a content-neutral way. "[R]egulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny under the First Amendment." *Netchoice*, slip op. at *64 (internal quotation marks omitted).  Whether one supports the legality of abortion or not, a person may not "knowingly perform, induce, or attempt an abortion" under the HLPA or "furnish[] the means for procuring an abortion" under the pre-*Roe* statutes. Texas Penal Code art. 1191 (West 1961). The statutes apply equally regardless of one's opinion on abortion, and the statutes' requirements in no way depend on the speaker's viewpoint or motives. *See Netchoice*, slip op. at *65. To survive intermediate scrutiny, the State need only show that its "statutory classification is substantially related to an important governmental objective. . . . It need not be perfect, or even the least restrictive alternative that can be used to achieve Texas's goal." *Netchoice*, slip op. at *72 n.35. Both preservation of unborn life and preservation of the integrity of the medical profession are legitimate and important State interests and well within the State's police powers. *See Dobbs*, 142 S. Ct. at 2284. Accordingly, Texas's abortion statutes satisfy intermediate scrutiny.

Yet even if Plaintiffs were correct and sliding a stack of bills across the counter to an abortionist's waiting palm were a restriction on pure speech, Texas's abortion statutes would still survive. Under the strict scrutiny that would apply in that counterfactual, Texas's laws would both serve a compelling state interest and be narrowly drawn to achieve that end. *See Burson v. Freeman*,

504 U.S. 552 (2011). The preservation of life is a compelling state interest , including the lives of unborn children. *See Dobbs*, 142 S. Ct. at 2284. Indeed, Plaintiffs do not question the existence of such an interest. *See generally* Dkt. #1; Dkt. #6. And the Texas statutes are narrowly drawn to protect that interest: They prohibit third parties from helping to end that life in the same way that statutes prohibit third parties from helping achieve any other criminal end. *Compare* Tex. Penal Code § 7.02(a)(2) (criminalizing aiding another person in committing an offense) *with* Tex. Rev. Civ. Stat. art. 4512.2 (criminalizing furnishing the means for procuring an abortion); *see also State v. Sandoval*, 842 S.W.2d 782, 787–88 (Tex. App. – Corpus Christi 1992, pet. ref'd) ("We find that the word 'procure' is neither vague nor indefinite. It has been used in various statutes over the years. . . . We find that a person of normal intellect would be able to determine what the term 'procure' means as used in the barratry statute.").

### E.  Texas's Laws Do Not Infringe on Plaintiffs' Right to Travel (Count I)

As with the purported burden on Plaintiffs' First Amendment rights, the purported burden on their right to interstate travel is vaporous. The Plaintiffs mischaracterize their and Texas's interests, take citations out of context, and misrepresent how Texas's statutes work and what they target. Their right-to-travel claim fails on every basis.

The right to travel is not mentioned in the Constitution; determining whether that liberty, as the Plaintiffs interpret it, is one protected by the Constitution requires us to "guard against the natural human tendency to confuse what [the Constitution] protects with our own ardent views about the liberty Americans should enjoy." *Dobbs*, 142 S. Ct. at 2247. Courts must "'exercise the utmost care whenever [they] are asked to break new ground in'" evaluating the existence of an unenumerated liberty "'lest the liberty protected . . . be subtly transformed into the policy preferences of the'" judiciary, "usurp[ing] authority that the Constitution entrusts to the people's elected representatives." *Dobbs*, 142 S. Ct. at 2247–48 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997), and citing *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225–26 (1985)). The process must begin "with a careful description of the asserted right[,] for the more general is the

right's description, *i.e.*, the free movement of people, the easier is the extension of substantive due process." *Hutchins v. Dist. of Columbia*, 188 F.3d 531, 538 (D.C. Cir. 1999) (en banc) (opn. of Silberman, J.) (citing *Reno v. Flores*, 507 U.S. 292, 302 (1993), and *Michael H. v. Gerald D.*, 491 U.S. 110, 127 n.6 (1989) (opn. of Scalia, J., joined by Rehnquist, C.J.)). Respect for "basic notions of ordered liberty" demands that these rights be "'deeply rooted in [our] history and tradition,'" not "lightly extended" as if slipshod. *Id.* (quoting *Glucksberg*, 521 U.S. at 721). "For that reason, we must ask not whether Americans enjoy a general right of free movement, but rather whatever are the scope and dimensions of such a right . . . ?" *Id.*

