## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| **Fund Texas Choice,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | |
| **KEN PAXTON, in his official capacity of Attorney General,** *et al.* | **Case No. 1:22-cv-859-RP** |
| **Defendants.** | |

**[PROPOSED]** *AMICUS CURIAE* **BRIEF OF PHYSICIANS FOR REPRODUCTIVE HEALTH IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## Table of Contents

**Page**

Introduction And Interest of *Amicus Curiae*..............................................................1

Argument ...................................................................................................................1

    I.     The Texas Anti-Abortion Laws Violate the Commerce Clause in Restricting Patients' Access to Safe and Effective Medical Care.............................................1

          a.     The Safety and Efficacy of Abortion Care, Including Medication Abortion Care.............................................................................1

          b.     Laws Preventing Pregnant People from Access to Abortion Care Outside of Texas Violate the Commerce Clause**.**......................................3

               i.     The Texas Anti-Abortion Laws Violate the Dormant Commerce Clause. ...........................................................3

               ii.     The Texas Anti-Abortion Laws Impermissibly Extend Extraterritoriality.............................................................5

    II.     The Texas Anti-Abortion Laws Subject Abortion Care Providers and Pregnant People to Potential Liability, Reputational Harm, and Uncertainty When Seeking or Providing Medical Care. .............................................7

Conclusion ...............................................................................................................10

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                          **Page(s)**

*Allstate Ins. Co. v. Abbott,*
   495 F.3d 151 (5th Cir. 2007) ...............................................................................4, 5

*Bouie v. City of Columbia,*
   378 U.S. 347 (1964)...........................................................................................7

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.,*
   476 U.S. 573 (1986)...........................................................................................5

*City of Philadelphia v. New Jersey,*
   437 U.S. 617 (1978)...........................................................................................4

*Dobbs v. Jackson Women's Health Org.,*
   142 S. Ct. 2228 (2022).....................................................................................2, 7

*Edgar v. MITE Corp.,*
   457 U.S. 624 (1982)...........................................................................................5

*Ferguson v. City of Charleston,*
   532 U.S. 67 (2001).............................................................................................9

*Healy v. Beer Inst.,*
   491 U.S. 324 (1989).....................................................................................4, 5, 6

*Michelson v. United States,*
   335 U.S. 469 (1948)...........................................................................................7

*Roe v. Wade,*
   410 U.S. 113 (1973)...........................................................................................1

*Saenz v. Roe,*
   526 U.S. 489 (1999)...........................................................................................7

*Utah v. Strieff,*
   579 U.S. 232 (2016)...........................................................................................8

*Whalen v. Roe,*
   429 U.S. 589 (1977)...........................................................................................9

**Constitution**

U.S. CONST. art. I, § 8, cl. 3 ...............................................................................3

U.S. CONST. art. I, § 10, cl. 1 .............................................................................7

**Statutes**

Tex. Health & Safety Code Ann. § 170A.001, *et seq*. ("Trigger Ban") ..........................................1

Tex. Penal Code Ann. § 7.02(a)(2) ...........................................................................................7

Tex. Rev. Civ. Stat. Ann. art. 4512.1 ("Pre-*Roe* Statutes") ...................................................1, 7

Tex. Rev. Civ. Stat. Ann. art. 4512.2 ...............................................................................1

Tex. Rev. Civ. Stat. Ann. art. 4512.3 ...............................................................................1

Tex. Rev. Civ. Stat. Ann. art. 4512.4 ...............................................................................1

Tex. Rev. Civ. Stat. Ann. art. 4512.6 ...........................................................................1, 7

**Senate Bill**

S.B. 8 (Tex. 2021) ("Heartbeat Act") ...........................................................................................1

**Other Authorities**

Abigail R.A. Aiken *et al.*,
    *Demand for Self-Managed Medication Abortion Through an Online*
    *Telehealth Service in the United States*,
    110(1) Am. J. Pub. Health 90, 92 (2020) ...............................................................................2

