**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| **Plaintiffs Fund Texas Choice, The North Texas Equal Access Fund, The Lilith Fund for Reproductive Equity, Frontera Fund, The Afiya Center, West Fund, Jane's Due Process, Clinic Access Support Network, and Dr. Ghazaleh Moayedi, DO, MPH, FACOG,** | |
| **Plaintiffs,** | **Civil Case No. 1:22-cv-859-RP** |
| **v.** | |
| **KEN PAXTON, et al.,** | |
| **Defendants.** | |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR**
**MOTION FOR PRELIMINARY INJUNCTION**

In response to Plaintiffs' Motion for Preliminary Injunction (ECF 6) ("**Motion**"), Defendant Ken Paxton, Attorney General of Texas, filed both a response to the Motion and a motion to dismiss under Rule 12(b)(1) and 12(b)(6) in the same document. (ECF 33) (Def. Paxton's "**Response**," ECF 33). As explained in detail below, the Response offers no meaningful rejoinder to Plaintiffs' requests for preliminary relief in the Motion[1] and is based on a fundamental misunderstanding of Plaintiffs' claims and the law that applies to them. Plaintiffs' Motion should be granted.

---

[1] Pursuant to the agreed briefing schedule this Court entered, Plaintiffs' reply in support of their Motion is due September 26, 2022. ECF 23. No briefing schedule has been entered on the motions to dismiss, and pursuant to Local Rule CV-7(d)(2), Plaintiffs' response is not due until October 3, 2022. This reply brief therefore focuses on the critical issues before the Court related to Plaintiffs' Motion for Preliminary Injunction. While a discussion of likelihood of success on the merits of certain critical arguments necessarily overlaps with certain of the motion to dismiss arguments, this Reply is not intended to be a full response to General Paxton's Motion to Dismiss, which Plaintiffs will file on or before October 3, 2022, or such other time as the Court directs.

## I.      ARGUMENT

**A.      This Court's jurisdiction is secure.**

General Paxton challenges Plaintiffs' standing, Resp. at 1, 4-11, and asserts that he enjoys immunity from suit, Resp. at 1, 11-14. Although Plaintiffs' response to General Paxton's motion to dismiss under Rule 12(b) is not due until at least October 3. 2022, Plaintiffs' factual allegations and the evidence already before the Court more than satisfy Plaintiffs' minimal burden on standing, and establishes that the *Ex Parte Young* exception to sovereign immunity applies to Plaintiffs' claims.

**1.      Plaintiffs have standing to sue General Paxton.**

General Paxton makes three arguments regarding standing. He asserts: (1) Plaintiffs have not suffered a personal injury; (2) that any injury suffered by Plaintiffs is not fairly traceable to his conduct (or that of his office); and (3) that Plaintiffs do not have associational standing to assert the rights of their donors, volunteers, and staff.[2] General Paxton is wrong on all fronts.

**a.      The chilling of Plaintiffs' activities and speech is a concrete injury.**

Showing "injury in fact" requires a plaintiff to allege "an invasion of a legally protected interest which is (a) concrete and particularized," and (b) "'actual or imminent, not conjectural or hypothetical.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). In a pre-enforcement challenge to a criminal law, a plaintiff meets these requirements by showing "threatened injury" that is "certainly impending." *Whitmore*, 495 U.S. at 158). In turn, this is shown by establishing that the plaintiff "(1) has an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) his intended

---

[2] In a motion for preliminary injunction, "the plaintiff must make a 'clear showing' that she has standing to maintain the preliminary injunction." *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017).

future conduct is arguably . . . proscribed by the policy in question, and (3) the threat of future enforcement of the [challenged policies] is substantial." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020), *as revised* (Oct. 30, 2020). "[W]hen dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Id.* (quoting *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996)).

Here, Plaintiffs' desire and intent to engage in conduct is clear. Every single Plaintiff has provided a sworn declaration describing the conduct they would like to engage in—paying for out of state abortions, providing funding and practical support for Texans to travel outside of the state to obtain abortions in states where that care is legal, traveling themselves in order to provide abortion care in states where it is legal or to accompany a pregnant Texan as they travel to access care. *See* Exs.16-23.[3] General Paxton does not address these facts or the descriptions of Plaintiffs' desired conduct, or the fact that Plaintiffs are not currently able to do so under threat of criminal and civil enforcement by government actors (including his office). Such injuries are "more than an identifiable trifle." *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017).

The First Amendment overbreadth doctrine protects parties who cannot afford the social or financial costs to "undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation[.]" *Virginia v. Hicks*, 539 U.S. 113, 119 (2003). This "expansive remedy" is provided by the Court "out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions." *Id.*; *see also Gooding v. Wilson*, 405 U.S. 518, 521

---

[3] Some or all Plaintiffs may testify at the Preliminary Injunction hearing on these points as well.

(1972) (finding the doctrine "necessary because persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions provided by a statute susceptible of application to protected expression.").[4] The risks inherent in an overly broad statute are even greater when the statute has criminal penalties. *See Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965) ("A criminal prosecution under a statute regulating expression usually involves imponderables and contingencies that themselves may inhibit the full exercise of First Amendment freedoms."). In such cases, the "assumption that defense of a criminal prosecution will generally assure ample vindication of constitutional rights is unfounded." *Id.* After all, the "threat of sanctions may deter their exercise almost as potently as the actual application of sanctions[.]" *NAACP v. Button*, 371 U.S. 415, 433 (1963).

Plaintiffs have all also sworn that they are currently not engaging in their desired conduct because it is arguably proscribed by the Pre-*Roe* Statutes and the Texas Trigger Ban. Exs. 16-23. That chilling effect would be undermined if General Paxton took the position that the Trigger Ban and the Pre-*Roe* Statutes cannot reach abortions performed in states where abortion is legal. General Paxton's Response does not assert that the challenged statutes do not apply to Plaintiffs' desired conduct.  Instead, it **confirms** that General Paxton's position on these statutes is exactly what Plaintiffs alleged—namely, that General Paxton, as the top state law enforcement official, believes that the state of Texas has, in fact, criminalized conduct that merely assists legal abortions that occur in another state. The Response states:

---

[4] *See also Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 634 (1980) ("[A] litigant whose own activities are unprotected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court."); *Bates v. State Bar of Ariz.*, 433 U.S. 350, 380 (1977) ("An overbroad statute might serve to chill protected speech …. a person who contemplates protected activity might be discouraged by the in terrorem effect of the statute.").

