UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| FUND TEXAS CHOICE, *et al.*, | § | |
|     *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | No. 1-22-CV-859-RP |
| KEN PAXTON, in his official capacity | § | |
| of Attorney General, *et al.* | § | |
|     *Defendants*. | § | |

## MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

A collection of non-profit organizations who assist women in procuring abortions, Dkt. 90 at ¶ 20, and an obstetrician who has performed abortions in Texas and other states, *id.* at ¶ 40, seek to enjoin the Attorney General from enforcing the pre-*Roe* statutes, Senate Bill 8, and the Human Life Protection Act (HLPA) against them for any action they take in connection with any abortion that occurs outside the State of Texas. Dkt. 90 at 57–61. Plaintiffs' pre-enforcement challenges to Texas's abortion laws are based on unsubstantiated legal conclusions and sheer speculation of future injury.

Plaintiffs' contention that they face an imminent threat of enforcement for helping women procure out-of-state abortions is not based on any statement or action taken by the Attorney General, and their manufactured threats of injury are insufficient to confer them with Article III standing. Moreover, their claims are barred by sovereign immunity. Their claims must be dismissed.

## STANDARD OF REVIEW

### I.   FEDERAL RULE OF CIVIL PROCEDURE 12(B)(1)

Rule 12(b)(1) governs motions to dismiss for lack of subject matter jurisdiction. "Federal courts are courts of limited jurisdiction, and absent jurisdiction conferred by statute, lack the power to adjudicate claims." *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). Accordingly, "[a] case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998) (citation omitted). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) motion before addressing any motion as to the merits. *Ramming*, 281 F.3d at 161. "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P 12(h)(3).

### II.   FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)

Rule 12(b)(6) governs motions to dismiss for failure to state a claim upon which relief can be granted. "To survive a Rule 12(b)(6) motion, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "A claim for relief is implausible on its face when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct.'" *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679).

Although a court accepts all well-pleaded facts as true, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A plaintiff's obligation to demonstrate his entitlement to relief requires more than mere conclusory statements. *Twombly*, 550 U.S. at 555. Rather, a plaintiff must plead facts with enough specificity "to raise a right to relief above the speculative level." *Id.* A plaintiff must allege more than "'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted). "Where the facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has stopped short of showing that the pleader is plausibly entitled to relief." *Howe v. Yellowbook, USA*, 840 F. Supp. 2d 970, 975 (N.D. Tex. 2011).

## Argument

### I. The Court Lacks Subject Matter Jurisdiction.

Plaintiffs' claims against the Attorney General are jurisdictionally barred. They lack standing, the State enjoys sovereign immunity, and the claims are not ripe. The Court should dismiss for lack of jurisdiction without opining on any other issues raised by Plaintiffs. *See Okpalobi v. Foster*, 244 F.3d 405, 409 (5th Cir. 2001) (en banc).

#### A. Plaintiffs lack standing.

Standing requires a plaintiff to "prove that he has suffered a concrete and particularized [injury in fact] that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). A plaintiff must clearly allege facts demonstrating each element of Article III standing. *See Spokeo, Inc. v.*

*Robins*, 136 S. Ct. 1540, 1547 (2016); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) ("[P]laintiffs bear the burden of pleading and proving concrete facts showing that the defendant's actual action has caused the substantial risk of harm."); *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (plaintiff "must clearly and specifically set forth [sufficient] facts"). An association or organization can demonstrate that it has incurred an injury-in-fact under either associational or organizational standing. *NAACP v. City of Kyle, Tex.*, 626 F.3d 233, 237–38 (5th Cir. 2010).

Not every dispute is entitled to judicial review. "Under Article III, federal courts do not adjudicate hypothetical or abstract disputes," as federal courts "do not possess a roving commission to publicly opine on every legal question." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). Put another way, "[f]ederal courts do not exercise general legal oversight of the Legislative and Executive Branches, or of private entities." *Id.* "And federal courts do not issue advisory opinions." *Id.*

Plaintiffs do not allege facts that "clearly and specifically" demonstrate they satisfy each element of Article III standing. *Whitmore*, 495 U.S. at 155. That alone requires dismissal. Permitting Plaintiffs to seek judicial review of conduct before an enforcement action is actually imminent or underway is the exact type of advisory opinion courts generally seek to avoid. *United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 89 (1947).

1. **Plaintiffs' speculative injuries are not fairly traceable to any action by the Attorney General.**

Plaintiffs' Amended Complaint alleges not a single enforcement action—past, present, or imminent—taken against them by the Attorney General. Plaintiffs allege that the *existence* of the challenged abortion statutes has exerted a chilling effect on their activities, but this is not an injury in fact. There is no standing to sue *statutes*; to bring this suit, Plaintiffs must allege facts sufficient for a reasonable person to infer that the *Attorney General* is so on the verge of violating their constitutional rights that only a court order

barring his action can prevent a violation of Section 1983. Because they are seeking prospective relief, that is, Plaintiffs' injury "must be certainly impending to constitute injury in fact"—"[a]llegations of possible future injury are not sufficient." *Clapper*, 568 U.S. at 409 (quotations omitted).

Plaintiffs allege no such threat. Their standing is based instead on a motley assortment of generalities that refer neither to Plaintiffs nor to persons like them. They cite Twitter posts, advisory documents, an interview in which the Attorney General said he would "look[] at" whether companies may be civilly liable for paying for employees' out-of-state abortions and would follow his statutory duty to enforce the HLPA's civil penalties; a letter sent by State legislators on which he was cc'ed; and the brief explaining why Plaintiffs are not entitled to a preliminary injunction. Dkt. 90 at ¶¶89–103. Absent from Plaintiffs' allegations are facts that would permit a reasonable person to infer that the Attorney General imminently intends to "criminalize entities that provide funding for abortion care or related travel, regardless of whether abortions take place in a jurisdiction outside of Texas in which abortion is legal," *id.* ¶ 59; is involved in a "partnership and/or coordinated effort between private and state actors to intimidate Plaintiffs," *id.* ¶ 8; or even attempt to enforce a law against them. The Attorney General cannot enforce S.B.8, *see Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 539 (2021), *Whole Woman's Health v. Jackson*, 642 S.W.3d 569 (Tex. 2022); Plaintiffs acknowledge that he lacks criminal-enforcement authority, Dkt. 90 at ¶ 104. They do not allege an imminent risk that the Attorney General will pursue civil enforcement against them under the HLPA. *See generally* Dkt. 90. Nor do Plaintiffs allege facts that would permit an inference that he is imminently about to pursue them for abortions they performed or assisted before *Roe v. Wade* was overturned. *See generally* Dkt. 90. What they do allege is that the Texas Freedom Caucus copied him on a letter and that Representative Briscoe Cain said things—but they allege nothing showing that the Attorney General agreed with or adopted those statements, much less that he was imminently likely to act on them, and even less that he was likely to do so against Plaintiffs.

