EXHIBIT A

Filed 12/5/2022 12:00 AM
Tammy Robinson
District Clerk
Taylor County, Texas
Carina Martinez

Cause No. 51499-A

| | |
|---|---|
| **In re Charles Byrn,**<br><br>               Petitioner | IN THE DISTRICT COURT<br>TAYLOR COUNTY, TEXAS<br>Taylor County - 42nd District Court<br>_____ JUDICIAL DISTRICT |

## VERIFIED PETITION TO TAKE DEPOSITION TO INVESTIGATE A LAWSUIT

Petitioner Charles Byrn respectfully asks the Court for permission to take a deposition by oral examination of Franz Theard. Mr. Byrn seeks this testimony to investigate potential claims brought by Mr. Byrn or others under section 171.208 of the Texas Health and Safety Code.

### PERSONS TO BE DEPOSED AND JURISDICTION

1. Petitioner Charles Byrn is a citizen of Texas and resident of Taylor County.

2. Mr. Byrn seeks to depose Franz Theard.

3. Upon information and belief, Franz Theard is a resident of **REDACTED** County and may be served at **REDACTED**.

4. In accordance with Rule 202.2(b)(1) of the Texas Rules of Civil Procedure, this petition is filed in Taylor County, the county in which the venue of the anticipated suit may lie.

5. This petition is verified by Mr. Byrn, as required by Rule 202.2(a) of the Texas Rules of Civil Procedure.

### FACTS

6. Franz Theard dispenses abortion-inducing drugs at Women's Reproductive Clinic of New Mexico, which is located only one mile from the Texas–New Mexico border.

7. Theard dispenses these abortion-inducing drugs to Texas residents who cross the border into New Mexico. *See* Jada Yuan, *The New Mexico Provider Trying to Save*

Copy from re:SearchTX

*Abortion for Texas Women*, Washington Post (May 10, 2022) (attached as Exhibit 1), available at https://wapo.st/3Es1Gxg (last visited on December 3, 2022).

8.   Some of the Texas residents who visit Theard's clinic in New Mexico return home after receiving abortion-inducing drugs from Theard's clinic and swallow the second of these two drugs (misoprostol) in Texas. *See* Shefali Luthra, *'I would wish this on absolutely no one': How three women dealt with pregnancy in the year since Texas' six-week abortion ban*, The 19th (August 29, 2022) (attached as Exhibit 2), available at https://bit.ly/3fLntWd (last visited on December 3, 2022).

## TEXAS'S ABORTION LAWS

9.   In 2021, the Texas legislature enacted the Texas Heartbeat Act, which outlaws abortion after a fetal heartbeat is detectable, which typically occurs at around six weeks of pregnancy. The governor signed the Heartbeat Act into law on May 19, 2021, and it took effect on September 1, 2021, after the Supreme Court denied a request for emergency relief from a coalition of Texas abortion providers and funders. *See Whole Woman's Health v. Jackson*, 141 S. Ct. 2494 (2021).

10.   The Texas Heartbeat Act prohibits state officials from enforcing the law. *See* Tex. Health & Safety Code § 171.207. Instead of public enforcement by state officials, the Heartbeat Act establishes a private right of action that authorizes individuals to sue anyone who violates the statute. *See* Tex. Health & Safety Code § 171.208. These private civil-enforcement suits may be brought against anyone who "performs or induces" a post-heartbeat abortion in Texas, *see id.* at § 171.208(a)(1), as well as anyone who "knowingly engages in conduct that aids or abets the performance or inducement of an abortion, including paying for or reimbursing the costs of an abortion through insurance or otherwise, if the abortion is performed or induced in violation of [the Heartbeat Act]," *id.* at § 171.208(a)(2). Lawsuits may also be brought

Copy from re:SearchTX

against anyone who "intends" to perform or aid or abet a post-heartbeat abortion in Texas.

11.  A plaintiff who successfully sues an individual or organization under section 171.208 is entitled to injunctive relief and at least $10,000 in statutory damages for each unlawful abortion that the defendant performed or facilitated, plus costs and attorneys' fees. *See* Tex. Health & Safety Code § 171.208(b).

12.  The law was structured this way to insulate the statute from pre-enforcement judicial review and ensure that the Heartbeat Act would remain enforceable despite the existence of *Roe v. Wade*, 410 U.S. 113 (1973), which had not been overruled when the Heartbeat Act took effect. Because no state official is charged with enforcing the law, there is no one for abortion providers to sue in a pre-enforcement lawsuit that challenges the constitutionality of the statute. *See Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 535 (2021); *Whole Woman's Health v. Jackson*, 642 S.W.3d 569 (Tex. 2022). And because the law is enforced by private citizens rather than government officials, abortion providers have been unable to obtain relief that will stop private lawsuits from being initiated against them.

13.  When the Supreme Court denied emergency relief on September 1, 2021, the Texas Heartbeat Act marked the first time that a state had successfully imposed a six-week abortion ban since *Roe v. Wade*, 410 U.S. 113 (1973).

14.  When the Texas Heartbeat Act took effect on September 1, 2021, abortions performed after fetal heartbeat became acts of murder under Texas law. The Texas Penal Code defines the offense of murder to include the intentional killing of "an unborn child at every stage of gestation from fertilization until birth." Texas Penal Code §§ 1.07, 19.02(b). The murder statute exempts "lawful medical procedures" and the dispensation or administration of a drug prescribed "in accordance with law." Texas Penal Code § 19.06(2), (4). But post-heartbeat abortions performed in Texas

Copy from re:SearchTX

ceased to be "lawful" (and became acts of murder) when the Heartbeat Act took effect on September 1, 2021.

## I.   Theard's Violations of the Texas Heartbeat Act

15.   After Senate Bill 8 took effect in September of 2021, Texas residents began coming to Theard's clinic in New Mexico to obtain abortion-inducing drugs. *See* Jada Yuan, *The New Mexico Provider Trying to Save Abortion for Texas Women*, Washington Post (May 10, 2022) (attached as Exhibit 1), available at https://wapo.st/3Es1Gxg (last visited on December 3, 2022).

16.   A drug-induced abortion requires the abortion patient to ingest two drugs. The first of these drugs is called mifepristone or mifeprex, and it is ingested at the abortion clinic. The second of the two drugs is called misoprostol, and it must be ingested 24–48 hours after the mifeprex. Most abortion providers send their patients away after they ingest the mifeprex and instruct them to swallow the misoprostol at home. *See* Caroline Kitchener, *New restrictions from major abortion funder could further limit access*, Washington Post (August 25, 2022) (attached as Exhibit 3), available at https://wapo.st/3T8G1xV (last visited on December 3, 2022).

17.   The news media reports that at least one of Theard's Texas-based patients, who is described as "Kaleigh" in the cited article, ingested misoprostol in Texas to abort an unborn child that already had a detectable heartbeat, in violation of the Texas Heartbeat Act. *See* Jada Yuan, *The New Mexico Provider Trying to Save Abortion for Texas Women*, Washington Post (May 10, 2022) (attached as Exhibit 1), available at https://wapo.st/3Es1Gxg (last visited on December 3, 2022).

18.   The state of Texas has jurisdiction to prosecute anyone who aids or abets a drug-induced abortion if either of the two drugs is swallowed in Texas. *See* Tex. Penal Code § 1.04(a) ("Texas has criminal jurisdiction to prosecute when: (1) either the conduct or a result that is an element of the offense occurs inside this state"). Any

Copy from re:SearchTX

such individual is also subject to private civil liability under the Texas Heartbeat Act if the aborted unborn child had a detectable heartbeat. *See* Tex. Health & Safety Code § 171.208.

19. By knowingly aiding or abetting a post-heartbeat abortion in violation of Texas law, Theard has not only exposed himself to $10,000 in statutory damages (plus costs and attorneys' fees) under the Texas Heartbeat Act, he also committed an act of first-degree murder. *See* Tex. Penal Code §§ 1.07, 19.02(b) (defining the offense of murder to include the intentional killing of "an unborn child at every stage of gestation from fertilization until birth.").

20. Any person who was complicit in this illegal abortion—including every employee, volunteer, and donor of the Women's Reproductive Clinic of New Mexico, and anyone who aided or abetted this illegal abortion in any manner, other than the woman upon whom the abortion was performed—is equally liable under the Texas Heartbeat Act and equally guilty of murder. *See* Tex. Health & Safety Code § 171.208(a)(2); Tex. Penal Code § 7.02.

21. Liability under SB 8 would also extend to anyone who paid for Kayleigh's abortion, anyone who referred Kayleigh to Theard's clinic, and anyone who knowingly provided Kayleigh with transportation to or from the Women's Reproductive Clinic of New Mexico. *See* Tex. Health & Saftey Code § 171.208(a)(2) (imposing liability on "any person who . . . knowingly engages in conduct that aids or abets the performance or inducement of an abortion, including paying for or reimbursing the costs of an abortion through insurance or otherwise, if the abortion is performed or induced in violation of this subchapter, regardless of whether the person knew or should have known that the abortion would be performed or induced in violation of this subchapter.").

Copy from re:SearchTX

## ANTICIPATED ACTION

22. This petition is filed in anticipation of possible future civil actions brought under section 171.208 of the Texas Health and Safety Code, against individuals and organizations that performed or aided or abetted abortions in violation of the Texas Heartbeat Act, also known as Senate Bill 8 or SB 8. It is also filed to investigate the possibilities for future civil actions brought under section 171.208 of the Texas Health and Safety Code.

