IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| FUND TEXAS CHOICE, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 1:22-CV-859-RP |
| | § | |
| KEN PAXTON, *in his official capacity of* | § | |
| *Attorney General*, et al., | § | |
| | § | |
| Defendants. | § | |

**ORDER**

Before the Court is a motion for a preliminary injunction brought by Plaintiffs Fund Texas

Choice, et al. ("Plaintiffs"), (Mot. Prelim. Inj., Dkt. 6), and a motion to dismiss brought by

Defendant Ken Paxton ("Paxton"). (Mot. Dismiss, Dkt. 110). Having considered the parties' briefs,

the record, and the relevant law, the Court will grant Paxton's motion to dismiss and grant the

preliminary injunction in part. Specifically, the Court finds that while Paxton has enforcement

authority under H.B. 1280, the statute does not regulate abortions that take place outside the State

of Texas and cannot even be arguably read to do so. By contrast, the pre–*Roe* laws do arguably

proscribe Plaintiffs' desired conduct, and the Court finds that Plaintiffs have standing to sue the

local prosecutors tasked with enforcing those laws. However, turning to the preliminary injunction,

the Court finds that the pre-*Roe* laws have been repealed by implication and will grant the motion in

part to enjoin the named local prosecutors from enforcing the pre-*Roe* laws.

**I. BACKGROUND**

This case concerns several non-profit Texas abortion funds and one physician who are suing

Texas Attorney General Ken Paxton and a proposed class of district and county attorneys ("local

prosecutors") (collectively, "Defendants"), in their official capacity, for alleged violations of their

constitutional rights. Plaintiffs contend that statements made by Paxton and threats from local

prosecutors chill their First Amendment rights to speak about and fund abortions. (Mot. Prelim. Inj., Dkt. 6, at 32). They further allege that Paxton's statements restrict their ability to facilitate out-of-state abortions, which is protected by the right to interstate travel. (*Id.* at 23). In addition, Dr. Moayedi argues that Paxton's actions and the threats of prosecution have restricted her ability to travel across state lines and provide abortion services where they remain legal. (*Id.* at 25). Plaintiffs request an injunction which, among other things, would enjoin Defendants from punishing organizations for facilitating abortions outside Texas. (*Id.* at 50–51).

Plaintiffs filed their complaint and a motion for a temporary restraining order and preliminary injunction on August 23, 2022. (Compl., Dkt. 1; Mot. Prelim. Inj., Dkt. 6). The Court denied Plaintiffs' ex parte motion for a temporary restraining order to give the Defendants time to respond and to allow the Court to decide the preliminary injunction with complete briefing from both parties. (Order, Dkt. 8). After the parties submitted a joint briefing schedule on September 8, the Court held a hearing on the preliminary injunction on September 27, 2022. (Order, Dkt. 24; Minute Entry, Dkt. 74).

## A.  Texas's Anti-Abortion Statutes

The Court will first provide an overview of Texas's relevant anti-abortion laws before turning to Plaintiffs' evidence and the history of this case. Plaintiffs focus their challenge on three sets of Texas statutes: (1) Sections 170A, et seq. of the Health and Safety Code ("H.B. 1280"), (2) former Articles 1191, 1192, 1193, 1194, and 1196 of the Texas Penal Code (the "pre–*Roe* abortion laws"), and (3) the Texas Heartbeat Act, commonly called "S.B. 8." (Am. Compl., Dkt. 60, at 22–25).

### 1.  H.B. 1280

In July 2021, Texas enacted an abortion ban that would take effect on the 30th day after the issuance of any Supreme Court opinion overruling *Roe v. Wade*, 410 U.S. 113 (1973). 2021 Tex. Sess. Law Serv. ch. 800 (H.B. 1280), Sec. 3 (West); Tex. Health & Safety Code § 170A.001, et seq. The law

took effect on August 25, 2022, following the Supreme Court's decision in *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022). H.B. 1280—often referred to as the Trigger Ban—prohibits any abortion except those performed by a licensed physician to prevent the death or serious risk of substantial impairment of a major bodily function of the pregnant person. Tex. Health & Safety Code § 170A.002. H.B. 1280 carries significant civil and criminal penalties for those who perform an abortion. Violations of H.B. 1280 where "the unborn child dies" constitute first degree felonies, and Texas law authorizes up to 99 years in prison for first degree felonies. *Id.* § 170A.004; Tex. Penal Code § 12.32. H.B. 1280 also requires the Attorney General to enforce civil penalties against violators. Section 170A.005 states that the "attorney general shall file an action to recover a civil penalty assessed under this section." Tex. Health & Safety Code § 170A.005. Finally, the law states that the "appropriate licensing authority shall revoke the license, permit, registration, certificate, or other authority of a physician . . . who performs, induces, or attempts an abortion." *Id.* § 170A.007.

H.B. 1280 incorporates the definition of abortion from the Texas Abortion Facility Reporting and Licensing Act, which defines abortion as "the act of using or prescribing an instrument, a drug, a medicine, or any other substance, device, or means with the intent to cause the death of an unborn child of a woman known to be pregnant." Tex. Health & Safety Code § 245.002(1). Nothing in the text of H.B. 1280 explicitly authorizes nor limits its prohibitions to cover extraterritorial conduct.

### 2. Pre-*Roe* Laws

Plaintiffs also challenge the validity of Texas statutes which criminalized abortion prior to the Supreme Court's decision in *Roe v. Wade*, 410 U.S. 113, 166 (1973). Prior to that 1973 decision, Articles 1191, 1192, 1193, 1194, and 1196 criminalized abortion in the state.[1] Article 1191 authorized

---

[1] These Articles, having been transferred in 1973, were then codified at Article 4512.1 to Article 4512.6 of the Texas Civil Code. Tex. Rev. Stat. Ann. arts. 4512.1, et seq. (West 1974).

two to ten years in prison for knowingly procuring an abortion, while Article 1192 provided similar punishment for accomplice liability for anyone who "furnishes the means for procuring an abortion." Because the laws have been null for at least 49 years, interpretive decisions about the laws are sparse. In *Moore v. State*, 40 S.W. 287, 290 (Tex. Crim. App. 1897), the Texas Court of Criminal Appeals ruled that "furnishing the means" was added to criminalize providing a woman with medication or tools to perform an abortion herself. In *Fondren v. State*, 169 S.W. 411, 414–16 (1914), the Texas Supreme Court held that "furnishing the means for procuring an abortion" applied to drugs, medicine, or procedure that could produce an abortion. In 1908, the Texas Court of Criminal Appeals affirmed that the pre-*Roe* laws' definition of "abortion" was not unconstitutionally vague, but gave no analysis on that point. *Jackson v. State*, 115 S.W. 262, 268 (1908).

In *Roe v. Wade*, the Supreme Court determined that these statutes were unconstitutional. 410 U.S. 113, 166 ("Our conclusion that Art. 1196 is unconstitutional means, of course, that the Texas abortion statutes, as a unit, must fall."). However, the Court found it unnecessary to issue further relief because it "assume[d] that the Texas prosecutorial authorities will give full credence to this decision that the present criminal abortion statutes of that State are unconstitutional." *Id.* Shortly after, the Texas Legislature removed the pre-*Roe* statutes from the Penal Code. *See* Act of May 24, 1973, S.B. 34, 63rd Leg., Reg. Sess., ch. 399, § 5(a). The pre-*Roe* statutes were initially transferred to Chapter 6-1/2 of Title 71 of the Civil Statutes but were absent from both criminal and civil statutes since 1984. *See* 1973 Tex. Gen. Laws 995 (codified at Tex. Rev. Civ. Stat. arts. 4512.1-4512.4, 4512.6 (West 1974)).

In 2004, the Fifth Circuit addressed whether the acts had been repealed. The appeals court wrote that the "Texas statutes that criminalized abortion (former Penal Code Articles 1191, 1192, 1193, 1194, and 1196) and were at issue in *Roe* have, at least, been repealed by implication." *McCorvey v. Hill*, 385 F.3d 846, 849 (5th Cir. 2004) (*cert denied* 543 U.S. 1154 (2005)). The Fifth Circuit further

noted that Texas's regulatory provisions that govern abortion "cannot be harmonized with provisions that purport to criminalize abortion" and stated firmly that "the statutes declared unconstitutional in *Roe* have been repealed . . . ." *Id.* The concurrence also explained that reopening *Roe* could not "turn back Texas's legislative clock to reinstate the laws, no longer effective, that formerly criminalized abortion." *Id.* at 850 (Jones, J., concurring). Similarly, two Texas appellate courts have held that the pre-*Roe* statutes are unenforceable. See *Dickson v. Afiya Cr.*, 636 S.W.3d 247, 263 (Tex. App.—Dallas 2021) (pet. granted); *Zimmerman v. City of Austin*, 620 S.W.3d 473, 477, n.4 (Tex. App.—El Paso 2021) (pet. granted).[2]

Notwithstanding these cases, the Texas Legislature included a legislative finding in S.B. 8 that Texas "never repealed, either expressly or by implication, the state statutes enacted before the ruling in *Roe v. Wade*, 410 U.S. 113 (1973), that prohibit and criminalize abortion unless the mother's life is in danger." S.B. 8 § 2 (Tex. 2021). Similarly, Paxton tweeted on July 1, 2022, that "Texas's pre-*Roe* statutes criminalizing abortion is 100% good law, and I'll ensure they're enforceable." (Paxton Tweet, Dkt. 42-42). On June 27, 2022, a group of abortion providers sued in Harris County Court seeking to enjoin the pre-*Roe* bans from taking effect. *Whole Woman's Health v. Paxton*, No. 2022-38397, 2022 WL 2314499 (Tex. Dist. June 27, 2022). Although the trial court granted a temporary restraining order blocking enforcement of the bans, the Texas Supreme Court stayed the order, allowing the ban to take effect. *In re Paxton*, No. 22-0527, 2022 WL 2425619 (Tex. July 1, 2022). On October 5, 2022, the case was voluntarily dismissed.[3] *Id.*

---

[2] The Texas Appeals Court decided *Zimmerman* on March 17, 2021, before the U.S. Supreme Court issued its opinion in *Dobbs v. Jackson*, 142 S. Ct. 2228 (2022). On December 30, 2022, the Texas Supreme Court vacated the appeals court's holding and remanded for consideration on how the holding in *Dobbs* might affect the case. *See Zimmerman v. City of Austin*, No. 21-0262, 2022 WL 17998212 (Tex. Dec. 30, 2022).

[3] As explained by Mariappuram, this emergency challenge to the pre-*Roe* laws aimed to allow abortions to take place in the 30-day window after *Dobbs* but before H.B. 1280 took effect. (Hr'g Tr., Dkt. 86-1, at 107). Presumably, after the Texas Supreme Court vacated the emergency temporary restraining order, H.B. 1280 took effect and this 30-day window closed, effectively mooting the petition. (*Id.*).

### 3. S.B. 8

Plaintiffs finally challenge Senate Bill 8. The Texas Legislature passed S.B. 8 in 2021, prior to the Supreme Court's decision in *Dobbs*. *See* Senate Bill 8, 87th Leg., Reg. Sess. (Tex. 2021). S.B. 8 purports to ban all abortions where cardiac activity has been detected in the embryo with no exceptions for rape, sexual abuse, incest, or fetal defects incompatible with life after birth. Tex. Health & Safety Code § 171.204(a). It amounts to a ban on all abortions after six weeks.

At the time it was passed, S.B. 8 was designed to prohibit constitutional conduct by evading judicial review. It creates liability for anyone who performs an abortion in violation of the six-week ban or "knowingly" aids or abets the performance of an abortion after six weeks. *Id.* § 171.208(a). To avoid federal court review, S.B. 8 delegates enforcement to private individuals and precludes state enforcement. Individuals who sue may be awarded injunctive relief, statutory damages not less than $10,000 for each abortion, and costs and attorney's fees. *Id.* § 171.208(b). The law contains other novel schemes to outlaw abortions, including provisions barring a prevailing defendant from recovering attorney's fees even if they are sued multiple times, denying parties the ability to raise defenses such as whether the law was unconstitutional, and denying the defense of issue or claim preclusion. *Id.*; *see also United States v. Texas*, 566 F. Supp. 3d 605, 625–27 (W.D. Tex.), *stay granted* No. 21-50949, 2021 WL 4706452 (5th Cir. Oct. 8, 2021), *cert. dismissed* No. 21-588, 142 S. Ct. 522 (2021) (discussing different provisions of the law).

By its own text, S.B. 8 limits its coverage to abortions performed by Texas-licensed physicians. Section 171.204 states that "a physician may not knowingly perform or induce an abortion on a pregnant woman if the physician detected a fetal heartbeat . . . ." Tex. Health & Safety Code § 171.204(a). The act defines "physician" as "an individual licensed to practice medicine in this state, including a medical doctor and a doctor of osteopathic medicine." *Id.* § 171.201(4).

