**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| **FUND TEXAS CHOICE, et al,**<br><br>    **Plaintiffs,**<br>**v.**<br><br>**JOSÉ GARZA, in his official capacity as Travis County District Attorney, et al.**<br><br>    **Defendants.** | **Civil Case No. 1:22-cv-859-RP** |

<u>**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AGAINST SB8 DEFENDANTS**</u>

## <u>TABLE OF CONTENTS</u>

Introduction and Overview ................................................................................... 1

Factual Background ............................................................................................... 2

Summary of Argument .......................................................................................... 6

Legal Standard ...................................................................................................... 8

Argument & Authorities ....................................................................................... 8

      I.      SB8's Standing Provisions Violate Article III of the U.S. Constitution ................ 9

      II.     SB8 Violates the U.S. Constitution's Due Process Guarantees ........................... 11

            A.      SB8's mandatory "damages," with no proof of injury, are
                     unconstitutionally excessive. ................................................................. 12

            B.      SB8's elimination of defenses and res judicata is unconstitutional ......... 14

            C.      SB8's imposition of joint and several liability of litigant and
                     counsel for good faith litigation is unconstitutional and preempted
                     by federal law ....................................................................................... 17

            D.      SB8 is unconstitutionally vague ............................................................... 21

      III.    SB8 Violates the Equal Protection Clause ............................................................ 24

            A.      SB8 targets a disfavored class for different and worse treatment ............ 25

            B.      SB8 is not narrowly tailored or rationally related to legitimate
                     purposes. ............................................................................................... 26

      IV.    SB8 Violates Plaintiffs' First Amendment rights. ................................................ 28

      V.     SB8 Cannot Apply to Conduct that Occurred Prior to July 26, 2022, when
           the *Dobbs* Mandate Issued. .................................................................................. 32

      VI.    Declaratory and Injunctive Relief Against the SB8 Defendants is
           Appropriate. ........................................................................................................ 36

      VII.   The Court Should Award Plaintiffs Reasonable Attorneys' Fees. ....................... 37

Conclusion & Requested Declarations ................................................................. 37

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937)......................................................8

*Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125 (2011) .............................11

*Ashcroft v. Free Speech Coal*, 535 U.S. 234 (2002)......................................................23

*B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138 (2015) ..............................16

*Baggett v. Bullitt*, 377 U.S. 360 (1964)..........................................................................22

*Baker by Thomas v. Gen. Motors Corp.*, 522 U.S. 222 (1998).....................................16

*Bigelow v. Old Dominion Copper Mining & Smelting Co.*, 225 U.S. 111 (1912).........16

*Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731 (1983)............................................28

*Boos v. Barry,* 485 U.S. 312 (1988)...............................................................................30

*Bouie v. City of Columbia*, 378 U.S. 347 (1964) ....................................................33, 34

*Brewer v. Wilkinson*, 3 F.3d 816 (5th Cir. 1993)...........................................................12

*Brown v. Hartlage*, 456 U.S. 45 (1982)..........................................................................31

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010)....................................31

*City of Chicago v. Morales*, 527 U.S. 41 (1999) .....................................................21, 24

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985).....................................24

*Collins v. City of Harker Heights, Tex.*, 503 U.S. 115 (1992).......................................11

*De Leon v. Perry*, 975 F. Supp. 2d 632 (W.D. Tex. 2014),
  *aff'd sub nom. De Leon v. Abbott*, 791 F.3d 619 (5th Cir. 2015)............................25

*Deposit Bank of Frankfort v. Bd. of Councilmen of City of Frankfort*,
  191 U.S. 499 (1903)...................................................................................................15

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022)........................ *passim*

*Dunn v. Blumstein*, 405 U.S. 330 (1972) .......................................................................12

*Edmondson v. Leesville Concrete Co.*, 500 U.S. 614 (1991).........................................36

*Employer Sols. Staffing Group II, L.L.C. v. Office of Chief Admin. Hearing Officer*,
    833 F.3d 480 (5th Cir. 2016) .................................................................22

*Ex parte Siebold*, 100 U.S. 371 (1879) .................................................35, 36

*First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765 (1978) .........................30

*Flemming v. Nestor*, 363 U.S. 603 (1960) ...............................................33

*Fox v. Vice*, 563 U.S. 826 (2011)..............................................................20

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ...............................................29

*Giaccio v. Pennsylvania*, 382 U.S. 399 (1966)..........................................24

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)................................22, 23

*Grutter v. Bollinger*, 539 U.S. 306 (2003)................................................25

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ..............................................20

*Holbrook v. Flynn*, 475 U.S. 560 (1986) ..................................................12

*Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253 (2022)........................30

*Hughes v. Rowe*, 449 U.S. 5 (1980) .........................................................20

*Int'l Ass'n of Machinists & Aerospace Workers, Dist.* 776 v. Tex. Steel Co.,
    538 F.2d 1116 (5th Cir. 1976) ...............................................................8

*Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265 (5th Cir. 2019),
    *rev'd and remanded*, 142 S. Ct. 2228 (2022) .......................................32

*Johnson v. United States*, 576 U.S. 591 (2015) ........................................24

*Kennedy v. Mendoza–Martinez*, 372 U.S. 144 (1963)......................15, 33, 34

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994)..............................15, 21

*Laufer v. Mann Hosp., L.L.C.*, 996 F.3d 269 (5th Cir. 2021) ........................9

*Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001).............................19, 20

*Lindsey v. Normet,* 405 U.S. 56 (1972).....................................................26

*Little Rock Family Planning Services v. Rutledge*,
    398 F. Supp. 3d 330 (E.D. Ark. 2019).................................................32

*Lovell v. Griffin*, 303 U.S. 444 (1938) .....................................................29

*Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921 (2019)................................................36

*Marbury v. Madison,* 5 U.S. 137 (1803)..........................................................................................36

*Martin v. City of Struthers*, 319 U.S. 141 (1943) ...........................................................................29

*McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185 (2014) .........................................................31

*Mendez v. Poitevent*, 823 F.3d 326 (5th Cir. 2016) ..........................................................................8

*MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768 (8th Cir. 2015) .....................................................32

*Moore v. Harper*, 600 U.S. ----, 143 S. Ct. 2065 (2023) ...............................................................36

*Mosley v. St. Louis Sw. Ry.*, 634 F.2d 942 (5th Cir. 1981) .............................................................19

*NAACP v. Button*, 371 U.S. 415 (1963)...........................................................................................29

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ...................................................................27

*Nike, Inc. v. Kasky*, 539 U.S. 654 (2003).......................................................................................23

*Planned Parenthood S. Atl. v. Wilson*, 520 F. Supp. 3d 823 (D.S.C. 2021)...................................32

*R.A.V. v. St. Paul*, 505 U.S. 377 (1992) ..........................................................................................30

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ...............................................................................30

*Richard v. Hinson*, 70 F.3d 415 (5th Cir. 1995) .............................................................................25

*Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749 (5th Cir. 2001) ...............................................10

*Romer v. Evans*, 517 U.S. 620 (1996)..............................................................................................27

*Sable Commc'n of Cal., Inc. v. F.C.C.*, 492 U.S. 115 (1989).........................................................30

*Schneider v. State*, 308 U.S. 147 (1939)..........................................................................................29

*Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497 (2001) ................................................16

*Shwab v. Doyle*, 258 U.S. 529 (1922)..............................................................................................15

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) ...............................................13

*Taylor v. Sturgell*, 553 U.S. 880 (2008)..........................................................................................15

*Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615 (2020).............................................................................9

*TransUnion LLC v. Ramirez,* 141 S. Ct. 2190 (2021) ...............................................................9, 23

*Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622 (1994).................................................30

*U.S. v. Texas*, 566 F. Supp. 3d 605 (W.D. Texas 2021) .............................................3, 4

*United States Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973)..................................27

*United States v. Carlton*, 512 U.S. 26 (1994) ............................................................12

*United States v. Mollier*, 853 F.2d 1169 (5th Cir. 1988) ...........................................16

*United States v. Peltier*, 422 U.S. 531 (1975)...........................................................15

*United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803 (2000) ...........................30

*United States v. Ross*, 948 F.3d 243 (5th Cir. 2020)..............................................23, 24

*United States v. Stevens*, 559 U.S. 460 (2010)...........................................................30

*United States v. Tex.*, No. 21-50949, 2021 WL 4706452 (5th Cir. Oct. 8, 2021) .........3

*United States v. Texas*, Case No. 21-588 (Argued Nov. 1, 2021) ............................9, 33

*United Transp. Union v. State Bar of Mich.*, 401 U.S. 576 (1971) ............................29

*Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765 (2000)................10

*Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620 (1980)...............12, 29

*Vill. of Willowbrook v. Olech*, 528 U.S. 562 (2000)..................................................24

*Virginia v. Hicks*, 539 U.S. 113 (2003)......................................................................31

*Whole Woman's Health v. Jackson*, 141 S. Ct. 2494 (2021) .............................1, 10, 37

*Wolff v. McDonnell*, 418 U.S. 539 (1974) ..................................................................11

*Women's Med. Ctr. of Nw. Houston v. Bell,* 248 F.3d 411 (5th Cir. 2001)..................22

*Zablocki v. Redhail*, 434 U.S. 374 (1978)...................................................................25

**Statutes and Constitutional Provisions**

28 U.S.C. § 2201(a) .....................................................................................................8

42 U.S.C. § 1983...........................................................................................20, 21, 37

42 U.S.C. § 1988................................................................................................ *passim*

Declaratory Judgment Act ...........................................................................................8

TEX. CIV. PRAC. & REM. CODE § 30.022 ............................................................... *passim*

TEX. HEALTH & SAFETY CODE ANN. § 171.201 ...............................................1

TEX. HEALTH & SAFETY CODE § 171.202.......................................................26

TEX. HEALTH & SAFETY CODE § 171.207.......................................................10

TEX. HEALTH & SAFETY CODE § 171.208....................................................... *passim*

TEX HEALTH & SAFETY CODE § 171.210.......................................................38

TEX HEALTH & SAFETY CODE § 171.211.......................................................38

TEX. HEALTH & SAFETY CODE § 171.212.......................................................14

Texas Heartbeat Act .......................................................................................6

**Rules**

FED. R. CIV. P. 56(a) .....................................................................................8

TEX. R. CIV. P. 202.......................................................................................3, 6

**Other Authorities**

Nelson S. Ebaugh, *The Liability: Why You Should Understand the Five Tests of
Civil Aiding and Abetting in Texas*, 78 TEX. B.J. 362 (2015) ...............................21

Texas Constitution ........................................................................................9

United States Constitution ............................................................................ *passim*

INTRODUCTION AND OVERVIEW

In May 2021, the Texas Legislature passed a sweeping new abortion statute known as Senate Bill 8 or the "Texas Heartbeat Act" ("SB8"). TEX. HEALTH & SAFETY CODE ANN. § 171.201 et seq.; TEX. CIV. PRAC. & REM. CODE ANN. § 30.022. The statute authorizes private citizens to file lawsuits against anyone who: (1) performs, assists, or encourages abortions in violation of SB8's provisions, or (2) merely intends to do any of those things. *Id.* Specifically, SB8 creates strict liability for at least $10,000 in statutory "damages" and an award of attorneys' fees to the SB8 plaintiff. *Id.* Additionally, upon entry of judgment, parties sued under SB8 are subject to a mandatory injunction to prevent future violations of SB8. *Id.*

Among other constitutional infirmities, SB8 improperly delegates all authority to enforce its punitive provisions from the State to private actors. SB8 also affords a windfall to plaintiffs who have suffered no injury whatsoever.[1] As Chief Justice Roberts described SB8:

> The statutory scheme before the Court is not only unusual, but unprecedented. The legislature has . . . essentially delegated enforcement of that prohibition to the populace at large. The desired consequence appears to be to insulate the State from responsibility for implementing and enforcing the regulatory regime.

*Whole Woman's Health v. Jackson*, 141 S. Ct. 2494, 2496 (2021) (Roberts, J., joined by Breyer, J., and Kagan, J., dissenting). SB8's "private enforcement mechanism" violates the U.S. Constitution in a myriad of ways, infringing on due process and equal protection rights, as well as

---

[1] This case does not challenge the constitutionality of SB8's abortion restrictions themselves. Instead, this case challenges the constitutionality of SB8's "private enforcement" provisions, which vitiate other constitutional rights held by persons subject to SB8's provisions; the application of SB8 to abortions that occur outside of the State of Texas where such abortion care is legal; and the application of SB8 to conduct that was undertaken prior to July 26, 2022, when the mandate in *Dobbs v. Jackson's Women's Health* was issued.

the rights to free speech and association. SB8 is also designed to inhibit lawyers from ethically and zealously representing their clients and otherwise seeks to stack the deck against parties sued under SB8 by depriving them of multiple aspects of procedural due process.

Plaintiffs—who assist pregnant Texans to access abortion care where such care is legal, provide financial assistance for legal abortions, and advocate for abortion rights—have been directly targeted by proponents of SB8. Exs. A-1 – A-6. Defendants Mistie Sharp, Sadie Weldon, Ashley Maxwell, Zach Maxwell, and Shannon D. Thomason ("SB8 Defendants") have each threatened enforcement of SB8 against Plaintiffs for assisting in abortions that allegedly violate SB8. Exs. A-4 – A-6, A-7 at ¶ 7, A-8 at ¶ 9, A-9 at ¶ 9, A-10. Plaintiffs are entitled to summary judgment and a declaration that SB8 is unconstitutional, as well as injunctive relief against the SB8 Defendants and their associates prohibiting them from: (1) bringing SB8 claims against Plaintiffs in any federal or state court; (2) seeking pre-suit discovery in support of any such claim; and/or (3) imposing on Plaintiffs any litigation preservation obligations related to such claims.

## FACTUAL BACKGROUND

SB8 became law on September 1, 2021, before the U.S. Supreme Court's decision in *Dobbs v. Jackson Women's Health Org*., 142 S. Ct. 2228 (2022). ECF 120 at 6; Senate Bill 8, 87th Leg., Reg. Sess. (Tex. 2021). As this Court has said, "SB8 purports to ban all abortions where cardiac activity has been detected . . . with no exceptions for rape, sexual abuse, or fetal defects incompatible with life" and "[i]t amounts to a ban on all abortions after six weeks." ECF 120 at 6. "It creates liability for anyone who performs an abortion in violation of the six-week ban or 'knowingly' aids or abets the performance of an abortion after six weeks." *Id.* "To avoid federal court review, S.B. 8 delegates enforcement to private individuals . . . who may be awarded injunctive relief, statutory damages . . . and costs and attorney's fees." *Id.* It also "contains other

novel schemes to outlaw abortions, including provisions barring a prevailing defendant from recovering attorney's fees . . . [and] denying parties the ability to raise defenses such as whether the law was unconstitutional, and denying the defense of issue or claim preclusion." *Id*.

In the fall of 2021, the United States filed suit against the State of Texas in this Court, challenging SB8 as being in "open defiance of the Constitution." *U.S. v. Texas*, 566 F. Supp. 3d 605, 627 (W.D. Texas 2021).  This Court granted the United States' motion for a preliminary injunction and denied Texas's motion to dismiss on October 6, 2021.  *Id*., *cert. granted before judgment*, 142 S. Ct. 14 (2021).  Two days later, the Fifth Circuit granted a temporary stay of the case.  *United States v. Tex*., No. 21-50949, 2021 WL 4706452, at *1 (5th Cir. Oct. 8, 2021).

During the two days that this Court's injunction was in effect, "post-cardiac" abortions resumed in Texas, as Defendants Thomason, Weldon, and A. Maxwell have pleaded in actions seeking pre-litigation discovery to support potential SB8 claims in Texas state court.  *See* TEX. R. CIV. P. 202; Exs. A-1 – A-3.  During that time, certain Plaintiffs assisted Texans in obtaining abortions (in Texas) without regard to whether cardiac activity may have been detectable.  *See* Exs. A-3 – A-5, A-9 (threat to TEA Fund regarding abortions funded during injunction); A-1, A-4 – A-5, A-8 (threat to Lilith Fund regarding abortions funded during injunction), A-4 – A-6.  When the Fifth Circuit stayed this Court's injunction, post-cardiac activity abortions in Texas largely stopped, as did Plaintiffs' efforts to assist Texans to obtain abortions in Texas.

At that time (while SB8 was in effect, but before *Dobbs* was decided), Plaintiffs started to undertake limited work helping pregnant Texans seeking to obtain abortions in states where abortion remained legal.  *See* ECF 120 at 10–13, 19 (summarizing the testimony of Anna Rupani of Fund Texas Choice, Neesha Davé of the Lilith Fund, and Rosann Mariappuram of Jane's Due Process).  Following the release of the *Dobbs* opinion, virtually every Plaintiff either restricted its

activities to advocacy or to advocacy plus helping Texans access legal non-abortion care in Texas.[2]

While Plaintiffs only provided assistance for post-cardiac activity abortions in Texas during the

injunction period in *U.S. v. Texas* or for abortions occurring in other states where they remain

legal, this did not stop the SB8 Defendants' threats to enforce SB8 against Plaintiffs (and others

like them):

- On May 31, 2022, Ms. Sharp submitted a sworn declaration to this Court in *Davis v. Sharp* (a case in which a group of plaintiffs including former Texas State Senator Wendy Davis who wanted to individually fund abortions sued Ms. Sharp and others who had shown an intention to enforce SB8) stating that she was "interested only in suing the abortion funds – the actual entities rather than the individuals – that pay for abortions in violations of [SB8]." Ex. A-7 at ¶ 7.

- The same day, Ms. Weldon submitted a sworn declaration to this Court in *Davis v. Sharp*, explaining that she had "no interest in suing anyone other than the individuals or organizations that aided or abetted the illegal post-heartbeat abortions described in Ms. Dave's sworn declaration" and that she had "no interest in suing any abortion fund or individuals involved with abortion funds apart from the Lilith Fund and those who aided or abetted the illegal post-heartbeat abortions described in Ms. Dave's sworn declaration." Ex. A-8 at ¶ 9.[3]

---

[2] After the entry of this Court's preliminary injunction against enforcement of the Pre-*Roe* Statutes by certain DA Defendants in this case (ECF 120), some Plaintiffs resumed their operations in certain jurisdictions to support pregnant Texans who seek abortion care outside of the state. *See, e.g.*, Exs. A-12 – A-19.

[3] Ms. Weldon also previously filed her petition for pre-suit discovery seeking information about these alleged abortions on January 26, 2022. Ex. A-1.

- Also on the same day, Ms. Maxwell submitted a sworn declaration to this Court in *Davis v. Sharp* that was virtually identical to the declaration that Ms. Weldon submitted except that her intentions are to sue "TEA Fund and those who aided or abetted the illegal post-heartbeat abortions described in Ms. Conner's sworn declaration."  Ex. A-9 at ¶ 9.[4]

- On July 7, 2022, several members of the Texas House of Representatives calling themselves "the Texas Freedom Caucus" sent a letter to the law firm of Sidley Austin, claiming that assisting Texans who access legal abortion care outside the state violates the Pre-*Roe* Statues and that paying for out-of-state post-cardiac abortions or the related travel violates SB8 if "the patient ingested the second drug in Texas after receiving the drugs from an out-of-state provider."  Ex. A-10.

- Also on July 7, 2022, Jonathan Mitchell—who is counsel for the SB8 Defendants in this lawsuit (and other court cases initiated by the SB8 Defendants )—sent three letters from his office in Austin, Texas on behalf of SB8 Defendant Thomason to counsel for Plaintiffs.  Exs. A-4 – A-6.  These letters mirrored the July 7, 2022 Texas Freedom Caucus Letter, including a lengthy direction to Plaintiffs (and counsel)[5] that all documents and information related to certain abortions must be retained.  *See* Exs. A-4-A-6, A-10.[6]

---

[4] Ms. Maxwell also previously filed her petition for pre-suit discovery seeking information about these alleged abortions on January 26, 2022.  Ex. A-3.

[5] The letters imply that counsel was also participating in the crime of murder, thus subjecting all communications to the "crime-fraud" exception to attorney-client privilege.

[6] One letter was sent to undersigned counsel Elizabeth G. Myers; one letter was sent to undersigned counsel Alexandra Wilson Albright; and the third was sent directly to a founder and board member

- On September 1, 2022, Defendant Zach Maxwell filed a Rule 202 Petition in Texas state court seeking pre-suit discovery from Makayla Montoya-Frazier of Plaintiff Buckle Bunnies in order to investigate potential SB8 claims against Buckle Bunnies and Ms. Montoya-Frazier based on his assertion that "if any Texas resident beyond the six-week limit ingested either of those two [medication abortion drugs] in Texas, then the abortion violated the Texas Heartbeat Act, and any abortion fund that aided or abetted the abortion is liable[.]"  *See* Ex. A-11 at 6.

In short, each of the SB8 Defendants has made clear that they intend to enforce SB8 against Plaintiffs for "aiding and abetting" (1) any "post-cardiac activity" abortions in Texas that occurred after September 1, 2021, including abortions that occurred while this Court's *U.S. v. Texas* injunction was in place; and (2) any "post-cardiac activity" abortions that are performed outside of the State of Texas if the pregnant Texan elected to have a medication abortion and any portion of the medication regime was ingested in Texas.  As explained below, enforcement of SB8 against any Plaintiff (or anyone else) in any circumstance violates the U.S. Constitution.

**SUMMARY OF ARGUMENT**

There are no disputed issues of material fact in the claims asserted against the SB8 Defendants.  They concern a facially unconstitutional effort by the Texas Legislature to create a mercenary incentive for private individuals and entities to do what the Texas Legislature and Texas Executive Branch cannot do.  And despite the fact that *Dobbs* allowed the Texas Legislature to criminalize abortion for the first time in 49 years, the Legislature has *not* repealed SB8 or its private

---

of Buckle Bunnies Fund.  The letters were sent on the same day Mr. Thomason filed his petition for pre-suit discovery.  Ex. A-2.

enforcement provisions. SB8 deputizes millions of people to file lawsuits without any connection whatsoever to an underlying injury, and specifically targets those who help pregnant Texans access care or who merely *intend* to help. The result is a statutorily-endorsed chilling of virtually all activity and speech related to abortion care, reproductive health, and reproductive justice generally in Texas. Because SB8 violates the U.S. Constitution, it is void and cannot be enforced.

A Texas MDL Pretrial Court has already declared that the state courts of Texas cannot entertain SB8 lawsuits because the statute is unconstitutional. A-20 at 18–19. This Court should do the same for at least eight reasons:

(1)   SB8's standing provision violates minimum constitutional standing requirements under Article III;

(2)   SB8's mandatory damages provision violates multiple due process guarantees that prohibit punitive awards;

(3)   SB8's elimination of defenses and requirements that courts ignore principles of res judicata violate due process by robbing parties defending against an SB8 claim of critical defenses and fair-trial procedures; they also violate bedrock principles of federalism;

(4)   SB8's attorney-fee shifting system that only penalizes challenges to the constitutionality of abortion regulations violates due process by interfering in the attorney-client relationship; violates the First Amendment by interfering with the right to petition in a content-based manner; violates the Supremacy Clause; and is preempted by 42 U.S.C. § 1988;

(5)   SB8's liability provisions violate due process because they are unconstitutionally vague and fail to provide clear notice of what conduct is forbidden;

(6)   SB8 violates due process and equal protection guarantees by authorizing and encouraging arbitrary and discriminatory enforcement;

(7)   SB8 violates equal protection because it singles out for disfavor only certain litigants based solely on the content of the claims and challenges they would bring in a manner that finds no basis in SB8's announced purposes; and

(8)   SB8 imposes unconstitutional content-based restrictions on First Amendment speech.

For all these reasons and more, SB8 violates the U.S. Constitution in all applications. Plaintiffs request that the Court so declare and enjoin the SB8 Defendants from: (1) instituting lawsuits against Plaintiffs under SB8; (2) seeking pre-suit discovery in support of any such claim; and/or (3) imposing on Plaintiffs any litigation preservation obligations related to such claims.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Where facts are undisputed, and "questions of law alone are involved in a case, summary judgment is appropriate." *Int'l Ass'n of Machinists & Aerospace Workers, Dist.* 776 v. Tex. Steel Co., 538 F.2d 1116, 1119 (5th Cir. 1976); *see also Mendez v. Poitevent*, 823 F.3d 326, 336 (5th Cir. 2016) ("Rule 56 does not require that any discovery take place before summary judgment can be granted." (citation omitted)).

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." *Id.* "[A]llegations that irreparable injury is threatened are not required." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937).

## ARGUMENT & AUTHORITIES

This case presents no material fact issues. SB8 is unconstitutional as a matter of law, and any attempt to enforce its terms against Plaintiffs (or anyone else) is per se invalid. SB8's provisions violate Plaintiffs' due process, equal protection, and First Amendment rights.

I.      **SB8's Standing Provisions Violate Article III of the U.S. Constitution.**

Both the U.S. and Texas Constitutions require an irreducible constitutional minimum injury to establish standing; absent that minimal standard, the courts lack the constitutional power to act.   A Texas MDL Pretrial Court has already correctly determined that SB8's private enforcement mechanism violates the Texas Constitution precisely because it violates state law constitutional standing requirements.   Ex. A-20 at 46–47.   SB8's sub-minimal standing requirement also creates a constitutional infirmity under the U.S. Constitution, which requires injury-in-fact even where the suit arises from a statutorily created right.   As the U.S. Supreme Court explained in *TransUnion LLC v. Ramirez*:

> [T]his Court has rejected the proposition that 'a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'  As the Court emphasized in *Spokeo*, Article III standing requires a concrete injury even in the context of a statutory violation.

141 S. Ct. 2190, 2205 (2021) (citations omitted); *see also Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1620 (2020).   The Texas Legislature cannot dispense with Article III standing requirements for SB8 plaintiffs who file their SB8 claims in the federal courts.   *See Laufer v. Mann Hosp., L.L.C.*, 996 F.3d 269, 272 (5th Cir. 2021) ("Article III standing requires a concrete injury even in the context of a statutory violation.").   Thus, SB8 cannot constitutionally permit any non-government actor to sue without an actual, particularized, and discrete injury-in-fact.

The more generalized injury analysis for qui tam and taxpayer cases cannot salvage SB8's purported conferral of standing on every private citizen in the world.   SB8 is not a qui tam statute.   Texas Solicitor General Judd Stone admitted this in his argument to the U.S. Supreme Court in *United States v. Texas*, Case No. 21-588 (argued Nov. 1, 2021).   In response to a question posed by Justice Thomas, General Stone said of the private parties bringing claims under SB8:

- 9 -

[T]hey're not subject to the state's control.  They don't have access to the state's investigatory resources.  The state can't at some point, for example, take the case over like in a qui tam action . . . .

Ex. A-21 at 57:4–8.[7]

Unlike an SB8 suit, a qui tam case requires that the government be injured, and the government is the real party in interest.  *See Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 773 (2000); *see also Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 753–57 (5th Cir. 2001) (discussing government control over qui tam suits).  A qui tam statute effectively allows a relator to sue as a partial assignee of the government's interest, giving the relator standing to assert an injury suffered by the government.  *Vermont Agency of Nat. Res.*, 529 U.S. at 774 n.10.  "[An] assignee of a claim has standing to assert the injury in fact suffered by the assignor."  *Id.* at 765.  In contrast, SB8 does not assign a State injury to a purported plaintiff because (1) the State is not injured, and (2) the power of government enforcement is explicitly disclaimed.[8]  Lacking any injury, and lacking the statutory power to sue, the State has no standing to bring a lawsuit under SB8, and no litigation right to assign to the private and uninjured litigant.  *Id.* at 773.

---

[7] The question General Stone was responding to related to whether the private individuals suing under SB8 would be acting as private attorneys general, demonstrating that this answer—that this is not *qui tam* statute—is necessary to achieve the State of Texas's purpose of avoiding federal pre-enforcement review.  Ex. A-21 at 56:25–57:10.  General Stone responded similarly to questions posed by Justice Kagan during the oral argument in *Whole Woman's Health v. Jackson*, Case No. 21-463.  There he said: "[T]he attorney general simply doesn't have any control of the procession of S.B. 8 lawsuits in any way.  He doesn't have a mechanism such as in the qui tam context to take over -- over the litigation.  He can't certify that a lawsuit is not in the state's interests or something on that order and order it dismissed."  Ex. A-22 at 70:25–71:7 (the entire exchange is 70:4–71:8).

[8] An injury to the State and the corresponding requisite standing for the State would require the State to enforce SB8—the exact outcome that SB8 was drafted to avoid.  Tᴇx. Hᴇᴀʟᴛʜ & Sᴀꜰᴇᴛʏ Cᴏᴅᴇ § 171.207 (prohibiting public enforcement of the law).  SB8 was carefully drafted to avoid State enforcement (and the antecedent state injury).

Nor can any alleged "taxpayer standing" under SB8 satisfy Article III's requirements. While some state courts maintain limited doctrines permitting uninvolved taxpayers to bring lawsuits to constrain or command government actions (with the payment of taxes being the only link to standing), those lawsuits are generally forbidden in the federal courts. The Supreme Court has recognized one narrow exception for cases involving violations of the Establishment Clause. *Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 134–39 (2011) (noting that "[t]his Court has rejected the general proposition" supporting taxpayer standing and then analyzing whether a limited exception for Establishment Clause cases applied). This case does not implicate the Establishment Clause. Moreover, the private cause of action authorized by SB8 does not fall within this narrow "taxpayer standing" doctrine because SB8 plaintiffs do not seek to prohibit government intrusion or misuse of tax dollars for an unauthorized government purpose. Instead, they seek damages and attorneys' fees from, and injunctions against, private individuals and organizations based on actions that have caused them no injury.

Because Section 171.208(a) purports to confer standing on "any person," it violates Article III's standing requirements, and no federal court may entertain SB8 claims.

## II.   SB8 Violates the U.S. Constitution's Due Process Guarantees.

SB8 also fails on due process grounds. "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). "[T]he Due Process Clause of the Fourteenth Amendment was intended to prevent government 'from abusing [its] power, or employing it as an instrument of oppression.'" *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 126 (1992) (citation omitted). Meaningful access to the courts, including the right to select and confer with counsel, is a fundamental right guaranteed by the Due Process clauses of the Fifth and Fourteenth Amendments. *Wolff*, 418 U.S. at 579 ("The

right of access to the courts . . . is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights.").

Due Process challenges fall under either a rational basis or strict scrutiny analysis. Rational-basis review requires that a government policy be rationally related to a legitimate legislative purpose. *United States v. Carlton*, 512 U.S. 26, 35 (1994). Strict scrutiny, which applies to the fundamental rights implicated here,[9] is more exacting:

> Statutes affecting constitutional rights must be drawn with precision, and must be tailored to serve their legitimate objectives. And if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose less drastic means.

*Dunn v. Blumstein*, 405 U.S. 330, 343 (1972) (cleaned up). SB8's rigged and one-sided litigation rules impair Plaintiffs' due process rights in numerous ways, and under either standard, SB8 is unconstitutional.[10]

## A.  SB8's mandatory "damages," with no proof of injury, are unconstitutionally excessive.

Section 171.208(b)(2) mandates statutory "damages" of "not less than $10,000" in each suit filed against a provider or "aider or abettor" of "post-cardiac-activity" abortions. TEX. HEALTH & SAFETY CODE § 171.208(b)(2). It provides for a minimum award in every case, but there are no

---

[9] *See Brewer v. Wilkinson*, 3 F.3d 816, 820 (5th Cir. 1993) (noting that Supreme Court has held that right of access to courts is also found in "First Amendment right to petition the government for grievances"); *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980) (applying strict scrutiny to ordinance restricting First Amendment-protected fundraising activities); *Holbrook v. Flynn*, 475 U.S. 560, 567–68 (1986) (requiring "close judicial scrutiny" of practices threatening the "fairness of the factfinding process") (internal quotation marks omitted).
[10] SB8's terms are codified in two different Texas Codes. Sections 171.208–212 are in the Texas Health & Safety Code; Section 30.022 is codified in the Texas Civil Practice & Remedies Code.

guidelines for how the court or jury should determine the amount of an award. These mandatory "damages" are coupled with a mandatory injunction without proof of any need for the injunction. *See* TEX. HEALTH & SAFETY CODE § 171.208(b)(1) ("[T]he court shall award . . . injunctive relief sufficient to prevent the defendant from violating this subchapter or engaging in acts that aid or abet violations of this subchapter.").

At a minimum, the U.S. Constitution requires a relationship between the amount of damages awarded to a plaintiff and the harm the plaintiff experiences. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (listing standards used to identify unconstitutional awards).[11] SB8's $10,000 minimum bounty, with an unlimited maximum, makes no pretense of satisfying constitutional requirements. The SB8 plaintiff need not submit proof of *any* injury to be compensated. Nor is the plaintiff limited to recovering a single $10,000 bounty per actual or contemplated abortion. They can sue as many people as they can find who "aid and abet" the same abortion—the mother or friend who called the clinic, the person who drove the patient to and from the clinic, the funder, the receptionist, the nurses, and the volunteer who holds the patient's hand during the procedure—and recover at least $10,000 from each of them. The possible targets and the amounts recoverable are infinite.

The mandatory, statutory minimum award of $10,000 given to a claimant who has suffered no harm is excessive and arbitrary on its face. It is also unconstitutionally vague—giving judges and juries carte blanche to deprive citizens of their property without any guiding principles or

---

[11] These standards or "guideposts" are: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Campbell*, 538 U.S. at 418.

limitations.  As Judge Peeples correctly held in the Texas MDL: "SB8 is not compensatory, and it is not a form of statutory liquidated damages known to American law.  The statute authorizes punishment by civil lawsuit, and deprivation of property, without due process of law as guaranteed by the Fourteenth Amendment."  *See* Ex. A-20 at 36–43, 46.

> **B.**    **SB8's elimination of defenses and res judicata is unconstitutional.**

SB8 strips potential defendants of traditional rights related to due process and the right to petition in numerous ways, including:

- Prohibiting defendants from asserting defenses based on judgments of other courts.  TEX. HEALTH & SAFETY CODE § 178.208(e).

- Commanding judges—including judges in federal courts—to ignore declaratory judgments and injunctions issued by other courts.  *Id.* § 171.212(e) (directing that a "judicial injunction or declaration of unconstitutionality . . . is nothing more than an edict" that can be vacated by a court that "has a different understanding of the requirements of the . . . United States Constitution").

- Prohibiting defendants from arguing that the abortion occurred under a court order allowing the abortions, which was subsequently overruled.  *Id.* § 171.208(e)(3).

- Prohibiting defendants from relying on the persuasive effect of a state or federal court's decision that is "not binding" on the court where the SB8 suit was brought.  *Id.* § 171.208(e)(4).

- Prohibiting defendants from relying on prior judgments through non-mutual claim and issue preclusion, *id.* § 171.208(e)(5), unless "the defendant demonstrates that the defendant previously paid the full amount of statutory damages . . . in a previous action for that particular . . . abortion . . . ." *Id.* § 171.208(c).

These prohibitions violate the federal Supremacy Clause, the Full Faith and Credit Clause, and the Due Process Clause of the Fourteenth Amendment.

First, SB8's provisions imposing liability for conduct that was lawful under existing federal court decisions when that conduct was undertaken interferes with the ability of courts, including the federal courts, to declare the law, and prevents parties and the public from relying on those

rulings.  As the U.S. Supreme Court has explained, "unless we are to hold that parties may not reasonably rely upon any legal pronouncement emanating from sources other than this Court, we cannot regard as blameworthy those parties who conform their conduct to the prevailing statutory or constitutional norm."  *United States. v. Peltier*, 422 U.S. 531, 542 (1975).  That is what happened here—certain Plaintiffs assisted "post-cardiac activity" abortions after September 1, 2021, in reliance on this Court's injunction allowing them to do so (before that injunction was stayed by the Fifth Circuit).  Exs. A-23 at ¶ 7, A-24 at ¶ 8.  Now the SB8 Defendants seek to sue Plaintiffs under SB8 for that lawful activity.[12]

Second, federal courts—not the Texas Legislature—determine the scope of their judgments.  *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008) ("The preclusive effect of a federal-court judgment is determined by federal common law."); *Deposit Bank of Frankfort v. Bd. of Councilmen of City of Frankfort*, 191 U.S. 499, 520 (1903) ("When the state court refused to give [the federal court's] judgment effect it denied a right secured by the federal court judgment upon matters wherein its decision was final . . . .  Any other conclusion . . . is a virtual abandonment of the final power of the Federal courts to protect all who come before them relying upon rights guaranteed by the Federal Constitution, and established by the judgments of the Federal courts.").  States cannot simply give federal court judgments in federal question cases "whatever effect they would give their own judgments;" instead, states "must accord them the effect" that federal law

---

[12] The U.S. Supreme Court has also applied the *ex post facto* clause to punitive statutes like SB8.  *See Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–69 (1963) (holding punitive statutes stripping citizenship to violate *ex post facto* clause); *see also Landgraf v. USI Film Products*, 511 U.S. 244, 281 (1994) (noting that "[r]etroactive imposition of punitive damages would raise a serious constitutional question."); *Shwab v. Doyle*, 258 U.S. 529, 537 (1922) (invalidating punitive tax act under *ex post facto* clause).

provides. *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 507 (2001) (U.S. Supreme Court "has the last word on the claim-preclusive effect of *all* federal judgments").

Likewise, under the Full Faith and Credit Clause, the judgments of courts of sister states are entitled to the enforceability and scope they would have under their *own* principles of preclusion, not under those the Texas Legislature might seek to impose on them. *See Baker by Thomas v. Gen. Motors Corp.*, 522 U.S. 222, 233 (1998) ("For claim and issue preclusion (res judicata) purposes, in other words, the judgment of the rendering State gains nationwide force."); *see also Bigelow v. Old Dominion Copper Mining & Smelting Co.*, 225 U.S. 111, 135 (1912) ("The general effect of a judgment of a court of one state, when relied upon as an estoppel in the courts of another state, is that which it has, by law or usage, in the courts of the state from which it comes.").

Third, SB8's abolition of non-mutual issue preclusion[13] is an attack on res judicata, a venerable principle of American justice. *See B & B Hardware, Inc. v. Hargis Indus.*, *Inc.*, 575 U.S. 138, 147 (2015) (preclusion protects "against 'the expense and vexation attending multiple lawsuits, conserv[ing] judicial resources, and foster[ing] reliance on judicial action by minimizing the possibility of inconsistent verdicts[.]' . . . In short, 'a losing litigant deserves no rematch after a defeat fairly suffered.'" (citation omitted)). SB8 instead allows its "private enforcers" to continue to harass any person or organization concerning an abortion procedure, despite losing a previous SB8 suit arising from that very same procedure.

---

[13] Section 171.208(e)(5) removes the trial court's discretion in applying non-mutual issue preclusion—"if a litigant has fully and fairly litigated an issue and lost, then third parties unrelated to the original action can bar the litigant from re-litigating that same issue in a subsequent suit." *United States v. Mollier*, 853 F.2d 1169, 1175 (5th Cir. 1988).

For example, if the physician who performed an abortion successfully defended the first SB8 suit on grounds that the abortion did not violate SB8, the receptionist at the clinic is prohibited from asserting issue preclusion as a defense against the same plaintiff for the very same abortion. Likewise, different plaintiffs may continue to sue the same SB8 defendants over and over for the same abortions, even if each claim fails, because the first judgment would not bar later claimants until (1) an SB8 plaintiff finally prevailed and (2) the SB8 defendant pays the first judgment completely. *See* Tex. Health & Safety Code § 171.208(c). Even then, the first judgment is merely an affirmative defense—it does not prevent the filing of additional harassing lawsuits about the very same abortion. *See id.* (requiring that defendant "demonstrate" that they have paid the judgment to defeat the claim), *see also id.* at § 171.208(i) (prohibiting recovery of attorney fees by prevailing defendant under the Texas Rules of Civil Procedure).

### C.   SB8's imposition of joint and several liability of litigant and counsel for good faith litigation is unconstitutional and preempted by federal law.

SB8 not only mandates an award of fees and costs to a successful SB8 plaintiff, it also includes a separate fee provision that penalizes any party and her lawyer who affirmatively challenge any abortion regulation. Tex. Civ. Prac. & Rem. Code § 30.022(a). Specifically, Section 30.022 imposes joint and several liability on any party and its counsel, if they "seek[] declaratory or injunctive relief" to prevent the enforcement of "any statute, ordinance, rule, regulation, or any other type of law that regulates or restricts abortion or that limits taxpayer funding for . . . abortions." Tex. Civ. Prac. & Rem. Code § 30.022(a). Thus, in this case, if SB8 were constitutional (and until it is ultimately determined that it is not), Plaintiffs and their attorneys have put themselves at considerable financial risk for seeking to prevent enforcement of SB8, or for challenging the constitutionality of *any* Texas abortion law. But the provision goes even further—it also provides an independent cause of action for attorneys' fees that can be pursued

against parties and lawyers as late as three years after the original lawsuit concludes—even if the court in that original lawsuit denied a fee recovery.  TEX. CIV. PRAC. & REM. CODE § 30.022(c) & (d).

The fee award ostensibly goes to "the prevailing party," but it goes just one way.  Under Section 30.022(a), only the person who seeks declaratory or injunctive relief or their lawyer can ever be liable for the fees awarded to the "prevailing party."  Although Section 30.022(b)'s definition of "prevailing party" could include the party seeking declaratory relief, under the terms of the statute, any award would be paid from that party (the party seeking relief) to itself (the prevailing party).  *See* TEX. CIV. PRAC. & REM. CODE § 30.022(b).  Thus, any award to the challenger of the law is entirely illusory.  But a significant award to the other side is almost certain.  If the court enters judgment in favor of the party defending the abortion-related law or regulation "on *any* such claim or cause of action" that party "prevails" and can recover its fees.  *Id.* (emphasis added).

For example, in this case, if the Court grants declaratory relief on some of Plaintiffs' claims but not others, the SB8 Defendants would arguably still be a "prevailing party" under Section 30.022 and have a claim for fees that they can assert in a separate action for up to three years after the judgment is final and all appeals are concluded, even if this Court considered and denied the fee award.[14]  *See* TEX. CIV. PRAC. & REM. CODE § 30.022(c) & (d).  These provisions ensure that

---

[14] Section 30.022's fee provision is also an attack on judicial power because it attempts to limit the preclusive effect of prior judgments, both state and federal.  As explained in Section B.2. above, the Texas Legislature cannot define the preclusive effects of federal judgments or the judgments entered by the courts of other states.  Section 30.022, however, is even more brazen because, for its attorneys' fee claims, it disclaims mutual or non-mutual preclusion of all kinds, including claim preclusion.  *See* TEX. CIV. PRAC. & REM. CODE § 30.022(d) (noting that "[i]t is not a defense to an

*parties and their lawyers* bringing good faith attacks on an abortion restriction (not just SB8) are liable for fees if they lose. This liability provision is clearly designed to inhibit parties from asserting their constitutional rights and to punish lawyers who help them. The right to petition the courts cannot be so restrained under the U.S. Constitution. *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548–49 (2001).

This provision also creates an immediate conflict of interest between any person seeking counsel about Texas's abortion laws and the lawyers with whom they confer. The lawyer has a personal interest in *not* asserting a valid claim that the regulation is unconstitutional for fear of joint and several liability, but a conflicting duty to the client to pursue all valid claims and defenses. This inherent conflict impairs the right to obtain counsel and implicates the due process rights of defendants in SB8 suits. *See Mosley v. St. Louis Sw. Ry.*, 634 F.2d 942, 945–46 (5th Cir. 1981) ("The right to the advice and assistance of retained counsel in civil litigation is implicit in the concept of due process. . . . The right of access to retained counsel is one of constitutional dimensions and should be freely exercised without impingement." (quoting *Potashnick v. Port City Const. Co.*, 609 F.2d 1101, 1118 (5th Cir. 1980)).

The U.S. Supreme Court has already struck down this type of provision, invalidating a statute that funded attorneys serving indigent litigants on non-criminal issues and also prohibited

---

action brought under subsection (c) that: (1) a prevailing party under this section failed to seek recovery of costs or attorney's fees in the underlying action; (2) the court in the underlying action declined to recognize or enforce the requirements of this section; or (3) the court in the underlying action held that any provisions of this section are invalid, unconstitutional, or preempted by federal law, *notwithstanding the doctrines of issue or claim preclusion*.") (emphasis added). Therefore, if a federal court were to rule that SB8 is unconstitutional and decline an award of fees under it, the party denied fees may file a new action in Texas state court under Section 30.022(d) seeking the very same fees.

those attorneys from challenging the constitutionality of statutes on behalf of those clients.  The

Court explained:

> The attempted restriction is designed to insulate the Government's
> interpretation of the Constitution from judicial challenge.  The
> Constitution does not permit the Government to confine litigants
> and their attorneys in this manner.  We must be vigilant when
> Congress imposes rules and conditions which in effect insulate its
> own laws from legitimate judicial challenge.

*Velazquez*, 531 U.S. at 548–49.  Because that statute's provisions run afoul of the Constitution,

SB8's provisions are equally impermissible.

Section 30.022 is also preempted by federal law, at least in cases (like this one) that assert

civil rights claims under 42 U.S.C. § 1983.  Fee awards in Section 1983 claims are governed by

42 U.S.C. § 1988.  Section 1988, as interpreted by the U.S. Supreme Court, means that "a

prevailing plaintiff should ordinarily recover an attorney's fee unless special circumstances would

render such an award unjust."  *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (internal quotation

mark omitted).  The civil rights plaintiff does not recover attorneys' fees *only if* the District Court

finds that the action was frivolous, unreasonable or without foundation.  *Hughes v. Rowe*, 449 U.S.

5, 14 (1980) (applying Section 1988 to a Title VII case to disallow fees and noting that while a

different standard might apply to a Section 1983 claim, "we can perceive no reason for applying a

less stringent standard" (internal quotation marks omitted).

Therefore, Section 30.022 cannot be read consistently with Section 1988 and is preempted.

Section 30.022 permits even a defendant who loses a Section 1983 claim to obtain, or file a later

action to obtain, attorney fees against the prevailing plaintiff if even one of the claims at issue was

decided in that defendant's favor.  On the other hand, Section 1988 only allows such a recovery

where the defendant's fees are "incurred because of," and "only because of, a frivolous claim."

*Fox v. Vice*, 563 U.S. 826, 836 (2011).  Section 30.022's post-action claim procedure also conflicts

with the requirement that requests for attorney fees under Section 1988 be filed "in [the] action or proceeding to enforce" the underlying civil rights statute.  *See* 42 U.S.C. § 1988(b).

Section 1988 was created to make access to the courts easier for Section 1983 and other civil rights claimants, while Section 30.022 of SB8 is specifically designed to make such claims—in one specific area—substantially more difficult.  The Supremacy Clause forbids such a naked attempt to undermine federal policy.  Section 30.022 is preempted by 42 U.S.C. § 1988.

### D.     SB8 is unconstitutionally vague.

Under the Fourteenth Amendment's guarantee of due process, a law can be void for vagueness "for either of two independent reasons.  First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement."  *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (plurality opinion).  SB8 suffers from both infirmities.

### 1.     SB8 fails to provide clear notice of what conduct is actionable.

"Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly . . . ."  *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994).  SB8 deprives Plaintiffs, as well as their staffs, volunteers, donors, and clients, of the ability to ascertain what conduct violates SB8's terms in at least three ways.

First, SB8 is vague because it fails to define "aids and abets."  That phrase is not defined in the Texas Penal Code and has no uniform definition under Texas law.  *See* Nelson S. Ebaugh, *The Liability*: *Why You Should Understand the Five Tests of Civil Aiding and Abetting in Texas*, 78 TEX. B.J. 362 (2015).  Moreover, unlike any other type of aiding-and-abetting liability, SB8 purports to impose liability regardless of whether a person knew that a critical element of the offense was present, specifically "whether the person knew or should have known that the abortion would be

performed or induced in violation" of the statute.  TEX. HEALTH & SAFETY CODE § 171.208(a)(2). This is fatal to the law's constitutionality.  *See Women's Med. Ctr. of Nw. Houston v. Bell,* 248 F.3d 411, 422 (5th Cir. 2001) (abortion regulation "is unconstitutionally vague on its face because it impermissibly subjects physicians to sanctions based not on their own objective behavior, but on the subjective viewpoints of others").

Second, as discussed in Section B.2. *supra*, SB8 imposes liability despite a party's reliance on court decisions, including Supreme Court decisions, in place at the time of the conduct but later overruled.  TEX. HEALTH & SAFETY CODE § 171.208€(3).  This fear of future liability is a primary reason why abortions came to a grinding halt in Texas in the face of SB8, despite then-binding Supreme Court authority that protected the right to access and obtain abortions.  This forced guessing game about what "aiding and abetting" includes and what future Supreme Court decisions may say is the opposite of "fair warning" with "explicit standards."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).[15]  Plaintiffs are subject to the "hazard of being prosecuted for knowing but guiltless behavior."  *Baggett v. Bullitt*, 377 U.S. 360, 373 (1964).  Due process does not allow for this uncertainty.  *Grayned*, 408 U.S. at 109.

Third, SB8's prohibitions purport to reach any person who even *intends* to assist with a forbidden abortion.  TEX. HEALTH & SAFETY CODE § 171.208(a)(3).  Not only is it patently unclear what "aids and abets" means, but that uncertainty is compounded by punishing a mere thought, mental plan, or intent—even if that person did not follow through or succeed in assisting an

---

[15] "Statutes and regulations which allow monetary penalties against those who violate them ... must give a regulated party fair warning of the conduct they prohibit or require . . . ."  *Employer Sols. Staffing Group II, L.L.C. v. Office of Chief Admin. Hearing Officer*, 833 F.3d 480, 487 (5th Cir. 2016) (cleaned up) (quoting *Diamond Roofing Co. v. Occupational Safety and Health Review Comm'n*, 528 F.2d 645, 649 (5th Cir. 1976)).

abortion at all.  This overbreadth results in a "thought crime" that is impermissibly vague in terms of what conduct is subject to prohibition, and subjects a defendant to massive liabilities simply for wishing to help a person access abortion care where it is legal to do so.  *See Ashcroft v. Free Speech Coal*, 535 U.S. 234, 253 (2002) (citing *Stanley v. Georgia*, 394 U.S. 557, 566 (1969)).

       2.      **SB8's vagueness leads to arbitrary and discriminatory enforcement of the law.**

SB8's enforcement provisions also empower precisely the kind of "arbitrary and discriminatory enforcement" that the vagueness doctrine prohibits.  *Grayned*, 408 U.S. at 108.  By "freely authoriz[ing] *unharmed* plaintiffs to" bring enforcement actions, SB8 takes discretionary decisions such as "how to prioritize and how aggressively to pursue legal actions against defendants who violate the law" away from public officials and hands that discretion to ideologically motivated plaintiffs who "are not accountable to the people and are not charged with pursuing the public interest."  *TransUnion LLC*, 141 S. Ct. at 2207.  Any person can drag an abortion supporter into a costly enforcement action by accusing them of doing nothing more than "inten[ding]" to violate the law.  TEX. HEALTH & SAFETY CODE § 171.208(a)(3).  Thus, SB8 permits and encourages activists—like the SB8 Defendants—to arbitrarily police their political and ideological opponents, and it allows them to "do so unencumbered by the legal and practical checks that tend to keep the energies of public enforcement agencies focused upon more" concrete harms.  *Nike, Inc. v. Kasky*, 539 U.S. 654, 679–80 (2003) (Breyer, J., dissenting from dismissal of certiorari as improvidently granted) (discussing the dangers of the "delegation of state authority" to "a purely ideological plaintiff").

Further, the statutory damages provision discussed in Section B.1., *supra* does not "provide standards to govern" the amount of the bounty that can be recovered.  *United States v. Ross*, 948 F.3d 243, 247 (5th Cir. 2020); *cf. Grayned*, 408 U.S. at 113–14 (statute's harm requirement,

"demonstrated causality," and requirement that acts be "'willfully' done" inform the due-process inquiry).   Thus, the penalty provision unconstitutionally invites arbitrary and discriminatory assessment of the amount of the penalty.  *See Johnson v. United States*, 576 U.S. 591, 597 (2015) (statute's indeterminacy held to "invite[] arbitrary enforcement by judges" when determining a defendant's sentence); *Morales*, 527 U.S. at 61 (1999) (plurality opinion) (loitering statute vague where it provides absolute discretion to police officers to decide what loitering is); *Giaccio v. Pennsylvania*, 382 U.S. 399, 403 (1966) (statute void for vagueness where it did not "place any conditions of any kind upon the jury's power to impose costs"); *Ross*, 948 F.3d at 247 (arbitrariness test requires standards for statutes fixing penalties).

## III.    SB8 Violates the Equal Protection Clause.

"[T]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination."  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  Therefore, it directs "that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  If, as here, similarly situated persons are treated differently, then the court determines the appropriate level of equal protection scrutiny:

> Strict scrutiny applies to suspect classifications based on race, alienage, or national origin.  Under strict scrutiny review, a state must show the challenged classification is narrowly tailored to further a compelling governmental interest.  Intermediate or heightened scrutiny applies to quasi-suspect, discriminatory classifications based on illegitimacy and gender.  To survive heightened scrutiny review, a classification must be substantially related to a sufficiently important governmental interest.  All other classifications are subject to rational basis review.  Under rational basis review, a classification will be upheld as long as there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.

*De Leon v. Perry*, 975 F. Supp. 2d 632, 650 (W.D. Tex. 2014), *aff'd sub nom. De Leon v. Abbott*, 791 F.3d 619 (5th Cir. 2015) (citations omitted).  SB8 fails under any level of equal protection scrutiny.

### A.    SB8 targets a disfavored class for different and worse treatment.

A challenged classification is subject to strict scrutiny if it burdens a fundamental right, "that is explicitly or implicitly protected by the Constitution."  *Richard v. Hinson*, 70 F.3d 415, 417 (5th Cir. 1995); *see Zablocki v. Redhail*, 434 U.S. 374, 388 (1978).  As discussed herein, SB8's enforcement provisions burden fundamental Due Process and First Amendment rights, so strict scrutiny applies.  Therefore, the state must have a compelling interest and demonstrate that the statutory classification "fit[s] the compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate."  *Grutter v. Bollinger*, 539 U.S. 306, 333 (2003) (internal quotation marks omitted).

There is no doubt that SB8 targets a disfavored class for different and worse treatment.  It creates a new and rigged private enforcement scheme that applies *only* to a subset of citizens—those who support Texans accessing abortion—and it intentionally and arbitrarily discriminates against them on the basis of the content of their speech and beliefs.  Plaintiffs fall squarely into this disfavored group. Exs. A-12 at ¶ 4, A-13 at ¶ 4, A-14 at ¶ 4, A-15 at ¶ 4, A-16 at ¶¶ 3-4, A-17 at ¶4, A-18 at ¶4, A-19 at ¶4.  Further, SB8 denies that same group of citizens—and that group of citizens only—full access to the courts, it impairs their ability to obtain legal counsel, and it prohibits them from asserting defenses available to every other citizen.  Its automatic fee recovery provision (and absolute denial of fee recovery for prevailing defendants, regardless of circumstances) burdens only those defending themselves in SB8 lawsuits.  These provisions clearly discriminate—they are special provisions that affect only one discrete class of litigants.

- 25 -

Targeting a subset of litigants for disparate treatment is a clear violation of the Equal Protection Clause.   For example, in *Lindsey v. Normet*, the U.S. Supreme Court found unconstitutional an "appeal penalty" statute that burdened only forcible entry and detainer defendants.   405 U.S. 56, 63 (1972).   The Oregon statute required a bond at double the expected rent during the action's pendency, which was forfeited if the tenant was unsuccessful on appeal. *Id.* at 63–64.   The Court found that because the double-bond requirement applied only to tenants and not to other types of appellants, it was an arbitrary and capricious denial of an appellate right otherwise available by statute, thus violating the Equal Protection Clause.   *Id.* at 77–78.   The strictures of SB8—automatic, one-sided attorneys' fees, elimination of standard defenses, and a provision that penalizes not only a declaratory or injunctive plaintiff but also lawyers for good faith lawsuits—are far worse than the unconstitutional penalty in *Lindsey*.   They burden original trial rights, rather than merely appellate rights, and they burden both an SB8 defendant's right to defend herself and a citizen's private right to petition the court for redress of constitutional grievances.

**B.**      **SB8 is not narrowly tailored or rationally related to legitimate purposes.**

The restrictions and penalties in SB8 are not narrowly tailored or rationally related to a legitimate government interest.   Therefore, they cannot meet any standard of equal-protection review.

The only government interests declared by the Legislature in SB8 are the "compelling interests from the outset of a woman's pregnancy in protecting the health of the woman and the life of the unborn child."   TEX. HEALTH & SAFETY CODE § 171.202(3).   Nothing about SB8's skewed private-enforcement mechanism is narrowly tailored to accomplish those stated interests. A one-sided fee provision allowing SB8 plaintiffs to file frivolous litigation without risk of fee

shifting does not further an interest in protecting women's health or the life of an "unborn child." Inhibiting challenges to the law's constitutionality by imposing joint-and-several attorneys' fees liability on a litigant's counsel also has no rational relationship to those stated goals.

The government's transparent purpose in enacting the private enforcement mechanism of SB8 was to prevent meaningful judicial review,[16] which is not a compelling or rational purpose sufficient to ignore the U.S. Constitution's guarantees of equal protection.  There is no legitimate purpose in deputizing every private citizen to do what the State itself is prohibited from doing. "What a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law . . . ."  *New York Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964). While the State of Texas may now criminally prohibit most abortion according to the prevailing view of the majority in *Dobbs,* it still cannot violate the other constitutional rights of its citizens in the way SB8 does.

SB8 is meant to purposefully and intentionally discriminate against the persons who assist, fund, or advocate for pregnant Texans to obtain legal abortions (or who "intend" to do any of those things).  But "if the constitutional conception of equal protection of the laws means anything, it must at the very least mean that a bare [legislative] desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."  *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973); *see also Romer v. Evans*, 517 U.S. 620, 632 (1996) (striking down

---

[16] *See* Ex. A-29 at 20:6–18 (Solicitor General of Texas Judd Stone: "Well the legislature clearly – first of all, as a matter of description about why the legislature did what it did, the point on restraining state actors from being able to take enforcement actions was specifically to preclude pre-enforcement challenges."  J. Lehrmann: "So you concede that."  Mr. Stone: "Oh, of course. We said that as much before the United States Supreme Court.  That's been the position of the state the entire time.").

constitutional amendment because "its sheer breadth [wa]s so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects; it lacks a rational relationship to legitimate state interests"); *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 743–44 (1983) (holding that states in right-to-petition challenge "have only a negligible interest, if any, in having insubstantial claims adjudicated by their courts, particularly in the face of the strong federal interest in vindicating" rights protected by federal law).

Thus, under any standard of equal protection analysis, SB8 violates the U.S. Constitution.

## IV.   SB8 Violates Plaintiffs' First Amendment rights.

SB8's aiding-and-abetting and "intent" provisions also violate the constitutional right to free speech.  While, as previously noted, "aids or abets" is not defined by the statute, SB8 does state that "paying for or reimbursing the costs of an abortion" constitutes aiding and abetting.  TEX. HEALTH & SAFETY CODE § 171.208(a)(2).  Liability is imposed "regardless of whether the person knew or should have known that the abortion would be performed or induced in violation of this subchapter."  *Id.*  Plaintiffs Fund Texas Choice, the North Texas Equal Access Fund, The Lilith Fund for Reproductive Equity, Frontera Fund, The Afiya Center, West Fund, Jane's Due Process, and Buckle Bunnies are abortion funds and practical support networks—charitable organizations that raise money to fund abortion care and the ancillary needs of patients.  Exs. A-12 – A-18.  Ms. Weldon, Ms. Maxwell, and Mr. Maxwell's Rule 202 Petitions focus on that fundraising activity, identifying Plaintiffs' sources of funding and their donors as topics for the deposition sought in anticipation of their SB8 lawsuits.  Ex. A-1 at 7; Ex. A-3 at 7, *see also supra* note 11.  The Maxwells and Ms. Weldon also seek the identity of donors and supporters who they may also sue under SB8 for exercising their First Amendment rights.  And Mr. Thomason has directed that all Plaintiffs preserve all such information for his intended litigation efforts.  *See* Exs. A-4 – A-6.

The U.S. Supreme Court has held that fundraising activities "involve a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment." *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980). The First Amendment clearly protects the Plaintiffs' rights as funders and advocates "to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).

Read broadly, SB8 regulates other free-speech activities as well. Conduct that "aids or abets the performance or inducement of abortion" could mean activities like picketing about reproductive rights, sharing abortion resources on social media, providing counseling or legal advice about abortion, campaigning for pro-choice officials, and even advocating for the overturning of SB8 itself—all of which are examples of protected free speech. *See, e.g.*, *Martin v. City of Struthers*, 319 U.S. 141, 146–49 (1943) (recognizing peaceful pamphleteering as a form of communication protected by the First Amendment); *Schneider v. State*, 308 U.S. 147, 150–52 (1939) (same); *Lovell v. Griffin*, 303 U.S. 444, 451–52 (1938) (same); *NAACP v. Button*, 371 U.S. 415, 438–39 (1963) (finding public interest litigation a form of advocacy constituting political expression subject to the highest levels of First Amendment protection); *United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 581–85 (1971) (finding collective activity undertaken to obtain meaningful access to the courts a fundamental right within First Amendment). Moreover, imposing civil liability on one who "intends to" aid or abet an abortion imposes liability on mere thoughts, which is the essence of unconstitutionally "chilling speech."

Section 171.208 is a content-based restriction subject to strict scrutiny, and it is not narrowly tailored to serve any compelling government interest. SB8 is content-based because the aiding and abetting liability specifically targets ideas and views related to abortion. *See Turner*

*Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 643 (1994) ("As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based"); *Boos v. Barry,* 485 U.S. 312, 318–19 (1988) (finding a municipal ordinance content-based because "[w]hether individuals may picket in front of a foreign embassy depends entirely upon whether their picket signs are critical of the foreign government or not").  Through selective enforcement against abortion providers, advocates, and those who help pregnant Texans access abortion care where it is legal, the Texas Legislature "attempt[s] to give one side of a debatable public question an advantage in expressing its views to the people."  *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 785 (1978).  "The First Amendment's guarantee of free speech does not extend only to categories of speech that survive [the Government's] *ad hoc* balancing of relative social costs and benefits."  *United States v. Stevens*, 559 U.S. 460, 470 (2010).

Because it is content-based, SB8 is "presumptively unconstitutional" and subject to strict scrutiny, requiring proof that the statute is narrowly tailored to serve compelling state interests. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *R.A.V. v. St. Paul*, 505 U.S. 377, 395 (1992). Therefore, it may be upheld only if it uses the least restrictive means to serve a compelling government interest.  *See United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813 (2000); *see also Sable Commc'n of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989).  Here, the Texas Legislature created the most broad and restrictive means imaginable, imposing strict liability and mandatory penalties on any person who performs or assists (or intends to perform or assist) an abortion in any location, and subjecting them to suit by any private citizen, located anywhere, in a one-sided, rigged civil process that is unlike any other in Texas or American law.  Government may not "subject[] individuals to 'retaliatory actions' after the fact for having engaged in protected speech."  *Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1259 (2022).

As discussed previously, to achieve its stated interests, SB8 impermissibly creates a mercenary incentive for individuals with no connection to the event to do what the State knows it cannot do. It deputizes countless people to file lawsuits without underlying injury to chill any activity or speech related to abortions beyond the time when "cardiac activity" is detectable. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003) ("Many persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech—harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas.") (citation omitted). And then the private actor acting on behalf of the State—in this case, the SB8 Defendants intent on enforcing SB8—impermissibly retaliates against parties, such as Plaintiffs, who exercise their constitutionally-protected speech activity.

SB8's aiding and abetting restriction also contravenes the constitutional precedent governing campaign spending and corporate speech. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010); *see also McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 193 (2014) (statutory limits on how much money a donor may contribute to political candidates or committees violate the First Amendment). SB8's "purpose and effect [is] to silence entities whose voices the Government deems to be suspect." *See Citizens United*, 558 U.S. at 339. "It is simply not the function of government to select which issues are worth discussing or debating." *Brown v. Hartlage*, 456 U.S. 45, 60 (1982). SB8 does precisely this by chilling donations and other abortion-related advocacy and other speech.[17] Because money is fungible, an eager SB8 plaintiff

---

[17] The "savings clause" at TEX. HEALTH & SAFETY CODE § 171.208(g) providing that "[t]his section may not be construed to impose liability on any speech or conduct protected by the First

could argue that donations to various political and social justice organizations violate SB8 if they could be construed in any way to aid an abortion with a relationship to Texas. Indeed, the SB8 Defendants are seeking discovery about Plaintiffs' donors for precisely this reason, and the chilling effect clearly violates settled free speech rights.

## V. SB8 Cannot Apply to Conduct that Occurred Prior to July 26, 2022, when the *Dobbs* Mandate Issued.

Under the nearly fifty years of precedent following *Roe v. Wade*, SB8 was unconstitutional. "Heartbeat" bans like SB8 and other (less stringent) laws prohibiting pre-viability abortions were universally struck down. *See, e.g.*, *MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768, 772 (8th Cir. 2015) (affirming district court ruling against a heartbeat ban under *Roe* and *Casey*); *Little Rock Family Planning Services v. Rutledge*, 398 F. Supp. 3d 330, 381 (E.D. Ark. 2019) (18-week ban unconstitutional under *Roe* and *Casey*); *Planned Parenthood S. Atl. v. Wilson*, 520 F. Supp. 3d 823, 826 (D.S.C. 2021) (collecting cases). Indeed, that was the result in *Dobbs* with respect to Mississippi's fifteen-week ban—a ban a full nine weeks less restrictive than the effective ban imposed by SB8—when the case was heard by the Fifth Circuit. *Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265, 274 (5th Cir. 2019), *rev'd and remanded*, 142 S. Ct. 2228 (2022).

The Texas Legislature knew this when it passed SB8—the purpose of the law's novel design was not to render it compliant with *Roe*, but to avoid pre-enforcement review entirely. Ex. A-29 at 20:6–18 (Texas Solicitor General Judd Stone admitting this to the Texas Supreme Court).

---

Amendment of the United States Constitution" fails because it is impossible to sever protected First Amendment activity from SB8. For example, "paying for or reimbursing the costs of an abortion"—an activity that any well-intended benefactor may be guilty of for merely donating to an abortion fund—is explicitly penalized under TEX. HEALTH & SAFETY CODE § 171.208(a)(2). The Texas Legislature clearly did not contemplate drafting a statute within constitutional parameters.

Because of this design, SB8 avoided federal merits review from the time it passed until the mandate in *Dobbs* was issued (on July 26, 2022), ending the era of *Roe*.  But that does not change the fact that prior to *Dobbs*, it was exceptionally clear as a matter of legal history that a six-week ban like SB8 was unconstitutional, and thus not a law at all.

SB8 Defendants, specifically Defendants Weldon and Ashley Maxwell, want to pursue SB8 actions against Plaintiffs Lilith Fund and TEA Fund (and possibly others) for abortions allegedly funded during the period of this Court's injunction in *United States v. Texas*.  *See* Exs. A-1, A-2.  Not only did this Court enjoin the enforcement of SB8 during that period, *Roe* was still the law when the conduct allegedly occurred.  As explained above, this Court's injunction in *United States v. Texas* was issued on October 6, 2021, and was terminated two days later. Therefore, any abortions that occurred during that injunction period occurred over eight months before the Supreme Court issued its opinion in *Dobbs*, and over nine months before the *Dobbs* mandate.

The Ex Post Facto Clause of the United States Constitution does not apply to judicial acts, but Due Process requires that substantial alterations in precedent that unpredictably expand the reach of punitive laws not be backward looking.  *Bouie v. City of Columbia*, 378 U.S. 347, 350– 55 (1964) (analyzing the due process concerns associated with changes in judicial construction of a criminal statute).  The Due Process Clause[18] at least requires that conduct that was innocent and

---

[18] For a non-criminal statute to violate the Ex Post Facto Clause, there must be the "clearest proof" that the statute, while civil, was intended to serve a punitive purpose.  *See Flemming v. Nestor*, 363 U.S. 603, 617 (1960) (setting the "clearest proof" standard).  To the extent this standard applies under the Due Process Clause analysis described in *Bouie*, it is easily met here.  The seven factors the Supreme Court announced in *Mendoza-Martinez* for deciding whether a nominally civil sanction constitutes a criminal penalty are:

legal when done not be retroactively punished as a result of a change in judicial opinion.  *Bouie*, 378 U.S. at 353 ("An ex post facto law has been defined by this Court as one that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action, or that aggravates a crime, or makes it greater than it was, when committed.  If a state legislature is barred by the Ex Post Facto Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction." (citations omitted)).

---

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned…

*Mendoza-Martinez*, 372 U.S. at 168–69.  All of these factors strongly weigh in favor of treating SB8 as a punitive statute.  But it is also unnecessary to consult the factors here because the Texas Legislature made the tie to criminal enforcement clear—SB8, as passed, specifically connects itself to the Pre-*Roe* Statutes.  Additionally, the chief sponsor of SB8, Senator Brian Hughes, explained the reason for using civil enforcement on the floor of the Texas Senate.  Responding to a question about other similar bills that had been enjoined, Senator Hughes explained:

> . . . those other bills—again, 12 or so that are working their way to the U.S. Supreme Court, they all provide for government enforcement, for criminal sanctions against those who violate the law . . . each one of those bills was enjoined before it ever took effect . . . We believe this bill will be upheld.

Ex. A-26, 177:1-11.  The Texas Legislature passed SB8 as a privately enforced civil remedy to prevent pre-enforcement review, not to render the statute any less punitive.  As explained in *Mendoza-Martinez*, the factor analysis is unnecessary where "the objective manifestations of [legislative] purpose indicate conclusively that the provisions in question can only be interpreted as punitive."  *Mendoza-Martinez*, 372 U.S. at 169.

A person who knew of *Roe* and its progeny before *Dobbs* knew that any law flatly forbidding a pre-viability abortion was unconstitutional.  A person violating such a law would therefore know that, even if an enforcement attempt was made, such an attempt would fail because unconstitutional laws are "no law" and "void."  *Ex parte Siebold*, 100 U.S. 371, 376–77 (1879) ("An unconstitutional law is void, and is as no law.  An offence created by it is not a crime.").  A person acting in reliance on forty-nine years of binding precedent establishing the clear unconstitutionality of a law has insufficient notice under the Due Process Clause to be penalized as a result of a post-violation change in precedent.  Any application of SB8 to abortions that occurred before *Dobbs* became effective would violate Due Process, as Justice Kavanaugh himself said in his *Dobbs* concurrence:

> Second, as I see it, some of the other abortion-related legal questions raised by today's decision are not especially difficult as a constitutional matter. . . .  May a State retroactively impose liability or punishment for an abortion that occurred before today's decision takes effect?  In my view, the answer is no based on the Due Process Clause or the Ex Post Facto Clause.

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. at 2309 (Kavanaugh, J., concurring) (citing *Bouie*, 378 U.S. at 347).

Plaintiffs therefore request that this Court (1) grant summary judgment on this "not especially difficult" Due Process question; (2) declare that SB8 may not be enforced in connection with any abortion that happened before the *Dobbs* mandate was issued; and (3) issue a permanent injunction against all SB8 Defendants prohibiting them from, with respect to allegations arising from abortions that actually or allegedly occurred before the *Dobbs* mandate was issued, (a) filing SB8 enforcement actions against Plaintiffs, (b) seeking from Plaintiffs pre-suit discovery seeking information regarding alleged SB8 violations, or (c) imposing on Plaintiffs any litigation preservation obligations related to any such claims.

**VI.     Declaratory and Injunctive Relief Against the SB8 Defendants is Appropriate.**

The Texas Legislature cannot enact a law that violates the U.S. Constitution.  Since *Marbury v. Madison*, the U.S. Supreme Court has declared that an unconstitutional statute is "void" and must be treated as "though it be not law."  5 U.S. 137, 177 (1803); *see also Ex parte Siebold*, 100 U.S. at 376–77 ("An unconstitutional law is void, and is as no law.  An offence created by it is not a crime.").  As the Supreme Court said just this term:

> Since early in our Nation's history, courts have recognized their duty to evaluate the constitutionality of legislative acts.  We announced our responsibility to review laws that are alleged to violate the Federal Constitution in *Marbury v. Madison*, proclaiming that "[i]t is emphatically the province and duty of the judicial department to say what the law is."  *Marbury* confronted and rejected the argument that Congress may exceed constitutional limits on the exercise of its authority. "Certainly all those who have framed written constitutions," we reasoned, "contemplate them as forming the fundamental and paramount law of the nation, and consequently the theory of every such government must be, that an act of the legislature, repugnant to the constitution, is void."

*Moore v. Harper*, 600 U.S. ----, 143 S. Ct. 2065, 2079–80 (2023) (citations omitted) (quoting *Marbury*, 5 U.S. at 177).    Therefore, this Court can and should declare SB8 void and unconstitutional.

The SB8 Defendants have repeatedly made clear that they intend to enforce SB8.  *See* Exs. A-1 – A-11, A-27 – A-28.  In so doing, the SB8 Defendants are acting under color of state law and declaratory and injunctive relief against them is appropriate.

A private party acts under color of state law if it exercises authority "traditionally exclusively reserved to the [s]tate," *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928–29 (2019), or if it makes extensive use of state procedures with the overt, significant assistance of state officials, even if those officials' assistance is limited to carrying out the state procedures, such as through *ex parte* attachment mechanisms.  *Edmondson v. Leesville Concrete Co.*, 500 U.S. 614, 622 (1991) (discussing several cases in which the Supreme Court has found a private party acting under color of

state law).  Here, the SB8 Defendants meet both tests—Texas delegated *all* of its enforcement authority under SB8 to private individuals by deputizing them to bring lawsuits.  *See Whole Woman's Health v. Jackson*, 141 S. Ct. 2494, 2497 (2021) (Roberts, C.J., dissenting) (Texas "delegated enforcement . . . to the populace at large. . . . to insulate the State from responsibility for implementing and enforcing the regulatory regime.").

The SB8 Defendants are plainly operating on behalf of the State of Texas—the statute was designed specifically for that end.  The SB8 Defendants are also actively seeking to enforce a facially unconstitutional statute against Plaintiffs and should be permanently enjoined from doing so.

## VII.   The Court Should Award Plaintiffs Reasonable Attorneys' Fees.

Pursuant to 42 U.S.C. § 1988, this Court may award attorneys' fees and costs to any prevailing party who brought suit to vindicate its rights under 42 U.S.C. § 1983.  In the event Plaintiffs prevail on any portion of their claims and declaratory or injunctive relief is awarded, this Court should award Plaintiffs as costs their reasonable attorneys' fees incurred in bringing these claims and vindicating their constitutional rights.

### CONCLUSION & REQUESTED DECLARATIONS

For all of these reasons, SB8 is unconstitutional and void under the U.S. Constitution, and any lawsuit brought under its terms is invalid.  There is no genuine issue of material fact whatsoever—the issues are purely legal—and Plaintiffs are entitled to judgment as a matter of law.  Therefore, Plaintiffs respectfully request that the Court make the following declarations:

(a)    That SB8 is unconstitutional because it violates the standing requirements imposed by Article III of the U.S. Constitution;

(b)    That SB8 is unconstitutional because it violates Plaintiffs' due process rights under the U.S. Constitution;

(c)    That SB8 is unconstitutional because it violates the Supremacy Clause of the U.S. Constitution;

(d)     That SB8 is unconstitutional because it violates the Full Faith and Credit Clause of the U.S. Constitution;

(e)     That SB8 is unconstitutional because it violates Plaintiffs' equal protection rights under the U.S. Constitution;

(f)     That SB8 is unconstitutional because it violates Plaintiffs' rights to free speech under the U.S. Constitution;

(g)     That SB8 is preempted by 42 U.S.C. § 1988;

(h)     That, for these or other reasons, the following provisions of SB8 are unconstitutional and unenforceable under the U.S. Constitution:

    (i)     Texas Health & Safety Code Section 171.208(a);

    (ii)     Texas Health & Safety Code Section 171.208(b);

    (iii)     Texas Health & Safety Code Section 171.208(e);

    (iv)     Texas Health & Safety Code Section 171.208(f);

    (v)     Texas Health & Safety Code Section 171.208(i);

    (vi)     Texas Health & Safety Code Section 171.210;

    (vii)     Texas Health & Safety Code Section 171.211; and

    (viii)     Texas Civil Practice & Remedies Code Section 30.022;

(i)     That SB8 cannot be applied to any abortions that occurred within the State of Texas prior to July 26, 2022;

(j)     That any claims asserted by the SB8 Defendants under any provision of SB8 declared to be invalid are themselves invalid and frivolous as a matter of law; and

(k)     That Plaintiffs are entitled to all other relief as the Court may deem just and proper, including, but not limited to, an award to Plaintiffs of costs and attorneys' fees incurred in bringing this action and defending against any and all related appealed and collateral actions as authorized by statute (if any).

Plaintiffs further request the entry of a permanent injunction against the SB8 Defendants prohibiting them from : (1) bringing SB8 claims against Plaintiffs in any federal or state court; (2) seeking pre-suit discovery in support of any such claim; and/or (3) imposing on Plaintiffs any litigation preservation obligations related to such claims.

Dated:  August 4, 2023

Respectfully submitted,

By: */s/ Jennifer R. Ecklund*
    Jennifer R. Ecklund
    Texas Bar No. 24045626
    jecklund@thompsoncoburn.com

    Elizabeth G. Myers
    Texas Bar No. 24047767
    emyers@thompsoncoburn.com

    Nicole L. Williams
    Texas Bar No. 24041784
    nwilliams@thompsoncoburn.com

    Allyn Jaqua Lowell
    Texas Bar No. 24064143
    alowell@thompsoncoburn.com

    John Atkins
    Texas Bar No. 24097326
    jatkins@thompsoncoburn.com

    Elizabeth B. Rocha
    Texas Bar No. 24127242
    erocha@thompsoncoburn.com

    Sarah E. Hillier
    Texas Bar No. 24130087
    shillier@thompsoncoburn.com

**THOMPSON COBURN LLP**
2100 Ross Avenue, Suite 3200
Dallas, Texas 75201
Telephone:  972/629-7100
Facsimile:  972/629-7171


    Alexandra Wilson Albright
    Texas Bar No. 21723500
    aalbright@adjtlaw.com

    Marcy Hogan Greer
    Texas Bar No. 08417560
    mgreer@adjtlaw.com
    515 Congress Ave., Suite 2350

Austin, TX 78701-3562
Telephone:  512/482-9300
Facsimile:  512/482-9303


Kevin Dubose
Texas Bar No. 06150500
kdubose@adjtlaw.com
1844 Harvard Street
Houston, TX 77008
Telephone:  713/523-2358
Facsimile:  713/522-4553


Kirsten M. Castañeda
Texas Bar No. 00792401
kcastaneda@adjtlaw.com
8144 Walnut Hill Lane, Suite 1000
Dallas, TX 75231-4388
Telephone:  214/369-2358
Facsimile:  214/369-2359

**ALEXANDER DUBOSE &
JEFFERSON, LLP**

**ATTORNEYS FOR PLAINTIFFS**


## <u>CERTIFICATE OF SERVICE</u>

I certify that this document was filed electronically on August 4, 2023, with the clerk of the Court for the U.S. District Court, Western District of Texas, using the electronic case filing system of the court.


/s/ *Jennifer R. Ecklund*
Jennifer R. Ecklund

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| **Fund Texas Choice, et al.,**<br><br>        **Plaintiffs,**<br><br>**v.**<br><br>**José Garza, in his official capacity as District Attorney of Travis County, Texas, et al.,**<br><br>        **Defendants.** | **Civil Case No. 1:22-cv-859-RP** |

**PLAINTIFFS' APPENDIX IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
AGAINST SB8 DEFENDANTS**

Plaintiffs now file their Appendix in Support of their Motion for Summary Judgment against SB8 Defendants' Motion to Dismiss.

| MSJ EXHIBIT NO. | EXHIBIT |
|---|---|
| A | Declaration of John P. Atkins |
| A-1 | In re Sadie Weldon Rule 202 |
| A-2 | In re Shannon D. Thomason Rule 202 |
| A-3 | In re Ashley Maxwell Rule 202 |
| A-4 | Shannon D. Thomason Hold Letter to Thompson Coburn dated 07.07.22 |
| A-5 | Shannon D. Thomason Hold Letter to ADJT dated 07.07.22 |
| A-6 | Shannon D. Thomason Hold Letter to Buckle Bunnies dated 07.07.22 |
| A-7 | M. Sharp Declaration dated 5.31.22 |
| A-8 | S. Weldon Declaration in Sharp dated 5.31.22 |
| A-9 | A.  Maxwell Declaration dated 5.31.22 |
| A-10 | Texas Freedom Caucus Letter to Sidley Austin |
| A-11 | In re Zach Maxwell Rule 202 |
| A-12 | Declaration of Anna Rupani |
| A-13 | Declaration of Kamyon Conner |
| A-14 | Declaration of Zaena Zamora |
| A-15 | Declaration of Marsha Jones |
| A-16 | Declaration of Rachel Cheek |

| A-17 | Declaration of Rosann Mariappuram |
|------|-----------------------------------|
| A-18 | Declaration of Bridget Schilling |
| A-19 | Declaration of Ghazaleh Moayedi |
| A-20 | MDL Order Declaring Certain Civil Procedures Unconstitutional 12.09.2021 |
| A-21 | SCOTUS Oral Argument Excerpts 21-588 |
| A-22 | SCOTUS Oral Argument Excerpts 21-463 |
| A-23 | Declaration of Kamyon Conner 04.15.2022 |
| A-24 | Declaration of Neesha Davé  04.15.2022 |
| A-25 | SB8 Enacted Text |
| A-26 | Texas Senate Session 03.29.2021 |
| A-27 | Excerpts from Deposition of Sadie Weldon |
| A-28 | Sharp Declaration 9.21.2021 |
| A-29 | Whole Woman's Health v. Jackson 22-0033 |

Dated: August 4, 2023                    Respectfully submitted,

By: */s/ Jennifer R. Ecklund*
Jennifer R. Ecklund
Texas Bar No. 24045626
jecklund@thompsoncoburn.com

Elizabeth G. Myers
Texas Bar No. 24047767
emyers@thompsoncoburn.com

Nicole L. Williams
Texas Bar No. 24041784
nwilliams@thompsoncoburn.com

Allyn Jaqua Lowell
Texas Bar No. 24064143
alowell@thompsoncoburn.com

John Atkins
Texas Bar No. 24097326
jatkins@thompsoncoburn.com

Elizabeth Rocha
Texas Bar No. 24127242
erocha@thompsoncoburn.com

Sarah E. Hillier
Texas Bar No. 24130087
shillier@thompsoncoburn.com

**THOMPSON COBURN LLP**
2100 Ross Avenue, Suite 3200
Dallas, Texas 75201
Telephone: 972/629-7100
Facsimile: 972/629-7171


Alexandra Wilson Albright
Texas Bar No. 21723500
aalbright@adjtlaw.com

Marcy Hogan Greer
Texas Bar No. 08417560
mgreer@adjtlaw.com

515 Congress Ave., Suite 2350
Austin, TX 78701-3562
Telephone: 512/482-9300
Facsimile: 512/482-9303
Kevin Dubose
Texas Bar No. 06150500
kdubose@adjtlaw.com
1844 Harvard Street
Houston, TX 77008
Telephone: 713/523-2358
Facsimile: 713/522-4553

Kirsten M. Castañeda
Texas Bar No. 00792401
kcastaneda@adjtlaw.com
8144 Walnut Hill Lane, Suite 1000
Dallas, TX 75231-4388
Telephone: 214/369-2358
Facsimile: 214/369-2359

**ALEXANDER DUBOSE &
JEFFERSON, LLP**

**ATTORNEYS FOR PLAINTIFFS**


## CERTIFICATE OF SERVICE

I certify that this document was filed electronically on August 4, 2023, with the clerk of the Court for the U.S. District Court, Western District of Texas, using the electronic case filing system of the court.


/s/ *Jennifer R. Ecklund*
Jennifer R. Ecklund

# EXHIBIT A
## Declaration of
## John Atkins

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| **Fund Texas Choice, et al.,**<br><br>      **Plaintiffs,**<br><br>**v.**<br><br>**José Garza, in his official capacity as District Attorney of Travis County, Texas, et al.,**<br><br>      **Defendants.** | **Civil Case No. 1:22-cv-859-RP** |

<u>**DECLARATION OF JOHN P. ATKINS**</u>

STATE OF TEXAS                  §

DALLAS COUNTY              §

1.       My name is John P. Atkins.  I am over the age of 18, and suffer from no legal or mental disabilities.  I have personal knowledge of, and full capacity to testify about, the facts stated in this Declaration, which is provided as Exhibit A to Plaintiffs' Motion for Summary Judgment Response against SB8 Defendants.

2.       I am an attorney at Thompson Coburn LLP and I represent Plaintiffs in the above-captioned matter.

3.       Exhibits A-1, A-2 and A-3 are true and correct copies of the Rule 202 Petitions filed by Sadie Weldon, Shannon D. Thomason, and Ashley Maxwell in, respectively: the 271st Judicial District Court of Jack County, Texas; the 118th Judicial District of Howard County, Texas; and the 431st Judicial District Court of Denton County, Texas.  Exhibits A-1, A-2, and A-3 are court documents filed publicly in the above-identified Texas Courts.  The redactions in each of these documents are original to them.  The only change to the original as-filed version of these documents is that I have appended an exhibit designation page to the beginning of each, marking them as Exhibits A-1, A-2 and A-3, respectively.  I personally compared Exhibits A-1, A-2, and

A-3 to the originals and they are true and correct copies, and their substantive text is identical to the originals.

4.      Exhibits A-4, A-5, and A-6 are true and correct copies of litigation hold letters sent by Jonathan F. Mitchell of Mitchell Law on behalf of his client Shannon D. Thomason to, respectively, Elizabeth Myers, Alex Wilson Albright, and Morgan Gimblet.  The letters in Exhibits A-4, and A-5, were sent to Elizabeth Myers and Alex Wilson Albright as counsel, in the ongoing state court litigation over the Texas Heartbeat Act, *Van Stean, et al. v. Texas Right to Life, et al.*, Cause No. D-1-GN-21-4179.  Exhibits A-4 and A-5 were included on Plaintiffs' Exhibit List for September 27, 2022 Hearing (ECF 65) as Exhibit 50, and was admitted into evidence at the September 27, 2022 hearing on Plaintiffs' Motion for Preliminary Injunction.  (ECF 57, 80.) Exhibit A-6 was sent to Morgan Gimblet as the Founder and member of Buckle Bunnies Fund. Exhibit A-6 was previously filed in the above caption matter as Exhibit D to Plaintiffs' Second Amended Complaint.  (ECF 129-4.)   I received true and correct copies of the letters includes as Exhibits A-4, A-5, and A-6 as counsel for Plaintiffs in the *Van Stean* matter on the dates the letters indicate.  I personally compared Exhibits A-4, A-5, and A-6 to the originals and they are true and correct copies, and their substantive text is identical to the originals.

5.      Exhibits A-7, A-8 and A-9 are true and correct copies of declarations filed by Mistie Sharp, Sadie Weldon, and Ashley Maxwell, respectively, in Case No. 1:22-cv-373-RP, *Davis v. Sharp*, in the Western District of Texas, Austin Division.  The only change to the original court records contained in Exhibits A-7, A-8, and A-9 is that I have appended an exhibit designation page to the beginning of the declarations.  I personally compared Exhibits A-7, A-8, and A-9 to the originals and they are true and correct copies, and their substantive text is identical to the originals.

6.      Exhibits A-10 is true and correct copy of a letter written by the Texas Freedom Caucus that was sent to the chair of the Sidley Austin LLP Management Committee on July 7, 2022,        and        publicized        on        social        media        at https://twitter.com/TxFreedomCaucus/status/1545118985959575554?lang=en.   The only change

to the original version of this letter is that I have appended an exhibit designation page to the beginning, marking it as Exhibit A-10.  I personally compared Exhibit A-10 to the original letter that was publicized and it is a true and correct copy, and its substantive text is identical to the original.

7.      Exhibit A-11 is a true and correct copy of the Rule 202 Petition filed by Zach Maxwell in the 355th Judicial District Court of Hood County, Texas.  In addition to its status as a court record, I am counsel of record in the case in which it was filed, and so have personal knowledge of this filing. The only change to the original as-filed court record is that I have appended an exhibit designation page to the beginning marking it as Exhibit A-11.  I personally compared Exhibit A-11 to the original and it is a true and correct copy, and its substantive text is identical to the original.

8.      Exhibits A-12, A-13, A-14, A-15, A-16, A-17, A-18, and A-19 are true and correct copies of declarations by Anna Rupani, Kamyon Conner, Zaena Zamora, Marsha Jones, Rachel Cheek, Rosann Mariappuram, Bridget Schilling, and Ghazaleh Moayedi, respectively, in this lawsuit.  Exhibits A-12, A-13, A-14, A-15, A-16, A-17, A-18, and A-19 were included on Plaintiffs' Exhibit List for September 27, 2022 Hearing (ECF 65) as Exhibits 16, 17, 18, 19, 20, 21, 22, and 23, respectively, and were previously submitted to the Court on approximately September 26, 2022, via the drop box link provided by Court Room Deputy Julie Golden.  A-13, A-14, A-15, and A-16 were previously admitted into evidence at the September 27, 2022 hearing on Plaintiffs' Motion for Preliminary Injunction.  (ECF 24, 80.)  The only change to the original court records is that I have appended an exhibit designation page to the beginning of each, marking them as Exhibits A-12, A-13, A-14, A-15, A-16, A-17, A-18, and A-19.  I personally compared A-12, A-13, A-14, A-15, A-16, A-17, A-18, and A-19 to the original  as filed documents and they are true and correct copies, and their substantive text is identical to the originals.

9.      Exhibit A-20 to the Motion is a true and correct copy of the December 9, 2021 Order issued by Judge David Peeples, specially appointed pretrial judge of the Texas Heartbeat Act MDL, *Van Stean, et al. v. Texas Right to Life, et al.*, Cause No. D-1-GN-21-4179.  The only

change to the original court record is that I have appended an exhibit designation page to the beginning marking it as Exhibit A-20.  In addition to its status as a court record, I am counsel of record in the case in which it was filed, and so have personal knowledge of this filing.  I personally compared Exhibit A-20 to the original and it is a true and correct copy, and its substantive text is identical to the original.

10.   Exhibits A-21 and A-22 are excerpts from the official United States Supreme Court transcripts of Case No. 21-463, *Whole Woman's Health v. Jackson*, and Case No. 21-588, *United States v. Texas*.  I obtained pdf copies of the official transcripts from the United States Supreme Court website at the following addresses on April 7, 2022: https://www.supremecourt.gov/oral_arguments/argument_transcripts/2021/21-588_m648.pdf; https://www.supremecourt.gov/oral_arguments/argument_transcripts/2021/21-463_6kgm.pdf.[1]  I modified these copies only by appending exhibit designation sheets, by deleting pages of the pdf (including the word index at the end of each original transcript) that are not relied upon in Plaintiffs' Motion for Summary Judgment against SB8 Defendants, and by highlighting the relevant exchange or exchanges in yellow electronically using pdf viewing software.  Exhibits A-21 and A-22 are otherwise true and correct copies of the original official transcripts, and the substantive text is identical to the originals.

11.   Exhibits A-23 and A-24 are true and correct copies of declarations filed by Kamyon Conner and Neesha Davé, respectively, in Case No. 1:22-cv-728-ABJ, *North Texas Equal Access Fund, et al. v. America First Legal Foundation*, in the United States District Court District of Columbia.  only change to the original court records is that I have appended an exhibit designation page to the beginning of the declarations, marking them as Exhibits A-23 and A-24.

12.   Exhibit A-25 is a copy of the Enrolled (and enacted) version of SB8 from the Texas Legislature Website.  I downloaded the document as a pdf from the official Texas Legislature

---

[1] In checking the transcripts at the time I executed this declaration, I noted that the web addresses for these transcripts has slightly changed since I originally collected them. They are now available at: https://www.supremecourt.gov/oral_arguments/argument_transcripts/2021/21-463_4315.pdf and https://www.supremecourt.gov/oral_arguments/argument_transcripts/2021/21-588_i3jm.pdf.

Website at this address: https://capitol.texas.gov/tlodocs/87R/billtext/pdf/SB00008F.pdf. To the best of my knowledge, I originally did this on March 22, 2022, and as of executing this declaration I have checked to ensure that the legislature's website still returns the same document at that URL. The only change to the official legislative copy I downloaded as a pdf and Exhibit A-25 is that I appended an exhibit designation page to the beginning, marking it as Exhibit A-25.

13.     Exhibit A-26 consists of relevant excerpts from a transcript by a third party court-reporting service that transcribed the Texas Senate Session held on March 29, 2021.  The only change to the excerpts of the original transcript is that I have appended an exhibit designation page to the beginning of the transcript, marking it as Exhibit A-26.  The original transcript was certified as a true record by an employed court reporter.

14.     Exhibit A-27 to the Motion is a true and correct copy of excerpts of the transcript of the deposition of Sadie Weldon taken on August 19, 2022, in Cause No. 22-03-032 in the 271st District Court of Jack County, Texas.  The only change to the excerpt of the original transcript is that I have appended an exhibit designation page to the beginning, marking it as Exhibit A-27. Exhibit A-27 has been certified as a true and correct record by an employed court reporter.

15.     Exhibit A-28 is a true and correct copy of the declaration filed by Mistie Sharp on September 21, 2021 in Case No. 1:22-cv-373-RP, in the Western District of Texas, Austin Division.  The only change to the original court record is that I have appended an exhibit designation page to the beginning, marking it as Exhibit A-28.

16.     Exhibit A-29 to the Motion is a true and correct copy of a transcript of the oral argument conducted by the Texas Supreme Court in Matter 22-0033, *Whole Women's Health v. Jackson*, on February 24, 2022.  While the Texas Supreme Court does not post official transcripts of its proceedings on its website, it does host audiovisual recordings of its oral arguments, and the recording     of     this     argument     is     available     at: https://www.texasbarcle.com/cle/SCPlayer5.asp?sCaseNo=22-0033 (last visited August 3, 2023). Exhibit A-29 was prepared from this audiovisual recording.  I obtained the transcript as a pdf, which was prepared and certified by Wendy Sawyer, CDLT.  I deleted pages of the transcript on

which the Motion does not rely, and I electronically highlighted in yellow the portions of the transcript cited in the Motion using pdf viewing software.  The only change to the original transcript that I obtained is that I have appended an exhibit designation page to the beginning of the transcript, marking it as Exhibit A-29.  Exhibit A-29 has been certified as a true record by an employed court reporter.  I also personally compared the text of the relevant section of the transcript to what is said during the oral argument as recorded on the official Texas Supreme Court website, set out above and the transcription is true and correct with respect to the items relied upon in the Motion.

**I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 4, 2023.**

_____

John P. Atkins

# EXHIBIT A-1
# In re
# Sadie Weldon
# Rule 202

E-Filed for Record
1/26/2022 8:06 PM
Jack County District Clerk , TX
By: Tracie Pippin

Cause No. __22-01-014__

| | |
|---|---|
| **In re Sadie Weldon**, | IN THE DISTRICT COURT |
| | JACK COUNTY, TEXAS |
| Petitioner | 271st JUDICIAL DISTRICT |

## VERIFIED PETITION TO TAKE DEPOSITION TO INVESTIGATE A LAWSUIT

Petitioner Sadie Weldon respectfully asks the Court for permission to take a deposition by oral examination of Neesha Davé of the Lilith Fund for Reproductive Equity. Ms. Weldon seeks this testimony to investigate potential claims brought by Ms. Weldon or others under section 171.208 of the Texas Health and Safety Code.

### PERSONS TO BE DEPOSED AND JURISDICTION

1. Petitioner Sadie Weldon is a citizen of Texas and resident of Jack County.

2. Ms. Weldon seeks to depose Neesha Davé. Upon information and belief, Ms. Davé is a resident of Travis County and may be served at █████████████ ███████████. Ms. Davé's telephone number is █████████████.

3. In accordance with Rule 202.2(b)(1) of the Texas Rules of Civil Procedure, this petition is filed in Jack County, the county in which the venue of the anticipated suit may lie.

4. This petition is verified by Ms. Weldon, as required by Rule 202.2(a) of the Texas Rules of Civil Procedure.

### ANTICIPATED ACTION

5. This petition is filed in anticipation of possible future civil actions brought under section 171.208 of the Texas Health and Safety Code, against individuals and organizations that performed or aided or abetted abortions in violation of the Texas Heartbeat Act, also known as Senate Bill 8 or SB 8. It is also filed to investigate the possibilities for future civil actions brought under section 171.208 of the Texas Health

and Safety Code. In her capacity as deputy director of the Lilith Fund for Reproductive Equity ("Lilith Fund"), Neesha Davé has stated in a sworn declaration that her organization knowingly and intentionally aided or abetted at least one post-heartbeat abortion in violation of the Texas Heartbeat Act. *See* Declaration of Neesha Davé ¶ 8 (attached as Exhibit 1).

6. Ms. Davé submitted this sworn declaration in a lawsuit that her organization brought against Texas Right to Life and its legislative director, John Seago. This lawsuit was originally filed as *Lilith Fund for Reproductive Equity v. State of Texas, et al.*, No. D-1-GN-21-004504 (Travis County), and was transferred by the multidistrict litigation panel to 98th Judicial District Court of Travis County. Those pre-trial proceedings were conducted under the caption of *Van Stean v. State of Texas, et al.*, No. D-1-GN-21-004179, and the cases are currently on appeal to the Third Court of Appeals in Austin. *See Texas Right to Life, et al. v. Van Stean, et al.*, No. 03-21-00650-CV.

7. The Lilith Fund for Reproductive Equity ("Lilith Fund") is expected to have information relevant to the potential claims that Ms. Weldon is investigating, and it is expected to have interests adverse to Ms. Weldon in any anticipated suit. The Lilith Fund's mailing address is Post Office Box 684949, Austin, Texas 78768-4949; its registered office is at 5900 Balcones Drive, Suite 100, Austin, Texas 78731; and its fax number is 512-521-0568. Its phone number is unknown.

8. Neesha Davé is expected to have information relevant to the potential claims that Ms. Weldon is investigating, and she is expected to have interests adverse to Ms. Weldon in any anticipated suit. On information and belief, Ms. Davé's address is █████ ███████████████████████████████, and her phone number is ███████████.

9. Additional parties are expected to have information relevant to the potential claims that Ms. Weldon is investigating, as well as interests adverse to Ms. Weldon's in any anticipated suit, but the identities of those parties are currently unknown. Ms.

Davé's sworn declaration states that the Lilith Fund aided or abetted the provision of at least one post-heartbeat abortion performed in Texas. But Ms. Davé's declaration does not say who provided those post-heartbeat abortions, nor does it identify the individuals who aided or abetted these illegal abortions. Ms. Weldon's goal is to use the deposition sought by this petition to ascertain the identity of all individuals and organizations who are subject to liability under section 171.208.

## NOTICE OF RELATED CASES

10.  There are no ongoing cases between Ms. Weldon and Neesha Davé. There are also no ongoing cases between Ms. Weldon and the Lilith Fund.

11.  There are several ongoing cases that seek to restrain state officials and private individuals from enforcing certain provisions in SB 8. One of those cases is *Whole Woman's Health v. Jackson*, in which the plaintiffs are attempting to enjoin state licensing authorities from taking adverse action against abortion providers and medical professionals that violate the Texas Heartbeat Act. That case is currently pending in the U.S. Court of Appeals for the Fifth Circuit, after a remand from the Supreme Court of the United States. *See Whole Woman's Health v. Jackson*, No. 21-50792 (5th Cir.); *see also Whole Woman's Health v. Jackson*, 142 S. Ct. 522 (2021). On January 17, 2022, the Fifth Circuit certified a state-law question to the Supreme Court of Texas. *See Whole Woman's Health v. Jackson*, --- F.4th ----, 2022 WL 142193 (5th Cir.). Those certification proceedings remain pending in the state supreme court.

12.  A coalition of abortion providers and abortion funds has also filed suit in state court to restrain Texas Right to Life and its legislative director, John Seago, from initiating lawsuits against them under section 171.208 of the Texas Health and Safety Code. The district judge in those cases denied the defendants' motion to dismiss un-

der the Texas Citizens Participation Act, and the defendants have taken an interlocutory appeal from that ruling. That appeal is currently pending in the Third Court of Appeals. *See Texas Right to Life v. Van Stean*, No. 03-21-00650-CV.

## BACKGROUND

13.  The Texas Heartbeat Act, also known as SB 8, outlaws abortion after a fetal heartbeat is detectable. *See* Tex. Health & Safety Code § 171.204.

14.  SB 8 prohibits state officials from enforcing the law. *See* Tex. Health & Safety Code § 171.207. Instead of public enforcement by state officials, SB 8 establishes a private right of action that authorizes individuals to sue those who violate the statute. *See* Tex. Health & Safety Code § 171.208. These private civil-enforcement suits may be brought against anyone who "performs or induces" a post-heartbeat abortion, *see id*. at § 171.208(a)(1), as well as anyone who "knowingly engages in conduct that aids or abets the performance or inducement of an abortion, including paying for or reimbursing the costs of an abortion through insurance or otherwise, if the abortion is performed or induced in violation of [SB 8]," *id*. at § 171.208(a)(2). Lawsuits may also be brought against anyone who "intends" to perform or aid or abet a post-heartbeat abortion in Texas.

15.  A plaintiff who successfully sues an individual or organization under section 171.208 is entitled to injunctive relief and $10,000 in statutory damages for each unlawful abortion that the defendant performed or facilitated, plus costs and attorneys' fees. *See* Tex. Health & Safety Code § 171.208(b).

16.  The Texas Heartbeat Act took effect on September 1, 2021, and it has remained in effect as the law of Texas since that time.

17.  The person that Ms. Weldon seeks to depose is the leader of an organization that helps women in Texas abort their unborn children. Neesha Davé is deputy director of the Lilith Fund for Reproductive Equity ("Lilith Fund"). She is "responsible

for executing Lilith Fund's mission, ensuring our programs are effective and efficient, and supervising staff and volunteers." Davé Decl. ¶ 3 (attached as Exhibit 1).

18.  The Lilith Fund aids or abets abortion in Texas through a variety of means. As Ms. Davé explained in a sworn statement, the Lilith Fund "provides financial assistance and emotional support for people needing abortions in Texas." Davé Decl. ¶ 4 (attached as Exhibit 1).

19.  Since the Texas Heartbeat Act took effect on September 1, 2021, the Lilith Fund has aided or abetted at least one post-heartbeat abortion in violation of the law. In her sworn declaration, Ms. Davé stated:

> Lilith Fund has engaged in conduct with the intent to assist pregnant Texans obtain abortions after the detection of cardiac activity. Specifically, following the entry of an injunction by the Honorable Robert Pitman on October 6, 2021, Lilith Fund paid for at least one abortion without confirming the gestational age of the client's pregnancy and at least one abortion with the belief that the client's pregnancy was after the period in which cardiac activity is usually detectable. In doing so, it was Lilith Fund's intention to pay for the abortions even if cardiac activity was detected.

Davé Decl. ¶ 8 (attached as Exhibit 1).

20.  Ms. Davé's sworn declaration also states that the Lilith Fund "partners with" several abortion providers in northern Texas. This includes "clinics that have publicly confirmed that post-cardiac activity abortions were performed" in violation of the Texas Heartbeat Act. Davé Decl. ¶ 9 (attached as Exhibit 1).

## REQUEST FOR DEPOSITION

21.  Ms. Weldon seeks a court order authorizing her to depose Ms. Davé because she seeks to investigate potential claims that she or others might bring under section 171.208 of the Texas Health and Safety Code, against any person or organization that performed or aided or abetted illegal post-heartbeat abortions of the type described in Ms. Davé's declaration. *See* Tex. R. Civ. P. 202(d)(2).

22.  Ms. Weldon additionally seeks to depose Ms. Davé because she anticipates the institution of a suit in which Ms. Davé or the Lilith Fund may be a party. *See* Tex. R. Civ. P. 202(d)(1).

23.  There is good reason for this court to find that deposing Ms. Davé at this time is the best way to avoid a delay or failure of justice in an anticipated suit. *See* Tex. R. Civ. P. 202.4(a). In addition, the likely benefit of allowing Ms. Weldon to depose Ms. Davé to investigate a potential claim outweighs the burden or expense of the procedure. *See* Tex. R. Civ. P. 202.4(b).

24.  Ms. Weldon is considering whether to sue individuals and organizations that performed or facilitated the illegal abortions described in Ms. Davé's declaration. The sworn statement of Ms. Davé makes it clear that the Lilith Fund has violated the Texas Heartbeat Act in a manner that could expose its employees, volunteers, and donors to liability under section 171.208 of the Texas Health and Safety Code.

25.  Yet Ms. Weldon is unwilling to file suit as this time because she is still investigating the range of potential defendants, as well as any possible defenses or substantive arguments that they might raise in the litigation. Ms. Weldon expects to be able to better evaluate the prospects for legal success after deposing Ms. Davé and discovering the extent of involvement of each individual that aided or abetted post-heartbeat abortions in violation of SB 8.

26.  Ms. Weldon also wishes to preserve evidence of how the Lilith Fund aided or abetted abortions in violation of SB 8, as well as evidence surrounding the involvement of each individual who aided or abetted these illegal abortions. Ms. Weldon seeks to depose Ms. Davé on topics including the following: the Lilith Fund's exact role in supporting, funding, and facilitating abortions provided in violation of the Texas Heartbeat Act; the identity of each individual or entity that the Lilith Fund collaborated with in providing these illegal abortions; the number of illegal abortions provided; whether the Lilith Fund has in any way distinguished its funding streams

for advocacy and its funding streams for conduct that aids or abets illegal abortions performed in Texas; and the sources of financial support for the Lilith Fund. Ms. Weldon also seeks discovery of documents[1] that reveal the sources of funding for Lilith Fund's operations and address the issues that will be covered in the deposition.

27.   Deposing Neesha Davé allows Ms. Weldon to preserve evidence of great importance to the anticipated litigation. Ms. Davé's sworn declaration already attests to her knowledge of violations of the law. What Ms. Weldon does not know is how many violations occurred and what other parties were involved in providing these illegal abortions. The value of this information to any subsequent litigation, and to the important policies embodied in the Heartbeat Act, is high. It is, indeed, essential to be able to implement the law.

28.   Delay in obtaining this evidence increases the chances that information about the abortions provided will be forgotten and that documentation will become more difficult to obtain. Given the widespread press coverage of the Texas Heartbeat Act, including attention to the risks taken by abortion providers who choose to violate the

---

1.   The scope of a pre-suit deposition under Rule 202 is the same as a regular deposition of non-parties in litigation. *See* Tex. R. Civ. P. 202.5. This specifically allows document-production requests. *See* Tex. R. Civ. P. 199.2(b)(5) (providing for requests for production along with a deposition notice); Tex. R. Civ. P. 205.1(c) (providing for noticing document production requests to nonparties); *In re City of Tatum*, 567 S.W.3d 800, 808 (Tex. App. 2018) ("The "language of these rules when read together permits a petition seeking a pre-suit deposition under Rule 202 to also request the production of documents.'" quoting *In re Anand*, No. 01-12-01106-CV, 2013 WL 1316436, at *3 (Tex. App. Apr. 2, 2013)). *See also City of Dallas v. City of Corsicana*, No. 10-14-00090-CV, 2015 WL 4985935, at *6 (Tex. App. Aug. 20, 2015) ("Under rule 202, documents can be requested in connection with a deposition."). While some courts have refused to permit document discovery under Rule 202, *see, e.g.*, *In re Pickrell*, No. 10-17-00091-CV, 2017 WL 1452851, at *6 (Tex. App. Apr. 19, 2017), they have not analyzed the text of Rule 202.5 or its relationship to Rule 199. *See In re City of Tatum*, 567 S.W.3d 800, 808 n. 7 (Tex. App. 2018) (criticizing courts denying document production under Rule 202).

Act's provisions,[2] there is considerable incentive for violators to hide or obscure any record of their involvement in unlawful activities.

29.  Without the documentation, there would be a risk of miscarriage or delay of justice, as the law of Texas would be difficult or impossible to enforce. The policy of the state will be thwarted if it is not possible to identify the parties complicit in providing illegal abortions.

30.  It would also enhance judicial efficiency to allow the eventual lawsuit to consider the entire chain of events (from funding to actual performance of the abortion) involved in the particular violations of SB 8 that Ms. Davé described in her sworn statement. Waiting for discovery in the course of litigation not only runs increased risks of forgetfulness or record-keeping deficiencies. It also has costs to the administration of justice in that the courts would have to adjudicate the matters either in separate proceedings, or through complaints successively amended to add additional defendants. Allowing deposition under Rule 202 would avoid this delay of justice.

31.  The burden on Ms. Davé is modest. To be sure, she must appear for a deposition and must produce documents. But the inconvenience will only grow greater with any delay, as memories fade and documents accumulate. The value of the information sought outweighs the burden, as required by Rule 202.

32.  Ms. Weldon seeks to depose Ms. Davé by oral deposition. *See* Tex. R. Civ. P. 199. A notice of deposition identifying the topics for examination is attached to this Petition as Exhibit 2. This procedure will impose a minimal burden on Ms. Davé while permitting Ms. Weldon to preserve for future litigation information about the illegal abortions that Ms. Davé has acknowledged.

---

2.  *See, e.g.*, Abigail Abrams, *Inside The Small Group of Doctors Who Risked Everything to Provide Abortions in Texas*, Time (Oct. 14, 2021), available at https://bit.ly/3qxa5qx.

33.  Ms. Weldon further requests that the court order Ms. Davé to produce at or before the deposition any and all non-privileged documents relating to: Lilith Fund's role in supporting, funding, and facilitating abortions provided in violation of the Texas Heartbeat Act; the identity of all individuals or entities that the Lilith Fund collaborated with in providing these illegal abortions; the number of post-heartbeat abortions provided in Texas since September 1, 2021; and the sources of financial support for the Lilith Fund's abortion-assistance activities.

## REQUEST FOR HEARING

34.  After the service of this petition and a notice of hearing, Ms. Weldon respectfully requests that the court conduct a hearing, in accordance with Rule 202.3(a) of the Texas Rules of Civil Procedure, to determine whether to issue an order allowing the deposition.

## REQUEST FOR RELIEF

35.  For these reasons, Ms. Weldon respectfully requests that the court set a date for a hearing on this petition, and thereafter issue an order:

  a.  finding that the benefits of a deposition and accompanying production of documents outweighs the burden;

  b.  finding that a deposition and accompanying production of documents will avoid delay or failure of justice;

  c.  authorizing Ms. Weldon to take an oral deposition of Ms. Davé;

  d.  requiring Ms. Davé to produce the documents identified by this petition, at a time and place to be agreed by the parties; and

  e.  awarding all other relief that the Court may deem just, proper, or equitable.

Respectfully submitted.

Gene P. Hamilton*
Virginia Bar No. 80434
Vice-President and General Counsel
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

D. Bryan Hughes
Texas Bar No. 00793995
Law Office of D. Bryan Hughes
110 North College Avenue, Suite 207
Tyler, Texas 75702-7221
(903) 581-1776 (phone)
bryan@hughesfirm.com

H. Dustin Fillmore III
Texas Bar No. 06996010
Charles W. Fillmore
Texas Bar No. 00785861
The Fillmore Law Firm, LLP
1200 Summit Avenue, Suite 860
Fort Worth, Texas 76102
(817) 332-2351 (phone)
(817) 870-1859 (fax)
dusty@fillmorefirm.com
chad@fillmorefirm.com

* *pro hac vice* applications
  forthcoming

Dated: January 26, 2022

 /s/ Jonathan F. Mitchell 
Jonathan F. Mitchell
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

Erick G. Kaardal*
Minnesota Bar No. 0229647
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, Minnesota 55402
(612) 341-1074 (phone)
(612) 341-1076 (fax)
kaardal@mklaw.com

Thomas Brejcha*
Illinois Bar No. 0288446
Martin Whittaker
Texas Bar No. 24095097
Thomas More Society
309 West Washington Street, Suite 1250
Chicago, Illinois 60606
(312) 782-1680 (phone)
(312) 782-1887 (fax)
info@thomasmoresociety.org

*Counsel for Petitioner*

Cause No. 22-01-014

| | |
|---|---|
| In re Sadie Weldon, | IN THE DISTRICT COURT |
| Petitioner | JACK COUNTY, TEXAS |
| | 271st JUDICIAL DISTRICT |

## VERIFICATION

STATE OF TEXAS

COUNTY OF JACK

Before me, the undersigned notary public, on this day personally appeared Sadie Weldon and after being duly sworn, stated under oath that she has read the above verified petition to take deposition to investigate potential legal claims and its exhibits; that every statement of fact contained in it is within her personal knowledge and is true and correct; and that every exhibit is an authentic copy of what it purports to be.

Sadie Weldon

SADIE WELDON

Subscribed and sworn to me this 26th day of January, 2020 2022

NOTARY

DEBRA TILLERY
Notary Public, State of Texas
My Commission Expires
May 04, 2024
NOTARY ID 705852-3

# Exhibit 1
## (Declaration of Neesha Davé)

## <u>DECLARATION OF NEESHA DAVÉ</u>

STATE OF TEXAS        §

TRAVIS COUNTY        §

1.      My name is Neesha Davé.  I am a resident of Travis County, Texas, over 21 years of age, competent, and capable of testifying to the facts stated in this Declaration.

2.      I declare that the statements within this Declaration are within my personal knowledge, and are true and correct.

3.      I am currently the Deputy Director, and from September 2 - November 1, 2021 served as the Acting Executive Director, for Lilith Fund for Reproductive Equity ("Lilith Fund"). As Deputy Director, I am responsible for executing Lilith Fund's mission, ensuring our programs are effective and efficient, and supervising staff and volunteers.

4.      Lilith Fund provides financial assistance and emotional support for people needing abortions in Texas, and seeks to foster a positive culture around abortion.  Lilith Fund also fights for reproductive justice throughout Texas.  Lilith Fund offsets the costs of abortion care itself, rather than paying for or providing assistance to people traveling to an abortion provider in Texas.

5.      Lilith Fund has nine staff members and more than thirty regular volunteers, and serves people in central and southeast Texas.

6.      SB8 specifically states that providing funds to assist a pregnant person in obtaining an abortion violates SB8 *even if* the funder had no knowledge that the abortion at issue would ultimately violate SB8.  Consequently, SB8, when it became effective, immediately rendered all of our services—even for people who have been pregnant fewer than six weeks—potentially subject to expensive litigation and punitive fines.

7.      According to the terms of SB8, Lilith Fund aids and abets abortions in the State of Texas by providing funding at all.  It is my understanding that Lilith Fund would also likely be liable for assisting pregnant people in locating legal abortion services by providing information, and by engaging in protected speech by advocating for safe, legal abortion services.

8.      Since September 1, 2021, Lilith Fund has engaged in conduct with the intent to assist pregnant Texans obtain abortions after the detection of cardiac activity.  Specifically, following the entry of an injunction by the Honorable Robert Pitman on October 6, 2021, Lilith Fund paid for at least one abortion without confirming the gestational age of the client's pregnancy and at least one abortion with the belief that the client's pregnancy was after the period in which cardiac activity is usually detectable.  In doing so, it was Lilith Fund's intention to pay for the abortions even if cardiac activity was detected.

9.      Lilith Fund partners with several abortion provider clinics in Texas, including the clinics that have publicly confirmed that post-cardiac activity abortions were performed following the injunction issued by Judge Pitman.

10.     I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct and that this Declaration was executed on this 3rd day of November, 2021.

_____
                  Neesha Davé

# Exhibit 2
**(Notice of Deposition)**

Cause No. <u>22-01-014</u>

| | |
|---|---|
| **In re Sadie Weldon**, | IN THE DISTRICT COURT |
| | 271st JACK COUNTY, TEXAS |
| Petitioner | ____ JUDICIAL DISTRICT |

## NOTICE OF DEPOSITION OF NEESHA DAVÉ
## AND SUBPOENA DUCES TECUM

To:  Neesha Davé, ███████████████████████

Please take notice that the attorneys for petitioner Sadie Weldon will take the oral deposition of Neesha Davé at 9:00 A.M. on March 3, 2022, in connection with this matter and on the topics designated in Exhibit A, which is attached to this notice. The deposition will be taken before a certified court reporter at the law offices of Mitchell Law PLLC, 111 Congress Avenue, Suite 400, Austin, Texas, 78701. The deposition will continue day-to-day, before a court reporter, until completed. The deposition may be videotaped.

Please take further notice that at the time and place of the deposition the deponent shall produce, at the commencement of the deposition, certain documents and tangible things described in the subpoena, which is attached as Exhibit 3 to the petition and incorporated by reference.

Respectfully submitted.

GENE P. HAMILTON*
Virginia Bar No. 80434
Vice-President and General Counsel
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

_/s/ Jonathan F. Mitchell_
JONATHAN F. MITCHELL
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

D. Bryan Hughes
Texas Bar No. 00793995
Law Office of D. Bryan Hughes
110 North College Avenue, Suite 207
Tyler, Texas 75702-7221
(903) 581-1776 (phone)
bryan@hughesfirm.com

H. Dustin Fillmore III
Texas Bar No. 06996010
Charles W. Fillmore
Texas Bar No. 00785861
The Fillmore Law Firm, LLP
1200 Summit Avenue, Suite 860
Fort Worth, Texas 76102
(817) 332-2351 (phone)
(817) 870-1859 (fax)
dusty@fillmorefirm.com
chad@fillmorefirm.com

Erick G. Kaardal*
Minnesota Bar No. 0229647
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, Minnesota 55402
(612) 341-1074 (phone)
(612) 341-1076 (fax)
kaardal@mklaw.com

Thomas Brejcha*
Illinois Bar No. 0288446
Martin Whittaker
Texas Bar No. 24095097
Thomas More Society
309 West Washington Street, Suite 1250
Chicago, Illinois 60606
(312) 782-1680 (phone)
(312) 782-1887 (fax)
info@thomasmoresociety.org

* *pro hac vice* applications
  forthcoming

Dated: January 26, 2022

*Counsel for Petitioner*

## EXHIBIT A

I. **DEFINITIONS**

For the purposes of this deposition notice, the following definitions apply:

- The terms "**Lilith Fund**," "**you**" and "**your**" refer to the Lilith Fund for Reproductive Equity, including any agent or person authorized to act for or on its behalf, including its officers, employees, staff, and unpaid volunteers.

- The terms "**communication**" and "**communicate**" refer to any method used to transmit or exchange information, concepts, or ideas (whether verbal or nonverbal) including oral, written, typed, or electronic transmittal of any type of information or data, by the use of words, silence, numbers, symbols, images, or depictions, from one person or entity to another person or entity.

- The term "**document**" refers to the act of noting, recording, or preserving any type of information, data, or communication, without regard to the method used to note, record, or preserve such information, data, or communication. The term includes any e-mail or text message.

- The term "**entity**" means any legal entity inquired about (other than a natural person) including a partnership, professional association, joint venture, corporation, governmental agency, or other form of legal entity.

- The terms "**identify**" and "**identity**," when used in connection with a natural person, require disclosure of that person's full name, present or last known address, and present or last known telephone number. When used in connection with a legal entity, the terms require disclosure of its legal name, its address, and telephone number.

- The terms "**implement**" and "**implementation**" refer to any method, process, or action used to put a decision or plan into effect or achieve a goal or obligation.

- The term "**information**" refers to and includes documents, records, communications, facts, ideas, data, observations, opinions, photographs, slides, video recordings, audio recordings, and tangible and intangible items and evidence of any kind or sort.

- The terms **"person"** and **"persons"** mean any legal entity inquired about, whether a natural person, partnership, sole proprietorship, professional association, joint venture, corporation, governmental agency, or other form of legal entity.

- The term **"record"** means letters, words, sounds, or numbers, or the equivalent of letters, words, sounds, or numbers, that have been written, recorded, documented, or received by Defendant by:

  (A)    handwriting;
  (B)    typewriting;
  (C)    printing;
  (D)    photostat;
  (E)    photograph;
  (F)    magnetic impulse;
  (G)    mechanical or electronic recording;
  (H)    digitized optical image; or
  (I)    another form of data compilation.

- The term **"record"** also includes any communication, including an e-mail or text-message communication.

- The term **"reproduction"** means an accurate and complete counterpart of an original document or record produced by:

  (A)    production from the same impression or the same matrix as the original;
  (B)    photograph, including an enlargement or miniature;
  (C)    mechanical or electronic re-recording;
  (D)    chemical reproduction;
  (E)    digitized optical image; or
  (F)    another technique that accurately reproduces the original.

- The term **"third party"** means any person, persons, or entity other than the defendants or the attorneys of record for the defendants.

- The terms **"and"** and **"or,"** when used in these definitions and in the discovery requests, include the conjunction "and/or."

## II.   DEPOSITION TOPICS

1.   Lilith Fund's involvement with or support for any abortions performed after September 1, 2021, in which a fetal heartbeat was detectable (or likely to be detectable if properly tested).

2.   Lilith Fund's role in supporting, funding, or facilitating abortions provided in violation of the Texas Heartbeat Act.

3.   Lilith Fund's role in supporting, funding, or facilitating abortions provided in violation of any other law enacted by the Texas legislature.

4.   The identity of any individuals or entities that the Lilith Fund consulted or collaborated with in supporting, funding, or facilitating abortions provided in violation of the Texas Heartbeat Act or any other law enacted by the Texas legislature.

5.   The manner in which the Lilith Fund has distinguished its funding streams for advocacy and its funding streams for conduct that aids or abets abortion.

6:   The sources of financial support for the Lilith Fund's conduct that aids or abets abortion.

7.   The identity of the officers, employees, volunteers, board members, and donors of the Lilith Fund.

# Exhibit 3

**(Subpoena for Deposition and Production of Documents)**

Cause No. __22-01-014__

| | |
|---|---|
| **In re Sadie Weldon**, | IN THE DISTRICT COURT |
| | 271st JACK COUNTY, TEXAS |
| Petitioner | ____ JUDICIAL DISTRICT |

## SUBPOENA FOR DEPOSITION AND PRODUCTION OF DOCUMENTS

This subpoena is issued in the name of the State of Texas:

To any sheriff or constable of the State of Texas, or any other person authorized to serve and execute subpoenas as provided by Texas Rule of Civil Procedure 176, Greetings:

You are hereby commanded to summon:

NEESHA DAVÉ

████████████

to appear at the offices of:

Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701

on March 3, 2022, at 9:00 A.M., to attend and give testimony at a deposition in this case, to produce and permit inspection and copying of documents or tangible things to be used as evidence in this case, and to remain in attendance from day to day until lawfully discharged. All documents or tangible items listed in Exhibit A must be produced.

Pursuant to Rule 176.8(a) of the Texas Rules of Civil Procedure:

**Failure by any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena is issued or a district court in the county in which the subpoena is served, and may be punished by fine or confinement, or both.**

This subpoena is issued by Jonathan F. Mitchell, counsel of record for the petitioner in the above-styled and numbered cause.

# RETURN OF SERVICE

Came to hand this _____ day of _____, 2022, and executed this the _____ day of _____, 2022, a true and correct copy hereof in the following manner: By delivering to the within named witness _____, via

_____ USPS Priority Mail
_____ USPS Certified Mail/Return Receipt Requested
_____ Personal Service/ Hand-Served
_____ Fax/Electronic Mail

Returned this _____ day of _____, 2022.


By: _____
    Authorized Person who is not a party to the suit and is not less than 18 years of age.


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## ACCEPTANCE OF SERVICE OF SUBPOENA BY WITNESS PER RULE 176 OF THE TEXAS RULES OF CIVIL PROCEDURE

I, the undersigned witness named in the Subpoena acknowledge receipt of a copy thereof, and hereby accept service of the attached subpoena.

Rule 176.8(a) Contempt. Failure by any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena is issued or a district court in the county in which the subpoena is served, and may be punished by fine or confinement, or both.


_____    _____
SIGNATURE OF WITNESS                         DATE

## EXHIBIT A

### Documents to Be Produced by Neesha Davé

I.  **DEFINITIONS AND INSTRUCTIONS FOR REQUESTS FOR PRODUCTION**

1. Each request shall operate and be responded to independently and, unless otherwise indicated, no request limits the scope of any other request.

2. Unless otherwise indicated, the relevant time period for these requests is from January 1, 2019, to the present.

3. Unless otherwise defined, the terms used should be read and construed in accordance with the English language and the ordinary meanings and definitions attached. You should, therefore: (i) construe the words "and" as well as "or" in the disjunctive or conjunctive, as necessary to make the request more inclusive; (ii) construe the term "including" to mean "including, but not limited to"; and (iii) construe the words "all" and "each" to mean all and each.

The following definitions apply to each of these requests:

- The terms "**Lilith Fund**," "**you**" and "**your**" refer to the Lilith Fund for Reproductive Equity, including any agent or person authorized to act for or on its behalf, including its officers, employees, staff, and unpaid volunteers.

- The terms "**communication**" and "**communicate**" refer to any method used to transmit or exchange information, concepts, or ideas (whether verbal or nonverbal) including oral, written, typed, or electronic transmittal of any type of information or data, by the use of words, silence, numbers, symbols, images, or depictions, from one person or entity to another person or entity.

- The term "**document**" refers to the act of noting, recording, or preserving any type of information, data, or communication, without regard to the method used to note, record, or preserve such information, data, or communication. The term includes any e-mail or text message.

- The term "**entity**" means any legal entity inquired about (other than a natural person) including a partnership, professional association, joint

venture, corporation, governmental agency, or other form of legal entity.

- The terms **"identify"** and **"identity,"** when used in connection with a natural person, require disclosure of that person's full name, present or last known address, and present or last known telephone number. When used in connection with a legal entity, the terms require disclosure of its legal name, its address, and telephone number.

- The terms **"implement"** and **"implementation"** refer to any method, process, or action used to put a decision or plan into effect or achieve a goal or obligation.

- The term **"information"** refers to and includes documents, records, communications, facts, ideas, data, observations, opinions, photographs, slides, video recordings, audio recordings, and tangible and intangible items and evidence of any kind or sort.

- The terms **"person"** and **"persons"** mean any legal entity inquired about, whether a natural person, partnership, sole proprietorship, professional association, joint venture, corporation, governmental agency, or other form of legal entity.

- The term **"record"** means letters, words, sounds, or numbers, or the equivalent of letters, words, sounds, or numbers, that have been written, recorded, documented, or received by Defendant by:

  - (A)    handwriting;
  - (B)    typewriting;
  - (C)    printing;
  - (D)    photostat;
  - (E)    photograph;
  - (F)    magnetic impulse;
  - (G)    mechanical or electronic recording;
  - (H)    digitized optical image; or
  - (I)    another form of data compilation.

- The term **"record"** also includes any communication, including an e-mail or text-message communication.

- The term **"reproduction"** means an accurate and complete counterpart of an original document or record produced by:

(A)     production from the same impression or the same matrix as the original;

(B)     photograph, including an enlargement or miniature;

(C)     mechanical or electronic re-recording;

(D)     chemical reproduction;

(E)     digitized optical image; or

(F)     another technique that accurately reproduces the original.

- The term "**third party**" means any person, persons, or entity other than the defendants or the attorneys of record for the defendants.

- The terms "**and**" and "**or**," when used in these definitions and in the discovery requests, include the conjunction "and/or."


## II.   Documents Or Tangible Things Requested

**Request No. 1**: Any and all non-privileged documents describing abortions provided with the Lilith Fund's support after September 1, 2021, in which a fetal heartbeat was detectable (or likely to be detectable if properly tested).

**Request No. 2**: Any and all non-privileged documents addressing the Lilith Fund's role in supporting, funding, or facilitating abortions provided in violation of the Texas Heartbeat Act.

**Request No. 3**: Any and all non-privileged documents identifying any individual or entities that the Lilith Fund consulted or collaborated with in supporting, funding, or facilitating abortions provided in violation of the Texas Heartbeat Act.

**Request No. 4**: Any and all non-privileged documents describing whether the Lilith Fund has in any way distinguished its funding streams for advocacy and its funding streams for conduct that aids or abets abortion.

**Request No. 5**: Any and all non-privileged documents describing or identifying the sources of financial support for the Lilith Fund's conduct that aids or abets abortion.

**Request No. 6**: Any and all non-privileged documents describing or identifying any officer, employee, volunteer, board member, or donor of the Lilith Fund.

## EXHIBIT B—TRCP 176.6

You are advised that under Texas Rule of Civil Procedure 176.6, a person served with a subpoena has certain rights and obligations, specifically, that rule states:

(a) Compliance required. Except as provided in this subdivision, a person served with a subpoena must comply with the command stated in the subpoena unless discharged by the court or by the party summoning such witness. A person commanded to appear and give testimony must remain at the place of deposition, hearing, or trial from day to day until discharged by the court or by the party summoning the witness.

(b) Organizations. If a subpoena commanding testimony is directed to a corporation, partnership, association, governmental agency, or other organization, and the matters on which examination is requested are described with reasonable particularity, the organization must designate one or more persons to testify on its behalf as to matters known or reasonably available to the organization.

(c) Production of documents or tangible things. A person commanded to produce documents or tangible things need not appear in person at the time and place of production unless the person is also commanded to attend and give testimony, either in the same subpoena or a separate one. A person must produce documents as they are kept in the usual course of business or must organize and label them to correspond with the categories in the demand. A person may withhold material or information claimed to be privileged but must comply with Rule 193.3. A nonparty's production of a document authenticates the document for use against the nonparty to the same extent as a party's production of a document is authenticated for use against the party under Rule 193.7.

(d) Objections. A person commanded to produce and permit inspection and copying of designated documents and things may serve on the party requesting issuance of the subpoena—before the time specified for compliance—written objections to producing any or all of the designated materials. A person need not comply with the part of a subpoena to which objection is made as provided in this paragraph unless ordered to do so by the court. The party requesting the subpoena may move for such an order at any time after an objection is made.

(e) Protective orders. A person commanded to appear at a deposition, hearing, or trial, or to produce and permit inspection and copying of designated documents and things may move for a protective order under Rule 192.6(b)—before the time specified for compliance—either in the court in which the action is pending or in a district court in the county where the subpoena was served. The person must serve the motion on all parties in accordance with Rule 21a. A person need not comply with the part of a subpoena from which protection is sought under this paragraph unless ordered to do so by the court. The party requesting the subpoena may seek such an order at any time after the motion for protection is filed.

# Exhibit 4
## (Declaration of Jonathan F. Mitchell)

Cause No. ___22-01-014___

| | |
|---|---|
| **In re Sadie Weldon**, | IN THE DISTRICT COURT |
| | 271st JACK COUNTY, TEXAS |
| Petitioner | ____ JUDICIAL DISTRICT |

## DECLARATION OF JONATHAN F. MITCHELL

I, Jonathan F. Mitchell, being duly sworn, states as follows:

1.  My name is Jonathan F. Mitchell. I am over 18 years old and fully competent to make this declaration.

2.  I have personal knowledge of the facts stated in this declaration, and all of these facts are true and correct.

3.  I represent petitioner Sadie Weldon in this litigation.

4.  I also represent Texas Right to Life and John Seago in the lawsuit that the Lilith Fund for Reproductive Equity has filed against them. That lawsuit was originally filed as *Lilith Fund for Reproductive Equity v. State of Texas, et al.*, No. D-1-GN-21-004504 (Travis County), and it is currently on appeal to the Third Court of Appeals in Austin. *See Texas Right to Life, et al. v. Van Stean, et al.*, No. 03-21-00650-CV.

5.  The document attached as Exhibit 1 to this petition is an authentic copy of a sworn declaration that Neesha Davé submitted in that litigation.

This concludes my sworn statement. I declare under penalty of perjury that the facts stated in this declaration are true and correct.

Dated: January 26, 2022

_____
JONATHAN F. MITCHELL

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jonathan Mitchell on behalf of Jonathan Mitchell
Bar No. 24075463
jonathan@mitchell.law
Envelope ID: 61190023
Status as of 1/27/2022 8:24 AM CST

Associated Case Party: Sadie Weldon

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Thomas Brejcha | | tbrejcha@thomasmoresociety.org | 1/26/2022 6:06:21 PM | SENT |
| Charles W.Fillmore | | chad@fillmorefirm.com | 1/26/2022 6:06:21 PM | SENT |
| H. Dustin Fillmore | | dusty@fillmorefirm.com | 1/26/2022 6:06:21 PM | SENT |
| Bryan Hughes | | bryan@hughesfirm.com | 1/26/2022 6:06:21 PM | SENT |
| Erick Kaardal | | kaardal@mklaw.com | 1/26/2022 6:06:21 PM | SENT |
| Jonathan F.Mitchell | | jonathan@mitchell.law | 1/26/2022 6:06:21 PM | SENT |
| Martin Whittaker | | privatrecht@gmail.com | 1/26/2022 6:06:21 PM | SENT |
| Gene P.Hamilton | | gene.hamilton@aflegal.org | 1/26/2022 6:06:21 PM | SENT |

# EXHIBIT A-2
# In re Shannon D. Thomason Rule 202

Filed 7/7/2022 3:34 PM
JoAnna Gonzales
District Clerk
Howard County, Texas

Mark Cohan

## 55561

Cause No. _____

| | |
|---|---|
| **In re Shannon D. Thomason**, | IN THE DISTRICT COURT |
| Petitioner | HOWARD COUNTY, TEXAS |
| | 118th JUDICIAL DISTRICT |

### VERIFIED PETITION TO TAKE DEPOSITION TO INVESTIGATE A LAWSUIT

Petitioner Shannon D. Thomason respectfully asks the Court for permission to take depositions by oral examination from Amy Hagstrom Miller, Marva Sadler, Alan Braid, and Andrea Gallegos. Mr. Thomason seeks this testimony to investigate potential claims brought by Mr. Thomason or others under section 171.208 of the Texas Health and Safety Code.

### PERSONS TO BE DEPOSED AND JURISDICTION

1. Petitioner Shannon D. Thomason is a citizen of Texas and resident of Howard County.

2. Mr. Thomason seeks to depose Amy Hagstrom Miller, Marva Sadler, Alan Braid, and Andrea Gallegos.

3. Upon information and belief, Amy Hagstrom Miller is a resident of Bastrop County and may be served at 8401 North I-35, Suite 1A, Austin, Texas 78753. Hagstrom Miller's phone number is (512) 371-8885.

4. Upon information and belief, Marva Sadler is a resident of Travis County and may be served at 8401 North I-35, Suite 1A, Austin, Texas 78753. Sadler's phone number is currently unknown to Mr. Thomason.

5. Upon information and belief, Alan Braid is a resident of Bexar County and may be served at 7402 John Smith Dr #101, San Antonio, Texas 78229. Braid's phone number is (210) 602-5776.

Copy from re:SearchTX

6. Upon information and belief, Andrea Gallegos is a resident of Bexar County and may be served at 7118 Spring Leaf Street, San Antonio, Texas 78249. Gallegos's phone number is (210) 408-4569.

7. In accordance with Rule 202.2(b)(1) of the Texas Rules of Civil Procedure, this petition is filed in Howard County, the county in which the venue of the anticipated suit may lie.

8. This petition is verified by Mr. Thomason, as required by Rule 202.2(a) of the Texas Rules of Civil Procedure.

## FACTS

9. Amy Hagstrom Miller is the founder, president, and CEO of Whole Woman's Health, an organization that provided abortions in Texas. Hagstrom Miller established Whole Woman's Health LLC in 2003 in Austin, Texas. Since then, it has grown to operate nine clinics in five states. *See* Who We Are, Whole Woman's Health, https://www.wholewomanshealth.com/who-we-are (last accessed July 6, 2022). The label "Whole Woman's Health" has been used as the doing business name of a consortium of abortion providers separately organized as distinct LLCs. They are held by a holding company, The Booyah Group LLC, of which Hagstrom Miller is listed as a "member" on the Texas Comptroller of Public Accounts online directory. Hagstrom Miller has also established a nonprofit organization called Whole Woman's Health Alliance, which engages in pro-abortion advocacy. Hagstrom Miller currently serves as president of the board of Whole Woman's Health Alliance. *See* About, Whole Woman's Health Alliance, https://www.wholewomanshealthalliance.org/about (last accessed July 6, 2022).

10. Because the details of the relationships among these interrelated corporate entities are unknown to Mr. Thomason, this petition uses "Whole Woman's Health"

Copy from re:SearchTX

to refer generically to the management company and the consortium of abortion providers.

11.  Marva Sadler is the senior director of clinical services with Whole Woman's Health and Whole Woman's Health Alliance.

12.  Alan Braid is an abortionist and owner of Alamo Women's Reproductive Services, where he performed abortions in San Antonio.

13.  Andrea Gallegos is the executive director of Alamo Women's Reproductive Services.

14.  In 2021, the Texas legislature enacted the Texas Heartbeat Act, which outlaws abortion after a fetal heartbeat is detectable, which typically occurs at around six weeks of pregnancy. The governor signed the Heartbeat Act into law on May 19, 2021, and it took effect on September 1, 2021, after the Supreme Court denied a request for emergency relief from a coalition of Texas abortion providers, which included Whole Woman's Health and Alamo Women's Reproductive Services. *See Whole Woman's Health v. Jackson*, 141 S. Ct. 2494 (2021).

15.  The Texas Heartbeat Act prohibits state officials from enforcing the law. *See* Tex. Health & Safety Code § 171.207. Instead of public enforcement by state officials, the Heartbeat Act establishes a private right of action that authorizes individuals to sue anyone who violates the statute. *See* Tex. Health & Safety Code § 171.208. These private civil-enforcement suits may be brought against anyone who "performs or induces" a post-heartbeat abortion, *see id*. at § 171.208(a)(1), as well as anyone who "knowingly engages in conduct that aids or abets the performance or inducement of an abortion, including paying for or reimbursing the costs of an abortion through insurance or otherwise, if the abortion is performed or induced in violation of [the Heartbeat Act]," *id*. at § 171.208(a)(2). Lawsuits may also be brought against anyone who "intends" to perform or aid or abet a post-heartbeat abortion in Texas.

Copy from re:SearchTX

16.  A plaintiff who successfully sues an individual or organization under section 171.208 is entitled to injunctive relief and at least $10,000 in statutory damages for each unlawful abortion that the defendant performed or facilitated, plus costs and attorneys' fees. *See* Tex. Health & Safety Code § 171.208(b).

17.  The law was structured this way to insulate the statute from pre-enforcement judicial review and ensure that the Heartbeat Act would remain enforceable despite the existence of *Roe v. Wade*, 410 U.S. 113 (1973), which had not been overruled when the Heartbeat Act took effect. Because no state official is charged with enforcing the law, there is no one for abortion providers to sue in a pre-enforcement lawsuit that challenges the constitutionality of the statute. *See Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 535 (2021); *Whole Woman's Health v. Jackson*, 642 S.W.3d 569 (Tex. 2022). And because the law is enforced by private citizens rather than government officials, abortion providers have been unable to obtain relief that will stop private lawsuits from being initiated against them.

18.  When the Supreme Court denied emergency relief on September 1, 2021, the Texas Heartbeat Act marked the first time that a state had successfully imposed a six-week abortion ban since *Roe v. Wade*, 410 U.S. 113 (1973).

19.  When the Texas Heartbeat Act took effect on September 1, 2021, abortions performed after fetal heartbeat became acts of murder under Texas law. The Texas Penal Code defines the offense of murder to include the intentional killing of "an unborn child at every stage of gestation from fertilization until birth." Texas Penal Code §§ 1.07, 19.02(b). The murder statute exempts "lawful medical procedures" and the dispensation or administration of a drug prescribed "in accordance with law." Texas Penal Code § 19.06(2), (4). But post-heartbeat abortions performed in Texas ceased to be "lawful" (and became acts of murder) when the Heartbeat Act took effect on September 1, 2021.

Copy from re:SearchTX

## I.     Braid's Illegal Abortion In September 2021

20.  On September 18, 2021, abortionist Alan Braid published an article in the Washington Post, in which he admitted that he had aborted an unborn child in violation of the Texas Heartbeat Act and the Texas murder statute. *See* Alan Braid, *Opinion: Why I Violated Texas's Extreme Abortion Ban*, Wash. Post (Sept. 18, 2021), https://wapo.st/3zLhKrm (attached as Exhibit 4).

21.  Braid claimed that he violated the law knowingly and intentionally, and that he did so to provoke a private civil-enforcement lawsuit that might provide a court with the opportunity to declare the Heartbeat Act unconstitutional. *See id.* ("I fully understood that there could be legal consequences—but I wanted to make sure that Texas didn't get away with its bid to prevent this blatantly unconstitutional law from being tested.").

22.  Braid also admitted that he performed this illegal abortion with full knowledge of the legal risks involved. *See id.* ("I understand that by providing an abortion beyond the new legal limit, I am taking a personal risk, but it's something I believe in strongly.").

23.  By knowingly and intentionally performing a post-heartbeat abortion in violation of Texas law, Braid has not only exposed himself to $10,000 in statutory damages (plus costs and attorneys' fees) under the Texas Heartbeat Act, he also committed an act of first-degree murder. *See* Tex. Penal Code §§ 1.07, 19.02(b) (defining the offense of murder to include the intentional killing of "an unborn child at every stage of gestation from fertilization until birth.").

24. Any person who was complicit in this illegal abortion—including Braid's employees, volunteers, and donors, and anyone who aided or abetted this illegal abortion in any manner, other than the woman upon whom the abortion was performed—is equally liable under the Texas Heartbeat Act and equally guilty of murder. *See* Tex. Health & Safety Code § 171.208(a)(2); Tex. Penal Code § 7.02.

Copy from re:SearchTX

## II.   Whole Woman's Health's Illegal Abortions In October 2021

25.  On October 6, 2021, federal district judge Robert Pitman issued a preliminary injunction that temporarily restrained the state of Texas from enforcing the Texas Heartbeat Act. *See United States v. Texas*, No. 1:21-CV-796-RP, 2021 WL 4593319 (W.D. Tex. Oct. 6, 2021).

26.  On October 8, 2021, the U.S. Court of Appeals for the Fifth Circuit stayed the preliminary injunction issued by Judge Pitman. *See United States v. Texas*, No. 21-50949, 2021 WL 4786458 (5th Cir. Oct. 14, 2021), cert. dismissed, 142 S. Ct. 522 (2021).

27.  The Texas Heartbeat Act explicitly states that abortion providers and their enablers can be sued for post-heartbeat abortions performed while an injunction against the law's enforcement is in effect, if that injunction is later vacated or reversed on appeal. *See* Tex. Health and Safety Code § 171.208(e) ("Notwithstanding any other law, the following are not a defense to an action brought under this section . . . (3) a defendant's reliance on any court decision that has been overruled on appeal or by a subsequent court, even if that court decision had not been overruled when the defendant engaged in conduct that violates this subchapter.").

28.  Because of section 171.208(e)(3), the overwhelming majority of Texas abortion providers decided to remain in compliance with the Texas Heartbeat Act while Judge Pitman's preliminary injunction was in effect, because the injunction could not protect them from future civil lawsuits if it were ever vacated, stayed, or overturned on appeal. *See* Caroline Kitchener, et al., *Despite Latest Court Ruling Blocking Texas Abortion Law, Most Providers Are Still Reluctant to Defy Ban*, Wash. Post, October 7, 2021, https://wapo.st/3a4JGfA; *see also Edgar v. MITE Corp.*, 457 U.S. 624, 648–50 (1982) (Stevens, J., concurring).

29.  Whole Woman's Health was one of the few Texas abortion providers that decided to resume post-heartbeat abortions after Judge Pitman issued his preliminary

Copy from re:SearchTX

injunction, apparently operating under a belief that Judge Pitman's preliminary injunction formally suspended the Texas Heartbeat Act. *But see Whole Woman's Health v. Jackson*, 141 S. Ct. 2494, 2495 (2021) ("[F]ederal courts enjoy the power to enjoin individuals tasked with enforcing laws, not the laws themselves." (citing *California* v. *Texas*, 141 S. Ct. 2104, 2115–16 (2021)); *Edgar v. MITE Corp.*, 457 U.S. 624, 649 (1982) (Stevens, J., concurring) ("[F]ederal judges have no power to grant such blanket dispensation from the requirements of valid legislative enactments. . . . "); *id.* at 650 (Stevens, J., concurring) (noting that a preliminary injunction cannot "provide permanent immunity for violations of the statute that occurred during its effective period.").

30.  On October 7, 2021, Hagstrom Miller told MSNBC: "We were able to provide abortions today." Hagstrom Miller was quoted as saying, "We have some physicians who are comfortable doing abortions today with this injunction." Dartunorro Clark & Chloe Atkins, *Federal Injunction Prompts Texas Abortion Provider to Resume Care*, MSNBC (Oct. 7, 2021), https://nbcnews.to/3ugJErJ (attached as Exhibit 1).

31.  These statements by Hagstrom Miller indicate that Whole Woman's Health, like Alamo Women's Reproductive Services, has offered and performed abortions in violation of the Texas Heartbeat Act and the Texas murder statute.

32.  At some point after the Texas Heartbeat Act took effect, Whole Woman's Health began to fund its Texas operations primarily through donations.

33.  In November of 2021, the Texas Tribune reported that "donations and funding from nonprofits have helped keep the lights on and the staff paid at Whole Woman's Health and several other independently owned clinics." Karen Brooks Harper & Eleanor Klibanoff, *Fewer Patients, Smaller Staff, An Uncertain Future: Abortion Providers Await Court Decision on Texas Law*, Texas Tribune (Nov. 23, 2021), https://bit.ly/3OUWZ10 (attached as Exhibit 2).

Copy from re:SearchTX

34.  In December of 2021, ABC News reported that Whole Woman's Health in Texas "is now providing abortion care—in accordance with the law—for free. The clinic is able to do so because of grant funding . . . ." Devin Dwyer, *Supreme Court Deals Another Blow to Texas Abortion Providers*, ABC News (Dec. 16, 2021), https://abcn.ws/3a7fbFS (attached as Exhibit 3).

35.  In March of 2022, Whole Woman's Health's website declared that "ALL ABORTION SERVICES ARE FREE OF CHARGE," and explained: "Because of SB 8, we have received generous funding that enables us to provide free abortion services in our Texas clinics." *See* https://bit.ly/3yrTI3J (attached as Exhibit 5).

36.  It is unclear when these donations started. It is also uncertain whether or to what extent these donations aided or abetted abortions performed in violation of the Texas Heartbeat Act and the Texas murder statute.

37.  By knowingly and intentionally allowing Whole Woman's Health to perform post-heartbeat abortions in violation of the Texas Heartbeat Act, Hagstrom Miller has not only exposed herself to $10,000 in statutory damages (plus costs and attorneys' fees) for each post-heartbeat abortion performed, she also committed acts of first-degree murder under section 19.02 of the Texas Penal Code. *See* Texas Penal Code §§ 1.07, 19.02(b) (defining the offense of murder to include the intentional killing of "an unborn child at every stage of gestation from fertilization until birth.").

38.  Any person who was complicit in these illegal abortions—including Whole Woman's Health employees, volunteers, and donors, and anyone who aided or abetted these illegal abortions in any manner, apart from the formerly pregnant woman upon whom the illegal abortion was performed—is equally liable under the Texas Heartbeat Act and equally guilty of murder.

Copy from re:SearchTX

### III.   Braid's And Whole Woman's Health's Illegal Abortions In June 2022

39.   On June 24, 2022, the Supreme Court overruled *Roe v. Wade*, 410 U.S. 113 (1973), and *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992). *See Dobbs v. Jackson Women's Health Organization*, No. 19-1392.

40.   When the Supreme Court announced its ruling in *Dobbs*, the Texas pre-*Roe* criminal abortion statutes became immediately and fully enforceable. *See* Ken Paxton, Attorney General of Texas, Advisory on Texas Law Upon Reversal of *Roe v. Wade* (attached as Exhibit 6) ("Texas abortion prohibitions predating *Roe* . . . were never repealed by the Texas Legislature. Although these statutes were unenforceable while *Roe* was on the books, they are still Texas law. Under these pre-*Roe* statutes, abortion providers could be criminally liable for providing abortions starting today."). These statutes impose felony criminal liability on any person who performs an abortion unless the mother's life is in danger. *See* Exhibit 7. The punishment is 2–5 years imprisonment, and the statute of limitations in three years. *See id*.

41.   When the Supreme Court announced its ruling in *Dobbs*, all abortion performed in Texas, other than abortions performed to save the life of the mother, became acts of first-degree murder under Texas law. *See* Texas Penal Code §§ 1.07, 19.02(b) (defining the offense of murder to include the intentional killing of "an unborn child at every stage of gestation from fertilization until birth.").

42.   Texas abortion providers immediately ceased operations in response to *Dobbs* and complied with the state's pre-*Roe* abortion ban. *See* Erin Douglas and Eleanor Klibanoff, *Abortions in Texas have stopped after Attorney General Ken Paxton said pre-Roe bans could be in effect, clinics say*, Texas Tribune (June 24, 2022), https://bit.ly/3nCEJxH (attached as Exhibit 8).

43.   On June 28, 2022, a Harris County district judge issued a temporary restraining order that falsely asserted that the state's pre-*Roe* criminal abortion prohibition "is repealed," and that prevented certain state officials and district attorneys from

Copy from re:SearchTX

initiating criminal prosecutions under the pre-*Roe* abortion statutes while the restraining order is in effect. *See* Exhibit 9.

44. The Harris County district judge did not enjoin anyone from enforcing the Texas murder statute against abortion providers, even though a post–*Roe v. Wade* abortion violates the murder statute by killing "an unborn child at [any] stage of gestation from fertilization until birth." Texas Penal Code §§ 1.07, 19.02(b).

45. The temporary restraining order also did not "block" or suspend the pre-*Roe* statutes themselves, which continued to exist as state law despite the temporary injunction against their enforcement. *See Whole Woman's Health*, 141 S. Ct. at 2495; *MITE Corp.*, 457 U.S. at 649–52 (Stevens, J., concurring). Any person who violated the state's pre-*Roe* statutes while the TRO was in effect can be prosecuted for their crimes if the TRO is vacated or dissolved on appeal—under both the state's pre-*Roe* abortion ban and the murder statute. *See id.*

46. Most Texas abortion clinics therefore remained in compliance with the state's pre-*Roe* abortion ban despite the TRO. But Whole Woman's Health and Alamo Women's Reproductive Services decided to immediately resume abortions on June 28, 2022, despite the legal risks, exposing themselves and each of their employees, volunteers, and donors, to criminal prosecution under the state's pre-*Roe* abortion ban, as well as the murder statute. *See* Caroline Kitchener and Meryl Kornfield, *Abortions in Texas can temporarily resume, judge rules*, Wash. Post (June 28, 2022), https://wapo.st/3OVjpzD (attached as Exhibit 10) (reporting that Andrea Gallegos claimed that Alamo Women's Reproductive Services had killed 10 unborn children on Tuesday, June 28, 2022, and that it had "scheduled more patients for Wednesday."); *id.* (reporting that Whole Woman's Health "will reopen four clinics in Texas once they have the staffing," and quoting Amy Hagstrom Miller as saying: "We immediately began calling the patients on our waiting lists and bringing our staff and providers back into the clinics in order to resume abortion care as soon as possible").

Copy from re:SearchTX

47.  On July 1, 2022, the Supreme Court of Texas issued a stay of the TRO. *See* Exhibit 11. On July 2, 2022, Hagstrom Miller announced that Whole Woman's Health has halted abortions in Texas in response to the state supreme court's order. *See* Exhibit 12.

## IV.   Other Potential Illegal Abortions That Occurred Since September 1, 2021

48.  After the Texas Heartbeat Act took effect on September 1, 2021, abortion providers in Texas began referring patients who were beyond the six-week limit to out-of-state abortion providers. The website of Whole Woman's Health, for example, offers to provide referrals and "help" to any patient seeking an out-of-state abortion. *See* Exhibit 21 ("If you are seeking an abortion and a Whole Woman's Health clinic site is restricted from providing the care you need, we will help you!").

49.  Surgical abortions performed after a fetal heartbeat is detectable do not violate the Texas Heartbeat Act if the surgical abortion is performed outside the state. Drug-induced abortions induced after fetal heartbeat also do not violate the Texas Heartbeat Act if both drugs are ingested outside the state and the entire abortion process is initiated and completed outside the state of Texas.

50.  But in a drug-induced abortion, a patient typically ingests only the first of the two drugs (mifepristone or mifeprex) at the clinic, and is instructed to return home and ingest the second drug (misoprostol) 24–48 hours later.

51.  If any Texas resident beyond the six-week limit ingested either of those two drugs in Texas, then the abortion violated the Texas Heartbeat Act, and the out-of-state abortion provider and anyone who aided or abetted that abortion is liable under Senate Bill 8. Liability would extend to any abortion provider in Texas that referred that patient to the out-of-state provider. See Tex. Health & Saftey Code § 171.208(a)(2) (imposing liability on "any person who . . . knowingly engages in conduct that aids or abets the performance or inducement of an abortion, including

Copy from re:SearchTX

paying for or reimbursing the costs of an abortion through insurance or otherwise, if the abortion is performed or induced in violation of this subchapter, regardless of whether the person knew or should have known that the abortion would be performed or induced in violation of this subchapter.").

## ANTICIPATED ACTION

52.  This petition is filed in anticipation of possible future civil actions brought under section 171.208 of the Texas Health and Safety Code, against individuals and organizations that performed or aided or abetted abortions in violation of the Texas Heartbeat Act, also known as Senate Bill 8 or SB 8. It is also filed to investigate the possibilities for future civil actions brought under section 171.208 of the Texas Health and Safety Code.

53.  Any person who performs or induces an abortion in violation of the Texas Heartbeat Act is detectable may be sued by "any person," and must pay "not less than" $10,000 in statutory damages for each illegal abortion, plus costs and attorneys' fees. *See* Tex. Health & Safety Code § 171.208(a)(1), (b). Anyone who knowingly engages in conduct that aids or abets an abortion is equally liable for any abortion performed in violation of the Texas Heartbeat Act, regardless of whether the individual knew or should have known that his abortion-assisting conduct was aiding or abetting a post-heartbeat abortion. *See* Tex. Health & Safety Code § 171.208(a)(2).

54.  Hagstrom Miller, Sadler, Braid, and Gallegos are all expected to have information relevant to the potential claims that Mr. Thomason is investigating. Hagstrom Miller and Braid have publicly admitted to violating the Texas Heartbeat Act. Sadler and Gallegos hold high-ranking administrative positions at Whole Woman's Health and Alamo Women's Reproductive Services. Each of them is likely to know the nature and extent of abortions performed in violation of the Heartbeat Act, and the identity

Copy from re:SearchTX

of individuals and organizations that aided or abetted these illegal abortions and acts of murder by providing funding, insurance coverage, or logistical support.

55.  To the extent that Hagstrom Miller, Sadler, Braid, and Gallegos have exposed themselves to civil liability for their violations of the Texas Heartbeat Act, each of them would have interests adverse to Mr. Thomason.

56.  Additional parties are expected to have information relevant to the potential claims that Mr. Thomason is investigating, as well as interests adverse to Mr. Thomason's in any anticipated suit, but the identities of those parties are currently unknown.

57.  Hagstrom Miller's and Braid's public statements indicate that they and their staff have knowledge of abortions performed in violation of the Texas Heartbeat Act. Mr. Thomason's goal is to use the depositions sought by this petition to ascertain the extent of the illegal conduct that has occurred at Whole Women's Health and Alamo Women's Reproductive Services, and the identity of all individuals and organizations subject to liability under section 171.208.

## NOTICE OF RELATED CASES

58.  There are no ongoing cases between Mr. Thomason and either Hagstrom Miller, Sadler, Braid, or Gallegos.

59.  There are several ongoing cases that seek to restrain state officials and private individuals from enforcing certain provisions in the Texas Heartbeat Act. One of those cases is *Whole Woman's Health v. Jackson*, in which Whole Woman's Health and Alamo Women's Reproductive Services are plaintiffs. That case is currently pending in the Western District of Texas. *See Whole Woman's Health v. Jackson*, No. 1:21-cv-00616-RP (W.D. Tex.).

60.  A coalition of abortion providers and abortion funds has also filed suit in state court to restrain Texas Right to Life and its legislative director, John Seago, from initiating lawsuits against them under section 171.208 of the Texas Health and Safety

Copy from re:SearchTX

Code. The district judge in those cases denied the defendants' motion to dismiss under the Texas Citizens Participation Act, and the defendants have taken an interlocutory appeal from that ruling. That appeal is currently pending in the Third Court of Appeals. *See Texas Right to Life v. Van Stean*, No. 03-21-00650-CV.

## REQUEST FOR DEPOSITIONS

61. Mr. Thomason seeks a court order authorizing him to depose Hagstrom Miller, Sadler, Braid, and Gallegos because he seeks to investigate potential claims that he or others might bring under section 171.208 of the Texas Health and Safety Code, against any person or organization that performed or aided or abetted an illegal post-heartbeat abortion. *See* Tex. R. Civ. P. 202(d)(2).

62. For the reasons already explained, it is likely that Whole Woman's Health, Alamo Women's Reproductive Services, and healthcare professionals operating under their auspices provided support for post-heartbeat abortions after the effective date of the Heartbeat Act. Hagstrom Miller, Sadler, Braid, and Gallegos will have information about the relevant methods and recordkeeping, based on their positions in those organizations, and based on their comments to the media and in court filings on the subject.

63. There is good reason for this court to find that deposing Hagstrom Miller, Sadler, Braid, and Gallegos at this time is the best way to avoid a delay or failure of justice in an anticipated suit. *See* Tex. R. Civ. P. 202.4(a). In addition, the likely benefit of allowing Mr. Thomason to depose these individuals to investigate a potential claim outweighs the burden or expense of the procedure. *See* Tex. R. Civ. P. 202.4(b).

64. Mr. Thomason is considering whether to sue individuals and organizations that performed or facilitated illegal abortions in violation of the Texas Heartbeat Act. The statements made by Hagstrom Miller, Sadler, Braid, and Gallegos suggest that Whole Women's Health and Alamo Women's Reproductive Services violated the Texas

Copy from re:SearchTX

Heartbeat Act in a manner that exposes its employees, volunteers, donors, and anyone involved in the provision of these illegal abortions to liability under section 171.208 of the Texas Health and Safety Code.

65. Yet Mr. Thomason is unwilling to file suit as this time because he is still investigating the range of potential defendants, as well as any possible defenses or substantive arguments that they might raise in the litigation. Mr. Thomason expects to be able to better evaluate the prospects for legal success after deposing Hagstrom Miller, Sadler, Braid, and Gallegos and discovering the nature and scope of their violations of Texas law, as well as the extent of involvement of each individual that aided or abetted post-heartbeat abortions in violation of the Texas Heartbeat Act.

66. Mr. Thomason also wishes to preserve evidence of illegal abortions performed in violation of the Texas Heartbeat Act, as well as evidence surrounding the involvement of organizations and individuals who aided or abetted illegal self-managed abortions. Mr. Thomason seeks to depose Hagstrom Miller, Sadler, Braid, and Gallegos on the topics described in the notices of deposition, which are attached to this petition as Exhibits 13, 15, 17, and 19. Mr. Thomason also seeks discovery of documents[1] that address the issues that will be covered in the depositions.

---

1. The scope of a pre-suit deposition under Rule 202 is the same as a regular deposition of non-parties in litigation. *See* Tex. R. Civ. P. 202.5. This specifically allows document-production requests. *See* Tex. R. Civ. P. 199.2(b)(5) (providing for requests for production along with a deposition notice); Tex. R. Civ. P. 205.1(c) (providing for noticing document production requests to nonparties); *In re City of Tatum*, 567 S.W.3d 800, 808 (Tex. App. 2018) ("The "language of these rules when read together permits a petition seeking a pre-suit deposition under Rule 202 to also request the production of documents.'" quoting *In re Anand*, No. 01-12-01106-CV, 2013 WL 1316436, at *3 (Tex. App. Apr. 2, 2013)). *See also City of Dallas v. City of Corsicana*, No. 10-14-00090-CV, 2015 WL 4985935, at *6 (Tex. App. Aug. 20, 2015) ("Under rule 202, documents can be requested in connection with a deposition."). While some courts have refused to permit document discovery under Rule 202, *see, e.g.*, *In re Pickrell*, No. 10-17-00091-CV, 2017 WL 1452851, at *6 (Tex. App. Apr. 19, 2017), they have not analyzed the text of Rule 202.5 or its relationship to Rule 199. *See In re City of Tatum*, 567

Copy from re:SearchTX

67.  Deposing Hagstrom Miller, Sadler, Braid, and Gallegos allows Mr. Thomason to preserve evidence of great importance to the anticipated litigation. Their public statements already attest that they have evidence of abortions that were performed or induced in violation of the Texas Heartbeat Act, at least prima facie. The value of this information to any subsequent litigation, and to the policies embodied in the Texas Heartbeat Act, is extremely high.

68.  Delay in obtaining this evidence increases the chance that information about any violations of the Texas Heartbeat Act will be forgotten and that documentation will become more difficult to obtain. Given the widespread press coverage of the Texas Heartbeat Act, including attention to the risks taken by those who choose to violate the Act's provisions,[2] there is considerable incentive for anyone who has violated the Heartbeat Act to hide or obscure evidence of their involvement in illegal abortions.

69.  Without the documentation, there would be a risk of miscarriage or delay of justice, as the law of Texas would be difficult or impossible to enforce. The policy of the state will be thwarted if it is not possible to identify the parties complicit in providing, aiding, or abetting abortions in violation of the Texas Heartbeat Act.

70.  It would also enhance judicial efficiency to allow the eventual lawsuit to consider the entire chain of events surrounding potentially illegal conduct described in Hagstrom Miller and Braid's public statements reported in the press. Waiting for discovery in the course of litigation not only runs increased risks of forgetfulness or record-keeping deficiencies. It also has costs to the administration of justice in that the

---

S.W.3d 800, 808 n. 7 (Tex. App. 2018) (criticizing courts denying document production under Rule 202).

2.  *See* Abigail Abrams, *Inside The Small Group of Doctors Who Risked Everything to Provide Abortions in Texas*, Time (Oct. 14, 2021), available at https://bit.ly/3qxa5qx.

Copy from re:SearchTX

courts would have to adjudicate the matters in separate proceedings, or through complaints successively amended to add additional defendants. Allowing depositions under Rule 202 would avoid this delay of justice.

71.  The burden on Hagstrom Miller, Sadler, Braid, and Gallegos is modest. To be sure, they must appear for a deposition and produce documents. But the inconvenience will only grow greater with any delay, as memories fade and documents accumulate. The value of the information sought outweighs the burden, as required by Rule 202.

72.  Mr. Thomason seeks to depose Hagstrom Miller, Sadler, Braid, and Gallegos by oral deposition. *See* Tex. R. Civ. P. 199. The notices of deposition identifying the topics for examination are attached to this petition as Exhibits 13, 15, 17, and 19. This procedure will impose a minimal burden on the deponents while permitting Mr. Thomason to preserve for future litigation information about the potentially illegal abortions that Hagstrom Miller and Braid have already admitted to in their statements to the media. This information is likely to be important evidence in any future litigation.

73.  Mr. Thomason further requests that the court order Hagstrom Miller, Sadler, Braid, and Gallegos to produce at or before the deposition all non-privileged documents described in the subpoenas attached as Exhibits 14, 16, 18, and 20 to this petition.

## REQUEST FOR HEARING

74.  After the service of this petition and a notice of hearing, Mr. Thomason requests that the court conduct a hearing, in accordance with Rule 202.3(a) of the rules of civil procedure, to determine whether to issue an order allowing the deposition.

Copy from re:SearchTX

## REQUEST FOR RELIEF

75. For these reasons, Mr. Thomason respectfully requests that the court set a date for a hearing on this petition, and thereafter issue an order:

    a. finding that the benefits of a deposition and accompanying production of documents outweighs the burden;

    b. finding that a deposition and accompanying production of documents will avoid delay or failure of justice;

    c. authorizing Mr. Thomason to take oral depositions of Hagstrom Miller, Sadler, Braid, and Gallegos;

    d. requiring Hagstrom Miller, Sadler, Braid, and Gallegos to produce the documents identified by this petition, at a time and place to be agreed by the parties; and

    e. awarding all other relief that the Court may deem just, proper, or equitable.

Respectfully submitted.

/s/ Jonathan F. Mitchell

H. Dustin Fillmore III
Texas Bar No. 06996010
Charles W. Fillmore
Texas Bar No. 00785861
The Fillmore Law Firm, LLP
1200 Summit Avenue, Suite 860
Fort Worth, Texas 76102
(817) 332-2351 (phone)
(817) 870-1859 (fax)
dusty@fillmorefirm.com
chad@fillmorefirm.com

Jonathan F. Mitchell
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

Dated: July 7, 2022

*Counsel for Petitioner*

Copy from re:SearchTX

Cause No. _____

| | |
|---|---|
| **In re Shannon D. Thomason,** | IN THE DISTRICT COURT |
| | HOWARD COUNTY, TEXAS |
| Petitioner | 118th JUDICIAL DISTRICT |

## VERIFICATION

STATE OF TEXAS

COUNTY OF _Howard_

Before me, the undersigned notary public, on this day personally appeared Shannon D. Thomason and after being duly sworn, stated under oath that he has read the above verified petition to take deposition to investigate potential legal claims and its exhibits; that every statement of fact contained in it is within his personal knowledge and is true and correct; and that every exhibit is an authentic copy of what it purports to be.

SHANNON D. THOMASON

Subscribed and sworn to me
this ___7th___ day of ___July___, 2022

NOTARY

MARIA IBANEZ
Notary Public, State of Texas
Comm. Expires 10-26-2024
Notary ID 132748124

# EXHIBIT A-3
# In re
# Ashley Maxwell
# Rule 202

FILED
2/2/2022 7:28 PM
David Trantham
Denton County District Clerk
By: Raquel Gonzalez, Deputy

Cause No. _____

22-1046-431

|  |  |
|---|---|
| **In re Ashley Maxwell**, | IN THE DISTRICT COURT |
| | DENTON COUNTY, TEXAS |
| Petitioner | ____ JUDICIAL DISTRICT |

## VERIFIED PETITION TO TAKE DEPOSITION TO INVESTIGATE A LAWSUIT

Petitioner Ashley Maxwell respectfully asks the Court for permission to take a deposition by oral examination of Kamyon Conner of the North Texas Equal Access Fund. Ms. Maxwell seeks this testimony to investigate potential claims brought by Ms. Maxwell or others under section 171.208 of the Texas Health and Safety Code.

### PERSONS TO BE DEPOSED AND JURISDICTION

1. Petitioner Ashley Maxwell is a citizen of Texas and resident of Hood County.

2. Ms. Maxwell seeks to depose Kamyon Conner. Upon information and belief, Ms. Conner is a resident of Denton County and may be served at ████████████ ████████████. Ms. Conner's telephone number is ████████████.

3. In accordance with Rule 202.2(b)(2) of the Texas Rules of Civil Procedure, this petition is filed in Denton County, the county in which Ms. Conner resides.

4. This petition is verified by Ms. Maxwell, as required by Rule 202.2(a) of the Texas Rules of Civil Procedure.

### NATURE OF THE ACTION

5. This petition is filed to investigate the possibilities for future civil actions brought under section 171.208 of the Texas Health and Safety Code, against individuals and organizations that performed or aided or abetted abortions in violation of the Texas Heartbeat Act, also known as Senate Bill 8 or SB 8. In her capacity as executive director of the North Texas Equal Access Fund ("TEA Fund"), Kamyon Conner has stated in a sworn declaration that her organization knowingly and intentionally

aided or abetted at least one post-heartbeat abortion in violation of the Texas Heart-beat Act. *See* Declaration of Kamyon Conner ¶ 7 (attached as Exhibit 1).

6. Ms. Conner submitted this sworn declaration in a lawsuit that her organization brought against Texas Right to Life and its legislative director, John Seago. This law-suit was originally filed as *North Texas Equal Access Fund v. State of Texas, et al.*, No. D-1-GN-21-004503 (Travis County), and was transferred by the multidistrict litiga-tion panel to 98th Judicial District Court of Travis County. Those pre-trial proceed-ings were conducted under the caption of *Van Stean v. State of Texas, et al.*, No. D-1-GN-21-004179, and the cases are currently on appeal to the Third Court of Appeals in Austin. *See Texas Right to Life, et al. v. Van Stean, et al.*, No. 03-21-00650-CV.

7. North Texas Equal Access Fund ("TEA Fund") is expected to have infor-mation relevant to the potential claims that Ms. Maxwell is investigating, and it is expected to have interests adverse to Ms. Maxwell in any anticipated suit. The TEA Fund's mailing address is 501 Winnewood Village Shopping Center #386, Dallas, Texas 75224-1838; its registered office is at 8035 East R.L. Thornton Freeway, Suite 128, Dallas, Texas 75228; and its phone number is (844) 832-3863.

8. Kamyon Conner is expected to have information relevant to the potential claims that Ms. Maxwell is investigating, and she is expected to have interests adverse to Ms. Maxwell in any anticipated suit. On information and belief, Ms. Conner's ad-dress is ████████████████████████, and her phone number is ████ ████.

9. Additional parties are expected to have information relevant to the potential claims that Ms. Maxwell is investigating, as well as interests adverse to Ms. Maxwell's in any anticipated suit, but the identities of those parties are currently unknown. Ms. Conner's sworn declaration states that the TEA Fund aided or abetted the provision of at least one post-heartbeat abortion performed in Texas. But Ms. Conner's decla-ration does not say who provided those post-heartbeat abortions, nor does it identify

the individuals who aided or abetted these illegal abortions. Ms. Maxwell's goal is to use the deposition sought by this petition to ascertain the identity of all individuals and organizations who are subject to liability under section 171.208.

## NOTICE OF RELATED CASES

10.  There are no ongoing cases between Ms. Maxwell and Kamyon Conner. There are also no ongoing cases between Ms. Maxwell and TEA Fund.

11.  There are several ongoing cases that seek to restrain state officials and private individuals from enforcing certain provisions in SB 8. One of those cases is *Whole Woman's Health v. Jackson*, in which the plaintiffs are attempting to enjoin state licensing authorities from taking adverse action against abortion providers and medical professionals that violate the Texas Heartbeat Act. That case is currently pending in the U.S. Court of Appeals for the Fifth Circuit, after a remand from the Supreme Court of the United States. *See Whole Woman's Health v. Jackson*, No. 21-50792 (5th Cir.); *see also Whole Woman's Health v. Jackson*, 142 S. Ct. 522 (2021). On January 17, 2022, the Fifth Circuit certified a state-law question to the Supreme Court of Texas. *See Whole Woman's Health v. Jackson*, --- F.4th ----, 2022 WL 142193 (5th Cir.). Those certification proceedings remain pending in the state supreme court.

12.  A coalition of abortion providers and abortion funds has also filed suit in state court to restrain Texas Right to Life and its legislative director, John Seago, from initiating lawsuits against them under section 171.208 of the Texas Health and Safety Code. The district judge in those cases denied the defendants' motion to dismiss under the Texas Citizens Participation Act, and the defendants have taken an interlocutory appeal from that ruling. That appeal is currently pending in the Third Court of Appeals. *See Texas Right to Life v. Van Stean*, No. 03-21-00650-CV.

## BACKGROUND

13.  The Texas Heartbeat Act, also known as SB 8, outlaws abortion after a fetal heartbeat is detectable. *See* Tex. Health & Safety Code § 171.204.

14.  SB 8 prohibits state officials from enforcing the law. *See* Tex. Health & Safety Code § 171.207. Instead of public enforcement by state officials, SB 8 establishes a private right of action that authorizes individuals to sue those who violate the statute. *See* Tex. Health & Safety Code § 171.208. These private civil-enforcement suits may be brought against anyone who "performs or induces" a post-heartbeat abortion, *see id.* at § 171.208(a)(1), as well as anyone who "knowingly engages in conduct that aids or abets the performance or inducement of an abortion, including paying for or reimbursing the costs of an abortion through insurance or otherwise, if the abortion is performed or induced in violation of [SB 8]," *id.* at § 171.208(a)(2). Lawsuits may also be brought against anyone who "intends" to perform or aid or abet a post-heartbeat abortion in Texas.

15.  A plaintiff who successfully sues an individual or organization under section 171.208 is entitled to injunctive relief and $10,000 in statutory damages for each unlawful abortion that the defendant performed or facilitated, plus costs and attorneys' fees. *See* Tex. Health & Safety Code § 171.208(b).

16.  The Texas Heartbeat Act took effect on September 1, 2021, and it has remained in effect as the law of Texas since that time.

17.  The person that Ms. Maxwell seeks to depose is the leader of an organization that helps women in Texas abort their unborn children. Kamyon Conner is executive director of the North Texas Equal Access Fund ("TEA Fund"). She is "responsible for executing TEA Fund's mission, protecting the organization's financial health, and supervising staff and volunteers." Conner Decl. ¶ 3 (attached as Exhibit 1).

18.  The TEA Fund aids or abets abortion in Texas through a variety of means. As Ms. Conner explained in a sworn statement, the TEA Fund "provides financial,

emotional, and logistical support for low-income abortion patients in north Texas." Conner Decl. ¶ 4 (attached as Exhibit 1).

19.  Most of the abortions that the TEA Fund aids or abets occur after a fetal heartbeat is detectable. Conner Decl. ¶ 4 (attached as Exhibit 1).

20.  Since the Texas Heartbeat Act took effect on September 1, 2021, the TEA Fund has aided or abetted at least one post-heartbeat abortion in violation of the law. In her sworn declaration, Ms. Conner stated:

> TEA Fund has engaged in conduct with the intent to assist pregnant Texans obtain abortions after the detection of cardiac activity. Specifically, following the entry of an injunction by the Honorable Robert Pitman on October 6, 2021, and while that injunction was still in place, TEA Fund paid for at least one abortion after confirming the gestational age of the fetus was beyond the time when cardiac activity is usually detected. In doing so, it was TEA Fund's intention to pay for the abortion even if cardiac activity was detected.

Conner Decl. ¶ 7 (attached as Exhibit 1).

21.  Ms. Conner's sworn declaration also states that the TEA Fund "partner[s] with" several abortion providers in northern Texas. This includes "clinics that have publicly confirmed that post-cardiac activity abortions were performed" in violation of the Texas Heartbeat Act. Conner Decl. ¶ 8 (attached as Exhibit 1).

## REQUEST FOR DEPOSITION

22.  Ms. Maxwell seeks a court order authorizing her to depose Ms. Conner because she seeks to investigate potential claims that she or others might bring under section 171.208 of the Texas Health and Safety Code, against any person or organization that performed or aided or abetted illegal post-heartbeat abortions of the type described in Ms. Conner's declaration. *See* Tex. R. Civ. P. 202(d)(2).

23.  Ms. Maxwell additionally seeks to depose Ms. Conner because she anticipates the institution of a suit in which Ms. Conner or the TEA Fund may be a party. *See* Tex. R. Civ. P. 202(d)(1).

24.  There is good reason for this court to find that deposing Ms. Conner at this time is the best way to avoid a delay or failure of justice in an anticipated suit. *See* Tex. R. Civ. P. 202.4(a). In addition, the likely benefit of allowing Ms. Maxwell to depose Ms. Conner to investigate a potential claim outweighs the burden or expense of the procedure. *See* Tex. R. Civ. P. 202.4(b).

25.  Ms. Maxwell is considering whether to sue individuals and organizations that performed or facilitated the illegal abortions described in Ms. Conner's declaration. The sworn statement of Ms. Conner makes it clear that the TEA Fund has violated the Texas Heartbeat Act in a manner that could expose its employees, volunteers, and donors to liability under section 171.208 of the Texas Health and Safety Code.

26.  Yet Ms. Maxwell is unwilling to file suit as this time because she is still investigating the range of potential defendants, as well as any possible defenses or substantive arguments that they might raise in the litigation. Ms. Maxwell expects to be able to better evaluate the prospects for legal success after deposing Ms. Conner and discovering the extent of involvement of each individual that aided or abetted post-heartbeat abortions in violation of SB 8.

27.  Ms. Maxwell also wishes to preserve evidence of how the TEA Fund aided or abetted abortions in violation of SB 8, as well as evidence surrounding the involvement of each individual who aided or abetted these illegal abortions. Ms. Maxwell seeks to depose Ms. Conner on topics including the following: the TEA Fund's exact role in supporting, funding, and facilitating abortions provided in violation of the Texas Heartbeat Act; the identity of each individual or entity that the TEA Fund collaborated with in providing these illegal abortions; the number of illegal abortions provided; whether the TEA Fund has in any way distinguished its funding streams for advocacy and its funding streams for conduct that aids or abets illegal abortions performed in Texas; and the sources of financial support for the TEA Fund. Ms. Maxwell

also seeks discovery of documents[1] that reveal the sources of funding for the TEA Fund's operations and address the issues that will be covered in the deposition.

28.   Deposing Kamyon Conner allows Ms. Maxwell to preserve evidence of great importance to the anticipated litigation. Ms. Conner's sworn declaration already attests to her knowledge of violations of the law. What Ms. Maxwell does not know is how many violations occurred and what other parties were involved in providing these illegal abortions. The value of this information to any subsequent litigation, and to the important policies embodied in the Heartbeat Act, is high. It is, indeed, essential to be able to implement the law.

29.   Delay in obtaining this evidence increases the chances that information about the abortions provided will be forgotten and that documentation will become more difficult to obtain. Given the widespread press coverage of the Texas Heartbeat Act, including attention to the risks taken by abortion providers who choose to violate the

---

1.  The scope of a pre-suit deposition under Rule 202 is the same as a regular deposition of non-parties in litigation. *See* Tex. R. Civ. P. 202.5. This specifically allows document-production requests. *See* Tex. R. Civ. P. 199.2(b)(5) (providing for requests for production along with a deposition notice); Tex. R. Civ. P. 205.1(c) (providing for noticing document production requests to nonparties); *In re City of Tatum*, 567 S.W.3d 800, 808 (Tex. App. 2018) ("The "language of these rules when read together permits a petition seeking a pre-suit deposition under Rule 202 to also request the production of documents.'" quoting *In re Anand*, No. 01-12-01106-CV, 2013 WL 1316436, at *3 (Tex. App. Apr. 2, 2013)). *See also City of Dallas v. City of Corsicana*, No. 10-14-00090-CV, 2015 WL 4985935, at *6 (Tex. App. Aug. 20, 2015) ("Under rule 202, documents can be requested in connection with a deposition."). While some courts have refused to permit document discovery under Rule 202, *see, e.g., In re Pickrell*, No. 10-17-00091-CV, 2017 WL 1452851, at *6 (Tex. App. Apr. 19, 2017), they have not analyzed the text of Rule 202.5 or its relationship to Rule 199. *See In re City of Tatum*, 567 S.W.3d 800, 808 n. 7 (Tex. App. 2018) (criticizing courts denying document production under Rule 202).

Act's provisions,[2] there is considerable incentive for violators to hide or obscure any record of their involvement in unlawful activities.

30.  Without the documentation, there would be a risk of miscarriage or delay of justice, as the law of Texas would be difficult or impossible to enforce. The policy of the state will be thwarted if it is not possible to identify the parties complicit in providing illegal abortions.

31.  It would also enhance judicial efficiency to allow the eventual lawsuit to consider the entire chain of events (from funding to actual performance of the abortion) involved in the particular violations of SB 8 that Ms. Conner described in her sworn statement. Waiting for discovery in the course of litigation not only runs increased risks of forgetfulness or record-keeping deficiencies. It also has costs to the administration of justice in that the courts would have to adjudicate the matters either in separate proceedings, or through complaints successively amended to add additional defendants. Allowing deposition under Rule 202 would avoid this delay of justice.

32.  The burden on Ms. Conner is modest. To be sure, she must appear for a deposition and must produce documents. But the inconvenience will only grow greater with any delay, as memories fade and documents accumulate. The value of the information sought outweighs the burden, as required by Rule 202.

33.  Ms. Maxwell seeks to depose Ms. Conner by oral deposition. *See* Tex. R. Civ. P. 199. A notice of deposition identifying the topics for examination is attached to this Petition as Exhibit 2. This procedure will impose a minimal burden on Ms. Conner while permitting Ms. Maxwell to preserve for future litigation information about the illegal abortions that Ms. Conner has acknowledged.

---

2.  *See, e.g.*, Abigail Abrams, *Inside The Small Group of Doctors Who Risked Everything to Provide Abortions in Texas*, Time (Oct. 14, 2021), available at https://bit.ly/3qxa5qx.

34.  Ms. Maxwell further requests that the court order Ms. Conner to produce at or before the deposition any and all non-privileged documents relating to: TEA Fund's role in supporting, funding, and facilitating abortions provided in violation of the Texas Heartbeat Act; the identity of all individuals or entities that the TEA Fund collaborated with in providing these illegal abortions; the number of post-heartbeat abortions provided in Texas since September 1, 2021; and the sources of financial support for the TEA Fund's abortion-assistance activities.

## REQUEST FOR HEARING

35.  After the service of this petition and a notice of hearing, Ms. Maxwell respectfully requests that the court conduct a hearing, in accordance with Rule 202.3(a) of the Texas Rules of Civil Procedure, to determine whether to issue an order allowing the deposition.

## REQUEST FOR RELIEF

36.  For these reasons, Ms. Maxwell respectfully requests that the court set a date for a hearing on this petition, and thereafter issue an order:

    a.  finding that the benefits of a deposition and accompanying production of documents outweighs the burden;

    b.  finding that a deposition and accompanying production of documents will avoid delay or failure of justice;

    c.  authorizing Ms. Maxwell to take an oral deposition of Ms. Conner;

    d.  requiring Ms. Conner to produce the documents identified by this petition, at a time and place to be agreed by the parties; and

    e.  awarding all other relief that the Court may deem just, proper, or equitable.

Respectfully submitted.

Gene P. Hamilton*
Virginia Bar No. 80434
Vice-President and General Counsel
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

 /s/ Jonathan F. Mitchell
Jonathan F. Mitchell
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

D. Bryan Hughes
Texas Bar No. 00793995
Law Office of D. Bryan Hughes
110 North College Avenue, Suite 207
Tyler, Texas 75702-7221
(903) 581-1776 (phone)
bryan@hughesfirm.com

Erick G. Kaardal*
Minnesota Bar No. 0229647
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, Minnesota 55402
(612) 341-1074 (phone)
(612) 341-1076 (fax)
kaardal@mklaw.com

H. Dustin Fillmore III
Texas Bar No. 06996010
Charles W. Fillmore
Texas Bar No. 00785861
The Fillmore Law Firm, LLP
1200 Summit Avenue, Suite 860
Fort Worth, Texas 76102
(817) 332-2351 (phone)
(817) 870-1859 (fax)
dusty@fillmorefirm.com
chad@fillmorefirm.com

Thomas Brejcha*
Illinois Bar No. 0288446
Martin Whittaker
Texas Bar No. 24095097
Thomas More Society
309 West Washington Street, Suite 1250
Chicago, Illinois 60606
(312) 782-1680 (phone)
(312) 782-1887 (fax)
info@thomasmoresociety.org

* *pro hac vice* applications
   forthcoming

Dated: February 2, 2022

*Counsel for Petitioner*

Cause No. _____

In re Ashley Maxwell,

Petitioner

IN THE DISTRICT COURT
DENTON COUNTY, TEXAS
___ JUDICIAL DISTRICT

## VERIFICATION

STATE OF TEXAS

COUNTY OF _____

Before me, the undersigned notary public, on this day personally appeared Ashley Maxwell and after being duly sworn, stated under oath that she has read the above verified petition to take deposition to investigate potential legal claims and its exhibits; that every statement of fact contained in it is within her personal knowledge and is true and correct; and that every exhibit is an authentic copy of what it purports to be.

KELLY WILKINSON
Notary ID #126738976
My Commission Expires
January 13, 2025

_____
ASHLEY MAXWELL

Subscribed and sworn to me
this __2__ day of _February_, 2020 2022

_____
NOTARY

# Exhibit 1
**(Declaration of Kamyon Conner)**

## DECLARATION OF KAYMON CONNER

STATE OF TEXAS            §

DALLAS COUNTY            §

1.      My name is Kaymon Conner.  I am a resident of Denton County, Texas, over 21 years of age, competent, and capable of testifying to the facts stated in this Declaration.

2.      I declare that the statements within this Declaration are within my personal knowledge, and are true and correct.

3.      I am the Executive Director of North Texas Equal Access Fund ("TEA Fund").  As Executive Director, I am responsible for executing TEA Fund's mission, protecting the organization's financial health, and supervising staff and volunteers.

4.      TEA Fund's mission is to foster reproductive justice.  It provides financial, emotional, and logistical support for low-income abortion patients in north Texas.  Almost all of its clients are at a point in pregnancy when cardiac activity can be detected.

5.      SB8 specifically states  that providing funds to assist a pregnant person in obtaining an abortion violates SB8 *even if* the funder had no knowledge that the abortion at issue would ultimately violate SB8.  Consequently, SB8, when it became effective, immediately rendered all of our services—even for people who have been pregnant fewer than  six weeks—potentially subject to expensive litigation and punitive fines.

6.      According to the terms of SB8, TEA Fund aids and abets abortions in the State of Texas by providing funding at all.  It is my understanding that TEA Fund would also likely be liable for assisting pregnant people in locating legal abortion services by providing information, and by engaging in protected speech by advocating for safe, legal abortion services.

7.      Since September 1, 2021, TEA Fund has engaged in conduct with the intent to assist pregnant Texans obtain abortions after the detection of cardiac activity.  Specifically, following the entry of an injunction by the Honorable Robert Pitman on October 6, 2021, and while that injunction was still in place, TEA Fund paid for at least one abortion after confirming the gestational age of the fetus was beyond the time when cardiac activity is usually detected.  In doing so, it was TEA Fund's intention to pay for the abortion even if cardiac activity was detected.

8.      TEA Fund partners with several abortion provider clinics in Texas, including the clinics that have publicly confirmed that post-cardiac activity abortions were performed following the injunction issued by Judge Pitman.

9.      I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct and that this Declaration was executed on this 3rd  day of November, 2021.


_____

Kamyon Conner

# Exhibit 2
## (Notice of Deposition)

Cause No. _____

| | |
|---|---|
| **In re Ashley Maxwell**, | IN THE DISTRICT COURT |
| | DENTON COUNTY, TEXAS |
| Petitioner | ____ JUDICIAL DISTRICT |

## NOTICE OF DEPOSITION OF KAMYON CONNER
## AND SUBPOENA DUCES TECUM

To:  Kamyon Conner, █████████████████████

Please take notice that the attorneys for petitioner Ashley Maxwell will take the oral deposition of Kamyon Conner at 9:00 A.M. on March 4, 2022, in connection with this matter and on the topics designated in Exhibit A, which is attached to this notice. The deposition will be taken before a certified court reporter at the law offices of Mitchell Law PLLC, 111 Congress Avenue, Suite 400, Austin, Texas, 78701. The deposition will continue day-to-day, before a court reporter, until completed. The deposition may be videotaped.

Please take further notice that at the time and place of the deposition the deponent shall produce, at the commencement of the deposition, certain documents and tangible things described in the subpoena, which is attached as Exhibit 3 to the petition and incorporated by reference.

Respectfully submitted.

_/s/ Jonathan F. Mitchell_

| | |
|---|---|
| GENE P. HAMILTON* | JONATHAN F. MITCHELL |
| Virginia Bar No. 80434 | Texas Bar No. 24075463 |
| Vice-President and General Counsel | Mitchell Law PLLC |
| America First Legal Foundation | 111 Congress Avenue, Suite 400 |
| 300 Independence Avenue SE | Austin, Texas 78701 |
| Washington, DC 20003 | (512) 686-3940 (phone) |
| (202) 964-3721 | (512) 686-3941 (fax) |
| gene.hamilton@aflegal.org | jonathan@mitchell.law |

D. Bryan Hughes
Texas Bar No. 00793995
Law Office of D. Bryan Hughes
110 North College Avenue, Suite 207
Tyler, Texas 75702-7221
(903) 581-1776 (phone)
bryan@hughesfirm.com

H. Dustin Fillmore III
Texas Bar No. 06996010
Charles W. Fillmore
Texas Bar No. 00785861
The Fillmore Law Firm, LLP
1200 Summit Avenue, Suite 860
Fort Worth, Texas 76102
(817) 332-2351 (phone)
(817) 870-1859 (fax)
dusty@fillmorefirm.com
chad@fillmorefirm.com

Erick G. Kaardal*
Minnesota Bar No. 0229647
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, Minnesota 55402
(612) 341-1074 (phone)
(612) 341-1076 (fax)
kaardal@mklaw.com

Thomas Brejcha*
Illinois Bar No. 0288446
Martin Whittaker
Texas Bar No. 24095097
Thomas More Society
309 West Washington Street, Suite 1250
Chicago, Illinois 60606
(312) 782-1680 (phone)
(312) 782-1887 (fax)
info@thomasmoresociety.org

* *pro hac vice* applications
  forthcoming

Dated: February 2, 2022

*Counsel for Petitioner*

## EXHIBIT A

I.   **DEFINITIONS**

For the purposes of this deposition notice, the following definitions apply:

- The terms "**TEA Fund**," "**you**" and "**your**" refer to the North Texas Equal Access Fund, including any agent or person authorized to act for or on its behalf, including its officers, employees, staff, and unpaid volunteers.

- The terms "**communication**" and "**communicate**" refer to any method used to transmit or exchange information, concepts, or ideas (whether verbal or nonverbal) including oral, written, typed, or electronic transmittal of any type of information or data, by the use of words, silence, numbers, symbols, images, or depictions, from one person or entity to another person or entity.

- The term "**document**" refers to the act of noting, recording, or preserving any type of information, data, or communication, without regard to the method used to note, record, or preserve such information, data, or communication. The term includes any e-mail or text message.

- The term "**entity**" means any legal entity inquired about (other than a natural person) including a partnership, professional association, joint venture, corporation, governmental agency, or other form of legal entity.

- The terms "**identify**" and "**identity**," when used in connection with a natural person, require disclosure of that person's full name, present or last known address, and present or last known telephone number. When used in connection with a legal entity, the terms require disclosure of its legal name, its address, and telephone number.

- The terms "**implement**" and "**implementation**" refer to any method, process, or action used to put a decision or plan into effect or achieve a goal or obligation.

- The term "**information**" refers to and includes documents, records, communications, facts, ideas, data, observations, opinions, photographs, slides, video recordings, audio recordings, and tangible and intangible items and evidence of any kind or sort.

- The terms "**person**" and "**persons**" mean any legal entity inquired about, whether a natural person, partnership, sole proprietorship, professional association, joint venture, corporation, governmental agency, or other form of legal entity.

- The term "**record**" means letters, words, sounds, or numbers, or the equivalent of letters, words, sounds, or numbers, that have been written, recorded, documented, or received by Defendant by:

  (A)   handwriting;
  (B)   typewriting;
  (C)   printing;
  (D)   photostat;
  (E)   photograph;
  (F)   magnetic impulse;
  (G)   mechanical or electronic recording;
  (H)   digitized optical image; or
  (I)   another form of data compilation.

- The term "**record**" also includes any communication, including an e-mail or text-message communication.

- The term "**reproduction**" means an accurate and complete counterpart of an original document or record produced by:

  (A)   production from the same impression or the same matrix as the original;
  (B)   photograph, including an enlargement or miniature;
  (C)   mechanical or electronic re-recording;
  (D)   chemical reproduction;
  (E)   digitized optical image; or
  (F)   another technique that accurately reproduces the original.

- The term "**third party**" means any person, persons, or entity other than the defendants or the attorneys of record for the defendants.

- The terms "**and**" and "**or**," when used in these definitions and in the discovery requests, include the conjunction "and/or."

## II.   Deposition Topics

1.   TEA Fund's involvement with or support for any abortions performed after September 1, 2021, in which a fetal heartbeat was detectable (or likely to be detectable if properly tested).

2.   TEA Fund's role in supporting, funding, or facilitating abortions provided in violation of the Texas Heartbeat Act.

3.   TEA Fund's role in supporting, funding, or facilitating abortions provided in violation of any other law enacted by the Texas legislature.

4.   The identity of any individuals or entities that the TEA Fund consulted or collaborated with in supporting, funding, or facilitating abortions provided in violation of the Texas Heartbeat Act or any other law enacted by the Texas legislature.

5.   The manner in which the TEA Fund has distinguished its funding streams for advocacy and its funding streams for conduct that aids or abets abortion.

6:   The sources of financial support for the TEA Fund's conduct that aids or abets abortion.

7.   The identity of the officers, employees, volunteers, board members, and donors of the TEA Fund.

# Exhibit 3

**(Subpoena for Deposition and Production of Documents)**

Cause No. _____

| | |
|---|---|
| **In re Ashley Maxwell**, <br><br> Petitioner | IN THE DISTRICT COURT <br> DENTON COUNTY, TEXAS <br> ____ JUDICIAL DISTRICT |

## SUBPOENA FOR DEPOSITION AND PRODUCTION OF DOCUMENTS

This subpoena is issued in the name of the State of Texas:

To any sheriff or constable of the State of Texas, or any other person authorized to serve and execute subpoenas as provided by Texas Rule of Civil Procedure 176, Greetings:

You are hereby commanded to summon:



to appear at the offices of:

Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701

on March 4, 2022, at 9:00 A.M., to attend and give testimony at a deposition in this case, to produce and permit inspection and copying of documents or tangible things to be used as evidence in this case, and to remain in attendance from day to day until lawfully discharged. All documents or tangible items listed in Exhibit A must be produced.

Pursuant to Rule 176.8(a) of the Texas Rules of Civil Procedure:

**Failure by any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena is issued or a district court in the county in which the subpoena is served, and may be punished by fine or confinement, or both.**

This subpoena is issued by Jonathan F. Mitchell, counsel of record for the petitioner in the above-styled and numbered cause.

# RETURN OF SERVICE

Came to hand this _____ day of _____, 2022, and executed this the _____ day of _____, 2022, a true and correct copy hereof in the following manner: By delivering to the within named witness _____, via

_____ USPS Priority Mail
_____ USPS Certified Mail/Return Receipt Requested
_____ Personal Service/ Hand-Served
_____ Fax/Electronic Mail

Returned this _____ day of _____, 2022.

By: _____
        Authorized Person who is not a party to the suit and is not less than 18 years of age.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## ACCEPTANCE OF SERVICE OF SUBPOENA BY WITNESS PER RULE 176 OF THE TEXAS RULES OF CIVIL PROCEDURE

I, the undersigned witness named in the Subpoena acknowledge receipt of a copy thereof, and hereby accept service of the attached subpoena.

Rule 176.8(a) Contempt. Failure by any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena is issued or a district court in the county in which the subpoena is served, and may be punished by fine or confinement, or both.

_____        _____
SIGNATURE OF WITNESS                              DATE

**EXHIBIT A**

**Documents to Be Produced by Kamyon Conner**

I.   **DEFINITIONS AND INSTRUCTIONS FOR REQUESTS FOR PRODUCTION**

1. Each request shall operate and be responded to independently and, unless otherwise indicated, no request limits the scope of any other request.

2. Unless otherwise indicated, the relevant time period for these requests is from January 1, 2019, to the present.

3. Unless otherwise defined, the terms used should be read and construed in accordance with the English language and the ordinary meanings and definitions attached. You should, therefore: (i) construe the words "and" as well as "or" in the disjunctive or conjunctive, as necessary to make the request more inclusive; (ii) construe the term "including" to mean "including, but not limited to"; and (iii) construe the words "all" and "each" to mean all and each.

The following definitions apply to each of these requests:

- The terms "**TEA Fund**," "**you**" and "**your**" refer to the North Texas Equal Access Fund, including any agent or person authorized to act for or on its behalf, including its officers, employees, staff, and unpaid volunteers.

- The terms "**communication**" and "**communicate**" refer to any method used to transmit or exchange information, concepts, or ideas (whether verbal or nonverbal) including oral, written, typed, or electronic transmittal of any type of information or data, by the use of words, silence, numbers, symbols, images, or depictions, from one person or entity to another person or entity.

- The term "**document**" refers to the act of noting, recording, or preserving any type of information, data, or communication, without regard to the method used to note, record, or preserve such information, data, or communication. The term includes any e-mail or text message.

- The term "**entity**" means any legal entity inquired about (other than a natural person) including a partnership, professional association, joint

venture, corporation, governmental agency, or other form of legal entity.

- The terms "**identify**" and "**identity**," when used in connection with a natural person, require disclosure of that person's full name, present or last known address, and present or last known telephone number. When used in connection with a legal entity, the terms require disclosure of its legal name, its address, and telephone number.

- The terms "**implement**" and "**implementation**" refer to any method, process, or action used to put a decision or plan into effect or achieve a goal or obligation.

- The term "**information**" refers to and includes documents, records, communications, facts, ideas, data, observations, opinions, photographs, slides, video recordings, audio recordings, and tangible and intangible items and evidence of any kind or sort.

- The terms "**person**" and "**persons**" mean any legal entity inquired about, whether a natural person, partnership, sole proprietorship, professional association, joint venture, corporation, governmental agency, or other form of legal entity.

- The term "**record**" means letters, words, sounds, or numbers, or the equivalent of letters, words, sounds, or numbers, that have been written, recorded, documented, or received by Defendant by:

  - (A)    handwriting;
  - (B)    typewriting;
  - (C)    printing;
  - (D)    photostat;
  - (E)    photograph;
  - (F)    magnetic impulse;
  - (G)    mechanical or electronic recording;
  - (H)    digitized optical image; or
  - (I)    another form of data compilation.

- The term "**record**" also includes any communication, including an e-mail or text-message communication.

- The term "**reproduction**" means an accurate and complete counterpart of an original document or record produced by:

(A)    production from the same impression or the same matrix as the
        original;
(B)    photograph, including an enlargement or miniature;
(C)    mechanical or electronic re-recording;
(D)    chemical reproduction;
(E)    digitized optical image; or
(F)    another technique that accurately reproduces the original.

- The term "**third party**" means any person, persons, or entity other than the defendants or the attorneys of record for the defendants.

- The terms "**and**" and "**or**," when used in these definitions and in the discovery requests, include the conjunction "and/or."


## II.   DOCUMENTS OR TANGIBLE THINGS REQUESTED

**Request No. 1**: Any and all non-privileged documents describing abortions provided with the TEA Fund's support after September 1, 2021, in which a fetal heartbeat was detectable (or likely to be detectable if properly tested).

**Request No. 2**: Any and all non-privileged documents addressing the TEA Fund's role in supporting, funding, or facilitating abortions provided in violation of the Texas Heartbeat Act.

**Request No. 3**: Any and all non-privileged documents identifying any individual or entities that the TEA Fund consulted or collaborated with in supporting, funding, or facilitating abortions provided in violation of the Texas Heartbeat Act.

**Request No. 4**: Any and all non-privileged documents describing whether the TEA Fund has in any way distinguished its funding streams for advocacy and its funding streams for conduct that aids or abets abortion.

**Request No. 5**: Any and all non-privileged documents describing or identifying the sources of financial support for the TEA Fund's conduct that aids or abets abortion.

**Request No. 6**: Any and all non-privileged documents describing or identifying any officer, employee, volunteer, board member, or donor of the TEA Fund.

## EXHIBIT B—TRCP 176.6

You are advised that under Texas Rule of Civil Procedure 176.6, a person served with a subpoena has certain rights and obligations, specifically, that rule states:

(a) Compliance required. Except as provided in this subdivision, a person served with a subpoena must comply with the command stated in the subpoena unless discharged by the court or by the party summoning such witness. A person commanded to appear and give testimony must remain at the place of deposition, hearing, or trial from day to day until discharged by the court or by the party summoning the witness.

(b) Organizations. If a subpoena commanding testimony is directed to a corporation, partnership, association, governmental agency, or other organization, and the matters on which examination is requested are described with reasonable particularity, the organization must designate one or more persons to testify on its behalf as to matters known or reasonably available to the organization.

(c) Production of documents or tangible things. A person commanded to produce documents or tangible things need not appear in person at the time and place of production unless the person is also commanded to attend and give testimony, either in the same subpoena or a separate one. A person must produce documents as they are kept in the usual course of business or must organize and label them to correspond with the categories in the demand. A person may withhold material or information claimed to be privileged but must comply with Rule 193.3. A nonparty's production of a document authenticates the document for use against the nonparty to the same extent as a party's production of a document is authenticated for use against the party under Rule 193.7.

(d) Objections. A person commanded to produce and permit inspection and copying of designated documents and things may serve on the party requesting issuance of the subpoena—before the time specified for compliance—written objections to producing any or all of the designated materials. A person need not comply with the part of a subpoena to which objection is made as provided in this paragraph unless ordered to do so by the court. The party requesting the subpoena may move for such an order at any time after an objection is made.

(e) Protective orders. A person commanded to appear at a deposition, hearing, or trial, or to produce and permit inspection and copying of designated documents and things may move for a protective order under Rule 192.6(b)—before the time specified for compliance—either in the court in which the action is pending or in a district court in the county where the subpoena was served. The person must serve the motion on all parties in accordance with Rule 21a. A person need not comply with the part of a subpoena from which protection is sought under this paragraph unless ordered to do so by the court. The party requesting the subpoena may seek such an order at any time after the motion for protection is filed.

# Exhibit 4
## (Declaration of Jonathan F. Mitchell)

Cause No. _____

| | |
|---|---|
| **In re Ashley Maxwell**, <br><br>                Petitioner | IN THE DISTRICT COURT <br> DENTON COUNTY, TEXAS <br> ____ JUDICIAL DISTRICT |

## DECLARATION OF JONATHAN F. MITCHELL

I, Jonathan F. Mitchell, being duly sworn, states as follows:

1.  My name is Jonathan F. Mitchell. I am over 18 years old and fully competent to make this declaration.

2.  I have personal knowledge of the facts stated in this declaration, and all of these facts are true and correct.

3.  I represent petitioner Ashley Maxwell in this litigation.

4.  I also represent Texas Right to Life and John Seago in the lawsuit that the North Texas Equal Access Fund has filed against them. That lawsuit was originally filed as *North Texas Equal Access Fund v. State of Texas, et al.*, No. D-1-GN-21-004503 (Travis County), and it is currently on appeal to the Third Court of Appeals in Austin. *See Texas Right to Life, et al. v. Van Stean, et al.*, No. 03-21-00650-CV.

5.  The document attached as Exhibit 1 to this petition is an authentic copy of a sworn declaration that Kamyon Conner submitted in that litigation.

This concludes my sworn statement. I swear under penalty of perjury that the facts stated in this declaration are true and correct.

_Jonathan F. Mitchell_
JONATHAN F. MITCHELL

Dated: January 28, 2022

# EXHIBIT A-4
Shannon D. Thomason
Hold Letter to Thompson
Coburn dated 07.07.22

# MITCHELL LAW

Jonathan F. Mitchell
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 tel
(512) 686-3941 fax
jonathan@mitchell.law

July 7, 2022

Elizabeth Myers
Thompson Coburn LLP
2100 Ross Avenue, Suite 3200
Dallas, Texas 75201
emyers@thompsoncoburn.com

Re:     Notice of Obligation to Preserve Documents

Dear Ms. Myers:

I represent Shannon D. Thomason, who earlier today filed a Rule 202 petition seeking to depose Amy Hagstrom Miller, Marva Sadler, Alan Braid, and Andrea Gallegos over illegal abortions that they performed or assisted in violation of the Texas Heartbeat Act and the Texas murder statute. Mr. Thomason is also seeking attorney–client communications concerning these illegal abortions under the crime–fraud exception to the attorney–client privilege, as well as the identity of every person who aided or abetted these illegal abortions.

In light of this pending litigation, as well as any anticipated litigation that might ensue, you and your colleagues at Thompson Coburn, along with your clients and each of their employees, officers, board members, and donors, must preserve and retain all documents, data, and electronically stored information relating in any way to: (1) Any abortions performed or induced in Texas on or after September 1, 2021, in which a fetal heartbeat was detectable (or likely to be detectable if tested), including any such abortions that occurred while Judge Pitman's injunction was in effect from October 6–8, 2021; (2) Any abortions performed or induced in Texas on or after June 24, 2022, including abortions performed while Judge Weems's TRO was in effect from June 28–July 1, 2022; (3) Any abortion that occurred on or after September 1, 2021, if there is any possibility that the patient might have opted for a drug-induced abortion and ingested either of the abortion drugs in Texas, even if the drugs were dispensed by a provider outside the state of Texas; and (4) The identity of any person or entity who has aided or abetted the abortions described in (1) – (3), including your clients' donors and financial supporters, and anyone who paid for or in any way reimbursed the costs of those abortions.

You and your clients and co-counsel must preserve these items regardless of the medium, format, or device on which they are stored or hosted, and regardless of whether they appear in documents, drafts, notes, calendar entries, emails, text messages, voicemails, social-media posts, or any other form. Failure to preserve these documents could subject you and your

clients to significant penalties. This letter is not a full recitation of Mr. Thomason's rights, which he expressly reserves.

This obligation extends to each of the clients that you are representing in the ongoing state-court litigation over the Texas Heartbeat Act, including The Afiya Center, the Clinic Access Support Network, Monica Faulkner, The Frontera Fund, Fund Texas Choice, the Lilith Fund for Reproductive Equity, Ghazaleh Moayedi, the North Texas Equal Access Fund, the Bridge Collective, the West Fund, Michelle Tuegal, and Allison Van Stean. If you are no longer representing these clients, please let me know and I will serve this letter on them directly.

Sincerely,

Jonathan F. Mitchell

Jonathan F. Mitchell
Mitchell Law PLLC

EXHIBIT A-5
Shannon D. Thomason
Hold Letter to ADJT
dated 07.07.22

# MITCHELL LAW

Jonathan F. Mitchell
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 TEL
(512) 686-3941 FAX
jonathan@mitchell.law

July 7, 2022

Alex Wilson Albright
Alexander Dubose Jefferson
515 Congress Avenue, Suite 2350
Austin, Texas 78701-3562
aalbright@adjtlaw.com

**Re:      Notice of Obligation to Preserve Documents**

Dear Ms. Albright:

I represent Shannon D. Thomason, who earlier today filed a Rule 202 petition seeking to depose Amy Hagstrom Miller, Marva Sadler, Alan Braid, and Andrea Gallegos over illegal abortions that they performed or assisted in violation of the Texas Heartbeat Act and the Texas murder statute. Mr. Thomason is also seeking attorney–client communications concerning these illegal abortions under the crime–fraud exception to the attorney–client privilege, as well as the identity of every person who aided or abetted these illegal abortions.

In light of this pending litigation, as well as any anticipated litigation that might ensue, you and your co-counsel, along with your clients and each of their employees, officers, board members, and donors, must preserve and retain all documents, data, and electronically stored information relating in any way to: (1) Any abortions performed or induced in Texas on or after September 1, 2021, in which a fetal heartbeat was detectable (or likely to be detectable if tested), including any such abortions that occurred while Judge Pitman's injunction was in effect from October 6–8, 2021; (2) Any abortions performed or induced in Texas on or after June 24, 2022, including abortions performed while Judge Weems's TRO was in effect from June 28–July 1, 2022; (3) Any abortion that occurred on or after September 1, 2021, if there is any possibility that the patient might have opted for a drug-induced abortion and ingested either of the abortion drugs in Texas, even if the drugs were dispensed by a provider outside the state of Texas; and (4) The identity of any person or entity who has aided or abetted the abortions described in (1) – (3), including your clients' donors and financial supporters, and anyone who paid for or in any way reimbursed the costs of those abortions.

You and your clients and co-counsel must preserve these items regardless of the medium, format, or device on which they are stored or hosted, and regardless of whether they appear in documents, drafts, notes, calendar entries, emails, text messages, voicemails, social-media posts, or any other form. Failure to preserve these documents could subject you and your

clients to significant penalties. This letter is not a full recitation of Mr. Thomason's rights, which he expressly reserves.

This obligation extends to each of the clients that you are representing in the ongoing state-court litigation over the Texas Heartbeat Act, including The Afiya Center, the Clinic Access Support Network, Monica Faulkner, The Frontera Fund, Fund Texas Choice, the Lilith Fund for Reproductive Equity, Ghazaleh Moayedi, the North Texas Equal Access Fund, the Bridge Collective, the West Fund, Michelle Tuegal, and Allison Van Stean. If you are no longer representing these clients, please let me know and I will serve this letter on them directly.

Sincerely,

Jonathan F. Mitchell
Mitchell Law PLLC

# EXHIBIT A-6
# Shannon D. Thomason
# Hold Letter to Buckle
# Bunnies dated 07.07.22

Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 TEL
(512) 686-3941 FAX
jonathan@mitchell.law

July 7, 2022

Morgan Gimblet
Founder & Member
Buckle Bunnies Fund
gimblemv@mail.uc.edu

**Re:     Notice of Obligation to Preserve Documents**

Dear Ms. Gimblet:

I represent Shannon D. Thomason, who earlier today filed a Rule 202 petition seeking to
depose Amy Hagstrom Miller, Marva Sadler, Alan Braid, and Andrea Gallegos over illegal
abortions that they performed or assisted in violation of the Texas Heartbeat Act and the
Texas murder statute. Mr. Thomason is also seeking attorney–client communications
concerning these illegal abortions under the crime–fraud exception to the attorney–client
privilege, as well as the identity of every person who aided or abetted these illegal abortions.
He is also seeking to discover evidence of any other illegal abortions that might have
occurred in Texas since the Heartbeat Act took effect on September 1, 2021.

In light of this pending litigation, as well as any anticipated litigation that might ensue, you
and your colleagues at the Buckle Bunnies Fund, including each of your employees, officers,
board members, and donors, must preserve and retain all documents, data, and
electronically stored information relating in any way to: (1) Any abortions performed or
induced in Texas on or after September 1, 2021, in which a fetal heartbeat was detectable
(or likely to be detectable if tested), including any such abortions that occurred while Judge
Pitman's injunction was in effect from October 6-8, 2021; (2) Any abortions performed or
induced in Texas on or after June 24, 2022, including abortions performed while Judge
Weems's TRO was in effect from June 28, 2022, through July 1, 2022; (3) Any abortion
that occurred on or after September 1, 2021, if there is any possibility that the patient
might have opted for a drug-induced abortion and ingested either of the abortion drugs in
Texas, even if the drugs were dispensed by a provider outside the state of Texas; (4) The
identity of any person or entity who has aided or abetted the abortions described in (1) –
(3); and (5) The identity of all past and present employees, officers, board members, and
donors of the Buckle Bunnies Fund.

You and each of the Buckle Bunnies Fund's employees, officers, board members, and
donors must preserve these items regardless of the medium, format, or device on which
they are stored or hosted, and regardless of whether they appear in documents, drafts,

NOTICE OF OBLIGATION TO PRESERVE DOCUMENTS                    Page 1 of 2

notes, calendar entries, emails, text messages, voicemails, social-media posts, or any other
form. Failure to preserve these documents could subject you and your colleagues to
significant penalties. This letter is not a full recitation of Mr. Thomason's rights, which he
expressly reserves.

Conduct yourselves accordingly.

Sincerely,

Jonathan F. Mitchell

JONATHAN F. MITCHELL
Mitchell Law PLLC

EXHIBIT A-7
Declaration of Mistie Sharp
5.31.22

DocuSign Envelope ID: 423116E4-1C99-4305-9173-F2122B631204

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

|  |  |
|---|---|
| **Wendy Davis**, et al., | |
| Plaintiffs, | |
| v. | Case No. 1:22-cv-00373-RP |
| **Mistie Sharp**, et al., | |
| Defendants. | |

## DECLARATION OF MISTIE SHARP

I, Mistie Sharp, being duly sworn, states as follows:

1. My name is Mistie Sharp. I am over 21 years old and fully competent to make this declaration.

2. I have personal knowledge of each of the facts stated in this declaration, and everything stated in this declaration is true and correct.

3. I am a named defendant in this lawsuit.

4. The plaintiffs have sued me because they claim that I have "sworn under penalty of perjury" that I "intend[] to sue abortion funds that pay for abortions in violation of S.B. 8." Complaint, ECF No. 1, at ¶ 7.

5. I have no intention, and I have never had any intention, of suing Wendy Davis, Marva Sadler, Sean Mehl, or the Stigma Relief Fund under the private civil-enforcement lawsuits described in Senate Bill 8. This is so for numerous reasons.

6. First, none of the four plaintiffs claim to have violated Senate Bill 8. I have reviewed the plaintiffs' complaint (ECF No. 1) and the motion for summary judgment (ECF No. 24) that they have filed in this case. Neither document makes any claim that the plaintiffs have violated Senate Bill 8 or behaved in a manner that exposes themselves to private civil-enforcement lawsuits under SB 8. I will not sue anyone that

has not violated SB 8, and I have never intended to sue anyone that has not acted in violation of SB 8.

7.   Second, I have no interest in suing individual donors to Texas abortion funds such as Wendy Davis, Marva Sadler, or Sean Mehl, nor do I have any interest in suing individual board members of Texas abortion funds such as Marva Sadler or Sean Mehl. I am interested in suing only the abortion *funds*—the actual entities rather than the individuals—that pay for abortions in violation of Senate Bill 8. The sworn declaration that I submitted in *United States v. Texas*, No. 1:21-cv-00796-RP (W.D. Tex.), ECF No. 28-1 makes this clear. Paragraph 9 of that declaration states: "I intend to sue *only abortion funds* who pay for other people's abortions in violation of Senate Bill 8." (emphasis added). An authentic copy of that declaration is attached as Exhibit A to this declaration.

8.   Third, every Texas abortion provider is, to the best of my knowledge, complying with Senate Bill 8 and refusing to perform abortions after a fetal heartbeat is detectable. So it is impossible for the Stigma Relief Fund (or any of the other plaintiffs) to violate SB 8 by paying for illegal post-heartbeat abortions in Texas even if they wanted to. And the plaintiffs have produced no allegations or evidence showing that it is possible for them to violate SB 8 and expose themselves to private civil-enforcement lawsuits given the categorical unwillingness of Texas abortion providers to violate the statute.

9.   I have never threatened to sue any of the plaintiffs under the private civil-enforcement lawsuits described in Senate Bill 8, either publicly or privately, and I have never told anyone that I intend to sue any of the plaintiffs under the private civil-enforcement lawsuits described in Senate Bill 8. Nor have I ever formed an intention to sue any of the plaintiffs under the private civil-enforcement lawsuits described in Senate Bill 8.

10.   I had never heard of Marva Sadler, Sean Mehl, or the Stigma Relief Fund before they sued me. And although I had heard of Wendy Davis, I have never threatened or intended to sue her under SB 8, and I still have no intention of suing her under SB 8 even after learning that she has donated money to the Lilith Fund and aided or abetted abortions performed in Texas, and I will not sue Ms. Davis even if she has in fact violated SB 8.

11.   I also have no intention of suing Wendy Davis, Marva Sadler, Sean Mehl, or the Stigma Relief Fund in the future even if they engage in conduct that violates Senate Bill 8, and I will not sue them under SB 8's private civil-enforcement mechanism under any circumstance.

12.   I have no ability to "enforce" article 4512.2 of the Revised Civil Statutes against the plaintiffs (or anyone else) because article 4512.2 is a criminal statute that can be enforced only by district attorneys and prosecutors. *See Ex parte Stephens*, --- S.W.3d ----, 2021 WL 5917198 (Tex. Crim. App.). As a private citizen, I have no connection with the enforcement of article 4512.2 whatsoever.

13.   The plaintiffs also seek to enjoin me from filing a lawsuit to recover attorneys' fees under section 30.022 of the Texas Civil Practice and Remedies Code. I currently have no intention of suing the plaintiffs under section 30.022 because I expect to recover fees from the plaintiffs under 42 U.S.C. § 1988(b) at the conclusion of this litigation. Section 1988(b) allows prevailing defendants to recover fees if the claims brought against them are "unreasonable" and "without foundation." *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 418 (1978). The law of the Fifth Circuit is clear that a private citizen does not act "under color of state law" merely by filing a lawsuit authorized by a state statute. *See McCartney v. First City Bank*, 970 F.2d 45, 47 (5th Cir. 1992); *Howard Gault Co. v. Texas Rural Legal Aid, Inc.*, 848 F.2d 544, 555 (5th Cir. 1988); *Hollis v. Itawamba County Loans*, 657 F.2d 746, 749 (5th Cir. 1981). So I will seek and expect to recover attorneys' fees from the plaintiffs under 42 U.S.C.

§ 1988(b) at the conclusion of this litigation, which will obviate the need for me to seek recovery of fees under section 30.022 of the Texas Civil Practice and Remedies Code.

14.   If I am unsuccessful in recovering fees under 42 U.S.C. § 1988(b) at the conclusion of this litigation, then I will consider at that time whether to sue the plaintiffs under section 30.022 of the Texas Civil Practice and Remedies Code, in consultation with my attorneys.

15.   I am not a party to any other lawsuit involving the plaintiffs that seeks to prevent the enforcement of any Texas abortion law, and I have not been a party to any such lawsuit in the past. If I become a party to any such lawsuit during the pendency of this litigation, I will notify the Court.

16.   I reside in Henderson County, in the Eastern District of Texas.

17.   The sworn declaration that I submitted in *United States v. Texas*, No. 1:21-cv-00796-RP (W.D. Tex.), was executed in Henderson County, and not in the Western District of Texas.

18.   I have not conspired or consulted with any judge or any government official with regard to any possible lawsuit that I might bring under Senate Bill 8, and I have no intention of doing so. If I ever decide to bring a civil-enforcement lawsuit under Senate Bill 8, it will be entirely of my own accord, and it will be brought in consultation with no one except my attorneys, who are private citizens and not government officials. Under no circumstance will I coordinate my efforts with any judge or any government official, and I will not allow my attorneys to do so.

This concludes my sworn statement. I swear under penalty of perjury that the facts stated in this declaration are true and correct.

Dated: 5/31/2022

_DocuSign by:_
*Mistie Sharp*
MISTIE SHARP

DocuSign Envelope ID: 423116E4-1C09-4305-9172-E2122B611204

# Exhibit A

**(to Sharp Declaration)**

DocuSign Envelope ID: 423146E4-1C99-4305-9172-E3122B631204
DocuSign Envelope ID: 24B2E055-4F99-4248-8E6F-A957DF75BDA8

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

|  |  |
|---|---|
| **United States of America,** | |
| Plaintiff, | |
| v. | Case No. 1:21-cv-00796-RP |
| **The State of Texas,** | |
| Defendant. | |

## DECLARATION OF MISTIE SHARP

I, Mistie Sharp, declare as follows:

1. My name is Mistie Sharp. I am over 21 years old and fully competent to make this declaration.

2. I have personal knowledge of each of the facts stated in this declaration, and everything stated in this declaration is true and correct.

3. I am a resident of Henderson County.

4. I am aware that the Texas Heartbeat Act, also known as Senate Bill 8, allows me to sue any individual or entity that violates the Act after it takes effect on September 1, 2021. *See* Tex. Health & Safety Code § 171.208.

5. I am also aware that the Texas Heartbeat Act exposes so-called abortion funds to private civil-enforcement suits if they pay for or reimburse the costs of a post-heartbeat abortion. *See* Tex. Health & Safety Code § 171.208(a)(2).

6. I have an interest in preserving my state-law right to sue abortion funds that violate the Texas Heartbeat Act, a right that the United States is attempting to take away by asking this Court to enjoin every person in the world from suing to enforce

DocuSign Envelope ID: 423146E4-1C99-4305-9172-F58122B631204
DocuSign Envelope ID: 24B2E055-4F99-4248-8E6F-A957DF75BDA8

Senate Bill 8 in any situation—even when they sue over conduct that is clearly unprotected by the Constitution—and by asking this Court to enjoin the Texas judiciary from "maintaining *any* civil proceeding pursuant to S.B. 8." Proposed Order, ECF No. 6-2 at 2 (emphasis added).

7. I have no intention of suing any abortion provider who violates Senate Bill 8, or any employee or volunteer of any such abortion provider.

8. Instead, I intend to sue only individuals and entities whose conduct is clearly unprotected by the Constitution, and who cannot plausibly assert an "undue burden" defense under section 171.209 of the Texas Health and Safety Code under the existing precedents of the Supreme Court.

9. Specifically, I intend to sue only abortion funds who pay for other people's abortions in violation of Senate Bill 8.

10. I have decided to target these entities because there is no constitutional right to pay for another person's abortion, and there is no constitutional right to receive financial assistance from others when seeking an abortion. *See Harris v. McRae*, 448 U.S. 297, 325 (1980).

11. In addition, the abortion funds that I intend to sue lack third-party standing to assert the constitutional rights of abortion patients under the tests for third-party standing established by the Supreme Court. *See, e.g., Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). Although the Supreme Court has allowed abortion *providers* to assert the third-party rights of abortion patients in constitutional litigation,[1] it has never allowed abortion funds to assert the constitutional rights of abortion patients.

12. I respectfully seek intervention to defend and preserve my state-law right to sue abortion funds that pay for post-heartbeat abortions in violation of Senate Bill 8.

---

1. *See, e.g., Singleton v. Wulff*, 428 U.S. 106, 113–18 (1976) (plurality opinion); *June Medical Services LLC v. Russo*, 140 S. Ct. 2103, 2118–20 (2020) (plurality opinion); *id.* at 2139 (Roberts, C.J., concurring).

This concludes my sworn statement. I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 21, 2021

MISTIE SHARP

# EXHIBIT A-8
# Declaration of Sadie Weldon
# in *Davis v. Sharp*
# 5.31.22

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| **Wendy Davis**, et al., | |
| Plaintiffs, | |
| v. | Case No. 1:22-cv-00373-RP |
| **Mistie Sharp**, et al., | |
| Defendants. | |

### DECLARATION OF SADIE WELDON

I, Sadie Weldon, being duly sworn, states as follows:

1. My name is Sadie Weldon. I am over 21 years old and fully competent to make this declaration.

2. I have personal knowledge of each of the facts stated in this declaration, and everything stated in this declaration is true and correct.

3. I am a named defendant in this lawsuit.

4. The plaintiffs have sued me because they claim that I have "initiated proceedings to sue certain Texas abortion funds and their donors, employees, and volunteers under S.B. 8" and "publicly threatened all Texas abortion funds and their associates with civil lawsuits under S.B. 8." Complaint, ECF No. 1, at ¶ 7.

5. The plaintiffs' claim that I have "initiated proceedings to sue certain Texas abortion funds and their donors, employees, and volunteers under S.B. 8" is false. I merely filed a Rule 202 petition that seeks to depose Neesha Davé, the deputy director of the Lilith Fund for Reproductive Equity, to ascertain the identity of those who aided or abetted illegal post-heartbeat abortions in Texas. A Rule 202 petition is not a lawsuit or a "proceeding to sue"; it is merely a request for pre-suit discovery. An

authentic copy of the Rule 202 petition that I served on Ms. Davé is attached as Exhibit A to this declaration.

6.  The plaintiffs' claim that I have "publicly threatened all Texas abortion funds and their associates with civil lawsuits under S.B. 8" is also false. I have never threatened to sue anyone under SB 8. I merely filed a Rule 202 petition that seeks to depose Neesha Davé in an effort to uncover evidence surrounding illegal post-heartbeat abortions that occurred in Texas that Ms. Davé claims to have knowledge of.

7.  I have no intention, and I have never had any intention, of suing Wendy Davis, Marva Sadler, Sean Mehl, or the Stigma Relief Fund under the private civil-enforcement lawsuits described in Senate Bill 8. This is so for numerous reasons.

8.  First, none of the four plaintiffs claim to have violated Senate Bill 8. I have reviewed the plaintiffs' complaint (ECF No. 1) and the motion for summary judgment (ECF No. 24) that they have filed in this case. Neither document makes any claim that the plaintiffs have violated Senate Bill 8 or behaved in a manner that exposes themselves to private civil-enforcement lawsuits under SB 8. I will not sue anyone that has not violated SB 8, and I have never intended to sue anyone that has not acted in violation of SB 8.

9.  Second, I have no interest in suing anyone other than the individuals or organizations that aided or abetted the illegal post-heartbeat abortions described in Ms. Davé's sworn declaration. I have no interest in suing anyone else that might have violated SB 8, and I have no interest in suing any abortion fund (or individuals involved with abortion funds) apart from the Lilith Fund and those who aided or abetted the illegal post-heartbeat abortions described in Ms. Davé's sworn declaration. I have no interest, and have never had any interest, in suing Wendy Davis, Marva Sadler, Sean Mehl, or the Stigma Relief Fund—even if there were evidence or reason to believe that these individuals or entities violated or intend to violate SB 8.

10.   Third, every Texas abortion provider is, to the best of my knowledge, complying with Senate Bill 8 and refusing to perform abortions after a fetal heartbeat is detectable. So it is impossible for Ms. Davis, Ms. Sadler, Mr. Mehl, or the Stigma Relief Fund to violate SB 8 by paying for illegal post-heartbeat abortions in Texas even if they wanted to. And the plaintiffs have produced no allegations or evidence showing that it is possible for them to violate SB 8 and expose themselves to private civil-enforcement lawsuits given the categorical unwillingness of Texas abortion providers to violate the statute.

11.   I have never threatened to sue any of the plaintiffs under the private civil-enforcement lawsuits described in Senate Bill 8, either publicly or privately, and I have never told anyone that I intend to sue any of the plaintiffs under the private civil-enforcement lawsuits described in Senate Bill 8. Nor have I ever formed an intention to sue any of the plaintiffs under the private civil-enforcement lawsuits described in Senate Bill 8.

12.   I had never heard of Marva Sadler, Sean Mehl, or the Stigma Relief Fund before they sued me. And although I had heard of Wendy Davis, I have never threatened or intended to sue her under SB 8, and I still have no intention of suing her under SB 8 even after learning that she has donated money to the Lilith Fund and aided or abetted abortions performed in Texas, and I will not sue Ms. Davis even if she has in fact violated SB 8.

13.   I also have no intention of suing Wendy Davis, Marva Sadler, Sean Mehl, or the Stigma Relief Fund in the future even if they engage in conduct that violates Senate Bill 8, and I will not sue them under SB 8's private civil-enforcement mechanism under any circumstance.

14.   I have no ability to "enforce" article 4512.2 of the Revised Civil Statutes against the plaintiffs (or anyone else) because article 4512.2 is a criminal statute that can be enforced only by district attorneys and prosecutors. *See Ex parte Stephens*, ---

S.W.3d ----, 2021 WL 5917198 (Tex. Crim. App.). As a private citizen, I have no connection with the enforcement of article 4512.2 whatsoever.

15.   The plaintiffs also seek to enjoin me from filing a lawsuit to recover attorneys' fees under section 30.022 of the Texas Civil Practice and Remedies Code. I currently have no intention of suing the plaintiffs under section 30.022 because I expect to recover fees from the plaintiffs under 42 U.S.C. § 1988(b) at the conclusion of this litigation. Section 1988(b) allows prevailing defendants to recover fees if the claims brought against them are "unreasonable" and "without foundation." *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 418 (1978). The law of the Fifth Circuit is clear that a private citizen does not act "under color of state law" merely by filing a lawsuit authorized by a state statute. *See McCartney v. First City Bank,* 970 F.2d 45, 47 (5th Cir. 1992); *Howard Gault Co. v. Texas Rural Legal Aid, Inc.*, 848 F.2d 544, 555 (5th Cir. 1988); *Hollis v. Itawamba County Loans*, 657 F.2d 746, 749 (5th Cir. 1981). So I will seek and expect to recover attorneys' fees from the plaintiffs under 42 U.S.C. § 1988(b) at the conclusion of this litigation, which will obviate the need for me to seek recovery of fees under section 30.022 of the Texas Civil Practice and Remedies Code.

16.   If I am unsuccessful in recovering fees under 42 U.S.C. § 1988(b) at the conclusion of this litigation, then I will consider at that time whether to sue the plaintiffs under section 30.022 of the Texas Civil Practice and Remedies Code, in consultation with my attorneys.

17.   I am not a party to any other lawsuit involving the plaintiffs that seeks to prevent the enforcement of any Texas abortion law, and I have not been a party to any such lawsuit in the past. If I become a party to any such lawsuit during the pendency of this litigation, I will notify the Court.

18.   I reside in Jack County, which is located in the Northern District of Texas.

DocuSign Envelope ID: F4255E46-5931-4273-8F03-85155CD560F5

19.   The Rule 202 petition that I filed against Neesha Davé was filed in Jack County and remains pending in Jack County, and not in the Western District of Texas.

20.   I have not conspired or consulted with any judge or any government official with regard to any possible lawsuit that I might bring under Senate Bill 8, and I have no intention of doing so. If I ever decide to bring a civil-enforcement lawsuit under Senate Bill 8, it will be entirely of my own accord, and it will be brought in consultation with no one except my attorneys, who are private citizens and not government officials. Under no circumstance will I coordinate my efforts with any judge or any government official, and I will not allow my attorneys to do so.


    This concludes my sworn statement. I swear under penalty of perjury that the facts stated in this declaration are true and correct.


Dated: _5/31/2022_____          DocuSigned by:

                                  Sᴀᴅɪᴇ Wᴇʟᴅᴏɴ

# EXHIBIT A-9
# Declaration of Ashley Maxwell in *Davis v. Sharp*
# 5.31.22

DocuSign Envelope ID: FFB2E805-17C7-4CAB-8431-916135F958D8

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

|  |  |
|---|---|
| **Wendy Davis**, et al., | |
| Plaintiffs, | |
| | Case No. 1:22-cv-00373-RP |
| v. | |
| **Mistie Sharp**, et al., | |
| Defendants. | |

## DECLARATION OF ASHLEY MAXWELL

I, Ashley Maxwell, being duly sworn, states as follows:

1. My name is Ashley Maxwell. I am over 21 years old and fully competent to make this declaration.

2. I have personal knowledge of each of the facts stated in this declaration, and everything stated in this declaration is true and correct.

3. I am a named defendant in this lawsuit.

4. The plaintiffs have sued me because they claim that I have "initiated proceedings to sue certain Texas abortion funds and their donors, employees, and volunteers under S.B. 8" and "publicly threatened all Texas abortion funds and their associates with civil lawsuits under S.B. 8." Complaint, ECF No. 1, at ¶ 7.

5. The plaintiffs' claim that I have "initiated proceedings to sue certain Texas abortion funds and their donors, employees, and volunteers under S.B. 8" is false. I merely filed a Rule 202 petition that seeks to depose Kamyon Conner, the executive director of the North Texas Equal Access Fund, to ascertain the identity of those who aided or abetted illegal post-heartbeat abortions in Texas. A Rule 202 petition is not a lawsuit or a "proceeding to sue"; it is merely a request for pre-suit discovery. An

authentic copy of the Rule 202 petition that I served on Ms. Conner is attached as Exhibit A to this declaration.

6. The plaintiffs' claim that I have "publicly threatened all Texas abortion funds and their associates with civil lawsuits under S.B. 8" is also false. I have never threatened to sue anyone under SB 8. I merely filed a Rule 202 petition that seeks to depose Kamyon Conner in an effort to uncover evidence surrounding illegal post-heartbeat abortions that occurred in Texas that Ms. Conner claims to have knowledge of.

7. I have no intention, and I have never had any intention, of suing Wendy Davis, Marva Sadler, Sean Mehl, or the Stigma Relief Fund under the private civil-enforcement lawsuits described in Senate Bill 8. This is so for numerous reasons.

8. First, none of the four plaintiffs claim to have violated Senate Bill 8. I have reviewed the plaintiffs' complaint (ECF No. 1) and the motion for summary judgment (ECF No. 24) that they have filed in this case. Neither document makes any claim that the plaintiffs have violated Senate Bill 8 or behaved in a manner that exposes themselves to private civil-enforcement lawsuits under SB 8. I will not sue anyone that has not violated SB 8, and I have never intended to sue anyone that has not acted in violation of SB 8.

9. Second, I have no interest in suing anyone other than the individuals or organizations that aided or abetted the illegal post-heartbeat abortions described in Ms. Conner's sworn declaration. I have no interest in suing anyone else that might have violated SB 8, and I have no interest in suing any abortion fund (or individuals involved with abortion funds) apart from the North Texas Equal Access Fund and those who aided or abetted the illegal post-heartbeat abortions described in Ms. Conner's sworn declaration. I have no interest, and have never had any interest, in suing Wendy Davis, Marva Sadler, Sean Mehl, or the Stigma Relief Fund—even if there were evidence or reason to believe that these individuals or entities violated or intend to violate SB 8.

10.   Third, every Texas abortion provider is, to the best of my knowledge, complying with Senate Bill 8 and refusing to perform abortions after a fetal heartbeat is detectable. So it is impossible for Ms. Davis, Ms. Sadler, Mr. Mehl, or the Stigma Relief Fund to violate SB 8 by paying for illegal post-heartbeat abortions in Texas even if they wanted to. And the plaintiffs have produced no allegations or evidence showing that it is possible for them to violate SB 8 and expose themselves to private civil-enforcement lawsuits given the categorical unwillingness of Texas abortion providers to violate the statute.

11.   I have never threatened to sue any of the plaintiffs under the private civil-enforcement lawsuits described in Senate Bill 8, either publicly or privately, and I have never told anyone that I intend to sue any of the plaintiffs under the private civil-enforcement lawsuits described in Senate Bill 8. Nor have I ever formed an intention to sue any of the plaintiffs under the private civil-enforcement lawsuits described in Senate Bill 8.

12.   I had never heard of Marva Sadler, Sean Mehl, or the Stigma Relief Fund before they sued me. And although I had heard of Wendy Davis, I have never threatened or intended to sue her under SB 8, and I still have no intention of suing her under SB 8 even after learning that she has donated money to the Lilith Fund and aided or abetted abortions performed in Texas, and I will not sue Ms. Davis even if she has in fact violated SB 8.

13.   I also have no intention of suing Wendy Davis, Marva Sadler, Sean Mehl, or the Stigma Relief Fund in the future even if they engage in conduct that violates Senate Bill 8, and I will not sue them under SB 8's private civil-enforcement mechanism under any circumstance.

14.   I have no ability to "enforce" article 4512.2 of the Revised Civil Statutes against the plaintiffs (or anyone else) because article 4512.2 is a criminal statute that can be enforced only by district attorneys and prosecutors. *See Ex parte Stephens*, ---

DocuSign Envelope ID: FFB2E805-17C7-4CAB-9431-916135F95BD8

S.W.3d ----, 2021 WL 5917198 (Tex. Crim. App.). As a private citizen, I have no connection with the enforcement of article 4512.2 whatsoever.

15.   The plaintiffs also seek to enjoin me from filing a lawsuit to recover attorneys' fees under section 30.022 of the Texas Civil Practice and Remedies Code. I currently have no intention of suing the plaintiffs under section 30.022 because I expect to recover fees from the plaintiffs under 42 U.S.C. § 1988(b) at the conclusion of this litigation. Section 1988(b) allows prevailing defendants to recover fees if the claims brought against them are "unreasonable" and "without foundation." *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 418 (1978). The law of the Fifth Circuit is clear that a private citizen does not act "under color of state law" merely by filing a lawsuit authorized by a state statute. *See McCartney v. First City Bank*, 970 F.2d 45, 47 (5th Cir. 1992); *Howard Gault Co. v. Texas Rural Legal Aid, Inc.*, 848 F.2d 544, 555 (5th Cir. 1988); *Hollis v. Itawamba County Loans*, 657 F.2d 746, 749 (5th Cir. 1981). So I will seek and expect to recover attorneys' fees from the plaintiffs under 42 U.S.C. § 1988(b) at the conclusion of this litigation, which will obviate the need for me to seek recovery of fees under section 30.022 of the Texas Civil Practice and Remedies Code.

16.   If I am unsuccessful in recovering fees under 42 U.S.C. § 1988(b) at the conclusion of this litigation, then I will consider at that time whether to sue the plaintiffs under section 30.022 of the Texas Civil Practice and Remedies Code, in consultation with my attorneys.

17.   I am not a party to any other lawsuit involving the plaintiffs that seeks to prevent the enforcement of any Texas abortion law, and I have not been a party to any such lawsuit in the past. If I become a party to any such lawsuit during the pendency of this litigation, I will notify the Court.

18.   I reside in Hood County, which is located in the Northern District of Texas.

19.   The Rule 202 petition that I filed against Kamyon Conner was filed in Denton County and remains pending in Denton County, and not in the Western District of Texas.

20.   I have not conspired or consulted with any judge or any government official with regard to any possible lawsuit that I might bring under Senate Bill 8, and I have no intention of doing so. If I ever decide to bring a civil-enforcement lawsuit under Senate Bill 8, it will be entirely of my own accord, and it will be brought in consultation with no one except my attorneys, who are private citizens and not government officials. Under no circumstance will I coordinate my efforts with any judge or any government official, and I will not allow my attorneys to do so.

This concludes my sworn statement. I swear under penalty of perjury that the facts stated in this declaration are true and correct.

Dated: 5/31/2022 _____

DocuSigned by:

*Ashley Maxwell*

DCA5CBE02BCC4B3...

ASHLEY MAXWELL

# EXHIBIT A-10
# Freedom Caucus Letter to Sidley Austin



P.O. Box 806 | Austin, Texas 78767-0806
(512) 228-6862 | www.FreedomForTexas.com

**Rep. Mayes Middleton**
District 23 – Wallisville
*Chairman*

**Rep. Matt Schaefer**
District 6 – Tyler
*Vice-Chairman*

**Rep. Matt Krause**
District 93 – Fort Worth
*Treasurer/Secretary*

**Rep. Briscoe Cain**
District 128 – Deer Park

**Rep. Gary Gates**
District 28 – Fulshear

**Rep. Brian Harrison**
District 10 – Waxahachie

**Rep. Matt Shaheen**
District 66 – Plano

**Rep. Valoree Swanson**
District 150 – Spring

**Rep. Steve Toth**
District 15 – The Woodlands

**Rep. Cody Vasut**
District 25 – Angleton

**Rep. James White**
District 19 – Woodville

July 7, 2022

Yvette Ostolaza
Chair of the Management Committee
Sidley Austin LLP
2021 McKinney Ave #2000
Dallas, Texas 75201
yvette.ostolaza@sidley.com

Dear Ms. Ostolaza:

It has come to our attention that Sidley Austin has decided to reimburse the travel costs of employees who leave Texas to murder their unborn children. It also appears that Sidley has been complicit in illegal abortions that were performed in Texas before and after the Supreme Court's ruling in *Dobbs v. Jackson Women's Health Organization*, No. 19-1392. We are writing to inform you of the consequences that you and your colleagues will face for these actions.

Abortion is a felony criminal offense in Texas unless the mother's life is in danger. *See* West's Texas Civil Statutes, article 4512.1 (1974) (attached). The law of Texas also imposes felony criminal liability on any person who "furnishes the means for procuring an abortion knowing the purpose intended." West's Texas Civil Statutes, article 4512.2 (1974). This has been the law of Texas since 1925, and Texas did not repeal these criminal prohibitions in response to *Roe v. Wade*, 410 U.S. 113 (1973). These criminal prohibitions extend to drug-induced abortions if any part of the drug regimen is ingested in Texas, even if the drugs were dispensed by an out-of-state abortionist. To the extent that Sidley is facilitating abortions performed in violation of article 4512.1, it is exposing itself and each of its partners to felony criminal prosecution and disbarment.

We will also be introducing legislation next session that will impose additional civil and criminal sanctions on law firms that pay for abortions or abortion travel. The legislation that we will introduce will include each of the following provisions.

First. It will prohibit any employer in Texas from paying for elective abortions or reimbursing abortion-related expenses—regardless of where the abortion occurs, and regardless of the law in the jurisdiction where the abortion occurs. This provision will impose felony criminal sanctions on anyone who pays for these abortions to ensure that it remains enforceable against self-insured plans as a generally applicable criminal law.

Second. It will allow private citizens to sue anyone who pays for an elective abortion performed on a Texas resident, or who pays for or reimburses the costs associated with these abortions—regardless of where the abortion occurs, and regardless of the law in the jurisdiction where the abortion occurs. This provision will be modeled after the Texas Heartbeat Act and its private civil-enforcement mechanism.

Third. It will require the State Bar of Texas to disbar any lawyer who has violated article 4512.2 by "furnishing the means for procuring an abortion knowing the purpose intended," or who violates any other abortion statute enacted by the Texas legislature. If the State Bar fails to disbar an attorney who has violated these laws, then any member of the public may sue the officers of the State Bar and obtain a writ of mandamus compelling them to impose the required disciplinary sanctions.

Fourth. The legislation that we will introduce next session will empower district attorneys from throughout the state to prosecute abortion-related crimes—including violations of article 4512.2 of the Revised Civil Statutes—when the local district attorney fails or refuses to do so. It will also eliminate the three-year statute of limitations that currently applies to violations of article 4512.2. The state of Texas will ensure that you and colleagues are held accountable for every abortion that you illegally assisted.

It also appears that Sidley may have aided or abetted drug-induced abortions in violation of the Texas Heartbeat Act, by paying for abortions (or abortion-related travel) in which the patient ingested the second drug in Texas after receiving the drugs from an out-of-state provider. Litigation is already underway to uncover the identity of those who aided or abetted these and other illegal abortions. In light of this pending litigation, as well as any anticipated litigation that might ensue, you and your colleagues at Sidley must preserve and retain all documents, data, and electronically stored information relating in any way to: (1) Any abortions performed or induced in Texas on or after September 1, 2021, in which a fetal heartbeat was detectable (or likely to be detectable if tested), including any such abortions that occurred while Judge Pitman's injunction was in effect from October 6–8, 2021; (2) Any abortions performed or induced in Texas on or after June 24, 2022, including abortions performed while Judge Weems's TRO was in effect from June 28, 2022, through July 1, 2022; (3) Any abortion that occurred on or after September 1, 2021, if there is any possibility that the patient might have opted for a drug-induced abortion and ingested either of the abortion drugs in Texas, even if the drugs were dispensed by a provider outside the state of Texas; and (4) The identity of any person or entity who has aided or abetted the abortions described in (1) – (3), including anyone at your firm, and anyone who paid for or in any way reimbursed the costs of those abortions.

You and your colleagues must preserve these items regardless of the medium, format, or device on which they are stored or hosted, and regardless of whether they appear in documents, drafts, notes, calendar entries, emails, text messages, voicemails, social-media posts, or any other form. Failure to preserve these documents could subject you and your colleagues to significant penalties.

Conduct yourselves accordingly.

Sincerely,

Rep. Mayes Middleton
Chairman, Texas Freedom Caucus

Enclosure:  West's Texas Civil Statutes, articles 4512.1 – 4512.6 (1974)

cc:   All attorneys at Sidley Austin LLP
      Ken Paxton, Attorney General of Texas

deformity or injury, by any system or method, or to effect cures thereof.

2. Who shall diagnose, treat or offer to treat any disease or disorder, mental or physical, or any physical deformity or injury, by any system or method, or to effect cures thereof and charge therefor, directly or indirectly, money or other compensation; provided, however, that the provisions of this Article shall be construed with and in view of Article 740, Penal Code of Texas [1] and Article 4504, Revised Civil Statutes of Texas as contained in this Act.

[1925 P.C.; Acts 1949, 51st Leg., p. 160, ch. 94, § 20(b); Acts 1953, 53rd Leg., p. 1029, ch. 426, § 11.]

[1] See, now, article 4504a.

### Art. 4510b. Unlawfully Practicing Medicine; Penalty

Any person practicing medicine in this State in violation of the preceding Articles of this Chapter shall be guilty of a misdemeanor, and upon conviction shall be punished by a fine of not less than Fifty Dollars ($50), nor more than Five Hundred Dollars ($500), and by imprisonment in the county jail for not more than thirty (30) days. Each day of such violation shall be a separate offense.

[1925 P.C.; Acts 1939, 46th Leg., p. 352, § 10.]

### Art. 4511. Definitions

The terms, "physician," and "surgeon," as used in this law, shall be construed as synonymous, and the terms, "practitioners," "practitioners of medicine," and, "practice of medicine," as used in this law, shall be construed to refer to and include physicians and surgeons.

[Acts 1925, S.B. 84.]

### Art. 4512. Malpractice Cause for Revoking License

Any physician or person who is engaged in the practice of medicine, surgery, osteopathy, or who belongs to any other school of medicine, whether they used the medicines in their practice or not, who shall be guilty of any fraudulent or dishonorable conduct, or of any malpractice, or shall, by any untrue or fraudulent statement or representations made as such physician or person to a patient or other person being treated by such physician or person, procure and withhold, or cause to be withheld, from another any money, negotiable note, or thing of value, may be suspended in his right to practice medicine or his license may be revoked by the district court of the county in which such physician or person resides, or of the county where such conduct or malpractice or false representations occurred, in the manner and form provided for revoking or suspending license of attorneys at law in this State.

[Acts 1925, S.B. 84.]

## CHAPTER SIX ½. ABORTION

**Article**
4512.1   Abortion.
4512.2   Furnishing the Means.
4512.3   Attempt at Abortion.
4512.4   Murder in Producing Abortion.
4512.5   Destroying Unborn Child.
4512.6   By Medical Advice.

### Art. 4512.1 Abortion

If any person shall designedly administer to a pregnant woman or knowingly procure to be administered with her consent any drug or medicine, or shall use towards her any violence or means whatever externally or internally applied, and thereby procure an abortion, he shall be confined in the penitentiary not less than two nor more than five years; if it be done without her consent, the punishment shall be doubled. By "abortion" is meant that the life of the fetus or embryo shall be destroyed in the woman's womb or that a premature birth thereof be caused.

[1925 P.C.]

### Art. 4512.2 Furnishing the Means

Whoever furnishes the means for procuring an abortion knowing the purpose intended is guilty as an accomplice.

[1925 P.C.]

### Art. 4512.3 Attempt at Abortion

If the means used shall fail to produce an abortion, the offender is nevertheless guilty of an attempt to produce abortion, provided it be shown that such means were calculated to produce that result, and shall be fined not less than one hundred nor more than one thousand dollars.

[1925 P.C.]

### Art. 4512.4 Murder in Producing Abortion

If the death of the mother is occasioned by an abortion so produced or by an attempt to effect the same it is murder.

[1925 P.C.]

### Art. 4512.5 Destroying Unborn Child

Whoever shall during parturition of the mother destroy the vitality or life in a child in a state of being born and before actual birth, which child would otherwise have been born alive, shall be confined in the penitentiary for life or for not less than five years.

[1925 P.C.]

### Art. 4512.6 By Medical Advice

Nothing in this chapter applies to an abortion procured or attempted by medical advice for the purpose of saving the life of the mother.

[1925 P.C.]

# EXHIBIT A-11
# September 1, 2022
# Rule 202 Petition
# of Zach Maxwell

Electronically Filed
9/1/2022 3:09 PM
District Clerk,
Hood County, Texas

Cause No. C2022388 _____

| | |
|---|---|
| **In re Zach Maxwell**, <br><br>             Petitioner | IN THE DISTRICT COURT <br> HOOD COUNTY, TEXAS <br> 355th JUDICIAL DISTRICT |

## VERIFIED PETITION TO TAKE DEPOSITION TO INVESTIGATE A LAWSUIT

Petitioner Zach Maxwell respectfully asks the Court for permission to take a deposition by oral examination of Makayla Montoya-Frazier. Mr. Maxwell seeks this testimony to investigate potential claims brought by Mr. Maxwell or others under section 171.208 of the Texas Health and Safety Code.

### PERSONS TO BE DEPOSED AND JURISDICTION

1.    Petitioner Zach Maxwell is a citizen of Texas and resident of Hood County.

2.    Mr. Maxwell seeks to depose Makayla Montoya-Frazier.

3.    Upon information and belief, Makayla Montoya-Frazier is a resident of Bexar County and may be served through her attorneys, Jennifer Ecklund and Elizabeth Myers, at Thompson Coburn LLP, 2100 Ross Avenue, Suite 3200, Dallas, Texas, 75201. Montoya-Frazier can be reached by phone through her attorneys, whose number is (972) 629-7100.

4.    In accordance with Rule 202.2(b)(1) of the Texas Rules of Civil Procedure, this petition is filed in Hood County, the county in which the venue of the anticipated suit may lie.

5.    This petition is verified by Mr. Maxwell, as required by Rule 202.2(a) of the Texas Rules of Civil Procedure.

### FACTS

6.    Makayla Montoya-Frazier is the founder of the Buckle Bunnies Fund, an organization that aids or abets abortions in Texas. Montoya-Frazier founded the Buckle

Bunnies Fund in 2020 while working as a prostitute. *See* Tina Vásquez, *Meet the 21-year-old helping to fund abortions in Texas*, Prism (March 25, 2021), https://bit.ly/3CxNVw5 (attached as Exhibit 1).

7.    The Buckle Bunnies Fund aids or abets illegal self-managed abortions in Texas. *See* Iris Dimmick, *Abortion access advocates face imposters, legal threats as trigger law nears*, San Antonio Report (August 1, 2022), https://bit.ly/3R6S3ad (attached as Exhibit 2) ("[T]he Buckle Bunnies Fund . . . helps Texans access and pay for abortions. That includes paying for transportation to a state where abortion is still legal, sharing information about abortion pills and guiding women through their self-managed abortions"). It also aids or abets drug-induced abortions by transporting pregnant women in Texas to other states to obtain the pills. *See id.*

## I.    The Texas Heartbeat Act

8.    In 2021, the Texas legislature enacted the Texas Heartbeat Act, which outlaws abortion after a fetal heartbeat is detectable, which typically occurs at around six weeks of pregnancy. The governor signed the Heartbeat Act into law on May 19, 2021, and it took effect on September 1, 2021, after the Supreme Court denied a request for emergency relief from a coalition of Texas abortion providers. *See Whole Woman's Health v. Jackson*, 141 S. Ct. 2494 (2021).

9.    The Texas Heartbeat Act prohibits state officials from enforcing the law. *See* Tex. Health & Safety Code § 171.207. Instead of public enforcement by state officials, the Heartbeat Act establishes a private right of action that authorizes individuals to sue anyone who violates the statute. *See* Tex. Health & Safety Code § 171.208. These private civil-enforcement suits may be brought against anyone who "performs or induces" a post-heartbeat abortion, *see id.* at § 171.208(a)(1), as well as anyone who "knowingly engages in conduct that aids or abets the performance or inducement of an abortion, including paying for or reimbursing the costs of an abortion

through insurance or otherwise, if the abortion is performed or induced in violation of [the Heartbeat Act]," *id.* at § 171.208(a)(2). Lawsuits may also be brought against anyone who "intends" to perform or aid or abet a post-heartbeat abortion in Texas.

10.  A plaintiff who successfully sues an individual or organization under section 171.208 is entitled to injunctive relief and at least $10,000 in statutory damages for each unlawful abortion that the defendant performed or facilitated, plus costs and attorneys' fees. *See* Tex. Health & Safety Code § 171.208(b).

11.  The law was structured this way to insulate the statute from pre-enforcement judicial review and ensure that the Heartbeat Act would remain enforceable despite the existence of *Roe v. Wade*, 410 U.S. 113 (1973), which had not been overruled when the Heartbeat Act took effect. Because no state official is charged with enforcing the law, there is no one for abortion providers to sue in a pre-enforcement lawsuit that challenges the constitutionality of the statute. *See Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 535 (2021); *Whole Woman's Health v. Jackson*, 642 S.W.3d 569 (Tex. 2022). And because the law is enforced by private citizens rather than government officials, abortion providers have been unable to obtain relief that will stop private lawsuits from being initiated against them.

12.  When the Supreme Court denied emergency relief on September 1, 2021, the Texas Heartbeat Act marked the first time that a state had successfully imposed a six-week abortion ban since *Roe v. Wade*, 410 U.S. 113 (1973).

13.  When the Texas Heartbeat Act took effect on September 1, 2021, abortions performed after fetal heartbeat became acts of murder under Texas law. The Texas Penal Code defines the offense of murder to include the intentional killing of "an unborn child at every stage of gestation from fertilization until birth." Texas Penal Code §§ 1.07, 19.02(b). The murder statute exempts "lawful medical procedures" and the dispensation or administration of a drug prescribed "in accordance with law." Texas Penal Code § 19.06(2), (4). But post-heartbeat abortions performed in Texas

ceased to be "lawful" (and became acts of murder) when the Heartbeat Act took effect on September 1, 2021.

## II.   The Texas pre–*Roe v. Wade* Abortion Statutes

14.   The State of Texas has never repealed its pre–*Roe v. Wade* statutes that outlaw and criminalize abortion unless the mother's life is in danger. *See* Senate Bill 8, 87th Leg., § 2 ("[T]he State of Texas never repealed, either expressly or by implication, the state statutes enacted before the ruling in Roe v. Wade, 410 U.S. 113 (1973), that prohibit and criminalize abortion unless the mother 's life is in danger.").

15.   Article 4512.2 of the Revised Civil Statutes imposes felony criminal liability on any person who "furnishes the means for procuring an abortion knowing the purpose intended." West's Texas Civil Statutes, article 4512.2 (1974) (attached as Exhibit 3).

16.   Violations of article 4512.2 are punishable by two to five years imprisonment for each abortion that was paid for, and the statute of limitations is three years. The only exception is for abortions "procured or attempted by medical advice for the purpose of saving the life of the mother." West's Texas Civil Statutes, article 4512.6 (1974).

17.   Montoya-Frazier and the Buckle Bunnies Fund have been violating and continue to violate this criminal statutory prohibition by paying for other people's abortions—even when those abortions are purely elective and are not performed for the purpose of saving the mother's life.

18.   On March 18, 2022, Representative Briscoe Cain sent a cease-and-desist letter to the Buckle Bunnies Fund demanding that they immediately halt their criminal activities and stop paying for elective abortions performed in Texas. *See* Exhibit 4.

19.   The Buckle Bunnies Fund defied this cease-and-desist letter and continues to aid or abet illegal abortions in Texas, even as other Texas abortion funds have

stopped their activities in response to the state's criminal abortion laws. *See* Iris Dimmick, *Abortion access advocates face imposters, legal threats as trigger law nears*, San Antonio Report (August 1, 2022), https://bit.ly/3R6S3ad (attached as Exhibit 2) ("[M]ost Texas nonprofit abortion access funds have stopped distributing money and clinics in the state have stopped providing abortions. But not the Buckle Bunnies. 'If we're scared of lawsuits, then nobody gets care,' Montoya Frazier said.").

## III.   The Texas Laws Against Self-Managed Abortion

20.  Self-managed abortion has been illegal in Texas for more than a century and was never constitutionally protected under *Roe v. Wade*, 410 U.S. 113 (1973), although the woman who self-aborts cannot be charged with a crime and cannot be sued under Senate Bill 8 even if the abortion occurs after a fetal heartbeat is detectable.

21.  Any person who aids or abets a self-managed abortion in Texas, other than the pregnant woman who self-aborts, has committed the crime of murder. *See* Tex. Penal Code §§ 1.07, 19.02(b) (defining the offense of murder to include the intentional killing of "an unborn child at every stage of gestation from fertilization until birth."); *see also* Texas Penal Code § 19.06(1) (exempting "the mother of the unborn child" from murder charges in response to a self-managed abortion).

## IV.   Montoya-Frazier's Violations Of Texas Law

22.  By knowingly and intentionally aiding or abetting self-managed abortions in Texas, and by transporting women to other states to obtain abortion-inducing drugs, Montoya-Frazier and the Buckle Bunnies Fund have exposed themselves and each of their employees, volunteers, board members, and donors to civil liability under SB 8 and felony criminal prosecution.

23.  Drug-induced abortions do not violate the Texas Heartbeat Act (or the state's criminal abortion statutes) if both drugs are ingested outside the state and the entire abortion process is initiated and completed outside the state of Texas.

24.  But in a drug-induced abortion, a patient typically ingests only the first of the two drugs (mifepristone or mifeprex) at the clinic, and is instructed to return home and ingest the second drug (misoprostol) 24–48 hours later.

25.  If any Texas resident beyond the six-week limit ingested either of those two drugs in Texas, then the abortion violated the Texas Heartbeat Act, and any abortion fund that aided or abetted the abortion is liable under Senate Bill 8. *See* Tex. Health & Saftey Code § 171.208(a)(2) (imposing liability on "any person who . . . knowingly engages in conduct that aids or abets the performance or inducement of an abortion, including paying for or reimbursing the costs of an abortion through insurance or otherwise, if the abortion is performed or induced in violation of this subchapter, regardless of whether the person knew or should have known that the abortion would be performed or induced in violation of this subchapter.").

26.  Montoya-Frazier and the Buckle Bunnies Fund, along with each of their employees, volunteers, board members, and donors, are also subject to liability under Senate Bill 8 for any self-managed abortion that they aided or abetted in Texas that occurred after a fetal heartbeat was detectable.

27.  In addition to civil liability under SB 8, Montoya-Frazier and the Buckle Bunnies Fund, along with each of their employees, volunteers, board members, and donors, have committed acts of first-degree murder by aiding or abetting illegal self-managed abortions in Texas. *See* Tex. Penal Code §§ 1.07, 19.02(b) (defining the offense of murder to include the intentional killing of "an unborn child at every stage of gestation from fertilization until birth.").

28.  Any person who was complicit in these illegal self-managed abortions—including Montoya-Frazier and the Buckle Bunnies Fund's employees, volunteers, board members and donors, and anyone who aided or abetted these illegal self-managed abortions in any manner, other than the woman upon whom the self-managed abortion was performed—is equally liable under the Texas Heartbeat Act and equally

guilty of murder. *See* Tex. Health & Safety Code § 171.208(a)(2); Tex. Penal Code § 7.02.

## ANTICIPATED ACTION

29. This petition is filed in anticipation of possible future civil actions brought under section 171.208 of the Texas Health and Safety Code, against individuals and organizations that performed or aided or abetted abortions in violation of the Texas Heartbeat Act, also known as Senate Bill 8 or SB 8. It is also filed to investigate the possibilities for future civil actions brought under section 171.208 of the Texas Health and Safety Code.

30. Any person who performs or induces an abortion in violation of the Texas Heartbeat Act may be sued by "any person," and must pay "not less than" $10,000 in statutory damages for each illegal abortion, plus costs and attorneys' fees. *See* Tex. Health & Safety Code § 171.208(a)(1), (b). Anyone who knowingly engages in conduct that aids or abets an abortion is equally liable for any abortion performed in violation of the Texas Heartbeat Act, regardless of whether the individuals knew or should have known that their abortion-assisting conduct was aiding or abetting a post-heartbeat abortion. *See* Tex. Health & Safety Code § 171.208(a)(2).

31. Montoya-Frazier is expected to have information relevant to the potential claims that Mr. Maxwell is investigating. Montoya-Frazier has publicly admitted that the Buckle Bunnies Fund aids or abets illegal self-managed abortion in Texas, and that it transports pregnant women in Texas to other states to obtain abortion-inducing drugs. Montoya-Frazier is likely to know the nature and extent of abortions performed in violation of the Heartbeat Act, and the identity of individuals that aided or abetted these illegal abortions and acts of murder by providing funding, insurance coverage, or logistical support.

32.  To the extent Montoya-Frazier and the Buckle Bunnies Fund's employees, volunteers, board members and donors have exposed themselves to civil liability for their violations of the Texas Heartbeat Act, each of them would have interests adverse to Mr. Maxwell.

33.  Additional parties are expected to have information relevant to the potential claims that Mr. Maxwell is investigating, as well as interests adverse to Mr. Maxwell's in any anticipated suit, but the identities of those parties are currently unknown.

34.  Montoya-Frazier's public statements indicate that she has knowledge of abortions performed in violation of the Texas Heartbeat Act. Mr. Maxwell's goal is to use the depositions sought by this petition to ascertain the extent of the illegal conduct that has occurred and the identity of all individuals and organizations subject to liability under section 171.208.

## NOTICE OF RELATED CASES

35.  There are no ongoing cases between Mr. Maxwell and Ms. Montoya-Frazier.

36.  There are several ongoing cases that seek to restrain state officials and private individuals from enforcing certain provisions in the Texas Heartbeat Act. One of those cases is *Whole Woman's Health v. Jackson*, No. 1:21-cv-00616-RP (W.D. Tex.), which is currently pending in the Western District of Texas.

37.  A coalition of abortion providers and abortion funds has also filed suit in state court to restrain Texas Right to Life and its legislative director, John Seago, from initiating lawsuits against them under section 171.208 of the Texas Health and Safety Code. The district judge in those cases denied the defendants' motion to dismiss under the Texas Citizens Participation Act, and the defendants have taken an interlocutory appeal from that ruling. That appeal is currently pending in the Third Court of Appeals. *See Texas Right to Life v. Van Stean*, No. 03-21-00650-CV.

## REQUEST FOR DEPOSITIONS

38.  Mr. Maxwell seeks a court order authorizing him to depose Montoya-Frazier because he seeks to investigate potential claims that he or others might bring under section 171.208 of the Texas Health and Safety Code, against any person or organization that performed or aided or abetted an illegal post-heartbeat abortion. *See* Tex. R. Civ. P. 202(d)(2).

39.  For the reasons already explained, it is likely that Montoya-Frazier and the Buckle Bunnies Fund aided or abetted illegal abortions performed in violation of Senate Bill 8. Montoya-Frazier will have information about the relevant methods and recordkeeping, based on her position in the Buckle Bunnies Fund, and based on their comments to the media on the subject.

40.  There is good reason for this court to find that deposing Montoya-Frazier at this time is the best way to avoid a delay or failure of justice in an anticipated suit. *See* Tex. R. Civ. P. 202.4(a). In addition, the likely benefit of allowing Mr. Maxwell to depose Montoya-Frazier to investigate a potential claim outweighs the burden or expense of the procedure. *See* Tex. R. Civ. P. 202.4(b).

41.  Mr. Maxwell is considering whether to sue individuals and organizations that performed or facilitated illegal abortions in violation of the Texas Heartbeat Act. The statements made by Montoya-Frazier suggest that the Buckle Bunnies Fund has violated and is violating the Texas Heartbeat Act in a manner that exposes its employees, volunteers, board members, donors, and anyone involved in the provision of these illegal abortions to liability under section 171.208 of the Texas Health and Safety Code.

42.  Yet Mr. Maxwell is unwilling to file suit as this time because he is still investigating the range of potential defendants, as well as any possible defenses or substantive arguments that they might raise in the litigation. Mr. Maxwell expects to be able to better evaluate the prospects for legal success after deposing Montoya-Frazier and

discovering the nature and scope of her violations of Texas law, as well as the extent of involvement of each individual that aided or abetted post-heartbeat abortions in violation of the Texas Heartbeat Act.

43.  Mr. Maxwell also wishes to preserve evidence of illegal abortions performed in violation of the Texas Heartbeat Act, as well as evidence surrounding the involvement of organizations and individuals who aided or abetted illegal self-managed abortions. Mr. Maxwell seeks to depose Montoya-Frazier on the topics described in the notice of deposition, which is attached to this petition as Exhibit 5. Mr. Maxwell also seeks discovery of documents[1] that address the issues that will be covered in the depositions.

44.  Deposing Montoya-Frazier allows Mr. Maxwell to preserve evidence of great importance to the anticipated litigation. Montoya-Frazier's public statements already attest that she and the Buckle Bunnies Fund have evidence of abortions that were performed or induced in violation of the Texas Heartbeat Act, at least prima facie. The value of this information to any subsequent litigation, and to the policies embodied in the Texas Heartbeat Act, is extremely high.

---

1.  The scope of a pre-suit deposition under Rule 202 is the same as a regular deposition of non-parties in litigation. *See* Tex. R. Civ. P. 202.5. This specifically allows document-production requests. *See* Tex. R. Civ. P. 199.2(b)(5) (providing for requests for production along with a deposition notice); Tex. R. Civ. P. 205.1(c) (providing for noticing document production requests to nonparties); *In re City of Tatum*, 567 S.W.3d 800, 808 (Tex. App. 2018) ("The "language of these rules when read together permits a petition seeking a pre-suit deposition under Rule 202 to also request the production of documents."" quoting *In re Anand*, No. 01-12-01106-CV, 2013 WL 1316436, at *3 (Tex. App. Apr. 2, 2013)). *See also City of Dallas v. City of Corsicana*, No. 10-14-00090-CV, 2015 WL 4985935, at *6 (Tex. App. Aug. 20, 2015) ("Under rule 202, documents can be requested in connection with a deposition."). While some courts have refused to permit document discovery under Rule 202, *see, e.g.*, *In re Pickrell*, No. 10-17-00091-CV, 2017 WL 1452851, at *6 (Tex. App. Apr. 19, 2017), they have not analyzed the text of Rule 202.5 or its relationship to Rule 199. *See In re City of Tatum*, 567 S.W.3d 800, 808 n. 7 (Tex. App. 2018) (criticizing courts denying document production under Rule 202).

45.  Delay in obtaining this evidence increases the chance that information about any violations of the Texas Heartbeat Act will be forgotten and that documentation will become more difficult to obtain. Given the widespread press coverage of the Texas Heartbeat Act, including attention to the risks taken by those who choose to violate the Act's provisions,[2] there is considerable incentive for anyone who has violated the Heartbeat Act to hide or obscure evidence of their involvement in illegal abortions.

46.  Without the documentation, there would be a risk of miscarriage or delay of justice, as the law of Texas would be difficult or impossible to enforce. The policy of the state will be thwarted if it is not possible to identify the parties complicit in providing, aiding, or abetting abortions in violation of the Texas Heartbeat Act.

47.  It would also enhance judicial efficiency to allow the eventual lawsuit to consider the entire chain of events surrounding potentially illegal conduct described in Montoya-Frazier's public statements reported in the press. Waiting for discovery in the course of litigation not only runs increased risks of forgetfulness or record-keeping deficiencies. It also has costs to the administration of justice in that the courts would have to adjudicate the matters in separate proceedings, or through complaints successively amended to add additional defendants. Allowing depositions under Rule 202 would avoid this delay of justice.

48.  The burden on Montoya-Frazier is modest. To be sure, she must appear for a deposition and produce documents. But the inconvenience will only grow greater with any delay, as memories fade and documents accumulate. The value of the information sought outweighs the burden, as required by Rule 202.

49.  Mr. Maxwell seeks to depose Montoya-Frazier by oral deposition. *See* Tex. R. Civ. P. 199. The notices of deposition identifying the topics for examination are

---

2.  *See* Abigail Abrams, *Inside The Small Group of Doctors Who Risked Everything to Provide Abortions in Texas*, Time (Oct. 14, 2021), available at https://bit.ly/3qxa5qx.

attached to this petition as Exhibit 5. This procedure will impose a minimal burden on Montoya-Frazier while permitting Mr. Maxwell to preserve for future litigation information about the potentially illegal abortions that Montoya-Frazier has already admitted to in her statements to the media. This information is likely to be important evidence in any future litigation.

50.  Mr. Maxwell further requests that the court order Montoya-Frazier to produce at or before the deposition all non-privileged documents described in the subpoenas attached as Exhibit 6 to this petition.

## REQUEST FOR HEARING

51.  After the service of this petition and a notice of hearing, Mr. Maxwell requests that the court conduct a hearing, in accordance with Rule 202.3(a) of the rules of civil procedure, to determine whether to issue an order allowing the deposition.

## REQUEST FOR RELIEF

52.  For these reasons, Mr. Maxwell respectfully requests that the court set a date for a hearing on this petition, and thereafter issue an order:

    a.  finding that the benefits of a deposition and accompanying production of documents outweighs the burden;

    b.  finding that a deposition and accompanying production of documents will avoid delay or failure of justice;

    c.  authorizing Mr. Maxwell to take an oral deposition of Makayla Montoya-Frazier;

    d.  requiring Makayla Montoya-Frazier to produce the documents identified by this petition, at a time and place to be agreed by the parties; and

    e.  awarding all other relief that the Court may deem just, proper, or equitable.

Respectfully submitted.

 /s/ Jonathan F. Mitchell

H. Dustin Fillmore III                Jonathan F. Mitchell
Texas Bar No. 06996010                Texas Bar No. 24075463
Charles W. Fillmore                   Mitchell Law PLLC
Texas Bar No. 00785861                111 Congress Avenue, Suite 400
The Fillmore Law Firm, LLP            Austin, Texas 78701
1200 Summit Avenue, Suite 860         (512) 686-3940 (phone)
Fort Worth, Texas 76102               (512) 686-3941 (fax)
(817) 332-2351 (phone)                jonathan@mitchell.law
(817) 870-1859 (fax)
dusty@fillmorefirm.com
chad@fillmorefirm.com

Dated: September 1, 2022              *Counsel for Petitioner*

Cause No. _____

| | |
|---|---|
| **In re Zach Maxwell,** | IN THE DISTRICT COURT |
| | HOOD COUNTY, TEXAS |
| Petitioner | 355th JUDICIAL DISTRICT |

## VERIFICATION

STATE OF TEXAS

COUNTY OF ___Hood___

Before me, the undersigned notary public, on this day personally appeared Zach Maxwell and after being duly sworn, stated under oath that he has read the above verified petition to take deposition to investigate potential legal claims and its exhibits; that every statement of fact contained in it is within his personal knowledge and is true and correct; and that every exhibit is an authentic copy of what it purports to be.

ZACH MAXWELL

Subscribed and sworn to me
this __31__ day of __August__, 2022

NOTARY

TRACI LEIGH DEVANEY
Notary Public, State of Texas
Comm. Expires 01-14-2024
Notary ID 11896086

# EXHIBIT A-12
# Declaration of Anna Rupani

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| **Plaintiffs Fund Texas Choice, North Texas Equal Acces Fund, The Lilith Fund for Reproductive Equity, Frontera Fund, The Afiya Center, West Fund, Jane's Due Process, Clinic Access Support Network, and Dr. Ghazeleh Moayedi, DO, MPH, FACOG,** | **Civil Case No. _____** |
| **Plaintiffs,** | |
| **v.** | |
| **KEN PAXTON, in his Official Capacity as Attorney General; Susan R. Deski, in her Official Capacity as County Attorney of Burleson County, Texas, and on behalf of a class of all County Attorneys similarly situated; and Julie Renken, in her Official Capacity of District Attorney for Washington County, Texas, Wiley B. "Sonny" McAfee, in his Official Capacity of District Attorney for Blanco, Burnet, Llano, and San Saba Counties, Texas, Jose Garza in his Official Capacity of District Attorney for Travis County, Texas, and Fred H. Weber, in his Official Capacity of District Attorney for Caldwell County, and on behalf of a class of all Texas District Attorneys similarly situated,** | |
| **Defendants.** | |

## DECLARATION OF ANNA RUPANI

| | |
|---|---|
| STATE OF TEXAS | § |
| DALLAS COUNTY | § |

16

1.     My name is Anna Rupani.  I am a resident of Dallas County, Texas, over 21 years of age, competent, and capable of testifying to the facts stated in this Declaration.

2.     I declare that the statements within this Declaration are within my personal knowledge, and a true and correct.

3.     I am the Executive Director of Fund Texas Choice ("FTC").

4.     FTC's mission is to help Texans equitably access abortion through safe, confidential, and comprehensive practical support.  FTC was founded in response to HB2, a Texas statute that shuttered over half of the state's abortion clinics, imposing long wait times on patients and forcing them to travel long distances for care.

5.     Until recent changes in Texas law, FTC fielded texts and calls from Texans seeking abortion care who cannot afford to travel to an abortion provider.  FTC then worked with pregnant individuals who had abortion appointments to help plan and support their trip.  This included booking and directly paying vendors for bus tickets, ride shares, providing food assistance, and lodging—and airfare for those forced out of Texas for care.  FTC also booked and directly paid for the transportation and lodging of companions for minor clients or clients who have a fetal anomaly.

6.     When clients were unable to find affordable childcare, FTC offered a childcare stipend or helped book travel for children to accompany their parent(s).  FTC connected callers unable to pay for the abortion itself to nonprofit organizations that provided cash subsidies to defray the cost of abortion services.  Occasionally, FTC helped callers identify the closest abortion provider that was appropriate for them and tried to secure an abortion appointment for them despite long wait times.

7.     In addition to providing practical support to access abortion care, FTC helped interested clients tell the stories of how they obtained abortion care, including by connecting them to the media.  FTC still regards this as a way to combat abortion stigma, which furthers its mission.

8.     When Senate Bill 8, also called the Texas Heartbeat Act, became effective in September of 2021, FTC began to limit its assistance activities to abortions done in compliance with that law so as to avoid potential civil litigation and civil penalties resulting from that law.[1] FTC continues to believe that Senate Bill 8 is unconstitutional for reasons that have nothing to do with *Roe v. Wade*, and is a party to litigation in which Senate Bill 8 has been challenged.

9.     As the expected date for the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization* approached, FTC ceased all of its assistive activities. In the wake of *Dobbs*, it has not restarted those activities—even with respect to assisting Texans seeking abortions in other states where abortion remains legal—due to various threats by Texas public officials and private litigants claiming that Texas laws now not only criminalize and civilly penalize abortion *in Texas*, but also criminalize and civilly penalize helping pregnant Texans get legal abortions elsewhere.

10.     These laws include the pre-*Roe* abortion-prohibiting statutes that were originally struck down in *Roe v. Wade*, and which criminalized abortion as a felony; the so-called "Trigger Ban" that prohibits abortion in nearly all circumstances and provides that abortion is a felony and further provides for the levying of civil penalties; and Senate Bill 8.

---

[1] Following the entry of an injunction by the Honorable Robert Pitman on October 6, 2021, that prohibited the enforcement of Senate Bill 8, and before that injunction was stayed by the Fifth Circuit Court of Appeals, FTC briefly resumed its normal operations and assisted pregnant Texans without regard to whether cardiac activity has been detected.  When Judge Pitman's injunction was stayed by the Fifth Circuit Court of Appeals, FTC immediately returned to its limited operations.

11.     FTC believes that, under the U.S. Constitution, FTC is allowed to provide funds or other assistance to help pregnant Texans obtain abortions in states where the abortion to be obtained is completely legal. It is only because of the threats of Defendants, and the fear of the related criminal prosecution and civil penalties, that FTC is not providing assistance to pregnant Texans seeking abortions in states where abortion is legal.

12.     FTC's (and its staff's, board's, volunteers', and donors') rights are being violated and FTC is already suffering injury.  It's associative and free speech conduct related to its charitable activities and mission have been chilled; FTC's donors' free speech rights are under threat; and FTC has in fact heard from regular donors who, due to the civil and criminal threats by Defendants, have decided not to donate to FTC any longer; FTC's volunteers and staff are chilled from associating with or traveling with people seeking abortions in states where abortion is legal, and are further chilled from providing even emotional and moral support to people seeking such abortions.

13.     FTC and its staff, board members, and volunteers would also be providing practical and/or financial support to Texans seeking abortions in states where abortions are legal now, but for the threat of enforcement of SB8, the pre-*Roe* statutes, and the Trigger Ban.

14.     FTC is (and its staff, board, volunteers, and donors are) suffering, and will continue to suffer irreparable harm if Defendants are not enjoined from bringing, and organizing and planning to bring criminal charges or civil actions against FTC, its staff, its board, its volunteers, or its donors who wish to again fund and provide support to organizations that help individuals access abortions and other reproductive health services where those abortions and services are legal.

**DECLARATION OF ANNA RUPANI**                                                          **PAGE 4**

15.     Civil penalties, and the related civil litigation, would be ruinous to a charitable organization like FTC. FTC would be unlikely to survive a successful civil penalty action against it, and certainly could not survive a successful criminal action against it or its staff, volunteers, or board members. A criminal action would, if successful, almost certainly result in the dissolution of FTC entirely.  Even an unsuccessful criminal prosecution would like result in organization's dissolution.  FTC believe that criminal or civil action would be imminent if it resumed its normal operations and assisted Texans to obtain abortions outside of the state.  If Defendants are allowed to proceed with criminal or civil enforcement proceedings on the basis of such conduct, FTC will be harmed in a manner from which it will be unable to recover.

16.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 22, 2022.

_____
Anna Rupani

# EXHIBIT A-13
# Declaration of Kamyon Conner

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

|  |  |
|---|---|
| **Plaintiffs Fund Texas Choice, North Texas Equal Acces Fund, The Lilith Fund for Reproductive Equity, Frontera Fund, The Afiya Center, West Fund, Jane's Due Process, Clinic Access Support Network, and Dr. Ghazeleh Moayedi, DO, MPH, FACOG,** | |
| **Plaintiffs,** | **Civil Case No. _____** |
| **v.** | |
| **KEN PAXTON, in his Official Capacity as Attorney General; Susan R. Deski, in her Official Capacity as County Attorney of Burleson County, Texas, and on behalf of a class of all County Attorneys similarly situated; and Julie Renken, in her Official Capacity of District Attorney for Washington County, Texas, Wiley B. "Sonny" McAfee, in his Official Capacity of District Attorney for Blanco, Burnet, Llano, and San Saba Counties, Texas,  Jose Garza in his Official Capacity of District Attorney for Travis County, Texas, and Fred H. Weber, in his Official Capacity of District Attorney for Caldwell County, and on behalf of a class of all Texas District Attorneys similarly situated,** | |
| **Defendants.** | |

**DECLARATION OF KAMYON CONNER**                                                          **PAGE 1**

## DECLARATION OF KAMYON CONNER

STATE OF TEXAS            §

DENTON COUNTY            §

1.      My name is Kamyon Conner.  I am a resident of Denton County, Texas, over 21 years of age, competent, and capable of testifying to the facts stated in this Declaration.

2.      I declare that the statements within this Declaration are within my personal knowledge, and a true and correct.

3.      I am the Executive Director of North Texas Equal Access Fund ("TEA Fund").

4.      TEA Fund's mission is to foster reproductive justice.  Until recent changes in Texas law, TEA Fund provided financial, emotional, and logistical support for low-income abortion patients in north Texas seeking abortion services.  TEA Fund previously funded reproductive healthcare, abortions, and people who seek abortions.

5.      TEA Fund continues to openly communicate with the public regarding abortion, voicing its support for abortion rights, advocating for reproductive freedom and reproductive justice, and seeking the support of others who share the same values.

6.      When Senate Bill 8, also called the Texas Heartbeat Act, became effective in September of 2021, TEA Fund began to limit its direct assistance activities to abortions done in compliance with that law so as to avoid potential civil litigation and civil penalties resulting from that law.[1]  TEA Fund continues to believe that Senate Bill 8 is unconstitutional for reasons that

---

[1] Following the entry of an injunction by the Honorable Robert Pitman on October 6, 2021, that prohibited the enforcement of Senate Bill 8, and before that injunction was stayed by the Fifth Circuit Court of Appeals, TEA Fund briefly resumed its normal operations and assisted pregnant Texans without regard to whether cardiac activity has been detected and paid for at least one abortion after confirming the gestational age of the fetus was beyond the time when cardiac activity is usually detected.  When Judge Pitman's injunction was stayed by the Fifth Circuit Court of

have nothing to do with *Roe v. Wade*, and it is a party to litigation in which Senate Bill 8 has been challenged.

7.     As the expected date for the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization* approached, TEA Fund ceased all of its direct assistive activities. In the wake of *Dobbs*, it has not restarted those activities—even for Texans seeking abortions in other states where abortion remains legal—due to various threats by Texas public officials and civil litigants claiming that Texas law now not only criminalize and civilly penalize abortion *in Texas*, but also criminalize and civilly penalize helping pregnant Texans get legal abortions elsewhere.

8.     These laws include the pre-*Roe* abortion-prohibiting statutes that were originally struck down in *Roe v. Wade*, and which criminalized abortion as a felony; the so-called "Trigger Ban" that prohibits abortion in nearly all circumstances and provides that abortion is a felony and further provides for the levying of civil penalties; and Senate Bill 8. .

9.     TEA Fund believes that, under the U.S. Constitution, it is legal for TEA Fund to provide funds or other assistance to help pregnant Texans obtain abortions in states where the abortion to be obtained is completely legal. It is only because of the threats by Defendants and the related fear of criminal prosecution and civil penalties, that TEA Fund is not providing assistance to pregnant Texans seeking abortions in states where abortion is legal.

10.     TEA Fund's (and its staff's, board's, volunteers', and donors') rights are being violated and it is being injured.  Its associative and free speech conduct related to its charitable activities and mission have been chilled; TEA Fund's donors' free speech rights are under threat;

---

Appeals, TEA Fund immediately returned to its limited operations. In response to TEA Fund's decision to resume its normal operations while Judge Pitman's injunction was in place, TEA Fund and I personally have been targeted for legal actions related to potential civil suits under Senate Bill 8.  TEA Fund has also been specifically targeted by members of the Texas Legislature.

and TEA Fund has in fact heard from regular donors who, due to the civil and criminal threats by Defendants have decided not to donate to TEA Fund any longer. TEA Fund's volunteers and staff are chilled from associating with or traveling with Texans seeking abortions in states where abortion is legal, and are further chilled from providing even emotional and moral support to Texans seeking such abortions.

11.     TEA Fund and its staff, board members, and volunteers would also provide practical and/or financial support to Texans seeking abortions in states where abortions are legal now, but for the threat of enforcement of SB8, the pre-*Roe* statutes, and the Trigger Ban.

12.     TEA Fund is (and its staff, board, volunteers, and donors are) suffering, and will continue to suffer immediate irreparable harm if Defendants are not enjoined from bringing, and organizing and planning to bring criminal charges or civil actions against TEA Fund, its staff, its board, its volunteers, or its donors who wish to again fund and provide support to organizations that help individuals access abortions and other reproductive health services where those abortions and services are legal.

13.     Civil penalties, and the related litigation, would be ruinous to a charitable organization like TEA Fund. TEA Fund would be unlikely to survive a successful civil penalty action against it, and certainly could not survive a successful criminal action against it or its staff, volunteers, or board members. A criminal action would, if successful, almost certainly result in the dissolution of TEA Fund entirely. Even an unsuccessful criminal prosecution would likely result in the organization dissolving. I am also personally afraid that I will be subject to criminal prosecution given the direct threats that have already been made against both TEA Fund and me. TEA Fund and I credibly believe that criminal or civil action would be imminent if TEA Fund returned to its normal operations and assisted pregnant Texans to obtain abortions, even if the

abortions occur outside the state.   If Defendants are allowed to proceed with civil or criminal enforcement proceedings based on such conduct, TEA Fund will be harmed in a manner in which it will be unable to recover.

14.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 23, 2022.

_____
Kamyon Conner

# EXHIBIT A-14
# Declaration of Zaena Zamora

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

**Plaintiffs Fund Texas Choice, North Texas Equal Acces Fund, The Lilith Fund for Reproductive Equity, Frontera Fund, The Afiya Center, West Fund, Jane's Due Process, Clinic Access Support Network, and Dr. Ghazeleh Moayedi, DO, MPH, FACOG,**

**Plaintiffs,**

**v.**

**KEN PAXTON, in his Official Capacity as Attorney General; Susan R. Deski, in her Official Capacity as County Attorney of Burleson County, Texas, and on behalf of a class of all County Attorneys similarly situated; and Julie Renken, in her Official Capacity of District Attorney for Washington County, Texas, Wiley B. "Sonny" McAfee, in his Official Capacity of District Attorney for Blanco, Burnet, Llano, and San Saba Counties, Texas, Jose Garza in his Official Capacity of District Attorney for Travis County, Texas, and Fred H. Weber, in his Official Capacity of District Attorney for Caldwell County, and on behalf of a class of all Texas District Attorneys similarly situated,**

**Defendants.**

**Civil Case No. _____**

## DECLARATION OF ZAENA ZAMORA

STATE OF TEXAS             §

HIDALGO COUNTY             §

1.      My name is Zaena Zamora.  I am a resident of Hidalgo County, Texas, over 21 years of age, competent, and capable of testifying to the facts stated in this Declaration.

2.      I declare that the statements within this Declaration are within my personal knowledge, and are true and correct.

3.      I am the Executive Director of Frontera Fund ("Frontera Fund").  As Executive Director, I am responsible for executing Frontera Fund's mission, protecting the organization's financial health, and supervising staff and volunteers.

4.      Frontera Fund is a Texas nonprofit that, until recent changes in Texas law, provided financial assistance for transportation, lodging, and abortion care for people who want to end a pregnancy but who could not afford to do so. Our mission is to make abortion accessible in the Rio Grande Valley by providing financial and practical support regardless of immigration status, gender identity, ability, sexual orientation, race, class, age, or religious affiliation and to build grassroots organizing power at intersecting issues across our region to shift the culture of shame and stigma as it relates to reproductive health care. Because of current Texas laws, and the threats of criminal and civil penalties made by the Defendants in this case, we are largely unable to pursue this mission currently.

5.      As Executive Director of Frontera Fund, I personally carry out, with assistance from Frontera Fund's Board of Directors, all of Frontera Fund's operations, including the fundraising, financial, communications, administrative, and programmatic work. I served on the

**DECLARATION OF ZAENA ZAMORA**                                    **PAGE 2**

board of Frontera Fund for two years before becoming Executive Director, helping to manage Frontera Fund's finances, providing fundraising support, and interacting directly with community members seeking Frontera's assistance, helping them obtain both funding for their abortion care, and the practical support necessary to access that care.

6.     Frontera Fund, when it provided assistance, screened its clients through an intake process, during which we obtained information about the client's needs and determined whether we could assist them by providing funding to support their abortion care. When the client qualified, we contacted the abortion clinic directly, and provided a voucher to defray abortion costs for the client. We pledged an average of $200-$300.

7.     When Senate Bill 8, also called the Texas Heartbeat Act, became effective in September of 2021, Frontera Fund began to limit its assistance activities to abortions done in compliance with that law so as to avoid potential civil litigation and civil penalties resulting from that law.[1]  Frontera Fund continues to believe that Senate Bill 8 is unconstitutional for reasons that have nothing to do with *Roe v. Wade*, and it is a party to litigation challenging Senate Bill 8.

8.     As the expected date for the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization* approached, Frontera Fund ceased all of its direct assistive activities. In the wake of *Dobbs*, it has not restarted those activities—even with respect to assisting Texans seeking abortions in other states where abortion remains legal—due to various threats by Texas public officials and civil litigants claiming that Texas law now not only criminalize and

---

[1] Following the entry of an injunction by the Honorable Robert Pitman on October 6, 2021, that prohibited the enforcement of Senate Bill 8, and before that injunction was stayed by the Fifth Circuit Court of Appeals, Frontera Fund briefly resumed its normal operations and assisted pregnant Texans without regard to whether cardiac activity has been detected and paid for at least one abortion without confirming the gestational age of the fetus. When Judge Pitman's injunction was stayed by the Fifth Circuit Court of Appeals, Frontera Fund immediately returned to its limited operations.

**DECLARATION OF ZAENA ZAMORA**                                           **PAGE 3**

civilly penalize abortion *in Texas*, but criminalize and civilly penalize helping pregnant Texans get legal abortions elsewhere.

9.      These laws include the pre-*Roe* abortion-prohibiting statutes that were originally struck down in *Roe v. Wade*, and which criminalized abortion as a felony; the so-called "Trigger Ban" which prohibits abortion in nearly all circumstances and also provides that abortion is a felony and further provides for the levying of civil penalties; and Senate Bill 8.

10.     Frontera Fund believes under the U.S. Constitution, Frontera Fund may provide funds or other assistance to help pregnant Texans obtain abortions in states where the abortion to be obtained is completely legal. It is only because of the threats by Defendants, and the related fear of criminal prosecution and civil penalties, that Frontera Fund is not providing assistance to pregnant Texans seeking abortions in states where abortion is legal.

11.     Frontera Fund's (and its staff's, board's, volunteers', and donors') rights are being violated and it is being injured.  Its associative and free speech conduct related to is charitable activities and mission have been chilled; Frontera Fund's donors' free speech rights are under threat; and Frontera Fund's volunteers and staff are chilled from associating with or traveling with people seeking abortions in states where abortion is legal, and are further chilled from providing even emotional and moral support to Texans seeking such abortions.

12.     Frontera Fund and its staff, board members, and volunteers would also provide practical and/or financial support to Texans seeking abortions in states where abortions are legal now, but for the threat of enforcement of SB8, the pre-*Roe* statutes, and the Trigger Ban.

13.     Frontera Fund is (and its staff, board, volunteers, and donors are) suffering, and will continue to suffer irreparable harm if Defendants are not enjoined from bringing, and organizing and planning to bring criminal charges or civil actions against Frontera Fund, its staff, its board,

its volunteers, or its donors who wish to again fund and provide support to organizations that help individuals access abortions and other reproductive health services where those abortions and services are legal.

14.      Civil penalties, and the related litigation, would be ruinous to a charitable organization like Frontera Fund. Frontera Fund would be unlikely to survive a successful civil penalty action against it, and certainly could not survive a successful criminal action against it or its staff, volunteers, or board members. A criminal action would, if successful, almost certainly result in the dissolution of Frontera Fund entirely.  Even an unsuccessful criminal prosecution would like result in the end of the organization.  Frontera Fund believes that criminal or civil action against it would be imminent if it resumed is normal operations and assisted pregnant Texans to obtain abortions in locations where it is legal.  If Defendants are allowed to proceed with civil or criminal proceedings on the basis of such conduct, Frontera Fund will be harmed in a manner from which it will be unable to recover.

15.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 22, 2022.

Zaena Zamora

# EXHIBIT A-15
# Declaration of Marsha Jones

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| **Plaintiffs Fund Texas Choice, North Texas Equal Acces Fund, The Lilith Fund for Reproductive Equity, Frontera Fund, The Afiya Center, West Fund, Jane's Due Process, Clinic Access Support Network, and Dr. Ghazeleh Moayedi, DO, MPH, FACOG,** | |
| **Plaintiffs,** | **Civil Case No. _____** |
| **v.** | |
| **KEN PAXTON, in his Official Capacity as Attorney General; Susan R. Deski, in her Official Capacity as County Attorney of Burleson County, Texas, and on behalf of a class of all County Attorneys similarly situated; and Julie Renken, in her Official Capacity of District Attorney for Washington County, Texas, Wiley B. "Sonny" McAfee, in his Official Capacity of District Attorney for Blanco, Burnet, Llano, and San Saba Counties, Texas,  Jose Garza in his Official Capacity of District Attorney for Travis County, Texas, and Fred H. Weber, in his Official Capacity of District Attorney for Caldwell County, and on behalf of a class of all Texas District Attorneys similarly situated,** | |
| **Defendants.** | |

**DECLARATION OF MARSHA JONES**                                                       **PAGE 1**

## DECLARATION OF MARSHA JONES

STATE OF TEXAS          §

DALLAS COUNTY          §

1.      My name is Marsha Jones.  I am a resident of Dallas County, Texas, over 21 years of age, competent, and capable of testifying to the facts stated in this Declaration.

2.      I declare that the statements within this Declaration are within my personal knowledge, and a true and correct.

3.      I am the Co-Founder and Executive Director of The Afiya Center ("Afiya").

4.      Afiya's mission is to transform the lives, health, and overall wellbeing of Black womxn and girls by providing refuge, education, and resources.  Afiya acts to ignite the communal voices of Black womxn resulting in full achievement of reproductive freedom.

5.      Prior to the enactment of several recent Texas laws, Afiya provided financial, practical and emotional support for abortion patients through its SYS Fund. Afiya continues to advocate for abortion access where abortion is legal. People seeking assistance from the SYS Fund were previously able to contact Afiya by phone or email twenty-four hours per day, seven days per week.  Afiya aimed to have a staff member or volunteer respond within twenty-four hours.

6.      Afiya stayed in touch with each recipient of financial assistance or practical support for thirteen months after the abortion.  Its staff and/or volunteers checked in with recipients the day before, the day of, and the day after their abortions to assess their emotional and practical support needs.  Subsequently, Afiya checked in with recipients once per week for the first month after their abortion, then once per month for the next three months, and then on a quarterly basis. The purpose of these check-ins was to assess a recipient's ongoing emotional and practical support

needs. For example, Afiya has provided individuals with financial assistance for rent and utilities during this thirteen-month period. Since its launch in 2019, approximately 318 pregnant women received financial or practical assistance from the SYS Fund.

7.      When Senate Bill 8, also called the Texas Heartbeat Act, became effective in September of 2021, Afiya began to limit its direct assistance activities to abortions done in compliance with that law so as to avoid potential civil litigation and civil penalties resulting from that law. Afiya continues to believe that Senate Bill 8 is unconstitutional for reasons that have nothing to do with *Roe v. Wade*, and is a party in litigation challenging Senate Bill 8.

8.      As the expected date for the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization* approached, Afiya ceased all of its direct assistance activities related to abortions. In the wake of *Dobbs*, it has not restarted those activities—even with respect to assisting Texans seeking abortions in other states where abortion remains legal—due to various threats by Texas public officials and private litigants claiming that Texas law now not only criminalize and civilly penalize abortion *in Texas*, but also criminalize and civilly penalize helping pregnant Texans get legal abortions elsewhere.

9.      These laws include the pre-*Roe* abortion-prohibiting statutes that were originally struck down in *Roe v. Wade*, and which criminalized abortion as a felony; the so-called "Trigger Ban" that prohibits abortion in nearly all circumstances and also provides that abortion is a felony and further provides for the levying of civil penalties; and Senate Bill 8.

10.      Afiya believes that, under the U.S. Constitution, it is legal for Afiya to provide funds to assist pregnant Texans obtain abortions in states where the abortion is completely legal. It is only because of the threats by Defendants and the related fear of criminal prosecution and civil penalties, that Afiya is not funding such abortions.

**DECLARATION OF MARSHA JONES**                                            **PAGE 3**

11.     Afiya's (and its staff's, board's, volunteers', and donors') rights are being violated and it is being injured.  Its association rights and free speech conduct related to its charitable activities have been chilled; Afiya's donors' free speech rights are under threat; and Afiya's volunteers and staff are chilled from associating with or traveling with Texans seeking abortions in states where abortion is legal, and are further chilled from providing even emotional and moral support to Texans seeking such abortions.

12.     Afiya and its staff, board members, and volunteers would also provide practical and/or financial support to Texans seeking abortions in states where abortions are legal now, but for the threat of enforcement of SB8, the pre-*Roe* statutes, and the Trigger Ban.

13.     Afiya is (and its staff, board, volunteers, and donors are) suffering, and will continue to suffer irreparable harm if Defendants are not enjoined from bringing, and organizing and planning to bring criminal charges or civil actions against Afiya, its staff, its board, its volunteers, or its donors who wish to again begin to fund and provide support to organizations that help Texans access abortions and other reproductive health services where those abortions and services are legal.

14.     Civil penalties, and related litigation, would be ruinous to charitable organization like Afiya. Afiya would be unlikely to survive a successful civil penalty action against it, and certainly could not survive a successful criminal action against it or its staff, volunteers, or board members. A criminal action would, if successful, almost certainly result in the dissolution of Afiya entirely. Even an unsuccessful criminal prosecution would likely result in the organization dissolving and the harm inflicted by an criminal prosecution on an organization created and run by Black women that serves the Black community is particularly acute.  Afiya believes that criminal or civil action against it would be imminent if it resumed its normal operations and funded

abortions for Texans, even if the abortions occurred outside of the state.  If Defendants are allowed to proceed with civil or criminal enforcement proceedings on the basis of such conduct, Afiya will be harmed in a manner from which it will be unable to recover.

15.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 22, 2022.

*Marsha Jones*_____
Marsha Jones

# EXHIBIT A-16
# Declaration of Rachel Cheek

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| **Plaintiffs Fund Texas Choice, North Texas Equal Acces Fund, The Lilith Fund for Reproductive Equity, Frontera Fund, The Afiya Center, West Fund, Jane's Due Process, Clinic Access Support Network, and Dr. Ghazeleh Moayedi, DO, MPH, FACOG,**<br><br>        **Plaintiffs,**<br>**v.**<br><br>**KEN PAXTON, in his Official Capacity as Attorney General; Susan R. Deski, in her Official Capacity as County Attorney of Burleson County, Texas, and on behalf of a class of all County Attorneys similarly situated; and Julie Renken, in her Official Capacity of District Attorney for Washington County, Texas, Wiley B. "Sonny" McAfee, in his Official Capacity of District Attorney for Blanco, Burnet, Llano, and San Saba Counties, Texas,  Jose Garza in his Official Capacity of District Attorney for Travis County, Texas, and Fred H. Weber, in his Official Capacity of District Attorney for Caldwell County, and on behalf of a class of all Texas District Attorneys similarly situated,**<br><br>        **Defendants.** | **Civil Case No. _____** |

<u>**DECLARATION OF RACHEL CHEEK**</u>

1.      My name is Rachel Cheek.  I am a resident of El Paso, Texas, over 21 years of age, competent, and capable of testifying to the facts stated in this Declaration.

2.      I declare that the statements within this Declaration are within my personal knowledge, and a true and correct.

**DECLARATION OF RACHEL CHEEK**                                                                 **PAGE 1**

3.     I am the President of the West Fund.  West Fund is a non-profit, grass-roots organization based in El Paso, Texas.  It was founded in November of 2013 after a variety of restrictions on abortion clinics were imposed by the Texas Legislature.  Its mission was to provide direct and/or supportive funding to assist pregnant people seeking abortion services in El Paso, Texas; Ciudad Juarez, Chihuahua, Mexico; and throughout southern and eastern New Mexico.  It operates a Spanish and English hotline through which it provides information to callers and does client intake, though it presently only does so in Mexico and New Mexico, where abortion remains legal.

4.     West Fund has also collaborated with other Texas reproductive justice organizations to advance advocacy for abortion access and engages in other political activities, with reproductive justice as its central focus.  It also provides comprehensive sexual education programs to high schoolers. West Fund also openly communicates with the public regarding abortion, voicing its support for abortion rights, advocating for reproductive freedom and reproductive justice, and seeking the support of others who share the same values.

5.     When Senate Bill 8, also called the Texas Heartbeat Act, became effective in September of 2021, West Fund began to limit its assistance activities to abortions done in compliance with that law so as to avoid potential civil litigation and civil penalties resulting from that law. West Fund continues to believe that Senate Bill 8 is unconstitutional for reasons that have nothing to do with *Roe v. Wade*, and is involved in litigation challenging Senate Bill 8.

6.     As the expected date for the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization* approached, West Fund ceased all of its assistive activities. In the wake of *Dobbs*, West Fund has not restarted those activities—even with respect to assisting Texans seeking abortions in other states where abortion remains legal—due to various threats by Texas

**DECLARATION OF RACHEL CHEEK**                                                    **PAGE 2**

public officials and high-profile litigants claiming that Texas laws now not only criminalize and civilly penalize abortion *in Texas*, but also criminalize and civilly penalize helping pregnant Texans get legal abortions elsewhere.

7.     These laws include the pre-*Roe* abortion-prohibiting statutes that were originally struck down in *Roe v. Wade*, and which criminalized abortion as a felony; the so-called "Trigger Ban" that prohibits abortion in nearly all circumstances and provides that abortion is a felony and further provides for the levying of civil penalties; and Senate Bill 8.

8.     West Fund believes that, under the Federal Constitution, West Fund may provide funds to assist pregnant Texans in obtaining abortions in states where the abortion to be obtained is completely legal.  It is only because of the threats posed by Attorney General Paxton and the District Attorney and County Attorney Defendants, and the fear of criminal prosecution and civil penalties that West Fund has not re-started funding such abortions.

9.     West Fund's (and its staff's, board's, volunteers', and donors') rights are presently being violated and it is presently being injured.  West Fund's associative and free speech conduct related to its charitable activities have been chilled; West Fund's donors' free speech rights are also under threat; and West Fund has heard from regular donors who, due to the civil and criminal threats by Defendants, have decided not to donate to West Fund any longer.  West Fund's volunteers and staff are also chilled from associating with or traveling with people seeking abortions in states where abortion is legal, and are further chilled from providing even emotional and moral support to people seeking such abortions.

10.    West Fund and its staff, board members, and volunteers would also be presently providing practical and/or financial support to Texans seeking abortions in states where abortions are legal now but for the threat of enforcement of SB8, the pre-*Roe* statutes, and the Trigger Ban.

11.     West Fund is (and its staff, board, volunteers, and donors are) suffering, and will continue to suffer irreparable harm if Defendants are not enjoined from bringing, and organizing and planning to bring criminal charges or civil actions against West Fund, its staff, its board, its volunteers, or its donors who wish to again fund and provide support to organizations that help individuals access abortions and other reproductive health services where those abortions and services are legal.

12.     Civil penalties and the related litigation would be ruinous West Fund. West Fund would be unlikely to survive a successful civil penalty action against it, and certainly could not survive a successful criminal action against it or its staff, volunteers, or board members. A criminal prosecution would, if successful, almost certainly result in the dissolution of West Fund. And even an unsuccessful criminal prosecution would likely result in the dissolution of the organization. If Defendants are allowed to proceed with either criminal or civil proceedings against West Fund for constitutionally protected activity, West Fund will be harmed in a manner in which it will be unable to recover.

13.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 22, 2022.

_____

Rachel Cheek

# EXHIBIT A-17
# Declaration of
# Rosann Mariappuram

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| **Plaintiffs Fund Texas Choice, North Texas Equal Acces Fund, The Lilith Fund for Reproductive Equity, Frontera Fund, The Afiya Center, West Fund, Jane's Due Process, Clinic Access Support Network, and Dr. Ghazeleh Moayedi, DO, MPH, FACOG,** | **Civil Case No. _____** |
| **Plaintiffs,** | |
| **v.** | |
| **KEN PAXTON, in his Official Capacity as Attorney General; Susan R. Deski, in her Official Capacity as County Attorney of Burleson County, Texas, and on behalf of a class of all County Attorneys similarly situated; and Julie Renken, in her Official Capacity of District Attorney for Washington County, Texas, Wiley B. "Sonny" McAfee, in his Official Capacity of District Attorney for Blanco, Burnet, Llano, and San Saba Counties, Texas,  Jose Garza in his Official Capacity of District Attorney for Travis County, Texas, and Fred H. Weber, in his Official Capacity of District Attorney for Caldwell County, and on behalf of a class of all Texas District Attorneys similarly situated,** | |
| **Defendants.** | |

**DECLARATION OF ROSANN MARIAPPURAM**                                                   **PAGE 1**

## <u>DECLARATION OF ROSANN MARIAPPURAM</u>

STATE OF TEXAS        §

TRAVIS COUNTY        §

1.      My name is Rosann Mariappuram.  I am a resident of Travis County, Texas, over 21 years of age, competent, and capable of testifying to the facts stated in this Declaration.

2.      I declare that the statements within this Declaration are within my personal knowledge, and a true and correct.

3.      I am the Executive Director of Jane's Due Process, Inc. ("JDP").

4.      JDP's mission was, for years, to help ensure that young people in Texas have full reproductive freedom and autonomy over their healthcare decisions.  JDP currently employs eight full-time staff members and nearly 100 volunteers.  Until recently, under Texas law, an abortion provider was required to obtain the written consent of a parent or guardian before providing abortion care to a minor.  Without parental consent, a minor's only recourse was to petition a court for a bypass of the requirement.  JDP operated a hotline through which young people could request assistance with the judicial bypass process.  Specifically, JDP connected young people to a network of volunteer attorneys who JDP had recruited and trained to provide free legal representation to minors in judicial bypass proceedings.

5.      JDP also provided case management services, which included providing emotional support and making referrals to housing, education, childcare, and other social services.  Until the recent changes in Texas law, JDP completed about 30 hotline intakes for judicial bypass assistance per month.  Roughly half of those clients completed the bypass process.

6.      JDP also historically provided funds to abortion providers in Texas on behalf of young patients to subsidize the cost of their care.  Occasionally, JDP also referred young people to abortion providers in Texas, secured the abortion appointments for them, and trained abortion providers on how to navigate Texas laws and regulations governing minors' abortion access.

7.      When Senate Bill 8, also called the Texas Heartbeat Act, became effective in September of 2021, JDP began to limit its assistance activities to abortions done in compliance with that law so as to avoid potential civil litigation and civil penalties resulting from that law. JDP continues to believe that Senate Bill 8 is unconstitutional for reasons that have nothing to do with *Roe v. Wade*, and litigation challenging Senate Bill 8 is ongoing.

8.      Following the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization* approached, JDP ceased all of its direct assistive activities and also stopped providing judicial bypass support for young Texans. It has not restarted those activities—even with respect to assisting Texans seeking abortions in other states where abortion remains legal— due to various threats by Texas public officials and civil litigants claiming that Texas law now not only criminalize and civilly penalize abortion *in Texas*, but also criminalize and civilly penalize helping pregnant people get legal abortions elsewhere.

9.      These laws include the pre-*Roe* abortion-prohibiting statutes that were originally struck down in *Roe v. Wade*, and which criminalized abortion as a felony; the so-called "Trigger Ban" that prohibits abortion in nearly all circumstances and also provides that abortion is a felony and further provides for the levying of civil penalties; and Senate Bill 8.

10.     JDP believes that, under the U.S. Constitution, JDP is allowed to provide funds or other assistance to help pregnant Texans obtain abortions in states where the abortion to be obtained is completely legal. It is only because of the threats by Defendants and the related fear of

criminal prosecution and civil penalties, that JDP has not re-started certain of its non-judicial bypass assistive activities.

11.      JDP's (and its staff's, board's, volunteers', and donors') rights are presently being violated and it is presently being injured.  It's associative and free speech conduct related to its charitable activities have been chilled; JDP's donors' free speech rights are under threat; and JDP's volunteers and staff are chilled from associating with or traveling with people seeking abortions in states where abortion is legal, and are further chilled from providing even emotional and moral support to Texans seeking such abortions.

12.      JDP and its staff, board members, and volunteers would also provide practical and/or financial support to Texans seeking abortions in states where abortions are legal now, but for the threat of enforcement of SB8, the pre-*Roe* statutes, and the Trigger Ban.

13.      JDP is (and its staff, board, volunteers, and donors are) suffering, and will continue to suffer irreparable harm if the Defendants are not enjoined from bringing, and organizing and planning to bring criminal charges or civil actions against JDP, its staff, its board, its volunteers, or its donors who wish to again fund and provide support to organizations that help Texans access abortions and other reproductive health services where those abortions and services are legal.

14.      Civil penalties, and the related litigation, would be ruinous to a charitable organization like JPD. JDP would be unlikely to survive a successful civil penalty action against it, and certainly could not survive a successful criminal action against it or its staff, volunteers, or board members. A criminal action would, if successful, almost certainly result in the dissolution of JDP entirely. Even an unsuccessful criminal prosecution would like result in the organization's dissolution.  JDP believes that criminal or civil action against it would be imminent if it resumed its normal operations and assisted Texans to obtain abortions, even if the abortions occurred

outside of the state.  If Defendants are allowed to proceed with civil and criminal proceeding on the basis of such conduct, JDP will be harmed in a manner in which it will be unable to recover.

15.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 22 , 2022.

_____
Rosann Mariappuram

# EXHIBIT A-18
# Declaration of Bridget Schilling

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| **Plaintiffs Fund Texas Choice, North Texas Equal Acces Fund, The Lilith Fund for Reproductive Equity, Frontera Fund, The Afiya Center, West Fund, Jane's Due Process, Clinic Access Support Network, and Dr. Ghazeleh Moayedi, DO, MPH, FACOG,**<br><br>      **Plaintiffs,**<br><br>**v.**<br><br>**KEN PAXTON, in his Official Capacity as Attorney General; Susan R. Deski, in her Official Capacity as County Attorney of Burleson County, Texas, and on behalf of a class of all County Attorneys similarly situated; and Julie Renken, in her Official Capacity of District Attorney for Washington County, Texas, Wiley B. "Sonny" McAfee, in his Official Capacity of District Attorney for Blanco, Burnet, Llano, and San Saba Counties, Texas,  Jose Garza in his Official Capacity of District Attorney for Travis County, Texas, and Fred H. Weber, in his Official Capacity of District Attorney for Caldwell County, and on behalf of a class of all Texas District Attorneys similarly situated,**<br><br>      **Defendants.** | **Civil Case No. _____** |

## <u>DECLARATION OF BRIDGET SCHILLING</u>

STATE OF GEORGIA          §

COUNTY OF FULTON         §

1. My name is Bridget Schilling. I am a resident of Fulton County, Georgia, over 21 years of age, competent, and capable of testifying to the facts stated in this Declaration.

2. I declare that the statements within this Declaration are within my personal knowledge, and are true and correct.

3. I am a member of the Board of Directors for Clinic Access Support Network ("CASN") and also serve as its Treasurer.

4. CASN's mission, until recent changes in Texas law, was to provide information and support for transportation, accommodations, meals, and dependent care for people seeking abortions in the greater Houston and Southeast Texas region. The majority of CASN's activities involved providing transportation, accommodations, and direct payments for other practical support needs to people trying to access abortion services in the Houston area or who are from the Greater Houston Area and surrounding reason, seeking abortions elsewhere. It also used a network of trained volunteers to drive people to and from their abortion appointments.

5. CASN mobilized volunteers and resources to attempt to ensure that all people seeking abortions in or from the Houston area and surrounding region had equal access to abortion care.

6. CASN continues to support the bodily autonomy of all people and its members believe everyone deserves access to reproductive healthcare. The support offered by CASN is unconditional and judgment-free.

7.      When Senate Bill 8, also called the Texas Heartbeat Act, became effective in September of 2021, CASN began to limit its assistance activities to abortions done in compliance with that law so as to avoid potential civil litigation and civil penalties resulting from that law. CASN continues to believe that Senate Bill 8 is unconstitutional for reasons that have nothing to do with *Roe v. Wade*, and is a party to litigation challenging Senate Bill 8.

8.      Upon the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization* approached, CASN ceased all of its assistive activities. In the wake of *Dobbs*, it has not restarted those activities—even with respect to assisting Texans seeking abortions in other states where abortion remains legal—due to various threats by Texas public officials and private litigants claiming that Texas law now not only criminalizes and civilly penalizes abortion *in Texas*, but also criminalizes and civilly penalizes helping pregnant people get legal abortions elsewhere.

9.      These laws include the pre-*Roe* abortion-prohibiting statutes that were originally struck down in *Roe v. Wade*, and which criminalized abortion as a felony; the so-called "Trigger Ban" that prohibits abortion in nearly all circumstances and also provides that abortion is a felony and further provides for the levying of civil penalties; and Senate Bill 8.

10.     CASN believes that, under the U.S. Constitution, CASN is allowed to provide funding and delivery of practical support, including travel assistance, to help pregnant Texans obtain abortions in states where the abortion to be obtained is completely legal. It is only because of the threats by Defendants and the related fear of criminal prosecution and civil penalties, that CASN is not providing assistance to pregnant Texans seeking abortions in states where abortion is legal.

11.     CASN's (and its staff's, board's, volunteers', and donors') rights are being violated and it is being injured.  Its associative and free speech conduct related to its charitable activities

and missions have been chilled; CASN's donors' free speech rights are under threat; and CASN's volunteers and staff are chilled from associating with or traveling with Texans seeking abortions in states where abortion is legal, and are further chilled from providing even emotional and moral support to Texans seeking such abortions.

12. CASN's travel volunteers would, but for threats of enforcement by Defendants, be driving pregnant Texans across state lines to places where abortion is legal now. They are therefore being injured because their exercise of their own personal right to travel (and right to associate) has been chilled. CASN and its staff, board members, and volunteers would also be providing practical and/or financial support to Texans seeking abortions in states where abortions are legal now, but for the threat of enforcement of SB8, the pre-*Roe* statutes, and the Trigger Ban.

13. CASN is (and its staff, board, volunteers, and donors are) suffering, and will continue to suffer irreparable harm if Defendants are not enjoined from bringing, and organizing and planning to bring criminal charges or civil actions against CASN, its staff, its board, its volunteers, or its donors who wish to again fund and provide support to organizations that help individuals access abortions and other reproductive health services where those abortions and services are legal.

14. Civil penalties, and the related litigation, would be ruinous to a charitable organization like CASN. CASN would be unlikely to survive a successful civil penalty action against it, and certainly could not survive a successful criminal action against it or its staff, volunteers, or board members. A criminal action would, if successful, almost certainly result in the dissolution of CASN entirely. Even an unsuccessful criminal prosecution would likely cause the organization to dissolve. CASN believes that criminal or civil action against it would be imminent if it decided to again assist pregnant Texans to obtain care outside of the state. If

**DECLARATION OF BRIDGET SCHILLING**                                      **PAGE 4**

Defendants are allowed to proceed with civil or criminal enforcement actions for undertaking such conduct, CASN will be harmed in a manner from which it will be unable to recover.

15.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 22, 2022.

_/s/Bridget Schilling_____
Bridget Schilling

# EXHIBIT A-19
# Declaration of
# Dr. Ghazaleh Moayedi

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| **Plaintiffs Fund Texas Choice, The North Texas Equal Access Fund, The Lilith Fund for Reproductive Equity, Frontera Fund, The Afiya Center, West Fund, Jane's Due Process, Clinic Access Support Network, and Dr. Ghazaleh Moayedi, DO, MPH, FACOG,** | |
| **Plaintiffs,** | **Civil Case No. _____** |
| **v.** | |
| **KEN PAXTON, in his Official Capacity as Attorney General; Susan R. Deski, in her Official Capacity as County Attorney of Burleson County, Texas, and on behalf of a class of all County Attorneys similarly situated; and Julie Renken, in her Official Capacity of District Attorney for Washington County, Texas, Wiley B. "Sonny" McAfee, in his Official Capacity of District Attorney for Blanco, Burnet, Llano, and San Saba Counties, Texas,  Jose Garza in his Official Capacity of District Attorney for Travis County, Texas, and Fred H. Weber, in his Official Capacity of District Attorney for Caldwell County, and on behalf of a class of all Texas District Attorneys similarly situated,** | |
| **Defendants.** | |

**DECLARATION OF DR. GHAZALEH MOAYEDI**

| | |
|---|---|
| STATE OF TEXAS | § |
| DALLAS COUNTY | § |

1.      My name is Dr. Ghazaleh Moayedi.  I am a resident of Dallas County, Texas, over 21 years of age, competent, and capable of testifying to the facts stated in this Declaration.

2.      I declare that the statements within this Declaration are within my personal knowledge, and are true and correct.

3.      I am a practicing medical doctor licensed in the State of Texas. I am also licensed to practice medicine in 19 other states.

4.      I am a Board Certified Obstetrician and Gynecologist who trained in Texas and who, until Senate Bill 8—also called the Texas Heartbeat Act—became effective in September of 2021, provided abortion care in Texas. I also hold a Master of Public Health degree and I am a Fellow of the American College of Obstetricians and Gynecologists.  As part of my routine practice, I also regularly travelled to others states in which I am licensed to provide abortion care to patients in those states and in compliance with the laws of those states.

5.      When SB8 became effective, I stopped providing abortion services in Texas except as permitted under that law—after a cardiac activity test, and only then if the result of that test was negative.  I continued to travel to other states in which I am licensed and continued to provide abortion care to patients in those states and in compliance with the laws of those states.  After SB8 became effective, many of the patients I cared for in other states were Texans who had traveled to the other states to obtain care that was no longer available in Texas.

6.      As the expected date for the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization* approached, I stopped provide any abortion services in Texas and also stopped traveling and providing abortion care to Texans in any other state. In the wake of *Dobbs*, I have not restarted this work—even with respect to assisting Texans seeking abortions in other states where abortion remains legal—due to various threats by Texas public officials and

civil litigants claiming that various Texas law now not only criminalize and civilly penalize abortion *in Texas*, but also criminalize and civilly penalize providing abortion services to Texans in other states where those abortions are legal.

7.     These laws include the pre-*Roe* abortion-prohibiting statutes that were originally struck down in *Roe v. Wade*, and which criminalized abortion as a felony; the so-called "Trigger Ban" that prohibits my provision of abortion services in nearly all circumstances and also provides imposes felony criminal sanctions and the levying of civil penalties; and Senate Bill 8.

8.     I believe that, under the U.S. Constitution, I am allowed to travel and provide abortion services in states where abortion is legal to any person, whether or not they are a Texan, provided that the abortion complies with the laws of the state in which I perform it.

9.     My rights are presently being violated in several ways. Defendants' threats of criminal and civil enforcement are preventing me from discharging what I believe to be my ethical and professional responsibilities to people who need my help.  I am prevented from associating with my Texas patients and providing services to them.  My right to travel is infringed by these threats as well.  Normally, any American citizen traveling to any other state has the right to benefit from the laws and legal commercial activities of the state they travel to without fearing that their legal conduct in the destination state would subject them to penalties in their home state.  I, however, am being prevented from traveling to another state to do what is completely legal there by the threat of civil penalties and criminal consequences back at my home in the State of Texas.

10.     But for the above-described laws, and the threats made by Texas public officials regarding them which are detailed in the Complaint I and my co-Plaintiffs have filed in this case, I would presently be traveling to other states and providing abortion services to pregnant Texans in those other states where abortions are permitted by law.  But for the same laws and threats, I

would also provide reproductive healthcare services—including medication abortion services—via telemedicine to other states in which I am licensed and such care is legal.  The Texas laws and the threats by state officials' interpretation and enforcement of them are presently chilling my exercise of my constitutional rights.

11.     Civil penalties, and the related civil litigation, could ruin me. My medical practice and professional licensure are also jeopardized by the threat of civil penalties and especially criminal prosecution. And, obviously, the threat of being charged with a first degree felony, or even *murder*, and being sentenced to life in prison, is terrifying. While I am confident in my view of the actual state of the law, I cannot subject myself or my family to the harm that criminal prosecution – even an ultimately unsuccessful one – inflicts.  If Defendants are not enjoined from pursing criminal or civil penalties against me for traveling to other states and performing legal abortion procedures for Texans in those states and providing telemedicine abortion care for patients in states where it is legal, I will continue to be irreparably harmed.

12.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 23, 2022.

_____
Dr. Ghazaleh Moayedi

# EXHIBIT A-20
MDL Order Declaring
Certain Civil Procedures
Unconstitutional
12.09.21

CAUSE No. D-1-GN-21-004179

| | | |
|---|---|---|
| **ALLISON VAN STEAN, et al** | * | **IN THE DISTRICT COURT** |
| | * | |
| | * | |
| **VS.** | * | **98ᵗʰ JUDICIAL DISTRICT** |
| | * | |
| | * | |
| **TEXAS RIGHT TO LIFE, et al** | * | **TRAVIS COUNTY, TEXAS** |

# ORDER DECLARING CERTAIN CIVIL PROCEDURES UNCONSTITUTIONAL and ISSUING DECLARATORY JUDGMENT[1]

INTRODUCTION ................................................................................................................2

I. SUMMARY OF SB 8's CIVIL PROCEDURES ...............................................................5

    A. "Any person" may sue and become a "claimant"......................................5

    B. A successful claimant receives a mandatory $10,000 (or more); the court "shall" issue an injunction.......................................................................................................6

    C. Venue in claimant's home county........................................................................7

II. HOW SB 8's CIVIL PROCEDURES WILL PROBABLY WORK IN PRACTICE ...........8

III. COULD SB 8's PROCEDURES BE USED IN OTHER SITUATIONS? ........................12

IV. JURISDICTIONAL AND PROCEDURAL CHALLENGES .............................................13

    A. Defendants' Plea to the Jurisdiction .................................................................14

    1. Standing................................................................................................................14

    2. Ripeness................................................................................................................16

---

[1] This Order Denies Defendants' Plea to the Jurisdiction, denies Defendants' Motion to Dismiss Under the Texas Citizens Participation Act, grants Partial Summary Judgment to Plaintiffs, and Issues a Declaratory Judgment holding parts of SB 8 unconstitutional.

3. State action and pre-enforcement relief ............................................17

B. Defendants' Motion to Dismiss Under the TCPA ..............................20

V. CHALLENGES BASED ON RIGHT TO PRIVACY UNDER THE TEXAS CONSTITUTION..........25

A. Right to end a pregnancy before viability ...................................26

B. Right to keep patient medical records and decision-making
out of public litigation .........................................................27

VI. CONSTITUTIONAL CHALLENGES TO SB 8'S CIVIL PROCEDURES .......................29

A. Standing for "any person" to seek and obtain automatic and
non-discretionary $10,000 is unconstitutional.............................29

1. The requirement of harm ..................................................29

2. Statutory standing ...........................................................31

3. Constitutional limits on standing........................................34

4. Four principles ...............................................................35

B. SB 8's mandated $10,000 provision is punishment without due process..........36

1. SB 8 does not compensate ...............................................36

2. The $10,000 is not defensible as a civil penalty or a form of statutory
liquidated damages .........................................................39

C. SB 8 is an unconstitutional delegation of power to private persons ...............43

VII. SUMMARY OF RULINGS .........................................................46

VIII. DECLARATORY JUDGMENT .....................................................47

IX. ISSUES REMAINING ............................................................47

## INTRODUCTION.

This case is about the Texas Heartbeat Act, Senate Bill 8. SB 8 combines new *abortion regulations* with completely new *civil procedures* to enforce them.

*But this case is not about abortion; it is about civil procedure.* It is about whether SB 8's civil procedures are constitutional. This Order declares that some of SB 8's civil procedures are unconstitutional, and that others will remain pending and will be given more study than the court has been able to provide at this time.[2]

---

[2] The parties are under an *agreed temporary injunction,* signed by this court on October 28. All

SB 8's provisions fall into two broad categories:

(1) *Abortion restrictions.* SB 8 imposes limits on when abortions may be performed or induced, and it states that deviation from those limits can subject the violator to civil liability. Most of SB 8's *substantive abortion provisions* are in sections 171.101 and 171.203–205. These sections define fetal heartbeat and require physicians (a) to test for fetal heartbeat before performing or inducing an abortion and (b) to keep records of the testing and results. (c) If no test is performed, the physician must record the reasons in detail. (d) A physician may not perform an abortion if a fetal heartbeat is detected *or* no test was done. (e) There is a provision for abortions in emergencies, provided that specified records are kept. (f) There are provisions for an "undue burden" affirmative defense.

These abortion rules could have been made criminal and enforced by official prosecutors. Instead SB 8 made them enforceable by "any person" using a set of stand-alone procedures for SB 8 cases only.

(2) *Civil enforcement procedures.* SB 8 enacts new and unprecedented procedures that change existing rules of civil procedure, apply them to SB 8 cases alone, and make an SB 8 lawsuit difficult to defend. These procedures threaten personal financial risks for everyone in an industry that has been declared legal and protected by the Constitution in a 49-year-old line of decisions from the United States Supreme Court. The procedures are summarized more fully on pages 5-8 below.

In September of this year, fourteen lawsuits were filed seeking declaratory and injunctive relief concerning SB 8. One case was filed by various Planned Parenthood organizations; the other thirteen were filed by organizations and individuals who are involved in different aspects of providing abortions in Texas. On October 14 the Texas Panel on Multi-District Litigation appointed the undersigned judge to serve as pretrial judge for the fourteen cases. After several pretrial Zoom discussions with counsel, on November 10

_____

parties approved the injunction as to form and substance, though Defendants expressly preserved and did not waive their right to present their arguments to the courts. The agreed temporary injunction says: "In the interest of resolving the Plaintiffs' applications, Defendants agree to stipulate to the entry of this Order provided that Defendants do not admit to the truth of Plaintiffs' allegations or to liability, and Defendants do not waive any defenses or objection to this suit."

the court held an in-person hearing. At that hearing the court heard argument on three matters: (1) Defendants' Plea to the Jurisdiction; (2) Defendants' Motion to Dismiss Under the Texas Citizens Participation Act; and (3) Plaintiffs' Motions for Summary Judgment, which attack SB 8's civil procedures as unconstitutional under Texas law and seek declaratory and injunctive relief.

Plaintiffs' motions for summary judgment challenge only the constitutionality of SB 8's *civil procedures*. The motions do not ask this court to make rulings on the *federal* constitutional law concerning *abortion* restrictions.[3] Some of the Plaintiffs do assert that SB 8's abortion restrictions violate the *Texas Constitution*, and the court has denied that claim below (see pages 25 – 28); but whether SB 8's abortion rules violate the United States Supreme Court's 49-year body of abortion law is not before this court. The federal abortion issues have been left to the federal courts, and therefore this court will consider *only* SB 8's new and unique set of *civil procedures*.

Because SB 8's civil procedures are completely new, there is not a single factual precedent for this court to consult—from Texas or from the rest of the United States, from the founding until now. In response to a direct question from this court, the attorneys responded that they are not aware of any comparable set of procedures in American law, ever, whether enacted for civil cases generally or for one special kind of lawsuit alone, as is true in this case. As a result, the court's task has been to study analogous constitutional decisions, from factually different situations, and to reason from them in assessing how these procedures will operate and whether they are constitutional.

---

[3] The Motion for Summary Judgment of thirteen groups of Plaintiffs expressly disclaims any federal challenge to SB 8's abortion rules *in this case*. They say (at page 2, note 2): "This case does not challenge the constitutionality of SB 8's abortion restrictions themselves—although the U. S. Supreme Court has expressly held that a ban on abortions pre-viability is unconstitutional. Instead, this case challenges the constitutionality of SB 8's private enforcement provisions, which vitiate other constitutional rights held by persons subject to SB 8's provisions." Similarly, the Planned Parenthood Plaintiffs do not challenge SB 8's abortion rules *on federal grounds in these cases or this motion,* either in their pleadings or in their motions for summary judgment.

## I. SUMMARY OF SB 8'S CIVIL PROCEDURES

SB 8's three most important provisions are:

(1) the grant of standing for "any person" to become a claimant;

(2) the mandate that courts award a fixed minimum of $10,000 per defendant; and

(3) the option for claimants to sue in their home county, which cannot be changed to a different county without the claimant's express agreement.

### A. "Any person" may sue and become a "claimant"

Traditional civil procedure generally grants people standing to sue if they have been "aggrieved" or "adversely affected" by something or someone. The Texas Supreme Court summarized well the *traditional rules of standing* in 1966, as quoted in footnote four.[4]

---

[4] The court said this in *Scott v. Board of Adjustment*, 405 S.W.2d 55 (Tex. 1966):

> In most cases of this general nature, it has usually been required that the plaintiff be a 'person aggrieved' or a person whose interests are adversely affected, or a person having a special interest in the matter. *This has been held to be true in the absence of statute.* . . . Many statutes give the right to review or to institute suit to 'persons aggrieved,' 'persons adversely affected,' 'any party in interest,' or any persons 'whose rights are substantially affected.' . . . Where the statute requires that the person be interested, affected, or aggrieved, or (*in the absence of a statute*) where the common law rule requiring the showing of particular injury or damage is controlling, the plaintiff must allege and show how he has been injured or damaged other than as a member of the general public in order to enjoin the actions of a governmental body. Such suits are essentially private in character and are for the protection of private rights.

> In other instances, however, the courts have recognized the rights of individuals to challenge governmental action without showing any particular damage. . . . *Within constitutional bounds*, the Legislature may grant a right to a citizen or to a taxpayer to bring an action against a public body or a right of review on behalf of the public without proof of particular or pecuniary damage peculiar to the person bringing the suit. Thus, in *Spence v. Fenchler*, 107 Tex. 443, 180 S.W. 597 (1915), the statute authorized 'any citizen' to bring an action to enjoin the operation of a bawdyhouse. The statute went further, specifically providing that 'such citizen shall not be required to show that he is personally injured by the acts complained of.' This Court concluded that the plaintiff did not have to show particular interest or damage.

*Id.* at 56 (emphasis added, citations omitted).

5

SB 8 grants to "any person" standing to sue "any person" who violates SB 8 by *performing* a prohibited abortion, and to sue "any person" who *helps* perform such an abortion. This means standing for 21+ million Texans, and probably for every adult in the United States.

## B.  A successful claimant receives a fixed, mandatory $10,000 (or more); the court "shall" issue an injunction

Traditional civil procedure specifies that a judge or jury will assess the evidence of harm to the plaintiff and then decide whether to award damages or other relief, and if so, how much. The judge or jury exercises *discretion* when determining an amount.

SB 8 *mandates* a judgment for *at least $10,000* against each defendant who has performed or induced an abortion or helped someone perform or induce one. The claimant need not introduce *any* evidence of injury or harm; in fact, the claimant can be a stranger from far away who wants only to recover the statutory sum of at least $10,000, plus costs and attorney fees. Neither judge nor jury is given any discretion to award *less* than $10,000, but they can award *more*. SB 8 does not give even a word of guidance about whether and how much more to award.[5]

This does not mean the SB 8 plaintiff receives $10,000 per abortion. It means $10,000 *per person, per abortion*. A judgment against defendants Dr. *A*, Nurse *B*, Contributor *C*, and

---

[5] **Sec. 171.208.  CIVIL LIABILITY FOR VIOLATION OR AIDING OR ABETTING VIOLATION.**

  (a)  *Any person*, other than an officer or employee of a state or local governmental entity in this state, may bring a civil action against *any person* who:

    (1)  *performs or induces an abortion* in violation of this subchapter;

    (2)  knowingly engages in conduct that *aids or abets* the performance or inducement of an abortion, including paying for or reimbursing the costs of an abortion through insurance or otherwise . . . . [or]

    (3)  *intends to engage in the conduct* described by Subdivision (1) or (2).

  (b)  If a claimant prevails in an action brought under this section, the court *shall award*:

    (1)  *injunctive relief* sufficient to prevent the defendant from violating this subchapter or engaging in acts that aid or abet violations of this subchapter;

    (2)  statutory damages in an amount of *not less than $10,000* for each abortion that the defendant performed or induced in violation of this subchapter, and for each abortion performed or induced in violation of this subchapter that the defendant aided or abetted; and

    (3)  *costs and attorney's fees.* . . .

TEX. HEALTH & SAFETY CODE ANN. § 171.208 (emphasis added).

Driver $D$ would not be simply a joint and several judgment for $10,000, collectable against any of the four defendants for a total recovery of $10,000. Instead the claimant would have a judgment against each defendant for $10,000 individually, for a total of $40,000—plus more if the court awards more, in addition to costs and attorney fees.

## C.  Venue in claimant's home county.

Legislatures have traditionally possessed great authority to enact and control venue rules. Statutes usually say venue is proper where the individual defendant *resides* or the entity defendant has its principal place of *business,* or where the *acts or conduct* alleged in the lawsuit took place. SB 8 modifies the usual rules and *adds* that any *Texas claimant* may choose to sue in the *county where he lives*.

Venue may or may not matter much in small states, but in Texas venue is especially important because it is so much more inconvenient and expensive (in terms of money and lost time) to litigate a case in a distant forum.

But venue is not just about distance and inconvenience—to choose venue is also to choose the *judge* (or judges) and the *jury pool*. All this can often influence the outcome, sometimes decisively. Venue is more than the "home team" advantage, with a familiar stadium and a partisan crowd that can make deafening noise on cue. Trial lawyers know that venue is more than location because *to choose venue* from several alternatives is also to *choose the referees*—the judge and the jury pool. Venue is so important in Texas that until 1983 our law allowed an interlocutory appeal if a request for change of venue was denied.

In an SB 8 case venue will always be proper in the claimant's home county, and the trial court is forbidden to transfer venue unless all parties expressly agree to the transfer.[6] It is hard to imagine why a claimant would ever agree to a change in venue from his home

---

[6] **Sec. 171.210.  CIVIL LIABILITY:  VENUE.**

   (a)  [A] civil action . . . shall be brought in:

      (1) the county in which all or a substantial part of the events . . . occurred;

      (2) [for individual defendants] the county of residence . . . .

      (3) [if the defendant is a company] the county of [its] principal office in this state; or

      (4) the county of [the claimant's] residence . . . if the claimant is a natural person residing in this state.

   (b)  If a civil action is brought . . . in any one of the venues described by Subsection (a), the action may not be transferred to a different venue without the written consent of all parties.

*Id.* § 171.210.

county to somewhere else.[7]

## II. HOW SB 8'S CIVIL PROCEDURES WILL PROBABLY WORK IN PRACTICE

**Claimants and home counties—If you build it, will they come?** SB 8 empowers some 21+ million Texas adults[8] to file enforcement cases. One would expect that claimants would usually choose to file in their home counties. When it is possible to choose venue (and the court system) where you live, a claimant would usually choose to file the case in one of his home county's courts rather than somewhere more distant and unfamiliar. More important though, is the reality that people motivated by ideology will study and will know *where* they prefer that cases be filed, and then they will be able to use social media to locate willing claimants to file suit in those counties.

Some claimants will likely be interested in the money award. But many may well be ideological claimants, interested in the enforcing the law against abortion providers and their helpers, including the mandatory injunction. Some claimants may be acting alone, filing cases from home at their computer. They will probably be people who have enough money to pay filing fees and enough leisure time to do this. Other claimants will be working in tandem with activists who have found claimants who live in "good venue" counties.

Counties that prove to be a receptive forum for SB 8 lawsuits will probably attract more

---

[7] The legislature might have been concerned, with good reason, that some elected prosecutors in some counties would not enforce SB 8. There is evidence in the declarations that some district attorneys have vowed not to enforce any abortion law in their districts. Prosecutors do have discretion in choosing which cases to prosecute. Prosecutors also have an ethical duty to see that justice is done, not just to seek a conviction. (See footnote 77 below) It is not clear to this court what alternatives are available when laws passed by a legislature won't be enforced by the elected prosecutors in some areas, that is, whether the legislature could have established a statewide prosecutor for these cases or given this duty to the Attorney General.

In any event, the choice made in SB 8 was to establish state-wide civil enforcers, tempted by the easy financial reward and also by the luxury of filing suit in one's home county against persons who live in the other 253 Texas counties, who will have to defend the case far from home.

[8] According to the 2020 census 21,866,700 adults (18 and over) live in Texas.

filings than other counties. Even though counsel for Defendants said offhandedly, in papers filed with this court, that "any person" means *anyone in the world*,[9] it seems very unlikely that even English-speaking foreigners would file SB 8 cases. Like non-Texans in this country, they would not be able to file suit in a home county because they don't live here and therefore don't have one; they could file only where the defendant lives or where the abortion took place. Those venues will seldom be as favorable to these lawsuits as some other counties in Texas.

Claimants and activists will learn quickly which venues and courts are friendly to SB 8 suits and which are not. Some courts will not prioritize these cases. A claimant might learn that his case keeps getting reset or placed last on the docket. *SB 8 filings will gravitate to the more favorable venues.*

**Choice of courts.** SB 8 does not specify which courts have jurisdiction to hear these cases, so the general rules of jurisdiction would apply. Each of Texas' 484 District Courts, many of its 256 Statutory County Courts, and all of its 840 Justices of the Peace would have *jurisdiction* to hear these cases.[10] Every claimant would have a pool of courts to choose

---

[9] *See Defendants' Motion to Dismiss under the Texas Citizens Participation Act* (at page 7): "An injunction that prevents Texas Right to Life and Mr. Seago from suing Ms. Van Stean does nothing to liberate abortion providers in Texas, who remain subject to private civil enforcement suits from *anyone else in the world* if they violate the statute." (emphasis added); *Defendants' Response to Plaintiffs' Motions for Summary Judgment* (at page 15): "An injunction that stops only Texas Right to Life and Mr. Seago from suing—while leaving the door open for *everyone else in the world* to sue the plaintiffs for their violations of SB 8—does not redress any injury that the plaintiffs are suffering on account of the statute." (emphasis added).

SB 8's language supports the conclusion that suit may be brought by *any person in the United States* and maybe beyond. SB 8 makes venue proper in the county of the claimant's residence "if the claimant is a natural person *residing in this state*." (emphasis added). This clearly means that natural persons who do *not* reside in Texas may bring suit, but only in one of the other three counties mentioned. *See* footnote 6 above for text of SB 8's venue provisions.

[10] All 484 *District Courts* in Texas would have *jurisdiction*, although many of the district courts specialize in criminal, family, or juvenile cases and might not handle civil cases. The 256 *statutory county courts* generally have jurisdiction in civil cases up to $250,000. *See* TEX. GOV'T CODE § 27.031. Special statutes sometimes limit their jurisdiction in particular counties or specify unique jurisdiction (e.g., combinations of family law, misdemeanors, civil, and probate). The 840 *Justices*

from within their home county.

**Discovery.** Claimants will need to know something about the abortion to know which persons to sue. It is more likely that ideological activists will have that information than the lone wolf. But Texas law allows persons to "petition the court" for an order allowing a deposition "before suit or to investigate claims."[11] These Rule 202 suits might well be used to compel documents from a potential defendant and to compel him to appear for sworn testimony in a deposition. Once a claimant locates one person who participated as a doctor or an aider, discovery will usually lead to more potential defendants.

**Default judgments.** An SB 8 lawsuit could not be safely ignored by any defendant, who would suffer a default judgment that would become final and be collectible by the procedures mentioned below. A defendant who has notice of the suit and ignores it will have a difficult time convincing a court to set aside the default judgment, all in the claimant's home county, where the motion for new trial or suit to set aside the judgment must be filed.

**Texas collection tools.** Claimants who file and win an SB 8 case will have access to several procedures for obtaining money or assets from judgment debtors who don't pay voluntarily.

Texas law gives a judgment creditor several tools for enforcing the judgment. (1) *Judgment lien.* The creditor can file an abstract of the judgment in the real property records where the debtor owns real property. This creates a lien that will cloud title so when the debtor/property owner eventually tries to sell the property, no one will buy it until the lien is paid and title cleared. In these days some buyers might just agree to pay off the lien, to prevent the holder from foreclosing when it is no longer the debtor's homestead and may lawfully be sold at auction. (2) *Turnover.* The creditor can seek a *turnover* order (usually appointing a receiver with court-approved power to investigate, question the defendant, locate nonexempt assets,[12] and sell them). *See* TEX. CIV. PRAC. & REM. CODE §

---

*of the Peace* generally may hear civil cases up to $20,000. *See id.* 25.0003.

[11] Rule 202, titled "Depositions Before Suit or to Investigate Claims," provides: "A person may petition the court for an order authorizing the taking of a deposition on oral examination or written questions . . . (b) to investigate a potential claim or suit." TEX. R. CIV. PRO. 202.

[12] Our state has longstanding and effective protections for a debtor's wages and homestead in addition to protections for some retirement, disability, and other benefits.

31.002. The turnover statute is too long to quote in this Order, but it has become the tool of choice for creditors who want to collect a judgment from a debtor who does not want to pay. (3) *Garnishment.* The judgment holder can *garnish* the defendant's bank accounts. A writ of garnishment requires the bank to freeze the debtor's money and ultimately pay it to the creditor, after a court hearing to make sure all is in order. *See* Tex. R. Civ. Pro. 657-679. (4) *Execution.* The creditor can have a sheriff or constable levy *execution* by seizing assets. *See* Tex. R. Civ. Pro. 621-656.

The court does not suggest that these tools *always* work (they do not) or that they are *easy* to employ (they are not). But there are lawyers who specialize in using these procedures and defending against their use, and in the hands of the right lawyer the tools could be used to extract money from most of the potential defendants in an SB 8 enforcement suit. Judgment liens are relatively simple to file and inexpensive; for the patient creditor they can produce payment when the debtor eventually wants to sell his house, or dies and his estate is in probate and the property is no longer exempt as homestead. These procedures can inflict pain on the debtor and can increase one's stress level.

On the subject of collecting the judgment, a money judgment against someone with a job or with assets is a thing of value. Lawyers could take collection cases for a percentage of the recovery. They could at least file the judgment for record and let it sit and earn interest at the statutory rate.[13]

**Injunctions.** SB 8 mandates that when a defendant is found liable the court "shall" issue an injunction.[14] Courts could enforce SB 8 injunctions by holding the defendant in contempt of court. If the defendant does not come in person for a contempt hearing, the court must issue a capias and have him arrested and brought to court. It is possible that the law enforcement officers in defendant's county might not be eager to arrest the local person. Claimant's home court might have to simply keep the capias/warrant active and then if the defendant is stopped for a traffic violation anywhere, that warrant will show

---

[13] On most judgments the statutory interest rate accrues at the Federal Reserve's prime rate, but at 5% if the prime rate is below 5 and at 15% if the prime rate is above 15. *See* Tex. Fin. Code Ann. § 304.003 (a).

[14] Section 171.208 (b) provides: "If a claimant prevails in an action brought under this section, the court shall award: (1) injunctive relief sufficient to prevent the defendant from violating this subchapter or engaging in acts that aid or abet violations of this subchapter." Tex. Health & Safety Code Ann. § 171.208 (b).

up on the officer's computer and the defendant could well be arrested and held.

## III. COULD SB 8'S PROCEDURES BE USED IN OTHER SITUATIONS?

SB 8 raises an obvious concern: if its civil procedures are constitutional for abortions, they will be constitutional for other targets. Other states (or future Texas Legislatures) might copy and paste them onto other substantive provisions to drive undesired activities out of business. In our polarized country, other states with different electorates and different priorities might decide to use these procedures to put other people out of business or to stamp out behavior they dislike intensely, including other areas of life covered by constitutional law. The undesired activities targeted in other states, of course, might be different from abortion providers in Texas.

How might these civil procedures work against gun owners? *State A* could copy the procedures and replace the abortion provisions with language that forbids *openly carrying* guns, or with language requiring *trigger locks* on all guns. There could be exceptions for carrying a gun to and from one's house and truck in a gun case, and provisions making it lawful to possess and openly carry a gun outside the city limits on your own property or when lawfully hunting or at a shooting range. The *State A* claimant (an activist physically distant from the gun-owning defendant) could simply file suit and obtain the judgment, record it in the real property records from his home computer, and wait until the owner tries to sell the property.

*State B* might use the procedures to enforce discrimination laws against bakery owners who will not, as a matter of conscience, decorate a cake with a message that is offensive to them or that violates their religious beliefs.[15] To be effective, this statute would need to cover the bakery *and its "aiders and abetters"* (aka employees, suppliers, financial backers), who might quickly decide it is best to stop helping the bakery discriminate and thereby avoid these lawsuits. Such a statute would not need to empower "any person" in the state to be a claimant; the person who arranged the test case(s) and whose message was not placed on the cake, would be a claimant with easy standing and a psychological injury. The courts might eventually uphold the baker's right not to be compelled to speak a message he disagrees with, but he and others like him and his employees might be

---

[15] *See, e.g., Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,* 138 S. Ct. 1719 (2018).

bankrupted in the meantime.

The procedures could be used not only to put people out of business, but to attack a disputed area of constitutional law that a legislature passionately disagrees with, like the First Amendment. Statutes could adapt these procedures to single out climate change deniers, or those who utter "hate speech," or American History teachers who teach X or don't teach X. We are a diverse and creative people, and it seems naïve to hope these procedures will be cabined voluntarily once they are upheld.

In sum, if SB 8's civil procedures are constitutional, a new and creative series of statutes could appear year after year, to be enforced by eager ideological claimants, who could bring suit in their home counties, where the judges would do their constitutional duty and enforce the law. Pandora's Box has already been opened a bit, and time will tell.

## IV. JURISDICTIONAL AND PROCEDURAL CHALLENGES

A threshold question in this case is whether Plaintiffs are entitled to make a pre-enforcement challenge to SB 8's procedures, or whether they must wait until cases are brought and then the persons sued would have to defend themselves case by case and appeal adverse decisions until the constitutionality of SB 8's procedures is decided.

Defendants challenge the standing of all Plaintiffs. If no plaintiff has standing, the court has no jurisdiction and must dismiss the suit. The challenge to Plaintiffs' standing is the heart of Defendants' Plea to the Jurisdiction, their Motion to Dismiss under the Texas Citizens Participation Act, and their response to Plaintiffs' Motions for Summary Judgment.

The Texas Supreme Court has stated the rules for evaluating a *plea to the jurisdiction*:

> When assessing a plea to the jurisdiction, our analysis begins with the live pleadings. We may also consider evidence of jurisdiction—and we must consider such evidence when necessary to resolve the jurisdictional issue. *We construe the plaintiff's pleadings liberally, taking all factual assertions as true*, and look to the plaintiff's intent.[16]

A *TCPA motion to dismiss* is assessed in much the same way:

---

[16] *Heckman v. Williamson County*, 369 S.W.3d 137, 150 (Tex. 2012) (emphasis added).

> In determining whether a legal action is subject to or should be dismissed under
> this chapter, the court shall consider the pleadings, evidence a court could
> consider under Rule 166a, Texas Rules of Civil Procedure, and supporting and
> opposing affidavits stating the facts on which the liability or defense is based.[17]

In keeping with these rules, the court will assess the pleadings and declarations.[18]

## A. Defendants' Plea to the Jurisdiction

### 1. Standing

Defendants challenge plaintiffs' standing to bring these lawsuits. Their Plea to the
Jurisdiction says no plaintiff has *standing* because everyone is complying with SB 8 and
therefore there is no one to "aid" or "abet":

> None of the plaintiffs can establish standing because every Texas abortion
> provider is complying with SB 8 . . . . [and] it is impossible for the plaintiffs to
> "aid or abet" post-heartbeat abortions in Texas, as no such abortions are being
> performed. . . . The defendants will not sue any of the plaintiffs because they are
> not violating SB 8—and they *cannot* violate, aid or abet abortions in violation of
> SB 8 even if they wanted to. . . . So there is nothing for the Court to enjoin: The
> plaintiffs are complying with the law, and the defendants are incapable of suing
> the plaintiffs because they are fully complying with SB 8.[19]

There are multiple Plaintiffs in these consolidated cases. The rules of standing for *multiple
plaintiffs* were recently summarized in *Patel v. Texas Department of Licensing & Regulation*,
469 S.W.3d 69, 77-78 (Tex. 2015):

> Generally, courts must analyze the standing of each individual plaintiff to bring
> each individual claim he or she alleges. *Heckman v. Williamson Cnty.*, 369 S.W.3d
> 137, 152 (Tex. 2012). However, "where there are multiple plaintiffs in a case, who
> seek injunctive or declaratory relief (or both), who sue individually, and who all
> seek the same relief[,] . . . the court need not analyze the standing of more than
> one plaintiff—so long as that plaintiff has standing to pursue as much or more

---

[17] Tex. Civ. Prac. & Rem. Code § 27.006(a).

[18] Affidavits and unsworn declarations are given essentially the same weight. *See id.* § 132.001.

[19] *Defendants' Plea to the Jurisdiction*, at 2.

relief than any of the other plaintiffs." *Id.* at 152 n.64. The reasoning is fairly simple: if one plaintiff prevails on the merits, the same prospective relief will issue regardless of the standing of the other plaintiffs. *Id.*

*Patel* and *Heckman* cited with approval *Andrade v. NAACP of Austin,* 345 S.W.3d 1, 6 (Tex. 2011), a voting case that put the principles in a nutshell: "Because the [plaintiff] voters seek only declaratory and injunctive relief, and because each voter seeks the same relief, only one plaintiff with standing is required."

In reliance on these authorities, this court will examine the standing of only a few representative plaintiffs, who clearly have standing to bring these cases and to seek declaratory and injunctive relief based on their constitutional arguments.

According to the pleadings, several plaintiffs in these fourteen cases have standing to challenge SB 8 in its entirety. This conclusion is based on their pleadings, taken as true under *Heckman,* and it is not changed by the abundant admissible evidence in the record.[20]

Plaintiff Dr. Ghazaleh Moayedi is a board certified obstetrician gynecologist who provides abortion care in Texas. She is a Fellow of the American College of Obstetricians and Gynecologists. If she continues to provide abortions after a fetal heartbeat is detectable, she would be subject to liability for at least $10,000 plus attorney fees and costs and a mandatory injunction forbidding her to do such abortions again. She would be liable for performing or inducing abortions.

Plaintiff Clinic Access Support Network is an organization whose volunteers provide transportation, information, money for meals, accommodations, and childcare or dependent care assistance, to people seeking abortion services. CASN is managed by a board and has one full-time employee. It brings suit for itself, because entities can be liable, and for its members and board, who might be held liable under SB 8's "aid and abet" provision.

Three different Planned Parenthood organizations are Plaintiffs who do business in Austin, Dallas, El Paso, Fort Worth, Houston, Lubbock, San Antonio, and Waco. They

---

[20] Defendants have made approximately 250 boilerplate objections to Plaintiffs declarations, which the court has read. *Those objections are overruled.* The objections to the declarations of the three plaintiffs discussed in this Order and the court's rulings on them have been expressly stated in footnotes 33, 35, and 36. The one-word hearsay objections to the Muniz and Adkins declarations are also overruled.

each have standing to bring these suits for declaratory and injunctive relief. Their petitions say their staff members provide information, transportation, meal funding, physical accommodations, childcare, dependent care, and compassionate care to people seeking abortion advice and services. For these aiding and abetting activities, they might face liability with no upper limits.

Dr. Bhavik Kumar is a board-certified family medicine doctor in Houston; he provides medication and procedural abortions. Before SB 8 the vast majority of the abortions provided by him occurred at a time when fetal cardiac activity could be detected.

Several Plaintiffs provide funding and/or refer patients to funding sources. They fear—reasonably—that they could be sued and held liable for $10,000 or more, plus attorney fees and costs.

All of these activities have been curtailed by the real possibility of SB 8 lawsuits against abortion providers and those who aid them.

## 2. Ripeness

The Defendants' Plea to the Jurisdiction also states that Plaintiffs' claims are not *ripe* for two reasons: (1) "because it is impossible to 'aid or abet' post-heartbeat abortions that Texas abortion providers are refusing to perform," and therefore Defendants cannot sue anybody. In addition, (2) it is "indeterminate and unknowable whether the Defendants, as opposed to some other person unrelated to the Defendants, would sue one of the Plaintiffs if they chose to violate [SB 8]."[21]

The court respectfully rejects these arguments. SB 8 empowers "any person" to seek $10,000 per defendant. Plaintiffs' petitions allege that the law is chilling abortion activity, and has had that effect since it took effect on September 1.

Defendants' filings in this case unwittingly admit the reality of the threat and the chill—Defendants' TCPA motion to dismiss and their response to the summary judgment motions both point out that Plaintiffs gain nothing by enjoining Defendants because they are still subject to lawsuits from *anyone and everyone else in the world* if they violate the act.[22] They also point out that there are no prohibited abortions taking place right now for

---

[21] *Id.* at 4.

[22] *See* footnote 9 on page 9.

anyone to aid or abet.

Plaintiffs' pleadings and declarations also state that their activities have been chilled by the prospect of having to defend SB 8 lawsuits and the danger of having $10,000 judgments and mandatory injunctions rendered against them.

The court holds that Plaintiffs have *standing* and their claims are *ripe*.

### 3. State action and pre-enforcement relief

Defendants' argue that the "state action" doctrine bars these suits. The court respectfully rejects this contention.

Plaintiffs would be able to challenge SB 8's constitutionality if and when they are sued for $10,000 in a lawsuit. A claimant in a regular *enforcement* case for $10,000 could simply not successfully make the following argument to the trial court:

> Your Honor, because I am a private person suing this abortion defendant, he cannot argue that SB 8 is unconstitutional because *I am not a state actor*. Yes, I am enforcing a state law and seeking $10,000 from him, and also my costs and attorney fees, but this doctor/nurse/driver/contributor can't even argue that any part of SB 8 is unconstitutional because there is *no state action*.

The state-action argument could not be successfully urged in an enforcement case in one of the 254 counties in Texas, when persons are being sued for $10,000 or more. The argument is also without merit in this *pre-enforcement* case.

Plaintiffs simply want to make their constitutional arguments in this *pre-enforcement* case instead of waiting until SB 8 is enforced by civil lawsuits. The law allows them to do that. In essence, Defendants challenge Plaintiffs' right to challenge SB 8 before case-by-case enforcement; they want the court to make these Plaintiffs wait until SB 8 claimants sue them in distant courts for the mandatory money awards. This court holds that these pre-enforcement suits are permissible.

The Texas Supreme Court in *In re Abbott*, 601 S.W.3d 802 (Tex. 2020), recently discussed principles of standing in pre-enforcement situations. *Abbott* was a suit by sixteen trial judges against the Governor and Attorney General seeking an injunction to prevent enforcement of an executive order concerning pretrial bail. Factually *Abbott* is dissimilar to this case—as is all existing American case law—but the pre-enforcement relief principles that it summarized are pertinent here:

To establish standing based on a perceived threat of injury that has not yet come to pass, the "threatened injury must be certainly impending to constitute injury in fact"; mere "allegations of possible future injury" are not sufficient. *Whitmore v. Arkansas*, 485 U.S. 149, 158 (1990) (citations omitted). A plaintiff does not need to be arrested and prosecuted before suing to challenge the constitutionality of a criminal law. He must, however, allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Babbitt v. Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).[23]

Here there is not a threat of *criminal prosecution*, but there is a real and serious threat of civil enforcement with ruinous $10,000-plus judgments issued by courts distant from the defendants' county of residence.[24]

Unlike the situation in *Abbott*, the SB 8 threat is much more real and serious than "unsubstantiated speculation"; and the plaintiffs here, unlike the judge-plaintiffs in *Abbott*, do not enjoy "long-established principles of judicial immunity that provide adequate protection." The Plaintiffs' complaints are certainly not "generalized complaints" about government.[25] A review of this court's summary of the procedures and how they will work in practice (above at pages 5-12) makes this plain.

As will be seen below on pages 29-46, the court holds SB 8's civil procedures unconstitutional on three grounds, standing, punishment without due process, and delegation: (1) SB 8 unconstitutionally grants standing for uninjured persons to take a fixed, automatic sum of money from a person who has not harmed them in any way; (2) SB 8 unconstitutionally punishes without due process of law; and (3) SB 8 unconstitutionally delegates enforcement authority to private persons.

**Concerning *standing*,** the state action concept does not apply because if a plaintiff does not have standing to bring the claim, the court has no jurisdiction to entertain the suit at all and must dismiss it for lack of jurisdiction. That is, in an SB 8 enforcement suit, the

---

[23] *See* 601 S.W.3d at 812.

[24] It is certainly *possible* that a plaintiff might bring an SB 8 suit against a resident defendant in Austin or Dallas or Houston, where a defendant lives. But in this court's experience, plaintiffs almost always bring cases in the better venue when one is available, as it is in SB 8 cases.

[25] *Id.* at 812-13.

defendant would be able to file a Plea to the Jurisdiction challenging the claimant's standing and the court's jurisdiction to entertain the suit. That defendant could argue that SB 8's grant of standing to 21 million uninjured persons is unconstitutional. The court holds they are permitted to make that assertion *now* in this *pre-enforcement* suit.

**Concerning *punishment*,** courts must give litigants due process of law, period. A civil lawsuit for punitive damages is usually a case between two (or more) private litigants— ordinarily *none* of the parties are *state actors*. Yet courts must still give each litigant a trial that conforms to principles of due process of law. The concept of "no state action" simply does not apply when a litigant is asking the court in a civil case to provide a trial that complies with due process. A litigant is entitled to due process even if the state does nothing but provide the *law* and the *court*. In most civil cases, neither the plaintiff nor the defendant is a state actor, but both are entitled to due process. Due process is something a court must provide before life, liberty, or property can be taken.

**Concerning *delegation*** of enforcement authority to private persons, it is *the state* that has delegated power to the private person. The act of delegating itself is state action. Another way of stating this is that the claimant is a state actor, or a *de facto agent of the state*. But when the constitutional assertion is improper delegation, there is no state action problem.

Defendants' request that the court dismiss this case because there is no state action is respectfully **denied.**

As part of their state-action argument, Defendants also say the Plaintiffs cannot employ third-party standing to assert the rights of pregnant mothers.[26] But Plaintiffs assert their own personal rights to engage in the provision of abortions. They do not need to assert third-party standing in this case because *they are not challenging SB 8's abortion restrictions in this case*. Plaintiffs' argument is not that the mother's rights are being violated; their argument is that *SB 8' civil procedures violate the Texas Constitution.*

---

[26] *Defendants' Motion to Dismiss Under the TCPA* at 11.

## B. Defendants' Motion to Dismiss Under the TCPA

Defendants' *Motion to Dismiss under the TCPA* is analyzed in three steps:[27] (1) Does the TCPA apply to the case? (The court answers *no, it does not*). (2) Have the Plaintiffs established a prima facie case? (The court answers *yes, they have*). (3) Have Defendants proven a valid defense? (The court answers *no, they have not*). The Motion to Dismiss under the TCPA is respectfully **denied** for the following reasons.

Defendants' motion to dismiss relies largely on the argument that these cases are not justiciable—that is, Plaintiffs have not shown *standing* and their claims are not *ripe*. This assertion is without merit for the reasons stated above in the discussion of the Plea to the Jurisdiction.

The Texas Supreme Court recently said: "The TCPA's purpose is to identify and summarily dispose of lawsuits designed only to chill First Amendment rights, not to dismiss meritorious lawsuits."[28] This statement is a fair distillation of the TCPA's statement of purpose.[29] These lawsuits do not seek to chill Defendants' First Amendment

---

[27] *See Youngkin v. Hines*, 546 S.W.3d 675, 679-80 (Tex. 2018) (discussing the TCPA's three-step analysis). As it pertains to this case, the TCPA states in § 27.005:

(b) Except as provided by Subsection (c) . . . a court shall dismiss a legal action . . . if the [defendant] demonstrates that the legal action is based on or is in response to: (1) the [defendant's] exercise of: (A) the right of free speech; (B) the right to petition; or (C) the right of association; . . .

(c) The court may not dismiss a legal action under this section if the [plaintiff] establishes by clear and specific evidence a prima facie case for each essential element of the claim in question.

(d) Notwithstanding the provisions of Subsection (c), the court shall dismiss a legal action [if the defendant] establishes an affirmative defense or other grounds on which the [defendant] is entitled to judgment as a matter of law.

TEX. REV. CIV. STAT. ANN. § 27.005.

[28] *In re Lipsky*, 460 S.W.3d 579, 589 (Tex. 2015).

[29] Section 27.002 of the act states: "The purpose of this chapter is to encourage and safeguard the constitutional rights of persons to *petition, speak freely, associate freely, and otherwise participate in government* to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." TEX. CIV. PRAC. & REM. CODE ANN.

rights or their right to "participate in government."

(1) The TCPA applies if a plaintiff's lawsuit "is based on or is in response to" Defendants' exercise of first amendment rights. Plaintiffs' pleadings do state that Defendants advocated and lobbied for SB 8 in the legislature and they have made public statements supporting it. *But Plaintiffs have not sued Defendants for making those statements; instead their pleadings complain essentially that Defendants have been encouraging persons to file SB 8 lawsuits or to provide information to that end.* It is clear that these cases are not "based on" and do not "respond to" Defendants' exercise of their First Amendment rights—Plaintiffs have not sued them for that.

If this court is correct that some of SB 8's core civil procedures are unconstitutional, as the court explains on pages 29-46 below, there is no First Amendment right to encourage persons in Texas and across the United States to file suits to take money from other persons *by using an unconstitutional civil procedure.*

The court holds that Defendants have not satisfied the TCPA's first step, and the motion is respectfully **denied** for that reason.

(2) A TCPA motion to dismiss should be denied if the court finds that Plaintiffs have made out a prima facie case. The supreme court recently discussed and explained step two's evidentiary burden:

> [The TCPA] does not impose an elevated evidentiary standard or categorically reject circumstantial evidence. In short, it does not impose a higher burden of proof than that required of the plaintiff at trial. [The act does not require] direct evidence of each essential element of the underlying claim to avoid dismissal.[30]

*Declaratory judgment.* The court finds and holds that Plaintiffs have made out a prima facie case that they are entitled to a declaratory judgment. Indeed, they have proven as a matter of law their right to a declaratory judgment for the reasons stated below on pages 29-46 of this Order.[31]

---

§ 27.002. (emphasis added).

[30] *In re Lipsky,* 460 S.W.3d at 591.

[31] The Texas Uniform Declaratory Judgments Act, TEX. CIV. PRAC. & REM. CODE § 37.006(a), requires that "all persons who have or claim any interest that would be affected by the declaration must be made parties." Defendants certainly qualify as such persons. The Texas Attorney General

*Permanent injunction.* The court makes two holdings on the request for a permanent injunction: (1) the court holds that Plaintiffs have shown a prima facie case for a permanent injunction, and therefore Defendants' *TCPA motion to dismiss* should be **denied**, but (2) Plaintiffs' request for issuance of a *permanent injunction* by summary judgment has not been established as a matter of law and is therefore **denied**.

There are contested fact issues on the injunction claim that should be decided by a conventional trial, not by summary judgment. The record shows that several plaintiffs are experiencing irreparable harm from SB 8's provisions and from Defendants' efforts to see that the law is enforced by private citizens if anyone violates SB 8. Plaintiffs' declarations, taken as true, show that defendant Texas Right to Life's website has asked for tips about violators, solicited funds, and promised to "sue the abortionists ourselves."[32]

Plaintiffs' evidence is contradicted by Defendants' summary judgment evidence, which includes sworn denials by Defendants that they ever intended to do anything to stir up SB 8 lawsuits or encourage people to file them. At trial both sides will have an opportunity to cross-examine witnesses and explore the facts. The court will then decide whether to grant or deny a permanent injunction.

---

was notified of this suit in September and has chosen not to attend hearings, file briefs, or defend SB 8. More recently, in response to an email from the court, the Attorney General's office replied on November 9 that the office did not intend to appear at the November 10 hearing.

[32] Defendant Seago's declaration in federal court (August 5) is part of this record: ¶ 6: "Texas Right to Life is publicizing the availability of private civil-enforcement lawsuits under Senate Bill 8 through social media and other forms of advertising, and we are encouraging individuals to sue abortion providers and abortion funds if they defy the law when it takes effect on September 1, 2021." Seago's declaration in this case (November 7): ¶ 6: Neither Texas Right to Life nor I will sue any person or entity that is *complying with SB 8.* We would consider suing *only* individuals or entities that are *violating the law* by performing or inducing a post-heartbeat abortion, or by aiding or abetting an illegal abortion of that sort, and only if we have credible information to support such a lawsuit (emphasis added)." The Texas Right to Life website said concerning SB 8 (September 2, 2021): "Use the links below to report anyone who is violating the Texas Heartbeat Act . . . . If you want to help enforce the Texas Heartbeat Act anonymously, or have a tip on how you think the law has been violated, fill out the form below. We will not follow up with or contact you." Muniz declaration, Exhibits 3 & 5.

In sum, on this record Plaintiffs have shown a prima facie case for a permanent injunction but have not proven all of their case as a matter of law, as is their summary judgment burden.

Concerning the request for a permanent injunction, Plaintiffs' affidavits contain competent evidence that Plaintiffs' claims are justiciable and individual Plaintiffs and Planned Parenthood organizations have standing to assert them. The summary judgment evidence shows particularized injury-in-fact, traceable to Defendants' conduct, that would be redressed adequately by an injunction. That evidence is countered by Defendants' evidence, which creates fact issues for trial.

As stated above (pages 14-15) if even one plaintiff has standing to seek the declaratory and/or injunctive relief sought by other plaintiffs in these cases, the one plaintiff with standing is sufficient for the whole case. The court has selected the declarations of three representative Defendants.

The affidavit of Dr. Bhavik Kumar establishes standing and ripeness as a provider. He is a board-certified family doctor who performs abortions. He clearly qualifies as an expert witness.[33]

Ken Lambrecht's affidavit establishes standing and ripeness as President and CEO of one of the Planned Parenthood organizations on behalf of the organizations and their

---

[33] Kumar's declaration says: ¶5. "I understand that SB 8 bans the provision of abortion in Texas after embryonic cardiac activity can be detected, which occurs at approximately 6 weeks LMP [last menstrual period]." The objection ("no personal knowledge, legal opinion, conclusory, foundation") is overruled. ¶12: "Viability is medically impossible at 6 weeks LMP. Viability is generally understood as the point when a fetus has a reasonable likelihood of sustained survival after birth, with or without artificial support, which occurs much later in pregnancy at approximately 24 weeks LMP, though some pregnancies are never viable." The objection to this paragraph ("foundation") is overruled. ¶44: "Since SB 8 has taken effect, I have seen only a small fraction of the patients I would see on a typical day—and of those, many have embryonic cardiac activity so I am unable to provide the patients care. For instance, on the first day I provided abortions after SB 8 became effective, I saw only 6 patients when I usually see approximately 20 to 30 in a day. Half of the patients I saw had embryonic cardiac activity and thus were ineligible for an abortion in Texas." The objection ("foundation") is overruled.

employees.[34] Their subsidiaries have eleven locations in central, east, north and west Texas, and in Austin, Dallas, El Paso, Fort Worth, and Waco.[35]

Lambrecht and Michelle Tuegel[36] establish standing and ripeness as Plaintiffs who "aid

---

[34] The court held in *Texas Workers' Comp. Comm'n v. Garcia,* 893 S.W.2d 504, 518 (Tex. 1995), that an association may sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Texas Ass'n of Business v. Texas Air Control Bd.,* 852 S.W.2d 440, 447 (Tex. 1993) (citing *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343 (1977))."

This court holds that an *organization* has the same standing to sue on behalf of its *employees.*

[35] Lambrecht says the organizations provide miscarriage management and contraception advice, and before September 1 when SB 8 took effect "offered medication abortion up to 10 weeks LMP and procedural abortion through 21 weeks 6 days LMP" in Austin; "offered medication abortion up to 10 weeks LMP and procedural abortion through 18 weeks 6 days LMP" in Dallas; he gave similar testimony (with slightly different numbers) for Fort Worth and Waco. Members of his staff receive intake calls, schedule patients, counsel patients on their options, and refer them to other providers when appropriate. The court holds that these activities would subject these people to lawsuits alleging "aid or abet" liability. ¶12: Lambrecht's organizations, "our physicians, and our staff cannot afford the certain cost of abusive litigation, plus any monetary penalties and attorneys' fees and costs that SB 8 would impose if we were to violate the Act by providing abortions after the six-week ban." The objection ("speculation, no personal knowledge, foundation") is overruled. ¶15: Lambrecht expressed his concern about "SB 8's fee-shifting provisions" which might "force us to pay opponents' legal costs and fees" in enforcement suits, and also might "expose our attorneys to joint liability for the other side's fees and costs." The objection ("legal opinion, conclusory, speculation") is overruled. ¶17: "Staff are understandably frightened that they will be sued and forced into a Texas court far away from home to defend themselves, and they are deeply worried about the impact that these suits will have on themselves and their families." The objection ("no personal knowledge, foundation, relevance") is overruled.

[36] Michelle Tuegel is a licensed practicing Texas attorney who "focuses her practice on representing victims of sexual assault and abuse." She has provided and will continue to provide her clients and potential clients with advice about abortion services. ¶8: "According to the terms of SB 8, I aid and abet abortions in the State of Texas. I have engaged in conduct that helped to facilitate the performance or inducement of an abortion in the past that would have violated SB 8's terms, and because I believe that SB 8 is void under both federal and Texas law, I cannot in

and abet" by providing funding, driving and transportation, counseling, and assistance to women trying to locate abortion facilities. This would expose Lambrecht (and his employees) and Tuegel to suits alleging liability as "aiders" in the abortion process.

The testimony of *any* of these persons should *alone* establish standing. The record contains more than adequate evidence of standing and ripeness and the impact on Plaintiffs. The court has read the declarations and the Defendants' 250 boilerplate objections are overruled.

In view of how SB 8's procedures will probably work and harm Plaintiffs, coupled with Defendants' statements in their declarations above, the court holds that Plaintiffs have presented a prima facie case of irreparable harm.

The court holds that Plaintiffs have shown "injury in fact," traced to Defendants' conduct. To show redressability Plaintiffs do not have to show that a declaratory judgment or injunction would remedy their situation *entirely*. It would be impossible to sue and enjoin every adult in Texas or in the United States. Plaintiffs are entitled to bring this pre-enforcement challenge to SB 8's constitutionality.

The summary judgment evidence proves Plaintiffs are entitled to a declaratory judgment as discussed below, and are entitled to proceed to trial on their request for a permanent injunction. They have not proved as a matter of law that they are entitled to *summary judgment* granting a permanent injunction. That issue is reserved for trial.

For all these reasons, Defendants' *Plea to the Jurisdiction* and their *Motion to Dismiss Under the TCPA* are respectfully **denied**.

## V. Challenges Based on Right to Privacy under the Texas Constitution

In 1996 the Texas Supreme Court observed that *federal decisions* have recognized two

---

good faith discontinue my supportive actions and philanthropic giving." The objection ("legal opinion, speculation, foundation, conclusory") is overruled. Tuegel is a Texas attorney who is qualified to give her opinion about SB 8's constitutionality as part of her reason for continuing her activities as a matter of principle. But in deciding *the legal question of SB 8's constitutionality* in this case, the court disregards her legal opinions about constitutionality.

distinct aspects of the privacy right:

> The United States Supreme Court has recognized that at least two different kinds
> of privacy interests are protected by the United States Constitution. . . . The first
> type of privacy protects an individual's interest in avoiding the *disclosure* of
> personal information. . . . This interest is the *'right to be let alone'* . . . . The second
> constitutionally protected privacy interest is the right to make certain kinds of
> important *decisions* and to engage in certain kinds of *conduct*. . . . The first privacy
> interest focuses on governmental action that is *intrusive or invasive*; the second
> concerns *decisions or conduct* by individuals."[37]

In 2002 the court spoke again about these two aspects of the privacy right: "We have
recognized that the Texas Constitution protects personal privacy from [i] *unreasonable
governmental intrusions* and [ii] *unwarranted interference with personal autonomy*."[38]

Plaintiffs argue that SB 8 violates their right to privacy in two ways:

> (1) "SB 8 denies Plaintiffs' patients their right under the Texas Constitution to
> end a pregnancy before viability" [i.e. the personal autonomy aspect], and

> (2) "SB 8 violates patients' right to disclosural privacy by permitting any person
> to place patient records and decision-making at issue in public litigation" [i.e. the
> disclosure of personal information/intrusion aspect].

## A. Right to end a pregnancy before viability

Plaintiffs assert that the *Texas* right of privacy "is at least as broad" as the *federal* right,
that it encompasses the right to end a pregnancy before viability, and that SB 8's "fetal
heart activity" provision violates this right.

The court respectfully rejects this contention. Though the Texas Supreme Court has cited
and discussed federal abortion decisions, it has never adopted those decisions as the
constitutional law of this state. The court in *Bell* made this clear when it discussed and
accepted the United States Supreme Court's distinction between a government's decision
to *prohibit abortion* and a decision to *encourage childbirth* by not subsidizing abortion:

> [The United States Supreme Court has] recognized a fundamental difference

---

[37] *City of Sherman v. Henry*, 928 S.W.2d 464, 467-68 (Tex. 1996) (emphasis added, citations omitted).

[38] *Bell v. Low Income Women of Texas*, 95 S.W.3d 253, 264 (Tex. 2002) (emphasis added).

> between governmental action prohibiting abortion, and the government's decision to encourage childbirth as a policy matter. . . . [There is a] 'basic difference between direct state interference with a protected activity {abortion] and state encouragement of an alternative activity' [childbirth].
>
> While *we have never decided whether the Texas Constitution creates privacy rights coextensive with those recognized under the United States Constitution*, we find this distinction persuasive.[39]

The Texas decisions have considered whether the Texas right of privacy: (1) requires subsidized abortion funding whenever the law also subsidizes childbirth,[40] (2) prevents a police chief from denying promotion to an officer because he had a sexual affair with a fellow officer's wife,[41] and (3) protects a public employee from having to submit to a polygraph examination.[42] But Texas constitutional law does not create a state right to end a pregnancy before viability.

The court respectfully declines to declare that the Texas right to privacy encompasses the right to end a pregnancy before viability. Plaintiffs have not argued or briefed the federal right to privacy, and therefore this court will not address that issue.

## 2. Right to keep patient medical records and decision-making out of public litigation

SB 8 requires doctors to keep specified medical records when they perform an abortion. The Planned Parenthood Plaintiffs argue essentially that disclosure of the patient's records in an SB 8 lawsuit would violate the intrusion/personal information aspect of the privacy right. Defendants point out that SB 8 says nothing about discovery of medical records and does not override evidence privileges—SB 8 simply requires that records be

---

[39] *Id.* at 265 (emphasis added, internal citations omitted).

[40] *Id* (the court answered *no*).

[41] Answering *no,* the court in *City of Sherman* held that "the Texas Constitution does not provide a right of privacy for a police officer who was denied a promotion because he had a sexual affair with the wife of another police officer. This conclusion does not mean, however, that the government is free to engage in intrusive methods to determine the sexual practices of individuals." 928 S.W.2d at 474.

[42] *Texas State Employees Union v. Texas Dep't of Mental Health & Mental Retardation,* 746 S.W.2d 203 (Tex. 1987) (the court answered *yes*).

kept.

The Texas Supreme Court has spoken on this question. In *R.K. v. Ramirez*, 887 S.W.2d 836 (Tex. 1994), the court interpreted TEX. R. EVID. 509, which states the Physician-Patient Privilege and makes the following exception for civil cases:

> **(e) Exceptions in a civil case.** The privilege does not apply: . . .
>
> > **(4) Party relies on patient's condition.** If any party relies on the patient's physical, mental or emotional condition as a part of the party's claim or defense and the communication or record is relevant to that condition.

The court said further: "We reject R.K.'s argument that discovery of his medical and mental health records violates his constitutional right of privacy. The patient-litigant exceptions in Rules 509 and 510, as we have interpreted them, are not unconstitutional."[43]

These decisions are sensitive to the patient's interest in keeping medical information private unless that interest is outweighed by a litigant's need to see the records. TEX. R. EVID. 509 states: "The physician may claim the privilege on the patient's behalf." And rule 509 also says the "patient's representative" may claim the privilege. Presumably the patient could sign a form in the doctor's office saying anyone accused of "aiding or abetting" within the meaning of SB 8 is authorized to claim the privilege on her behalf.[44]

The court concludes that Plaintiffs' facial attack on SB 8's record-keeping mandate is without merit. It is respectfully **denied**. If and when an SB 8 case is brought and a *physician* and/or a *patient representative* asserts the privilege, that issue will be for the trial court to decide.

---

[43] 887 S.W.2d at 843. The supreme court in *In re Collins*, 286 S.W.3d 911 (Tex. 2009), also discussed when and whether medical records are subject to discovery and may be admitted at trial.

[44] The mother cannot be a party to an SB 8 enforcement case because SB 8 prohibits lawsuits against her. *See* § 171.206 (b) (1).

## VI. Constitutional Challenges to SB 8's Civil Procedures

### A. Standing for "any person" to seek and obtain automatic and non-discretionary $10,000 is unconstitutional

Plaintiffs' motions for summary judgment argue that "SB 8's standing provision is unconstitutional" and it "violates the Texas Constitution by conferring on uninjured persons a right to sue [Plaintiffs in this case] in Texas courts."

Section 171.208 provides *procedures* for civil lawsuits by claimants to allege and prove violations of SB 8's substantive provisions, summarized above. SB 8 authorizes "any person" (but not a state or local government official or employee) to sue "any person" who *performs or induces* an abortion in violation of SB 8's terms and against any person who *aids or abets* a violator.

If the claimant prevails by proving a violation, section 171.208 mandates that the court "shall award ... not less than $10,000," plus costs and attorney fees, against each physician and each person who aided the physician. The statute expressly includes insurers or businesses that pay for medical care that includes abortions done in violation of SB 8.[45]

### 1. The requirement of harm

Plaintiffs argue that SB 8's grant of standing to "any person" exceeds the boundaries set by the Texas Constitution and case law, which require some kind of harm for standing. The case law establishes that standing in Texas generally requires some kind of harm or injury.

The Texas Supreme Court has said often and recently that the standing doctrine rests on two provisions of our constitution: *separation of powers* and *open courts*.[46] The court said in

---

[45] Section 171.208: (a) Any person ... may bring a civil action against *any person* who: ... (2) knowingly engages in *conduct that aids or abets* the performance or inducement of an abortion, including *paying for or reimbursing the costs* of an abortion through *insurance or otherwise*, if the abortion is performed or induced in violation of this subchapter, regardless of whether the person knew or should have known that the abortion would be performed or induced in violation of this subchapter; ... See Tex. Health & Safety Code § 171.208 (emphasis added).

[46] The Texas Bill of Rights provides: "Sec. 13. EXCESSIVE BAIL OR FINES; CRUEL OR UNUSUAL PUNISHMENT; OPEN COURTS; REMEDY BY DUE COURSE OF LAW. Excessive bail shall not be

*In re Abbott,* 601 S.W.3d 802 (Tex. 2020):

> The Texas standing doctrine derives from the Texas Constitution's provision for *separation of powers* among the branches of government, which denies the judiciary authority to decide issues in the abstract, and from the *open courts* provision, which provides court access only to a "person for an injury done him."[47]

Similar statements were made recently in *Finance Comm'n of Texas v. Norwood,* 418 S.W.3d 566, 580 (Tex. 2013); *Daimler-Chrysler Corp. v. Inman,* 252 S.W.3d 299, 304 & n.17 (Tex. 2008); and *South Texas Water Authority v. Lomas,* 223 S.W.3d 304, 307 (Tex. 2007).

*Lomas* phrased the harm requirement in these words:

> And our constitution's open-courts provision contemplates access to the courts for only those litigants who have suffered an actual injury, as opposed to one that is general or hypothetical. Thus, as a general rule, to have standing an individual must demonstrate a particularized interest in a conflict distinct from that sustained by the public at large.[48]

Texas standing law generally mirrors federal law. It is true, as Defendants point out, that federal standing law rests in part on Article III's limitation of federal court standing to "cases and controversies," language not found in the Texas Constitution. It is also true that Texas standing law rests in part on our open-courts provision, language not found in the U. S. Constitution.

Harm can be intangible. The United States Supreme Court said this year:

> To have Article III standing to sue in federal court, plaintiffs must demonstrate, among other things, that they suffered a concrete harm. *No concrete harm, no standing.* Central to assessing concreteness is whether the asserted harm has a *"close relationship" to a harm traditionally recognized as providing a basis for a lawsuit in American courts*—such as physical harm, monetary harm, or various intangible

---

required, nor excessive fines imposed, nor cruel or unusual punishment inflicted. *All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law."* TEX. CONST. Art. I, § 13 (emphasis added).

[47] 601 S.W.3d at 807 (emphasis added, citations omitted).

[48] 223 S.W.3d at 307.

harms including (as relevant here) reputational harm. *Spokeo, Inc.* v. *Robins*, 578 U. S. 330, 340–341 (2016). . . .

Various intangible harms can also be concrete. Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts. Those include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion. . . .[49]

## 2. Statutory standing

Defendants argue that SB 8's grant of standing to "any person" is constitutional, and that "a plaintiff is not required to demonstrate injury if standing has been conferred by statute." They cite Texas cases that say *unless standing is granted by statute*, the general rule of standing is that a plaintiff must have an interest in the conflict that differs from the interest of the general public.[50]

Defendants also cite *Spence v. Fenchler*, 180 S.W. 597 (Tex. 1915), which involved a statute granting "any citizen" standing to seek an *injunction* against a bawdyhouse, without having to show that he was "*personally injured* by the acts complained of."[51] The supreme court approved enforcement of that statute by a citizen who did not show that he was "personally harmed," although his pleadings did allege the bawdyhouse was near his

---

[49] *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200, 2204 (2021) (emphasis added, citations omitted).

[50] *E.g., Sneed v. Webre*, 465 S.W.3d 169, 180 (Tex. 2015) ("Generally, *unless standing is conferred by statute*, a plaintiff must demonstrate that he or she possesses an interest in a conflict distinct from that of the general public, such that the defendant's actions have caused the plaintiff some particular injury.") (emphasis added, citation omitted); *Hunt v. Bass*, 664 S.W.2d 323, 324 (Tex. 1984) ("Standing consists of some interest peculiar to the person individually and not as a member of the general public. The general rule of standing is applied in all cases *absent a statutory exception to the contrary.*") (emphasis added, citations and internal quotation marks omitted).

[51] The statute authorized the attorney general and local prosecutors to bring suit and said "any citizen of this state" may also bring such a case, and "such citizen shall not be required to show that he is *personally injured* by the acts complained of." 180 S.W. at 603 (emphasis added).

property and he alleged concrete and specific harm to his *business* and the *property's rental value and market value*. [52]

---

[52] The trial court had denied Spence's request for an injunction without hearing evidence, based on the pleadings alone. The supreme court summarized and quoted plaintiffs' petition at length, which stated in vivid detail how the bawdyhouse had damaged the usefulness and value of Spence's property *nearby* (and the property of other plaintiffs similarly situated). Spence's sworn petition had alleged:

> That each of the plaintiffs owns and is in possession of certain described real estate in the city of El Paso, Tex.; that the defendant Fenchler owns and . . . sublets or rents said building at 214 Broadway to his codefendant, Bess Montell, who is now in possession thereof and interested therein as tenant or lessee; 'that the said Bess Montell . . . [runs] a bawdy and disorderly house on said property . . . defendants have often been notified that their said property is being used, rented, and kept for such illegal purposes . . . that prostitutes are permitted to resort and reside in and on the said premises for the purpose of plying their vocation, and that said lewd women and women of bad reputation for chastity are employed and permitted to display and conduct themselves in a lewd, lascivious, and indecent manner on the said premises . . . .

> 'That the keeping and maintaining of said bawdy and disorderly house, or houses, upon said premises . . . is a nuisance, and *seriously damages and depreciates the rental value and market value* of plaintiffs' property hereinbefore described, which said property is *situated in close proximity and near* to the said property so owned by said defendants . . . that said nuisances make the dwelling houses . . . of these plaintiffs, and others similarly situated, *unfitted for the occupancy of respectable people* . . . and the said immoral and illegal places drive out and turn away the respectable citizens from that vicinity . . . and greatly reduce and decrease, and will continue to so greatly reduce and decrease, the *rental value and market value* thereof, unless the said nuisance is abated' [and are] irreparably damaging the property of these plaintiffs, as well as the property of other citizens and taxpayers . . . [that all of this] 'renders the property of these plaintiffs, as well as the property of other citizens and taxpayers, unfit for occupation by respectable families as tenants, and prevent these plaintiffs, and others similarly situated, from improving their property and building thereon because of the impossibility of securing good tenants; that said bawdy and disorderly house, or houses . . . prevent these plaintiffs, and others similarly situated, from maintaining and running business houses, stores, and rooming houses for decent and first-class trade and patronage, and *hamper them in securing decent and respectable girls, men, and women to enter their employ and work for them* . . . and prevent the

32

The statutory grant of standing in *Spence* empowered citizens to seek an *injunction pursuant to the usual court procedures of the time, as in all civil suits*.[53] SB 8 grants standing to "any person," using an unfairly tilted set of procedures, with venue always available at home for Texas claimants, against defendants from anywhere in the state, who are liable for a significant sum.[54] The court in *Spence* was not allowing an El Paso citizen to sue an East Texas person in El Paso to shut down an East Texas brothel. In fact. Spence had pleaded in detail that his property was *nearby* to Fecnhler's and that the bawdyhouse *damaged his property's value* as shown in footnote 52 above.

When the Texas Supreme Court discussed *Spence* in 1966, it said there are "constitutional bounds" around a legislature's grant of standing:

> [T]he courts have recognized the rights of individuals to challenge governmental action without showing any particular damage. . . . *Within constitutional bounds*, the Legislature may grant a right to a citizen or to a taxpayer to bring an action against a public body or a right of review on behalf of the public without proof of particular or pecuniary damage peculiar to the person bringing the suit. Thus, in *Spence v. Fenchler*, 107 Tex. 443, 180 S.W. 597 (1915), the statute authorized 'any citizen' to bring an action to enjoin the operation of a bawdyhouse. The statute went further, specifically providing that 'such citizen shall not be required to show that he is personally injured by the acts complained of.' This Court concluded that the plaintiff did not have to show particular interest or damage.[55]

None of the cases that mention statutory standing involved a statute that granted standing to "any person." And none authorized the claimant to win a significant, mandatory amount of money without showing any connection to, or harm from, the

---

wives and daughters of the citizens of El Paso from visiting their stores and business houses owned by plaintiffs, and other citizens of El Paso, Tex., similarly situated to the great and irreparable injury and damage of these plaintiffs and others similarly situated.' 180 S.W. at 599-600 (emphasis added).

[53] The statute said that "the procedure in all cases brought hereunder shall be the same as in other suits for injunction, as near as may be." *Id.*

[54] At the risk of mixing metaphors, one might say SB 8 tilts the playing field, or stacks the deck, or puts a thumb on the scales.

[55] *Scott v. Board of Adjustment*, 405 S.W.2d 55, 56 (Tex. 1966) (emphasis added).

defendant or his conduct.

Many of the statutory cases grant standing to challenge the action of a *government agency*. None give persons standing to seek a money judgment against a fellow citizen, and then to use the machinery of the courts and collection procedures of our rules and statutes. Volunteer drivers, nurses, receptionists, social workers, and others will often not have liquid funds to pay a judgment. But Texas law gives the holder of a judgment a range of tools for collecting judgments from them. These collection tools can be used to make life miserable for the judgment debtor when the creditor has the time, the desire, and the know-how, as discussed on pages 10-12 above.

It is one thing to authorize taxpayers or citizens to file suits against government officials to make them obey a law, and to compensate these private attorneys general for their time and trouble and their attorney fees with money from the state treasury, as statutes sometimes do. It is quite another thing to incentivize citizens or persons to file suits against other private citizens to extract money from them, with no pretense of compensating the claimant for anything.

### 3. Constitutional limits on standing

Plaintiffs point out that recent cases say the legislature cannot grant standing beyond constitutional limits. The court in *Norwood* said:

> The [Administrative Procedure Act] does not purport to set a higher standard than that set by the general doctrine of standing, and *it cannot be lower, since courts' constitutional jurisdiction cannot be enlarged by statute. In re Allcat Claims Serv. L.P.*, 356 S.W.3 455, 462 (Tex. 2011) ("If the grant of jurisdiction or the relief authorized in the statute exceeds the limits of [the Constitution], then we simply exercise as much jurisdiction over the case as the Constitution allows . . . .").[56]

The United States Supreme Court has recently discussed the issue of constitutional limits on standing. As the Court said in *Ramirez*:

> Congress may "elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." . . . But even though "Congress may 'elevate' harms that 'exist' in the real world before Congress recognized them to actionable legal status, *it may not simply enact an injury into*

---

[56] 418 S.W.3d at 582 n. 83 (emphasis added).

*existence, using its lawmaking power to transform something that is not remotely harmful into something that is." . . .*

[I]f the law of Article III did not require plaintiffs to demonstrate a "concrete harm," *Congress could authorize virtually any citizen to bring a statutory damages suit against virtually any defendant who violated virtually any federal law.*[57]

Three dissenters disagreed with the majority about the *adequacy of the proof of harm* in *Ramirez*. But they took pains to make clear, as did the majority, that *there are limits on Congress's constitutional power to grant standing to plaintiffs who have suffered no harm whatsoever*:

[I]n *Spokeo*, this Court held that "Article III requires a concrete injury even in the context of a statutory violation." . . . Article III requires for concreteness only a "real harm" (that is, a harm that "actually exist[s]") or a "risk of real harm." . . . Overriding an authorization [by Congress] to sue is appropriate *when but only when* Congress could not reasonably have thought that a suit will contribute to *compensating or preventing the harm at issue.*[58]

The Supreme Court in *Ramirez* stressed that its standing rules rest on Article III's "case or controversy" requirement. Though Texas has no such constitutional requirement, the Texas Constitution does have the open-courts provision, which opens the Texas courts for those who seek redress for injury, requiring proof of injury perhaps stronger than is found in Article III.

## 4. Four principles

From all these authorities, four overriding principles emerge:

(1) standing ordinarily requires that a plaintiff show some kind of harm different from harm to the public generally,

(2) the legislature can change the usual rules with a statute,

(3) statutory standing rules must stay within constitutional boundaries, and

(4) Texas standing law rests in part on Texas Supreme Court decisions inter-

---

[57] *TransUnion LLC v. Ramirez,* 141 S. Ct. at 2204-2208.

[58] *Id.* at 2226 (Kagan, J., joined by Breyer and Sotomayor, JJ, dissenting) (emphasis added, citations omitted).

preting the Constitution's open courts provision.

Applying these principles, this court holds that SB 8's grant of standing for persons who have not been harmed to sue persons who have not harmed them, mandating a large award without proof of harm, is unconstitutional.

## B. SB 8's mandated $10,000 provision is punishment without due process

Plaintiffs argue that SB 8's "mandatory statutory minimum $10,000 is excessive and arbitrary" because "there is no articulable individual injury," citing *State Farm Mutual Automobile Insurance Company v. Campbell*, 538 U.S. 408 (2003). The court sustains this contention. SB 8 is not compensatory, and it is not a form of statutory liquidated damages known to American law. The statute authorizes punishment by civil lawsuit, and deprivation of property, without due process of law as guaranteed by the Fourteenth Amendment.

### 1. SB 8 does not compensate

The Court in *State Farm v. Campbell* summarized the traditional American understandings about damages for *compensation* and damages for *punishment*:

> [I]n our judicial system compensatory and punitive damages . . . serve different purposes. . . . Compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." . . .
>
> While States possess discretion over the imposition of punitive damages, it is well established that there are procedural and substantive constitutional limitations on these awards. . . . The due process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor. . . .
>
> "Despite the broad discretion that States possess with respect to the imposition of *criminal penalties* and *punitive damages*, the Due Process Clause . . . imposes substantive limits on that discretion." . . . To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an *arbitrary deprivation of property*. . . .[59]

The Court then held that there must be a *proportionate relationship* between the *harm* to the

---

[59] 538 U.S. at 416-17 (emphasis added, citations omitted).

plaintiff and the *amount* of punitive damages:

> [C]ourts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered.[60]

For twenty-five years Texas law of punitive (or exemplary) damages has been consistent with federal due process as declared by the United States Supreme Court. Our statute codifies due process principles: Exemplary damages may be awarded only when the claimant proves with *clear and convincing evidence* that his *harm* resulted from *fraud, malice, or gross negligence.*[61] The standard jury instruction says: "'Exemplary damages' means any damages awarded as a penalty or by way of punishment but not for compensatory purposes."[62] SB 8 makes no attempt to comply with these due process principles.

The person who files an SB 8 lawsuit will not have to prove injury to be awarded a sum of money; he will have to prove only that the defendant violated SB 8. And he can increase the monetary award by adding defendants. Needless to say, the number of defendants a claimant can name has nothing to do with whether or how much he has been harmed. (See the example on page 6 above.)

SB 8's award of at least $10,000 from one stranger to another is not compensatory. Yet it cannot lawfully be punitive without observing at least some of the constitutional rights and procedures for criminal cases. SB 8 does not come close to satisfying constitutional due process. Instead it lessens the procedural rights enjoyed by other civil litigants, such as a court and jury with *discretion* to assess damages, and *fair notice* of what the court and jury may consider when deciding whether to award more than the statutory minimum.

In addition to the money award, which can only be seen as punitive and not compensatory, SB 8 has other provisions that have the effect of *punishing* a defendant rather than *compensating* a plaintiff. For example:

---

[60] *Id.* at 426.

[61] *See* TEX. CIV. PRAC. & REM. CODE § 41.003(a): "[Unless they are authorized by another specific statute], exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damage results from: (1) fraud; (2) malice; or (3) gross negligence."

[62] *See State Bar of Texas,* Texas Pattern Jury Charges §§ 28.7 & 29.7 (2018).

(a) Lawyers and law firms who advise their clients to bring a pre-enforcement challenge to SB 8's provisions are potentially liable for the claimant's attorney fees.[63] But a defendant wrongfully sued and totally innocent can never recover his attorney fees from an SB 8 claimant.[64]

(b) The longstanding rules of claim preclusion (res judicata) do not apply in SB 8 cases—a judgment against an abortion defendant does not bar additional lawsuits against him on the same facts and same event *unless he has paid the judgment in full.* This means that second and third claimants litigating the same event have every reason to pursue their lawsuits in other counties because if they are the first to collect, their judgment will be first in time and will bar the others. The incentive is to hurry and sue and collect, using the collection tools discussed above on pages 10-12.[65] And

---

[63] SB 8 includes this provision in **§ 30.002 (a):** "Notwithstanding any other law, any person, including an *entity, attorney, or law firm*, who seeks declaratory or injunctive relief to prevent . . . any person in this state from enforcing [SB 8 or any other abortion law] in any state or federal court, or that *represents any litigant seeking such relief* . . . is jointly and severally liable to pay the costs and attorney's fees of the prevailing party." TEX. CIV. PRAC. & REM. CODE ANN. § 30.002 (a) (emphasis added).

[64] **§ 171.208:** . . . "(i) Notwithstanding any other law, a court *may not award* costs or attorney's fees under the Texas Rules of Civil Procedure or any other rule adopted by the supreme court under Section 22.004, Government Code, *to a defendant* in an action brought under this section." TEX. HEALTH & SAFETY CODE ANN. § 171.208 (i) (emphasis added).

[65] SB 8 gives a defendant a defense to successive or multiple suits for the same abortion *only if* he has already paid the first judgment completely. **Section 171.208 (c)** says a defendant has this defense "if the defendant demonstrates that the defendant previously *paid the full amount* of statutory damages under Subsection (b)(2) in a previous action for that particular abortion . . . . (emphasis added). In other words, *ordinary principles of claim preclusion do not apply to an SB 8 case,* as Section **171.208 (e)** makes clear: "Notwithstanding any other law, the following are not a defense to an action brought under this section: . . . (5) non-mutual issue preclusion or non-mutual claim preclusion; . . ." TEX. HEALTH & SAFETY CODE. ANN. § 171.208 (c) & (e). Claimant *A*, having secured a judgment, would be barred from bringing case after case on the same cause of action, but *claimant A's judgment* would not bar claimants *B, C,* and *D* from continuing to litigate their cases to judgment and, hopefully, to collection.

even after he has paid, the defendant might still have the other judgments against him on the books in multiple counties. This "multiple lawsuits" feature of SB 8 is a total change from the usual and longstanding claim preclusion rules, and a departure from other rules that bring order when more than one suit is filed concerning the same subject matter.[66]

---

Curious to determine the correct reading of the statute, the court asked counsel the following question by email on November 26:

> After a judgment for $10,000 in Case 1 for abortion number 1 on a certain day, *can there be successive judgments* (i.e. case 2, case 3, case 4, etc.) brought by different claimants against the same abortion provider or aider *for that same abortion number 1* until the defendant actually pays in full the first judgment? Or does the *first judgment itself* bar assertion of a second case about Abortion 1?
>
> Section 171.208 (c) appears to *allow successive cases* if the first one has not been paid in full. In other words the judgment itself does not bar the later cases on the same event because the claimant in those cases is not bound by res judicata aka claim preclusion because it is not mutual. *If there is a different claimant in cases 2, 3, and 4, etc. wouldn't 171.208 (e) (5) allow those later suits on the same event* when it says there is no defense on the basis of "non-mutual issue preclusion or non-mutual claim preclusion"? (emphasis added).

Both sides answered *yes* to the court's question.

[66] In other kinds of civil litigation, the litigants have no incentive to keep filing new lawsuits against a defendant for the same conduct because the courts will *consolidate* the cases (if they are in the same county) and will *abate* the second-filed case (if they are in different counties). *See In re J. B. Hunt Transport, Inc.*, 492 S.W.3d 287 (Tex. 2016); *Wyatt v Shaw Plumbing Co.*, 760 S.W.2d 645 (Tex. 1988). The *J. B. Hunt* case stated the usual rules:

> "The general common law rule in Texas is that the court in which suit is first filed acquires dominant jurisdiction to the exclusion of other coordinate courts." As a result, when two suits are inherently interrelated, "a plea in abatement in the second action *must* be granted." This first-filed rule flows from "principles of comity, convenience, and the necessity for an orderly procedure in the trial of contested issues." The default rule thus tilts the playing field in favor of according dominant jurisdiction to the court in which suit is first filed.

In sum, SB 8 is punitive and not compensatory.

## 2. The $10,000 is not defensible as a civil penalty or a form of statutory liquidated damages

Federal and state statutes sometimes grant a fixed statutory amount to the Government or to an injured or aggrieved person rather than requiring proof of actual damages. Some of these statutes grant the injured party a statutory amount *or* actual damages, whichever is higher. *These statutes always involve culpable conduct and harm to either the government or the authorized plaintiff.* SB 8's statutory $10,000 cannot be considered as rough liquidated damages for anything.

One Texas example is the fraudulent lien statute, which makes the filer of a fraudulent lien on property liable for "the greater of $10,000 or [the property owner's] actual damages" plus costs, attorney fees, and exemplary damages.[67] Another example is Texas Property Code § 5.077, which provides rules to govern executory contracts for the sale of residential property (that is, sales where the deed will not be delivered to the buyer until full payment is made, aka "contracts for deed"). Section 5.077 requires sellers to send buyers an annual accounting statement of payments. A seller who does not do this is liable for daily statutory liquidated damages: $100 a day for one violation and $250 a day if the seller has also violated the statute in a second transaction in that year.

The supreme court discussed an earlier version of § 5.077 in *Flores v. Millennium Interests, Ltd.*, 185 S.W.3d 427 (Tex. 2005.) *Flores* cited several Texas statutes that impose civil penalties and/or liquidated damages, but all involved *culpable conduct by the defendant toward the plaintiff,* such as illegal wiretapping, freight overcharges, and violating the

---

492 S.W.3d at 294 (emphasis by the court, citations omitted). When multiple cases involving the same or similar issues are filed, the Multi-district Litigation process may be available, and the suits might be placed into one pretrial court, as happened in these pre-enforcement cases.

[67] TEX. CIV. PRAC. & REM. CODE §§ 12.001: "A person who [files a fraudulent lien] is liable to each injured person for:

    (1) the greater of:

      (A) $10,000; or

      (B) the actual damages caused by the violation;

    (2) court costs;

    (3) reasonable attorney 's fees; and

    (4) exemplary damages in an amount determined by the court."

minimum wage laws.[68] The court then said this about *statutory damages without actual harm:*

> We have found statutory damage schemes far less draconian than this one [§ 5.077] to be penal in nature. *See Johnson v. Rolls,* 97 Tex. 453, 79 S.W. 513, 514 (1904) (statutory liquidated damages awarded *without reference to any actual loss or injury* have "much the character of exemplary or punitive damages"); *The Houston & Tex. Central Ry. Co. v. H.W. Harry & Bros.,* 63 Tex. 256, 260 (1885) (to the extent that an award of statutory damage *exceeds the amount necessary to compensate* plaintiff's injury, "the excess is but exemplary damage").[69]

It is interesting to compare the differences between SB 8 and the Texas Medicaid Fraud Prevention Act discussed in *In re Xerox,* 555 S.W.3d 518 (Tex. 2018). There the supreme court reviewed a statute that empowered the *state* to sue and recover *civil penalties within a range* of $5500 to $15,000, and allowed the *trier of fact* to decide the amount depending upon the defendant's *culpability* and whether there was *injury* to an elderly or disabled person, or a youth under 18 years of age, all with *venue* available in either Travis County or a county where all or part of the *conduct* occurred.[70]

---

[68] 185 S.W.3d at 432 & n. 7.

[69] *Id.* at 433 (emphasis added).

[70] Sec. 36.052. CIVIL REMEDIES. (a) . . . a person who commits an unlawful act [of Medicaid fraud] is liable to the *state* for: . . . (3) a civil penalty of:

(A) not less than $5,500 . . . and not more than $15,000 . . . for each unlawful act . . . that results in injury to an elderly person . . . a person with a disability . . . or a person younger than 18 years of age; or

(B) not less than $5,500 . . . and not more than $11,000 . . . for each unlawful act . . . that does not result in injury to [an elderly, disabled, or young] person . . .

(b) In *determining the amount of the civil penalty* . . . the *trier of fact* shall consider:

(1) whether the person has previously violated the provisions of this chapter

(2) the seriousness of the unlawful act committed by the person . . .

(3) whether the health and safety of the public or an individual was threatened       by the unlawful act;

(4) whether the person acted in bad faith . . . and

(5) the amount necessary to deter future unlawful acts. . . .

In the *Xerox* case the court summarized the core principles of liquidated damages in the context of a suit for civil penalties. "Liquidated damages constitute a penalty unless (1) the harm caused by the breach is incapable or difficult of estimation and (2) the amount of liquidated damages is a reasonable forecast of just compensation." The court then discussed the civil penalty statute quoted in footnote 70 and said: "At first blush, this sounds like damages, but in operation, it is a *penalty* because it is fixed without regard to any *loss* to the Medicaid program and without a direct *benefit* to the liable party. *A remedy unrelated to actual loss is a penalty*." (emphasis added).

The United States Supreme Court's civil penalty cases examine the penalty to determine whether they are *comparable to liquidated damages* and *proportionate* or *remedial* to redress harm or expense to the Government, and whether they are *so disproportionate as to be punitive*. The statutory civil penalty cases involve conduct such as smuggling,[71] filing false

---

(d) An action under this section shall be brought in Travis County or in a *county* in which any part of the *unlawful act occurred.*

(e) The *attorney general* may: . . . bring an action for civil remedies . . . [with or without] a suit for injunctive relief . . . .

*See* TEX. HUM. RES. CODE § 36.052 (emphasis added).

[71] *See One Lot Emerald Cut Sones and One Ring v. United States,* 409 U.S. 232 (1972) ("[The statute] prevents forbidden merchandise from circulating in the United States, and, by its monetary penalty, it provides a *reasonable form of liquidated damages* for violation of the inspection provisions and serves to *reimburse the Government for investigation and enforcement expenses.* In other contexts we have recognized that such purposes characterize *remedial* rather than *punitive* sanctions. [citations omitted] Moreover, it cannot be said that the measure of recovery fixed by Congress in [the statute] is so unreasonable or excessive that it transforms what was clearly intended as a *civil remedy* into a *criminal penalty*." (emphasis added).

Medicare claims,[72] and polluting navigable waters.[73]

This court has not found any instance—and none has been cited—in which any American legislature has authorized a private person to sue another private person for a fixed automatic sum of money without any showing of harm to the claimant or culpable conduct by the defendant toward the claimant, as does SB 8.

The court sustains Plaintiffs' contention that SB 8 violates due process of law because it is punitive and not compensatory.

## C.  SB 8 is an unconstitutional delegation of enforcement power to private persons

*SB 8 is an unguided and unsupervised delegation of enforcement power to private persons.* Delegation to an *agency* or to *public officials* is of course a different matter and is common in the well-developed field of administrative law, with many precedents concerning delegation of *rulemaking, adjudication, and enforcement* to agencies. But *agencies* are staffed at the top by appointed officials, and the statute that creates them must provide sufficient guidance to guide them, narrow their discretion, and provide for review. Agency decisions are subject to judicial review by traditional courts with their full powers. *None*

---

[72] *See United States v. Halper*, 490 U.S. 435 (1989), where the Court discussed the statute's fixed civil penalty as "remedial" and liquidated damages for the Government's expenses in enforcing the law. The Court expressed concern about "the possibility that in a particular case a civil penalty authorized by the Act may be *so extreme and so divorced from the Government's damages and expenses as to constitute punishment.* . . . [T]he question we face today [is] whether a civil sanction, in application, may be *so divorced from any remedial goal that it constitutes "punishment"* for the purpose of double jeopardy analysis. . . . [A] *civil sanction that* cannot fairly be said solely to serve a remedial purpose, but rather *can only be explained as also serving either retributive or deterrent purposes, is punishment,* as we have come to understand the term."

 A concurrence summarized the unanimous Court's holding: "Our rule permits the imposition in the ordinary case of at least *a fixed penalty roughly proportionate to the damage caused or a reasonably liquidated amount,* plus double damages." *Id.* at 452-53 (Kennedy, J., concurring) (emphasis added).

[73] *See United States v. Ward*, 448 U.S. 242, 248-49 (1980) ("[W]here Congress has indicated an intention to establish a *civil penalty,* we have inquired further whether the statutory scheme was *so punitive either in purpose or effect* as to negate that intention.") (emphasis added).

*of this can be said about SB 8's delegation to private persons.*

SB 8 grants to 21 million Texans the power to bring cases without any guidance, supervision, or screening. There is no guidance in the statute and no guidance from any public official. There is nothing to prevent a billionaire from Texas or another state, motivated by ideology, from setting up an enforcement system by locating a few willing Texans who live in favorable counties of venue to file suits in their home counties and enforce SB 8 across Texas.

Because SB 8 is unique and unprecedented, there is no case law factually the same from Texas or elsewhere about outsourcing law enforcement to private parties who act with no supervision or guidance from a statute or from any state official. There is no Texas law governing delegation of enforcement to private parties who may sue in the county where they live and seek mandatory money awards and injunctions. Defendants argue that the courts provide guidance, supervision, and review, but that seems hollow when SB 8 has tied the courts' hands and deprived them of real discretion concerning the money to be taken from the defendant or equitable discretion in deciding whether to issue an injunction.

The Texas Supreme Court has stated eight factors for courts to assess and apply when a statute has delegated authority to *private persons*:

1. Are the private delegate's actions subject to meaningful review by a state agency or other branch of state government?

2. Are the persons affected by the private delegate's actions *adequately represented* in the decisionmaking process?

3. Is the private delegate's power limited to making rules, or does the delegate also apply the law to particular individuals?

4. Does the private delegate have a pecuniary or other personal interest that may conflict with his or her public function?

5. Is the private delegate empowered to define criminal acts or impose criminal sanctions?

6. Is the delegation narrow in duration, extent, and subject matter?

7. Does the private delegate possess special qualifications or training for the task delegated to it?

8. Has the Legislature provided sufficient standards to guide the private delegate in its work?[74]

Other cases have applied these eight factors in assessing delegations for adherence to the constitution.[75] The supreme court has suggested that the eight factors may apply to delegations of enforcement power and not just to legislative power.[76]

SB 8 makes no pretense of satisfying these factors and clearly falls short, on some factors more than others. There is no supervision or meaningful review by government (#1), no one is represented in the claimant's decision-making process (#2), the claimant obviously applies and enforces the law (#3), the claimant has a clear monetary incentive (although ideological claimants would not necessarily be subject to this problem) (#4), the claimant would not be enforcing criminal law, but as stated on pages 36-43 his lawsuit would be imposing punishment on the defendant (#5), the subject matter is narrow (abortion) but state-wide in its reach and potentially broad in its extension to those who "aid or abet" (#6), there is no assurance whatsoever that any claimant would "possess special qualification or training for the task delegated" (#7), and the Legislature has provided no guidance or standards at all for claimants (#8).

This court would also note that SB 8 does not choose specified private persons to exercise SB 8 power; it lets 21 million private persons *self-select* and *volunteer* for the SB 8 job. They have no ethical training or guidelines, in contrast to professional ethics for lawyers and especially for criminal prosecutors.[77]

---

[74] *See Texas Boll Weevil Eradication Foundation., Inc. v. Lewellen,* 952 S.W.2d 454, 472 (Tex. 1993).

[75] *See, e.g., FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868 (Tex. 2000), and authorities cited.

[76] *See Texas Workers' Comp. Comm'n v. Patient Advocates of Texas,*136 S.W.3d 643 (Tex. 2004) (discussing the eight factors in context of delegation of executive authority but deciding case on other grounds).

[77] The Texas Code of Criminal Procedure commands, for example, that prosecutors seek not only to convict but that justice be done. Prosecutors are also told not to hide exculpatory evidence or witnesses. *See* Art. 2.01. DUTIES OF DISTRICT ATTORNEYS. . . . "It shall be the primary duty of all prosecuting attorneys, including any special prosecutors, not to convict, but to see that justice is done. They shall not suppress facts or secrete witnesses capable of establishing the innocence of

The court holds that SB 8's delegation of enforcement power to private claimants[78] is unconstitutional.

## VII. Summary of Rulings

1. Defendants' Plea to the Jurisdiction is **denied**.

2. Defendants' Motion to Dismiss Under the Texas Citizens Participation Act is **denied**.

3. Plaintiffs' challenge to SB 8 based on the Texas right to privacy is **denied**.

    A. Their contention that under Texas law there is a right to end a pregnancy before viability is **denied**.

    B. Their contention that there is a right under Texas law to keep patient medical records and decision-making out of pubic litigation is **denied**.

4. Plaintiffs' Motions for Summary Judgment are **granted in part** and **denied in part**.

    A. **Standing for uninjured persons.** The court **sustains** Plaintiffs' contention that SB 8's grant of standing for "any person" to seek $10,000 and a mandatory injunction without showing harm violates the Texas Constitution's "open courts" provision. Plaintiffs' request that the court declare Tex. Health & Safety Code Ann. § 171.208 unconstitutional on this ground is **granted**.

    B. **Punishment without due process.** The court **sustains** Plaintiffs' contention that SB 8 denies due process of law as guaranteed by the Fourteenth Amendment because it is punitive and not compensatory. Plaintiffs' request that the court declare Tex. Health & Safety Code Ann. § 171.208 unconstitutional on this ground is **granted**.

---

the accused." Art. 45.201. Municipal Prosecutions. . . . "(d) It is the primary duty of a municipal prosecutor not to convict, but to see that justice is done." Prosecutors are also subject to a degree of periodic review and control by the voters or by the persons who appointed them; they are not self-appointed.
Tex. Code Crim. Proc. arts. 2.01 & 45.201.

[78] SB 8 is not comparable to qui tam lawsuits, in which a private party can notify the federal government of unlawful conduct and, with the government's permission, participate in a lawsuit to recover damages from that misconduct.

C. **Delegation of enforcement power to private persons.** The court **sustains** Plaintiffs' contention that SB 8's grant of enforcement power to "any person" is an unlawful delegation of enforcement power to a private person that violates the Texas Constitution. Plaintiffs' request that the court declare TEX. HEALTH & SAFETY CODE ANN. § 171.208 unconstitutional on this ground is **granted**.

D. **Permanent injunction.** Plaintiffs' request for summary judgment granting a permanent injunction to prevent Defendants from encouraging the filing SB 8 lawsuits is **denied**. That issue will be tried on the merits and is not disposed of by this summary judgment.

E. **Other contentions.** The remaining arguments in this case about SB 8's constitutionality are **neither granted nor denied** and remain pending.

## VIII.   DECLARATORY JUDGMENT

**This court declares that** TEXAS HEALTH & SAFETY CODE § **171.208 (a) & (b)** is unconstitutional, and should not be enforced or applied in Texas courts, for the following three separate and independent reasons:

A. **Standing for uninjured persons.** SB 8's grant of standing to "any person" to be awarded "no less than $10,000" and a mandatory injunction without showing harm to himself, taken from a person who has not harmed him, violates the Texas Constitution's "open courts" provision and is unconstitutional.

B. **Punishment without due process.** SB 8's mandate that trial courts "shall" award "no less than $10,000" to an unharmed claimant from a defendant who did him no harm is punishment and not compensation that will deprive persons of property without due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution.

C. **Delegation of executive power to private persons.** SB 8's grant of enforcement power to "any person" is an unlawful delegation of power to private persons that violates the Texas Constitution's separation of powers provision and is unconstitutional.

## IX. ISSUES REMAINING

1.   The court will sign an order of severance and will ensure that the issues addressed in this Order are promptly appealable to the appellate courts.

2.    The court will contact the attorneys in the coming week and, after discussion, will schedule a hearing to consider the remaining issues.

SIGNED: December 9, 2021

*David Peeples*

DAVID PEEPLES, JUDGE PRESIDING
Sitting by Assignment

EXHIBIT A-21
Excerpts from Transcript
of United States Supreme Court
Oral Argument in Case No.
21-588, *United States v. Texas*

# SUPREME COURT
# OF THE UNITED STATES

IN THE SUPREME COURT OF THE UNITED STATES

- - - - - - - - - - - - - - - - - -

UNITED STATES,                          )

        Petitioner,             )

          v.                   ) No. 21-588

TEXAS, ET AL.,                          ) (21A85)

        Respondents.            )

- - - - - - - - - - - - - - - - - -

Pages:  1 through 96

Place:  Washington, D.C.

Date:   November 1, 2021

**HERITAGE REPORTING CORPORATION**

*Official Reporters*
1220 L Street, N.W., Suite 206
Washington, D.C.  20005
(202) 628-4888
www.hrccourtreporters.com

1

1        IN THE SUPREME COURT OF THE UNITED STATES

2    - - - - - - - - - - - - - - - - - -

3    UNITED STATES,                    )

4                  Petitioner,         )

5              v.                      ) No. 21-588

6    TEXAS, ET AL.,                    ) (21A85)

7                  Respondents.        )

8    - - - - - - - - - - - - - - - - - -

9

10                    Washington, D.C.

11                Monday, November 1, 2021

12

13        The above-entitled matter came on for

14    oral argument before the Supreme Court of the

15    United States at 11:28 a.m.

16

17    APPEARANCES:

18    ELIZABETH B. PRELOGAR, Solicitor General,

19        Department of Justice, Washington, D.C.; on behalf

20        of the Petitioner.

21    JUDD E. STONE, II, Solicitor General, Austin, Texas;

22        on behalf of the State Respondent.

23    JONATHAN F. MITCHELL, ESQUIRE, Austin, Texas; on

24        behalf of the Private Respondents.

25

```
 1                    C O N T E N T S
 2   ORAL ARGUMENT OF:                        PAGE:
 3   ELIZABETH B. PRELOGAR, ESQ.
 4        On behalf of the Petitioner          3
 5   ORAL ARGUMENT OF:
 6   JUDD E. STONE, II, ESQ.
 7        On behalf of the State Respondent   52
 8   ORAL ARGUMENT OF:
 9   JONATHAN F. MITCHELL, ESQ.
10        On behalf of the Private Respondents  79
11   REBUTTAL ARGUMENT OF:
12   ELIZABETH R. PRELOGAR, ESQ.
13        On behalf of the Petitioner         93
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                P R O C E E D I N G S
 2                              (11:28 a.m.)
 3            CHIEF JUSTICE ROBERTS:  We'll hear
 4    argument next in Case 21-588, United States
 5    versus Texas.
 6            General Prelogar.
 7            ORAL ARGUMENT OF ELIZABETH B. PRELOGAR
 8               ON BEHALF OF THE PETITIONER
 9            GENERAL PRELOGAR:  Mr. Chief Justice,
10    and may it please the Court:
11            Texas designed S.B. 8 to thwart the
12    supremacy of federal law in open defiance of our
13    constitutional structure.  States are free to
14    ask this Court to reconsider its constitutional
15    precedents, but they are not free to place
16    themselves above this Court, nullify the Court's
17    decisions in their borders, and block the
18    judicial review necessary to vindicate federal
19    rights.
20            As this case comes to the Court, there
21    are three principal questions:  First, is Texas
22    responsible for this law?  Second, can the
23    United States sue to hold Texas to account?
24    And, third, is the injunctive relief available?
25            And the answer is yes down the line.
```

1    more important part here is that eventually

2    those sorts of cases would be decided on stare

3    decisis grounds by appellate courts, which would

4    prevent follow-on cases to some extent.

5             But, in terms of relief, you get

6    declarations basically out of the Texas state

7    system, a declaration that S. -- that an

8    application of S.B. 8 against an individual -- I

9    misspoke earlier with an injunction, I'm

10    sorry -- that a declaration that -- that a -- an

11    S.B. 8 claim by that individual against the

12    protected conduct that someone was raising would

13    violate state law, federal law, whatever the

14    claim might be.

15             JUSTICE THOMAS:  And one final point.

16    The -- why wouldn't -- and -- and I think I --

17    you know, I've alluded to this before, I'd asked

18    this before -- why wouldn't these private

19    individuals be considered private attorneys

20    generals?  The -- because so much seems to be --

21    one thing that seems rather implicit on the

22    other side is that they are in effect, if not in

23    designation by law, attorneys generals because

24    they are enforcing a statewide policy.

25             So your argument, again, would be that

1    they are not private attorneys general because,

2    or they are not acting in concert, they're not

3    deputized, they're not agents because?

4              MR. STONE:   Because they're not

5    subject to the state's control.   They don't have

6    access to the state's investigatory resources.

7    The state can't at some point, for example, take

8    the case over, like in a qui tam action, those

9    sorts of answers that I was providing earlier,

10   Justice Thomas.

11             But my answer would run specifically

12   to the lack of control between the state with

13   regards to an S.B. 8 private plaintiff suit.

14             JUSTICE BREYER:   Let me think of -- of

15   just a specific example which was the worst one

16   I could think of for you, the -- the -- I mean,

17   suppose a governor filed this, you know, had

18   this model law and said anyone who brings a

19   black child to a white school is subject to, you

20   know, and then we copy the law.   Here we are.

21             Now, if you were in that situation,

22   which I'm sure you're glad you're not, what?

23   What would you do?   I mean, if we uphold this,

24   are we retroactively upholding that?

25             MR. STONE:   No, Your Honor.   As a

```
1    that the United States can proceed with this
2    action and affirm the preliminary injunction
3    entered by the district court and immediately
4    vacate the stay that the Fifth Circuit entered
5    in this case so that Texas cannot continue to
6    deny women in its borders a right protected by
7    this Court's precedents one day longer.
8              CHIEF JUSTICE ROBERTS:  Thank you,
9    counsel.  The case is submitted.
10             (Whereupon, at 12:55 p.m., the case
11   was submitted.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

EXHIBIT A-22
Excerpts from Transcript
of United States Supreme Court
Oral Argument in Case No.
21-463, *Whole Woman's
Health v. Jackson*

# SUPREME COURT
# OF THE UNITED STATES

---

IN THE SUPREME COURT OF THE UNITED STATES

- - - - - - - - - - - - - - - - - -

WHOLE WOMAN'S HEALTH, ET AL.,          )

        Petitioners,          )

        v.                    ) No. 21-463

AUSTIN REEVE JACKSON, JUDGE,           )

DISTRICT COURT OF TEXAS,               )

114TH DISTRICT, ET AL.,                )

        Respondents.          )

- - - - - - - - - - - - - - - - - -

Pages:  1 through 91

Place:  Washington, D.C.

Date:   November 1, 2021

---

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 206
Washington, D.C.  20005
(202) 628-4888
www.hrccourtreporters.com

1

1    IN THE SUPREME COURT OF THE UNITED STATES

2   - - - - - - - - - - - - - - - - - -

3  WHOLE WOMAN'S HEALTH, ET AL.,    )

4            Petitioners,      )

5            v.          ) No. 21-463

6  AUSTIN REEVE JACKSON, JUDGE,    )

7  DISTRICT COURT OF TEXAS,      )

8  114TH DISTRICT, ET AL.,       )

9           Respondents.      )

10  - - - - - - - - - - - - - - - - - -

11

12                Washington, D.C.

13            Monday, November 1, 2021

14

15        The above-entitled matter came on for

16  oral argument before the Supreme Court of the

17  United States at 10:03 a.m.

18

19  APPEARANCES:

20

21  MARC A. HEARRON, ESQUIRE, Washington, D.C.; on behalf

22      of the Petitioners.

23  JUDD E. STONE, II, Solicitor General, Austin, Texas;

24      on behalf of the Respondents.

25

Official - Subject to Final Review

2

```
 1                C O N T E N T S

 2   ORAL ARGUMENT OF:                    PAGE:

 3   MARC A. HEARRON, ESQ.

 4        On behalf of the Petitioners        3

 5   ORAL ARGUMENT OF:

 6   JUDD E. STONE, II, ESQ.

 7        On behalf of the Respondents      45

 8   REBUTTAL ARGUMENT OF:

 9   MARC A. HEARRON, ESQ.

10        On behalf of the Petitioners      88

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2                              (10:03 a.m.)
 3            CHIEF JUSTICE ROBERTS:  We'll hear
 4    argument first this morning in Case 21-463,
 5    Whole Woman's Health versus Jackson.
 6            Mr. Hearron.
 7             ORAL ARGUMENT OF MARC A. HEARRON
 8              ON BEHALF OF THE PETITIONERS
 9            MR. HEARRON:  Mr. Chief Justice, and
10    may it please the Court:
11            In enacting Senate Bill 8, the Texas
12    legislature not only deliberately prohibited the
13    exercise of a constitutional right recognized by
14    this Court, it did everything it could to evade
15    effective judicial protection of that right in
16    federal or state court.
17            Texas delegated enforcement to
18    literally any person anywhere except its own
19    state officials.  The only conceivable reason
20    for doing so was to evade federal court review
21    under Ex parte Young.
22            Texas then created special rules
23    applicable only to S.B. 8 claims that make it
24    all but impossible to protect one's
25    constitutional rights in state court.  For a
```

1    general in any way.  But let's -- if I may

2    modify your hypo a little bit and say that the

3    office of the attorney general --

4            JUSTICE KAGAN:   I guess what I was

5    suggesting was that in just the same way that

6    the attorney general does not have direct-line

7    authority over the DAs, but nobody would dream

8    of bringing a challenge to Ex parte Young in

9    that circumstance, so too the fact that they

10   don't have direct authority over these private

11   delegated -- private individuals exercising

12   delegated power shouldn't matter for the same

13   reason.

14           MR. STONE:   In the example you're

15   describing with county and district attorneys,

16   individuals would be able to bring Ex parte

17   Young challenges against those individuals, to

18   be sure, but not against the attorney general.

19   And the key difference here would be those

20   individuals, the county attorneys and district

21   attorneys, would ultimately be able to enforce

22   the law by bringing a lawsuit.

23           The -- the reason that we're sort

24   of -- the hypos that I'm -- I'm pushing back

25   against here are that the United -- that the

Official Subject to Final Review

1    attorney general simply doesn't have any control

2    of the procession of S.B. 8 lawsuits in any way.

3    He doesn't have a mechanism such as in the qui

4    tam context to take over -- over the litigation.

5    He can't certify that a lawsuit is not in the

6    state's interests or something on that order and

7    order it dismissed.  He has none of those sorts

8    of mechanisms whatsoever.

9         Because of that, that can't possibly

10   at a minimum redress the injuries of the

11   Petitioners unless this Court were to say that

12   private individuals who have not yet articulated

13   they plan to bring suits or anything like that

14   are somehow agents who are acting in concert

15   with the attorney general.

16        The problem with that is that, again,

17   we have no authority over them.  The basic

18   concept of agency is that there is a principal

19   and an agent and the agent is responsible to the

20   principal.

21        The principal in this hypothetical,

22   the attorney general, exercises no supervisory

23   authority whatsoever over putative -- putative

24   suit bringers.  And we're not acting in concert

25   for the ordinary factual reason that, in fact,

1          Every single person, and that's

2    exactly what this Court addressed in Ex parte

3    Young.  Ex parte Young and the reason the

4    principles underlying Ex parte Young support

5    relief here is one of the things that it said is

6    that -- that the railroad may not be able to

7    find an agent or an employee even willing to

8    violate the law to -- to generate a test case.

9          And so, Your Honor, for all the

10   reasons that we've stated, we think the

11   principles of -- of Ex parte Young support

12   relief here, and we ask that the district

13   court's decision be affirmed.

14         CHIEF JUSTICE ROBERTS:  Thank you,

15   counsel.  The case is submitted.

16         (Whereupon, at 11:26 a.m., the case

17   was submitted.)

18

19

20

21

22

23

24

25

# EXHIBIT 23
Declaration of
Kamyon Conner

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

**NORTH TEXAS EQUAL ACCESS FUND**,
on behalf of itself and its staff, its volunteers, and
its donors,

     P.O. Box 227336
     Dallas, Texas 75222

**LILITH FUND FOR REPRODUCTIVE
EQUITY**, on behalf of itself and its staff, its
volunteers, and its donors,

     P.O. Box 684949
     Austin, Texas 78768

        Plaintiffs,

v.

**AMERICA FIRST LEGAL FOUNDATION**,

     300 Independence Avenue, S.E.
     Washington, D.C. 20003

     c/o CT Corporation System
     1015 15th Street, N.W., Suite 1000
     Washington, D.C. 20005

        Defendant

Civil Case No. 1:22-cv-00728

## DECLARATION OF KAYMON CONNER

STATE OF TEXAS        §

DENTON COUNTY      §

    1.     My name is Kaymon Conner.  I am over the age of 18, and suffer from no legal or

mental disabilities.  I have personal knowledge of, and full capacity to testify about, the facts stated

in this Declaration, which is provided as Exhibit B to Plaintiffs the North Texas Equal Access Fund's and The Lilith Fund for Reproductive Equity's Motion for Summary Judgment (the "Motion"). Pursuant to 28 U.S.C. § 1746 I make this declaration under penalty of perjury.

2.    I am the Executive Director of North Texas Equal Access Fund ("TEA Fund"). As Executive Director, I am responsible for executing TEA Fund's mission, protecting the organization's financial health, and supervising staff and volunteers.

3.    TEA Fund's mission is to foster reproductive justice. It provides financial, emotional, and logistical support for low-income abortion patients in north Texas. Almost all of its clients are at a point in pregnancy when cardiac activity can be detected.

4.    TEA Fund also engages, and is presently engaged in other litigation regarding reproductive rights and has filed lawsuits challenging abortion regulations in Texas, including this one.

5.    SB8 specifically states that providing funds to assist a pregnant person in obtaining an abortion violates SB8 even if the funder had no knowledge that the abortion at issue would ultimately violate SB8. Consequently, SB8, when it became effective, immediately rendered our services—even for people who have been pregnant fewer than six weeks—potentially subject to expensive litigation and punitive fines.

6.    According to the terms of SB8, TEA Fund aids and abets abortions in the State of Texas by providing funding.

7.    After September 1, 2021, TEA Fund also engaged in specific and limited conduct with the intent to assist pregnant Texans obtain abortions after the detection of cardiac activity, while SB8's enforcement had been enjoined by a federal court. Specifically, following the entry of an injunction by the Honorable Robert Pitman on October 6, 2021, and before that injunction

was stayed by the Fifth Circuit Court of Appeals, TEA Fund paid for at least one abortion without confirming the gestational age of the fetus. In doing so, it was TEA Fund's intention to pay for the abortion even if cardiac activity was detected.

8.     I understand that on February 2, 2022, a Petition was filed against me by a woman I have never met and do not know named Ashley Maxwell. I have reviewed the Petition and it is substantially identical to what is attached as exhibit A-3 to the Motion. The Petition seeks to take my deposition and obtain documents so that Ms. Maxwell can obtain evidence to file potential SB8 actions against myself and TEA Fund, including its staff, volunteers, and donors. The Petition is signed by several attorneys, and one of them is Gene P. Hamilton. His part of the signature block says he is the Vice-President and General Counsel of the America First Legal Foundation.

**I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 15 , 2022.**

_____
Kamyon Conner

EXHIBIT 24
Declaration of
Neesha Davé

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

**NORTH TEXAS EQUAL ACCESS FUND**, on behalf of itself and its staff, its volunteers, and its donors,

      P.O. Box 227336
      Dallas, Texas 75222

**LILITH FUND FOR REPRODUCTIVE EQUITY**, on behalf of itself and its staff, its volunteers, and its donors,

      P.O. Box 684949
      Austin, Texas 78768

      Plaintiffs,

v.

**AMERICA FIRST LEGAL FOUNDATION**,

      300 Independence Avenue, S.E.
      Washington, D.C. 20003

      c/o CT Corporation System
      1015 15th Street, N.W., Suite 1000
      Washington, D.C. 20005

      Defendant

Civil Case No. 1:22-cv-00728

## DECLARATION OF NEESHA DAVÉ

STATE OF TEXAS       §

TRAVIS COUNTY       §

    1.     My name is Neesha Davé.  I am over the age of 18, and suffer from no legal or mental disabilities.  I have personal knowledge of, and full capacity to testify about, the facts stated

in this Declaration, which is provided as Exhibit C to Plaintiffs the North Texas Equal Access Fund's and The Lilith Fund for Reproductive Equity's Motion for Summary Judgment (the "Motion"). Pursuant to 28 U.S.C. § 1746 I make this declaration under penalty of perjury.

2. I am the Deputy Director and prior Acting Executive Director for Lilith Fund for Reproductive Equity ("Lilith Fund"). As Deputy Director, I am responsible for executing Lilith Fund's mission, protecting the organization's financial health, and supervising staff and volunteers. I also had the same duties when I was Acting Executive Director for Lilith Fund from September 2, 2021 to November 1, 2021.

3. Lilith Fund provides financial assistance and emotional support for people needing abortions in Texas, and seeks to foster a positive culture around abortion. Lilith Fund also fights for reproductive justice throughout Texas. Lilith Fund offsets the costs of abortion care itself, rather than paying for or providing assistance to people traveling to an abortion provider in Texas. Many of Lilith Fund's clients are at a point in pregnancy when cardiac activity can be detected.

4. Lilith Fund has nine staff members and more than thirty regular volunteers, and serves people in central and southeast Texas.

5. Lilith Fund also engages, and is presently engaged in, litigation regarding reproductive rights and has filed lawsuits challenging abortion regulations in Texas including this one.

6. SB8 states that providing funds to assist a pregnant person in obtaining an abortion violates SB8 even if the funder had no knowledge that the abortion at issue would ultimately violate SB8. Consequently, SB8, when it became effective, immediately rendered our services— even for people who have been pregnant fewer than six weeks—potentially subject to expensive litigation and punitive fines.

**DECLARATION OF NEESHA DAVÉ**                                                    **PAGE 2**

7.      According to the terms of SB8, Lilith Fund aids and abets abortions in the State of Texas by providing funding at all.

8.      Since September 1, 2021, Lilith Fund has engaged in specific and limited conduct with the intent to assist pregnant Texans obtain abortions after the detection of cardiac activity, during the time SB8's enforcement was enjoined by a federal judge.  Specifically, following the entry of an injunction by the Honorable Robert Pitman on October 6, 2021, and before the Fifth Circuit Court of Appeals stayed the injunction, Lilith Fund paid for at least one abortion without confirming the gestational age of the fetus.  In doing so, it was Lilith Fund's intention to pay for the abortion even if cardiac activity was detected.

9.      On February 12, 2022 I was personally served at home with court documents relating to a "Rule 202" Petition filed by a woman I have never met and do not know named Sadie Weldon.  The documents I was served with are substantially identical to the materials attached as Exhibit A-2 to the Motion. The Petition seeks to take my deposition and obtain documents so that Ms. Weldon can obtain evidence to file potential SB8 actions against myself and Lilith Fund, including its staff, volunteers, and donors.  The Petition is signed by several attorneys, and one of them is Gene P. Hamilton.  His part of the signature block says he is the Vice-President and General Counsel of the America First Legal Foundation.

**I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 15, 2022.**

_____
Neesha Davé

# EXHIBIT 25
# SB8 Enacted Text

S.B. No. 8

1              AN ACT

2  relating to abortion, including abortions after detection of an

3  unborn child's heartbeat; authorizing a private civil right of

4  action.

5       BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

6       SECTION 1.  This Act shall be known as the Texas Heartbeat

7  Act.

8       SECTION 2.  The legislature finds that the State of Texas

9  never repealed, either expressly or by implication, the state

10 statutes enacted before the ruling in *Roe v. Wade*, 410 U.S. 113

11 (1973), that prohibit and criminalize abortion unless the mother's

12 life is in danger.

13      SECTION 3.  Chapter 171, Health and Safety Code, is amended

14 by adding Subchapter H to read as follows:

15          SUBCHAPTER H.  DETECTION OF FETAL HEARTBEAT

16      Sec. 171.201.  DEFINITIONS.  In this subchapter:

17          (1)  "Fetal heartbeat" means cardiac activity or the

18 steady and repetitive rhythmic contraction of the fetal heart

19 within the gestational sac.

20          (2)  "Gestational age" means the amount of time that

21 has elapsed from the first day of a woman's last menstrual period.

22          (3)  "Gestational sac" means the structure comprising

23 the extraembryonic membranes that envelop the unborn child and that

24 is typically visible by ultrasound after the fourth week of

1

S.B. No. 8

1  pregnancy.

2  (4) "Physician" means an individual licensed to

3  practice medicine in this state, including a medical doctor and a

4  doctor of osteopathic medicine.

5  (5) "Pregnancy" means the human female reproductive

6  condition that:

7  (A) begins with fertilization;

8  (B) occurs when the woman is carrying the

9  developing human offspring; and

10  (C) is calculated from the first day of the

11  woman's last menstrual period.

12  (6) "Standard medical practice" means the degree of

13  skill, care, and diligence that an obstetrician of ordinary

14  judgment, learning, and skill would employ in like circumstances.

15  (7) "Unborn child" means a human fetus or embryo in any

16  stage of gestation from fertilization until birth.

17  Sec. 171.202.  LEGISLATIVE FINDINGS.  The legislature finds,

18  according to contemporary medical research, that:

19  (1) fetal heartbeat has become a key medical predictor

20  that an unborn child will reach live birth;

21  (2) cardiac activity begins at a biologically

22  identifiable moment in time, normally when the fetal heart is

23  formed in the gestational sac;

24  (3) Texas has compelling interests from the outset of

25  a woman's pregnancy in protecting the health of the woman and the

26  life of the unborn child; and

27  (4) to make an informed choice about whether to

1  continue her pregnancy, the pregnant woman has a compelling

2  interest in knowing the likelihood of her unborn child surviving to

3  full-term birth based on the presence of cardiac activity.

4  Sec. 171.203.  DETERMINATION OF PRESENCE OF FETAL HEARTBEAT

5  REQUIRED; RECORD.  (a)  For the purposes of determining the

6  presence of a fetal heartbeat under this section, "standard medical

7  practice" includes employing the appropriate means of detecting the

8  heartbeat based on the estimated gestational age of the unborn

9  child and the condition of the woman and her pregnancy.

10  (b)  Except as provided by Section 171.205, a physician may

11  not knowingly perform or induce an abortion on a pregnant woman

12  unless the physician has determined, in accordance with this

13  section, whether the woman's unborn child has a detectable fetal

14  heartbeat.

15  (c)  In making a determination under Subsection (b), the

16  physician must use a test that is:

17  (1)  consistent with the physician's good faith and

18  reasonable understanding of standard medical practice; and

19  (2)  appropriate for the estimated gestational age of

20  the unborn child and the condition of the pregnant woman and her

21  pregnancy.

22  (d)  A physician making a determination under Subsection (b)

23  shall record in the pregnant woman's medical record:

24  (1)  the estimated gestational age of the unborn child;

25  (2)  the method used to estimate the gestational age;

26  and

27  (3)  the test used for detecting a fetal heartbeat,

S.B. No. 8

1    including the date, time, and results of the test.

2         Sec. 171.204.   PROHIBITED ABORTION OF UNBORN CHILD WITH

3    DETECTABLE FETAL HEARTBEAT; EFFECT.   (a)   Except as provided by

4    Section 171.205, a physician may not knowingly perform or induce an

5    abortion on a pregnant woman if the physician detected a fetal

6    heartbeat for the unborn child as required by Section 171.203 or

7    failed to perform a test to detect a fetal heartbeat.

8         (b)   A physician does not violate this section if the

9    physician performed a test for a fetal heartbeat as required by

10   Section 171.203 and did not detect a fetal heartbeat.

11        (c)   This section does not affect:

12             (1)   the provisions of this chapter that restrict or

13   regulate an abortion by a particular method or during a particular

14   stage of pregnancy; or

15             (2)   any other provision of state law that regulates or

16   prohibits abortion.

17        Sec. 171.205.   EXCEPTION FOR MEDICAL EMERGENCY; RECORDS.

18   (a)   Sections 171.203 and 171.204 do not apply if a physician

19   believes a medical emergency exists that prevents compliance with

20   this subchapter.

21        (b)   A physician who performs or induces an abortion under

22   circumstances described by Subsection (a) shall make written

23   notations in the pregnant woman's medical record of:

24             (1)   the physician's belief that a medical emergency

25   necessitated the abortion; and

26             (2)   the medical condition of the pregnant woman that

27   prevented compliance with this subchapter.

4

S.B. No. 8

1      (c)  A physician performing or inducing an abortion under
2  this section shall maintain in the physician's practice records a
3  copy of the notations made under Subsection (b).
4      Sec. 171.206.  CONSTRUCTION   OF   SUBCHAPTER.   (a)  This
5  subchapter does not create or recognize a right to abortion before a
6  fetal heartbeat is detected.
7      (b)  This subchapter may not be construed to:
8          (1)  authorize the initiation of a cause of action
9  against or the prosecution of a woman on whom an abortion is
10 performed or induced or attempted to be performed or induced in
11 violation of this subchapter;
12         (2)  wholly or partly repeal, either expressly or by
13 implication, any other statute that regulates or prohibits
14 abortion, including Chapter 6-1/2, Title 71, Revised Statutes; or
15         (3)  restrict a political subdivision from regulating
16 or prohibiting abortion in a manner that is at least as stringent as
17 the laws of this state.
18     Sec. 171.207.  LIMITATIONS   ON   PUBLIC   ENFORCEMENT.
19 (a) Notwithstanding Section 171.005 or any other law, the
20 requirements of this subchapter shall be enforced exclusively
21 through the private civil actions described in Section 171.208.  No
22 enforcement of this subchapter, and no enforcement of Chapters 19
23 and 22, Penal Code, in response to violations of this subchapter,
24 may be taken or threatened by this state, a political subdivision, a
25 district or county attorney, or an executive or administrative
26 officer or employee of this state or a political subdivision
27 against any person, except as provided in Section 171.208.

S.B. No. 8

1      (b)   Subsection (a) may not be construed to:

2          (1)   legalize the conduct prohibited by this subchapter

3   or by Chapter 6-1/2, Title 71, Revised Statutes;

4          (2)   limit in any way or affect the availability of a

5   remedy established by Section 171.208; or

6          (3)   limit the enforceability of any other laws that

7   regulate or prohibit abortion.

8     Sec. 171.208.   CIVIL LIABILITY FOR VIOLATION OR AIDING OR

9   ABETTING VIOLATION.   (a)   Any person, other than an officer or

10   employee of a state or local governmental entity in this state, may

11   bring a civil action against any person who:

12         (1)   performs or induces an abortion in violation of

13   this subchapter;

14         (2)   knowingly engages in conduct that aids or abets

15   the performance or inducement of an abortion, including paying for

16   or reimbursing the costs of an abortion through insurance or

17   otherwise, if the abortion is performed or induced in violation of

18   this subchapter, regardless of whether the person knew or should

19   have known that the abortion would be performed or induced in

20   violation of this subchapter; or

21         (3)   intends to engage in the conduct described by

22   Subdivision (1) or (2).

23      (b)   If a claimant prevails in an action brought under this

24   section, the court shall award:

25         (1)   injunctive relief sufficient to prevent the

26   defendant from violating this subchapter or engaging in acts that

27   aid or abet violations of this subchapter;

S.B. No. 8

1    (2) statutory damages in an amount of not less than
2 $10,000 for each abortion that the defendant performed or induced
3 in violation of this subchapter, and for each abortion performed or
4 induced in violation of this subchapter that the defendant aided or
5 abetted; and

6    (3) costs and attorney's fees.

7   (c) Notwithstanding Subsection (b), a court may not award
8 relief under this section in response to a violation of Subsection
9 (a)(1) or (2) if the defendant demonstrates that the defendant
10 previously paid the full amount of statutory damages under
11 Subsection (b)(2) in a previous action for that particular abortion
12 performed or induced in violation of this subchapter, or for the
13 particular conduct that aided or abetted an abortion performed or
14 induced in violation of this subchapter.

15   (d) Notwithstanding Chapter 16, Civil Practice and Remedies
16 Code, or any other law, a person may bring an action under this
17 section not later than the fourth anniversary of the date the cause
18 of action accrues.

19   (e) Notwithstanding any other law, the following are not a
20 defense to an action brought under this section:

21    (1) ignorance or mistake of law;

22    (2) a defendant's belief that the requirements of this
23 subchapter are unconstitutional or were unconstitutional;

24    (3) a defendant's reliance on any court decision that
25 has been overruled on appeal or by a subsequent court, even if that
26 court decision had not been overruled when the defendant engaged in
27 conduct that violates this subchapter;

1         (4)  a defendant's reliance on any state or federal

2    court decision that is not binding on the court in which the action

3    has been brought;

4         (5)  non-mutual issue preclusion or non-mutual claim

5    preclusion;

6         (6)  the consent of the unborn child's mother to the

7    abortion; or

8         (7)  any claim that the enforcement of this subchapter

9    or the imposition of civil liability against the defendant will

10   violate the constitutional rights of third parties, except as

11   provided by Section 171.209.

12      (f)  It is an affirmative defense if:

13        (1)  a person sued under Subsection (a)(2) reasonably

14   believed, after conducting a reasonable investigation, that the

15   physician performing or inducing the abortion had complied or would

16   comply with this subchapter; or

17        (2)  a person sued under Subsection (a)(3) reasonably

18   believed, after conducting a reasonable investigation, that the

19   physician performing or inducing the abortion will comply with this

20   subchapter.

21      (f-1)  The defendant has the burden of proving an affirmative

22   defense under Subsection (f)(1) or (2) by a preponderance of the

23   evidence.

24      (g)  This section may not be construed to impose liability on

25   any speech or conduct protected by the First Amendment of the United

26   States Constitution, as made applicable to the states through the

27   United States Supreme Court's interpretation of the Fourteenth

S.B. No. 8

1   Amendment of the United States Constitution, or by Section 8,

2   Article I, Texas Constitution.

3       (h)  Notwithstanding any other law, this state, a state

4   official, or a district or county attorney may not intervene in an

5   action brought under this section.  This subsection does not

6   prohibit a person described by this subsection from filing an

7   amicus curiae brief in the action.

8       (i)  Notwithstanding any other law, a court may not award

9   costs or attorney's fees under the Texas Rules of Civil Procedure or

10   any other rule adopted by the supreme court under Section 22.004,

11   Government Code, to a defendant in an action brought under this

12   section.

13       (j)  Notwithstanding any other law, a civil action under this

14   section may not be brought by a person who impregnated the abortion

15   patient through an act of rape, sexual assault, incest, or any other

16   act prohibited by Sections 22.011, 22.021, or 25.02, Penal Code.

17       Sec. 171.209.  CIVIL LIABILITY:  UNDUE BURDEN DEFENSE

18   LIMITATIONS.  (a)  A defendant against whom an action is brought

19   under Section 171.208 does not have standing to assert the rights of

20   women seeking an abortion as a defense to liability under that

21   section unless:

22          (1)  the United States Supreme Court holds that the

23   courts of this state must confer standing on that defendant to

24   assert the third-party rights of women seeking an abortion in state

25   court as a matter of federal constitutional law; or

26          (2)  the defendant has standing to assert the rights of

27   women seeking an abortion under the tests for third-party standing

S.B. No. 8

1   established by the United States Supreme Court.

2       (b)  A defendant in an action brought under Section 171.208

3   may assert an affirmative defense to liability under this section

4   if:

5           (1)  the   defendant   has   standing   to   assert   the

6   third-party rights of a woman or group of women seeking an abortion

7   in accordance with Subsection (a); and

8           (2)  the defendant demonstrates that the relief sought

9   by the claimant will impose an undue burden on that woman or that

10  group of women seeking an abortion.

11      (c)  A court may not find an undue burden under Subsection

12  (b) unless the defendant introduces evidence proving that:

13          (1)  an award of relief will prevent a woman or a group

14  of women from obtaining an abortion; or

15          (2)  an   award   of   relief   will   place   a   substantial

16  obstacle in the path of a woman or a group of women who are seeking

17  an abortion.

18      (d)  A defendant may not establish an undue burden under this

19  section by:

20          (1)  merely demonstrating that an award of relief will

21  prevent women from obtaining support or assistance, financial or

22  otherwise, from others in their effort to obtain an abortion; or

23          (2)  arguing or attempting to demonstrate that an award

24  of relief against other defendants or other potential defendants

25  will impose an undue burden on women seeking an abortion.

26      (e)  The affirmative defense under Subsection (b) is not

27  available if the United States Supreme Court overrules *Roe v. Wade*,

S.B. No. 8

1    410 U.S. 113 (1973) or *Planned Parenthood v. Casey*, 505 U.S. 833
2    (1992), regardless of whether the conduct on which the cause of
3    action is based under Section 171.208 occurred before the Supreme
4    Court overruled either of those decisions.

5        (f)  Nothing in this section shall in any way limit or
6    preclude a defendant from asserting the defendant's personal
7    constitutional rights as a defense to liability under Section
8    171.208, and a court may not award relief under Section 171.208 if
9    the conduct for which the defendant has been sued was an exercise of
10   state or federal constitutional rights that personally belong to
11   the defendant.

12       Sec. 171.210.  CIVIL        LIABILITY:         VENUE.
13   (a)  Notwithstanding any other law, including Section 15.002,
14   Civil Practice and Remedies Code, a civil action brought under
15   Section 171.208 shall be brought in:

16           (1)  the county in which all or a substantial part of
17   the events or omissions giving rise to the claim occurred;

18           (2)  the county of residence for any one of the natural
19   person defendants at the time the cause of action accrued;

20           (3)  the county of the principal office in this state of
21   any one of the defendants that is not a natural person; or

22           (4)  the county of residence for the claimant if the
23   claimant is a natural person residing in this state.

24       (b)  If a civil action is brought under Section 171.208 in
25   any one of the venues described by Subsection (a), the action may
26   not be transferred to a different venue without the written consent
27   of all parties.

11

S.B. No. 8

1    Sec. 171.211. SOVEREIGN, GOVERNMENTAL, AND OFFICIAL

2  IMMUNITY PRESERVED.    (a)  This section prevails over any

3  conflicting law, including:

4         (1)  the Uniform Declaratory Judgments Act; and

5         (2)  Chapter 37, Civil Practice and Remedies Code.

6    (b)  This state has sovereign immunity, a political

7  subdivision has governmental immunity, and each officer and

8  employee of this state or a political subdivision has official

9  immunity in any action, claim, or counterclaim or any type of legal

10 or equitable action that challenges the validity of any provision

11 or application of this chapter, on constitutional grounds or

12 otherwise.

13   (c)  A provision of state law may not be construed to waive or

14 abrogate an immunity described by Subsection (b) unless it

15 expressly waives immunity under this section.

16   Sec. 171.212. SEVERABILITY.  (a)  Mindful of *Leavitt v.*

17 *Jane L.*, 518 U.S. 137 (1996), in which in the context of determining

18 the severability of a state statute regulating abortion the United

19 States Supreme Court held that an explicit statement of legislative

20 intent is controlling, it is the intent of the legislature that

21 every provision, section, subsection, sentence, clause, phrase, or

22 word in this chapter, and every application of the provisions in

23 this chapter, are severable from each other.

24   (b)  If any application of any provision in this chapter to

25 any person, group of persons, or circumstances is found by a court

26 to be invalid or unconstitutional, the remaining applications of

27 that provision to all other persons and circumstances shall be

12

S.B. No. 8

1  severed and may not be affected.  All constitutionally valid
2  applications of this chapter shall be severed from any applications
3  that a court finds to be invalid, leaving the valid applications in
4  force, because it is the legislature's intent and priority that the
5  valid applications be allowed to stand alone.  Even if a reviewing
6  court finds a provision of this chapter to impose an undue burden in
7  a large or substantial fraction of relevant cases, the applications
8  that do not present an undue burden shall be severed from the
9  remaining applications and shall remain in force, and shall be
10 treated as if the legislature had enacted a statute limited to the
11 persons, group of persons, or circumstances for which the statute's
12 application does not present an undue burden.

13      (b-1)  If any court declares or finds a provision of this
14 chapter facially unconstitutional, when discrete applications of
15 that provision can be enforced against a person, group of persons,
16 or circumstances without violating the United States Constitution
17 and Texas Constitution, those applications shall be severed from
18 all remaining applications of the provision, and the provision
19 shall be interpreted as if the legislature had enacted a provision
20 limited to the persons, group of persons, or circumstances for
21 which the provision's application will not violate the United
22 States Constitution and Texas Constitution.

23      (c)  The legislature further declares that it would have
24 enacted this chapter, and each provision, section, subsection,
25 sentence, clause, phrase, or word, and all constitutional
26 applications of this chapter, irrespective of the fact that any
27 provision, section, subsection, sentence, clause, phrase, or word,

S.B. No. 8

1  or applications of this chapter, were to be declared

2  unconstitutional or to represent an undue burden.

3     (d)  If any provision of this chapter is found by any court to

4  be unconstitutionally vague, then the applications of that

5  provision that do not present constitutional vagueness problems

6  shall be severed and remain in force.

7     (e)  No court may decline to enforce the severability

8  requirements of Subsections (a), (b), (b-1), (c), and (d) on the

9  ground that severance would rewrite the statute or involve the

10  court in legislative or lawmaking activity.  A court that declines

11  to enforce or enjoins a state official from enforcing a statutory

12  provision does not rewrite a statute, as the statute continues to

13  contain the same words as before the court's decision.  A judicial

14  injunction or declaration of unconstitutionality:

15     (1)  is nothing more than an edict prohibiting

16  enforcement that may subsequently be vacated by a later court if

17  that court has a different understanding of the requirements of the

18  Texas Constitution or United States Constitution;

19     (2)  is not a formal amendment of the language in a

20  statute; and

21     (3)  no more rewrites a statute than a decision by the

22  executive not to enforce a duly enacted statute in a limited and

23  defined set of circumstances.

24     SECTION 4.  Chapter 30, Civil Practice and Remedies Code, is

25  amended by adding Section 30.022 to read as follows:

26     Sec. 30.022.  AWARD OF ATTORNEY'S FEES IN ACTIONS

27  CHALLENGING ABORTION LAWS.  (a)  Notwithstanding any other law, any

S.B. No. 8

1   person, including an entity, attorney, or law firm, who seeks
2   declaratory or injunctive relief to prevent this state, a political
3   subdivision, any governmental entity or public official in this
4   state, or any person in this state from enforcing any statute,
5   ordinance, rule, regulation, or any other type of law that
6   regulates or restricts abortion or that limits taxpayer funding for
7   individuals or entities that perform or promote abortions, in any
8   state or federal court, or that represents any litigant seeking
9   such relief in any state or federal court, is jointly and severally
10  liable to pay the costs and attorney's fees of the prevailing party.
11       (b)  For purposes of this section, a party is considered a
12  prevailing party if a state or federal court:
13            (1)  dismisses any claim or cause of action brought
14  against the party that seeks the declaratory or injunctive relief
15  described by Subsection (a), regardless of the reason for the
16  dismissal; or
17            (2)  enters judgment in the party's favor on any such
18  claim or cause of action.
19       (c)  Regardless of whether a prevailing party sought to
20  recover costs or attorney's fees in the underlying action, a
21  prevailing party under this section may bring a civil action to
22  recover costs and attorney's fees against a person, including an
23  entity, attorney, or law firm, that sought declaratory or
24  injunctive relief described by Subsection (a) not later than the
25  third anniversary of the date on which, as applicable:
26            (1)  the dismissal or judgment described by Subsection
27  (b) becomes final on the conclusion of appellate review; or

15

S.B. No. 8

1    (2)  the time for seeking appellate review expires.

2    (d)  It is not a defense to an action brought under

3 Subsection (c) that:

4    (1)  a prevailing party under this section failed to

5 seek recovery of costs or attorney's fees in the underlying action;

6    (2)  the court in the underlying action declined to

7 recognize or enforce the requirements of this section; or

8    (3)  the court in the underlying action held that any

9 provisions of this section are invalid, unconstitutional, or

10 preempted by federal law, notwithstanding the doctrines of issue or

11 claim preclusion.

12    SECTION 5.  Subchapter C, Chapter 311, Government Code, is

13 amended by adding Section 311.036 to read as follows:

14    Sec. 311.036.  CONSTRUCTION OF ABORTION STATUTES.  (a)  A

15 statute that regulates or prohibits abortion may not be construed

16 to repeal any other statute that regulates or prohibits abortion,

17 either wholly or partly, unless the repealing statute explicitly

18 states that it is repealing the other statute.

19    (b)  A statute may not be construed to restrict a political

20 subdivision from regulating or prohibiting abortion in a manner

21 that is at least as stringent as the laws of this state unless the

22 statute explicitly states that political subdivisions are

23 prohibited from regulating or prohibiting abortion in the manner

24 described by the statute.

25    (c)  Every statute that regulates or prohibits abortion is

26 severable in each of its applications to every person and

27 circumstance.  If any statute that regulates or prohibits abortion

16

S.B. No. 8

1 is found by any court to be unconstitutional, either on its face or
2 as applied, then all applications of that statute that do not
3 violate the United States Constitution and Texas Constitution shall
4 be severed from the unconstitutional applications and shall remain
5 enforceable, notwithstanding any other law, and the statute shall
6 be interpreted as if containing language limiting the statute's
7 application to the persons, group of persons, or circumstances for
8 which the statute's application will not violate the United States
9 Constitution and Texas Constitution.

10 SECTION 6.  Section 171.005, Health and Safety Code, is
11 amended to read as follows:

12 Sec. 171.005.  COMMISSION  [DEPARTMENT]  TO  ENFORCE;
13 EXCEPTION.  The commission [department] shall enforce this chapter
14 except for Subchapter H, which shall be enforced exclusively
15 through the private civil enforcement actions described by Section
16 171.208 and may not be enforced by the commission.

17 SECTION 7.  Subchapter A, Chapter 171, Health and Safety
18 Code, is amended by adding Section 171.008 to read as follows:

19 Sec. 171.008.  REQUIRED DOCUMENTATION.  (a)  If an abortion
20 is performed or induced on a pregnant woman because of a medical
21 emergency, the physician who performs or induces the abortion shall
22 execute a written document that certifies the abortion is necessary
23 due to a medical emergency and specifies the woman's medical
24 condition requiring the abortion.

25 (b)  A physician shall:

26 (1)  place the document described by Subsection (a) in
27 the pregnant woman's medical record; and

17

S.B. No. 8

1    (2) maintain a copy of the document described by

2 Subsection (a) in the physician's practice records.

3    (c) A physician who performs or induces an abortion on a

4 pregnant woman shall:

5    (1) if the abortion is performed or induced to

6 preserve the health of the pregnant woman, execute a written

7 document that:

8    (A) specifies the medical condition the abortion

9 is asserted to address; and

10    (B) provides the medical rationale for the

11 physician's conclusion that the abortion is necessary to address

12 the medical condition; or

13    (2) for an abortion other than an abortion described

14 by Subdivision (1), specify in a written document that maternal

15 health is not a purpose of the abortion.

16    (d) The physician shall maintain a copy of a document

17 described by Subsection (c) in the physician's practice records.

18    SECTION 8.  Section 171.012(a), Health and Safety Code, is

19 amended to read as follows:

20    (a) Consent to an abortion is voluntary and informed only

21 if:

22    (1) the physician who is to perform or induce the

23 abortion informs the pregnant woman on whom the abortion is to be

24 performed or induced of:

25    (A) the physician's name;

26    (B) the particular medical risks associated with

27 the particular abortion procedure to be employed, including, when

S.B. No. 8

1  medically accurate:

2                      (i)  the risks of infection and hemorrhage;

3                      (ii)  the  potential  danger  to  a  subsequent

4  pregnancy and of infertility; and

5                      (iii)  the  possibility  of  increased  risk  of

6  breast  cancer  following  an  induced  abortion  and  the  natural

7  protective  effect  of  a  completed  pregnancy  in  avoiding  breast

8  cancer;

9                  (C)  the  probable  gestational  age  of  the  unborn

10  child at the time the abortion is to be performed or induced; and

11                  (D)  the  medical  risks  associated  with  carrying

12  the child to term;

13              (2)  the  physician  who  is  to  perform  or induce  the

14  abortion or the physician's agent informs the pregnant woman that:

15                  (A)  medical  assistance  benefits  may  be  available

16  for prenatal care, childbirth, and neonatal care;

17                  (B)  the  father  is  liable  for  assistance  in  the

18  support  of  the  child  without  regard  to  whether  the  father  has

19  offered to pay for the abortion; and

20                  (C)  public    and    private    agencies    provide

21  pregnancy  prevention  counseling  and  medical  referrals  for

22  obtaining  pregnancy  prevention  medications  or  devices,  including

23  emergency contraception for victims of rape or incest;

24              (3)  the  physician  who  is  to  perform  or induce  the

25  abortion or the physician's agent:

26                  (A)  provides the pregnant woman with the printed

27  materials described by Section 171.014; and

19

S.B. No. 8

1          (B)  informs  the  pregnant  woman  that  those

2 materials:

3              (i)  have  been  provided  by  the  commission

4 [Department of State Health Services];

5              (ii)  are accessible on an Internet website

6 sponsored by the commission [department];

7              (iii)  describe  the  unborn  child  and  list

8 agencies that offer alternatives to abortion; and

9              (iv)  include a list of agencies that offer

10 sonogram services at no cost to the pregnant woman;

11       (4)  before any sedative or anesthesia is administered

12 to the pregnant woman and at least 24 hours before the abortion or

13 at least two hours before the abortion if the pregnant woman waives

14 this requirement by certifying that she currently lives 100 miles

15 or more from the nearest abortion provider that is a facility

16 licensed under Chapter 245 or a facility that performs more than 50

17 abortions in any 12-month period:

18          (A)  the physician who is to perform or induce the

19 abortion or an agent of the physician who is also a sonographer

20 certified by a national registry of medical sonographers performs a

21 sonogram on the pregnant woman on whom the abortion is to be

22 performed or induced;

23          (B)  the physician who is to perform or induce the

24 abortion displays the sonogram images in a quality consistent with

25 current medical practice in a manner that the pregnant woman may

26 view them;

27          (C)  the physician who is to perform or induce the

20

S.B. No. 8

1   abortion provides, in a manner understandable to a layperson, a

2   verbal explanation of the results of the sonogram images, including

3   a medical description of the dimensions of the embryo or fetus, the

4   presence of cardiac activity, and the presence of external members

5   and internal organs; and

6            (D)  the physician who is to perform <u>or induce</u> the

7   abortion or an agent of the physician who is also a sonographer

8   certified by a national registry of medical sonographers makes

9   audible the heart auscultation for the pregnant woman to hear, if

10  present, in a quality consistent with current medical practice and

11  provides, in a manner understandable to a layperson, a simultaneous

12  verbal explanation of the heart auscultation;

13           (5)  before receiving a sonogram under Subdivision

14  (4)(A) and before the abortion is performed <u>or induced</u> and before

15  any sedative or anesthesia is administered, the pregnant woman

16  completes and certifies with her signature an election form that

17  states as follows:

18               "ABORTION AND SONOGRAM ELECTION

19           (1)  THE INFORMATION AND PRINTED MATERIALS DESCRIBED BY

20  SECTIONS 171.012(a)(1)-(3), TEXAS HEALTH AND SAFETY CODE, HAVE BEEN

21  PROVIDED AND EXPLAINED TO ME.

22           (2)  I UNDERSTAND THE NATURE AND CONSEQUENCES OF AN

23  ABORTION.

24           (3)  TEXAS LAW REQUIRES THAT I RECEIVE A SONOGRAM PRIOR

25  TO RECEIVING AN ABORTION.

26           (4)  I UNDERSTAND THAT I HAVE THE OPTION TO VIEW THE

27  SONOGRAM IMAGES.

21

S.B. No. 8

1          (5)   I UNDERSTAND THAT I HAVE THE OPTION TO HEAR THE
2  HEARTBEAT.

3          (6)   I UNDERSTAND THAT I AM REQUIRED BY LAW TO HEAR AN
4  EXPLANATION OF THE SONOGRAM IMAGES UNLESS I CERTIFY IN WRITING TO
5  ONE OF THE FOLLOWING:

6          ____ I AM PREGNANT AS A RESULT OF A SEXUAL ASSAULT,
7  INCEST, OR OTHER VIOLATION OF THE TEXAS PENAL CODE THAT HAS BEEN
8  REPORTED TO LAW ENFORCEMENT AUTHORITIES OR THAT HAS NOT BEEN
9  REPORTED BECAUSE I REASONABLY BELIEVE THAT DOING SO WOULD PUT ME AT
10  RISK OF RETALIATION RESULTING IN SERIOUS BODILY INJURY.

11         ____ I AM A MINOR AND OBTAINING AN ABORTION IN ACCORDANCE
12  WITH JUDICIAL BYPASS PROCEDURES UNDER CHAPTER 33, TEXAS FAMILY
13  CODE.

14         ____ MY UNBORN CHILD [FETUS] HAS AN IRREVERSIBLE MEDICAL
15  CONDITION OR ABNORMALITY, AS IDENTIFIED BY RELIABLE DIAGNOSTIC
16  PROCEDURES AND DOCUMENTED IN MY MEDICAL FILE.

17          (7)   I AM MAKING THIS ELECTION OF MY OWN FREE WILL AND
18  WITHOUT COERCION.

19          (8)   FOR A WOMAN WHO LIVES 100 MILES OR MORE FROM THE
20  NEAREST ABORTION PROVIDER THAT IS A FACILITY LICENSED UNDER CHAPTER
21  245, TEXAS HEALTH AND SAFETY CODE, OR A FACILITY THAT PERFORMS MORE
22  THAN 50 ABORTIONS IN ANY 12-MONTH PERIOD ONLY:

23         I CERTIFY THAT, BECAUSE I CURRENTLY LIVE 100 MILES OR
24  MORE FROM THE NEAREST ABORTION PROVIDER THAT IS A FACILITY LICENSED
25  UNDER CHAPTER 245 OR A FACILITY THAT PERFORMS MORE THAN 50 ABORTIONS
26  IN ANY 12-MONTH PERIOD, I WAIVE THE REQUIREMENT TO WAIT 24 HOURS
27  AFTER THE SONOGRAM IS PERFORMED BEFORE RECEIVING THE ABORTION

S.B. No. 8

1   PROCEDURE. MY PLACE OF RESIDENCE IS:_____.

2   _____          _____

3   SIGNATURE                        DATE";

4          (6)  before the abortion is performed or induced, the

5   physician who is to perform or induce the abortion receives a copy

6   of the signed, written certification required by Subdivision (5);

7   and

8          (7)  the pregnant woman is provided the name of each

9   person who provides or explains the information required under this

10  subsection.

11         SECTION 9.  Section 245.011(c), Health and Safety Code, is

12  amended to read as follows:

13      (c)  The report must include:

14         (1)  whether the abortion facility at which the

15  abortion is performed is licensed under this chapter;

16         (2)  the patient's year of birth, race, marital status,

17  and state and county of residence;

18         (3)  the type of abortion procedure;

19         (4)  the date the abortion was performed;

20         (5)  whether the patient survived the abortion, and if

21  the patient did not survive, the cause of death;

22         (6)  the probable post-fertilization age of the unborn

23  child based on the best medical judgment of the attending physician

24  at the time of the procedure;

25         (7)  the date, if known, of the patient's last menstrual

26  cycle;

27         (8)  the number of previous live births of the patient;

23

S.B. No. 8

1  [and]

2  (9)  the  number  of  previous  induced  abortions  of  the

3  patient;

4  (10)  whether  the  abortion  was  performed  or  induced

5  because  of  a  medical  emergency  and  any  medical  condition  of  the

6  pregnant woman that required the abortion; and

7  (11)  the  information  required  under  Sections

8  171.008(a) and (c).

9  SECTION 10.  Every  provision  in  this  Act  and  every

10  application of the provision in this Act are severable from each

11  other.  If any provision or application of any provision in this Act

12  to any person, group of persons, or circumstance is held by a court

13  to be invalid, the invalidity does not affect the other provisions

14  or applications of this Act.

15  SECTION 11.  The change in law made by this Act applies only

16  to an abortion performed or induced on or after the effective date

17  of this Act.

18  SECTION 12.  This Act takes effect September 1, 2021.

24

S.B. No. 8

_____     _____
        President of the Senate                   Speaker of the House

    I hereby certify that S.B. No. 8 passed the Senate on March 30, 2021, by the following vote: Yeas 19, Nays 12; and that the Senate concurred in House amendments on May 13, 2021, by the following vote: Yeas 18, Nays 12.


                                                  _____
                                             Secretary of the Senate

    I hereby certify that S.B. No. 8 passed the House, with amendments, on May 6, 2021, by the following vote:  Yeas 83, Nays 64, one present not voting.


                                                  _____
                                         Chief Clerk of the House

Approved:

_____
                Date

_____
            Governor

25

# EXHIBIT A-26
# Texas Senate Session
# 3.29.21

Page 174

1 have this procedure done in order to prevent a serious
2 damage to her -- her health or save her life?  Would
3 this tie the hands of the doctors or make them subject
4 to a lawsuit simply for treating their patient?
5        SENATOR HUGHES:  It would not.  And I
6 would point to you existing law, 171.002 of the Health
7 and Safety Code, medical emergency means a
8 life-threatening physical condition aggravated by,
9 caused by, or arising from a pregnancy that if certified
10 by a physician places a woman in danger of death or a
11 serious risk of substantial impairment of a major bodily
12 function unless an abortion is performed.
13        That's -- you know, we -- the Legislature
14 passed that some years ago.  That's been tested in
15 court.  Docs have testified about that.  So that medical
16 emergency exception is specifically provided for in the
17 Texas heartbeat bill.
18        SENATOR MENENDEZ:  Senator, is there a
19 fiscal note affiliated or associated with this bill?
20        SENATOR HUGHES:  Senator, a number of
21 the -- a number of the pro-life bills that were
22 considered had questions about fiscal notes, because
23 believe it or not, there was a discussion about whether
24 more babies being born would be a cost to the taxpayers.
25 I know that's not what you're talking about.  We -- we

Page 175

1 are for more Texans being born.
2        To my knowledge, the Nelson amendment was
3 placed on this bill in the process to make sure, but I'm
4 not aware of any -- of any fiscal implication of the
5 State.  And yes, here's why I would say that.  There is
6 no state action in this bill.  This does not compel or
7 allow the State of Texas to take any action.  This is
8 about private enforcement.
9        SENATOR MENENDEZ:  It's about suing a
10 doctor or anybody who aides and abets a woman if she has
11 an abortion prior to or after the detection of a
12 heartbeat.
13        Who would determine -- I mean, I guess I'm
14 trying to figure out the -- I'm trying to figure out a
15 fact pattern for how this would -- this would go down
16 the road.
17        SENATOR HUGHES:  So the law requires -- if
18 this law passes -- and -- and by the bay, the experts
19 tell me to make sure I'm clear that there is no fiscal
20 note on this bill, no fiscal impact whatever.  I was
21 talking about some other bill, but so we're clear, no
22 fiscal impact.
23        Practically speaking --
24        SENATOR MENENDEZ:  Are you sure if there's
25 a fiscal impact?

Page 176

1        SENATOR HUGHES:  I beg your pardon?
2        SENATOR MENENDEZ:  Is there a fiscal
3 impact?
4        SENATOR HUGHES:  There is not.  Thank you.
5        SENATOR MENENDEZ:  Okay.  Just -- just
6 checking.
7        SENATOR HUGHES:  Thanks for helping me
8 clarify that.
9        As far as the process goes, the law
10 requires that a physician, before performing the
11 abortion, check for that heartbeat.  And if a heartbeat
12 is detected, to stop there.
13        So we might -- questions about
14 enforcement, we could talk about the state in other
15 pro-life bills.  There's always going to be questions
16 about proof and about enforcement.  But so many of these
17 things happened in -- in the abortion clinic, and that-
18 -- that's not changing.
19        SENATOR MENENDEZ:  So do you -- do you
20 think -- I mean, I -- my understanding is other bills
21 that have passed in other states like this one have been
22 found unconstitutional.
23        Do you feel that -- that we're working on
24 a bill that's eventually going to be unconstitutional.
25        SENATOR HUGHES:  We believe this will be

Page 177

1 upheld.  Again, those other bills -- again, 12 or so
2 that are working their way to the US Supreme Court, they
3 all provide for government enforcement, for criminal
4 sanctions against physicians who violate the law.
5        SENATOR MENENDEZ:  Right.
6        SENATOR HUGHES:  Each one of those bills
7 was enjoined before it ever took effect.  Someone
8 brought suit and enjoined them, and so they were stayed
9 pending ruling by the Supreme Court.
10        We believe this rule will be upheld --
11 this bill will be upheld, and we believe it will be
12 upheld by the US Supreme Court.
13        SENATOR MENENDEZ:  So this bill literally
14 creates a new cause of action?
15        SENATOR HUGHES:  It does.
16        SENATOR MENENDEZ:  So cause of action.
17 This is -- is this -- is this the first cause of action
18 we've created here in a -- in a while?
19        SENATOR HUGHES:  In Senate Bill 1978, last
20 session, we created a cause of action for those people
21 whose religious freedoms were being -- were being
22 trampled by -- being affected by the state.
23        There was, I guess, a cause of action for
24 barratry.  I think the -- maybe the -- maybe TLR and
25 TTLA kind of got together on that one.

# EXHIBIT A-27
# Excerpts from Deposition
# Of Sadie Weldon

```
 1                    CAUSE NO. 22-03-032
 2  THE LILITH FUND FOR        )    IN THE DISTRICT COURT
    REPRODUCTIVE EQUITY,       )
 3  on behalf of itself and its )
    staff, volunteers, and its )
 4  donors,                    )
            Plaintiff,         )
 5                             )    JACK COUNTY, TEXAS
    V.                         )
 6                             )
                               )
 7  SADIE WELDON,              )
            Defendant.         )    271st JUDICIAL DISTRICT
 8
 9
10       * * * * * * * * * * * * * * * * * * * * * * * *
11         ORAL AND VIDEOTAPED DEPOSITION OF SADIE WELDON
12       * * * * * * * * * * * * * * * * * * * * * * * *
13
14
15
16
17       ORAL AND VIDEOTAPED DEPOSITION OF SADIE WELDON, being
18  produced as a witness at the instance of the Plaintiff, taken
19  in the above-styled and numbered cause on the 19th day of
20  August, 2022, from 9:09 a.m. to 3:29 p.m., before Rhonda Jacks,
21  Certified Shorthand Reporter in and for the State of Texas, by
22  machine shorthand, at the offices of The Fillmore Law Firm,
23  201 Main Street, Suite 801, Fort Worth, Texas, in accordance
24  with the Texas Rules of Civil Procedure and the agreements
25  hereinafter set forth:
```

Page 1

APPEARANCES

APPEARING ON BEHALF OF THE PLAINTIFF:
MS. ELIZABETH G. MYERS
emyers@thompsoncoburn.com
MR. JOHN P. ATKINS
jatkins@thompsoncoburn.com
THOMPSON COBURN, LLP
2100 Ross Avenue
Suite 3200
Dallas, TX 75201
972-629-7100

APPEARING ON BEHALF OF THE DEFENDANT:
MR. JONATHAN F. MITCHELL
jonathan@mitchell.law
MITCHELL LAW, PLLC
111 Congress Avenue
Suite 400
Austin, TX 78701
512-686-3940

MR. D. BRYAN HUGHES
bryan@hughesfirm.com
LAW OFFICE OF D. BRYAN HUGHES
110 North College Avenue
Suite 207
Tyler, TX 75702
903-581-1776

MR. JOHN C. SULLIVAN
john.sullivan@the-sl-lawfirm.com
SL LAW, PLLC
610 Uptown Blvd.
Suite 2000
Cedar Hill, TX 75104
469-523-1351

Also present:
Megan King - Videographer

Page 2

INDEX

WITNESS:                                    PAGE
SADIE WELDON
  Examination by Ms. Myers ........................ 5
  Change and Correction Sheet .................... 141
  Witness Signature Page ......................... 142
  Reporter's Certificate ......................... 143

EXHIBITS
NUMBER & DESCRIPTION
Exhibit 1 ........................................ 8
  Plaintiff the Lilith Fund for Reproductive
  Equity's Notice of Oral Deposition of
  Sadie Weldon Duces Tecum
Exhibit 2 ........................................ 23
  Verified Petition to Take Deposition to
  Investigate a Lawsuit
Exhibit 3 ........................................ 47
  Defendant's Motion to Dismiss Under the Texas
  Citizens Participation Act and Rule 91a and
  Plead in Abatement
Exhibit 4 ........................................ 48
  Declaration of Sadie Weldon
Exhibit 5 ........................................ 80
  Declaration of Sadie Weldon
Exhibit 6 ........................................ 101
  Declaration of Sadie Weldon
Exhibit 7 ........................................ 118
  Declaration of Sadie Weldon

Page 3

Exhibit 8 ........................................ 132
  Order Declaring Certain Civil Procedures
  Unconstitutional and Issuing Declaratory
  Judgment

Exhibit 9 ........................................ 132
  Agreed Order on Application for Temporary
  Injunction

Page 4

(Deposition commenced at 9:09 a.m.)

THE VIDEOGRAPHER:  Good morning.  We are on the record at 9:09 a.m. on August 19th, 2022.  This is the deposition of Sadie Weldon in the matter of The Lilith Fund for Reproductive Equity versus Sadie Weldon filed in the 271st Judicial District, Jack County, Texas, Case Number 22-03-032.  At this time, counsel, please state your appearances for the record.

MS. MYERS:  Elizabeth Myers from Thompson Coburn on behalf of the Plaintiff.

MR. ATKINS:  John Atkins from Thompson Coburn on behalf of the Plaintiff.

MR. MITCHELL:  Jonathan Mitchell with Mitchell Law PLLC on behalf of the Defendant.

MR. HUGHES:  Bryan Hughes here for the Defendant.

THE REPORTER:  Ms. Weldon, will you raise your right hand?  Do you swear to tell the truth, the whole truth and nothing but the truth?

MS. WELDON:  I do.

THE REPORTER:  Okay.  Thank you.  Go ahead.

SADIE WELDON,
having being first duly sworn, testified as follows:

EXAMINATION
BY MS. MYERS:

Page 5

2 (Pages 2 - 5)

**Page 18**

1   A   If someone has broken the Texas Heartbeat law.
2   Q   Okay.  And -- and what would a citizen file if they
3   believed someone had -- had broken the Texas Heartbeat Act law?
4   A   What I did in the county courthouse.
5   Q   What -- What's your understanding of what you filed
6   in the county courthouse?
7   A   That something would be done.
8   Q   What did -- What did you think would be done?
9   A   That they would be held accountable.
10   Q   And by they, are you referring to The Lilith Fund?
11   A   Anyone.
12   Q   Do you believe that the Texas Heartbeat Act is a
13   valid law?
14   A   Yes.
15   Q   Do you believe that it allows you to file a lawsuit
16   against someone who violates it?
17   A   Yes.
18   Q   Have you ever filed a lawsuit under the Texas
19   Heartbeat Act?
20   A   From my understanding.
21   Q   I'm sorry?
22   A   Rephrase the question please.
23   Q   Sure.  Sure.  You believe that the Texas Heartbeat
24   Act is a valid law that allows you to file a lawsuit against
25   someone that you believe has broken that law.  Is that right?

**Page 19**

1   A   Yes.
2   Q   Okay.  Do you believe that you have filed a lawsuit
3   under the Texas Heartbeat Act?
4   A   Yes.
5   Q   Okay.  Do you believe that you filed that lawsuit
6   against Ms. Dave'?
7   A   Yes.
8   Q   Do you -- Do you think it was filed against anyone
9   other than Ms. Dave'?
10   A   Not to my knowledge.
11   Q   Okay.  Do you believe that the Texas Heartbeat Act is
12   constitutional?
13   A   Yes.
14   Q   Do you believe that all of its terms are
15   constitutional?
16   A   Yes.
17   Q   Do you believe that you can file a lawsuit against
18   anyone who violates the Texas Heartbeat Act?
19   A   Yes.
20   Q   Do you believe that you can file a lawsuit against
21   anyone who violates the Texas Heartbeat Act even if you don't
22   know the person who had the abortion?
23   A   Rephrase that.
24   Q   Sure.  It was -- It was a long question.  Do you
25   believe that you need to know the person who had the abortion

**Page 20**

1   in order to file a lawsuit under the Texas Heartbeat Act?
2   A   No.
3   Q   Why not?  I am just looking for your understanding.
4   I am not trying to confuse you.  I want -- I want to understand
5   why you think you don't need to know the person who had the
6   abortion.
7   A   I don't need to know it.
8   Q   Do you know whether any court has ruled on the
9   constitutionality of the Texas Heartbeat Act?
10   A   Yes.
11   Q   Which court has ruled on the constitutionality of the
12   Texas Heartbeat Act?
13   A   I am not sure.
14   Q   You just know a court did?
15   A   Yes.
16   Q   Okay.  Do you know whether the court that you know of
17   ruled that it was constitutional or unconstitutional?
18   A   Yes.
19   Q   Which one was it?
20   A   Constitutional.
21   Q   Okay.  So you know of a court that said that the
22   Texas Heartbeat Act was constitutional?
23   A   Yes.
24   Q   Okay.  Do you know whether any other court has said
25   it is unconstitutional?

**Page 21**

1   A   Repeat that.
2   Q   I think what you told me is you're aware that -- that
3   a judge, a court, has said that SB-8 -- sorry -- has said the
4   Texas Heartbeat Act is constitutional.  Right?  My question is
5   whether you know if another judge or another court has ruled
6   that it is not constitutional?
7   A   Not to my knowledge.
8   Q   Okay.  Do you know who Judge David Peeples is?
9   A   No.
10   Q   I will represent to you that Judge David Peeples has
11   ruled that the Texas Heartbeat Act is unconstitutional.  Have
12   you ever seen the order in which he ruled that?
13   A   No.
14   Q   Is it fair for me to assume that you would disagree
15   with Judge Peeples?
16   A   Yes.
17   Q   Okay.  All right.  What is your understanding of this
18   lawsuit that we are here on today?
19   A   Can I elaborate a little?
20   Q   You can -- You can respond in any -- in any way that
21   makes sense to you.
22   A   I feel we are here today for the fact that I stood up
23   for the Texas Heartbeat law.
24   Q   Okay.  Can you tell me what you mean by that please?
25   A   I want the Texas Heartbeat law upheld.

6 (Pages 18 - 21)

1   Q   Do you understand that we are here today because The
2   Lilith Fund filed a lawsuit against you?
3   A   Yes.
4   Q   Okay.  What's your understanding of why that lawsuit
5   was filed?
6   A   Because I stood up for the law.
7   Q   And how did you stand up for the law?
8   A   Because I filed in the county courthouse.
9   Q   Okay.  What did you file in the county courthouse?
10  A   I am not sure.
11  Q   Okay.  That's fine.  That's a perfectly -- perfectly
12  fine answer.  Do you know what you were trying to do by filing
13  in the county courthouse?
14  A   I wanted the Texas Heartbeat law honored.
15  Q   Okay.  What were you hoping to achieve with the
16  filing in the county courthouse?
17  A   People held accountable.
18  Q   What does that look like to you?  I don't know what
19  accountable means to you.
20      MR. HUGHES:  Object to form.  You can answer if
21  you're able to if you understand the question.  I just -- From
22  time to time we will make an objection.  Unless we tell you not
23  to, you can go ahead and answer.
24  A   Repeat the question.
25  Q   Sure.  You said you -- you made your filing in -- in

Page 22

1   the county courthouse.  And I think by that you mean the filing
2   that was done in Jack County.  Is that right?
3   A   Yes.
4   Q   Okay.  Have you ever seen the filing that you -- that
5   you made in Jack County?
6   A   I know what I signed.
7   Q   That's fine.  I think it may be easier if I
8   just give you a copy of the document.  I am not -- I am not
9   trying to -- I am not trying to be tricky at all.
10      MS. MYERS:  Would you mark this as Exhibit 2
11  please.
12      (Exhibit 2 was published to the witness.)
13  Q   Ms. Weldon, the court reporter just handed you what I
14  have marked as Exhibit 2 to your deposition.  Do you recognize
15  what Exhibit 2 is?
16  A   Yes.
17  Q   What is it?
18  A   What it says in the item.
19  Q   Okay.  I think this is what you have been talking
20  about when you said the filing in the county courthouse.  And I
21  just want to make sure that we are talking about the same
22  thing.  Is Exhibit 2 to your deposition the filing that you
23  made to uphold the Texas Heartbeat Act?
24  A   Yes.
25  Q   Okay.  Did you review a copy of Exhibit 2 before it

Page 23

1   was filed?
2   A   No.
3   Q   No.  Okay.  You said you did review something that
4   you signed though.  Is that right?
5   A   It was one piece of paper.
6   Q   Okay.  And I think -- I think it may actually be part
7   of Exhibit 2.  So if you would -- if you would look at -- There
8   are some numbers on the bottom of the first ten pages of
9   Exhibit 2, and then there's a page right after page 10 of 10.
10      MS. MYERS:  Oh, you shouldn't have that one.
11      MR. MITCHELL:  Sorry.  Sorry.  Sorry.
12      MS. MYERS:  It's fine.  No, no, no.  It's fine.
13  It's because I did it late at night.
14      MR. HUGHES:  Mine is too.
15      MS. MYERS:  Oh, my goodness.  It's fine.
16      MR. HUGHES:  It's just highlights as far as I
17  can tell.
18      MS. MYERS:  It's fine.  It may have been that we
19  -- Did we copy the highlighted ones?  Oh, okay.  Great.
20      MR. MITCHELL:  Nothing privileged in there?
21      MR. HUGHES:  I don't think there's --
22      MR. MITCHELL:  We have it here.
23      MR. HUGHES:  We have got a copy.
24      MS. MYERS:  I mean I'm going to -- I will
25  represent to you I am going to ask Ms. Weldon about these

Page 24

1   highlighted passages, but there's nothing unique or unusual.
2   There shouldn't be any notes in there about what I am going to
3   ask.  So I am fine with it as long as you will stipulate that
4   that is not a waiver of my attorney work product privilege.
5       MR. HUGHES:  Yes.  That's agreed.
6       MS. MYERS:  Okay.
7   Q   All right.  So, Ms. Weldon, I'm sorry.  So are you to
8   the page that's right after page 10 of 10 in Exhibit 2?
9   A   Yes.
10  Q   Okay.  Is this the document that you reviewed and
11  signed?
12  A   Yes.
13  Q   Okay.  You only reviewed this one page though.  Is
14  that right?
15      MR. HUGHES:  Objection; form.
16  Q   You can answer if you understand the question.  If
17  you don't understand, I am happy to rephrase it.
18  A   Rephrase it.
19  Q   Okay.  Earlier you told me that you hadn't seen
20  Exhibit 2, that you had only seen a page that you signed.
21      MR. HUGHES:  Objection; form.
22      MR. MITCHELL:  I think that misstates her
23  testimony.  She said --
24  Q   Did you review the first ten pages of Exhibit 2
25  before it was filed?

Page 25

7 (Pages 22 - 25)

| | |
|---|---|
| 1   A  No. | 1  just -- Why don't we try it, and we'll see if it gets |
| 2   Q  You did not.  Okay.  Did you review -- | 2  complicated.  If we have to re-visit, we will.  Is that okay? |
| 3       MR. HUGHES:  Were you trying to -- Sorry to | 3   A  Okay. |
| 4  interrupt.  It looked like she was trying to say something | 4   Q  Okay.  Why did you decide to file the document that's |
| 5  else.  We just want to make sure that you're understanding the | 5  been marked as Exhibit 2? |
| 6  question.  Thank you, counsel.  I am just trying to help. | 6   A  So the Texas Heartbeat law would be upheld. |
| 7       MS. MYERS:  No.  I hear you. | 7   Q  How did you decide that you needed to file Exhibit 2 |
| 8       MR. HUGHES:  You didn't ask when it might have | 8  for the Texas Heartbeat Act to be upheld? |
| 9  taken place.  She has seen a lot of documents.  I just want | 9   A  Somebody -- |
| 10  to -- I think she's confused. | 10       MR. HUGHES:  Object to form.  You can answer. |
| 11   Q  I want to -- What I am asking is before the first ten | 11   A  Somebody needed to. |
| 12  pages of Exhibit 2 were filed, which is how you were going to | 12   Q  When did you decide that you wanted to file what's |
| 13  stand up for the Texas Heartbeat Act, did you review the first | 13  been marked as Exhibit 2 to your deposition? |
| 14  ten pages? | 14   A  When I found out I legally could. |
| 15   A  Before I filed, did I? | 15   Q  When -- When did you find out you legally could do |
| 16   Q  Yes, before it was filed. | 16  that? |
| 17   A  No. | 17   A  I called someone who could explain the law to me. |
| 18   Q  Okay.  You signed a verification that's the 11th | 18   Q  Who did you call? |
| 19  page.  Right.  I know it doesn't have a page number on it.  You | 19   A  David Barton. |
| 20  did sign this verification though.  Right? | 20   Q  Who's David Barton? |
| 21   A  Yes. | 21   A  A very close friend. |
| 22   Q  Okay.  And you reviewed this page before you signed | 22   Q  What happened before you decided to call David Barton |
| 23  it because you read it before you signed it.  Right? | 23  that made you think -- Go ahead. |
| 24   A  This page. | 24       MR. HUGHES:  I apologize.  I thought you were |
| 25   Q  Okay.  Thank you.  Do you know what a verified | 25  done.  I'm very sorry.  Go ahead. |
| Page 26 | Page 28 |
| 1  petition to take a deposition to investigate a lawsuit is? | 1       MS. MYERS:  That's all right. |
| 2   A  No. | 2       MR. HUGHES:  I'm sorry. |
| 3       MR. HUGHES:  Objection; form. | 3   Q  What happened before you called David Barton that |
| 4   Q  I am going to tell you I use a shorthand for that. | 4  made you think you should call him? |
| 5  It's a Rule 202 petition.  If you would like me to say verified | 5   A  Because I had knowledge that it had been broken. |
| 6  petition to take a deposition to investigate a lawsuit, I will, | 6   Q  What knowledge did you have before you called David |
| 7  or I can refer to it however you want to refer to it.  Do you | 7  Barton? |
| 8  have a preference on how we talk about the filing that went | 8   A  News travels fast. |
| 9  into the county courthouse? | 9   Q  Specifically what news gave you knowledge that you |
| 10   A  Simpler the better. | 10  should call David Barton? |
| 11   Q  Simpler the better.  Okay.  Can I say -- Can we call | 11   A  That the Texas Heartbeat law had been broken. |
| 12  it your filing?  Is that okay?  Can we call it Weldon filing? | 12   Q  Who told you that? |
| 13  What word would be good for you?  I don't -- I don't want to | 13   A  I read it -- |
| 14  complicate it and make it difficult for you.  Jack County | 14   Q  Where did you read it? |
| 15  filing, you want to do that? | 15   A  -- somewhere. |
| 16       MR. HUGHES:  What you're asking is not an | 16   Q  I'm sorry.  I didn't mean to interrupt you. |
| 17  official designation.  You're just asking how she would like to | 17   A  Somewhere. |
| 18  describe it? | 18   Q  Where did you read it? |
| 19   Q  I just want to be able to talk with you without | 19   A  I don't recall. |
| 20  having to read the title the whole time.  And so I want -- I | 20   Q  Do you know when you read it? |
| 21  want to agree to a term so when we talk about it we know we are | 21   A  No. |
| 22  talking about Exhibit 2.  I can also just say Exhibit 2 if you | 22   Q  Was it in a news article? |
| 23  want. | 23   A  I don't remember. |
| 24   A  I don't know how to answer this. | 24   Q  Was it an alert from Texas Right to Life? |
| 25   Q  That's fine.  If you don't have a preference, I'll | 25   A  No. |
| Page 27 | Page 29 |

8 (Pages 26 - 29)

Texas Rules of Civil Procedure

Part II, Section 9, Evidence and Discovery

Rule 203

203.1 Signature and Changes.

(a) Deposition transcript to be provided to witness. The deposition officer must provide the original deposition transcript to the witness for examination and signature. If the witness is represented by an attorney at the deposition, the deposition officer must provide the transcript to the attorney instead of the witness.

(b) Changes by witness; signature. The witness may change responses as reflected in the deposition transcript by indicating the desired changes, in writing, on a separate sheet of paper, together with a statement of the reasons for making the changes. No erasures or obliterations of any kind may be made to the original deposition transcript. The witness must then sign the transcript under oath and return it to the deposition officer. If the witness does not return the transcript to the deposition officer within 20 days of the date the transcript was provided to the witness or the

witness's attorney, the witness may be deemed to
have waived the right to make the changes.

(c) Exceptions. The requirements of presentation
and signature under this subdivision do not apply:

    (1) if the witness and all parties waive the
signature requirement;

    (2) to depositions on written questions; or

    (3) to non-stenographic recordings of oral
depositions.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
201Ï.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT A-28
# Declaration of Mistie Sharp
# 9.21.21

DocuSign Envelope ID: 423146F4-1C99-4305-9173-F3122B631204
DocuSign Envelope ID: 24B2E055-4F99-4248-8E6F-A957DF75BDA8

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

|  |  |
|---|---|
| **United States of America,** | |
| Plaintiff, | |
| v. | Case No. 1:21-cv-00796-RP |
| **The State of Texas,** | |
| Defendant. | |

## DECLARATION OF MISTIE SHARP

I, Mistie Sharp, declare as follows:

1. My name is Mistie Sharp. I am over 21 years old and fully competent to make this declaration.

2. I have personal knowledge of each of the facts stated in this declaration, and everything stated in this declaration is true and correct.

3. I am a resident of Henderson County.

4. I am aware that the Texas Heartbeat Act, also known as Senate Bill 8, allows me to sue any individual or entity that violates the Act after it takes effect on September 1, 2021. *See* Tex. Health & Safety Code § 171.208.

5. I am also aware that the Texas Heartbeat Act exposes so-called abortion funds to private civil-enforcement suits if they pay for or reimburse the costs of a post-heartbeat abortion. *See* Tex. Health & Safety Code § 171.208(a)(2).

6. I have an interest in preserving my state-law right to sue abortion funds that violate the Texas Heartbeat Act, a right that the United States is attempting to take away by asking this Court to enjoin every person in the world from suing to enforce

DocuSign Envelope ID: 4231I6E4-1C99-4305-9178-52122BB31204
DocuSign Envelope ID: 24B2E055-4F99-4248-8E6F-A957DF75BDA8

Senate Bill 8 in any situation—even when they sue over conduct that is clearly unprotected by the Constitution—and by asking this Court to enjoin the Texas judiciary from "maintaining *any* civil proceeding pursuant to S.B. 8." Proposed Order, ECF No. 6-2 at 2 (emphasis added).

7. I have no intention of suing any abortion provider who violates Senate Bill 8, or any employee or volunteer of any such abortion provider.

8. Instead, I intend to sue only individuals and entities whose conduct is clearly unprotected by the Constitution, and who cannot plausibly assert an "undue burden" defense under section 171.209 of the Texas Health and Safety Code under the existing precedents of the Supreme Court.

9. Specifically, I intend to sue only abortion funds who pay for other people's abortions in violation of Senate Bill 8.

10. I have decided to target these entities because there is no constitutional right to pay for another person's abortion, and there is no constitutional right to receive financial assistance from others when seeking an abortion. *See Harris v. McRae*, 448 U.S. 297, 325 (1980).

11. In addition, the abortion funds that I intend to sue lack third-party standing to assert the constitutional rights of abortion patients under the tests for third-party standing established by the Supreme Court. *See, e.g., Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). Although the Supreme Court has allowed abortion *providers* to assert the third-party rights of abortion patients in constitutional litigation,[1] it has never allowed abortion funds to assert the constitutional rights of abortion patients.

12. I respectfully seek intervention to defend and preserve my state-law right to sue abortion funds that pay for post-heartbeat abortions in violation of Senate Bill 8.

---

1. *See, e.g., Singleton v. Wulff*, 428 U.S. 106, 113–18 (1976) (plurality opinion); *June Medical Services LLC v. Russo*, 140 S. Ct. 2103, 2118–20 (2020) (plurality opinion); *id.* at 2139 (Roberts, C.J., concurring).

DocuSign Envelope ID: 24B2E055-4F99-4248-8E6F-A957DF75BDA8

This concludes my sworn statement. I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 21, 2021

MISTIE SHARP

EXHIBIT A-29
Excerpts from Transcript
of Texas Supreme Court
Oral Argument in Case No.
22-0033, *Whole Woman's
Health v. Jackson*

1

2

3

4

5        Whole Woman's Health v. Jackson

6               22-0033

7  Certified Question from U.S. Court of Appeals

8          for the Fifth Circuit

9          (No. 21-50792)

10

11          Transcription of Video

12         Video Runtime:  0:58:55

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            (Beginning of Audio Recording.)

 2            THE CLERK:  All rise.  Oh yea, oh yea,

 3    oh yea, the Honorable, the Supreme Court of

 4    Texas.  All persons having business before the

 5    Honorable, the Supreme Court of Texas, are

 6    admonished to draw near and give their

 7    attention for the Court is now sitting.  God

 8    save the State of Texas and this Honorable

 9    Court.

10            CHIEF JUSTICE HECHT:  Please be seated.

11    I would ordinary apologize, especially when we

12    have counsel from D.C., for delaying argument

13    for icy weather conditions that would go

14    wholly unnoticed there, but Mr. Aaron

15    (phonetic) is no stranger to Texas, and he

16    should understand.

17            We have two cases set for argument this

18    morning.  First is 22-0033, Jackson versus

19    Whole Woman's Health, a certified question

20    from the United States Court of Appeals for

21    the 5th Circuit.

22            And then 20-0687, Berry against Berry,

23    from Nueces County and the 13th Court of

24    Appeals District.  Justice Huddle and Justice

25    Young are not participating in the decision of
```

1  state defendants couldn't possibly prevent

2  private individuals from attempting to enforce

3  SB 8's subsection 204 requirements through the

4  civil mechanisms provided in SB 8 in 208.

5       There are cases percolating up

6  regarding some of the procedures where those

7  cases -- one in the Third Court of Appeals

8  right now, those involve private parties.

9  That's -- the decisions in those cases might

10  well determine how and whether individuals can

11  bring them.  But an injunction against the

12  governmental defendants simply can't prevent

13  outside private individuals from bringing SB 8

14  lawsuits nonetheless.

15       That's why they initially sought an

16  injunction against courts and court systems so

17  that they wouldn't have those cases docketed,

18  and the Supreme Court obviously rejected that.

19       CHIEF JUSTICE HECHT:  Any other

20  questions?

21       JUSTICE LEHRMANN:  So we have -- excuse

22  me, I'm sorry.  A statute here that is clearly

23  prohibiting ends of pregnancy within a certain

24  period of time.  But within that same

25  legislative scheme, the language indicates

```
 1    that they're also preventing discipline of

 2    someone who violates that.

 3             Now, as loathe as we are to say that --

 4    that anything is absurd, how does that make

 5    sense?

 6             MR. STONE:  Well, the legislature

 7    clearly -- first of all, as a matter of

 8    description about why the legislature did what

 9    it did, the point on restraining state actors

10    from being able to take enforcement actions

11    was specifically to preclude federal pre-

12    enforcement challenges.  That was the reason,

13    both of those --

14             JUSTICE LEHRMANN:  So you concede that.

15             MR. STONE:  Oh, of course.  We said

16    that as much before the United States Supreme

17    Court.  That's been the position of the state

18    the entire time.  The State of Texas'

19    legislature is not required to be naive about

20    the federal court consequences of the rules

21    that they embody in laws.

22             Of course, there isn't actually a

23    federal constitutional right to a federal pre-

24    enforcement challenge.  So there's no problem

25    with that in priori.
```

Page 52

1    only known to the drafters of this act.  But

2    remember, the goal here is to just to figure

3    out the ordinary English meaning of this

4    statute.  And reading 207(a), there's simply

5    no ordinary English interpretation that

6    entertains any possibility of public

7    enforcement.

8         CHIEF JUSTICE HECHT:  Any other

9    questions?  Thank you, gentlemen.  The case is

10   submitted, and the Court will take a brief

11   recess.

12        THE CLERK:  All rise.

13        (End of Audio Recording.)

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATE

2

3            I, Wendy Sawyer, do hereby certify that I was

     authorized to and transcribed the foregoing recorded
4
     proceedings and that the transcript is a true record, to the
5
     best of my ability.
6

7

8
                          DATED this 24th day of February, 2022.
9

10

11
                          _____
12
                          WENDY SAWYER, CDLT
13

14

15

16

17

18

19

20

21

22

23

24

25