And on this first step, the Plaintiffs already fail. They describe the right at stake as "interstate travel to engage in lawful conduct in another state." Dkt. #6 at 22. But that is not a "'careful description' of the asserted fundamental liberty interest," *Glucksberg*, 521 U.S. at 721 (quoting *Reno v. Flores*, 507 U.S. at 302); it essentially asks "whether Americans enjoy a general right of free movement[.]" *Hutchins*, 188 F.3d at 538. Similarly, the Plaintiffs mischaracterize Texas's interests as an "alleged interest in restricting abortion in the State of Texas." Dkt. #6 at 22. The Court need not rely on the Plaintiffs' characterization, however; Texas has explicitly codified its interest by statute so there can be no mistake about it—it has "compelling interests from the outset of a woman's pregnancy in protecting the health of the woman and the life of the unborn child[.]" Tex. Health & Safety Code § 171.202(3). And a perusal of the Plaintiffs' Complaint and Motion shows the right to travel they actually claim: A right to "travel with pregnant Texans across state lines to help them obtain legal abortions our of state[.]" Dkt. #6 at 25.

No such right is protected by the Constitution. There is no constitutional right to have an abortion paid for, to pay for someone's abortion, or to assist in performing or procuring an abortion. *See Harris v. McRae*, 448 U.S. 297, 325 (1980); *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 912 (6th Cir. 2019) (en banc). But more, the Texas statutes do not criminalize what the Plaintiffs claim. Texas does not "criminalize interstate travel," Dkt. #6 at 22; the Plaintiffs are free to come and go from the State as they please, and they are neither taxed when doing so, *see Crandall*

*v. Nevada*, 73 U.S. (6 Wall.) 35 (1867), nor prohibited from returning with impoverished friends whose goal is to settle in Texas themselves, *see Edwards v. California*, 314 U.S. 60 (1941). Nor, contra the Plaintiffs' suggestion, is Texas interested in criminalizing abortion for its own sake. Dkt. #6 at 22, 24. Rather, criminalization is a means to an end—the protection of human life, including the life of the unborn. That interest continues whether the Texan mother seeks an abortion in Denver or Dallas, in Las Cruces or Lamesa. When that procurement takes the form of a bus ticket for the pregnant Texan to an abortion clinic, or the paying from Texas of the cost of a pregnant Texan's hotel room adjacent to that clinic, it does not matter if the travel and hotel are in Albuquerque or Austin—the procurement in Texas of the means of an abortion has intruded upon the State's interest in the protection of human life.

Texas's statutes do not result in Texans' being treated in other states as "an unfriendly alien" rather than a "welcome visitor[.]" *Cf. Saenz v. Roe*, 526 U.S. 489, 500 (1999). They do not regulate the sending of advertisements into the State promoting services that are legal in other jurisdictions. *Cf. Bigelow v. Virginia*, 421 U.S. 809, 824 (1975). They do not discriminate between Texans and visitors. *Cf. Barnard v. Thorstenn*, 489 U.S. 546, 552–53 (1989). They regulate conduct in Texas that has an effect in Texas upon the lives of persons in Texas. They do not target travel; whatever impact they have on travel is incidental to the goal of preserving the lives of unborn children and ensuring the health of their mothers.

Nor do Texas's statutes improperly interfere with interstate commerce. The Court need not actually reach that issue, for the Plaintiffs don't actually identify the proper test; they skip from *ipse* directly to *dixit* without telling the Court that it's supposed to use the balancing test announced in *Pike v. Bruce Church, Inc.*, to determine whether the Texas statutes improperly burden interstate commerce. *See* 397 U.S. 137, 142 (1970); *Wal-Mart Stores, Inc. v. Tex. Alcoholic Bev. Comm'n*, 945 F.3d 206, 221–22 (5th Cir. 2019). Having not properly joined the issue, their discussion of it is forfeit. *See Mission Toxicology LLC v. UnitedHealthcare Ins. Co.*, 499 F. Supp. 3d 350, 359 (W.D. Tex. 2020) (citing *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010). But at any rate, the Texas statutes satisfy the *Pike* test: They do not directly discriminate against interstate commerce; there

are clear local benefits (*i.e.*, the preservation of lives that are not aborted thanks to the restrictions on procuring the means of an abortion for a third party); and there is no clearly excessive burden on interstate commerce—indeed, the existence of a burden is entirely theoretical as the Plaintiffs have introduced no evidence about the number of interstate abortion trips they would take or the impact they would have on the national economy.