Diana Greene Foster *et al.*,
    *The Turnaway Study*,
    ANSIRH,
    https://www.ansirh.org/research/ongoing/turnaway-study
    (last visited Sept. 23, 2022) .......................................................................................8

Dovile Vilda *et al.*,
    *State Abortion Policies and Maternal Health in the United States 2015-2018*,
    AM. J. PUB. HEALTH (May 12, 2021),
    https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2021.306396 ...................................8

Elizabeth O. Schmidt *et al.*,
    *Mifepristone: A Safe Method of Medical Abortion and Self-Managed Medical*
    *Abortion in the Post-Roe Era*,
    29 Am. J. Therapeutics e534, e535 (2022) ............................................................................3

AM. COLL. OF OBSTETRICIANS & GYNECOLOGISTS,
    *Increasing Access to Abortion,*

Committee Opinion Number 815,
ACOG (Dec. 2020),
https://www.acog.org/clinical/clinical-guidance/committee-
opinion/articles/2020/12/increasing-access-to-abortion .......................................................2, 9

Kaiser Family Found.,
*The Availability and Use of Medication Abortion,*
KFF (Apr. 6, 2022),
https://www.kff.org/womens-health-policy/fact-sheet/the-availability-and-use-
of-medication-abortion/ ...........................................................................................................3

Megan K. Donovan,
*Improving Access to Abortion via Telehealth*,
GUTTMACHER INST. (May 16, 2019),
https://www.guttmacher.org/gpr/2019/05/improving-access-abortion-telehealth ...................2

National Academies of Sciences, Engineering, and Medicine,
*The safety and quality of abortion care in the United States* (2018),
https://nap.nationalacademies.org/read/24950/chapter/1..........................................................2

Pam Belluck,
*They Had Miscarriages, and New Abortion Laws Obstructed Treatment*,
N.Y. TIMES (July 17, 2022),
https://www.nytimes.com/2022/07/17/health/abortion-miscarriage-treatment.html................9

Rachel Jones *et al.*,
*New Evidence: Texas Residents Have Obtained Abortions in at Least 12
States That Do Not Border Texas,*
GUTTMACHER INST. (Nov. 9, 2021),
https://www.guttmacher.org/article/2021/11/new-evidence-texas-residents-
have-obtained-abortions-least-12-states-do-not-border .........................................................10

Sean Price,
*Texas Ranked Worst State for Access to Prenatal, Maternal Care*,
TEX. MED. ASS'N (June 10, 2022),
https://www.texmed.org/TexasMedicineDetail.aspx?id=59688...............................................8

Sophia Chae, *et al.*,
*Reasons why women have induced abortions: a synthesis of findings from 14 countries*,
NLM (July 8, 2017)
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5957082/ ....................................................9

Whitney Arey *et al.*,
*A Preview of the Dangerous Future of Abortion Bans — Texas Senate Bill 8*,
387 New England Journal of Medicine 388–390 (2022).........................................................10

World Health Org.,
    Model List of Essential Medicines, *Mifepristone – Misoprostol*,
    https://list.essentialmeds.org/recommendations/304 (last visited Sept. 23, 2022) ...................3

## <u>INTRODUCTION AND INTEREST OF *AMICUS CURIAE*</u>

Physicians for Reproductive Health, ("PRH"), is a doctor-led 501(c)(3) nonprofit organization with a mission to ensure meaningful access to safe, effective, and comprehensive reproductive health care, including abortion care. Since its founding in 1992, PRH has organized and amplified the voices of medical providers to advance sexual and reproductive health, rights, and justice. PRH's network is comprised of over 450 PRH-trained physicians working in forty-seven states and the District of Columbia. PRH has insight into the challenges providers and patients face when confronted by laws designed or applied to prevent pregnant people[1] from accessing necessary medical care and harming their ability to live freely, with dignity, safety, and security.