> That interest continues whether the Texan mother seeks an abortion in Denver or Dallas[.] ... When that procurement [of an abortion] takes the form of a bus ticket for the pregnant Texan to an abortion clinic, or paying from Texas of the cost of a pregnant Texans' hotel room adjacent to that clinic, **it does not matter if the travel and hotels are in Albuquerque or Austin**—the procurement in Texas of the means of an abortion has intruded upon the State's interest in the protection of human life.

*Id.* (emphasis added). Assisting pregnant Texans by helping them procure abortion care in other states where that care is legal is precisely the conduct in which all of the Plaintiffs want to engage.[5] This intended future conduct is proscribed by General Paxton's position, and the threat of future enforcement is substantial. *See Fenves*, 979 F.3d at 330; *see also* Section A.2.a, *infra.*

> **b.      Plaintiffs' injuries are directly traceable to General Paxton.**

General Paxton also claims that the injuries already being suffered by Plaintiffs are not traceable to him because he has not directly threatened to enforce the challenged statutes against Plaintiffs. Resp. at 5-6. This argument misstates the facts and misapplies the law. To meet both the requirements of standing and those of the *Ex Parte Young* exception[6], plaintiffs "must demonstrate that the state officer has 'some connection' with the enforcement of the disputed act." *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010). "The fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact". *Ex Parte Young*, 209 U.S. 123, 157 (1908).

With respect to the law, "federal courts have consistently found a case or controversy in suits between state officials charged with enforcing a law and private parties potentially subject to

---

[5] General Paxton also makes clear his position that the laws of Texas can "regulate conduct in Texas that has an effect in Texas upon the lives of persons in Texas," again confirming that the laws challenged by Plaintiffs in this case "arguably" apply to their desired conduct. Resp. at 24.

[6] As discussed further in Section I.A.2.a, *infra*, the "connection" component of its *Ex Parte Young* analysis overlaps with the traceability requirement Article III standing. *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019). For the purposes of this section, Plaintiffs address them interchangeably.

enforcement." *Sullo & Bobbitt, PLLC v. Abbott*, No. 3:11-CV-1926-D, 2012 WL 2796794, at \*5 (N.D. Tex. July 10, 2012), *aff'd in part sub nom.*, 536 Fed. App'x. 473 (5th Cir. 2013). This is because, when a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing simply requires the named defendants to possess authority to enforce the complained-of provision. *See*, *e.g.*, *Socialist Workers Party v. Leahy,* 145 F.3d 1240, 1248 (11th Cir. 1998) ("In a suit such as this one, where the plaintiff seeks a declaration of the unconstitutionality of a state statute and an injunction against its enforcement, a state officer, in order to be an appropriate defendant, must, at a minimum, have some connection with enforcement of the provision at issue.").[7] As explained in Section I.A.2.a, *infra*, General Paxton has direct enforcement authority for the Texas Trigger Ban and also has secondary enforcement authority for the Pre-*Roe* Statutes.

General Paxton cites to *Okpalobi v. Foster*, as support for his request that this case be dismissed for lack of standing. Resp. at 4. But the plaintiffs in *Okpalobi* lacked standing because they sued state officials who had no power to enforce the challenged statute. *See Okpalobi v. Foster*, 244 F.3d 405, 424-27 (5th Cir. 2001). Therefore, the defendants could not have caused the alleged injury, nor would any injunction against those officials redress the plaintiffs' grievances; the defendants had "**no power** to redress the asserted injuries," and "no state official has any duty or ability to do **anything**" related to the enforcement of the law at issue. *Id.* at 427 (emphasis added

---

[7] *See also Shell Oil Co. v. Noel*, 608 F.2d 208, 211 (1st Cir. 1979) (noting that "an officer of a state is an appropriate defendant if he has some connection with the enforcement of the act"); 13 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3531.5, at 1072–73 (Supp. 2007) (commenting on cases that view the identification of the proper governmental defendant as a standing issue and "at times focus[ ] explicitly on the causal nexus between the official's role and the claimed injury")."

to "no power"). Unlike the *Okpalobi* defendants, General Paxton is specifically authorized to enforce the Trigger Ban and he has made clear his intention to do so.

General Paxton clearly believes that the challenged statutes apply to the conduct Plaintiffs wish to resume. For example,

- In his Response he states that the challenged Texas laws apply to activities that help pregnant Texans procure out-of-state abortions. Resp. at 24.

- Immediately after the *Dobbs* opinion issued, General Paxton, without any apparent request or prompting, put out an alert on the state of Texas law that confirmed his civil enforcement authority under the Trigger Ban and his intention to embrace that authority in full. Exs. 3, 27, 34. That same alert also confirmed his position that the Pre-*Roe* Statutes were currently effective, and confirmed his willingness to assist in any criminal prosecution initiated under those statutes. Exs. 3 at 2; 27 at 2.

- On June 28, 2022, General Paxton tweeted that the "Harris County judge froze pre-Roe laws criminalizing abortion in TX. But w/SCOTUS's Dobbs decision, these laws are 100% in effect & constitutional." Exs. 4, 42.

- On June 30, 2022, General Paxton filed an emergency motion with the Texas Supreme Court asserting that the Pre-Roe Statutes were and are fully enforceable. Ex. 32.

- Also on July 1, 2022 General Paxton tweeted, "Texas's pre-Roe statutes criminalizing abortion is 100% good law, and I'll ensure they're enforceable." Ex. 42.

- Following the Texas Supreme Court's decision granting in part General Paxton's emergency motion for temporary relief, General Paxton tweeted "Our state's pre-Roe statutes banning abortion in Texas are 100% good law." Ex. 41.