*See, e.g.*, Dkt. 90 at 3–5, 35–37. In sum, the Court may not "hold unconstitutional 'a statute that is . . . constitutional on its face, on the basis of what fewer than a handful of [state representatives] said about it.'" *NetChoice, LLC v. Paxton*, 49 F.4th 439, 482 (5th Cir. 2022) (quoting *United States v. O'Brien*, 391 U.S. 367, 384 (1968)).

Plaintiffs' general allegations are inadequate to clearly and specifically plead facts sufficient for the Court to draw the reasonable inference that the Attorney General aims to prosecute Plaintiffs for these actions. *Cf. Whitmore*, 495 U.S. at 155 ("A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing."). Plaintiffs' claims against the Attorney General should be dismissed.

### 2.   Plaintiffs lack a concrete and particularized injury.

Plaintiffs must show a concrete and particularized injury-in-fact. *Friends of the Earth, Inc.*, 528 U.S. at 180. "Central to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021) (citing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549–50 (2016)). The Supreme Court "has always required proof of a more concrete injury and compliance with traditional rules of equitable practice" regardless of the constitutional interest at stake. *Jackson*, 142 S. Ct. at 538. And "pleadings must be something more than an ingenious academic exercise in the conceivable." *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 688–89 (1973). Instead, a "plaintiff must allege that he has been or will in fact be perceptibly harmed by the challenged . . . action, not that he can imagine circumstances in which he could be affected by the . . . action." *Id.*

Here, whether the Attorney General may enforce the HLPA to encompass Plaintiffs' activities in the future is purely speculative. Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm

that is not certainly impending." *Clapper*, 568 U.S. at 416. As long as Plaintiffs bear no probable, imminent risk of the Attorney General enforcing the HLPA against them or their members in the way they hypothesize, their reactions deriving from "subjective fear" do "not give rise to standing." *Id.* at 418. The vividity of Plaintiffs' imaginations about ways the Attorney General might enforce the law does not confer standing. Federal courts' jurisdiction is limited to actual controversies; they do not "anticipate a question of constitutional law in advance of the necessity of deciding it." *Liverpool, N.Y & Phila. S.S. Co. v. Comm'rs of Emigration*, 113 U.S. 33, 39 (1885) (quoted in *NetChoice*, 49 F.4th at 449)). The same is true of their claimed need for protection from retroactive application of the pre-*Roe* statutes, Dkt. 90 at ¶¶ 187–92: they identify no threat of such enforcement from the Attorney General, or any other Defendant, for that matter. *See generally* Dkt. 90.

### B. Plaintiffs' speculative injuries are not fairly traceable to the Attorney General.

Plaintiffs do not satisfy Article III's standing requirements by complaining about injuries that arise not from threatened action but from the mere *existence* of Texas's abortion laws. Plaintiffs contend that the pre-*Roe* statutes and the HLPA "chill" their First Amendment rights. *See, e.g.*, Dkt. 90 at ¶¶ 161–63. But this purported "chilling effect" cannot support their standing unless it is "fairly traceable" to the conduct of the Attorney General. *See California v. Texas*, 141 S. Ct. 2104, 2113 (2021) ("A plaintiff has standing only if he can 'allege personal injury *fairly traceable to the defendant's allegedly unlawful conduct* and likely to be redressed by the requested relief.'" (emphasis added) (citation omitted)). The purported chill here is not traceable to the Attorney General, who Plaintiffs do not allege has threatened to enforce those laws against them and who has, by Plaintiffs' own admission, no power to do so. Dkt. 90 at ¶ 104. Nor, as previously described, have Plaintiffs alleged facts that would permit an inference that he is about to enforce the HLPA against them; any injury they have incurred bracing themselves for that hypothetical is self-imposed, not traceable to the Attorney General. Whatever "chilling effect" the Defendants

are suffering is traceable to the *legislature*, not the Attorney General or the other defendants. *Cf. Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021) ("[F]or purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to allegedly unlawful conduct of the defendant, not to the provision of law that is challenged." (internal quotation marks omitted)). Moreover, as Plaintiffs acknowledge, the Attorney General lacks criminal enforcement authority under both the pre-*Roe* statutes and the HLPA. Dkt. 90 at ¶ 104.

Plaintiffs have not alleged facts sufficient to permit an inference that the Attorney General is imminently likely to pursue them. They "can only speculate" about such a possibility. *Clapper*, 568 U.S. at 410–12. Their speculation does not confer subject-matter jurisdiction upon the Court.

### 1. Plaintiffs do not have associational standing.

In addition to suing for themselves, the Fund Groups and CASN purport to bring claims on behalf of "their staff, volunteers, and donors." *E.g.*, Dkt. 90 at ¶ 171. An association has standing to bring claims on behalf of its members when "(1) individual members would have standing, (2) the association seeks to vindicate interests germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the individual members' participation." *Students for Fair Admissions, Inc. v. Univ. of Tex. at Austin*, 37 F.4th 1078, 1084 (5th Cir. 2022). But Plaintiffs do not allege that their donors, volunteers, or staff are *members* of their organizations. *See generally* Dkt. 90. Plaintiffs could try to demonstrate standing on those individuals' behalf by showing that they satisfy the indicia-of-membership test, but they don't. That test asks "whether an organization's purported 'members' (1) elect the organization's leaders, (2) serve in the organization's leadership, (3) finance the organization's activities, (4) associate voluntarily with the organization, and (5) provide sworn testimony of membership." *Id.* at 1084 n.7. Plaintiffs

do not plead any facts demonstrating that any of the of the Fund Plaintiffs' or CASN's donors, volunteers, or staff satisfy these requirements. *See generally* Dkt. 90.

Nor do Plaintiffs plead facts sufficient to demonstrate that they have a "close relationship" with these third-parties and "there is a hindrance to the [third-parties'] ability to protect [their] own interests." *Vote.Org v. Callanen*, 39 F.4th 297, 303–04 (5th Cir. 2022). Because Plaintiffs fail to allege the necessary elements of representational standing, all claims they assert based on injury to their donors, volunteers, and staff should be dismissed.

### 2. Plaintiffs lack standing to assert claims challenging the application of S.B.8 outside of Texas (Count VII).

Assuming that Section 1983 protects some federal right to prohibit S.B.8 from operating outside of Texas, Plaintiffs would not have standing to pursue that claim. An injunction against the Attorney General's enforcing S.B.8 outside of Texas would not redress Plaintiffs' purported injury because any injury caused by the enforcement of S.B.8 is not traceable to the Attorney General. S.B.8 specifically prohibits State officers and employees from enforcing it. Tex. Health & Safety Code § 171.208(a); *see also Whole Woman's Health*, 642 S.W.3d at 583 (no state official has authority to enforce S.B.8). Rather, S.B.8 allows *private litigants* to sue to enforce its terms. *Id.* An injunction that merely reiterates the statutory prohibition on Defendants' filing suit would do nothing to redress any injury Plaintiffs would purportedly suffer due to S.B.8. Remedies "operate with respect to specific parties." *California v. Tex.*, 141 S. Ct. at 2115 (internal citation omitted). Remedies for violations of S.B.8 are pursued by private plaintiffs. The Court lacks subject-matter jurisdiction to hear Plaintiffs' claims related to S.B.8 because no injunction running against a Defendant could redress an injury Plaintiffs purport to suffer from enforcement of that statute by private plaintiffs. *Whole Woman's Health*, 142 S. Ct. at 535 (internal citation omitted) ("But under traditional equitable principles, no court may 'lawfully enjoin the world at large,' or purport to enjoin challenged 'laws themselves.'").