23. Any person who performs or induces an abortion in violation of the Texas Heartbeat Act is detectable may be sued by "any person," and must pay "not less than" $10,000 in statutory damages for each illegal abortion, plus costs and attorneys' fees. *See* Tex. Health & Safety Code § 171.208(a)(1), (b). Anyone who knowingly engages in conduct that aids or abets an abortion is equally liable for any abortion performed in violation of the Texas Heartbeat Act, regardless of whether the individual knew or should have known that his abortion-assisting conduct was aiding or abetting a post-heartbeat abortion. *See* Tex. Health & Safety Code § 171.208(a)(2).

24. Theard is expected to have information relevant to the potential claims that Mr. Byrn is investigating. The media is reporting that Theard's clinic is dispensing abortion-inducing drugs to Texas residents, and that at least of his patients ingested the misoprostol in Texas. Theard and his staff are likely to know the nature and extent of drug-induced abortions performed in violation of the Heartbeat Act, and the identity of individuals and organizations that aided or abetted these illegal abortions and acts of murder by providing funding, insurance coverage, or logistical support.

25. To the extent that Theard has exposed himself to civil liability for his violations of the Texas Heartbeat Act, he would have interests adverse to Mr. Byrn.

26. Additional parties are expected to have information relevant to the potential claims that Mr. Byrn is investigating, as well as interests adverse to Mr. Byrn's in any anticipated suit, but the identities of those parties are currently unknown.

Copy from re:SearchTX

27.  The media reports cited in this petition indicate that Theard and his staff have knowledge of abortions performed in violation of the Texas Heartbeat Act. Mr. Byrn's goal is to use the depositions sought by this petition to ascertain the extent of the illegal conduct that has occurred at the Women's Reproductive Clinic of New Mexico, and the identity of all individuals and organizations subject to liability under section 171.208.

### NOTICE OF RELATED CASES

28.  There are no ongoing cases between Mr. Byrn and Theard.

29.  There are other Rule 202 petitions pending against abortion providers and funders who have violated the Texas Heartbeat Act by performing or assisting post-heartbeat abortions in Texas. Those include: *In re Ashley Maxwell*, No. 22-1046-431 (Denton County); *In re Weldon*, No. 22-01-014 (Jack County); *In re Moore*, No. 22-1519-B (Smith County); *In re Thomason*, No. 55561 (Howard County); *In re Zach Maxwell*, No. C2022388 (Hood County). Another Rule 202 petition is pending against a researcher who has studied illegal self-managed abortions in Texas in the aftermath of SB 8. *See In re York*, No. CV2246294 (Eastland County).

30.  A coalition of abortion providers and abortion funds has also filed suit in state court to restrain Texas Right to Life and its legislative director, John Seago, from initiating lawsuits against them under section 171.208 of the Texas Health and Safety Code. The district judge in those cases denied the defendants' motion to dismiss under the Texas Citizens Participation Act, and the defendants have taken an interlocutory appeal from that ruling. That appeal is currently pending in the Third Court of Appeals. *See Texas Right to Life v. Van Stean*, No. 03-21-00650-CV.

### REQUEST FOR DEPOSITION

31.  Mr. Byrn seeks a court order authorizing him to depose Theard because he seeks to investigate potential claims that he or others might bring under section

Copy from re:SearchTX

171.208 of the Texas Health and Safety Code, against any person or organization that performed or aided or abetted an illegal post-heartbeat abortion. *See* Tex. R. Civ. P. 202(d)(2).

32. For the reasons already explained, it is likely that Theard and Women's Reproductive Clinic of New Mexico provided support for post-heartbeat abortions after the effective date of the Heartbeat Act. Theard and his staff will have information about those illegal abortions and the identity of those who assisted them.

33. There is good reason for this court to find that deposing Theard at this time is the best way to avoid a delay or failure of justice in an anticipated suit. *See* Tex. R. Civ. P. 202.4(a). In addition, the likely benefit of allowing Mr. Byrn to depose these individuals to investigate a potential claim outweighs the burden or expense of the procedure. *See* Tex. R. Civ. P. 202.4(b).

34. Mr. Byrn is considering whether to sue individuals and organizations that performed or facilitated illegal abortions in violation of the Texas Heartbeat Act. The media reports indicate that Theard and the Women's Reproductive Clinic of New Mexico violated the Texas Heartbeat Act in a manner that exposes their employees, volunteers, donors, and anyone involved in the provision of these illegal abortions to liability under section 171.208 of the Texas Health and Safety Code.

35. Yet Mr. Byrn is unwilling to file suit as this time because he is still investigating the range of potential defendants, as well as any possible defenses or substantive arguments that they might raise in the litigation. Mr. Byrn expects to be able to better evaluate the prospects for legal success after deposing Theard and discovering the nature and scope of his clinic's violations of Texas law, as well as the extent of involvement of each individual that aided or abetted post-heartbeat abortions in violation of the Texas Heartbeat Act.

36. Mr. Byrn also wishes to preserve evidence of illegal abortions performed in violation of the Texas Heartbeat Act, as well as evidence surrounding the involvement

Copy from re:SearchTX

of organizations and individuals who aided or abetted illegal self-managed abortions. Mr. Byrn seeks to depose Theard on the topics described in the notice of deposition, which is attached to this petition as Exhibit 4. Mr. Byrn also seeks discovery of documents[1] that address the issues that will be covered in the depositions.

37. Deposing Theard allows Mr. Byrn to preserve evidence of great importance to the anticipated litigation. The media reports already indicate that Theard has evidence of abortions that were performed or induced in violation of the Texas Heartbeat Act, at least prima facie. The value of this information to any subsequent litigation, and to the policies embodied in the Texas Heartbeat Act, is extremely high.

38. Delay in obtaining this evidence increases the chance that information about any violations of the Texas Heartbeat Act will be forgotten and that documentation will become more difficult to obtain. Given the widespread press coverage of the Texas Heartbeat Act, including attention to the risks taken by those who choose to violate

---

1. The scope of a pre-suit deposition under Rule 202 is the same as a regular deposition of non-parties in litigation. *See* Tex. R. Civ. P. 202.5. This specifically allows document-production requests. *See* Tex. R. Civ. P. 199.2(b)(5) (providing for requests for production along with a deposition notice); Tex. R. Civ. P. 205.1(c) (providing for noticing document production requests to nonparties); *In re City of Tatum*, 567 S.W.3d 800, 808 (Tex. App. 2018) ("The "language of these rules when read together permits a petition seeking a pre-suit deposition under Rule 202 to also request the production of documents." quoting *In re Anand*, No. 01-12-01106-CV, 2013 WL 1316436, at *3 (Tex. App. Apr. 2, 2013)). *See also City of Dallas v. City of Corsicana*, No. 10-14-00090-CV, 2015 WL 4985935, at *6 (Tex. App. Aug. 20, 2015) ("Under rule 202, documents can be requested in connection with a deposition."). While some courts have refused to permit document discovery under Rule 202, *see, e.g.*, *In re Pickrell*, No. 10-17-00091-CV, 2017 WL 1452851, at *6 (Tex. App. Apr. 19, 2017), they have not analyzed the text of Rule 202.5 or its relationship to Rule 199. *See In re City of Tatum*, 567 S.W.3d 800, 808 n. 7 (Tex. App. 2018) (criticizing courts denying document production under Rule 202).

Copy from re:SearchTX

the Act's provisions,[2] there is considerable incentive for anyone who has violated the Heartbeat Act to hide or obscure evidence of their involvement in illegal abortions.

39.   Without the documentation, there would be a risk of miscarriage or delay of justice, as the law of Texas would be difficult or impossible to enforce. The policy of the state will be thwarted if it is not possible to identify the parties complicit in providing, aiding, or abetting abortions in violation of the Texas Heartbeat Act.

40.   It would also enhance judicial efficiency to allow the eventual lawsuit to consider the entire chain of events surrounding potentially illegal conduct described in the media. Waiting for discovery in the course of litigation not only runs increased risks of forgetfulness or record-keeping deficiencies. It also has costs to the administration of justice in that the courts would have to adjudicate the matters in separate proceedings, or through complaints successively amended to add additional defendants. Allowing depositions under Rule 202 would avoid this delay of justice.

41.   The burden on Theard is modest. To be sure, he must appear for a deposition and produce documents. But the inconvenience will only grow greater with any delay, as memories fade and documents accumulate. The value of the information sought outweighs the burden, as required by Rule 202.

42.   Mr. Byrn seeks to depose Theard by oral deposition. *See* Tex. R. Civ. P. 199. The notices of deposition identifying the topics for examination are attached to this petition as Exhibit 4. This procedure will impose a minimal burden on the deponent while permitting Mr. Byrn to preserve for future litigation information about the potentially illegal abortions reported by the media. This information is likely to be important evidence in any future litigation.

---

2.   *See* Abigail Abrams, *Inside The Small Group of Doctors Who Risked Everything to Provide Abortions in Texas*, Time (Oct. 14, 2021), available at https://bit.ly/3qxa5qx.

Copy from re:SearchTX

43.  Mr. Byrn further requests that the court order Theard to produce at or before the deposition all non-privileged documents described in the subpoenas attached as Exhibit 5 to this petition.

## REQUEST FOR HEARING

44.  After the service of this petition and a notice of hearing, Mr. Byrn requests that the court conduct a hearing, in accordance with Rule 202.3(a) of the rules of civil procedure, to determine whether to issue an order allowing the deposition.