6

In July 2021, a group of abortion service providers and advocacy organizations filed a pre-enforcement challenge, seeking injunctive relief to stop S.B. 8 from taking effect. *Whole Woman's Health v. Jackson*, 556 F. Supp. 3d 595 (W.D. Tex. 2021), *aff'd in part, rev'd in part* 142 S. Ct. 522 (2021). Defendants filed a motion to dismiss, which this Court denied on August 25, 2021. *Id.* The Fifth Circuit then issued a temporary administrative stay of proceedings in the case. Hours before S.B. 8 took effect, Plaintiffs filed an emergency application for injunctive relief or to vacate the stay with the Supreme Court. *Whole Woman's Health v. Jackson*, 141 S. Ct. 2494 (2021). In a brief opinion, the Supreme Court denied the emergency application, with Justices Breyer, Kagan, Sotomayor, and Chief Justice Roberts each filing a dissenting opinion. *Id.* In dissent, Chief Justice Roberts noted that "[t]he statutory scheme before the Court is not only unusual, but unprecedented," because "[t]he legislature has imposed a prohibition on abortions after roughly six weeks, and then essentially delegated enforcement of that prohibition to the populace at large," with the "desired consequence appear[ing] to be to insulate the State from responsibility for implementing and enforcing the regulatory regime." *Id.*

The Supreme Court then granted cert before judgment and, in an opinion written by Justice Gorsuch, explained its reasoning at greater length. *Whole Woman's Health v. Jackson*, 142 S. Ct. 522 (2021). The Court held that *Ex Parte Young* barred suit against the Attorney General, but that Plaintiffs had sufficiently alleged the enforcement authority of Texas executive officials with disciplinary authority over medical licensees. *Id.* at 535. On remand to the Fifth Circuit, the remaining defendants moved to certify a question as to whether state officials could enforce any provision of S.B. 8. *Whole Woman's Health v. Jackson*, 23 F.4th 380 (5th Cir.). The Fifth Circuit granted the motion for certification. *Id.* On March 11, 2022, the Texas Supreme Court held that none of the remaining defendants could enforce S.B. 8, effectively bringing the case to a halt. *Whole Woman's Health v. Jackson*, 642 S.W.3d 569 (Tex. 2022).

Also during the fall of 2021 and pre-*Dobbs*, the United States filed a separate action against the State of Texas, challenging S.B. 8 as being in "open defiance of the Constitution." *United States v. Texas*, 566 F. Supp. 3d 605 (W.D. Tex. 2021). This Court granted the United States' motion for a preliminary injunction and denied Texas's motion to dismiss. *Id.* In a per curiam, three-sentence order, the Fifth Circuit granted a temporary stay of the case, and the Supreme Court later dismissed the writ of cert. *United States v. Texas*, No. 21-50949, 2021 WL 4706452 (5th Cir. Oct. 8, 2021), *cert. dismissed* No. 21-588, 142 S. Ct. 522 (2021).

Since *Whole Woman's Health* and *United States v. Texas* came to a standstill,[4] state courts have issued at least two opinions addressing the constitutionality of S.B. 8. In *Gomez v. Braid*, a Texas state court held that a plaintiff could not bring suit under S.B. 8 unless they had suffered some actual injury resulting from the law's violation. *Gomez v. Braid*, No. 2022CI8302 (224th Dist. Ct. Bexar County, Tex. Dec. 8, 2021).  In another case, Travis County Judge Peeples issued a declaratory judgment holding S.B. 8 unconstitutional under both the Texas and U.S. Constitutions because it authorizes lawsuits by plaintiffs who lack standing, unconstitutionally delegates enforcement to private parties, and creates liability without due process under the Fourteenth Amendment. *Van Stean v. Texas Right to Life*, No. D–1–GN–21–004179, at 2 (98th Dist. Ct., Travis County, Tex. Dec. 9, 2021). However, the declaratory judgment applied only to those particular parties, and the case is currently on appeal. *Texas Right to Life v. Van Stean*, No. 03-21-00650-CV (Tex. App.—Austin, 2021).

---

[4] In addition to *Whole Woman's Health* and *United States v. Texas*, Wendy Davis and other Texas abortion funds have challenged the constitutionality of S.B. 8 by filing a lawsuit against defendants who have threatened to bring S.B. 8 suits against them. *See Davis, et al. v. Sharp, et al.*, No. 1:22-CV-373-RP (W.D. Tex. filed Apr. 19, 2022). On February 16, 2023, the Court granted the Defendants' motions to dismiss. *Id.*

**B.  Factual Background**

1. Plaintiffs' Exhibits

In their briefing and at the preliminary injunction hearing, Plaintiffs presented evidence that their speech and conduct has been chilled by the Defendants threatening to enforce Texas's abortion laws against those who facilitate out-of-state abortions. First, Plaintiffs introduced several statements from Paxton and other members of the Texas government that threaten enforcement against violations of the state's abortion bans. This included statements from State Representative Briscoe Cain stating that "[d]onating money to a Texas abortion is a crime" and another accusing Fortune Magazine of "confusing the right to interstate travel with the nonexistent right to pay for another person to travel to another state." (Cain Tweets, Dkts. 42-8, 42-9). In addition, Plaintiffs introduced a letter from the "Texas Freedom Caucus"—a group of Texas House representatives— to Sidley Austin LLP ("Sidley") informing the firm that it has been "complicit" in illegal abortions, and that "criminal prohibitions extend to drug-induced abortions if any part of the drug regimen is ingested in Texas, even if the drugs are dispensed by an out-of-state abortionist." (Freedom Caucus Letter, Dkt. 42-1). The letter also purported to place a litigation hold on Sidley for violating S.B. 8. (*Id.*). The "Freedom Caucus" copied Attorney General Paxton on the letter. (*Id.* at 3).

Plaintiffs also introduced several letters, press releases, and Tweets from Paxton that threaten to prosecute violations of Texas's abortion law. First, Plaintiffs included a Tweet from Paxton that the Supreme Court of Texas has "slapped down the abortion providers and the district court carrying their water. Our state's pre-*Roe* statutes banning abortion in Texas are 100% good law." (Paxton Tweet, Dkt. 42-26). An advisory, issued by the Attorney General's office on July 27, 2022, stated that "a person who violates [H.B. 1280] commits a first-degree felony if an unborn child dies as a result, a second-degree felony if the child lives, incurs civil penalties of no less than $100,000 for each violation and may lose his or her professional license." (Advisory, Dkt. 42-27, at

1). The advisory further notes that the Attorney General's "office is specifically authorized to pursue and recover civil penalties for violations of the Act . . . [and] will do my duty to enforce this law. Further, we stand ready to assist any local prosecutor who pursues criminal charges." (*Id.* at 2).

Finally, Plaintiffs included a series of media interviews given by Paxton discussing his future enforcement of Texas's anti-abortion laws. These included a statement, immediately after the leak of the Supreme Court's draft ruling in *Dobbs*, that "the most important thing right now is that . . . prosecutors aren't the last line of defense in prosecuting crime, particularly as it relates to abortion." (Paxton Interview with Chris Krok, Dkt. 42-62, at 10:40–10:50). In another interview, Paxton stated "I have the opportunity to impose some of the civil penalties. The minimum penalty is $100,000 and it can go up to unlimited amounts. . . . So we will be pursuing the civil side of this." (Paxton Interview with Leland Vittert, Dkt. 42-63, at 1:10–1:20).[5] Finally, Plaintiffs introduced an interview with Lou Dobbs where Paxton promises to "use the full force of [the Trigger Ban] to make people pay if they're going to do abortions." (Paxton Interview with Lou Dobbs, Dkt. 42-64).

### 2. Plaintiffs' Testimony

Beyond their exhibits, representatives for Plaintiffs also testified to the chilling effect that Texas's anti-abortion laws have had. First, Plaintiffs presented Anna Rupani, the Executive Director at Fund Texas Choice. (Hr'g Tr., Dkt. 86-1, at 7). Rupani testified that, before S.B. 8 was enacted, Fund Texas Choice would provide "travel support and logistics to get pregnant Texans to their abortion care appointment. . . . [W]e would buy their flights. We would book their hotels." (Hr'g Tr., Dkt. 86-1, at 9–10). After S.B. 8 was passed, Rupani testified that more Texans turned to Fund Texas Choice because nearly all their callers had to leave the state to access abortions. (*Id.* at 10).

---

[5] Vittert further asked Paxton about whether companies could pay their employees to travel outside the state to obtain abortions, and Paxton indicated that his office would be "looking at" whether those penalties were enforceable and thus "penalties could even be for corporations over $100,000." (*Id.* at 2:40–2:50).

This left Fund Texas Choice overwhelmed and unable to fully support each caller who needed funds to access abortions. (*Id.* at 10–11).

Following the Supreme Court's decision in *Dobbs*, Fund Texas Choice stopped providing resources to callers and began simply referring them to online websites and other third parties. Since *Dobbs*, Rupani testified that Fund Texas Choice has been unable to "offer practical support" out of fear of "civil and criminal prosecution," in large part because of "General Paxton's advisory" that the pre-*Roe* laws were valid. (*Id.* at 11–14). In addition, Rupani stated that Fund Texas Choice has received communications from its donors saying that they will not donate because of the potential for criminal and civil liability, while others are not donating because Fund Texas Choice has had its standard operations stymied. (*Id.* at 14). Finally, Rupani noted that Fund Texas Choice "might have to shut down" if it does not obtain a court order allowing it to support Texans in need of abortions. (*Id.* at 17–18).

Several more witnesses testified for Plaintiffs, all to similar effect. Neesha Davé, Deputy Director for the Lilith Fund, testified that the organization had, since 2001, been providing financial assistance to those who need to access abortions. (*Id.* at 54). In addition to direct funds, Davé testified that the Lilith Fund provides support, resource connection, movement building, and advocacy to those seeking care. (*Id.*). Like Fund Texas Choice, after S.B. 8 took effect, the Lilith Fund had to spend more to fund travel to help people obtain out-of-state abortions. (*Id.* at 55). However, "when the *Dobbs* decision came down in June, . . . Lilith Fund was forced to immediately pause all direct abortion funding" because H.B. 1280 provides such severe punishment, including life imprisonment, if someone provides an abortion in violation of the law (*Id.*). According to Davé, "for the first time in [Lilith Fund's] 21-year history, [the Fund] had to call out clients back and tell them that we would not be able to fund a single one of their calls." (*Id.*).

11

Next, Rosann Mariappuram, the Executive Director at Jane's Due Process, testified. Like Davé and Rupani, Mariappuram stated that Jane's Due Process had to "transition to helping youth travel outside of the state for care" after S.B. 8 was enacted. (*Id.* at 79). However, even this was limiting, because Jane's Due Process focuses its services on minors who need abortions or support. (*Id.*). Because "minors are uniquely . . . kept from traveling because they often don't have the financial resources" and lack experience traveling alone, Jane's Due Process would do "extensive emotional support and also logistical support if a teen did have to travel out of state." (*Id.* at 86). After *Dobbs*, Mariappuram testified Jane's Due Process, among other abortion funds, began to fear prosecution from local district attorneys because of statements made by Paxton. (*Id.* at 79–85). Jane's Due Process interpreted Paxton's advisories as "clarification from Attorney General Paxton to prosecutors across Texas about how [H.B. 1280] will take effect and also, once again, referring to the pre-*Roe* ban because it refers to criminal charges and how the Attorney General's Office will be ready to assist any prosecutors across the state who use criminal charges." (*Id.* at 83–84).[6] Because Jane's Due Process did not know the meaning of the "unclear provisions about what counts as aiding and abetting and also [what] counts under any of these criminal prosecution charges," the organization had to be limit itself to only offering publicly available resources. (*Id.* at 85).

As Mariappuram testified, "Because of these laws, I don't know if it's safe for us to [help people obtain abortion services outside the state]. So we completely stopped any travel, practical

---

[6] In particular, Mariappuram described the chilling effect on Jane's Due Process's ability to operate its phone lines.

> So the day of the *Dobbs* decision, we immediately ceased all abortion-related direct services. That is because of these types of statements we saw coming from Attorney General Ken Paxton. And also, other prosecutors made statements around whether or not they would enforce the law. It was also because of the law itself. And so, we closed our hotline, which was awful. It's a 24/7 hotline that normally teenagers can call or text, and we had to assess was it safe to even have the hotline open. Normally the hotline's run by volunteers. I wasn't sure if that was safe anymore. I also wasn't sure what we could say. So we took time -- we did eventually reopen the hotline, but it's no longer live. It goes to a voicemail and our staff members are calling folks back if we think we can at least give information.

(*Id.* at 84–85).

support work and, also, any funding of abortion care outside of Texas and in the states where abortion is legal." (*Id.* at 86). When asked whether Jane's Due Process would like to resume these activities, Mariappuram responded, "Yes. Deeply." (*Id.*).