### F.  Texas's Abortion Laws are Not Unconstitutionally Vague (Count VI)

A law is not void for vagueness unless it "is impermissibly vague in all of its applications." *Hoffman Estates*, 455 U.S. at 497. A law need not "'delineate the exact actions a [person] would have to take to avoid liability.'" *Doe I*, 909 F.3d at 118 (quoting *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 552 (5th Cir. 2008)). As the Supreme Court has put it, "'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'" *Minn. Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1891 (2018) (alteration in original) (quoting *Ward*, 491 U.S. at 794). That perfection, however, is exactly what Plaintiffs demand. Plaintiffs argue that any one of their activities could constitute "inducement" under the HLPA. Dkt. #6 at 37. But Plaintiffs point to nothing other than statements by a handful of legislators in making this assertion, and Plaintiffs do not dispute that those legislators have no enforcement authority. *See* Dkt. #1 at ¶¶ 5–6, 83. "[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.'" *Hill v. Colorado*, 530 U.S. 703, 733 (2000) (quoting *United States v. Raines*, 362 U.S. 17, 23 (1960)); *see also SisterSong*, 40 F.4th at 1328 ("To be sure, there might be vague applications of that definition in other provisions of the Georgia Code, but challenges to those applications—like the arguments . . . about potential applications to constitutionally protected conduct—are properly brought in an as-applied manner.").

"The Fourteenth Amendment's guarantee of Due Process proscribes laws so vague that persons 'of common intelligence must necessarily guess at [their] meaning and differ as to [their] application.'" *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001)

(alterations in original) (quoting *Smith v. Goguen*, 415 U.S. 566, 572 n.8 (1974)). Belying their contention that the Pre-*Roe* statutes are impermissibly vague, Plaintiffs spill much ink explaining what exactly they understand the Pre-*Roe* statutes to prohibit. Dkt. 6 at 35–37. "'[O]nly a reasonable degree of certainty is required'" for a statute to survive a vagueness challenge. *Roark & Hardee*, 522 F.3d 552–53 (quoting *United States v. Tansley*, 986 F.2d 880, 885 (5th Cir. 1993)) (emphasis and internal quotation marks omitted). The pre-*Roe* statutes and HLPA give that reasonable degree of certainty, so Plaintiffs' vagueness challenge fails.

### G.   Section 1988 Does Not Preempt the Fee Shifting Provision of SB8

"There are three types of federal preemption: (1) express preemption; (2) field preemption; and (3) conflict preemption." *Aldridge v. Mississippi Dep't of Corr.*, 990 F.3d 868, 874 (5th Cir. 2021). Courts "start with the basic presumption that Congress did not intend to displace state law." *Id.* at 875. As an initial matter, there is no express preemption in Section 1988. *See* 42 U.S.C. § 1988. Plaintiffs appear to argue that § 1988 constitutes field preemption because it is "a comprehensive fee-shifting statute" for § 1983 claims. Dkt. #6 at 48. "Field preemption exists when (1) 'the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation,' or (2) 'where the field is one in which 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Aldridge*, 990 F.3d at 874 (quoting *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985)). However, § 1988 cannot be a "comprehensive" fee statue because Congress left room for supplementary state regulation. Specifically, the award of fees under § 1988 is discretionary. *See* 42 U.S.C. § 1988(b). Therefore, § 1988 leaves room for the States to regulate, namely where the court declines to award fees to a prevailing party. S.B.8 fills that void. Tex. Civ. Prac. & Rem. Code § 30.022(a). For the same reason the fee-shifting provision of S.B.8 is not conflict preempted. "Conflict preemption, which is not 'rigidly distinct' from field preemption, is present when (1) 'compliance with both state and federal law is impossible,' or (2) state law 'stands as an obstacle to the accomplishment

and execution of the full purposes and objectives of Congress.'" *Aldridge*, 990 F.3d at 875. S.B.8's fee shifting provision does not directly conflict with § 1988 in all circumstances and does not render compliance with federal law impossible or stand as an obstacle to the purposes of § 1988. Therefore, S.B.8 is not conflict preempted. Because none of the three types of preemption apply to the fee shifting provision of SB 8, Plaintiffs have failed to state a claim for preemption (if such a claim existed).