## <u>ARGUMENT</u>

I.   **The Texas Anti-Abortion Laws Violate the Commerce Clause in Restricting <u>Patients' Access to Safe and Effective Medical Care.</u>**

The Texas Anti-Abortion Laws[2] unconstitutionally obstruct pregnant people from seeking abortion care in violation of the Commerce Clause and impermissibly extend extraterritorially.

   a.   **The Safety and Efficacy of Abortion Care, Including Medication Abortion Care**.

The American College of Obstetricians and Gynecologists ("ACOG"), along with other medical societies, identifies abortion as an essential health care service that requires timely

---

[1] Movants recognize that both people who identify as women and people who do not identify as women are capable of becoming pregnant. In order to include each of these groups, this Brief hereinafter refers to them in the aggregate as "pregnant people".

[2] Movants refer to: Texas anti-abortion laws that pre-dated the Supreme Court's ruling in *Roe v. Wade*, 410 U.S. 113 (1973), (Tex. Rev. Civ. Stats. Ann. art. 4512.1, 4512.2, 4512.3, 4512.4, 4512.6) [(the "Pre-*Roe* Statutes")]; the so-called Texas "Trigger Ban" (Tex. Health & Safety Code Ann. § 170A.001, *et seq.*) [the "Trigger Ban"]; and the Texas "Heartbeat Act" S.B. 8 (Tex. 2021) [the "Heartbeat Act"]. The Pre-*Roe* Statutes, the Heartbeat Act, and the Texas Trigger Ban, are collectively hereinafter referred to as the "Texas Anti-Abortion Laws".

access to care. ACOG also explicitly recommends the repeal of legislation that imposes barriers to access and interferes with the patient-provider relationship, including abortion bans.[3] Abortion care, including both procedural and medication abortion care is extremely safe. The National Academies of Sciences, Engineering, and Medicine ("NASEM") published a comprehensive study affirming the safety record of abortion and pointed out that the biggest threat to patient safety is the litany of medically unnecessary regulations that raise costs and delay procedures, ultimately putting patients' health at risk.[4] Texas's Anti-Abortion Laws serve no medical or scientific purpose. They cause harm and make people less safe.

Prior to the Supreme Court's ruling in *Dobbs v. Jackson Women's Health Org.,* 142 S. Ct. 2228, 2309 (2022), pregnant people in Texas were able to seek access to abortion care through a number of routes.[5] In addition to in-clinic abortion care, patients may have been able to obtain medication abortion care through telehealth.[6] Telehealth allows providers to virtually prescribe medication abortion pills, and has become more prevalent, likely in part because laws restricting access to in-clinic abortion care have proliferated.[7]

---

[3] AM. COLL. OF OBSTETRICIANS AND GYNECOLOGISTS, *Increasing Access to Abortion*, Committee Opinion Number 815 (Dec. 2020), https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2020/12/increasing-access-to-abortion.
[4] National Academies of Sciences, Engineering, and Medicine, *The safety and quality of abortion care in the United States* (2018), https://nap.nationalacademies.org/read/24950/chapter/1.
[5] Even under *Roe*, accessing abortion care was difficult due to the litany of medically unnecessary restrictions imposed by anti-abortion states, including: mandatory waiting periods, biased counseling, unnecessary ultrasounds, and unjustified facility and staffing requirements.
[6] However, many states have attempted to ban access to FDA approved medications by banning provisions of medication abortion care via telehealth. *See* Megan K. Donovan, *Improving Access to Abortion via Telehealth*, GUTTMACHER INST. (May 16, 2019), https://www.guttmacher.org/gpr/2019/05/improving-access-abortion-telehealth.
[7] *See* Abigail R.A. Aiken *et al.*, *Demand for Self-Managed Medication Abortion Through an Online Telehealth Service in the United States*, 110(1) Am. J. Pub. Health 90, 92 (2020) (76% of U.S.-based requests came from states that heavily restrict abortion).