Moreover, in an interview with Leland Vittert on June 21, 2022, General Paxton stated that he can, and that his Office will, enforce civil penalties under the Trigger Ban. Ex. 63. He further stated that **he believed the laws reached corporations that offer abortion travel assistance for employees**. Ex. 63; 63-B (asked whether Texas would go after companies who offered to pay for their employees to go out of state to have an abortion, Paxton responded: "We're going to look whether the language covers at least the civil side, and that's obviously at least what we can deal with. These penalties can be, even for corporations, over $100,000 per violation, so we'll see…were looking at that literally as we speak."). General Paxton says he will enforce the Trigger Ban and he says he can enforce it in precisely the context in which Plaintiffs wish to act and express their First Amendment rights. This statement by General Paxton—on its own—exceeds the requirements of standing for challenging a "non-moribund" statute. *Fenves*, 979 F.3d at 330, 335.

### c.     Plaintiffs are asserting their own injuries.

General Paxton also claims that Plaintiffs lack standing because they are asserting the rights of others—namely their donors, staff, and volunteers—but have not satisfied the standard for associational standing. Resp. at 15-16. First, this argument is irrelevant to whether the case should be dismissed or the preliminary injunction granted; it pertains only to the scope of the case going forward, since Plaintiffs do assert their own rights, and one Plaintiff, Dr. Moayedi, is a natural person to whom associational standing does not apply. Second, General Paxton ignores the facts establishing associational standing.  However, for purposes of Plaintiffs' Motion for Preliminary Injunction, Plaintiffs' focus on their own rights.[8]  In this regard, General Paxton misunderstands

---

[8] Plaintiffs do not waive any argument regarding their associational standing and will respond more fully in the response to General Paxton's Motion to Dismiss.

the rights and injuries underlying Plaintiffs' claims.

Plaintiffs assert that their own constitutional rights have been violated. For the Fund Plaintiffs, each organization has rights to donate money to help pregnant Texans procure legal care in another state under each of the constitutional claims alleged.[9] For the Practical Support Plaintiffs, each organization has the right to provide funding for practical support—like travel funds and funds for childcare—to assist pregnant Texans to procure legal healthcare in another state, as well as the right to freely travel with those pregnant Texans to help them procure that care. And Dr. Moayedi has constitutionally protected rights to freely travel among the states to actually provide care to pregnant Texans in other states where abortion care is legal, to donate money to fund travel and abortion services for pregnant Texans through her service on the TEA Fund Board, and as a donor in her own personal capacity to other similar organizations (including some of the other Plaintiffs in this case).

## 2. *Ex Parte Young* applies to Plaintiffs' claims against General Paxton.

General Paxton also claims sovereign immunity precludes Plaintiffs claims. But Plaintiffs' claims against General Paxton fall squarely within the *Ex Parte Young* exception to sovereign immunity. In *Ex Parte Young*, the Supreme Court found an exception to sovereign immunity based on the principle that no state can act unconstitutionally. 209 U.S. 123, 159 (1908). Thus, when a government official attempts to enforce an unconstitutional law, he is stripped of his immunity and becomes subject to suit. *Id.* at 160. *Ex Parte Young* applies to "[s]uits for injunctive or declaratory relief" filed "against a state official" who is connected to the enforcement of "an allegedly

---

[9] Organizations—even for-profit corporations—have constitutional rights of their own. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 365 (2010) ("[T]he Government may not suppress political speech on the basis of the speaker's corporate identity.").

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION – Page 9**

unconstitutional law." *Tex. Democratic Party v. Abbott* (*Abbott II*), 978 F.3d 168, 179 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1124 (2021)

> **a.**    **General Paxton is an enforcer of the Texas Trigger Ban, and has demonstrated a willingness to enforce it.**

General Paxton suggests that he does not enforce the Texas Trigger Ban because (he argues) he does not have criminal enforcement power over it.[10] Resp. at 13. Yet General Paxton has the **exclusive** power to file suits for ruinous civil penalties under the Texas Trigger Ban:

> A person who violates Section 170A.002 is subject to a civil penalty of not less than $100,000 for each violation. **The attorney general shall file an action** to recover a civil penalty assessed under this section and may recover attorney's fees and costs incurred in bringing the action.

TEX. HEALTH & SAFETY CODE ANN. § 170A.005 (emphasis added). General Paxton is the correct defendant with respect to the Trigger Ban, a fact that is not altered by the existence of other correct defendants (who have different enforcement authority). *La Union del Pueblo Entero v. Abbott*, No. 5:21-CV-0844-XR, 2022 WL 3052489, at *5-21 (W.D. Tex. Aug. 2, 2022) (both the Attorney General and the Secretary of State were sufficiently connected to the enforcement of certain election laws to be proper *Ex Parte Young* defendants). In the same interview in which he said his Office would enforce the challenged statutes, and that they could be applied to corporations providing travel funding for Texans seeking abortions, General Paxton also made clear that the statutory penalties only **begin** at $100,000 per violation, but are actually **unlimited**. *See* Ex. 63. General Paxton therefore has the actual authority to ruin each and every Plaintiff, and has professed publicly that the Trigger Ban can reach the conduct in which they wish to engage.

---

[10] For the reasons given in Section I.A.2.b. *infra*, even this claim is dubious, since General Paxton can join criminal prosecutions, and has been very public about (1) his desire to make sure these anti-abortion laws are criminally enforced, and (2) his desire to ensure that these laws are enforced even in counties where the district or county attorney elects not to pursue criminal prosecutions.

His numerous public statements belie General Paxton's litigation position that he has not shown a willingness to enforce the Texas Trigger Ban.  Regardless, *Ex Parte Young* does not require that the defendant show a willingness to enforce in a precise context. Instead, it simply requires a willingness to enforce the challenged provision. *City of Austin*, 943 F.3d at 1002 (finding that 5th Circuit caselaw "requires some scintilla of 'enforcement' by the relevant state official with respect to the challenged law."). Here, that provision is the prohibition on pregnant Texans obtaining an abortion (and attendant "law of parties" liability for conduct that assists). General Paxton's Response confirms that he believes Texas's abortion bans (1) may be violated through assistive rather than direct conduct, and (2) may be violated even when the assistive conduct is undertaken in connection with an abortion that occurs outside the state. Resp. at 20, 24.