### 3.   Plaintiffs lack standing to sue the Attorney General over SB8's fee-shifting language (Counts IX, XI).[1]

Plaintiffs lack standing to sue the Attorney General over S.B.8's fee-shifting provision because they do not allege the Attorney General has sought (or will imminently seek) attorneys' fees under S.B.8. Plaintiffs do not allege that any of the defendants will acquire "prevailing party" status in this litigation, as any such prediction would amount to a confession that their claims should lose. Any possibility that the Attorney General might someday sue them for fees under S.B.8 is "conjectural" and "hypothetical," which is insufficient to confer Article III standing. *See Lujan*, 504 U.S. at 560 (holding that an injury in fact must be "actual or imminent, not conjectural or hypothetical" (citation and internal quotation marks omitted)); *O'Shea v. Littleton*, 424 U.S. 488, 494 (1974) ("It must be alleged that the plaintiff has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged statute or official conduct. The injury or threat of injury must be both real and immediate, not conjectural or hypothetical." (citations and internal quotation marks omitted)).

### C.   The Attorney General is entitled to sovereign immunity.

Absent a waiver of immunity, sovereign immunity bars suit against states in federal court, regardless of the remedy sought. *See, e.g., Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100–01 (1984); *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974) ("[T]his Court has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State") (internal citations omitted)). "A suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). "Suits against state officials in their official capacity [] should be treated as suits against the State." *Hafer v. Melo*, 502 U.S. 21, 25 (1991).

---

[1] Plaintiffs' Amended Complaint does not include a Count X. *See* Dkt. 90 at 56–57.

Section 1983 does not abrogate sovereign immunity. *Will*, 491 U.S. at 67. Nor has Texas voluntarily waived sovereign immunity for Section 1983 claims. *See Texas A&M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 839 (Tex. 2007). The Declaratory Judgment Act does not waive sovereign immunity either. *E.g. Acosta v. Univ. of Tex. at El Paso*, No. 3:06-cv-408, 2007 WL 9701442, at *2 (W.D. Tex. 2007) ("A litigant cannot circumvent [sovereign immunity] by pleading a claim under the Declaratory Judgment Act."). As a preliminary matter, then, any Section 1983 claim or request for declaratory relief against the Attorney General in his official capacity is barred by sovereign immunity unless an exception applies. *See McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 412 (5th Cir. 2004) (citation omitted). And the most commonly relied upon such exception, the one available under *Ex parte Young*, does not apply here.

Under the *Ex parte Young* exception, sovereign immunity is no bar when the suit "seeks prospective, injunctive relief from a state actor, in [his] official capacity, based on an alleged ongoing violation of the federal constitution" or other federal law. *K.P. v. LeBlanc*, 729 F.3d 427, 439 (5th Cir. 2013); *McCarthy*, 381 F.3d at 413–14. But the state official being sued "must have some connection with the enforcement of the [challenged] act, or else [the suit] is merely making him a party as a representative of the state, and thereby attempting to make the state a party." *City of Austin v. Paxton*, 943 F.3d 993, 997–98 (5th Cir. 2019) (cleaned up); *see also Air Evac EMS Inc. v. Tex. Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 517 (5th Cir. 2017); *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014). This analysis has significant overlap with the redressability and traceability standing analyses. *See City of Austin*, 943 F.3d at 1003. A court's initial step is determining whether the plaintiff has sued the right defendant. *City of Austin*, 943 F.3d at 997. "Where a state actor or agency is statutorily tasked with enforcing the challenged law and a different official is the named defendant, [the court's] *Young* analysis ends." *City of Austin*, 943 F.3d at 998. An official's "general duty to see that the laws of the state are implemented" is insufficient to establish the requisite connection to enforcement. *Morris*, 739 F.3d at 746.

Rather, the official sued must bear "the particular duty to enforce the [provision] in question," alongside a demonstrated willingness to enforce it. *Id.*

Enforcement "typically involves compulsion or constraint." *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010); *see Air Evac EMS, Inc. v. Tex. Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 519 (5th Cir. 2017). While the Fifth Circuit has recognized that a specific threat can satisfy *Ex parte Young*, it has done so only when the alleged threat "intimat[ed] that formal enforcement was on the horizon" based on a specific wrongdoer's conduct. *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 392 (5th Cir. 2015). The Supreme Court discussed the intersection between *Ex parte Young*, Article III, and the immediacy of the threat of enforcement in *Morales v. Trans World Airlines*:

> *Ex parte Young* thus speaks of enjoining state officers "*who threaten and are about to commence proceedings*," and we have recognized in a related context that a conjectural injury cannot warrant equitable relief[.] Any other rule (assuming it would meet Article III case-or-controversy requirements) would require federal courts to determine the constitutionality of state laws in hypothetical situations where it is not even clear the State itself would consider its laws applicable.

504 U.S. 374, 382 (1992) (emphasis in *Morales*) (internal citations omitted).

As mentioned above, the Attorney General does not have independent statutory authority to enforce the criminal provisions of the pre-*Roe* statutes or the HLPA. *See* Tex. Gov't Code § 402.028. As the Attorney General does not enforce those statutes, the *Ex parte Young* exception does not apply, and sovereign immunity bars Plaintiffs' claims. *See Mi Familia Vota v. Abbott*, 977 F.3d 461, 477 (5th Cir. 2020); *see also Haverkamp v. Linthicum*, 6 F.4th 662, 670 (5th Cir. 2021); *cf. Whole Woman's Health*, 141 S. Ct. at 2495. The Attorney General's power to assist in certain criminal cases is not sufficient to establish that he has enforcement authority for the *Ex parte Young* analysis. *Starr v. Cnty. of El Paso*, No. 3:09-cv-353, 2010 WL 3122797, at *5 (W.D. Tex. Aug. 5, 2010).

Even if the Attorney General had enforcement authority, the *Ex parte Young* exception would not apply because, as described above, he has not "demonstrated a willingness to enforce" the statutes in the way Plaintiffs hypothesize. *See* Argument § I.A.1.

Without a specific threat of enforcement, Plaintiffs cannot establish an exception to immunity under *Ex parte Young*. As the Supreme Court has opined, "those seeking to challenge the constitutionality of state laws are not always able to pick and choose the timing and preferred forum for their arguments." *Whole Woman's Health*, 142 S. Ct. at 537. And the Supreme Court "has never recognized an unqualified right to pre-enforcement review of constitutional claims in federal court." *Id.* at 537–38.