## REQUEST FOR RELIEF

45.  For these reasons, Mr. Byrn respectfully requests that the court set a date for a hearing on this petition, and thereafter issue an order:

    a.  finding that the benefits of a deposition and accompanying production of documents outweighs the burden;

    b.  finding that a deposition and accompanying production of documents will avoid delay or failure of justice;

    c.  authorizing Mr. Byrn to take oral depositions of Theard;

    d.  requiring Theard to produce the documents identified by this petition, at a time and place to be agreed by the parties; and

    e.  awarding all other relief that the Court may deem just, proper, or equitable.

Respectfully submitted.

Thomas Brejcha*
Illinois Bar No. 0288446
Martin Whittaker
Texas Bar No. 24095097
Thomas More Society
309 West Washington Street, Suite 1250
Chicago, Illinois 60606
(312) 782-1680 (phone)
(312) 782-1887 (fax)
info@thomasmoresociety.org

_/s/ Jonathan F. Mitchell_
Jonathan F. Mitchell
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

Copy from re:SearchTX

\* *pro hac vice* applications
forthcoming

Dated: December 3, 2022                    *Counsel for Petitioner*

Copy from re:SearchTX

# Exhibit 1

Copy from re:SearchTX

MAGAZINE

# The New Mexico Provider Trying to Save Abortion for Texas Women

This 73-year-old physician is on a mission to make his clinic a refuge for women's health care on the border

By Jada Yuan

May 10, 2022 at 12:07 p.m. EDT

Franz Theard plies his trade in the sunniest of shadow worlds. His innocuously named Women's Reproductive Clinic of New Mexico is hidden in plain sight, down a slope in a strip mall, neighboring a Subway and a State Farm office, in a border town of a border town. It's less than a mile from the Texas state line, amid the sprawl of El Paso, which is itself a crossing to Ciudad Juárez in old Mexico, as folks here call it, surrounded by fireworks stores and delicious tacos and the desert beyond.

Here, this 73-year-old Haitian American OB/GYN and abortion provider sits in windowless exam rooms,

Copy from re:SearchTX

handing patients pills to end their pregnancies, skirting Texas law by a trick of New Mexico geography. (And, if the protesters stationed outside during all business hours are to be believed, charting his path to hell.) He is alone on the southern edge of America, at the westernmost corner of the country's second biggest state. And if *Roe v. Wade* is overturned, Theard soon may be one of the only abortion providers in the western United States.

---

# The Washington Post Magazine



How George Floyd Spent His Final Hours

Agony, Endurance and Escape: Ukraine in Pictures

---

"You're going to go to your favorite hospital and blame the cramps on — tell them you're having a miscarriage," Theard (pronounced thay-ARD) told 32-year-old mother of three Cynthia Mena, explaining that she'd need a shot of medication because pregnancy termination can trigger her blood type to create antibodies that could attack future pregnancies. "Just don't tell them about the pill. I recommend that you don't," Theard went on. "They'll treat you like you killed Jesus or something." (Texas is full of antiabortion OB/GYNs who often shame their patients, Theard explained.)

Gov. Greg Abbott (R) has been an unstoppable force behind Texas's S.B. 8, a.k.a. the "Heartbeat Act," a law imposing some of the tightest abortion restrictions in the country. Ever since it went into effect in September, Theard's clinic has had an influx of patients from East Texas who've suddenly found themselves without options in their own state. Many of them, like Mena, went to clinics in big cities like Dallas, Houston, Austin or San Antonio, only to get turned away because a gestational heartbeat could be detected on an ultrasound, which usually happens around six weeks — often before most women know they're pregnant. Providers have been incentivized to stick to the law, because it also contains provisions for people to sue anyone — from providers to Uber drivers — who "aids and abets" an illegal abortion.

Theard thought S.B. 8 would go the way of 2013's H.B. 2, which banned abortion after 20 weeks and which

Copy from re:SearchTX

Abbott (then Texas's attorney general) fought tirelessly to keep in place, before it was struck down by the U.S. Supreme Court in 2016. "We figured the same thing was going to happen. They were just rattling their sabers. I felt confident that this can't last," said Theard. "It doesn't make any sense, people putting bounties on doctors. But it's here and it looks like it's gonna stay."

Now he's made it his mission to persuade the women of East Texas to come west instead of going to Oklahoma, Louisiana, Kansas or Arkansas — all states with mandatory 24- to 72-hour waiting periods, and where getting an appointment may take two to three weeks because of the sudden increased demand from Texas. And in some of those states, the laws are getting increasingly more strict. "Thank God we're in New Mexico," which has some of the most liberal abortion laws in the country, says Theard. That demand will only increase if *Roe v. Wade* is overturned and Texas bans abortion outright, as is expected.

Just because Texas is making it almost impossible to get an abortion doesn't mean demand is down. Studies released in March showed that the law didn't stop Texas women from getting abortions — they just went out of state. Last year, Theard says, his clinic treated 1,845 abortion patients, in the middle of the pandemic. And that's before S.B. 8 started driving patients his way. In April he did 260 abortions, up 85 from the same month last year; half were from East Texas. Theard estimates that 95 percent of all of his patients are Hispanic.

Theard opened his office on weekends to make it easier for patients to come from East Texas and got his staff on board with the cause. "I don't need the money, to be honest with you," he told me, when I visited his clinic on a Saturday in late March. Fliers supporting Beto O'Rourke in his governor's race against Abbott were displayed around the waiting room. "People ask me, 'What's your goal? What do you want to do? I am so left-wing, liberal Democrat. I would like for Santa Teresa, New Mexico, to be almost like continuing getting abortion pills in El Paso — to be known as the exception to the S.B. 8 rule in Texas. Anybody who gets pregnant, you don't really have to leave the state of Texas to get your pill." (Technically, you do have to leave Texas.)

To that end, he's offering incentives, like rolling the tax New Mexico charges for the procedure into a flat $700 fee, or the free abortions he offered on International Women's Day in March and on Armed Forces Day in May. For those traveling long distances, he offers $100 to $150 back as a fuel rebate, on a discretionary basis and if the journey seems like a financial hardship. ("If you tell me you flew in your private jet, I don't give you a refund," he says.)

Mena, who works in accounts receivable for a tire company, had her third child just a year ago and recently found out that her husband cheated on her. She doesn't want to add another child to the mix. And when a clinic in Dallas turned her down, she found Theard on Google and decided it was worth driving 10 hours from Irving, Tex., to see him. All told, she'll have spent more than $1,400: $700 for the procedure, and the rest for gas, two days of a rental car and one night in a hotel. She's a fan of Theard's — but not of the new law. "I was very disappointed and angry, and it's not fair," she said. "Because I had to go all the way to another state so I can get a service that I need."

Inside Theard's waiting room on that March Saturday, 14 patients sat in silence, accompanied by their sisters, mothers or female friends, staring at their phones or at the soundless Scott Bakula procedural playing on TV. Because the staff recognizes how uncomfortable and taboo this all is, they call patients into their appointments with numbers, not by name. "We have patients that come, like, with all these insecurities, nervous," says medical assistant Rocio Negrete. "They're afraid to say the 'abortion' word. When they call, they're like, 'I have a situation. I don't know how to say it.' "

Since the new law, that fear has gotten worse. "We do have some patients that come in like, 'No one's gonna arrest me, right? No one's gonna be outside waiting for me?' " says medical assistant Elizabeth Hernandez. They also worry that they're going to get arrested on their way back to Texas, or when they go to the pharmacy for prescriptions for antibiotics and pain medication.

Theard has wire-rimmed glasses, a warm smile surrounded by a salt-and-pepper goatee, and a penchant for dark humor that seems to put his patients immediately at ease. He asks them where they're from, what they do, and subtly peppers in questions about their partners — and parents, if they're younger — to make sure no one is forcing them to have this procedure. He often urges patients to use birth control or a different method if theirs failed them. (His favorite sign-off: "Don't be a repeat customer. We love you, but don't come back.")

He immigrated to Washington, D.C., from Haiti in 1964, when he was 15, the biracial son of a German mother (a secretary) and Haitian father (government statistician). He was admitted to Catholic University that summer without a high school diploma and with minimal ability to speak English. (He spoke only French and German but later picked up English from watching horror films and American football.) Medical school at George Washington University allowed him to defer fighting in the Vietnam War.

He figured out early on that he wanted to be an OB/GYN specializing in high-risk pregnancies. "People don't die, more or less," he explains about his preference. "Usually it's a happy experience, and I've always enjoyed working with women."

Abortions, which Theard started doing in 1973 during his residency at what is now MedStar Washington Hospital Center in D.C., were a natural extension. *Roe v. Wade* had just been decided by the Supreme Court that January, and all of Theard's medical idols not only had their own abortion practices but were teaching him how to perform the procedure.

He had been a young man when abortion wasn't legal and had seen his friends taking their girlfriends up to New York to get abortions from Haitian doctors who were "charging them a lot of money because they were taking a big risk," he says. "But once *Roe vs. Wade* became the law, I mean, I've never seen clinics so busy. Just like when you discovered the birth control pill. It was a big demand."

He continued doing abortions on a military base in Frankfurt, Germany, after the Army held him to his

deferred draft. A fellowship at the William Beaumont Army Medical Center brought him to El Paso. He left the Army to open his OB/GYN practice downtown in 1983, and an abortion clinic followed the next year. The New Mexico clinic came in 2010, both because Theard anticipated the overturn of *Roe* and because he couldn't stand the paperwork and "constant harassment" connected with performing abortions in Texas; he closed the El Paso clinic last year. In Texas, he would get fined constantly for technicalities, deal with surprise inspections and have to pay for patient literature ("with stupid stuff like 'abortion causes breast cancer' ") that the state demanded he pass out.