Mariappuram also testified to the impact that other Texas politicians have had on Jane's Due Process. For example, she testified that Jane's Due Process became aware of a letter from the Texas Freedom Caucus threatening felony criminal prosecution against abortion funds but did not understand what conduct was covered by these statutes because it was unclear what "furnishing" and "procuring" meant. (*Id.* at 88–90). In addition, Jane's Due Process became subject to a purported litigation hold from Jonathan Mitchell (despite allegedly never being sent an actual copy), for alleged violations of S.B. 8. (*Id.* at 94–95). Mariappuram discussed how Jane's Due Process was threatened with criminal prosecution by Representative Briscoe Cain in a tweet for "helping Texans pay for care in Texas and outside of the state" and that "they're already facing jail time for their criminal acts. #prosectuteTexasabortionfunds." (*Id.* at 98–99). In summary, Mariappuram stated that her "understanding is that [Cain] does think it is illegal to help someone travel, specifically to also fund their abortion if it's—even if it's not the state of Texas. Even if it's somewhere where abortion care is still legal." (*Id.* at 101).

In particular, Paxton's statement that the pre-*Roe* bans were in full effect, as well as the fact that Paxton would assist in any prosecutions of H.B. 1280, chilled Jane's Due Process from helping fund abortions. (*Id.*). Similarly, Bridget Schilling, a Board Member of the Clinic Access Support Network ("CASN"), testified that the organization "immediately paused operations" following *Dobbs.* (*Id.* at 154). Since CASN lacks "the capacity to take on a high degree of risk," Schilling testified that CASN had effectively ceased all conduct. (*Id.*).

Finally, Dr. Ghazaleh Moayedi, an OB-GYN and abortion provider, testified for Plaintiffs. (*Id.* at 183). Dr. Moayedi testified that she had been providing abortions in her hometown of Dallas

and in Oklahoma but stopped providing care in Texas following the enactment of S.B. 8. (*Id.* at 183–85). Still, before *Dobbs* but after S.B. 8, Dr. Moayedi would provide consultations to people in Dallas and "then travel with them to other states to provide abortion care for them." (*Id.*) However, while abortion care had historically been "75 to 90 percent" of Dr. Moayedi's practice, she has since stopped providing abortion care in Texas. (*Id.* at 185–90). She has also stopped traveling to provide abortions out of concern for being arrested in Texas for providing care for Texans in other states. (*Id.* at 190).

### 3. Writ of Mandamus

After the Plaintiffs' witnesses, the Court briefly heard arguments as to whether Paxton should be compelled to testify. Christopher Hilton, arguing on behalf of Paxton, contended that "the Attorney General's statements are not causing any chill here. It's either their own subjective chill or it's, you know, whatever is happening in state law that is chilling their conduct." (*Id.* at 252). He further explained, "[I]t's the legislature's prerogative to criminalize conduct they don't want to occur. And so, if that's chilling the conduct, well, then, that's having a constitutional and intended effect of the legislation." (*Id.* at 252–53). A week later, in an order granting Plaintiffs' motion for reconsideration, the Court determined that Paxton had provided conflicting statements about whether he intended to enforce Texas's anti-abortion statutes against out-of-state conduct. (Order, Dkt. 83). The Court ordered the parties to confer on the particulars of Paxton's testimony *Id.* The Fifth Circuit then issued a writ of mandamus, stating that this Court erred by refusing to quash the subpoenas and by not first addressing Paxton's jurisdictional challenge before ordering discovery. *In re Paxton*, 53 F.4th 303, 308 (5th Cir. 2022). The Fifth Circuit held that there was no need for his testimony to clarify the jurisdictional issues because sovereign immunity would turn principally on whether Paxton "is statutorily tasked with enforcing the challenged law." *Id.* A concurring opinion noted that "a trier of fact, which we are not, could find there is sufficient evidence of an unsettling

and chilling want of clarity in statements by officials with enforcement authority to allow this case to proceed." *Id.* at 313 (Higginbotham, J., concurring).

While Paxton's petition was pending before the Fifth Circuit, Plaintiffs filed their first amended complaint, (Dkt. 90). Paxton filed an amended motion to dismiss on December 9, 2022. (Mot. Dismiss, Dkt. 110). Plaintiffs responded, and Paxton filed a reply on January 3, 2023. (Pl.'s Resp., Dkt. 112; Def.'s Reply, Dkt. 115).

## II. LEGAL STANDARD

### A. Motion to Dismiss

#### 1. Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows a party to assert lack of subject-matter jurisdiction as a defense to suit. Fed. R. Civ. P. 12(b)(1). Federal district courts are courts of limited jurisdiction and may only exercise such jurisdiction as is expressly conferred by the Constitution and federal statutes. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A federal court properly dismisses a case for lack of subject matter jurisdiction when it lacks the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001), *cert. denied*, 536 U.S. 960 (2002). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* In ruling on a Rule 12(b)(1) motion, the court may consider any one of the following: (1) the complaint alone; (2) the complaint plus undisputed facts evidenced in the record; or (3) the complaint, undisputed facts, and the court's resolution of disputed facts. *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008).

2.  Rule 12(b)(6)

Pursuant to Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a 12(b)(6) motion, a "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir. 2008) (citations and internal quotation marks omitted). A court may also consider documents that a defendant attaches to a motion to dismiss "if they are referred to in the plaintiff's complaint and are central to her claim." *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). But because the court reviews only the well-pleaded facts in the complaint, it may not consider new factual allegations made outside the complaint. *Dorsey,* 540 F.3d at 338. "[A] motion to

16

dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

### B. Preliminary Injunction

A preliminary injunction is an extraordinary remedy, and the decision to grant such relief is to be treated as the exception rather than the rule. *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The party seeking injunctive relief carries the burden of persuasion on all four requirements. *PCI Transp. Inc. v. W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005). A movant cannot be granted a preliminary injunction unless it can establish that it will suffer irreparable harm without an injunction. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001).

### III. DISCUSSION

Plaintiffs seek an injunction prohibiting Defendants from pursuing civil or criminal penalties for any conduct related to abortions obtained outside the State of Texas. (Mot. Prelim. Inj., Dkt. 6, at 49–50). Paxton has filed a motion to dismiss, asserting that Plaintiffs lack standing and that their claims are barred by sovereign immunity. (Mot. Dismiss, Dkt. 110, at 1).[7] The Court will first address Paxton's motion to dismiss before turning to Plaintiffs' motion for a preliminary injunction.

---

[7] The remaining Defendants have not filed a motion to dismiss. Defendant José Garza, Travis County District Attorney, filed an agreed stipulation with Plaintiffs, seeking clarification on the scope of Texas's anti-abortion laws. (Agreed Stipulation, Dkt. 31, at 2).

**A. Paxton's Motion to Dismiss**

Paxton's motion to dismiss proceeds in two parts. First, Paxton argues that Plaintiffs lack standing because their injuries are both speculative and not traceable to the Attorney General. (*Id.* at 4–9). Second, Paxton argues that Plaintiffs do not state a claim to relief the Constitution does not protect Plaintiffs' right to facilitate or fund out-of-state abortions. (*Id.* at 17–25). Here, the Court finds that Paxton lacks enforcement authority with respect to S.B. 8 and the pre-*Roe* laws. Moreover, nothing in the text or statutory construction of H.B. 1280 plausibly authorizes the Texas Attorney General to prosecute conduct related exclusively to out-of-state abortions. Because the conduct is not "arguably" proscribed by H.B. 1280, the Court will grant Paxton's motion.

To have Article III standing, a plaintiff must "(1) have suffered an injury in fact, (2) that is fairly traceable to the challenged action of the defendant, and (3) that will likely be redressed by a favorable decision." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) (citing *Lujan v. Def's. of Wildlife*, 504 U.S. 555, 560–61 (1992), *as revised* (Oct. 30, 2020)). Here, Plaintiffs bring a pre-enforcement challenge to several statutes that threaten criminal and civil penalties. In the context of pre-enforcement challenges, an injury-in-fact is established when the plaintiff "(1) has an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) his intended future conduct is arguably proscribed by the policy in question, and (3) the threat of future enforcement of the challenged policies is substantial." *Fenves*, 979 F.3d at 330 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). The Court will initially discuss whether Plaintiffs have standing to bring a claim against Paxton under H.B. 1280 before turning to the pre-*Roe* laws and S.B. 8.

1. Intent to Engage in Conduct

At this Court's hearing on Plaintiffs' motion for a preliminary injunction, representatives from every Plaintiff organization testified in detail how they have stopped engaging in their desired

conduct because of Texas's anti-abortion laws. Plaintiffs' witnesses testified that, prior to S.B. 8, they had engaged in direct funding and support of Texans who sought abortions in the state. Anna Rupani's testimony on behalf of Fund Texas Choice is representative: "We recognize that Texans would need travel support, so we were providing travel support and logistics to get pregnant Texans to their abortion care appointment. . . . [W]e would buy their flights. We would book their hotels." (Hr'g Tr., Dkt. 86-1, at 9–10). After S.B. 8, "99.5 percent of [Fund Texas Choice's] callers had to leave the state to access care because they were unable to receive that care in the state of Texas due to the six-week limit." (*Id.* at 10). While the core activities remained unchanged, Fund Texas Choice saw a substantial increase in costs, was unable to help the majority of callers, and was effectively limited to providing assistance for out-of-state care. (*Id.* at 10–11). After *Dobbs*, Fund Texas Choice entirely stopped funding abortions. (*Id.*). Instead, the organization simply refers callers to other organizations in the country and has shifted completely toward "advocacy and educational activities . . ." (*Id.*). Directors of every other Plaintiff organization testified to similar effect.

In short, Plaintiffs meet the first element of a pre-enforcement challenge standing. *See Driehaus*, 573 U.S. at 158 (stating that a plaintiff must show "an intention to engage in a course of conduct arguably affected with a constitutional interest"). There is no doubt that they intend to speak about and fundraise for Texans who seek abortions in other states. These speech and fundraising efforts are plainly afforded constitutional interests by the First Amendment. *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 789 (1988); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 365 (2010) ("[A] prohibition on corporate independent expenditures is thus a ban on speech."). Dr. Moayedi's desire to travel across state lines is afforded constitutional interest by the Fifth and Fourteenth Amendments. *Saenz v. Roe*, 526 U.S. 489, 502 (1999). The history of Fund Texas Choice, among other Plaintiffs, demonstrates that the organization intends to fund abortions for pregnant Texas. During the period in which S.B. 8 was enacted but before *Dobbs*, Fund Texas

Choice provided abortion funds for out-of-state abortions, and they have presented strong evidence showing that they intend to do so again if such conduct is deemed constitutional. Because Plaintiffs have demonstrated a clear intent to engage in conduct afforded a constitutional interest, there is no question that Plaintiffs are suffering a substantial and ongoing injury sufficient to satisfy the first element of *Driehaus*.

### 2. Substantial Threat

In addition, Plaintiffs have shown that they face a substantial threat of prosecution from Paxton. Undoubtedly, Paxton's suggestion that he will use the "full force" of Texas's abortion prohibitions has substantially chilled Plaintiffs' activities. (Paxton Interview with Lou Dobbs, Dkt. 42-64). Plaintiffs presented ample evidence that their conduct and speech are chilled by Paxton's threats of enforcement.[8] They have further shown that a delay in relief would potentially result in their organizations being forced to shut down.[9] The Court finds that these fears are genuine and demonstrate serious hardship. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) ("We are not troubled by the pre-enforcement nature of this suit. The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise. We conclude that plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them.").

The severe punishments under H.B. 1280 add to this threat. H.B. 1280 requires the Attorney General to bring civil prosecutions with fines starting at $100,00.00 up to an unlimited amount. Tex. Health & Safety Code § 170A.005. On the criminal side, violations of H.B. 1280 may result in life in

---

[8] *See, e.g., infra* Section I.B.2; (Hr'g Tr., Dkt. 86-1, at 55–56 ("[F]or the first time in our 21-year history, [we] had to call our clients back and tell them that we would not be able to fund a single one of their calls.")).

[9] *See, e.g., infra*, Section I.B.2; (Hr'g Tr., Dkt. 86-1, at 17–18 ("[T]o not be able to fulfill its mission would potentially be catastrophic for us. . . . [W]e fear that we might have to shut down and not be able to support pregnant Texas if we're not able to get a court order that says we can.")).

prison.[10] *Id.* § 004. This extreme punishment undoubtedly adds to the threat faced by those who wish to fund out-of-state abortions.

Paxton's statements are exacerbated by his repeated refusal to clarify whether he will prosecute organizations that fund out-of-state abortions. The Supreme Court has repeatedly held that "whether the government disavows prosecution is a factor in finding a credible threat of prosecution." *Seals v. McBee*, 898 F.3d 587, 592 (5th Cir. 2018), *as rev'd* (Aug. 9, 2018); *see also Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010) (holding that a case was "suitable for judicial review" in part because the "Government has not argued to this Court that plaintiffs will not be prosecuted if they do what they say they wish to do."); *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 302 (1979) ("[T]he State has not disavowed any intention of invoking the criminal penalty provision against unions that commit unfair labor practices. Appellees are thus not without some reason in fearing prosecution[.]").