### H. CMS Billing Requirements Do Not Preempt Texas's Regulation of the Practice of Medicine

In Count VII, Plaintiffs claim that the pre-*Roe* statues and HLPA cannot apply to abortions provided out-of-State via telemedicine because a CMS billing requirement preempts State law. Dkt. #1 at 45; Dkt. #6 at 38. Plaintiffs' contention that a CMS billing requirement preempts any State law concerning the practice of medicine must be dismissed. The requirement Plaintiffs cite relates to fee-for-services delivered during the COVID-19 public health emergency. Dkt. #6 at 38; *id.* at 38 n.22. This billing requirement says *nothing* about preempting State laws regulating the practice of medicine. And, moreover, President Biden has declared that the "pandemic is over."[1]

The State of Texas regulates the practice of telemedicine, and its authority to do so is traditional and well-established. Tex. Occ. Code § 111.004; *see also* Tex. Occ. Code § 111.001(4) (defining "telemedicine medical service" as "a health care service delivered by a physician licensed in his state . . . and acting within the scope of the physician's . . . license to a patient at a different physical location than the physician or health professional using telecommunications or information technology"). Plaintiffs' assertion that a CMS billing requirement issued pursuant to a public health emergency preempts "any state law" related to telemedicine strains credulity. CMS regulations relate to reimbursement, not what is permissible as a matter of practice. It does not purport to govern what procedures are or are not lawful. Whether the federal government has

---

[1] Dan Diamond, *Biden's claim that 'pandemic is over' complicates efforts to secure funding*, The Washington Post (Sept. 18, 2022), https://www.washingtonpost.com/health/2022/09/18/biden-covid-pandemic-over/ (last visited Sept. 19, 2022).

authority to regulate telemedicine *nationwide* is a question of deep economic and political significance, and Plaintiffs cite nothing supporting the proposition that Congress intended CMS or the Department of Health and Human Services to exercise such broad authority. *See Util. Air. Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (holding that Congress must "speak clearly if it wishes to assign . . . decisions of vast economic and political significance.").

## I.   Pre-Roe Statutes were Never Repealed

In their Motion, Plaintiffs contend that the pre-*Roe* statutes "cannot criminalize any conduct because they were already repealed by implication." Dkt. #6 at 39. That is incorrect. While *Roe* effectively prevented enforcement of Texas's criminal prohibitions for nearly five decades, federal courts have no ability to "strike down" or revoke a statute. *See Whole Woman's Health v. Jackson*, 141 S. Ct. 2494, 2495 (2021) (per curiam). "When a court declares a law unconstitutional, the law remains in place unless and until the body that enacted it repeals it, even though the government may no longer constitutionally enforce it." *Pidgeon v. Turner*, 538 S.W.3d 73, 88 n.21 (Tex. 2017).

"Repeals by implication are never favored." *Cole v. State*, 170 S.W. 1036, 1037 (Tex. 1914). There must be "total repugnance" between the new statute and the old; "the antagonism must be absolute—so pronounced that both [statutes] cannot stand." *Id.*; *see also J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 142 (2001) (there must be "an irreconcilable conflict"). That stringent standard is not met here.

"A legislative enactment covering a subject dealt with by an older law, but not repealing that law, should be harmonized whenever possible with its predecessor in such a manner as to give effect to both." *Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990); *see also Diruzzo v. State*, 581 S.W.3d 788, 799 n.13 (Tex. Crim. App. 2019). Plaintiffs point to *McCorvey v. Hill*, 385 F.3d 846 (5th Cir. 2005), in which the Fifth Circuit guessed that Texas's preexisting criminal prohibitions had been repealed. *See id.* at 849. The Court noted "regulatory provisions" governing abortion and concluded "[t]hese regulatory provisions cannot be harmonized with provisions that