The most common prescribed regimen for medication abortion care involves a two-step process using the FDA approved medications, mifepristone and misoprostol. The first step involves taking mifepristone which works by blocking progesterone, a hormone that supports the development of a pregnancy. Misoprostol pills are then taken 24 to 48 hours later and cause the uterus to contract and expel the pregnancy. The safety and effectiveness of these medications have been well documented and are supported by decades of medical evidence. The FDA, following this large body of scientific and medical evidence, recently lifted its restrictions mandating in-person dispensation to allow patients to receive medication abortion pills by mail.[8] Mifepristone can also be taken in a provider's office if a patient has sought in-clinic care. When prescribed by providers either at an in-office visit or through telehealth, misoprostol is then self-administered by patients in the comfort of their own home. This regimen is so safe that its use has been approved by the FDA, and it is recommended as an option for pregnancy termination by the World Health Organization within the first 12 weeks of pregnancy.[9] Its use is also supported by ACOG, along with other medical societies for abortion care and to treat early pregnancy loss.[10]

> **b.** **Laws Preventing Pregnant People from Access to Abortion Care Outside of Texas Violate the Commerce Clause.**
>
> > *i.* *The Texas Anti-Abortion Laws Violate the Dormant Commerce Clause.*

Article I of the United States Constitution reserves for Congress the authority to regulate interstate commerce. U.S. CONST. art. I, § 8, cl. 3. In addition, the U.S. Supreme Court has long

---

[8] *See* Kaiser Family Found., *The Availability and Use of Medication Abortion*, KFF (Apr. 6, 2022), https://www.kff.org/womens-health-policy/fact-sheet/the-availability-and-use-of-medication-abortion/.

[9] Since 2005, the World Health Organization has included the mifepristone/misoprostol regimen in its Essential Medicines list. World Health Org., Model List of Essential Medicines, *Mifepristone – Misoprostol*, https://list.essentialmeds.org/recommendations/304 (last visited Sept. 23, 2022).

[10] *See* Elizabeth O. Schmidt *et al.*, Mifepristone: A Safe Method of Medical Abortion and Self-Managed Medical Abortion in the Post-Roe Era, 29 Am. J. Therapeutics e534-35 (2022).

recognized that the Commerce Clause "also encompasses a 'dormant' limitation on the authority of the States to enact legislation affecting interstate commerce." *Healy v. Beer Inst.*, 491 U.S. 324, 326 n.1 (1989). The Dormant Commerce Clause applies to all "[a]ll objects of interstate trade," including pharmaceutical products. *See City of Philadelphia v. New Jersey*, 437 U.S. 617, 622 (1978). The Fifth Circuit has explained that if a "statute impermissibly discriminates" against interstate commerce, it is "valid only if the state 'can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest.'" *Teladoc, Inc. v. Tex. Med. Bd.*, 1-15-CV-343-RP, at *19 (W.D. Tex. Dec. 14, 2015) (internal citations omitted).

Courts look to four factors in determining whether a statute impermissibly discriminates against interstate commerce: (1) whether a clear pattern of discrimination emerges from the effect of the state action; (2) the historical background of the decision; (3) the sequence of events preceding the challenged decision; and (4) the legislative history of the state action. *See Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 160 (5th Cir. 2007). A regulation is subject to rigorous scrutiny even if it does "not in explicit terms seek to regulate interstate commerce, [but] does so nonetheless by its practical effect and design." *See Teladoc,* 1-15-CV-343-RP at *19.

The Texas Anti-Abortion Laws impermissibly discriminate against interstate commerce by (1) preventing access to abortion care services within the state and to patients outside the state originating from within the state; and (2) creating liability against abortion providers when one part of the two-step medication abortion regimen is completed within Texas. Applying the *Allstate* factors, Texas has clearly engaged in a historical pattern of discrimination against abortion providers.[11] The Texas Anti-Abortion Laws perpetuate Texas's pattern of intentionally targeting

---

[11] In 2019, Texas passed House Bill 16, which criminalized not providing medical care to a fetus if born after an abortion, and Senate Bill 22, preventing government entities from entering into partnerships or providing assistance to clinics affiliated with abortion providers, even if they do

abortion providers and patients. Moreover, the effect and design of these laws prevent abortion providers from entering or remaining in the state to provide abortion care, and also prohibit patients from leaving the state to seek abortion care and returning to complete it.