The "connection" component of the *Ex Parte Young* analysis overlaps with Article III standing analysis. *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019). ("In fact, it may be the case that an official's connection to enforcement is satisfied when standing has been established.") (cleaned up).[11] As explained in Section I.A.1 *supra*, the threat of enforcement is more than sufficient to satisfy the concreteness and traceability requirements of Article III standing with respect to General Paxton. This conclusion either decides the question under *Ex Parte Young*, or, at a minimum "bolsters" the conclusion that General Paxton has a sufficient connection to the

---

[11] The Sixth Circuit has explicitly so ruled. *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015) ("It would be a perverse reading of *Young* to say that, although Russell might have an Article III injury before the Attorney General directly communicates his intent to prosecute him, the Eleventh Amendment would nonetheless simultaneously bar us from enjoining the Attorney General's initiating a prosecution. Rather, at the point that a threatened injury becomes sufficiently imminent and particularized to confer Article III standing, that threat of enforcement also becomes sufficient to satisfy this element of *Ex Parte Young*.").

enforcement of the Texas Trigger Ban to be subject to suit under *Ex Parte Young*. *City of Austin*, 943 F.3d at 1002.

As explained above, the Trigger Ban is a new law that arguably proscribes the conduct at issue in this case, and the Pre-*Roe* Statutes arguably have been unearthed from their graves as a result of *Dobbs*, according to General Paxton. *Dobbs v. Jackson Women's Health Org.*, 142 S.Ct. 2228 (2022). Therefore, Plaintiffs are entitled to a presumption of a credible threat of enforcement absent compelling evidence to the contrary. For example, if General Paxton testified under oath before this Court that the challenged statutes do not reach the conduct Plaintiffs seek to engage in, and that Plaintiffs cannot be prosecuted or subjected to civil enforcement proceedings by General Paxton under these statutes for their desired conduct, that could provide compelling evidence to help General Paxton rebut the presumption. But he has not done so. In fact, his Response indicates that he **cannot truthfully do so** because he believes the State's interest under the challenged statutes is the same whether the abortion occurs inside or outside of Texas. Resp. at 20, 24.

General Paxton has also made multiple statements indicating his desire to enforce Texas's abortion-restraining laws. Asked specifically what will happen in the event a District Attorney declines to prosecute, General Paxton explained in an interview, "I have the opportunity to impose some of the civil penalties, so the minimum penalty is 100,000, and it can go up to an unlimited amount. **So we will be pursuing the civil side of this**." Ex. 63-A (transcribed from audio by drafter, emphasis added). As the Fifth Circuit has explained, "A scintilla of enforcement by the relevant state official with respect to the challenged law will do." *Abbott II*, 978 F.3d at 179 (quoting *City of Austin*, 943 F.3d at 1002). The record here contains far more than a "scintilla."

As abortion funds, practical support networks, and providers, Plaintiffs are a part of a very small (and shrinking) universe of Texas targets for the enforcement General Paxton has threatened.

Moreover, while not necessary to establish a right to preliminary relief in this case, they are targets who have been specifically called out by General Paxton's political allies for enforcement. Ex. 1-2, 5-10, 61. Far from disavowing his ability or intention to pursue enforcement of the Trigger Ban against funding and assistive conduct, General Paxton has expressed an interest in doing precisely that.  to the contrary he has expressed an interest in precisely that. Ex. 63-B. If Plaintiffs violate General Paxton's unconstitutional and textually incorrect construction of the Trigger Ban, they face an imminent threat that they will be sued for civil penalties by his Office, and/or that General Paxton will encourage and assist in criminal prosecutions against them.

> **b.      General Paxton would be an enforcer of the pre-*Roe* statutes if they were still extant, and he has shown a willingness to attempt to enforce them.**

Plaintiffs' position is that the Pre-*Roe* statutes are not effective because they were impliedly repealed. *See* § I.B.3. *infra*. General Paxton's position is that these laws **are** effective, and that prosecutions for violating them could be brought immediately after the *Dobbs* decision issued. *E.g.* Ex. 27. As already noted, General Paxton has made numerous clear and express statements that he intends to enforce all of Texas's abortion-restraining laws to the maximum degree possible. Exs. 3-4, 27, 32, 34, 42, 60, 62-63. General Paxton has the authority by Texas law to assist any district attorney who brings an action under the criminal provisions of the Trigger Ban or under the pre-*Roe* statutes. Exs. 3, 25, 27.

With regard to the threatened criminal prosecution (as opposed to the threatened civil penalties), it is true that the Fifth Circuit has held that an attorney general's authority to assist with a criminal prosecution, coupled with a few statements indicating that a particular order "would be enforced," were not alone sufficient to establish the attorney general as a proper defendant. *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020), *judgment vacated sub nom. Planned Parenthood Ctr.*

*for Choice v. Abbott*, 141 S. Ct. 1261 (2021). But here, the only inference to be drawn from General Paxton's near-exclusivity among Texas law enforcement officials in advocating full enforcement of the pre-*Roe* statutes is that he intends to directly assist to the maximum degree he can. In fact, General Paxton's conduct—more than that of any other law enforcement official in Texas—is what has caused the chilling of Plaintiffs' constitutional rights.[12]

     *In re Abbott* is also inapposite because of the high profile threats being made by other state officials regarding the legal status of the actions that Plaintiffs want to take, and the fact that, post-*Dobbs*, abortion funds, practical support networks, and providers are the natural targets of these brand new and allegedly recently restored, politically high-profile laws. Unlike in *In re Abbott* the organizations in this lawsuit are already known to Defendants because of their public litigation against Senate Bill 8, and the drumbeat of public threats that continues around them. Therefore, the enforcement General Paxton has threatened is almost certain to target one or more of the entities presently before the Court. *See NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 394 (5th Cir. 2015) (finding *Ex Parte Young* applied where threatening letter to business, which attorney general refused to explain, continued to chill commercial conduct). Plaintiffs are among the only persons against whom General Paxton's conduct and threats are likely to be carried out.  His