Plaintiffs also challenge S.B.8's attorneys' fees language, arguing it violates their First Amendment rights and is "preempted" by 28 U.S.C. § 1988. Dkt. 90 at 56–57. Plaintiffs theorize that the very existence of this fee-shifting provision requires them to "liv[e] under an existential threat to their operations, conduct, and freedom." *Id.* at ¶ 226. But "the proposition that the [F]irst [A]mendment, or any other part of the Constitution, prohibits or even has anything to say about fee-shifting statutes in litigation seems too farfetched to require extended analysis." *Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*, 814 F.2d 358, 373 (7th Cir. 1987) (footnote omitted). More, the Attorney General does not "enforce" the fee-shifting language merely because he may recover attorneys' fees if he defends certain Texas laws. In the *Ex parte Young* context, an "enforcer" is one who exercises powers of "compulsion or constraint." *City of Austin*, 943 F.3d at 1000. A litigant who seeks attorneys' fees does not compel or constrain in this sense. A fee-shifting statute does not prohibit plaintiffs from filing lawsuits, it just makes them liable for attorneys' fees if they lose. If the Attorney General were to seek attorneys' fees under S.B.8, it would be in the posture of a litigant, not as a government official "enforcing" the law within the meaning of *Ex parte Young*. Like other litigants invoking fee-shifting statutes, the Attorney General would have to seek an award of attorneys' fees from the court. *See* Tex. Civ. Prac. & Rem. Code § 30.022(a), (c). Without a court order, he cannot compel anyone to pay

attorneys' fees. And, as with their other claims, Plaintiffs have not shown that the Attorney General has a "demonstrated willingness" to seek attorney's fees under S.B.8. *City of Austin*, 943 F.3d at 1000. It is not enough that a defendant official "*might*" someday request attorneys' fees, *id.*, but "might" is the very most plaintiffs can allege.

### D.  Plaintiffs' lawsuit is not ripe because the threat of enforcement is not sufficiently imminent.

Plaintiffs' lawsuit has not "matured sufficiently to warrant judicial intervention" because Plaintiffs' injury is premised on a fear of enforcement that has not yet materialized. *Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975).

Under Article III, federal courts are confined to adjudicating "cases" and "controversies." *United Transp. Union v. Foster*, 205 F.3d 851, 857 (5th Cir. 2000) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998)). The doctrine of ripeness "separates those matters that are premature because the injury is speculative and may never occur from those that are appropriate for judicial review." *Foster*, 205 F.3d at 857. This generally requires "a substantial controversy of sufficient immediacy and reality between parties having adverse legal interests." *Middle South Energy, Inc. v. City of New Orleans*, 800 F.2d 488, 490 (5th Cir. 1986).

Whether an injury predicated on threat of litigation is ripe "'focuses on whether an injury that has not yet occurred is sufficiently likely to happen to justify judicial intervention.'" *Orix Credit All, Inc. v. Wolfe*, 212 F.3d 891, 897 (5th Cir. 2000) (citing *Chevron U.S.A., Inc. v. Traillour Oil Co.,* 987 F.2d 1138, 1153 (5th Cir. 1993)). That in turn depends on "the likelihood that these contingencies will occur." *Id*. at 897. "[E]ven where an issue presents purely legal questions, the plaintiff must show some hardship in order to establish ripeness." *Cent. & S.W. Services, Inc. v. EPA*, 220 F.3d 683, 690 (5th Cir. 2000). Ripeness and standing "often intersect because the question of whether a plaintiff has suffered an adequate harm is integral to both." *Prestage Farms, Inc. v. Bd. of Sup'rs of Noxubee Cnty., Miss.*, 205 F.3d 265, 268 (5th Cir. 2000).

Plaintiffs' claim that they may be subject to enforcement "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Ag. Prods. Co.*, 473 U.S. 568, 580–581 (1985)). Because the threat of enforcement is too speculative—and contingent on events that must be initiated by third parties and might never be initiated at all—Plaintiffs cannot establish that their claims are sufficiently ripe to merit judicial intervention.

## II. Plaintiffs Fail to State a Claim for Relief

### A. The Declaratory Judgment Act does not create a cause of action.

The Declaratory Judgment Act is not a cause of action. It is "not an independent source of federal jurisdiction; the availability of such relief presupposes the existence of a judicially remediable right." *Schilling v. Rogers*, 363 U.S. 666, 677 (1960); *see also Sid Richardson Carbon & Gasoline Co. v. Interenergy Res. Ltd.*, 99 F.3d 746, 752 n.3 (5th Cir. 1996). A request for a declaratory judgment is not a substantive claim. Accordingly, to the extent Plaintiffs bring standalone claims under the Declaratory Judgment Act, they should be dismissed for failure to state a claim.

### B. Plaintiffs do not state cognizable claims under Section 1983.

"Section 1983 provides a federal remedy for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 105 (1989). "Section 1983 speaks in terms of 'rights, privileges, or immunities,' not violations of federal law" *Id.* at 106. "To state a section 1983 claim, 'a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.'" *James v. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008) (quoting *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000)).

### 1.    Plaintiffs cannot assert third-parties' rights under Section 1983.

CASN brings third-party claims on behalf of its volunteers and staff, contending that the pre-*Roe* statutes and HLPA violate these third parties' right to travel. Dkt. 90 at ¶ 128. The Fund Groups and CASN bring third-party claims on behalf of their donors, staff, and volunteers, contending that the pre-*Roe* statutes and HLPA violate their First Amendment rights. Dkt. 90 at 46–51. Neither Section 1983 nor the Declaratory Judgment Act, however, allows a plaintiff to assert the rights of a non-litigant third party. The relief they authorize extends only to litigants who assert their *own* rights. *See* 42 U.S.C. § 1983 (every "person" who acts under color of state law and deprives another person of his constitutional or federal rights "shall be liable *to the party injured*") (emphasis added); 28 U.S.C. § 2201(a) (authorizing federal courts to "declare the rights and other legal relations of *any interested party seeking such declaration* . . .") (emphasis added).

As a general rule, a plaintiff "must assert his own legal rights and interests, not those of third parties." *McCormack v. Nat'l Collegiate Athletic Ass'n*, 845 F.2d 1338, 1341 (5th Cir. 1988). Section 1983 is no exception: it creates a cause of action only when the plaintiff suffers "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. It does not furnish a cause of action to plaintiffs claiming an injury based on the violation of a third-party's rights. *Cf. Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2275 (2022) ("The Court's abortion cases have . . . ignored the Court's third-party standing doctrine.").