Following a nasty bout of covid-19 late last year, he retired from doing surgical abortions, which means the closest place to get one is four hours north in Albuquerque. He's too old, he says, but a lot of the decision is emotional. "I mean, imagine crushing something and taking it out. It's not pleasant," he says. "It's heartbreaking to a certain extent. Honestly, I didn't like to do it. I hate to admit it to myself. It's not just because I'm getting old. I just didn't want to deal with it. It was hard." He did it for 34 years.

Still, he continues to do medical abortions. "It feels satisfying to be able to help people who are desperate — and they are desperate — to get something done," he says. "And I can't understand why the other OB/GYNs don't feel the same way. It's part of what we do. I think abortion is woman's care."

s the last patient filed out on Saturday afternoon, Theard was getting a rundown from his nursing staff about the man they'd had to call the police on that morning. "I've seen that scenario before," Theard said. "We haven't had one of those guys in a while."

For once, Theard wasn't the target of anyone's rage. An agitated young man in a tracksuit had stormed into the women-only waiting area at least three times demanding to see his wife, who was in the treatment rooms. She had come out to placate him and returned to the back, only to have him storm in again. Soon, they were outside, locked in a screaming match.

"He was angry, blamed her for having an affair," said Theard, who had managed to give her a sonogram and then refunded all her money. The last time they had called the police, a man and his wife were both hauled to jail, and then they sued Theard for wrongful arrest, a case that was dismissed.

Outside the clinic, five protesters handed out brochures reading "Pray for Unborn Babies." A parked van was offering free ultrasounds — a technique for persuading the undecided. As I got out of my car, I was peppered with questions about what Jesus would think of what I was doing, until a distinguished and wiry older gentleman named Juan Carlos, who serves as security, ushered me inside.

"I know them all," Theard says of the protesters, some of whom trade hellos with him. He's fine with them asking to talk to any woman who seems undecided. "I don't have any problems with that," he says. "I mean, if a patient can be swayed that way, then she didn't want to have the abortion."

Once or twice a month, one man will place dozens of signs all the way down the street. "The signs are, like,

Copy from re:SearchTX

really, really ugly. There's one, 'This is what's for lunch: shredded baby,' " says Hernandez. Or they'll compare the clinic to Auschwitz or condemn Theard by name. The man has hung baby dolls in the trees and left doll parts and baby shoes at the clinic's door.

The clinic is in regular contact with the FBI. It's ostensibly for the staff's protection; Theard believes they are simultaneously being surveilled. He installed security cameras on the FBI's guidance. "I think it helps, and the girls like it because if somebody gets irate, there's a camera in the waiting area and they know they really can be documented," he says.

He doesn't wear a bulletproof vest, and never has, even though clinics were bombed in the 1980s, and doctors were shot and killed in the mid-'90s and late 2000s. Sometimes people would come into the clinic to cast a curse; staff once caught someone with white powder trying to perform some kind of ritual. In the '80s, members of a group called Operation Rescue would block the entrance to Theard's clinic in downtown El Paso, pulling women as they tried to enter, telling Theard they knew where he lived.

And they did know where he lived. They'd come to his house and march around his cul-de-sac for hours on end, terrifying his first wife, and daughter and son, who were 7 and 8 at the time. "It was not a pleasant time, so to speak," he says. "But my two kids who bore the brunt of the stress are, thank God, liberal Democrats like me." The last time it happened was three years ago: Someone chalked his driveway with antiabortion messages like "baby killer."

In a way, he respects their stamina. "*Roe* was a liberation for my generation, but then we got lazy. We weren't forceful enough," he says. While there have been street demonstrations since the leaked Supreme Court draft decision, Theard says that since the early '90s, he has never seen an abortion rights person ("not even a crazy one") outside his clinic to counter the antiabortion demonstrators. "A lot of blah-blah, but no on-the-ground support. They did not walk the walk. It's just like everybody's so scared."

He worries that he's part of a dying breed. Everyone he knows who owns an abortion clinic in Texas is 70 or older. "We're all baby boomers," he says. "It's important, but I can't find a young doctor who wants to do it." He worries about what will happen when he's gone and hopes someone who can do surgical abortions will move to the area. "I don't have a plan B," he says. "I'm recruiting."

*Jada Yuan is a Washington Post staff writer.*

Copy from re:SearchTX

# Exhibit 2

Copy from re:SearchTX



Sign up for our
newsletter

**Abortion**

# 'I would wish this on absolutely no one': How three women dealt with pregnancy in the year since Texas' six-week abortion ban

To mark the first anniversary of SB 8 going into effect, The 19th spoke with Texans who sought an abortion in this past year. Each has a different story. But all shared

Copy from re:SearchTX

similar sentiments: anger, sorrow, frustration and fear.

Tiff found out she was

**Shefali Luthra**
Health Reporter

**Published**          August 29, 2022,
                       4:13 a.m. PT

pregnant on New Year's Day.

Her period was three days late, just enough to suspect that something was off. Still, when she saw the two pink lines, she was shocked.

She was 16. She didn't know what to do or what would happen with her parents, whom she describes as conservative.
"I was like, 'Oh my God. This is it. I'm not going to have a place to live. They're going to kick me out,'" she recalled.

Copy from re:SearchTX

Tiff, whose full name has been withheld to protect her privacy, wanted an abortion. She went to a gynecologist, who told her she was five weeks and five days pregnant. Since September 1, 2021, Texas law has banned abortion past six weeks of pregnancy.

Her parents didn't approve of abortion as an option. And because she is a minor, state law required that they would have to sign off on any abortion, unless she could get a state judge to deem her mature enough to decide for herself — a process that could take weeks.

With all of those factors at play, it was all but impossible to get an abortion in Texas. Tiff, who lives just outside of Houston, could theoretically have tried to go out of state — but getting the funds to do that would've required convincing her parents. She also considered trying to find abortion pills online. But if none of those options worked, she would give birth shortly after her 17th birthday — still a child herself, living at home.

Copy from re:SearchTX

# A newsletter you can relate to

Storytelling that represents you,
delivered to your inbox.

→

I agree to the terms

"I promised myself when I was younger that I would absolutely never raise a kid in my house with my parents," she said. "I just don't feel like I can give the baby what he needs to have a good life."

September 1 will mark one year since Texas became the first state to ban most abortions. The state's law, known as Senate Bill 8, was without precedent. Rather than criminal punishment, it relied on civil litigation — anyone who "aided or abetted" an illegal abortion could be sued for $10,000. That novel structure allowed it to stay in effect even with Roe v. Wade in place.

Copy from re:SearchTX

Six weeks is an incredibly short window: Because of how pregnancies are dated — people learn they have conceived at the first missed menstrual period, at which point they are already technically four weeks pregnant — the law gave people two weeks at the most to get a legal abortion in the state of Texas.

SB 8 offered a first glimpse into a world without Roe, which for nearly five decades protected the federal right to an abortion. It also provided an early clue that the current Supreme Court, which upheld the Texas abortion ban, might be prepared to overturn the 1973 case. So this summer, when five of the court's justices struck down Roe — giving states the power to directly and completely outlaw abortion — health care providers, policy researchers and legal experts across the country already had a sense for just how seismic the impact would be. In Texas, they had already seen a trial run.

Copy from re:SearchTX

In the past year, the law's impact has been expansive. Clinics in nearby states — Oklahoma, Kansas, New Mexico, Colorado and Louisiana — reported a surge in new patients traveling from Texas. Wait times for an abortion ballooned, jumping from a few days to as long as four weeks. The law even inspired copycat legislation in other states, including a law in Oklahoma that took Texas' punitive structure and applied it to virtually all abortions. That ban took effect in May, banning abortion in yet another state two months before Roe would be overturned.

READ NEXT: The midterms' big issues — abortion and the economy — are supercharged in Nevada's Senate race

Copy from re:SearchTX

In 2020, the last full year before SB 8 took effect, Texas recorded about 55,000 abortions performed in the state — the third most in the country, behind only Florida and New York. In 2021, the state recorded closer to 50,000, and the number of abortions performed in September, October, November and December — after the law took effect — fell by about half compared to the previous months in the year. Data from the first three months of 2022, the latest available, shows the number of abortions never picked up; each month, about half as many abortions were performed in state compared to the same timespan a year prior. As of March, about 1,400 people in Texas were traveling out of state for an abortion each month. The number of people requesting medication abortion pills from Aid Access, a European medical service, tripled, research suggests.

Copy from re:SearchTX

The landscape for Texans with unintended pregnancies has completely changed. While some successfully got an abortion in a clinic — either in their home state, or after traveling hundreds of miles to another — countless other did not. Some tried to induce abortions at home with medication abortion. Still others carried their unwanted pregnancies to term.

The 19th spoke with three Texas women who sought an abortion in this past year. Each has a different story. But all shared similar sentiments: anger, sorrow, frustration and fear.

"I would wish this on absolutely no one," Tiff said.

After learning she was pregnant, Tiff tried for months to find an abortion. But she worried that leaving the state for a procedure could open her up to prosecution when she came home. (It would not.) Her parents' disapproval made it even harder to consider leaving the state for an abortion.