The Texas Government Code, in fact, embodies this principle by requiring the Attorney General to "issue a written opinion on a question affecting the public interest or concerning the official duties of the requesting person" when it is requested by "a committee of a house of the legislature." Tex. Gov't. Code § 402.042. Here, Representative Nicole Collier, Chair of the House Committee on Criminal Jurisprudence, requested clarification from Paxton on whether Texans may facilitate out-of-state abortions. (Letter from Rep. Collier, Dkt. 113-22). Plaintiffs allege that Paxton refused to answer the question.[11] (Pl.'s Resp., Dkt. 113, at 12). Paxton's refusal to answer this

---

[10] Tex. Health & Safety Code § 170A.004 (stating that abortion is a first-degree felony if the "unborn child" dies); Tex. Penal Code § 12.32 (authorizing punishment for first degree felonies "not more than 99 years or less than 5 years).

[11] According to Plaintiffs, Paxton refused to answer the request "due to pending litigation." This makes little sense, as the Fifth Circuit has already held that Paxton's subjective views of the law are not relevant to whether Plaintiffs have standing. *In re Paxton*, 53 F.4th 303, 308 (5th Cir. 2022). Either Paxton's interpretation of the law is relevant or it is not. But having taken the position that his statements are not relevant, it appears contradictory that he should not answer a question required by Texas law out of fear that it might affect this litigation.

question—despite his requirement to do so—adds to the chilling effect where he threatens

prosecutions sufficient to chill Plaintiffs' conduct but then declines to clarify what he means by his

threats. *United Farm Workers Nat. Union*, 442 U.S. at 302.

Thus, the Court finds that Plaintiffs face a substantial risk of prosecution and have thus

established an injury-in-fact at this stage of the litigation. The Court now turns to whether the three

challenged statutes—H.B. 1280, S.B. 8, and the pre-*Roe* laws—authorize Paxton to prosecute

Plaintiffs' desired conduct.

### 3. Paxton's Enforcement Authority

#### a. H.B. 1280

Here, the Court will focus its analysis on whether Plaintiffs' desired conduct is "arguably

proscribed by the policy in question." *Fenves*, 979 F.3d at 330.[12] In his motion to dismiss, Paxton

argues that Plaintiffs' "standing is based instead on a motley assortment of generalities that refer

neither to Plaintiffs nor to persons like them. . . . Absent from Plaintiffs' allegations are facts that

would permit a reasonable person to infer that the Attorney General imminently intends to

criminalize entities that provide funding for abortion care." (*Id.* at 5 (internal quotations omitted)).

Paxton contends that Plaintiffs "do not allege an imminent risk that the Attorney General will

pursue civil enforcement against them under [H.B. 1280]." (Mot. Dismiss, Dkt. 110, at 5).

Here, there is no doubt that Paxton is tasked with some enforcement power under H.B.

1280. *See OCA-Greater Houston v. Texas*, 867 F.3d 604, 613 (5th Cir. 2017) ("The facial invalidity of a

Texas election statute is, without question, fairly traceable to and redressable by the State itself and

---

[12] There is some uncertainty as to whether "actual proscription" is necessary when the threat of enforcement beyond the limits of the law is still threatened. *See Fenves*, 979 F.3d at 330 ("First, even assuming that actual proscription is necessary . . . ." citing *Laird v. Tatum*, 408 U.S. 1, 11 (1972)); *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 764–65 (6th Cir. 2019) (noting that actual authority may not be necessary to produce an objective chill when someone acts to quell speech). Nonetheless, as Paxton himself has stopped short of directly holding that funding out-of-state abortions violates H.B. 1280, the Court does not reach the question of whether direct threats of enforcement could confer standing.

its Secretary of State, who serves as the 'chief election officer of the state.'"). As the Fifth Circuit has already noted in this case, "Where Paxton may be sued under the *Ex Parte Young* exception to sovereign immunity does not turn on Paxton's campaign statements or tweets. Rather, it turns principally on whether Paxton is statutorily tasked with enforcing the challenged law." *In re Paxton*, 53 F.4th 303, 309 (5th Cir. 2022) (cleaned up). And there is "significant overlap" between the threat of enforcement and sovereign immunity. *Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 520 (5th Cir. 2017). In fact, the express language of the statute tasks Paxton with enforcement: the "attorney general shall file an action to recover a civil penalty assessed under this section." Tex. Health & Safety Code § 170A.005. Not only is Paxton tasked with enforcing the law, he is required to enforce its civil penalties.

### i. Statutory Analysis

However, just because Paxton is authorized to enforce H.B. 1280 does not mean that he has the ability to pursue civil penalties for Plaintiffs' particular activities. H.B. 1280 must, at least, "arguably" proscribe the conduct which Plaintiffs' desire to resume. *Fenves*, 979 F.3d at 330. Straightforward applications of statutory construction lead to the conclusion that Paxton may not pursue civil penalties for abortions that occur outside of Texas. Because his scope of power in this regard is not even "arguable," the Court finds that Plaintiffs have not met the second element of pre-enforcement review.

H.B. 1280 is not susceptible to a construction that it applies extraterritorially or penalizes those who facilitate an abortion which occurs outside Texas. H.B. 1280 incorporates the definition of abortion from the Texas Abortion Facility Reporting and Licensing Act, which defines abortion as "the act of using or prescribing an instrument, a drug, a medicine, or any other substance, device, or means with the intent to cause the death of an unborn child of a woman known to be pregnant." Tex. Health & Safety Code § 245.002(1). Nothing in the Texas Abortion Facility Reporting and

Licensing Act expresses a clear intent to apply extraterritorially. To the contrary, Chapter 245 centers around facility licensing requirements, and the Chapter explicitly discusses abortion facilities "in this state." *Id.* § 245.003(a). Chapter 245 is a regulation of healthcare, and there is no reason to think that the licensing scheme should regulate conduct or facilities outside of Texas.[13] The Court is not aware of any instances where the provision was held to regulate conduct outside of Texas. Chapter 245.002(1) provides the definition of an "abortion," while Chapter 245.002(2) defines "abortion facility" as a "place where abortions are performed." *Id.* § 245.002. If the statute is read—as it has always been—to only regulate *Texas* abortion facilities, then it must logically have only regulated abortions in Texas. To put it another way, if Chapter 245 did include abortions taking place outside of Texas, then every abortion facility outside the state would necessarily be covered by Texas law. This is not a plausible interpretation of Chapter 245, so the Court will not create extraterritorial effect where it does not exist. Neither party points to, and the Court is not aware of, any instances in which a doctor operating outside of Texas had to comply with Chapter 245 prior to the *Dobbs* decision.

When this Court decided *Whole Woman's Health v. Lakey*, which dealt with admitting privileges for abortion providers, no suggestion was made that Chapter 245 of the Texas Health and Safety Code applied extraterritorially. *Whole Woman's Health v. Lakey*, 46 F. Supp. 3d 673 (W.D. Tex. 2014). Throughout the course of that litigation, it proceeded as an assumption so obvious that it did not even need to be stated that Texas's regulation only applied within its borders. *Whole Woman's Health v. Cole*, 790 F.3d 563 (5th Cir. 2015), *rev'd and remanded sub nom. Whole Woman's Health v.*

---

[13] Applying this type of licensing scheme beyond a state's borders would almost certainly lead to irreconcilable conflict of laws, as abortion providers in one state would have to abide by at least two states' different and possibility contradictory regulations.

*Hellerstedt*, 579 U.S. 582 (2016).[14] No changes to Chapter 245 since that decision have expanded the statute's scope beyond Texas.

Nor does anything in the text of H.B. 1280 itself purport to apply extraterritorially. Section 170A.002 states, "A person may not knowingly perform, induce, or attempt an abortion." Tex. Health & Safety Code § 170A.001. Sections 170A.004–005 provide criminal and civil liability for any person who violates Section 170A.002—in other words, those who knowingly perform, induce, or attempt an abortion. *Id.* §§ 170A.004–005. Nothing in the statute mentions out-of-state abortions, facilitating such care, or any in-state conduct related to out-of-state abortions, and the Court is not aware of any state law prohibiting abortion that applies to out-of-state abortions. The core inquiry remains whether "abortion" is limited to those occurring in Texas, and nothing in Section 170 nor Section 245 suggests any extraterritorial effect.

Beyond the text of the statute, it is settled law in Texas that a law will not be given extraterritorial effect unless such intent is clear. In a 2006 case, the Texas Supreme Court decided whether "Texas courts can adjudicate and remedy an anticompetitive injury occurring in another state, either under [Texas law] or the law of that state." *Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671 (Tex. 2006). The Supreme Court held firmly that it could not, stating that the presumption against extraterritoriality was "so obviously the necessary result that it needs no supporting authority." *Id.* at 682. It held that, even though conduct outside the state might implicate Texas's interest in protecting its consumers, the idea that the statute thus applied extraterritorially was "simply unreasonable." *Id.* at 683. As a more general rule, the Texas Supreme Court held that "a statute will not be given extraterritorial effect by implication but only when such intent is clear." *Id.*

---

[14] In fact, *Hellerstedt* is particularly telling because, following that Supreme Court decision, Louisiana passed an identical law and argued that the decision did not apply because the burden in Louisiana was much less substantial than in Texas. *June Medical Services L. L. C. v. Russo*, 140 S.Ct. 2103 (2020). This cannot have been the case if Texas's identical law had already regulated conduct in Louisiana.

at 682; *see also Marmon v. Mustang Aviation, Inc.*, 430 S.W.2d 182 (Tex. 1968) (affirming same principle regarding wrongful death statute). H.B. 1280 does not express any intent, much less a clear one, to apply extraterritorially.[15] Accordingly, there is no plausible construction of the statute that allows the Attorney General or local prosecutor to penalize out-of-state abortions.

Moreover, as noted by amici in this case, H.B. 1280 cannot create liability for aiding and abetting where there is no principal offense. (Sepper & Mohapatra Amicus Br., Dkt. 107, at 15). Texas law does not authorize aiding and abetting liability unless the state can prove a primary violation of a statute. *Beier v. State*, 687 S.W.2d 2, 3 (Tex. Crim. App. 1985) (en banc). Under H.B. 1280, Texas would have to prove that someone knowingly performed, induced, or attempted an abortion, which, as already explained, must have occurred in the State of Texas. Because Plaintiffs only wish to facilitate out-of-state abortions, they would not be aiding or abetting an abortion covered by H.B. 1280.

The same is true for civil liability as well. *See West Fork Advisors, LLC v. SunGard Consulting Servs., LLC*, 437 S.W.3d 917, 921 (Tex. App.—Dallas 2014) (noting that aiding and abetting is a dependent claim premised on an underlying tort); *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573 (Tex. 2001) (holding that aiding and abetting liability could not attach where there was no principal offense); *Nguyen v. Watts*, 605 S.W.3d 761 (Tex. App.—Houston 2020) (pet. denied) ("[A]iding and abetting is a derivative tort."); *Four Bros. Boat Works v. Tesoro Petroleum Companies, Inc.*, 217 S.W.3d 653, 668 (Tex. App.—Houston [14th Dist.] 2006) (pet. denied) ("[B]ecause a defendant's liability depends upon its participation in some underlying tort for which the plaintiff seeks to hold

---

[15] Paxton might argue that Texas's abortion laws do express an intent to apply extraterritorially. (*See* Mot. Dismiss, Dkt. 110, at 23–24 ("Texas has explicitly codified its interest by statute so there can be no mistake about it—it has 'compelling interests from the outset of a woman's pregnancy in protecting the health of the woman and the life of the unborn child[.]'") (quoting Tex. Health & Safety Code § 171.202(3))). This is not a clear intent to regulate extraterritorially. The Texas Legislature presumably passes every statute because it advances some state interest, many of which may extend beyond the state's borders, but that does not accord those statutes extraterritorial effect.

the defendant liable, conspiracy is considered a derivative tort."). Plaintiffs cannot face aiding and

abetting or civil conspiracy liability for facilitating an out-of-state abortion under H.B. 1280 because

it would be derivative of a nonexistent principal offense.

Finally, were there any ambiguity regarding H.B. 1280, it would be addressed by remaining

canons of statutory construction. The rule of lenity, which is long-established in Texas law, counsels

against a broad reading of penal statutes. *State v. Johnson*, 219 S.W.3d 386 (Tex. Crim. App. 2007)

("We are mindful of the proposition that criminal statutes outside the penal code must be construed

strictly, with any doubt resolved in favor of the accused."); *Murray v. State*, 2 S.W. 757, 761 (Tex.

App. 1886) ("[T]he doctrine is fundamental in English and American law that there can be no

constructive offenses; that, before a man can be punished, his case must be plainly and unmistakably

within the statute, and, if there be any fair doubt whether the statute embraces it, that doubt is to be

resolved in favor of the accused."). Finally, were the statute ambiguous, Texas courts would

presumably read it in a way to avoid the overbreadth or vagueness challenge. *See Quick v. City of*

*Austin*, 7 S.W.3d 109 (Tex. 1998) ("In analyzing the constitutionality of a statute, we should, if

possible, interpret the statute in a manner that avoids constitutional infirmity.").