purport to criminalize abortion." *Id.* But federal courts' *Erie* guesses are not definitive statements of Texas law; "*Erie* guesses are just that—guesses. Hopefully we get them right, but sometimes we get them wrong." *Priester v. JP Morgan Chase Bank, N.A.*, 927 F.3d 912 (5th Cir. 2019). This Court should not now follow *McCorvey*'s *Erie* guess because the Legislature has enacted provisions designed specifically to reject it. *E.g.* Tex. Gov't Code § 311.036(a) ("A statute that regulates or prohibits abortions may not be construed to repeal any other statute that regulates or prohibits abortion, either wholly or partly, unless the repealing statute explicitly states that it is repealing the other statute."). Even if *McCorvey* had been correct—it was not—today, it is contrary to Texas law to treat subsequent abortion regulations as impliedly repealing the preexisting criminal prohibitions.

And *McCorvey*'s *Erie* guess is unpersuasive in any event. The Fifth Circuit did not recognize, much less address, Texas's strong presumption against implied repeal. Enforcement was impossible for many years; the Texas Legislature cannot be said to have "repealed" its criminal law by enacting additional regulations that *could* be enforced under the *Roe v. Wade* regime. Doing so is hardly an expression of intent to repeal the then-unenforceable criminal statutes. Moreover, there is no repeal by implications so long as the "later statute reasonably admits of a construction which will allow effect to the older law and still leave an ample field for its own operation." *Cole*, 170 S.W. at 1037. That is the case here. When necessary to save the life of the mother, abortion is not criminal, Tex. Civ. Stat. art. 4512.6, so Texas's other regulations of abortion have effect even though most abortions are criminal. Because both the preexising criminal prohibitions and the later-enacted regulations have some effect, "total repugnance" is lacking. *Cole*, 170 S.W. at 1037.

"The bright-line rule" is that "[a] statute is *not* repealed by nonuse or desuetude." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 336 (2012) (emphasis added). Instead, "a statute has effect until it is repealed" by the body that enacted it. *Id.* That body was the Texas Legislature, and, far from repealing the preexisting criminal prohibitions on abortion, the Legislature has twice stated that these prohibitions have *not* been repealed. *See*

H.B. 1280, § 4; S.B. 8, § 2. The criminal prohibitions on abortion that the Supreme Court held unconstitutional in *Roe v. Wade* remain in force.

### J.    The pre-*Roe* Statutes and the HLPA Do Not Irreconcilably Conflict

Finally, contrary to Plaintiffs' assertions otherwise, the pre-*Roe* laws and HLPA do not conflict. Both laws prohibit abortion so there is no question as to what conduct is prohibited. *Compare* Tex. Civ. Stat. art. 4512.1*, with* Tex. Health & Safety Code § 170A.002. The only conflict Plaintiffs raise is the length of criminal punishment, Dkt. #6 at 41, and that is a matter to be taken up at sentencing if a prosecution under either statute occurs. Given that the Legislature found that the pre-*Roe* laws had never been repealed in the same bill that enacted the HLPA (H.B. 1280), the Court must presume that the Legislature intended both sets of laws to apply and to give prosecutors a choice once the HLPA became effective.

### III. *Pullman* Abstention Counsels Against Finding Texas's Abortion Laws Unconstitutional

When a federal court is considering a facial challenge to legislation, any purported vagueness claim "can be ameliorated by a state court's authoritative interpretations." *Roy v. City of Monroe*, 950 F.3d 245, 252 (5th Cir. 2020) (internal quotation marks omitted). That exercise of comity, in which "the federal courts, exercising a wise discretion, restrain their authority because of scrupulous regard for the rightful independence of the state governments and the smooth working of the federal judiciary," is known as *Pullman* abstention. *Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941) (internal quotation marks omitted). "The paradigm of the 'special circumstances' that make abstention appropriate is a case where the challenged state statute is susceptible of a construction by the state judiciary that would avoid or modify the necessity of reaching a federal constitutional question." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 306 (1979). This is so because federal courts are loath to deprive "state courts of the opportunity to construe a law to avoid constitutional infirmities." *NetChoice,* slip op. at *10 (cleaned up). *Pullman* abstention serves values of federalism, comity, and judicial administration because, "no matter how seasoned the judgment" of a federal court may be on an

issue of state law, "it cannot escape being a forecast rather than a determination," as "the last word" on state law always rests with the state's courts. *Pullman*, 312 U.S. at 499–500.