Even assuming, *arguendo,* that the Texas Anti-Abortion Laws do not impermissibly discriminate against interstate commerce (which they do), they would still violate the Dormant Commerce Clause as they impose a "clearly excessive" burden on interstate commerce compared to the putative local benefits they provide. The Texas Anti-Abortion Laws do not provide local benefits to abortion providers or pregnant people seeking medication abortions, as they prevent providers from administering safe and effective abortion care outside of Texas. Moreover, the Texas Anti-Abortion Laws prevent providers from administering the FDA-approved medication abortion regimen depriving pregnant people in Texas of necessary medical care.

  ii. *The Texas Anti-Abortion Laws Impermissibly Extend Extraterritoriality.*

Under the extraterritoriality doctrine, "the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *See Healy,* 491 U.S. at 336. The "critical consideration in determining whether the extraterritorial reach of a statute violates the Commerce Clause is the overall effect of the statute on both local and interstate commerce." *Id.* at 337 n.14.

The extraterritoriality doctrine is based on three principles. First the "Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State," *Edgar v. MITE Corp*., 457 U.S. 624, 642-643 (1982) (plurality opinion); *see also Brown-Forman Distillers Corp. v. N.Y.*

---

not provide abortion themselves. *See Allstate*, 495 F.3d at 160 (holding that a court may consider "the historical background of the decision, which may take into account any history of discrimination by the decision-making body").

*State Liquor Auth.*, 476 U.S. 573, 581-583 (1986). "Second, a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature." *See Healy*, 491 U.S. at 336. "Third, the practical effect of the statute must be evaluated [by considering both the statute's consequences and how it] may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." *Id.* at 336–37.

Here, the Texas Anti-Abortion Laws could be applied to restrict the ability of pregnant people to seek abortion care outside of Texas. In addition, these statutes purport to create criminal and civil liability wholly outside of Texas by subjecting abortion care providers to criminal liability for prescribing abortion medications to patients in a state where legally prescribed but that is then self-administered by the patient within Texas as part of well-established standards of care. As such, Texas purports to not only affect the market in states near and far but also to criminalize activity that is entirely legal as provided and only transmuted into illegality by the free movement of the provider's patient—over whose agency the provider has no ability or duty to control, nor should they. While Texas may have the authority under its police power to regulate the conduct of patients and providers within the state, it may not extend that power to commercial activity wholly outside the state's borders, and this includes care provided via telehealth from the State of Texas to patients in other states where abortion remains legal. *See id.* at 332-36. Moreover, it is axiomatic that other states are not subject to Texas's determination that pregnant people who traveled to a destination state may not avail themselves of legal medical care within the destination state. As such, providers and patients should not face criminal or civil liability for seeking legal care outside of Texas upon reentry to, or prior to exit from, Texas.

II.     **The Texas Anti-Abortion Laws Subject Abortion Care Providers and Pregnant People to Potential Liability, Reputational Harm, and Uncertainty When Seeking or Providing Medical Care.**

The Texas Anti-Abortion Laws purportedly provide state and non-state actors in Texas with the means to prevent anyone from seeking, providing, or assisting with pregnant people's access to abortion care, with very limited exceptions,[12] compounding the obstacles to seeking abortion care by infringing upon the universally recognized right of U.S. citizens to travel freely between states. *See Saenz v. Roe*, 526 U.S. 489, 498 (1999); *see also Dobbs*, 142 S. Ct. at 2309 (". . . some of the other abortion-related legal questions raised by today's decision are not especially difficult as a constitutional matter. For example, may a State bar a resident of that State from traveling to another State to obtain an abortion? In my view, the answer is no based on the constitutional right to interstate travel.") (Kavanaugh, J., concurring).