---

[12] As the Court knows, Plaintiffs also sued several District Attorneys and one County Attorney, who all have authority to criminally enforce both the Texas Trigger Ban and the Pre-*Roe* Statutes (to the extent they have not been impliedly repealed). Each of those prosecutor defendants remains a party to this case, and each has (1) stipulated that they have the authority to bring criminal prosecutions under the challenged laws and they are therefore proper defendants in this case; (2) agreed not to bring any such prosecutions until a final, unappealable order is issued in this case; and (3) each has stipulated that there is significant confusion and controversy about the constitutionality of the challenged laws. Exs. 46-47. Thus, even if General Paxton were not a proper defendant with respect to Plaintiffs' claims challenging the Pre-*Roe* Statutes, the prosecuting defendants are properly before the Court as well. The prosecuting defendants did not file a response or opposition to Plaintiffs' Motion and they have all agreed they and their offices will be bound by any order of the Court. *Id.*

conduct and threats are presently chilling conduct protected by the U.S. Constitution. Coupled with General Paxton's statutory authority to make good on these threats, this is enough to satisfy *Ex Parte Young*.[13]

**B.      Plaintiffs are likely to succeed on the merits because they have plausibly alleged that the challenged laws violate federal law and the United States Constitution.**

General Paxton also argues that a preliminary injunction is not proper because Plaintiffs are not likely to succeed on the merits of their claims. This argument fails because of the clear constitutionally-protected conduct impacted by Texas's abortion bans.

**1.      Plaintiffs' First Amendment challenges—facial and as-applied—are plausibly alleged and likely to succeed.**

**a.      Plaintiffs have a First Amendment right to fund legal conduct.**

Plaintiffs themselves have First Amendment rights to associate freely with each other and with pregnant Texans, and to engage in expressive conduct. Mot. at 17. General Paxton does not dispute this; instead, he argues that funding abortions in other states—though such care is legal there—is illegal in Texas because the State's purported interest is the same no matter where an abortion occurs. Resp. pp. 21-22. This argument is meritless.

Donations and funding are inherently protected speech. "[T]he solicitation of charitable contributions is protected speech." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 789 (1988); *see also Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 967 (1984) (finding unconstitutional a law that limited the ability of charitable organizations to raise contributions because the law was therefore "a direct restriction on protected First

---

[13] General Paxton's position that the laws **can** be enforced against assistive and aiding conduct associated with out-of-state abortions involving Texans, strenuously argued for in his Response, further establishes the necessary "actual controversy" for Plaintiffs' claim under the Declaratory Judgment Act. *See Frye v. Anadarko Petroleum Corp.*, 953 F.3d 285, 294 (5th Cir. 2019) (setting out the standard).

Amendment activity."). Defendant himself is the beneficiary of such expressive speech because he receives political campaign donations.[14] *See Ted Cruz for Senate v. Fed. Election Comm'n*, 542 F. Supp. 3d 1, 4 (D.D.C. 2021), *aff'd sub nom.*, *Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638 (2022) ("Protections for political speech extend to campaign financing because effective speech requires spending money.").[15]

Since he vehemently disagrees with Plaintiffs' missions, however, General Paxton differentiates their funding by calling it "illegal": "the First Amendment does not protect [paying for an abortion, helping someone get an abortion] just because Plaintiffs want to perform those illegal deeds at the same time they talk about performing them." Resp. at 21. But Plaintiffs have not asked to fund or perform any illegal deeds; they have not claimed that funding abortions **in Texas** is protected speech. Plaintiffs' assert only that they may fund legal conduct, whether it be

---

[14] Following Defendant's own theory of the law, contributors to his campaign may be subject to criminal sanctions if any of Defendant's actions in office are criminal.

[15] *See also Citizens United*, 558 U.S. at 339  ("prohibition on corporate independent expenditures is thus a ban on speech."); *Schaumburg*, 444 U.S. at 632 (charitable solicitations "involve a variety of speech interests ... that are within the protection of the First Amendment"); *Dep't of Texas, Veterans of Foreign Wars of U.S. v. Texas Lottery Comm'n*, 760 F.3d 427, 430 (5th Cir. 2014) (applying strict scrutiny to the Texas Bingo Enabling Act, which allowed charitable organizations to raise money by holding bingo games on the condition that the money is used only for the organizations' charitable purpose, and finding that the statute restricted organizations speech, and was therefore invalid under the First Amendment.); *Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) ("[Texans for Free Enterprise's] ability to speak is undoubtedly limited when it cannot raise money to pay for speech. Consistent with our precedents, then, [Texans for Free Enterprise] has established irreparable harm."); *Texas Mun. Police Assoc. v. Texas Ethics Comm'n*, No. A-08-CA-741-SS, 2010 WL 11506913, at *7-8 (W.D. Tex. Oct. 29, 2010) (finding that Texas statute that prohibited a corporation or labor organization from making political contribution or political expenditure conflicted with *Citizens United*, and holding that Texas may not restrict political speech based on the speaker's corporate identity); *Free Mkt. Found. v. Reisman*, 573 F. Supp. 2d 952, 954 (W.D. Tex. 2008) ("Contribution limits imposed on groups can be especially problematic when they 'severely inhibit collective political activity by preventing [a group] from using contributions by small donors to provide meaningful assistance to any individual candidate.'" (quoting *Randall v. Sorrell,* 548 U.S. 230  (2006) (Breyer, J., plurality)).

advocacy for reproductive justice in Texas, or legal abortions performed outside of Texas. Deeds are not rendered illegal in New Mexico, Kansas, or elsewhere simply because Texas has decreed them illegal within its own borders. Thus, funding abortion-related activity—where actual abortions are performed where legal—is not funding illegal activity.  Rather, it is protected speech. *See Riley*, 487 U.S. at 789; *Joseph H. Munson Co.*, 467 U.S. at 967.