The Declaratory Judgment Act imposes similar obstacles to third-party claims. A request for a declaratory judgment is not a cause of action. *Id.* Nevertheless, assuming Plaintiffs have a valid cause of action, like Section 1983, the federal Declaratory Judgment Act provides limited relief, allowing litigants to seek a declaration only of their *own* rights and legal relations. *See* 28 U.S.C. § 2201 ("In a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations *of any interested party seeking such declaration*.") (emphasis added). The

Declaratory Judgment Act necessarily excludes actions brought to declare the rights or legal relations of non-parties—or anyone other than the party "seeking such declaration" under the Act. It provides no authority for a federal court to declare the rights of those who are not "seeking" a declaration under the statute.

Failing to establish associational or representational standing, Plaintiffs' third-party claims brought on behalf of their donors, volunteers, and staff cannot proceed, and these claims must be dismissed for failing to state a claim on which relief can be granted.

### 2. As to Counts VII–VIII, Plaintiffs fail to assert any federal right enforceable under Section 1983.

In Counts VII–VIII of their Complaint, Plaintiffs contend that Texas's abortion laws do not apply to abortions or medical care occurring outside of Texas, but Plaintiffs fail to identify any violation of a federal right in these counts. *Ex parte Young* does not extend to determining the meaning of state laws. *See Pennhurst*, 465 U.S. at 106. Because a violation of a federal right is a necessary element of a cognizable Section 1983 claim, these claims must be dismissed. *See James*, 535 F.3d at 373.

### 3. "Preemption" is not a right secured by Section 1983

In Count IX, Plaintiffs assert that S.B.8's fee-shifting provision is preempted by § 1988. But Section 1988 does not confer any substantive right. Nor can Plaintiffs bring this claim under Section 1983, because Section 1983 itself does not confer any substantive rights. *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (plurality opinion) (cleaned up) ("Section 1983 is not itself a source of substantive rights; it merely provides a method for vindicating already conferred federal rights."); *Chapa v. City of Alvin*, No. 3:20-cv-00362, 2021 WL 3077671, at *2 (S.D. Tex. July 21, 2021) ("Section 1988 does not provide a substantive right or cause of action.") Similarly, "the Supremacy Clause is not the source of any federal rights." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015) (internal quotations and citations omitted) (citing *Golden State Corp.*, 493 U.S. at 107); *see also Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't*, 849 F.3d 615, 626 (5th

Cir. 2017). Rather, it "creates a rule of decision." *Armstrong*, 575 U.S. at 324. As the Supreme Court has explained, the Supremacy Clause instructs courts to "not give effect to state laws that conflict with federal laws." *Id.* In other words, the Supremacy Clause does not create a right to preemption a litigant can preemptively assert; instead, it "instructs courts what to do when state and federal law clash." *Id.* at 325–26. Accordingly, preemption is not a "right[] secured by the Constitution or laws of the United States" and cannot be asserted under Section 1983. *Armstrong*, 575 U.S. at 324.

### C.   Plaintiffs do not state a claim for facial relief on their First Amendment or travel claims.

Plaintiffs bring both facial and as-applied First Amendment and right-to-travel challenges to the pre-*Roe* statutes and HLPA. *See* Dkt. 90 at ¶¶ 143, 152, 169, 186. Plaintiffs do not allege facts sufficient to meet the high burden to obtain such relief. *See Justice v. Hosemann*, 771 F.3d 285, 296 (5th Cir. 2014).

Pre-enforcement facial challenges to legislation are "disfavored for several reasons"—"to put it mildly." *NetChoice,* 49 F.4th at 448 (internal quotation omitted). "[F]acial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange v. Wash. State Rep. Party*, 552 U.S. 442, 451 (2008). States and their duly enacted legislation are entitled to deference when a court is considering a facial challenge to the constitutionality of that legislation. *See NetChoice*, 49 F.4th at 449.

"[F]acial and as-applied challenges have different substantive requirements." *Catholic Leadership Coal. of Texas v. Reisman*, 764 F.3d 409, 425–26 (5th Cir.2014) (citing *Doe v. Reed,* 561 U.S. 186 (2010)). A facial challenge fails unless "no set of circumstances exists under which the Act would be valid." *U.S. v. Salerno*, 481 U.S. 739, 745 (1987). This is an "extraordinarily high" standard, *NetChoice*, 49 F.4th at 449, and courts "must be careful not to go beyond the statute's facial requirements and speculate about

'hypothetical' or 'imaginary' cases." *Wash. State Grange*, 552 U.S. at 449. And this standard applies in "cases concerning abortion" just as it applies in "any other context." *SisterSong Women of Color Reprod. Justice Collective v. Governor of Georgia*, 40 F.4th 1320, 1328 (11th Cir. 2022). The overbreadth doctrine eases this burden slightly in the First Amendment context, permitting a plaintiff to succeed "if a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *NetChoice*, 49 F.4th at 450 (quotation omitted). But this overbreadth doctrine is "a last resort," not a saving grace, and it "attenuates as the regulated expression moves from pure speech toward conduct." *Id.* (quotation omitted).

More, nothing on the face of Texas's abortion laws purports to burden speech, burden the freedom of association, or impose a burden on the right to travel. Plaintiffs' "whataboutisms . . . exemplify why it's inappropriate to hold the law facially unconstitutional in a pre-enforcement posture." *NetChoice*, 49 F.4th at 451–52. A talented talespinner can weave a saga of woe, but facial challenges are not dramaturgy—Plaintiffs must come forward with allegations of imminent danger of punishment. Mights and coulds and maybes do not build such a case, and mights and coulds and maybes are all the Plaintiffs can identify. *See NetChoice*, 49 F.4th at 452 (courts should avoid determining the constitutionality of State statutes "in hypothetical situations where it is not even clear the State itself would consider its law applicable" (quotation omitted)); *see also Hersh v. U.S. ex rel. Mukasey*, 553 F.3d 743, 762 (5th Cir. 2008) ("[t]he fact that a court can hypothesize situations in which the statute will impact protected speech is not alone sufficient" to support a facial challenge).

Because the statutes are not facially unconstitutional, any constitutional challenge must be to the statutes as they are applied. "Exercising judicial restraint in a facial challenge 'frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional

application might be cloudy." *Wash. State Grange*, 552 U.S. at 450 (citing *United States v. Raines*, 362 U.S. 17, 22 (1960)).

### D. Plaintiffs have not alleged facts sufficient to state a violation of the First Amendment.

#### 1. Plaintiffs do not have a First Amendment right to fund illegal conduct.

The thrust of Plaintiffs' claims is their desire to fund abortions or to pay to transport a mother to her abortion appointment, *see, e.g.*, Dkt. 90 at ¶¶ 22–39, and, for Moayedi, to actually *perform* or *prescribe* medications for the abortion. Dkt. 90 at ¶ 110. That is conduct, not speech, and courts have long drawn the line between the two. *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2373 (2018). States may make certain conduct illegal, and "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 62 (2006). Even if Plaintiffs' conduct is carried out through speech by talking to a client, that does not transform the conduct into a protected speech issue. *See Rumsfeld*, 547 U.S. at 62; *see also NIFLA*, 138 S. Ct. at 2373 ("The First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." (internal quotation marks omitted)). It does not violate the First Amendment to "regulat[e] the *conduct* of an entity," and invoking the First Amendment does not shroud conduct with constitutional protection. *See NetChoice*, 49 F.4th at 455, 464 (emphasis added).