Copy from re:SearchTX

Tiff looked online for any website that might help her find medication abortion pills. She posted on Reddit, asking for advice. One of her friends gave her mugwort, an herb commonly used by people trying to induce abortions but that evidence suggests is ineffective. She may have tried other herbs, too, she said, but those months are such a blur that it's hard to remember.

At five months pregnant, Tiff was hospitalized due to concerns about her mental health brought on, she said, by the stress of her pregnancy. It was only then that the reality set in. She was pregnant. There was no way she was getting an abortion. And in a few months, she would have a child.

On August 11, Tiff, 17, gave birth to a son. Her parents are supportive. Her ex-boyfriend is not. Even now, with a weeks-old baby boy, it's hard for Tiff to fathom what she has been through.

She loves her baby. "But I still ideally would have had that abortion," she said.

Copy from re:SearchTX

Minors like Tiff have faced a particularly onerous burden. In Texas, people younger than 18 were required to obtain parental consent before they could get an abortion. If their parents were unwilling to provide that, the minor could appeal to a judge in a process known as "judicial bypass" to argue that they were mature enough to get the procedure.

That process could take days or even weeks depending on where in the state someone lived and how quickly the court moved, said Irma Garcia, the client services manager for Jane's Due Process, a Texas advocacy group that helps minors who are seeking abortions. Those delays could mean missing the six-week window. Unless their parents offered consent, people younger than 18 were typically unable to get approved for an abortion under the Texas law, Garcia said.

And for most, traveling out of state — neighboring New Mexico, for instance, does not require parental notification or consent for minors to get an abortion — wasn't viable, either. Teens were less likely to have the money, resources and privacy to take multi-day trips without their parents or caretakers knowing.

Copy from re:SearchTX

"Many minors cannot safely get out of the house and maintain confidentiality," Garcia said. "This was a full abortion ban for many youth in Texas."

Things are only more difficult now. Since June 24, when Roe was overturned, Texas has begun enforcing a law banning virtually all abortions. Clinics have closed their doors, with some making plans to relocate to neighboring states. Texas' abortion funds — nonprofit organizations that help people pay for abortions — have stopped covering those costs. And many of the states people in Texas once turned to — Oklahoma, Arkansas, Louisiana and Mississippi — have banned abortions in most circumstances.

Copy from re:SearchTX

"The last year was certainly incredibly difficult for abortion providers, for people needing abortions, for the people who were supporting them," said Kari White, an associate professor at the University of Texas at Austin and the lead investigator of the Texas Policy Evaluation Project, which has studied the impact of Texas' six-week abortion ban. "The circumstances are just far poorer now with no in-state abortion being available, and many out-of-state options being shut off, and financial assistance really being curtailed."

(CHANELLE NIBBELINK FOR THE 19TH)

Those neighboring states were critical, said Kaleigh, a Dallas resident. (Kaleigh has told few people about the abortion and requested her full name be withheld.) The 29-year-old took a pregnancy test this past April after she missed her period twice and battled daily nausea. She'd been putting it off, she said — she and her boyfriend weren't ready to be parents. She was scared of what she would see.

Copy from re:SearchTX

Kaleigh knew about the six-week abortion ban. So she opened her computer and searched the internet for "pregnancy clinics." One kept appearing at the top of her search list. So she made an appointment, and that Tuesday showed up for her sonogram at the Prestonwood Pregnancy Center, a crisis pregnancy center in the Dallas suburb of Richardson. (The center did not respond to multiple requests for comment.)

"All they did was just asked me about why I was trying to … get an abortion. 'Do you want to see your baby?'" she recalled.

After the sonogram was complete, they showed her pictures, she said, and gave her a critical piece of information: Kaleigh was eight weeks pregnant. She could not get an abortion in Texas.

Copy from re:SearchTX

Kaleigh and her boyfriend were on the same page. They could drive to another state for an abortion — they had a car, and they had the money. They could work remotely if needed. So she started calling clinics. She tried some in Texas, just in case somehow, they might make an exception. When none could see her, she called the three abortion providers then operating in Louisiana. The earliest appointment she could get wouldn't be for three weeks.

She couldn't bear the idea of being pregnant that long.

Finally, Kaleigh found something: a clinic in Sunland Park, New Mexico, just a mile from the Texas border city El Paso. The drive was nine hours, and they could see her that Friday. So on Thursday night, she and her boyfriend drove west. The next morning, she got two pills at the clinic: mifepristone to take there and misoprostol to take at home.

The abortion was a relief, but Kaleigh couldn't stop thinking about what it took to get it. Ten years ago, at age 19, she'd had an abortion. Then, like in April, she'd found out at eight weeks pregnant.

Copy from re:SearchTX

In 2012, though, she could legally get an abortion in Texas. Per state law, she still had to make multiple visits to the clinic. The process took about a week in total, but she didn't have to worry about driving for hours across state lines, potentially navigating morning sickness while in transit.

"It was just so much more difficult to figure out how to safely do this, you know?" she said. "It wasn't a problem 10 years ago. Since the six-week ban, it's like a totally different place."

"I feel like the world hates women," she added. "How can we not take it that way?"

SB 8 is technically still on the books. But it's now no longer the dominant abortion ban in the state.

Copy from re:SearchTX

Since Roe was overturned, the Texas government began enforcing an abortion ban that predates Roe, one originally passed in the 1800s. It prohibits all abortions, with a narrow exception if the abortion is needed to save the pregnant person's life. This past Thursday, the state's trigger ban also took effect. That law replaces a near-total abortion ban with one that also makes abortion a felony, punishable with lifetime imprisonment and a fine of up to $100,000.

"I think it is probably more confusing now than it was a year ago," said White, the UT professor. "There are essentially no services here. With the exception of New Mexico facilities, and depending on what part of Texas you live in, facility-based abortion services are not nearby."

Instead, she said, people seeking abortions may try to induce them on their own, through what is called self-managed abortions. Some may use ineffective mechanisms, like certain herbs or vitamin C supplements. Others may do so through dangerous means, such as inflicting physical trauma on themselves.

(CHANELLE NIBBELINK FOR THE 19TH)

Copy from re:SearchTX

Abortion providers and reproductive rights advocates are instead trying to help people access mifepristone and misoprostol, the medication abortion pills that people can safely take from their homes. It's a process that requires knowing someone who can help people safely access authentic, accurately labeled pills.

Maria, also from Dallas, learned she was pregnant in January. Between her vomiting and abdominal pain, she thought she had a terrible stomach bug until she showed up at the hospital and was given a pregnancy test. (Maria is her middle name; she requested her full name be withheld because her family does not approve of the procedure.)

Maria, 27, was five weeks along when she found out. The hospital staff congratulated her, but she didn't want to be pregnant.

Theoretically, she could have made it to an abortion clinic. But her immigration status is tenuous. Would going to a clinic in Texas show up on her record? Could it jeopardize her ability to live in the United States? Her immigration concerns meant she couldn't travel out of state, either. She viewed self-managing as her only option.

Copy from re:SearchTX

She texted a woman she knew, someone who worked in reproductive health advocacy. That person had helped Maria six years ago, when she had her first abortion. They connected her with someone else who was based in Texas and could mail her abortion pills. By the time the pills reached Maria's house, she was six weeks pregnant.

READ NEXT: The midterms' big issues — abortion and the economy — are supercharged in Nevada's Senate race

When the first pills came, they were broken. Maria couldn't use them. When a second set of pills arrived she was seven weeks pregnant. She had heard stories about medication abortions — there could be hours of pain, and a good amount of blood. People had told her that if she needed to go to the hospital, she should just tell them she had miscarried; theoretically, no one would know the difference. But Maria was still afraid. What if someone in the hospital suspected she had an abortion? What if she was arrested anyway?

Copy from re:SearchTX

"I was just really freaked out. I was really scared," she said.

She took the pills alone in her apartment; the person who had gotten her pregnant didn't support her getting an abortion, and she didn't feel able to tell her friends or family. The pain from her abortion lasted two whole days — at some points, Maria said, "I thought I wanted to die." Even once the pain abated, her bleeding continued about a month longer. She felt awful, but she couldn't tell anyone.

"People were like, 'You look really pale.' I knew why I was pale," she said. "I was like, 'Oh, I'm weak, 'I haven't had water or eaten well.'"

Maria's body has recovered. But still, she rarely tells people she knows about the abortion. When she has talked about it, it's because she wants other people with experiences like hers to know that they're not alone.

As she has watched abortion rights erode in Texas, that kind of awareness feels even more critical, she said.

Copy from re:SearchTX

"I'm not the only one," she said. "There's a lot of girls wanting to have an abortion. And they're just scared."

**The 19th**

The 19th is a 501(c)(3) tax-exempt organization. Our stories are free to republish in accordance with these guidelines.

# Exhibit 3

Copy from re:SearchTX

# The Washington Post

POLITICS

# New restrictions from major abortion funder could further limit access

The National Abortion Federation has imposed rules that many providers say are burdensome for patients and legally unnecessary

By Caroline Kitchener

August 25, 2022 at 7:01 p.m. EDT

New restrictions from one of the country's largest abortion funding organizations could add new obstacles for many patients in antiabortion states seeking the procedure elsewhere.

Since *Roe v. Wade* was overturned in June, patients have flooded clinics in states where abortion is legal — with many driving long distances to receive a medication abortion, a two-part regimen that includes mifepristone and misoprostol. These patients usually take the mifepristone in the clinic before driving home with the misoprostol, to be taken between 24 and 48 hours later.