In short, this is not a scenario where the Court is deciding between multiple plausible

constructions of H.B. 1280. Instead, H.B. 1280—by its own language and in the context of Texas

law—carries only one meaning: it regulates abortions occurring within the state boundaries.

Plaintiffs only wish to facilitate out-of-state abortions, so H.B. 1280 does not authorize civil or

criminal prosecution against that conduct.

### ii. Paxton's Statements

The confusion about H.B. 1280 comes not from the statute itself, but the conduct of Texas

politicians—including Paxton—since the leak of the *Dobbs* draft. Most prominently, Representative

Briscoe Cain explicitly said that "[d]onating money to a Texas abortion is a crime." (Cain Tweet,

27

Dkt. 42-8). In another tweet, he accused Fortune Magazine of "confusing the right to interstate travel with the nonexistent right to pay for another person to travel to another state." (Cain Tweet, Dkt. 42-9). The Texas Freedom Caucus sent a letter to Sidley Austin LLP informing the law firm that it has been "complicit" in illegal abortions, and that "criminal prohibitions extend to drug-induced abortions if any part of the drug regimen is ingested in Texas, even if the drugs are dispensed by an out-of-state abortionist." (Freedom Caucus Letter, Dkt. 42-1).

Paxton has repeatedly suggested that H.B. 1280 (and the pre-*Roe* laws) might have extraterritorial effect though he has stopped short of definitively saying so. He stated on June 24, 2022, just after the official *Dobbs* decision, that his office would be "looking at" whether it could prosecute abortion funds who facilitate out of state abortions. (Paxton Interview with Leland Vittert, Dkt. 42-63, at 1:10–1:20). He said he would use the "full-force" of Texas's laws to deter abortions. (Paxton Interview with Lou Dobbs, Dkt. 42-64). But Paxton's strongest statements come from his briefing in the instant case. In his motion to dismiss, Paxton states:

> "[C]riminalization is a means to an end—the protection of human life, including the life of the unborn. That interest continues whether the Texan mother seeks an abortion in Denver or Dallas, in Las Cruces or Lamesa. When that procurement takes the form of a bus ticket for the pregnant Texan to an abortion clinic, or the paying from Texas of the cost of a pregnant Texan's hotel room adjacent to that clinic, it does not matter if the travel and hotel are in Albuquerque or Austin—the procurement in Texas of the means of an abortion has intruded upon the State's interest in the protection of human life."

(Mot. Dismiss, Dkt. 110, at 24).

These threats, while they have created a chill on Plaintiffs' conduct, do not influence or change the statutory analysis. Regardless of whether Texas has an "interest" in protecting unborn life outside the state, it has not codified that extraterritorial interest in H.B. 1280. This is a point that the Freedom Caucus implicitly concedes, acknowledging that it will be "introducing legislation next session that will impose addition civil and criminal sanctions on law firms that pay for abortions or abortion travel" beyond those in the pre-*Roe* laws. (Freedom Caucus Letter, Dkt. 42-1, at 1). But as

the law stands today, H.B. 1280 does not penalize conduct that facilitates out-of-state abortions, and Paxton has stopped short of issuing an opinion or statement that explicitly says otherwise.

In sum, the Court is faced with an unusual pre-enforcement challenge. H.B. 1280, employing all standard means of statutory construction, cannot apply extraterritorially or regulate Plaintiffs' desired conduct. Yet Paxton and others, for the deliberate purpose of deterring funds from facilitating out-of-state abortions, have suggested the opposite. If H.B. 1280 were at all ambiguous, the Court would find that Plaintiffs' conduct is arguably covered by the law. But H.B. 1280 is unambiguous—it does not penalize out-of-state abortions, and as such, does not penalize conduct related to out-of-state abortions. Thus, the Court finds that Plaintiffs' conduct is not arguably covered by H.B. 1280 and will grant Paxton's motion to dismiss.[16]

### b. S.B. 8

Having determined that H.B. 1280 does not apply to Plaintiffs' conduct, the Court turns to the third statute that Plaintiffs challenge: S.B. 8. As previously explained, *infra* Section I.A.3, S.B. 8 has survived several challenges to its novel enforcement scheme. To state the matter simply: S.B. 8 was passed to prohibit abortions that were constitutional at the time it was enacted and to evade federal judicial review so that a plaintiff could only challenge the law by subjecting themselves to liability. *See United States v. Texas*, 566 F. Supp. 3d 605, 628 (W.D. Tex.), *cert. granted before judgment*, 142 S. Ct. 14 (2021) (discussing legislative history of S.B. 8). The Supreme Court twice declined to grant an emergency application on the Fifth Circuit's stay of this Court's injunctions that prohibited enforcement of the law. *See id.*; *Whole Woman's Health v. Jackson*, 556 F. Supp. 3d 595 (W.D. Tex.), *aff'd in part, rev'd in part* 142 S. Ct. 522 (2021).

---

[16] While the Court dismisses Plaintiffs' H.B. 1280 claims without prejudice, it recognizes that there may be certain situations where the statutory analysis changes. For example, the analysis might change if a local prosecutor imminently threatens charges for funding out-of-state abortions or an opinion from the Attorney General's office declares it illegal. *See Hill v. City of Houston*, 789 F.2d at 1164–65 (finding standing for overbreadth where the city prosecuted and did not disavow a broad reading of the ordinance).

Plaintiffs attempt to circumvent the appellate court's rulings by focusing their challenge on preemption and the attorney's fees provision of S.B. 8. (Am. Compl., Dkt. 60, at 56–57). Before reaching the question of preemption, the Court is obliged to determine the threshold issue of standing. *Whole Woman's Health*, 142 S. Ct. at 537. Here, Plaintiffs' challenge is directly precluded by the Supreme Court's prior decision on S.B. 8. *Id.* at 534–35. Justice Gorsuch, writing for the majority, held in that case that the petitioners "do not direct this Court to any enforcement authority the attorney general possesses in connection with S.B. 8 that a federal court might enjoin him from exercising." *Id.* at 534. He further noted that, even if the Attorney General did "have some enforcement authority under S.B. 8," a court could not "parlay that authority, or any defendant's enforcement authority, into an injunction against all unnamed private persons who might seek to bring their own S.B. 8 suits." *Id.* at 535.[17] Plaintiffs do not identify how Paxton or the local prosecutors have enforcement authority under the fee shifting provision. For lack of subject-matter jurisdiction, the Court dismisses Plaintiffs' claims under S.B. 8.

### c. Pre-*Roe* Laws

Paxton finally moves to dismiss Plaintiffs' claims under the pre-*Roe* statutes. (Mot. Dismiss, Dkt. 110, at 12). Here, whether Paxton is entitled to sovereign immunity merges with whether Plaintiffs' injury is redressable. To fall under *Ex Parte Young*, an officer "must have some connection with the enforcement of the act." *Ex Parte Young*, 209 U.S. at 157. "Panels in [the Fifth] Circuit have defined 'enforcement' as typically involving compulsion or constraint." *City of Austin v. Paxton*, 943 F.3d at 1000 (citing *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010)).

It is undisputed that Paxton, as the Attorney General, lacks the power to enforce the pre-*Roe* laws. (*See* Mot. Dismiss, Dkt. 110, at 12; Pl.'s Resp., Dkt. 113, at 10; Tex. Code Crim. Proc. arts.

---

[17] While Plaintiffs allege facts which suggest an Article III injury resulting from the litigation holds placed upon them, they do not name any people who sent those litigation hold letters as defendants in this case that might allow an S.B. 8 claim to survive.

2.01, 202). Instead, prosecutions of the pre-*Roe* laws are delegated exclusively to Texas district and county attorneys. Tex. Code Crim. Proc. arts. 2.01, 202. Here, in addition to filing suit against Paxton, Plaintiffs have filed suit against a class of Texas district and county attorneys as the parties "statutorily tasked with enforcing the challenged law." (Am. Compl., Dkt. 60).[18]

In *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389 (5th Cir. 2015), the Fifth Circuit held that Paxton was not entitled to sovereign immunity where he continuously refused to justify sending numerous threatening letters from his office accusing a manufacturer of violating the Texas Deceptive Trade Practices Act. Similarly here, Paxton has repeatedly made threats that he will use the "full force" of Texas's abortion laws. However, the Attorney General in *NiGen Biotech* was delegated with enforcement power under the Deceptive Trade Practices Act. (*Id.* at 392). By contrast, he does not have enforcement power under the pre-*Roe* laws, so his threats alone about enforcing the laws are insufficient to confer standing. Nor are Paxton's promises to help enforce violations of the act enough to overcome sovereign immunity. This Court has held that the mere power to "assist" in criminal cases in insufficient to fall under the *Ex Parte Young* exception. *See Starr v. Cnty. of El Paso*, No. EP-09-CV-353-KC, 2010 WL 3122797 at *5 (W.D. Tex. Aug. 5, 2010). An official must have "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Morris v. Livingston*, 739 F.3d 740 (5th Cir. 2014). As Paxton's ability to enforce the pre-*Roe* statutes is merely to "assist" in criminal prosecutions, the Court lacks jurisdiction over the injunctive claims against him under those statutes.

Instead, Plaintiffs claim that the Court has supplemental jurisdiction over Paxton for under the Declaratory Judgment Act. (Pl.'s Resp., Dkt. 113, at 17 (citing 28 U.S.C. § 1367(a); 28 U.S.C. § 2202)). But Plaintiffs do not elaborate how either Section 1367 or 2202 overcomes Paxton's

---

[18] The district and county attorneys have agreed stipulations, but not motions to dismiss. (Dkts. 31, 32). Certification of the proposed classes is abated until 14 days after the Court's order on Paxton's motion to dismiss. (Mot. Abate, Dkt. 97).

assertion of sovereign immunity. In short, there is no dispute that Paxton has no authority to enforce the state's pre-*Roe* laws, and Plaintiffs' claims against him under those statutes are dismissed. Because Plaintiffs do not allege that Paxton may enforce any of Texas's three abortion statutes against them, the Court dismisses Paxton entirely from the suit.

### B. Standing to Sue Local Prosecutors

Having dismissed Paxton, the Court turns to whether it has standing against the local prosecutors. The local prosecutors have not filed a motion to dismiss, and class certification is abated pending the resolution of Paxton's instant motion. (Agreed Stipulation, Dkt. 31, at 2). Nonetheless, Paxton's motion implicates many arguments that may also apply to local prosecutors, and "[a] court has a fundamental duty to examine its jurisdiction." *In re Paxton*, 53 F.4th 303, 307.

#### 1. Desire to Engage in Conduct and Threat of Enforcement

The Fifth Circuit has held that district and county attorneys are not protected by Eleventh Amendment immunity. *See Crane v. Texas*, 766 F.2d 193 (5th Cir. 1985); *Hudson v. City of New Orleans*, 174 F.3d 677 (5th Cir. 1999). Of course, the group of local prosecutors represents a disparate class, and this remains an early stage of litigation. Accordingly, the elements of standing must only be met "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). As already discussed, Plaintiffs have demonstrated a clear intent to engage in conduct arguably afforded a constitutional interest. *See infra* Section III.A.1.

In addition, Plaintiffs have shown, at this early stage of litigation, that they face a substantial threat of enforcement from the local prosecutors. Plaintiffs cite several news articles stating that many local prosecutors do intend to enforce the pre-*Roe* statutes. (Mot. Prelim. Inj., Dkt. 6, at 7).[19]

---

[19] Plaintiffs cite several articles to this point, including: J. David Goodman & Jack Healy, *In States Banning Abortion a Growing Rift Over Enforcement*, N.Y. Times (June 29, 2022), available at https://www.nytimes.com/2022/06/29/us/abortion-enforcement-prosecutors.html; Lauren Rangel, *Some Texoma district attorneys say they will prosecute abortion cases*, KXII (June 30, 2022), available at https://www.kxii.com/2022/06/30/some-texoma-district-attorneys-say-theywill-prosecute-abortion-cases.

The extent to which local prosecutors intend to prosecute abortion funds for facilitating out-of-state abortions will become clear as this litigation progresses, especially when the Court potentially hears from members of the proposed sub-class of prosecutors who intend to enforce the pre-*Roe* laws. (Mot. Class Cert., Dkt. 93). For now, Plaintiffs have made a prima facie showing that the pre-*Roe* laws will be enforced, and that the local prosecutors are the proper officials who will enforce those laws.