"Where resolution of the federal constitutional question is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law, abstention may be proper in order to avoid unnecessary friction in federal-state relations." *Harman v. Forssenius*, 380 U.S. 528, 534 (1965). As Plaintiffs reiterate throughout their pleadings, their various federal constitutional theories are dependent upon, and may be materially altered by, determinations regarding uncertain issues of Texas law. *See e.g.*, Dkt. #1 at ¶ 14 ("If these statutes are construed as expansively as asserted by Texas state actors[, they] violate the constitutional rights of Plaintiffs. . . ."); Dkt. #6 at 35 ("But the statute nowhere defines the phrase 'furnishing the means.' Nor is it defined in the Texas Penal Code. And it has no uniform definition under Texas law."); *id.*, pp. 39–40 (discussing implied repeal under Texas law and whether "Pre-*Roe* statutes" have been impliedly repealed); *id.* pp. 40–41 (alleging that pre-*Roe* statutes and "Trigger Ban" irreconcilably conflict); *id.* p. 43 (discussing the proper construction of Tex. Civ. Prac. & Rem. Code § 30.022 and alleging that it conflicts with 42 U.S.C. § 1988). In short, Plaintiffs allege that "Texas has an intricate, contradictory, and complicated set of laws" at issue in this case. Dkt. #1 at ¶ 10. To further the values of federalism, comity, and judicial administration, this Court should decline Plaintiffs' invitation to make the provisional pronouncements on these unsettled issues of Texas law that are necessary to adjudicate Plaintiffs' novel constitutional theories.

While it has been said that federal courts "have been particularly reluctant to abstain in cases involving facial challenges based on the First Amendment," *City of Houston v. Hill*, 482 U.S. 451, 467 (1987), in such cases, "the pivotal question" remains "whether the statute is 'fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question.'" *Id.* at 468 (quoting *Harman*, 380 U.S. at 534–35). In *Babbitt*, the Court concluded that the district court should have abstained from adjudicating the plaintiffs' First Amendment overbreadth challenge to a criminal penalty provision because "the statute [was]

reasonably susceptible of constructions that might undercut or modify [the] vagueness attack."
442 U.S. at 307.

Abstention would be particularly appropriate here, where Plaintiffs seek a pre-enforcement facial challenge to a state's legislative acts. *See e.g.*, *NetChoice*, slip op. at *8–9. Pre-enforcement facial challenges are uniquely troubling because they "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.* at *10 (further noting that "[t]he respect owed to a sovereign State" requires restraint when a plaintiff asks "unelected federal judges to countermand the State's democratically accountable policymakers."). In abstaining from adjudication before the Texas courts can determine these unsettled questions of state law, this Court would be following the principled course of eschewing premature federal intervention as the states experiment with different approaches to this sensitive political issue. *See Bellotti v. Baird*, 428 U.S. 132, 134 (1976) (Blackmun, J., maj. op.) (district court should have abstained from adjudicating constitutionality of Massachusetts statute enacted in response to *Roe v. Wade* and requiring parental consent for abortions performed on minors); *id.* at 136 (noting that plaintiffs filed their action one day before the Massachusetts statute's effective date); *cf. Younger v. Harris*, 401 U.S. 37, 52 (1971) (even when pre-enforcement facial challenges present a case or controversy, "the task of analyzing a proposed statute, pinpointing its deficiencies, and requiring correction of these deficiencies before the statute is put into effect, is rarely if ever an appropriate task for the judiciary.").

## IV. PLAINTIFFS HAVE NOT MET THEIR BURDEN TO OBTAIN A PRELIMINARY INJUNCTION

Plaintiffs' claims of irreparable harm fail for at least two reasons. First, Plaintiffs' substantial and unjustifiable delay in bringing their Motion demonstrate that preliminary relief is unwarranted. Second, Plaintiffs' only evidence to prove their injuries are their self-serving, conclusory, unsupported declarations that do not sustain their heavy burden. Accordingly, Plaintiffs cannot establish that they face a substantial threat of irreparable injury.