By their terms, the Pre-*Roe* Statutes unconstitutionally create criminal liability for any person or provider leaving the state to perform or obtain an abortion. *See* Tex. Rev. Stats. Ann. art. 4512.1. As written, the Pre-*Roe* Statutes also suggest that providers of abortion care to Texans seeking it in states where it is legal could be criminally liable. Tex. Penal Code Ann. § 7.02(a)(2). However, providers may not be subject to criminal penalties for conduct that was entirely legal at the time it was engaged in. U.S. CONST. art. I, § 10, cl. 1; *see Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964). While prior to prosecution or civil action against providers or patients, they have not yet suffered the harm or stigma inherent in being subjected to such actions, prosecution itself causes harm. Laws wielded against providers for their provision of safe and effective medical care within or without the state effectively punishes them regardless of whether the laws are later found unconstitutional. *See, e.g.*, *Michelson v. United States*, 335 U.S. 469, 482 (1948) ("Arrest without

---

[12] Including an exception for the life of the pregnant person. S*ee* Tex. Rev. Civ. Stat. Ann. art. 4512.6.

more may nevertheless impair or cloud one's reputation."); *Utah v. Strieff*, 579 U.S. 232, 253 (2016) (noting that even the innocent "experience the 'civil death' of discrimination by employers, landlords, and whoever else conducts a background check") (Sotomayor, J., dissenting).

Even absent prosecution, the specter of criminal or civil liability under the Texas Anti-Abortion Laws causes a "catch-22" for both providers and their patients. For patients, being forced to travel for time-sensitive, essential abortion care can mean the difference between being able to obtain the care they need and being forced to remain pregnant. When people are forced to travel they must often take time away from work, arrange for childcare, and arrange for transportation and other accommodations. This raises costs and pushes care further out of reach. Being unable to access abortion care can be devastating to their health and well-being. Research shows people who were denied abortion care are more likely to experience high blood pressure and other serious medical conditions during the end of pregnancy; more likely to remain in relationships where interpersonal violence is present; and more likely to experience poverty.[13] Research also shows that states with higher numbers of abortion restrictions are the same states with poorer maternal health outcomes.[14] A recent study ranked Texas 50th among all states in access to high-quality prenatal and maternal care, a dire situation made worse by the state's extreme abortion restrictions.[15] While most people will have healthy pregnancies, some will experience illness or conditions where pregnancy can cause serious problems. For example, pregnant people can experience a variety of complications during pregnancy, including placental abruption, bleeding

---

[13] Diana Greene Foster *et. al*, *The Turnaway Study*, Advancing New Standards in Reproductive Health, https://www.ansirh.org/research/ongoing/turnaway-study (last visited Sept. 23, 2022).
[14] Dovile Vilda *et. al*, *State Abortion Policies and Maternal Health in the United States 2015-2018*, AM. J. PUB. HEALTH (May 12, 2021), https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2021.306396.
[15] Sean Price, *Texas Ranked Worst State for Access to Prenatal, Maternal Care*, TEX. MED. ASSOC. (June 10, 2022), https://www.texmed.org/TexasMedicineDetail.aspx?id=59688.

from placenta previa, preeclampsia or eclampsia, chorioamnionitis, and cardiac or renal conditions—conditions that may not initially qualify under a limited abortion ban exception but can be so life-threatening that abortion becomes the only treatment to save a patient's life.[16]  When abortion is difficult or impossible to access, health conditions can worsen and even result in death.

The Texas Anti-Abortion Laws' impact falls most heavily on those who already face the most barriers to health care. Black, Indigenous, people of color, people who are immigrants (particularly in Texas where internal immigration checkpoints prevent many from traveling to receive care), young people, LGBTQ+ people, people with disabilities, people with low incomes, as well as those living in geographically isolated areas bear the brunt of abortion restrictions. Texas's Anti-Abortion Laws take all of this a step further by subjecting pregnant people to criminalization and the vast harm and stigma associated with arrest, prosecution, and criminal or civil penalties. The Supreme Court has previously acknowledged that the possibility of being reported to law enforcement in connection with prenatal care "may have adverse consequences because it may deter patients from receiving needed medical care." *See, e.g.*, *Ferguson v. City of Charleston*, 532 U.S. 67, 78 n. 14 (2001), citing *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977). Accordingly, the mere threat of criminal or civil liability may prevent patients, including those in life-threatening situations, from accessing safe, effective, and necessary care or burden them in