> **b.**   **A restraint on funding or assistance regarding out-of-state legal abortions cannot pass even rational basis scrutiny, much less strict scrutiny.**

General Paxton also asserts that the Pre-*Roe* statutes and Trigger Ban are content-neutral because they "apply equally regardless of one's opinion on abortion, and the statutes' requirements in no way depend on the speaker's viewpoint or motives." [Dkt. 33, p. 21]. But this is a fundamental misunderstanding of content-based discrimination. A regulation targeted at specific subject matter is content-based even if it does not discriminate among viewpoints within that subject matter. *Reed v. Town of Gilbert*, 576 U.S. 155, 156 (2015). Earlier this month, the Fifth Circuit affirmed that, under *Reed*, "the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *NetChoice, L.L.C. v. Paxton*, No. 21-51178, 2022 WL 4285917, at *30 (5th Cir. Sept. 16, 2022) (quoting *Reed*, 576 U.S. at 163). "Whether laws define regulated speech by particular subject matter or by its function or purpose, they are subject to strict scrutiny." *Reed*, 576 U.S. at 156. "This stringent standard reflects the fundamental principle that governments have no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (cleaned up).

The only speech targeted by the Pre-*Roe* Statutes and the Trigger Ban is speech (including funding) that supports Texans seeking safe and legal abortion. Only those Texans (natural and

organizational, such as Plaintiffs) who believe that pregnant Texans should be allowed to obtain safe abortions where those abortions are legal are impacted by these laws if/when they assist pregnant people in obtaining legal, out-of-state abortions. *See Police Department of Chicago v. Mosley*, 408 U.S. 92 (1972) (holding government cannot selectively exclude speakers from the public sphere based on the content of their message).

General Paxton argues that Texas has an interest in its citizens' health and medical care, regardless of where it is obtained. But the U.S. Supreme Court rejected similar arguments in *Bigelow v. Virginia*, 421 U.S. 809 (1975). In that case, a Virginia law prohibited speech about out-of-state abortion, and the plaintiffs challenged the statute as being overbroad in violation of the First Amendment. *Bigelow*, 421 U.S. at 815. The U.S. Supreme Court agreed, holding that whatever interests Virginia had in overseeing medical care within its borders did not pertain to regulating its residents' understanding of, and even procurement of, out-of-state medical care in the form of abortions. *Bigelow*, 421 U.S. at 824-25. Texas's statutes are even broader, however, and conceivably could arguably Plaintiffs' conduct even when the person traveling from Texas isn't even a resident or citizen of the state. Texas has no legitimate or protectible interest in regulating the conduct that is the subject of Plaintiffs' request for preliminary relief.

**2.      Plaintiffs are likely to succeed on their right-to-travel claims.**

General Paxton argues that the travel right asserted by Plaintiffs in their Motion—that is, the right to interstate travel to engage in lawful conduct in another state—is (1) too broadly defined, and (2) when properly narrowed, is not historically protected. Resp. at 23-4. Both arguments fail.

Taking the second argument first, a broad right to travel has been recognized since before the country's founding. Justice Bushrod Washington, nephew of George Washington, recognized

precisely the right asserted by Plaintiffs in this case within a generation of Constitutional ratification:

> The right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise … may be mentioned as some of the particular privileges and immunities of citizens, which are clearly embraced by the general description of privileges deemed to be fundamental…

*Corfield v. Coryell*, 6 F. Cas. 546, 552 (C.C.E.D. Pa. 1823).[16] To contend that the untrammeled right to travel to conduct legal business in another state is not "deeply rooted" in American history or tradition is frivolous; the is "virtually unqualified," and has been recognized and affirmed by the Supreme Court for more than a century. *Califano v. Gautier Torres*, 435 U.S. 1, 5 n.1 (1978).

Turning to the breadth argument, General Paxton asserts that construing a right to "interstate travel to engage in lawful conduct in another state," is too broad, contending that it is too similar to a "general right of free movement" that the D.C. Circuit has suggested is too broad to be administrable. Resp. at 23 (citing *Hutchins v. Dist. of Columbia*, 188 F.3d 531, 538 (D.C. Cir. 1999)). Plaintiffs construction of the right, however is limited to travel between states and to conduct legal in the destination state; it does not cover international travel, which is meaningfully constitutionally different, *Califano*, 435 U.S. at 5 n.6, nor do Plaintiffs claims assert a right to travel in order to violate the laws or other regulations of the destination state. Plaintiffs are

---

[16] A broad right to travel in peacetime is also present in Blackstone's commentaries. Blacktone, COMMENTARIES ON THE LAWS OF ENGLAND, Book 1: The Rights of Persons, Chapter 1 – Of the Absolute Rights of Individuals, II ("Next to personal security, the law of England regards, asserts, and preserves the personal liberty of individuals. This personal liberty consists in the power of locomotion, of changing situation, or removing one's person to whatsoever place one's own inclination may direct; without imprisonment or restraint, unless by due course of law.") It is also explicit in the Articles of Confederation, U.S.C.A. § ARTICLES OF CONFEDERATION, Art. IV, ¶ 1. (1777), and enshrined in Magna Carta, Leonard B. Boudin, The Constitutional Right to Travel, 56 COLUM. L. REV. 47 (1956) (citing Magna Carta, Ch. 42, as giving to every free man the right to leave the realm at his pleasure in time of peace).

asserting a right to travel to a destination state to engage in conduct that is legal and protected in that state, which is nearly identical to the Supreme Court's holding shortly after the ratification of the 14th Amendment that the right to travel "plainly and unmistakably" embraces the right to cross state lines to engage in "lawful commerce, trade, or business." *Ward v. State*, 79 U.S. 418, 430 (1870).

General Paxton's position—that the Right to Travel for a specific **type** of legal commerce must be shown to be deeply rooted in American history and tradition—is absent from any authority he cites.[17] Moreover, binding Supreme Court precedent makes clear that the Right to Travel specifically includes the right to do so "to procure medical services." *Saenz v. Roe*, 526 U.S. 489, 502 (1999). Construing it even more narrowly, the Right to Travel specifically prohibits restraints on travel to procure abortion services, and restraints on in-state advertising and advocacy for people to travel across state lines to obtain abortions where those abortions are legal. *Bigelow*, 421 U.S. at 822–24. Both the Trigger Ban and the Pre-*Roe* statutes run roughshod over the Right to Travel if construed to extend to prohibitions of abortions in states where abortion is legal.