Moreover, Plaintiffs' conduct is not inherently expressive. *See Rumsfeld*, 547 U.S. at 66. Making appointments, performing abortions, funding abortions, and paying for incidental expenses are no more inherently expressive conduct than paying for a tank of gas is inherently expressing disagreement with support for alternative energy. Supreme Court precedent supports this. A person does not cloak unlawful conduct in the First Amendment by first "announc[ing] that he intends to express his disapproval of the Internal Revenue

Service by refusing to pay his income taxes." *Id.* So too here. "If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it." *Id.* There is no constitutional right to an abortion, there is no constitutional right to pay for an abortion, there is no constitutional right to help someone get an abortion, and the First Amendment does not protect those things just because Plaintiffs want to perform those deeds at the same time they talk about performing them. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 30 (2010).

### 2. Even if Texas's abortion statutes implicated the First Amendment, they survive constitutional scrutiny.

Even if the pre-*Roe* statutes and HLPA burdened Plaintiffs' First Amendment rights, they do so in a content-neutral way. "[R]egulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny under the First Amendment." *NetChoice*, 49 F.4th at 480 (internal quotation marks omitted). Whether one supports the legality of abortion or not, a person may not "knowingly perform, induce, or attempt an abortion" under the HLPA or "furnish[] the means for procuring an abortion" under the pre-*Roe* statutes. Texas Rev. Civ. Stat. art. 4512.2. The statutes apply equally regardless of one's opinion on abortion, and the statutes' requirements in no way depend on the speaker's viewpoint or motives. *See NetChoice*, 49 F.4th at 480. To survive intermediate scrutiny, the State need only show that its "statutory classification is substantially related to an important governmental objective. . . . It need not be perfect, or even the least restrictive alternative that can be used to achieve Texas's goal." *NetChoice*, 49 F.4th at 484 n.35. Both preservation of unborn life and preservation of the integrity of the medical profession are legitimate and important State interests and well within the State's police powers. *See Dobbs*, 142 S. Ct. at 2284. Accordingly, Texas's abortion statutes satisfy intermediate scrutiny.

Yet even if Plaintiffs were correct and sliding a stack of bills across the counter to an abortionist's waiting palm were pure speech, Texas's abortion statutes would still survive. Under the strict scrutiny that would apply in that counterfactual, Texas's laws would both serve a compelling state interest and be narrowly drawn to achieve that end. *See Burson v. Freeman*, 504 U.S. 552 (2011). The preservation of life is a compelling state interest, including the lives of unborn children. *See Dobbs*, 142 S. Ct. at 2284. Indeed, Plaintiffs do not question the existence of such an interest. *See generally* Dkt. 90. And the Texas statutes are narrowly drawn to protect that interest: They prohibit third parties from helping to end that life in the same way that statutes prohibit third parties from helping achieve any other criminal end. *Compare* Tex. Penal Code § 7.02(a)(2) (criminalizing aiding another person in committing an offense) *with* Tex. Rev. Civ. Stat. art. 4512.2 (criminalizing furnishing the means for procuring an abortion); *see also State v. Sandoval*, 842 S.W.2d 782, 787–88 (Tex. App.—Corpus Christi 1992, pet. ref'd) ("We find that the word 'procure' is neither vague nor indefinite. It has been used in various statutes over the years. . . . We find that a person of normal intellect would be able to determine what the term 'procure' means as used in the barratry statute.").

## E.   The statutes do not infringe on the right to travel (Count I).

As with the purported burden on Plaintiffs' First Amendment rights, the purported burden on their right to interstate travel is vaporous. The Plaintiffs mischaracterize their and Texas's interests, take citations out of context, and misrepresent how Texas's statutes work and what they target. Their right-to-travel claim fails on every basis.

The right to travel is not mentioned in the Constitution; determining whether that liberty, as the Plaintiffs interpret it, is one protected by the Constitution requires us to "guard against the natural human tendency to confuse what [the Constitution] protects with our own ardent views about the liberty Americans should enjoy." *Dobbs*, 142 S. Ct. at 2247. Courts must "'exercise the utmost care whenever [they] are asked to break new

ground in'" evaluating the existence of an unenumerated liberty "'lest the liberty protected . . . be subtly transformed into the policy preferences of the'" judiciary, "usurp[ing] authority that the Constitution entrusts to the people's elected representatives." *Dobbs*, 142 S. Ct. at 2247–48 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997), and citing *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225–26 (1985)). The process must begin "with a careful description of the asserted right[,] for the more general is the right's description, *i.e.*, the free movement of people, the easier is the extension of substantive due process." *Hutchins v. Dist. of Columbia*, 188 F.3d 531, 538 (D.C. Cir. 1999) (en banc) (opn. of Silberman, J.) (citing *Reno v. Flores*, 507 U.S. 292, 302 (1993), and *Michael H. v. Gerald D.*, 491 U.S. 110, 127 n.6 (1989) (opn. of Scalia, J., joined by Rehnquist, C.J.)). Respect for "basic notions of ordered liberty" demands that these rights be "'deeply rooted in [our] history and tradition,'" not "lightly extended" as if slipshod. *Id.* (quoting *Glucksberg*, 521 U.S. at 721). "For that reason, we must ask not whether Americans enjoy a general right of free movement, but rather whatever are the scope and dimensions of such a right . . . ?" *Id.*

And on this first step, the Plaintiffs already fail. They describe the right at stake as "travel to another state [to] engage in lawful commerce and activities." Dkt. 90 at ¶ 133. But that is not a "'careful description' of the asserted fundamental liberty interest," *Glucksberg*, 521 U.S. at 721 (quoting *Reno v. Flores*, 507 U.S. at 302); it essentially asks "whether Americans enjoy a general right of free movement[.]" *Hutchins*, 188 F.3d at 538. Similarly, the Plaintiffs mischaracterize Texas's interests as a "state interest in criminalizing or preventing Plaintiffs' provision of transportation and emotional support (or financial assistance for transportation or other material aid) for pregnant Texans seeking abortion care." Dkt. 90 at ¶ 46. The Court need not rely on the Plaintiffs' characterization, however; Texas has explicitly codified its interest by statute so there can be no mistake about it—it has "compelling interests from the outset of a woman's pregnancy in protecting the health of the woman and the life of the unborn child[.]" Tex.

Health & Safety Code § 171.202(3). The right to travel Plaintiffs actually claim is a right to travel with pregnant women across state lines to help them get abortions in other states, and in the case of Moayedi, to travel across state lines to perform abortions on "pregnant Texans." Dkt. 90 at 43–44.