The National Abortion Federation and its NAF Hotline Fund will now require patients who receive their funding to take both abortion pills in a state where abortion is legal, according to emails sent on Aug. 22 and obtained by The Washington Post. The nonprofit, which is backed largely by billionaire Warren Buffett, helped fund at least 10 percent of all abortions in the United States in 2020. The new rules could impact thousands of patients a year, providers say.

Copy from re:SearchTX

Patients in need of abortion funding can either call the NAF's hotline or request financial help at a clinic authorized to offer support. Under NAF's new regulations, which go into effect on Aug. 29, patients whose procedures are funded by the NAF will now need to affirm to clinic staff that they will not take their second pill in a state where abortion is illegal.

Clinics need only impose the NAF's new restrictions on patients who receive NAF funding, according to an email to abortion providers from NAF Hotline Fund Operations Director Chloe Hanson Hebert. The restrictions will disproportionately impact poor women and women of color, several providers said.

These new restrictions go beyond what is explicitly required by abortion bans enacted since *Roe* was reversed. The various bans in antiabortion states prohibit providers from performing abortions within the state's borders, but don't bar providers elsewhere from prescribing pills to out-of-state patients they know will be returning home.

The NAF did not respond to a request for comment about this story. But in earlier interviews, NAF officials have said that they're struggling to adapt to the changing legal landscape in order to protect the organization and the patients they serve. This latest policy shift highlights the ripple effects of the Dobbs decision, which has created widespread uncertainty about how state laws will be enforced, even against providers and doctors in states where abortion is legal.

Some abortion providers and advocates say the restrictions are unnecessary and burdensome for patients already facing steep obstacles to abortion care in the wake of the Supreme Court decision, which has left 1 in 3 women without access to the procedure. The NAF's restrictions mean that out-of-state patients traveling to receive medication abortion may have to spend up to two additional nights in a hotel, in addition to extra food and child care costs.

"It's hard enough to make that trip even if you return home the same day," said an abortion provider in New Mexico who is subject to the NAF's regulations. Like others interviewed for this story, the provider spoke on the condition of anonymity because approximately 50 percent of their patients rely on NAF funding.

"Now my patients are being further regulated unnecessarily by a so-called ally."

The new NAF restrictions, the provider added, "look like something that an antiabortion lawyer would write."

With a $7 million annual budget, the National Abortion Federation partners with hundreds of clinics all over the country — including independent clinics and those affiliated with Planned Parenthood — offering training for staff and security support, among other resources. NAF-affiliated personnel visit member clinics regularly in order to "ensure they provide the highest quality care," according to the NAF website.

Copy from re:SearchTX

In a mid-July interview with The Post, NAF chief operating officer Veronica Jones acknowledged that the Supreme Court decision had changed the abortion landscape. "Failing to incorporate this new reality into our decision-making would put our entire operation at risk, ultimately leaving hundreds of thousands without access to care," she said, adding that the NAF helped 3,000 people access abortion in the weeks since the Supreme Court ruling.

Medication abortions now account for more than 50 percent of abortion procedures in the United States, according to NAF estimates and data from the Guttmacher Institute, a research organization that supports abortion rights — with many patients preferring to take pills rather than undergo a surgical procedure.

While both abortion pills — mifepristone and misoprostol — can be taken at the same time if the misoprostol is taken vaginally, this method is far less popular and would made immediate travel risky, providers say, because the patient could begin passing the pregnancy on their way home.

With abortion now banned or mostly banned in 15 states, organizations like the NAF that offer abortion funding play an even more important role in helping patients access care. To get a legal abortion, some patients in antiabortion states have to raise money to travel — sometimes hundreds of miles — in addition to the price of the procedure itself, which costs an average of $500 in the first trimester.

Under the new regulations, providers need to certify that the patient either took the pills at the clinic or promised to take them both in a state where abortion is legal up to the point when the patient received care.

"Lots of patients are [traveling out of state] without telling their community, friends, partners," said an abortion provider who works in Kansas, where abortion remains legal up to 22 weeks of pregnancy. "The poorest and most disenfranchised patients will need to arrange even more child care, time off work and change their story of what is going on."

Some abortion providers have grown increasingly skeptical of the NAF since the organization threatened to withdraw funding from any Texas clinic that did not fully comply with the state's strict ban that took effect last fall, said several abortion providers, some of whom worked in Texas when abortion was still legal there. That decision, first reported by Jezebel, prevented legal challenges that could have led to an injunction and allowed abortions to continue as normal.

Some abortion providers say they understand the NAF's decision.

When she heard about the new policies, Michigan abortion provider Renee Chelian wasn't surprised: A few weeks after the Supreme Court decision, her clinics started requiring patients to take both pills before leaving the state. Chelian and her staff drafted a form for patients to sign, promising to start and finish their medication abortion in Michigan.

Copy from re:SearchTX

Chelian said she started to worry more about legal liability after an Ohio pharmacist called to inquire about pain medication her clinic had prescribed to an abortion patient who lived in Ohio, where abortion is now banned after six weeks of pregnancy. The pharmacist wanted to know if the patient had a miscarriage.

"We need to do everything we can to make sure NAF is protected, our doctors are protected, and our patients are protected," Chelian said.

"It's post-*Roe*," she added. "There is nothing that's safe anymore."

*Christopher Rowland contributed to this report.*

Copy from re:SearchTX

# Exhibit 4
## (Notice of Deposition)

Copy from re:SearchTX

Cause No. _____

| | |
|---|---|
| **In re Charles Byrn**, | IN THE DISTRICT COURT |
| _Petitioner_ | TAYLOR COUNTY, TEXAS |
| | _____ JUDICIAL DISTRICT |

## NOTICE OF DEPOSITION OF FRANZ THEARD
## AND SUBPOENA DUCES TECUM

To:   Amy Hagstrom Miller, 8401 North I-35, Suite 1A, Austin, Texas 78753

Please take notice that the attorneys for petitioner Charles Byrn will take the oral deposition of Franz Theard at 9:00 A.M. on January 18, 2023, in connection with this matter and on the topics designated in Exhibit A, which is attached to this notice. The deposition will be taken before a certified court reporter at the law offices of Mitchell Law PLLC, 111 Congress Avenue, Suite 400, Austin, Texas, 78701. The deposition will continue day-to-day, before a court reporter, until completed. The deposition may be videotaped.

Please take further notice that at the time and place of the deposition the deponent shall produce, at the commencement of the deposition, certain documents and tangible things described in the subpoena, which is attached as Exhibit 5 to the petition and incorporated by reference.

Respectfully submitted.

_/s/ Jonathan F. Mitchell_
JONATHAN F. MITCHELL
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

Dated: December 3, 2022                    _Counsel for Petitioner_

Copy from re:SearchTX

# EXHIBIT A

## I.    DEFINITIONS

For the purposes of this deposition notice, the following definitions apply:

- The terms "**Women's Reproductive Clinic of New Mexico**," "**you**" and "**your**" refer to Franz Theard and any and all of the entities owned or controlled by Franz Theard, including the Women's Reproductive Clinic of New Mexico, including any agent or person authorized to act for or on behalf of any of those individuals or entities, including their officers, employees, staff, and unpaid volunteers.

- The terms "**communication**" and "**communicate**" refer to any method used to transmit or exchange information, concepts, or ideas (whether verbal or nonverbal) including oral, written, typed, or electronic transmittal of any type of information or data, by the use of words, silence, numbers, symbols, images, or depictions, from one person or entity to another person or entity.

- The term "**document**" refers to the act of noting, recording, or preserving any type of information, data, or communication, without regard to the method used to note, record, or preserve such information, data, or communication. The term includes any e-mail or text message.

- The term "**entity**" means any legal entity inquired about (other than a natural person) including a partnership, professional association, joint venture, corporation, governmental agency, or other form of legal entity.

- The terms "**identify**" and "**identity**," when used in connection with a natural person, require disclosure of that person's full name, present or last known address, and present or last known telephone number. When used in connection with a legal entity, the terms require disclosure of its legal name, its address, and telephone number.

- The terms "**implement**" and "**implementation**" refer to any method, process, or action used to put a decision or plan into effect or achieve a goal or obligation.

- The term "**information**" refers to and includes documents, records, communications, facts, ideas, data, observations, opinions, photographs, slides, video recordings, audio recordings, and tangible and intangible items and evidence of any kind or sort.

Copy from re:SearchTX

- The terms "**person**" and "**persons**" mean any legal entity inquired about, whether a natural person, partnership, sole proprietorship, professional association, joint venture, corporation, governmental agency, or other form of legal entity.

- The term "**record**" means letters, words, sounds, or numbers, or the equivalent of letters, words, sounds, or numbers, that have been written, recorded, documented, or received by Defendant by:

  (A)   handwriting;
  (B)   typewriting;
  (C)   printing;
  (D)   photostat;
  (E)   photograph;
  (F)   magnetic impulse;
  (G)   mechanical or electronic recording;
  (H)   digitized optical image; or
  (I)   another form of data compilation.

- The term "**record**" also includes any communication, including an e-mail or text-message communication.

- The term "**reproduction**" means an accurate and complete counterpart of an original document or record produced by:

  (A)   production from the same impression or the same matrix as the original;
  (B)   photograph, including an enlargement or miniature;
  (C)   mechanical or electronic re-recording;
  (D)   chemical reproduction;
  (E)   digitized optical image; or
  (F)   another technique that accurately reproduces the original.

- The term "**third party**" means any person, persons, or entity other than the defendants or the attorneys of record for the defendants.

- The terms "**and**" and "**or**," when used in these definitions and in the discovery requests, include the conjunction "and/or."