### 2. The Pre-*Roe* Laws Arguably Cover Plaintiffs' Desired Conduct

While such an interpretation is unlikely, some of the pre-*Roe* laws arguably do cover extraterritorial abortions. In this way, Plaintiffs have standing to maintain a suit against the local prosecutors. First, the direct ban on abortion, Article 4512.1, falls under a similar analysis as H.B. 1280. It does not evince any intent to apply extraterritorially and as such, does not appear to prohibit out-of-state abortions on its own.[20] Article 4512.1 states, "If any person shall designedly administer to a pregnant woman or knowingly procure to be administered with her consent any drug or medicine, or shall use towards her any violence or means whatever externally or internally applied, and thereby procure an abortion, he shall be confined in the penitentiary not less than two nor more than five years." Tex. Rev. Civ. Stat. arts. 4512.1-.1 (West. 1974). Nothing in the law purports to apply this definition beyond Texas's borders. This abortion prohibition dates back, in some form, to 1854, and it does not appear that there is any instance of it being used to regulate abortions outside of Texas. Paxton does not identify—and the Court is not aware of—any prosecutions of out-of-state abortions under this law.

The remainder of Texas's pre-*Roe* laws create the ambiguity. Article 4512.2 provides accomplice liability for an abortion and states "Whoever furnishes the means for procuring an

---

[20] Texas moved its pre-*Roe* laws to its revised civil statutes after *Roe* was decided. Articles 1191–1196 of the Penal Code now correspond to Articles 4512.1–4512.6 of the Revised Civil Statutes.

abortion knowing the purpose intended is guilty as an accomplice." Tex. Rev. Civ. Stat. arts. 4512.1-.2 (West 1974). Article 4512.3 states, "If the means used shall fail to produce an abortion, the offender is nevertheless guilty of an attempt to produce abortion, provided it be shown that such means were calculated to produce that result, and shall be fined not less than one hundred nor more than one thousand dollars." *Id.* art. 4512.1-.3. Unlike H.B. 1280, these prohibitions do not necessarily extend only to the abortions covered by Article 4512.1. In other words, if an abortion takes place outside of Texas, a plausible (albeit unlikely) construction of the statute authorizes prosecution for "furnishing the means" of that abortion if that "furnishing" takes place in Texas.

The presumption against extraterritoriality is not dispositive here. The "furnishing" that Plaintiffs intend to engage in takes place in Texas. The pre-*Roe* laws prohibit "furnishing the means" within the state, and do not necessarily limit that prohibition to abortions which occur in Texas.[21] Nor is it clear whether the rule of lenity applies. The pre-*Roe* laws were codified into the Texas Penal Code in 1925 (but have since been transferred to Texas' civil statutes). The Texas Penal Code does not require its provisions to be strictly construed. *Ochoa v. State*, 355 S.W.3d 48 (Tex. App.—Houston 2010) (pet. denied); Tex. Penal Code. Ann. § 1.05(a) (Vernon 2021) ("The rule that a penal statute is to be strictly construed does not apply to this code. The provisions of this code shall be construed according to the fair import of their terms, to promote justice and effect the objectives of the code."). Here, the statutes are plainly criminal prohibitions, transferred into civil statutes, and, according to Paxton, revived with their full criminal effect, notwithstanding the fact that they are codified into civil statutes. Given this murky history, it is unclear that the rule of lenity would apply.

---

[21] Article 4512.2 provides the key distinction between H.B. 1280 and the pre-*Roe* laws. H.B. 1280 provides principal liability for inducing an abortion, while facilitating that abortion only creates accomplice liability for that principal offense. Because the principal offense occurs outside Texas, aiding and abetting liability cannot attach, even if the aid occurs in Texas. Article 4512.2, however, arguably turns accomplice liability into a principal offense (depending on the definition of "procure" and "furnish the means"). Because that conduct may occur in Texas, there may be principal liability, regardless of where the abortion takes place.

The strongest argument that the pre-*Roe* laws do not apply is that "furnishing the means" does not refer to the conduct Plaintiffs intend. This convincing interpretation is taken by amici, who argue that "furnish" is defined as "supply" or "provide" and means to literally provide the procedure or medicine to bring about an abortion. (Sepper & Mohapatra Amicus Br., Dkt. 107, at 10–13). This understanding comports with the Criminal Court of Appeal's holding in *Moore v. State*, 40 S.W. 287, 290 (Tex. Crim. App. 1897). In that case, the Court held that the Texas Legislature criminalized "furnishing the means" so that a doctor who provides abortion medication for a woman to take has still committed a principal offense. *Id.* Because Plaintiffs do not provide abortions—only support for Texans to obtain them—they do not "furnish the means" within the meaning of the pre-*Roe* laws.

While this appears the most plausible interpretation of the pre-*Roe* laws, "[f]ederal courts . . . may not impose [their] own narrowing construction onto the ordinance if the state courts have not already done so." *Hill v. City of Houston*, 789 F.2d 1103 (5th Cir. 1986) (en banc) *aff'd* 482 U.S. 451 (1987). Here, statutory analysis suggests that "furnishing the means" and "procuring" refer to the medication or equipment needed to perform or induce an abortion. But *Moore*'s discussion is arguably dicta, and it is unclear whether the 126-year-old case would still be binding on Texas courts who might now understand those words differently. As Plaintiffs note, the pre-*Roe* statute "nowhere defines the phrase 'furnishing the means.' Nor is it defined in the Texas Penal Code. And it has no uniform definition under Texas law." (Mot. Prelim. Inj., Dkt. 6, at 35). Unlike H.B. 1280, the interpretation of "furnishing the means" has not been clearly and unambiguously defined by Texas courts. Indeed, Paxton (despite vociferously stating that he cannot enforce the law) appears to believe that "procuring" applies to activities such as the "procurement of a bus ticket" to New

Mexico. (Paxton's Resp., Dkt. 33, at 24). Accordingly, it is at least "arguable" that the pre-*Roe* laws cover Plaintiffs' desired conduct.[22]

Because they have shown an intent to engage in conduct afforded a constitutional interest, that the pre-*Roe* laws arguably proscribe their desired conduct, and the threat of enforcement is substantial, Plaintiffs are suffering an injury sufficient for pre-enforcement review. *Fenves*, 979 F.3d at 330.

### 3. Traceability and Redressability

Having established that Plaintiffs' desire to facilitate out-of-state abortions is arguably prohibited by the pre-*Roe* laws, both traceability and redressability to the local prosecutors becomes straightforward. *See Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655 (5th Cir. 2006) ("The causation and redressability prongs of the standing inquiry are easily satisfied here."). Potential enforcement of the pre-*Roe* laws has caused Plaintiffs' censorship. It has led them to stop funding, directing, or even providing resources or assistance to callers who seek help obtaining out-of-state abortions. *See infra* Section I.B. It was directly cited by the Freedom Caucus, who threatened that facilitating out-of-state abortions would expose someone to prosecution. (Freedom Caucus Letter, Dkt. 42-1). It will likewise be redressed by an injunction or declaratory judgment preventing the local prosecutors from enforcing the law as applied to Plaintiffs' conduct. Having established an injury, traceability, and redressability, the Court finds that Plaintiffs have standing against the local prosecutors.

---

[22] While only Article 4512.2 appears to regulate Plaintiffs' desired conduct, the pre-*Roe* laws may not be severable. At this early stage of litigation, with the severability question unaddressed, Plaintiffs have standing to challenge all sections of the pre-*Roe* laws and not just Article 4512.2.

4. Associational Standing

Beyond the three elements under *Lujan*, Paxton also raises whether Plaintiffs have associational standing.[23] (Mot. Dismiss, Dkt. 110, at 8–9). Specifically, Paxton challenges whether Plaintiffs have established that their donors and staff are not members of their organization, and that they do not have a close relationship to the third parties whose rights they assert. (*Id.*). Again, while Paxton is dismissed on other grounds, the Court nonetheless finds it prudent to briefly discuss associational standing. An association has standing to bring claims on behalf of its members when "(1) individual members would have standing, (2) the association seeks to vindicate interests germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the individual members' participation." *Students for Fair Admissions, Inc. v. Univ. of Tex. at Austin*, 37 F.4th 1078, 1084 (5th Cir. 2022).

First, Plaintiffs have organizational standing. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 365 (2010) ("[T]he Government may not suppress political speech on the basis of the speaker's corporate identity."); *see also OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017) ("Associational standing is derivative of the standing of the association's members, requiring that they have standing and that the interests the association seeks to protect be germane to its purpose. By contrast, organizational standing does not depend on the standing of the organization's members. The organization can establish standing in its own name if it "meets the same standing test that applies to individuals.") (cleaned up). As previously discussed, Plaintiffs, as organizations, have suffered an injury that is traceable to the local prosecutors and redressable by the Court, and thus have organizational standing.

Paxton correctly points out that Plaintiffs have not alleged their staff or volunteers are "members," but this alone does not warrant a dismissal of their entire case. Plaintiffs do allege facts

---

[23] Paxton does not make this challenge as to Dr. Moayedi, who is, of course, a natural person.

which suggest they are traditional membership organizations, but they do not specifically allege that their volunteers or staff are "members" of the association. The Court agrees that Plaintiffs have not pled the elements necessary to establish associational standing. Yet this does not affect the Court's resolution of either the motion to dismiss or motion for preliminary injunction, as Plaintiffs only assert rights that they maintain as organizations. It is well-established that non-profits maintain a First Amendment right to speech. *Citizens United*, 558 U.S. at 339. Dr. Moayedi properly asserts the right to travel as a natural person. Thus, the Court finds that Plaintiffs lack standing to assert the rights of their staff or volunteers but do have standing on organizational grounds.

### 5. Abstention

Finally, the Court addresses whether it should abstain from deciding the issues presented in Plaintiffs' complaint. Because Plaintiffs' claims under H.B. 1280 and S.B. 8 have been dismissed, the Court need only discuss abstention as to the pre-*Roe* laws. The Supreme Court's landmark *Pullman* decision established that "a federal court may, and ordinarily should, refrain from deciding a case in which state action is challenged in federal court as contrary to the federal constitution if there are unsettled questions of state law that may be dispositive of the case and avoid the need for deciding the constitutional question." *United Home Rentals, Inc. v. Tex. Real Estate Com.*, 716 F.2d 324, 331 (5th Cir. 1983) (citation omitted). Two elements must be met for *Pullman* abstention to apply: (1) the case must present an unsettled question of state law, and (2) the question of state law must be dispositive of the case or would materially alter the constitutional question presented. *Harman v. Forssenius*, 380 U.S. 528, 534 (1965). The purpose of *Pullman* abstention is to "avoid unnecessary friction in federal-state functions, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication." *Id.*

*Pullman* abstention is discretionary. "[A]bstention is the exception, not the rule." *Nissan Motor Corp. in U.S.A. v. Harding*, 739 F.2d 1005, 1008 (5th Cir. 1984). *Pullman* abstention is not "an

automatic rule applied whenever a federal court is faced with a doubtful issue of state law" but

rather considered on "a case-by-case basis." *Baggett v. Bullitt*, 377 U.S. 360, 376 (1964). Before

abstaining under *Pullman*, a "district court must carefully assess the totality of circumstances

presented by a particular case. This requires a broad inquiry which should include consideration of

the rights at stake and the costs of delay pending state court adjudication." *Lipscomb v. Columbus Mun.*

*Separate Sch. Dist.*, 145 F.3d 238, 243 (5th Cir. 1998). In particular, federal courts "have been

particularly reluctant to abstain in cases involving facial challenges based on the First Amendment."

*City of Houston v. Hill*, 482 U.S. 451, 467 (1987); *Zwickler v. Koota*, 389 U.S. 241, 252 (1967); *Baggett*,

377 U.S. at 376–79.

### a. No Unsettled Question of State Law

First, there is no unsettled question of state law at issue. The case does not meet the first

requirement of *Pullman* abstention. *Harman*, 380 U.S. at 534. *Pullman* abstention depends first and

foremost upon an ambiguity in state law. *Lipscomb v. Columbus Mun. Separate Sch. Dist.*, 145 F.3d 238,

243 (5th Cir. 1998). But here, the pre-*Roe* laws have existed in their modern form for 98 years, and in

some shape since 1854. State court interpretations of the laws' meaning have existed for over 130

years. *Moore v. State*, 40 S.W. 287, 290 (Tex. Crim. App. 1897); *Willingham v. State*, 25 S.W. 424 (Tex.

1894); *Jackson v. State*, 115 S.W. 262 (Tex. 1908); *Thompson v. State*, 493 S.W.2d 913, 920 (Tex. Crim.

App. 1971). Moreover, the issue of the pre-*Roe* laws' repeal was addressed 18 years ago by the Fifth

Circuit. *McCorvey v. Hill*, 385 F.3d 846 (5th Cir. 2004). Because this is not a novel issue to be

determined by a state court, the first element of *Pullman* abstention is not met.