**A. Plaintiffs' delay in bringing their motion dooms their allegations of irreparable harm**

The equities weigh against a preliminary injunction. As this Court recognized when it denied Plaintiffs' requests for a TRO, "Plaintiffs have been aware of the threat of enforcement since *Dobbs* but requested an ex parte TRO the day before the Trigger Ban took effect." Dkt. #13 at 3. Plaintiffs substantially and unjustifiably delayed filing their motion for two months since the date *Dobbs* was issued on June 24, thereby demonstrating that there is no emergency at all. *See Dobbs*, 142 S. Ct. 2228. Rather than immediately file their motion, Plaintiffs waited to file until the eve of the effective date of the HLPA and twice requested an *ex parte* temporary restraining order, which the Court denied. Dkt. #6; Dkt. #8; Dkt. #9; Dkt. #13.

It is long established that "[d]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction. Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *GoNannies, Inc v. GoAuPair, Inc.*, 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006); *see also High Tech Med. Instmt'n, Inc. v. New Image Indus.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995) ("[D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction."). Unjustified delay on its own is sufficient to "preclude the granting of preliminary relief, because the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Tough Traveler, Ltd. v. Outbounds Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (citations and internal quotation marks omitted); *see also Kensington Partners v. Cordillera Ranch, Ltd.*, No. 98-121, 1998 WL 1782540, at *11 (W.D. Tex. June 16, 1998) ("Delay in bringing suit may preclude a finding of irreparable injury, which would then preclude the granting of preliminary injunctive relief.").

Courts have found that comparable periods of delay have undone the urgency that is required to justify granting preliminary injunctive relief. *See, e.g.*, *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975) (affirming denial to movant who "waited three months before petitioning the district court for temporary relief"); *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322,

333 (S.D.N.Y. 2011) ("The Second Circuit has found delays of 'as little as ten weeks' sufficient to defeat the presumption of irreparable harm.") (quoting *Weight Watchers Int'l v. Lugino's, Inc.*, 423 F.3d 137, 145 (2d Cir. 2005)). A movant's "delay in seeking injunctive relief . . . weighs heavily against a finding of irreparable injury." *Rimkus Consulting Grp., Inc. v. Cammarata*, 255 F.R.D. 417, 438 (S.D. Tex. 2008).

Here, Plaintiffs cannot justify their delay. They concede they "paused all activities assisting access to abortion care, including for care provided out of state" before the Supreme Court even issued its opinion in *Dobbs*. Dkt. #1 at ¶ 11. The declarations they submit in support of their motion repeatedly emphasize that they were tracking the "expected date" of the issuance of the *Dobbs* opinion and "ceased [their] assistive activities" before the opinion was even published. Dkt. #4-3 at ¶¶ 8–9; Dkt. #4-4 at ¶ 7 (same); Dkt. #4-6 at ¶ 8 (same); Dkt. #4-7 at ¶ 8 (same); Dkt. 4-8 at ¶ 6 (same); *see also see also* Dkt. #4-5 at ¶ 7; Dkt. #4-9 at ¶ 8; Dkt. #4-10 at ¶ 8. Likewise, Moayedi testified that she "stopped provid[ing] any abortion services in Texas and also stopped traveling and providing abortion care to Texans in any other states" *before Dobbs* was even issued." Dkt. #4-11 at ¶ 6.

Plaintiffs' delay bringing their motion for preliminary injunction precludes a finding of irreparable injury. Plaintiffs offer no justification for waiting two months before initiating this litigation. Plaintiffs' inexcusable delay alone is sufficient to justify denying their motion.

### B. Plaintiffs' claim of injury rests on speculation and conjecture

Plaintiffs have not provided sufficient evidence to demonstrate they are entitled to the relief they seek. Their argument for irreparable harm rest on speculation and conjecture about how the Attorney General may enforce the provisions of the HLPA. Plaintiffs' claims that they will be immediately and irreparably injured are unfounded.