---

[16] *See* Am. Coll. of Obstetricians and Gynecologists, *supra* note 3; *see also* Sophia Chae, *et al.*, *Reasons why women have induced abortions: a synthesis of findings from 14 countries*, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5957082/ (discussing the reasons individuals seek abortions, including life-threatening complications from pregnancy); Pam Belluck, *They Had Miscarriages, and New Abortion Laws Obstructed Treatment*, N.Y. TIMES (July 17, 2022), https://www.nytimes.com/2022/07/17/health/abortion-miscarriage-treatment.html.

seeking it. Indeed, Texas's attempts to restrict access to abortion-related care have increased the number of pregnant people seeking such care in other states that allow for legal abortion care.[17]

Providers are also facing difficult choices under Texas's extreme abortion bans, for example, choosing between rendering assistance and care and maintenance of their livelihoods. The New England Journal of Medicine recently documented the broad consequences of banning abortion and imposing criminal liability on health care providers.[18] These consequences include: providers not believing they have the right to provide abortion or even counsel or refer people in need of care; providers refusing to treat ectopic pregnancy; and forcing providers to wait to intervene until their patient's condition worsens because of uncertainty around what is "sick enough" to qualify under an exception to the state's abortion ban. These consequences on patient care are only the tip of the iceberg. Providers also face devastating consequences. Indeed, PRH notes that one of the Plaintiffs, Dr. Ghazaleh Moayedi, has also been affected financially, including by having to cease providing abortion-related care in Texas because of fear of criminal prosecution to her own financial detriment. Dkt. No. 25 at ¶3. Pregnant people and the providers that care for them should not be subject to the liability or harms imposed by the Texas Anti-Abortion Laws.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion for Preliminary Injunction.

---

[17] *See e.g.*, Rachel Jones *et al.*, New Evidence: Texas Residents Have Obtained Abortions in at Least 12 States That Do Not Border Texas, Guttmacher Inst. (Nov. 9, 2021), https://www.guttmacher.org/article/2021/11/new-evidence-texas-residents-have-obtained-abortions-least-12-states-do-not-border.
[18] Whitney Arey *et al.*, *A preview of the dangerous future of abortion bans — Texas senate Bill 8*, 387 New England Journal of Medicine 388–390 (2022).

Dated: September 26, 2022                          Respectfully submitted,

                                                   **SCHULTE ROTH & ZABEL LLP**

                                                   By:      */s/ Gayle R. Klein*
                                                   Gayle R. Klein (TX Bar No. 00797348)
                                                   Douglas Koff (*pro hac vice* application
                                                   forthcoming)
                                                   J. Eric Prather (*pro hac vice* application
                                                   forthcoming)
                                                   Paulina Piasecki (*pro hac vice* application
                                                   forthcoming)
                                                   Rebecca Raskind (*pro hac vice* application
                                                   forthcoming)
                                                   Sabrina Singh (*pro hac vice* application
                                                   forthcoming)
                                                   919 Third Avenue
                                                   New York, NY 10022
                                                   Tel: 212-756-2000
                                                   Fax: 212-593-5955
                                                   Gayle.Klein@srz.com
                                                   Douglas.Koff@srz.com
                                                   Eric.Prather@srz.com
                                                   Paulina.Piasecki@srz.com
                                                   Rebecca.Raskind@srz.com
                                                   Sabrina.Singh@srz.com

                                                   **PHYSICIANS FOR REPRODUCTIVE
                                                   HEALTH**

                                                   MiQuel Davies (*pro hac vice* application
                                                   forthcoming)
                                                   Physicians for Reproductive Health, Inc.
                                                   PO Box 35
                                                   Hartsdale, NY 10530
                                                   Tel: 202-425-8607
                                                   Mdavies@prh.org

                                                   ***Attorneys for Movant Physicians for
                                                   Reproductive Health***

11