General Paxton also argues that Texas could nevertheless pass the strict scrutiny test because it has a compelling interest in "protecting … the life of [an] unborn child." Resp. at 23. Whether that is true is irrelevant. The question is whether that State interest continues beyond Texas's border, and the Supreme Court has already made clear that it does not. "A State does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that State." *Bigelow,* 421 U.S.

---

[17] It is also borders on the absurd. Visiting Disneyland is not deeply rooted in the history and tradition of the United States of America—it didn't exist before 1955. County fairs, by contrast, likely did exist at the time of constitutional ratification. Under General Paxton's argument, traveling to Orange County for a county fair would be protected by the Right to Travel, while Texas may punish any travel to Orange County for theme-park-related purposes.

at 824. Indeed, in a case specifically involving a situation in which the State of Virginia attempted to prosecute local advertisements for abortion placement services available in New York (at a time when abortion was illegal in Virginia, but legal in New York) the Court opined:

> The Virginia Legislature could not have regulated the advertiser's activity in New York, and obviously could not have proscribed the activity in that State. Neither could Virginia prevent its residents from traveling to New York to obtain those services or, as the State conceded prosecute them for going there.

*Id.* at 822–24. This holding is not a one-off decision. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 421 (2003) ("A State cannot punish a defendant for conduct that may have been lawful where it occurred.") (separately citing and quoting *Bigelow* with approval); *New York Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914) ("… it would be impossible to permit the statutes of Missouri to operate beyond the jurisdiction of that State and in the State of New York and there destroy freedom of contract without throwing down the constitutional barriers…upon the preservation of which the Government under the Constitution depends."); *Huntington v. Attrill*, 146 U.S. 657, 669 (1892) ("Laws have no force of themselves beyond the jurisdiction of the state which enacts them, and can have extraterritorial effect only by the comity of other states."); *Bonaparte v. Appeal Tax Court of Baltimore*, 104 U.S. 592, 594 (1881) ("No State can legislate except with reference to its own jurisdiction."). Texas may or may not have a compelling state interest to protect "unborn life," but any such interest ceases at the interstate border.[18]

---

[18] It may be that Texas retains more of its original interests in situations involving international travel or travel on the high seas. *See Califano*, 435 U.S. at 5 n.6 (1978) (noting international travel less protected than interstate travel, the right to which is "virtually unqualified"); *Skiriotes v. State of Florida*, 313 U.S. 69, 77 (1941) (jurisdiction on the high seas). The issue in this case is travel between and among sister states, and the precedent on that issue could not be clearer. *Nielsen v. State of Oregon*, 212 U.S. 315, 321 (1909) ("It is enough to decide, as we do, that, for an act done within the territorial limits of the state of Washington, under authority and license from that state, one cannot be prosecuted and punished by the state of Oregon.").

The alternative to the correct application of existing standards is a world in which State power disrespects state borders, follows its citizens in their interstate movement against their will, and dictates what conduct is illegal within the others' state borders. It is a world in which five visitors to the same state may have five different sets of legal rights, rather than what the Constitution says they are entitled to: "the Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2. It is perhaps for this reason that, addressing the dissent's concerns in *Dobbs* regarding confusion over the effect of abortion laws on interstate travel, Justice Kavanaugh in his concurrence expressed the view that (1) states do not have the power to prevent travel to obtain an abortion, and (2) the questions was "not especially difficult as a constitutional matter." *Dobbs*, 142 S. Ct. at 2309 (U.S. 2022) (Kavanaugh, J., concurring).

### 3. The Pre-*Roe* Statutes were impliedly repealed and enforcing them would violate Due Process.

The Pre-*Roe* Statues were repealed by implication and cannot be revived by general statements of the Texas Legislature. General Paxton, however, incorrectly contends that the repealed Pre-Roe Statutes are enforceable. This threatened application of a repealed statute, is "a deprivation of the right of fair warning [that] can result not only from vague statutory language but also from an unforeseeable and retroactive judicial expansion of narrow and precise statutory language." *Bouie v. City of Columbia*, 378 U.S. 347, 352 (1964).

As conceded by General Paxton, the Fifth Circuit held that Texas's regulatory scheme on abortion after *Roe v. Wade* "cannot be harmonized with provisions that purport to criminalize abortion. There is no way to enforce both sets of laws; the current regulations are intended to form a comprehensive scheme—not an addendum to the criminal statutes struck down in *Roe*." *McCorvey v. Hill*, 385 F.3d 846, 849 (5th Cir. 2004). General Paxton's disagreement with the Fifth Circuit's holding in *McCorvey* does not undo this Court's obligation to follow it. *See F.D.I.C. v.*

*Abraham*, 137 F.3d 264, 269 (5th Cir. 1998) ("[W]hen our Erie analysis of controlling state law is conducted for the purpose of deciding whether to follow or depart from prior precedent of this circuit. . . we should not disregard our own prior precedent on the basis of subsequent intermediate state appellate court precedent unless such precedent comprises unanimous or near-unanimous holdings from several—preferably a majority—of the intermediate appellate courts of the state in question."); *see also Poindexter v. R.J. Reynolds Tobacco Co.*, No. CIV.A.3:99-CV-262-X, 2000 WL 358473, at *1 (N.D. Tex. Apr. 7, 2000), *aff'd*, 237 F.3d 630 (5th Cir. 2000) ("*Erie* predictions made by the Fifth Circuit are controlling authority unless and until state court decisions or statutory amendments overrule the prior decision."). The Supreme Court of Texas has not disagreed with *McCorvey*, nor has any Texas Court of Appeals disapproved it.