No such right is protected by the Constitution. There is no constitutional right to have an abortion paid for, to pay for someone's abortion, or to assist in performing or procuring an abortion. *See Harris v. McRae*, 448 U.S. 297, 325 (1980); *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 912 (6th Cir. 2019) (en banc). But more, the Texas statutes do not criminalize what the Plaintiffs claim. Texas does not criminalize interstate travel, as Plaintiffs suggest, Dkt. 90 at 45; the Plaintiffs are free to come and go from the State as they please, and they are neither taxed when doing so, *see Crandall v. Nevada*, 73 U.S. (6 Wall.) 35 (1867), nor prohibited from returning with impoverished friends whose goal is to settle in Texas themselves, *see Edwards v. California*, 314 U.S. 60 (1941). Nor, contra the Plaintiffs' suggestion, is Texas interested in criminalizing abortion for its own sake. *See* Dkt. 90 at ¶ 149. Rather, criminalization is a means to an end—the protection of human life, including the life of the unborn. That interest continues whether the Texan mother seeks an abortion in Denver or Dallas, in Las Cruces or Lamesa. When that procurement takes the form of a bus ticket for the pregnant Texan to an abortion clinic, or the paying from Texas of the cost of a pregnant Texan's hotel room adjacent to that clinic, it does not matter if the travel and hotel are in Albuquerque or Austin—the procurement *in Texas* of the means of an abortion has intruded upon the State's interest in the protection of human life.[2]

Texas's statutes do not result in Texans' being treated in other states as "an unfriendly alien" rather than a "welcome visitor[.]" *Cf. Saenz v. Roe*, 526 U.S. 489, 500 (1999). They do not regulate the sending of advertisements into the State promoting

---

[2] *See also* Dkt. 90 at ¶ 103 (citing Dkt. 33 at 24).

services that are legal in other jurisdictions. *Cf. Bigelow v. Virginia*, 421 U.S. 809, 824 (1975). They do not discriminate between Texans and visitors. *Cf. Barnard v. Thorstenn*, 489 U.S. 546, 552–53 (1989). They regulate conduct in Texas that has an effect in Texas upon the lives of persons in Texas. They do not target travel; whatever impact they have on travel is incidental to the goal of preserving the lives of unborn children and ensuring the health of their mothers.

Nor do Texas's statutes improperly interfere with interstate commerce. The Court need not actually reach that issue, for the Plaintiffs don't actually identify the proper test; they skip from *ipse* directly to *dixit* without telling the Court that it's supposed to use the balancing test announced in *Pike v. Bruce Church, Inc.*, to determine whether the Texas statutes improperly burden interstate commerce. *See* 397 U.S. 137, 142 (1970); *Wal-Mart Stores, Inc. v. Tex. Alcoholic Bev. Comm'n*, 945 F.3d 206, 221–22 (5th Cir. 2019). Having not properly joined the issue, their discussion of it is forfeit. *See Mission Toxicology LLC v. UnitedHealthcare Ins. Co.*, 499 F. Supp. 3d 350, 359 (W.D. Tex. 2020) (citing *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010)). But at any rate, the Texas statutes satisfy the *Pike* test: They do not directly discriminate against interstate commerce; there are clear local benefits (*i.e.*, the preservation of lives that are not aborted thanks to the restrictions on procuring the means of an abortion for a third party); and there is no clearly excessive burden on interstate commerce—indeed, the existence of a burden is entirely theoretical as the Plaintiffs have alleged nothing about the number of interstate abortion trips they would take or the impact they would have on the national economy.

### F.   Texas's abortion laws are not unconstitutionally vague (Count VI).

A law is not void for vagueness unless it "is impermissibly vague in all of its applications." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982). A law need not "'delineate the exact actions a [person] would have to take to avoid liability.'" *Doe I v. Landry*, 909 F.3d 99, 118 (5th Cir. 2018) (quoting *Roark & Hardee LP*

*v. City of Austin*, 522 F.3d 533, 552 (5th Cir. 2008)). As the Supreme Court has put it, "'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'" *Minn. Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1891 (2018) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)). That perfection, however, is exactly what Plaintiffs demand. Plaintiffs argue that any one of their activities could constitute "inducement" under the HLPA. *See* Dkt. 90 at 36. But Plaintiffs do not point to any statement by the Attorney General that supports this assertion. *See generally* Dkt. 90. "[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.'" *Hill v. Colorado*, 530 U.S. 703, 733 (2000) (quoting *Raines*, 362 U.S. at 23); *see also SisterSong*, 40 F.4th at 1328 ("To be sure, there might be vague applications of that definition in other provisions of the Georgia Code, but challenges to those applications—like the arguments . . . about potential applications to constitutionally protected conduct—are properly brought in an as-applied manner.").

"The Fourteenth Amendment's guarantee of Due Process proscribes laws so vague that persons 'of common intelligence must necessarily guess at [their] meaning and differ as to [their] application.'" *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001) (alterations in original) (quoting *Smith v. Goguen*, 415 U.S. 566, 572 n.8 (1974)). "'[O]nly a reasonable degree of certainty is required'" for a statute to survive a vagueness challenge. *Roark & Hardee*, 522 F.3d 552–53 (quoting *United States v. Tansley*, 986 F.2d 880, 885 (5th Cir. 1993)) (emphasis and internal quotation marks omitted). The pre-*Roe* statutes and HLPA give that reasonable degree of certainty, so Plaintiffs' vagueness challenge fails.

## G.    Section 1988 does not preempt S.B.8's fee-shifting language.

"There are three types of federal preemption: (1) express preemption; (2) field preemption; and (3) conflict preemption." *Aldridge v. Miss. Dep't of Corr.*, 990 F.3d 868,

874 (5th Cir. 2021). Courts "start with the basic presumption that Congress did not intend to displace state law." *Id.* at 875. As an initial matter, there is no express preemption in Section 1988. *See* 42 U.S.C. § 1988. Plaintiffs appear to argue that § 1988 constitutes field preemption because it is "a comprehensive fee-shifting statute" for § 1983 claims. Dkt. 90 at ¶ 221. "Field preemption exists when (1) 'the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation,' or (2) 'where the field is one in which 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Aldridge*, 990 F.3d at 874 (quoting *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985)). Section 1988 cannot be a "comprehensive" fee statue because Congress left room for state regulation. Specifically, the award of fees under § 1988 is discretionary. *See* 42 U.S.C. § 1988(b). Therefore, § 1988 leaves room for the States to regulate, namely where the court declines to award fees to a prevailing party. S.B.8 fills that void. Tex. Civ. Prac. & Rem. Code § 30.022(a).

For the same reason, the fee-shifting language of S.B.8 is not conflict preempted. "Conflict preemption, which is not 'rigidly distinct' from field preemption, is present when (1) 'compliance with both state and federal law is impossible,' or (2) state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Aldridge*, 990 F.3d at 875. S.B.8's fee shifting provision does not directly conflict with § 1988 in all circumstances and does not render compliance with federal law impossible or stand as an obstacle to the purposes of § 1988. Therefore, S.B.8 is not conflict preempted.