Copy from re:SearchTX

## II.  Deposition Topics

1.  Your involvement with or support for any abortions performed or completed in Texas on or after September 1, 2021, in which a fetal heartbeat was detectable (or likely to be detectable if properly tested), including abortions that occurred while Judge Pitman's injunction was in effect from October 6–8, 2021, as well as drug-induced abortions in which either of the abortion pills was swallowed in Texas.

2.  Your role in performing, supporting, funding, or facilitating abortions performed or completed in Texas on or after September 1, 2021, in which a fetal heartbeat was detectable (or likely to be detectable if properly tested), including abortions that occurred while Judge Pitman's injunction was in effect from October 6–8, 2021, as well as drug-induced abortions in which either of the abortion pills was swallowed in Texas.

3.  Your role in performing, supporting, funding, or facilitating abortions provided in violation of any statute enacted by the Texas legislature, including abortions that occurred while Judge Pitman's injunction was in effect from October 6–8, 2021, or while Judge Weems's TRO was in effect from June 28–July 1, 2022, as well as drug-induced abortions in which either of the abortion pills was swallowed in Texas.

4.  The identity of any individuals or entities, including attorneys, that you consulted or collaborated with in performing, supporting, funding, or facilitating abortions provided in violation of the Texas Heartbeat Act or any other law enacted by the Texas legislature, including abortions that occurred while Judge Pitman's injunction was in effect from October 6–8, 2021, or while Judge Weems's TRO was in effect from June 28–July 1, 2022, as well as drug-induced abortions in which either of the abortion pills was swallowed in Texas.

5.  The manner in which you have distinguished your funding streams for advocacy and your funding streams for conduct that aids or abets abortion.

Copy from re:SearchTX

6.   The sources of financial support for you and the Women's Reproductive Clinic of New Mexico.

7.   The identity of all officers, employees, volunteers, board members, and donors of the Women's Reproductive Clinic of New Mexico.

8.   The identity of any individuals, including attorneys, who aided or abetted any illegal abortion. This includes abortions performed or completed in Texas on or after September 1, 2021, in which a fetal heartbeat was detectable (or likely to be detectable if properly tested), including abortions that occurred while Judge Pitman's injunction was in effect from October 6–8, 2021. It also includes abortions performed or completed in Texas while Judge Weems's TRO was in effect from June 28–July 1, 2022. It also includes drug-induced abortions in which either of the abortion pills was swallowed in Texas.

9.   Your communications with others regarding the abortions described in paragraph 8, including any communications between your and your attorneys that fall within the crime–fraud exception to the attorney–client privilege. This includes communications concerning any abortion performed or completed in Texas on or after September 1, 2021, in which a fetal heartbeat was detectable (or likely to be detectable if properly tested), including such abortions that occurred while Judge Pitman's injunction was in effect from October 6–8, 2021. It also includes communications concerning any abortions performed or completed in Texas on or after June 24, 2022, including abortions performed while Judge Weems's TRO was in effect from June 28–July 1, 2022. It also includes communications concerning drug-induced abortions in which either of the abortion pills was swallowed in Texas.

Copy from re:SearchTX

# Exhibit 5

**(Subpoena for Deposition and Production of Documents)**

Copy from re:SearchTX

Cause No. _____

| | |
|---|---|
| **In re Charles Byrn,** | IN THE DISTRICT COURT |
| | TAYLOR COUNTY, TEXAS |
| *Petitioner* | _____ JUDICIAL DISTRICT |

## SUBPOENA FOR DEPOSITION AND PRODUCTION OF DOCUMENTS

This subpoena is issued in the name of the State of Texas:

To any sheriff or constable of the State of Texas, or any other person authorized to serve and execute subpoenas as provided by Texas Rule of Civil Procedure 176, Greetings:

You are hereby commanded to summon:

Franz Theard

**REDACTED**

to appear at the offices of:

Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701

on January 18, 2023, at 9:00 A.M., to attend and give testimony at a deposition in this case, to produce and permit inspection and copying of documents or tangible things to be used as evidence in this case, and to remain in attendance from day to day until lawfully discharged. All documents or tangible items listed in Exhibit A must be produced.

Pursuant to Rule 176.8(a) of the Texas Rules of Civil Procedure:

**Failure by any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena is issued or a district court in the county in which the subpoena is served, and may be punished by fine or confinement, or both.**

This subpoena is issued by Jonathan F. Mitchell, counsel of record for the petitioner in the above-styled and numbered cause.

Copy from re:SearchTX

# RETURN OF SERVICE

Came to hand this _____ day of _____, 2022, and executed this the _____ day of _____, 2022, a true and correct copy hereof in the following manner: By delivering to the within named witness _____, via

_____ USPS Priority Mail
_____ USPS Certified Mail/Return Receipt Requested
_____ Personal Service/ Hand-Served
_____ Fax/Electronic Mail

Returned this _____ day of _____, 2022.


By: _____

      Authorized Person who is not a party to the suit and is not less than 18 years of age.


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## ACCEPTANCE OF SERVICE OF SUBPOENA BY WITNESS PER RULE 176 OF THE TEXAS RULES OF CIVIL PROCEDURE

I, the undersigned witness named in the Subpoena acknowledge receipt of a copy thereof, and hereby accept service of the attached subpoena.

Rule 176.8(a) Contempt. Failure by any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena is issued or a district court in the county in which the subpoena is served, and may be punished by fine or confinement, or both.


_____      _____

SIGNATURE OF WITNESS           DATE

Copy from re:SearchTX

## EXHIBIT A

### Documents to Be Produced by Franz Theard

**I.    DEFINITIONS AND INSTRUCTIONS FOR REQUESTS FOR PRODUCTION**

1. Each request shall operate and be responded to independently and, unless otherwise indicated, no request limits the scope of any other request.

2. Unless otherwise indicated, the relevant time period for these requests is from January 1, 2019, to the present.

3. Unless otherwise defined, the terms used should be read and construed in accordance with the English language and the ordinary meanings and definitions attached. You should, therefore: (i) construe the words "and" as well as "or" in the disjunctive or conjunctive, as necessary to make the request more inclusive; (ii) construe the term "including" to mean "including, but not limited to"; and (iii) construe the words "all" and "each" to mean all and each.

The following definitions apply to each of these requests:

- The terms "**Women's Reproductive Clinic of New Mexico**," "**you**" and "**your**" refer to Franz Theard and any and all of the entities owned or controlled by Franz Theard, including the Women's Reproductive Clinic of New Mexico, including any agent or person authorized to act for or on behalf of any of those individuals or entities, including their officers, employees, staff, and unpaid volunteers.

- The terms "**communication**" and "**communicate**" refer to any method used to transmit or exchange information, concepts, or ideas (whether verbal or nonverbal) including oral, written, typed, or electronic transmittal of any type of information or data, by the use of words, silence, numbers, symbols, images, or depictions, from one person or entity to another person or entity.

- The term "**document**" refers to the act of noting, recording, or preserving any type of information, data, or communication, without regard to the method used to note, record, or preserve such information, data, or communication. The term includes any e-mail or text message.

Copy from re:SearchTX

- The term "**entity**" means any legal entity inquired about (other than a natural person) including a partnership, professional association, joint venture, corporation, governmental agency, or other form of legal entity.

- The terms "**identify**" and "**identity**," when used in connection with a natural person, require disclosure of that person's full name, present or last known address, and present or last known telephone number. When used in connection with a legal entity, the terms require disclosure of its legal name, its address, and telephone number.

- The terms "**implement**" and "**implementation**" refer to any method, process, or action used to put a decision or plan into effect or achieve a goal or obligation.

- The term "**information**" refers to and includes documents, records, communications, facts, ideas, data, observations, opinions, photographs, slides, video recordings, audio recordings, and tangible and intangible items and evidence of any kind or sort.

- The terms "**person**" and "**persons**" mean any legal entity inquired about, whether a natural person, partnership, sole proprietorship, professional association, joint venture, corporation, governmental agency, or other form of legal entity.

- The term "**record**" means letters, words, sounds, or numbers, or the equivalent of letters, words, sounds, or numbers, that have been written, recorded, documented, or received by Defendant by:

  (A)    handwriting;
  (B)    typewriting;
  (C)    printing;
  (D)    photostat;
  (E)    photograph;
  (F)    magnetic impulse;
  (G)    mechanical or electronic recording;
  (H)    digitized optical image; or
  (I)    another form of data compilation.

- The term "**record**" also includes any communication, including an e-mail or text-message communication.

Copy from re:SearchTX

- The term "**reproduction**" means an accurate and complete counterpart of an original document or record produced by:

  (A)    production from the same impression or the same matrix as the original;
  (B)    photograph, including an enlargement or miniature;
  (C)    mechanical or electronic re-recording;
  (D)    chemical reproduction;
  (E)    digitized optical image; or
  (F)    another technique that accurately reproduces the original.

- The term "**third party**" means any person, persons, or entity other than the defendants or the attorneys of record for the defendants.

- The terms "**and**" and "**or**," when used in these definitions and in the discovery requests, include the conjunction "and/or."

## II.   DOCUMENTS OR TANGIBLE THINGS REQUESTED

**Request No. 1**: Any and all non-privileged documents describing abortions provided by you or with your support on or after September 1, 2021, in which a fetal heartbeat was detectable (or likely to be detectable if properly tested), including abortions that occurred while Judge Pitman's injunction was in effect from October 6–8, 2021.