### b. Texas Law Does Not Authorize Pre-Enforcement Criminal Challenges

*Pullman* abstention is also inappropriate in the instant case because it appears to be

unavailable for pre-enforcement challenges to criminal laws. A court should not abstain under

*Pullman* unless the state courts provide the parties with adequate means to adjudicate the

controverted state law issue. *City of Houston v. Hill*, 482 U.S. at 476 (Powell, J., concurring); *Railroad Comm'n v. Pullman Co.*, 312 U.S. at 501 (abstaining because the "law of Texas appears to furnish easy and ample means for determining the Commission's authority"). *See State v. Morales*, 869 S.W.2d 941, 943 (Tex. 1994) ("[C]ivil courts . . . have no power to grant either injunctive or declaratory relief based on the unconstitutionality of a criminal statute."); *City of Forth Worth v. Craik*, 411 S.W.2d 541, 543 (Tex. 1967) (noting that while criminal courts may test the validity of a penal ordinance, "a court of equity will not determine originally the validity of a criminal regulation in the absence of a showing of irreparable injury to vested property rights."). Both the pre-*Roe* statutes and H.B. 1280 criminalize abortion in Texas, so Plaintiffs could not seek a pre-enforcement challenge in state court.

Paxton himself has asserted that state courts would lack the authority to enjoin prosecutors from enforcement of the pre-*Roe* laws.

> Plaintiffs contend "this Court has jurisdiction over Plaintiff's request for declaratory and injunctive relief against Defendants sued in their official capacity because the UDJA waives sovereign and governmental immunity for challenges to the validity of statutes." That misapprehends Texas law. "[T]here is no general right to sue a state agency for a declaration of rights." *Tex. Parks & Wildlife Dep't v. Sawyer Tr.*, 354 S.W.3d 384, 388 (Tex. 2011). The UDJA supplies only an implied waiver for constitutional challenges to ordinances or statutes. *Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 621-22 (Tex. 2011); *see* Tex. Civ. Prac. & Rem. Code § 37.006(b). Plaintiffs primarily do not challenge the constitutional validity of Texas's criminal prohibitions on abortion. Instead, they ask the courts to opine on the meaning of those provisions. The UDJA's limited waiver of sovereign immunity does not extend to a "bare statutory construction claim" like that. *McLane Co., Inc. v. Tex. Alcoholic Beverage Comm'n*, 514 S.W.3d 871, 876 (Tex. App.—Austin 2017, pet. denied). And the UDJA's limited waiver of sovereign immunity only applies to "the relevant governmental entities," not state officials. *Sefzik*, 355 S.W.3d at 621-22 & n.3.

Petition for Writ of Mandamus, *In re Paxton*, No. 22-0527, 2022 WL 2812940 at \*7 (Tex. July 1, 2022).

Because Plaintiffs lack an adequate state remedy, it would be improper to abstain.

c. Additional Concerns

Two other factors suggest that the Court should not use its discretion to abstain in this case. As Plaintiffs further note, federal courts should be particularly reluctant to abstain in facial challenges regarding their First Amendment rights. *See City of Houston v. Hill*, 482 U.S. at 467; *Zwickler*, 389 U.S. at 404; *Baggett*, 377 U.S. at 376–79. There is a "high cost of abstention when the federal constitutional challenge concerns facial repugnance to the First Amendment." *Procunier v. Martinez*, 416 U.S. 396, 404 (1974). Forcing a plaintiff to "suffer the delay of state court proceedings might itself effect the impermissible chilling of the very constitution right [the plaintiff] seeks to protect." *Zwickler*, 389 U.S. at 397–98. Here, the chilling effect would endure—and likely be exacerbated—if Plaintiffs were forced to litigate their claims in state court. Several witnesses for Plaintiffs testified that their organizations would be forced to shut down or close if they did not obtain preliminary relief from a court. *See infra* Section I.B.2. This would result in the very chill the First Amendment seeks to protect and potentially moot the state court's ability to resolve the question at all. Because Plaintiffs bring a facial challenge under the First Amendment and assert an ongoing chill on their protected speech, it would be inappropriate to abstain.

Finally, the Court notes that the question presented by Plaintiffs—whether the First Amendment protects the right to speak about conduct that is lawful in other states—implicates profound federal interests. "The First Congress created federal courts as the chief—though not always the exclusive—tribunals for enforcement of federal rights." *McNeese v. Bd. of Ed. for Cmty. Unit Sch. Dist. 187, Cahokia, Ill.*, 373 U.S. 668, 672 (1963). Here, the argument is not just that Plaintiffs assert a federal constitutional right—but that their constitutional right implicates the interests of several states.[24] "Whatever practices may have a tendency to disturb the harmony between the States,

---

[24] As stated in the amicus brief of 20 states:

> Amici States have a strong interest in preserving the right to interstate travel. Thousands of Amici States' residents live in Texas to attend college, go to graduate school, or to serve as

are proper objects of federal superintendence and control." The Federalist No. 80, at 445–46

(Alexander Hamilton) (Clinton Rossiter ed., 1961). As the Fourth Circuit has noted, "No state's

dignity could be offended by acknowledging the obvious point that the Framers consciously

withdrew interstate commerce from the vast collection of interests that remain the primary

responsibility of the states." *Harper v. Pub. Serv. Comm'n of W.VA.*, 396 F.3d 348, 356 (4th Cir. 2005).

While the State of Texas may assert that its interest in regulating abortion may extend beyond its

borders, at least 20 states have contested its ability to do so. (Mot. Dismiss, Dkt. 110, at 24).[25] The

amici states have a powerful interest in assuring that people within their borders can exercise the

privileges guaranteed to them by their own constitutions and laws. Plaintiffs should not have to

litigate in Texas state courts to assert the rights afforded to them by New Mexico, California, or the

large majority of states where abortions remain legal.

### B. Motion for Preliminary Injunction

Having addressed the jurisdictional challenges, the Court turns to Plaintiffs' motion for a

preliminary injunction. "A plaintiff seeking a preliminary injunction must establish that he is likely to

---

temporary workers; millions of others enter Texas as visitors each year. Amici States have a
significant interest in ensuring that those residents may leave Texas and return to their home
state to access time sensitive, lawful, and safe medical care, including abortions. We also have
an interest in preserving those residents' right to travel to Amici States to provide abortion
services or to accompany a patient in need of abortion care. And more generally, as states
that are committed to protecting access to reproductive healthcare, Amici States have a
profound interest in preserving the right to travel for the millions of individuals living in
states with restrictive abortion laws that are applied to limit interstate travel, which is critical.
Texas's anti-abortion laws—and Texas lawmakers' threats to use those laws to restrict travel
outside their state borders—pose a substantial threat to the liberty and safety of those
individuals who may need to exit Texas under sometimes urgent circumstances.

(Amicus Br. on Behalf of 20 States and the District of Columbia, Dkt. 48, at 1).

[25] The Court does not reach whether a state may constitutionally prohibit its citizens from traveling to
another jurisdiction to obtain an abortion, nor whether it may penalize funding such conduct. Nonetheless, it
is undisputed that the right to travel is afforded some constitutional weight and is regularly protected by
federal courts. *See Shapiro v. Thompson*, 394 U.S. 618, 629 (1969) *overruled on other grounds by Edelman v. Jordan*, 415
U.S. 651 (1974) ("[T]he nature of our Federal Union and our constitutional concepts of personal liberty . . .
require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes,
rules, or regulations which unreasonably burden or restrict this movement.").

succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Before turning to the elements of injunctive relief, the Court will first address the scope of the preliminary injunction at this stage of litigation.

### 1. Scope of the Injunction

Federal Rule of Civil Procedure 65 requires a court to state the terms of an injunction with specificity and in reasonable detail. Fed. R. Civ. P. 65(d). In particular, an injunction under Rule 65 may only bind those who receive actual notice by personal service, are parties to the case, or are in "active concert or participation" with the parties or their agents. *Id.* Here, only certain district and county attorneys are named parties to the case.[26] They have appeared in the case; they are represented by counsel; and they necessarily have had notice of the preliminary injunction. Rule 65's notice requirement is met. The other local prosecutors are prospective class members, and the class certification determination has been abated pending a ruling on Paxton's motion to dismiss. (Mot. Abate, Dkt. 97). Given the procedural posture of the case and because prospective class members are not yet formal parties to the case who would be automatically served with notice of this order, any preliminary injunction shall, for now, apply only to the named local prosecutors.

At some point, those local prosecutors may appear in the case and take a position on whether this Court should grant injunctive relief. For example, if the Court certifies the class and Plaintiffs re-urge their request for injunctive relief, the Court could hear from members of Plaintiffs' proposed subclass of prosecutors who intend on enforcing the pre-*Roe* laws. (Mot. Class Cert., Dkt. 93). After giving local prosecutors the opportunity to respond, the Court could address whether the pre-*Roe* laws are severable and whether to preliminarily or permanently enjoin the class from

---

[26] Specifically, these named Defendants are Susan R. Deski, Julie Renken, Wiley B. McAfee, José Garza, and Fred H. Weber.

enforcing the pre-*Roe* laws. For now, only Paxton has filed an opposition brief to Plaintiffs' Rule 65 motion. Accordingly, while he has been dismissed as a Defendant, the Court will consider his arguments insofar as they speak to whether Plaintiffs meet the four elements of a preliminary injunction.

### 2. Likelihood of Success on the Merits

Plaintiffs request an injunction preventing the local prosecutors from pursuing criminal sanctions against Plaintiffs "for any conduct related to an abortion that is obtained outside of the State of Texas." (Mot. Prelim. Inj., Dkt. 6, at 49–50). In support of their motion, Plaintiffs raise a wide variety of constitutional defenses. Plaintiffs argue that the pre-*Roe* statutes violate the right to travel under the Constitution and the Commerce Clause. (*Id.* at 21–26). They claim that the laws violate the First Amendment by chilling the right to speak freely about abortion resources, (*Id.* at 28–30), the right to associate, (*Id.* at 30–32), and the right to free expression. (*Id.* at 33–34). They further argue that the laws are unconstitutionally vague, that the pre-*Roe* laws have been repealed by implication, and that the pre-*Roe* statutes and H.B. 1280 irreconcilably conflict. (*Id.* at 34–41). Ultimately, however, the Court's merits analysis begins and ends with the fact that the pre-*Roe* laws have been repealed.

### a. The Pre-*Roe* Laws Were Repealed by Implication

While Plaintiffs argue that the pre-*Roe* laws are unconstitutionally vague, the Court need not reach the question because the laws have been repealed by implication. Before the Supreme Court's decision in *Roe v. Wade*, Texas had enacted two statutes which criminalized abortion except in the cases of life-endangerment. Tex. Penal Code. Arts. 1191-94, 96 (West 1970).[27] In *Roe*, the Supreme Court affirmed the district court's judgment that the statutes were unconstitutional and held that

---

[27] In 1925, Texas reorganized its penal code. However, the laws in some form date back to 1854. *See* The Laws of Texas, 1822-1897, Vol. 3 at 1,502–03.

"the Texas abortion statutes, as a unit, must fall." *Roe v. Wade*, 410 U.S. at 166. The Texas Legislature then removed the pre-*Roe* statutes from the Penal Code. *See* Act of May 24, 1973, S.B. 34, 63rd Leg., Reg. Sess., ch. 399, § 5(a). They were transferred to the Texas Civil Statutes but have been absent since 1984. Tex. Rev. Civ. Stat. arts. 4512.1-4512.4, 4512.6 (West 1974)).

Between 1973 and 2021, Texas enacted a broad and comprehensive statutory scheme to regulate abortion. These laws defined which abortion procedures could be used, how facilities must be equipped to perform abortions, how patients could give consent to an abortion, and how medication abortions could be provided. Tex. Health & Safety Code §§ 171.011–171.018; 171.061–171.066; 171.151–171.153. In short, these regulations provided a statutory scheme that authorized Texas physicians to perform abortions—in direct contradiction of the pre-*Roe* laws.

More than thirty years after *Roe*, the Fifth Circuit was directly confronted with the issue of whether Texas's regulatory scheme meant the pre-*Roe* laws had been repealed. In *McCorvey v. Hill*, 385 F.3d 846 (5th Cir. 2004), Norma McCovery—who was the pseudonymous plaintiff in *Roe*—filed a motion for relief from judgment, asking the Northern District of Texas to revisit its holding in *Roe*. *McCorvey*, 385 F.3d at 847. A unanimous Fifth Circuit panel held that McCorvey's claim was moot because the pre-*Roe* laws had been repealed. The Supreme Court denied the petition for writ of certiorari. *McCorvey v. Hill*, 543 U.S. 1154, (2005). As the Fifth Circuit noted,

> Under Texas law, statutes may be repealed expressly or by implication. The Texas statutes that criminalized abortion (former Penal Code Articles 1191, 1192, 1193, 1194 and 1196) and were at issue in *Roe* have, at least, been repealed by implication. Currently, Texas regulates abortion in a number of ways. For example, a comprehensive set of civil regulations governs the availability of abortions for minors. Texas also regulates the practices and procedures of abortion clinics through its Public Health and Safety Code. Furthermore, Texas regulates the availability of state-funded abortions.
>
> These regulatory provisions cannot be harmonized with provisions that purport to criminalize abortion. There is no way to enforce both sets of laws; the current regulations are intended to form a comprehensive scheme—not an addendum to the criminal statutes struck down in *Roe*. As the court stated in *Weeks,* a strikingly similar case, "it is clearly inconsistent to provide in one statute that abortions are permissible

if set guidelines are followed and in another provide that abortions are criminally prohibited."  Thus, because the statutes declared unconstitutional in *Roe* have been repealed, McCorvey's 60(b) motion is moot.