The requisite showing of immediate irreparable injury requires more than demonstrating a merely serious or substantial harm. *ECRI v. McGraw-Hill*, 809 F.2d 223, 226 (3d Cir. 1987). An injunction is not issued "simply to prevent the possibility of some remote future injury." *Texas v.*

*United States*, 86 F. Supp. 3d 591, 672 (S.D. Tex. 2015) (internal quotation marks omitted). "'[E]specially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative.'" *Machete Prods., L.L.C. v. Page*, 809 F.3d 281, 288 (5th Cir. 2015) (quoting *Eccles v. Peoples Bank*, 333 U.S. 426, 431 (1948)).

As discussed throughout this brief, Plaintiffs' threat of future injury depends entirely on whether the Attorney General will eventually enforce Texas's abortion laws to prohibit all conduct in support of out-of-state abortions, and Plaintiffs point to no evidence supporting this hypothetical harm. Instead, Plaintiffs rely entirely on statements made by Texas Legislators that have no connection to the Attorney General. *See, e.g.*, Dkt. #1 at ¶¶ 5–6.

While Plaintiffs' note that the Attorney General is authorized to assist local prosecutors in the prosecution of a criminal case at the request of the district or county attorney, several prerequisites would need to occur before that authority alone could threaten harm to Plaintiffs: (1) Plaintiffs would have to undertake proscribed activity, (2) the local prosecutor would have to decide to prosecute, (3) the local prosecutor would need to request assistance from the Attorney General, and finally (4) the Attorney General must agree to assist. "Such speculation built upon further speculation does not amount to a reasonably certain threat of imminent harm and does not warrant injunctive relief." *City of Austin v. Kinder Morgan Tex. Pipeline, LLC*, 447 F. Supp. 3d 558, 571 (W.D. Tex. 2020) (internal quotation marks omitted).

Plaintiffs' allegations and declarations show only that their alleged injuries are merely possible, which is not enough for this Court to issue preliminary relief.  Accordingly, the Court should deny Plaintiffs' Motion.

## C. Preliminary injunctive relief disserves the public interest and would encroach upon Texas's sovereignty

The remaining two factors—the public interest and potential harm to Defendants—both weigh against granting Plaintiffs' Motion. Though the first two factors are often the most salient, a preliminary injunction should not issue if the applicant fails to carry its burden on "any one of the four prerequisites." *Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d

464, 472 (5th Cir. 1985). "The public interest standard is a hurdle which must be overcome before employing the drastic remedy of interim injunctive relief, not a clarion call for action before reaching final judgment." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 633 (5th Cir. 1985). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 24 (2008).

Exercising caution is especially important where the defendant is itself a state actor because of the federalism concerns that are attendant to a federal court intervening to grant preliminary injunctive relief against, in this case, a democratically elected public official. *Machete Prods.*, 809 F.3d at 288 ("'[E]specially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative.'") (quoting *Eccles*, 333 U.S. at 431)). The equities and public interest weigh strongly against enjoining the Attorney General's enforcement of the State's laws, particularly when the statutes at issue are entitled to a "strong presumption of validity." *Dobbs*, 142 S. Ct. at 2284.

## Conclusion

For the foregoing reasons, the Court should deny the Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, and grant Defendants' Motion to Dismiss.

Dated September 19, 2022.                    Respectfully submitted,

**KEN PAXTON**                               **CHRISTOPHER D. HILTON**
Attorney General of Texas                    Chief, General Litigation Division

**BRENT WEBSTER**                            */s/Amy S. Hilton*
First Assistant Attorney General             **AMY SNOW HILTON**
                                             Assistant Attorney General
**GRANT DORFMAN**                            Texas Bar No. 24097834
Deputy First Assistant Attorney General      Amy.Hilton@oag.texas.gov

**SHAWN E. COWLES**                          **LEIF OLSON**
Deputy Attorney General for Civil Litigation Special Counsel
                                             Texas Bar No. 24032801
                                             Leif.Olson@oag.texas.gov

                                             **WILLIAM D. WASSDORF**
                                             Assistant Attorney General
                                             Texas Bar No. 24103022
                                             Will.Wassdorf@oag.texas.gov

                                             Office of the Attorney General of Texas
                                             General Litigation Division
                                             P.O. Box 12548, Capitol Station
                                             Austin, Texas 78711-2548

                                             **Counsel for Attorney General**
                                             **Ken Paxton**

### CERTIFICATE OF SERVICE

I hereby certify that on September 19, 2022, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/Amy S. Hilton*