The Texas Legislature's attempts to retroactively construe the Pre-*Roe* Statutes as not having been repealed also fail, because a later legislature cannot speak for the intention of an earlier legislature. *Pruett v. Harris Cnty. Bail Bond Bd.*, 249 S.W.3d 447, 454 (Tex. 2008) ("That another session of the Legislature decided to incorporate into the Bail Bond Act broader statewide restrictions on bail bond solicitation does not mean that the Board lacked the power to regulate solicitation under the Legislature's prior broad grant.").[19] The Legislature had the power to simply re-enact the Pre-*Roe* Statutes if it wished. It did not. It cannot do so by retroactive construction simply by claiming that courts have no power. Its attempt to do so invokes the possibility of retroactive enforcement of a law that was struck down by a U.S. Supreme Court decision and

---

[19] *Fed. Crude Oil Co. v. Yount-Lee Oil Co*., 52 S.W.2d 56, 63 (1932) ("[T]he expression of an opinion by one Legislature in construing the act of a former Legislature is not conclusive upon the courts as it is their province to arrive at the intention of the particular legislature which enacted each of these laws."); *see also Rowan Oil Co. v. Texas Employment Commission*, 263 S.W.2d 140, 144 (Tex. 1953) ("[T]he Act cannot release any contributions which accrued … before its passage and neither does one session of the Legislature have the power to construe the Acts or declare the intent of a past session.").

impliedly repealed by later legislative acts. Such a threat violates the due process rights of any targets of such enforcement, including Plaintiffs.

**C.    Plaintiffs have established, and will further establish at the upcoming hearing, the required elements for preliminary injunctive relief.**

General Paxton also argues that Plaintiffs cannot establish irreparable injury or that a preliminary injunction is in the public interest. But the deprivation of constitutional rights is always an irreparable injury, and never in the public interest and Plaintiffs did not delay in seeking relief from the Court.

First, Plaintiffs did not unduly delay the filing of their lawsuit or their motion for preliminary injunctive relief. They filed their claims as soon as practicable after securing necessary funding to prevent a full divestiture of their organization funds (and potentially the personal assets of their officers and board members) should this lawsuit not succeed. The Texas legislature's unique fee-shifting provision that attaches to all affirmative abortion-related constitutional challenges, *see* TEX. CIV. PRAC. & REM. CODE ANN., § 30.022, is so chilling that few organizations can afford to test the scope of the laws for fear of the financial ruin they may suffer in the case of any loss in court. And few organizations will be able to find counsel willing to risk the severe financial injury attendant to cases such as this, since Section 30.022 imposes joint and several liability on any counsel who assist in the challenge of an abortion statute. *Id.*

Between the time the *Dobbs* decision was announced and the effective date of the Trigger Ban—an extremely short time frame—Plaintiffs secured funding to ensure their continued financial viability if the draconian and one-sided fee shifting regime in Section 30.022 were applied to the claims in this lawsuit, and then filed suit. The purported "delay" lasted only two months, during which all of those who work in the reproductive health and justice communities were thrown into complete operational upheaval just to comply with new laws and possibly

effective "zombie" laws, while attempting to protect their associates from possible criminal prosecutions and ruinous civil penalties. Plaintiffs are prepared to introduce evidence and testimony at the upcoming hearing on September 27, 2022, about the reason for the amount of time it took to file their lawsuit. To characterize this time period as "delay" and deny a preliminary injunction on that basis would be counter to the principles of equity that govern injunctive relief. It would also reward the State of Texas for a legislative strategy transparently designed to obstruct access to justice and deter constitutional challenges (as the fee-shifting provisions of SB8 have done to date, while they await judicial review).

Second, as this Court previously recognized, Plaintiffs have alleged "serious constitutional injuries." *See* ECF 13, p. 3. Enforcement of an unconstitutional law always violates the public interest, and enjoining such enforcement serves the public interest. *Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996) ("The School Prayer Statute is unconstitutional so the public interest was not disserved by an injunction preventing its implementation.")[20]

## II.   CONCLUSION

For all of these reasons, Plaintiffs respectfully request the Court issue the preliminary injunction requested in their Motion.

---

[20] *See also De Leon v. Perry*, 975 F. Supp. 2d 632, 665 (W.D. Tex. 2014), *aff'd sub nom.*, *De Leon v. Abbott*, 791 F.3d 619 (5th Cir. 2015) ("Therefore, a preliminary injunction preventing the enforcement of an unconstitutional law serves, rather than contradicts, the public interest."); *Texas Med. Providers Performing Abortion Servs. v. Lakey*, No. A-11-CA-486-SS, 2011 WL 13137818, at *1 (W.D. Tex. Oct. 12, 2011) ("Accordingly, the Court concludes: . . . the public interest does not favor enforcement of an unconstitutional act.").

Dated: September 26, 2022                Respectfully submitted,

By: */s/ Jennifer R. Ecklund*
Jennifer R. Ecklund
Texas Bar No. 24045626
jecklund@thompsoncoburn.com

Elizabeth G. Myers
Texas Bar No. 24047767
emyers@thompsoncoburn.com

Allyn Jaqua Lowell
Texas Bar No. 24064143
alowell@thompsoncoburn.com

John Atkins
Texas Bar No. 24097326
jatkins@thompsoncoburn.com

Elizabeth Rocha
Texas Bar No. 24127242
erocha@thompsoncoburn.com

**THOMPSON COBURN LLP**
2100 Ross Avenue, Suite 3200
Dallas, Texas 75201
Telephone: 972/629-7100
Facsimile: 972/629-7171


Alexandra Wilson Albright
Texas Bar No. 21723500
aalbright@adjtlaw.com

Marcy Hogan Greer
Texas Bar No. 08417560
mgreer@adjtlaw.com

515 Congress Ave., Suite 2350
Austin, TX 78701-3562
Telephone: 512/482-9300
Facsimile: 512/482-9303
Kevin Dubose
Texas Bar No. 06150500
kdubose@adjtlaw.com
1844 Harvard Street

Houston, TX 77008
Telephone: 713/523-2358
Facsimile: 713/522-4553

Kirsten M. Castañeda
Texas Bar No. 00792401
kcastaneda@adjtlaw.com
8144 Walnut Hill Lane, Suite 1000
Dallas, TX 75231-4388
Telephone: 214/369-2358
Facsimile: 214/369-2359

**ALEXANDER DUBOSE &
JEFFERSON, LLP**

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I certify that this document was filed electronically on September 26, 2022, with the clerk of the Court for the U.S. District Court, Western District of Texas, using the electronic case filing system of the court.

_/s/ Jennifer R. Ecklund_
Jennifer R. Ecklund