Because none of the three types of preemption apply to the fee shifting provision of SB 8, Plaintiffs have failed to state a claim for preemption (if such a claim existed).

**H.  CMS billing requirements do not preempt Texas's regulation of the practice of medicine.**

In Count VIII, Plaintiffs claim that Texas's abortion statutes cannot apply to abortions provided out of State via telemedicine because a CMS billing requirement preempts State law. Dkt. 90 at 54–55. Plaintiffs' contention that a CMS billing requirement preempts any State law concerning the practice of medicine must be dismissed. Plaintiffs cite no CMS billing requirement that purports to preempt State laws regulating the practice of medicine. *See generally* Dkt. 90.

The State of Texas regulates the practice of medicine, and its authority to do so is traditional and well-established. Tex. Occ. Code § 111.004; *see also id.* § 111.001(4) ("telemedicine medical service" is "a health care service delivered by a physician licensed in his state . . . and acting within the scope of the physician's . . . license to a patient at a different physical location than the physician or health professional using telecommunications or information technology"). Plaintiffs' assertion that unidentified CMS billing requirements preempt "any state law" related to telemedicine strains credulity. CMS regulations relate to reimbursement, not what is permissible as a matter of practice. It does not purport to govern what procedures are or are not lawful. Whether the federal government has authority to regulate telemedicine *nationwide* is a question of deep economic and political significance, and Plaintiffs cite nothing supporting the proposition that Congress intended CMS or the Department of Health and Human Services to exercise such broad authority. *See Util. Air. Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (Congress must "speak clearly if it wishes to assign . . . decisions of vast economic and political significance.").

### III. *PULLMAN* ABSTENTION COUNSELS AGAINST FINDING TEXAS'S ABORTION LAWS UNCONSTITUTIONAL

When a federal court is considering a facial challenge to legislation, any purported vagueness claim "can be ameliorated by a state court's authoritative interpretations." *Roy v. City of Monroe*, 950 F.3d 245, 252 (5th Cir. 2020) (internal quotation marks omitted).

That exercise of comity, in which "the federal courts, exercising a wise discretion, restrain their authority because of scrupulous regard for the rightful independence of the state governments and the smooth working of the federal judiciary," is known as *Pullman* abstention. *Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941) (internal quotation marks omitted). "The paradigm of the 'special circumstances' that make abstention appropriate is a case where the challenged state statute is susceptible of a construction by the state judiciary that would avoid or modify the necessity of reaching a federal constitutional question." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 306 (1979). This is so because federal courts are loath to deprive "state courts of the opportunity to construe a law to avoid constitutional infirmities." *NetChoice,* 49 F.4th at 449 (cleaned up). *Pullman* abstention serves values of federalism, comity, and judicial administration because, "no matter how seasoned the judgment" of a federal court may be on an issue of state law, "it cannot escape being a forecast rather than a determination," as "the last word" on state law always rests with the state's courts. *Pullman*, 312 U.S. at 499–500.

"Where resolution of the federal constitutional question is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law, abstention may be proper in order to avoid unnecessary friction in federal-state relations." *Harman v. Forssenius*, 380 U.S. 528, 534 (1965). As Plaintiffs reiterate throughout their Amended Complaint, their various federal constitutional theories depend upon, and may be materially altered by, determinations regarding uncertain issues of Texas law. *See e.g.*, Dkt. 90 at ¶ 14 ("If these statutes are construed as expansively as asserted by Texas state actors[, they] violate the constitutional rights of Plaintiffs, their staff, volunteers, and donors."). In short, Plaintiffs allege that "Texas has an intricate, contradictory, and complicated set of laws" at issue in this case. *Id.* ¶ 10. To further the values of federalism, comity, and judicial administration, the Court should decline Plaintiffs' invitation to make

the provisional pronouncements on these unsettled issues of Texas law that are necessary to adjudicate Plaintiffs' novel constitutional theories.

While it has been said that federal courts "have been particularly reluctant to abstain in cases involving facial challenges based on the First Amendment," *City of Houston v. Hill*, 482 U.S. 451, 467 (1987), in such cases, "the pivotal question" remains "whether the statute is 'fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question.'" *Id.* at 468 (quoting *Harman*, 380 U.S. at 534–35). And indeed, the Supreme Court in *Babbitt v. United Farm Workers* concluded that the district court should have abstained from adjudicating a First Amendment overbreadth challenge to a newly enacted criminal penalty—about which the State of Arizona admitted it was "impossible to know what [would] be considered a [violation]"—because "the statute [was] reasonably susceptible of constructions that might undercut or modify [the] vagueness attack." 442 U.S. at 307.

Abstention would be particularly appropriate here, where Plaintiffs seek a pre-enforcement facial challenge to a state's legislative acts. *See e.g.*, *NetChoice*, 49 F.4th at 448. Pre-enforcement facial challenges are uniquely troubling because they "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.* at 449 (further noting that "[t]he respect owed to a sovereign State" requires restraint when a plaintiff asks "unelected federal judges to countermand the State's democratically accountable policymakers."). In abstaining from adjudication before the Texas courts can determine these unsettled questions of state law, this Court would be following the principled course of eschewing premature federal intervention as the states experiment with different approaches to this sensitive political issue. *See Bellotti v. Baird*, 428 U.S. 132, 134 (1976) (Blackmun, J., maj. op.) (district court should have abstained from adjudicating constitutionality of Massachusetts statute enacted in response to *Roe v. Wade* and requiring parental consent for abortions performed on minors); *cf. Younger v. Harris*, 401 U.S. 37, 52

(1971) (even when pre-enforcement facial challenges present a case or controversy, "the task of analyzing a proposed statute, pinpointing its deficiencies, and requiring correction of these deficiencies before the statute is put into effect, is rarely if ever an appropriate task for the judiciary.").

## Conclusion

For the foregoing reasons, the Court should grant Defendants' Motion to Dismiss.

Dated December 9, 2022.

Respectfully submitted,

**Ken Paxton**
Attorney General of Texas

**Brent Webster**
First Assistant Attorney General

**Grant Dorfman**
Deputy First Assistant Attorney General

**Shawn E. Cowles**
Deputy Attorney General for Civil Litigation

**Christopher D. Hilton**
Chief, General Litigation Division

*/s/Amy S. Hilton*

**Amy Snow Hilton**
Assistant Attorney General
Texas Bar No. 24097834
Amy.Hilton@oag.texas.gov

**Leif Olson**
Special Counsel
Texas Bar No. 24032801
Leif.Olson@oag.texas.gov

**William D. Wassdorf**
Assistant Attorney General
Texas Bar No. 24103022
Will.Wassdorf@oag.texas.gov

Office of the Attorney General of Texas
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

**Counsel for Attorney General Ken Paxton**

## Certificate of Service

I hereby certify that on December 9, 2022, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/Amy S. Hilton*