**Request No. 2**: Any and all non-privileged documents addressing your role in providing, supporting, funding, or facilitating abortions performed on or after September 1, 2021, in which a fetal heartbeat was detectable (or likely to be detectable if properly tested), including abortions that occurred while Judge Pitman's injunction was in effect from October 6–8, 2021.

**Request No. 3**: Any and all non-privileged documents identifying any individual or entity, including attorneys, that you consulted or collaborated with in performing supporting, funding, or facilitating abortions performed on or after September 1, 2021, in which a fetal heartbeat was detectable (or likely to be detectable if properly tested), including abortions that occurred while Judge Pitman's injunction was in effect from October 6–8, 2021.

**Request No. 4**: Any and all non-privileged documents identifying any individual or entity, including attorneys, that aided or abetted an abortion performed on or after September 1, 2021, in which a fetal heartbeat was detectable (or likely to be detectable if properly tested), including abortions that occurred while Judge Pitman's injunction was in effect from October 6–8, 2021. This includes the identify of anyone who paid for or reimbursed the costs of the abortion, including insurers, employers of the patient, and abortion funds, and any individual or entity (apart from the pregnant

Copy from re:SearchTX

woman upon whom the abortion was performed) that paid for or reimbursed the costs of the abortion in whole or in part.

**Request No. 5**: Any and all non-privileged documents describing abortions provided by you or with your support on or after June 24, 2022, including abortions that occurred while Judge Weems's TRO was in effect from June 28–July 1, 2022.

**Request No. 6**: Any and all non-privileged documents addressing your role in providing, supporting, funding, or facilitating abortions performed on or after June 24, 2022, including abortions that occurred while Judge Weems's TRO was in effect from June 28–July 1, 2022.

**Request No. 7**: Any and all non-privileged documents identifying any individual or entity, including attorneys, that you consulted or collaborated with in performing supporting, funding, or facilitating abortions performed on or after June 24, 2022, including abortions that occurred while Judge Weems's TRO was in effect from June 28–July 1, 2022.

**Request No. 8**: Any and all non-privileged documents identifying any individual or entity, including attorneys, that aided or abetted an abortion performed on or after June 24, 2022, including abortions that occurred while Judge Weems's TRO was in effect from June 28–July 1, 2022. This includes the identify of anyone who paid for or reimbursed the costs of the abortion, including insurers, employers of the patient, and abortion funds, and any individual or entity (apart from the pregnant woman upon whom the abortion was performed) that paid for or reimbursed the costs of the abortion in whole or in part.

**Request No. 9**: Any and all non-privileged documents describing any abortion performed on or after September 1, 2021, if there is any possibility that the patient might have opted for a drug-induced abortion and ingested either of the abortion drugs in Texas.

**Request No. 10**: Any and all non-privileged documents addressing your role in providing, supporting, funding, or facilitating any abortion on or after September 1, 2021, if there is any possibility that the patient might have opted for a drug-induced abortion and ingested either of the abortion drugs in Texas.

**Request No. 11**: Any and all non-privileged documents identifying any individual or entity, including attorneys, that you consulted or collaborated with in performing supporting, funding, or facilitating any abortion on or after September 1, 2021, if there is any possibility that the patient might have opted for a drug-induced abortion and ingested either of the abortion drugs in Texas.

Copy from re:SearchTX

**Request No. 12**: Any and all non-privileged documents identifying any individual or entity, including attorneys, that aided or abetted any abortion performed on or after September 1, 2021, if there is any possibility that the patient might have opted for a drug-induced abortion and ingested either of the abortion drugs in Texas. This includes the identify of anyone who paid for or reimbursed the costs of the abortion, including insurers, employers of the patient, and abortion funds, and any individual or entity (apart from the pregnant woman upon whom the abortion was performed) that paid for or reimbursed the costs of the abortion in whole or in part.

**Request No. 13**: Any and all non-privileged documents describing whether you have in any way distinguished your funding streams for advocacy and your funding streams for conduct that aids or abets abortion.

**Request No. 14**: Any and all non-privileged documents describing or identifying the sources of financial support for you and the Women's Reproductive Clinic of New Mexico.

**Request No. 15**: Any and all non-privileged documents describing or identifying any officer, employee, volunteer, board member, or donor of Women's Reproductive Clinic of New Mexico.

**Request No. 16**: Any and all non-privileged documents describing or identifying any individual who aided or abetted: (1) any abortion performed or completed in Texas on or after September 1, 2021, in which a fetal heartbeat was detectable (or likely to be detectable if properly tested), including abortions that occurred while Judge Pitman's injunction was in effect from October 6–8, 2021; (2) any abortion performed or completed in Texas on or after June 24, 2022, including abortions performed while Judge Weems's TRO was in effect from June 28–July 1, 2022; or (3) any abortion performed on or after September 1, 2021, if there is any possibility that the patient might have opted for a drug-induced abortion and ingested either of the abortion drugs in Texas. This includes the identity of anyone who paid for the abortion, including insurers, employers of the patient, and abortion funds.

**Request No. 17**: Any and all non-privileged documents describing, identifying, or containing communications between you and your attorneys that fall within the crime–fraud exception to the attorney–client privilege. This includes communications concerning any abortion performed or completed in Texas on or after September 1, 2021, in which a fetal heartbeat was detectable (or likely to be detectable if properly tested), including such abortions that occurred while Judge Pitman's injunction was in effect from October 6–8, 2021. It also includes communications concerning any abortions performed or completed in Texas on or after June 24, 2022, including abortions performed while Judge Weems's TRO was in effect from June 28–July 1, 2022. It also includes any abortion performed on or after September 1, 2021, if there

Copy from re:SearchTX

is any possibility that the patient might have opted for a drug-induced abortion and ingested either of the abortion drugs in Texas.

Copy from re:SearchTX

## EXHIBIT B—TRCP 176.6

You are advised that under Texas Rule of Civil Procedure 176.6, a person served with a subpoena has certain rights and obligations, specifically, that rule states:

(a) Compliance required. Except as provided in this subdivision, a person served with a subpoena must comply with the command stated in the subpoena unless discharged by the court or by the party summoning such witness. A person commanded to appear and give testimony must remain at the place of deposition, hearing, or trial from day to day until discharged by the court or by the party summoning the witness.

(b) Organizations. If a subpoena commanding testimony is directed to a corporation, partnership, association, governmental agency, or other organization, and the matters on which examination is requested are described with reasonable particularity, the organization must designate one or more persons to testify on its behalf as to matters known or reasonably available to the organization.

(c) Production of documents or tangible things. A person commanded to produce documents or tangible things need not appear in person at the time and place of production unless the person is also commanded to attend and give testimony, either in the same subpoena or a separate one. A person must produce documents as they are kept in the usual course of business or must organize and label them to correspond with the categories in the demand. A person may withhold material or information claimed to be privileged but must comply with Rule 193.3. A nonparty's production of a document authenticates the document for use against the nonparty to the same extent as a party's production of a document is authenticated for use against the party under Rule 193.7.

(d) Objections. A person commanded to produce and permit inspection and copying of designated documents and things may serve on the party requesting issuance of the subpoena—before the time specified for compliance—written objections to producing any or all of the designated materials. A person need not comply with the part of a subpoena to which objection is made as provided in this paragraph unless ordered to do so by the court. The party requesting the subpoena may move for such an order at any time after an objection is made.

(e) Protective orders. A person commanded to appear at a deposition, hearing, or trial, or to produce and permit inspection and copying of designated documents and things may move for a protective order under Rule 192.6(b)—before the time specified for compliance—either in the court in which the action is pending or in a district court in the county where the subpoena was served. The person must serve the motion on all parties in accordance with Rule 21a. A person need not comply with the part of a subpoena from which protection is sought under this paragraph unless ordered to do so by the court. The party requesting the subpoena may seek such an order at any time after the motion for protection is filed.

Copy from re:SearchTX

# Exhibit 6
## (Declaration of Jonathan F. Mitchell)

Copy from re:SearchTX

Cause No. _____

| | |
|---|---|
| **In re Charles Byrn**, | IN THE DISTRICT COURT |
| | TAYLOR COUNTY, TEXAS |
| Petitioner | _____ JUDICIAL DISTRICT |

## DECLARATION OF JONATHAN F. MITCHELL

I, Jonathan F. Mitchell, being duly sworn, states as follows:

1.   My name is Jonathan F. Mitchell. I am over 18 years old and fully competent to make this declaration.

2.   I have personal knowledge of the facts stated in this declaration, and all of these facts are true and correct.

3.   I represent petitioner Charles Byrn in this litigation.

4.   The documents attached as Exhibits 1–3 to this petition are authentic copies of news reports that I downloaded from the internet.

This concludes my sworn statement. I swear under penalty of perjury that the facts stated in this declaration are true and correct.

Jonathan F. Mitchell

Dated: December 3, 2022                    JONATHAN F. MITCHELL

Copy from re:SearchTX

### Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jonathan Mitchell on behalf of Jonathan Mitchell
Bar No. 24075463
jonathan@mitchell.law
Envelope ID: 70675270
Status as of 12/5/2022 8:26 AM CST

Associated Case Party: Charles Byrn

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jonathan F.Mitchell | | jonathan@mitchell.law | 12/3/2022 5:55:40 PM | SENT |
| Thomas Brejcha | | tbrejcha@thomasmoresociety.org | 12/3/2022 5:55:40 PM | SENT |
| Martin Whittaker | | privatrecht@gmail.com | 12/3/2022 5:55:40 PM | SENT |

Copy from re:SearchTX