*McCorvey*, 385 F.3d at 849 (internal citations omitted).

The key holding, in short, is that the "Texas statutes that criminalized abortion . . . and were at issue in *Roe* have, at least, been repealed by implication." *Id.* The concurrence also noted hope that the U.S. Supreme Court would revisit its decision in *Roe* because the court could not "turn back Texas's legislative clock to reinstate the laws, no longer effective, that formerly criminalized abortion." *Id.* at 850 (Jones, J., concurring).

Paxton characterizes the Fifth Circuit's holding in *McCorvey* as a mistaken *Erie* guess. (Paxton's Resp., Dkt. 33, at 28–29). But nothing in *McCorvey* suggests that the case was an *Erie* guess. Rather, *McCorvey* was the necessary holding to decide an irreconcilable conflict between Texas's statutory scheme and the pre-*Roe* laws. And even if this Court were to assume that *McCorvey* was an *Erie* guess, this Court would still be bound by its holding. A district court cannot refuse to abide by a circuit court's holding based on the mere suggestion that it was wrong. *See Batts v. Tow-Motor Forklift Co.*, 66 F.3d 743, 747 (5th Cir. 1995) ("[T]he district court was therefore obligated to try the case under the consumer expectations test, because it was bound by our interpretation of state law absent a subsequent state court decision or statutory amendment that rendered this court's prior decision clearly wrong."); *Go Green Botanicals, Inc. v. Drexler Ins. Servs., LLC*, No. 5:22-CV-373-XR, 2022 WL 2286961 (W.D. Tex. June 23, 2022) ("District courts within the Fifth Circuit and subsequent panels of the Fifth Circuit Court are bound by the Fifth Circuit's *Erie* predictions of state law absent any subsequent state-court decisions establishing that the Fifth Circuit's prediction of state law is incorrect."). Because the pre-*Roe* laws were held unconstitutional by federal courts, their validity is not simply a question of state law, but also one of federal constitutional precedent. *Erie* guess or not, we are bound by *McCorvey* and its holding that Texas's pre-*Roe* laws have been repealed.

46

There are two reasons why *McCorvey* may no longer be applicable, but neither is convincing. First, the Texas Supreme Court denied emergency relief in August 2022, allowing the pre-*Roe* laws to be enforced in the 30-day period after *Dobbs* but before H.B. 1280 took effect. *In re Paxton*, No. 22-0527, 2022 WL 2425619 (Tex. July 1, 2022). However, the case was moot once H.B. 1280 took effect, so the Texas Supreme Court never issued an opinion on the matter. Nothing in the Supreme Court's unwritten order staying the emergency relief pending further briefing suggests that *McCovery* was overturned. *Id.*

Second, Paxton argues that the Texas Legislature enacted provisions designed to reject *McCorvey.* (Paxton's Resp., Dkt. 33, at 28–29). Both S.B. 8 and H.B. 1280 note that "the legislature finds that the state statutes enacted before the ruling in *Roe v. Wade* that prohibit and criminalize abortion unless the mother's life is in danger, have not been repealed by the legislature, either expressly or by implication." 2021 Tex. Sess. Law Serv. ch. 800 (H.B. 1280), Sec. 4 (West); Texas Health & Safety Code § 171.206(b)(2). But legislative findings are insufficient to revive a law that has been repealed, and even assuming that resuscitation were possible, the Texas Legislature has not chosen to reenact the pre-*Roe* laws. The mere finding that its pre-*Roe* laws were not repealed is not a "statutory amendment" and does not render the decision in *McCorvey* clearly wrong. *Batts*, 66 F.3d at 747.

Finally, *McCorvey* fully comports with Texas law. Paxton cites a 2017 Texas Supreme Court case for the proposition that a law may only be repealed by a legislature. (Paxton's Resp., Dkt. 33, at 28 (citing *Pidgeon v. Turner*, 538 S.W.3d 73, 88 n.21 (Tex. 2017)). But the applicability of *Pidgeon* to the pre-*Roe* laws has already been disposed of by at least one Texas appellate court. *See Dickson*, 636 S.W.3d at 262. First, *Pidgeon* differs from *Roe* because it did not deal with a statute that had been directly addressed by the U.S. Supreme Court. Second, the mere fact that a statute "remains in place" does not mean it is enforceable. This is plainly the case, as the pre-*Roe* laws were clearly

unenforceable prior to *Dobbs*, even if a court were to hold that they "remained in place." In addition, the Texas Supreme Court has affirmed the U.S. Supreme Court's principle that an "unconstitutional law is void, and is no law." *Ex parte E.H.*, 602 S.W.3d 486, 494 (Tex. 2020) (citing *Ex parte Siebold*, 100 U.S. 371, 376 (1880)). It stated that a statute declared unconstitutional was "void from its inception" and "as a legal reality, never existed at all." *Id.* (citing *Smith v. State*, 463 S.W.3d 890, 895 (Tex. Crim. App. 2015) and *Ex parte Fournier*, 473 S.W.3d 789 (Tex. Crim. App. 2015)). The pre-*Roe* laws, as criminal prohibitions that have been declared unconstitutional, are null and void under this precedent.

The laws also irreconcilably conflict with prior abortion regulation in Texas. The Texas Supreme Court has held that "[w]here a later enactment is intended to embrace all the law upon the subject with which it deals, it repeals all former laws relating to the same subject . . . ." *Gordon v. Lake*, 356 S.W.2d 138, 139 (Tex. 1962). Between 1973 and 2021, Texas repeatedly enacted a set of laws that are impossible to reconcile with the near-total criminal ban on abortion. (*See* Sepper & Mohapatra Amicus Br., Dkt. 107, at 6); *Weeks v. Connick*, 733 F. Supp. 1036, 1038 (E.D. La. 1990) ("[I]t is clearly inconsistent to provide in one statute that abortions are permissible if set guidelines are followed and in another provide that abortions are criminally prohibited."). It is true that legislative enactments in Texas "should be harmonized wherever possible with its predecessor to give effect to both." (Paxton's Resp., Dkt. 33, at 28). But it is impossible to harmonize statutes which criminalize abortion with those that authorize it under certain regulations. Accordingly, this Court is bound by *McCorvey* and holds that the pre-*Roe* laws have been repealed. Plaintiffs are likely to succeed on the merits of this claim.

### 3. Irreparable Harm

The party seeking a preliminary injunction must prove that irreparable harm is likely, not merely possible. *Winter*, 555 U.S. at 22. Irreparable harm "consists of harm that could not be

sufficiently compensated by money damages or avoided by a later decision on the merits." *Canon, Inc. v. GCC Int'l Ltd.*, 263 F. App'x 57, 62 (Fed. Cir. 2008). Again, while Paxton is no longer a party to the suit, his response to Plaintiffs' motion provides relevant arguments that go to whether the Court should grant a preliminary injunction. (Paxton's Resp., Dkt. 33). In particular, as to irreparable harm, Paxton argues that Plaintiffs have not suffered irreparable harm for two reasons: (1) they delayed in bringing their suit and (2) their injury is speculative. (*Id.* at 33–35). Both arguments are unavailing.

### a. Delay

The Court finds that Plaintiffs' two-month long wait in bringing this challenge does not constitute a delay which might mitigate a finding of irreparable harm. Quoting from this Court's order denying Plaintiffs' motion for a temporary restraining order, Paxton says that "Plaintiffs have been aware of the threat of enforcement since *Dobbs* but requested an ex parte TRO the day before the Trigger Ban took effect." (*Id.* (quoting Order, Dkt. 13, at 3)). But this Court's order denying the TRO was focused on the *public interest*, not the irreparable harm. (Order, Dkt. 13, at 3). This Court's order did not dispute whether Plaintiffs had suffered an irreparable harm. (*Id.*). Instead, it emphasized only that the public interest would best be served by allowing Defendants to file responsive briefing, and to hold an evidentiary hearing on the issues. (*Id.* at 3–4).

Indeed, the evidence introduced by Plaintiffs at the hearing does show how Plaintiffs have suffered irreparable harm. Representatives from every organization talked about how they were forced to stop activities supporting travel for out-of-state abortions. (Hr'g Tr. of Hearing, Dkt. 86-1, at 15, 85, 101, 185). Several representatives spoke about how the organizations might have to shut down if they did not obtain legal relief. (*Id.* at 18, 154). Dr. Moayedi discussed how she is unable to provide medical care for her patients because of the threat of prosecution, even if her patients reside in other states. (*Id.* at 183). In addition, a two-month delay is not necessarily fatal, or even dilatory,

depending on the circumstances. Here, Plaintiffs testified that the two-month delay was largely a result of needing to make sure the organizations had funding to pursue a legal challenge. (*Id.* at 61).

These restrictions on Plaintiffs' desired activities, most especially their ability to fund and speak openly about abortions, will cause irreparable harm if not addressed. It is well-established that restrictions on First Amendment rights can constitute irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971))); *Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) ("[Texans for Free Enterprise's] ability to speak is undoubtedly limited when it cannot raise money to pay for speech. Consistent with our precedents, then, [Texans for Free Enterprise] has established irreparable harm."). Because Texas's abortion laws restrict the ability to speak openly about abortion support and threaten to force the organizations to close entirely, Plaintiffs are suffering an ongoing and irreparable harm.

### b. Concrete Injury

In addition, Paxton's response raises the argument that Plaintiffs' injury is purely speculative and based on hypothetical threats of enforcement. (Paxton's Resp., Dkt. 33, at 35). This element largely mirrors the Court's analysis on whether the Defendants have enforcement authority under each law. The Court agrees with Paxton insofar as H.B. 1280 does not authorize him to bring civil fines against Plaintiffs who facilitate out-of-state abortions. But that does not render the entire injury "speculative," because Plaintiffs also face prosecution under the pre-*Roe* laws. *See Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979) ("When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.") (cleaned up); *see also*

*VanDerStok v. Garland*, No. 4:22-CV-00691-O, 2022 WL 4809376 (N.D. Tex. Oct. 1, 2022) (finding irreparable harm where ATF threatened prosecution even though it would exceed ATF's statutory authority). It is a credible threat of prosecution when several district attorneys have declared they will enforce the law and the state's attorney general has effectively declared that the law proscribes Plaintiffs' desired conduct. Paxton has already given the interpretation that "procurement" includes conduct such as buying a bus ticket to New Mexico. (*Id.* at 24). Plaintiffs face a real and concrete threat of prosecution from district and county attorneys if they engage in their desired conduct that the state attorney general has effectively declared illegal.

### 4. Balance of Equities and Public Interest

The parties do not contest the balance of equities at length, so the Court's discussion of it is brief. Here, the harms to Plaintiffs are severe—they will be unable to fulfill their core organizational missions, their speech will be suppressed, and they may even be forced to shut down. Texas's interest, on the other hand, is relatively small. Abortion will remain illegal in the state regardless of this Court's holding. The extent to which Texas has a cognizable interest, if any, in preventing abortions which occur outside its borders is not decided by this Court today. Texas's interest in enforcing the pre-*Roe* laws is minimal because, as held in *McCorvey*, they have long ago been repealed. As the Texas Supreme Court explained, an "unconstitutional law is void, and is no law." *Ex parte E.H.*, 602 S.W.3d 486, 494 (Tex. 2020). Texas's interest in enforcing a void law does not outweigh Plaintiffs' extreme harm in the absence of relief.

In addition, a preliminary injunction serves the public interest. Where constitutional rights are concerned, "enforcement of an unconstitutional law is always contrary to the public interest[.]" *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); see also *Vote.org v. Callanen*, No. SA-21-CV-00649-JKP, 2022 WL 2181867, at *17 (W.D. Tex. June 16, 2022) ("Injunctions protecting constitutional freedoms are always in the public interest.") (citing *Texans for Free Enter. v. Tex. Ethics*

*Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013)). Absent injunctive relief, Plaintiffs' First Amendment rights—and those of Texans more generally—may be chilled by laws that were "void from [their] inception" and "as a legal reality, never existed at all." *Ex parte E.H.*, 602 S.W.3d at 494.

## IV. CONCLUSION

**IT IS ORDERED** that Paxton's motion to dismiss, (Dkt. 110), is **GRANTED**. Plaintiffs' claims against Paxton are **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that Plaintiffs' claims under S.B. 8 and H.B. 1280 against the District and County Attorney Defendants are **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** Plaintiffs' motion for a preliminary injunction, (Dkt. 6), is **GRANTED IN PART**. The named District and County Attorney Defendants are preliminarily enjoined from enforcing the pre-*Roe* laws. Plaintiffs' motion is **DENIED IN PART** as to all other relief.

**IT IS FINALLY ORDERED** that the District and County Attorney Defendants shall respond to Plaintiffs' motion for class certification on or before March 10, 2023.

**SIGNED** on February 24, 2023.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE